THE STATE OF NEW HAMPSHIRE
SUPERIOR COURT
NORTHERN DISTRICT OF HILLSBOROUGH COUNTY


I, John M. Safford, Clerk of the Superior Court of the State
of New Hampshire, for the County of Hillsborough, the same being a
court of record having a seal, and having custody of the records of
the said Superior Court, do hereby certify that the attached is a
true copy of all pleadings & docket sheets in the action
#216-2009-CV-522 Seff Enterprises and Holdings, LLC, et al v.
Federal Deposit Insurance Corporation as Receiver of Butler Bank,
et al at the September Term, 2013 of said Superior Court.

In witness whereof I have hereunto
set my hand and affixed the seal
of said Superior Court
this twenty-fifth day of October, 2013.

Clerk of Superior Court

HILLSBOROUGH SUPERIOR COURT NORTHERN DISTRICT

# CASE SUMMARY
## CASE NO. 216-2009-CV-00522

| | | |
|---|---|---|
| Seff Enterprises & Holdings, LLC, et al  v.  Butler Bank, | § § § § § | Location: **Hillsborough Superior Court Northern District**<br>Judicial Officer: **Garfunkel, David A**<br>Filed on: **09/03/2009**<br>Appear by: **10/06/2009** |

---

### CASE INFORMATION

Case Type: **Other**

Case Status: **01/07/2011  Reopened**

---

### PARTY INFORMATION

| | | |
|---|---|---|
| **Defendant** | **Butler Bank**<br>    Removed: 08/22/2013<br>    Substitute Party | |
| | **Chapman, Robert** | |
| | **Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Ban** | McCall, Robert A., ESQ<br>*Retained*<br>617-951-2100(W) |
| | **Hassel, Hans Harro** | |
| | **Shelzi, Antonia** | Laboe, James F., ESQ<br>*Retained*<br>603-224-2381(W) |
| **Plaintiff** | **Foistner, Laurie** | |
| | **Seff Enterprises & Holdings, LLC** | Aivalikles, William E, ESQ<br>*Retained*<br>603-880-0303(W) |

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 09/03/2009 | Receipt<br>    *Filed by: CT* | |
| 09/30/2009 | Return of Service<br>    *Filed by: ATP* | |
| 10/01/2009 | Appearance<br>    *Filed by: ATD; Party Cross-Reference - (R) Butler Bank; Party Cross-Reference - (R) Chapman; Robert; Party Cross-Reference - (F) Duggan, Esq.; Stephen A.* | |
| 10/01/2009 | Appearance<br>    *Filed by: ATD; Party Cross-Reference - (R) Butler Bank; Party Cross-Reference - (R) Chapman; Robert; Party Cross-Reference - (F) Forbes, Esq.; Karyn P.* | |
| 11/04/2009 | Answer<br>    *Filed by: ATD; Party Cross-Reference - (R) Butler Bank; Party Cross-Reference - (R) Chapman; Robert; Party Cross-Reference - (F) Duggan, Esq.; Stephen A.* | |
| 11/04/2009 | Notice Bankruptcy Filed<br>    *Filed by: ATP; Memo: ...as to Seff Enterprises* | |
| 11/09/2009 | Order on Bankruptcy<br>    *Filed by: CT; Disp Date: 11/9/2009; Memo: JMS/Clerk* | |
| 11/09/2009 | **Bankruptcy Filed** (Judicial Officer: Tucker, Brian T) | |
| 12/13/2010 | Notice-Removal to Federal Dist Ct | *Index #9* |

*Printed on 10/25/2013 at 10:35 AM*

HILLSBOROUGH SUPERIOR COURT NORTHERN DISTRICT

# CASE SUMMARY
## CASE NO. 216-2009-CV-00522

|  |  |  |  |
|---|---|---|---|
|  | *filed by Plaintiff* |  |  |
| 01/07/2011 | Court Order<br>*Copy of Order from US District Court - Remanded - (IN LARGE DOC FILE)* | | *Index #10* |
| 07/08/2011 | Withdrawal<br>*by Karen P. Forbes, Esq. obo DEFENDANTS - Butler Bank and Robert Chapman* | | *Index #11* |
| 03/16/2012 | Withdrawal<br>*by Stephen A. Duggan, Esq. obo Butler Bank and Chapman* | | *Index #12* |
| 04/12/2012 | Motion to Withdraw as Counsel<br>*by By Stephen A. Duggan, Esq. obo Butler Bank and Chapman* | | *Index #13* |
| | 05/07/2012 | Granted<br>*(Garfunkel, J.)* | |
| 04/12/2012 | Withdrawal<br>*by Stephen A. Duggan, Esq. obo Butler Bank and Chapman (AMENDED)* | | *Index #14* |
| 04/13/2012 | Court Order<br>*as to Pending Motions (Garfunkel, J.) - COPY - Original in 05-E-464* | | *Index #15* |
| 08/15/2012 | Motion to Withdraw as Counsel<br>*for Butler Bank filed by Stephen A. Duggan, Esq. - SEE # 13* | | *Index #16* |
| 09/10/2012 | Rule 20 Notice; Withdrawal Counsel<br>*to BUTLER BANK and ROBERT CHAPMAN* | | *Index #17* |
| 09/20/2012 | Court Order<br>*- Copy of Order Issued in 05-E-464 (Garfunkel, J.)* | | *Index #18* |
| 11/09/2012 | *CANCELED* **Structuring Conference** | | |
| 11/14/2012 | **Structuring Conference** (Judicial Officer: Garfunkel, David A)<br>*with 08-C-83* | | |
| 12/04/2012 | Motion to Amend<br>*Complaint by Substituting PEOPLE'S UNITED BANK in place of Butler Bank filed by Plaintiffs* | | *Index #19* |
| | 12/17/2012 | Obj-Motion<br>*to Amend filed by FDIC (IN LARGE DOC FILE)* | *Index #25* |
| | 12/31/2012 | Replication<br>*to # 25 filed by Plaintiffs (IN LARGE DOC FILE)* | *Index #26* |
| | 08/22/2013 | Denied<br>*see Index # 40. Heard 6/24/13 Garfunkel, J.* | |
| 12/04/2012 | Other<br>*(Motion to Consolidated this action w/ 05-E-464 and 07-C-113 filed by Foistner, New, Boston, Waldorf & See in 05-E-464* | | *Index #999* |
| 12/06/2012 | Motion to Intervene<br>*and to be Substituted in Place of Butler Bank filed by FDIC-Receiver* | | *Index #20* |
| | 12/13/2012 | Response<br>*to Index # 20 filed by Plaintiff* | *Index #22* |
| | 07/01/2013 | Memorandum of Law<br>*Post Hearing Memorandum on Motion to Substitute and Mo to Amend filed by FDIC* | *Index #37* |

*Printed on 10/25/2013 at 10:35 AM*

HILLSBOROUGH SUPERIOR COURT NORTHERN DISTRICT

# CASE SUMMARY
## CASE NO. 216-2009-CV-00522

| | | | |
|---|---|---|---|
| | 07/16/2013 | Response<br>*to Post Hearing Memorandum filed by*<br>*Plaintiffs* | Index #39 |
| | 08/22/2013 | Granted<br>*see Index # 40 6/24/13 Heard; Garfunkel, J.* | |
| 12/06/2012 | | Appearance<br>*by Robert A. McCall, Esq. obo Intervenor* | Index #21 |
| 12/13/2012 | | Special Appearance<br>*by James F. Laboe, Esq. obo Defendant Antonia Shelzi* | Index #23 |
| 12/13/2012 | | Motion to Dismiss<br>*filed by Defendant Shelzi* | Index #24 |
| | 12/26/2012 | Obj-Motion to Dismiss<br>*and Cross-Motion for New Orders of Notice filed by Plaintiffs* | Index #27 |
| | 08/27/2013 | Granted<br>*Regarding new orders of notice, see Index*<br>*# 41 6/24/13 Heard; Garfunkel, J.* | |
| 01/11/2013 | | Motion to Continue<br>*1/16/13 Structuring Conference filed by Defenant Robert Chapman* | Index #28 |
| | 01/14/2013 | Granted<br>*(Garfunkel, J.)* | |
| 01/16/2013 | | *CANCELED* **Structuring Conference** | |
| 01/17/2013 | | Court Order<br>*- Case Stayed Until 3/15/13. Cambers Conference Had; Garfunkel, J.* | Index #29 |
| 02/25/2013 | | Appearance<br>*by Joseph A. Foistner, Esq. obo Both Plaintiffs* | Index #42 |
| 05/16/2013 | | **Status Conference** (Judicial Officer: Garfunkel, David A)<br>*Hearing Held* | |
| 05/16/2013 | | Court Order<br>*on Status Conference (Mangones, J.)* | Index #30 |
| 05/22/2013 | | Motion<br>*for Default Against Robert Chapman and Hans Hassel filed by PLaintiff* | Index #31 |
| | 06/03/2013 | Motion<br>*of Opposition to Index # 31 and Request to Attend 6/24/13 Hg*<br>*by Telephone filed by Defendant Chapman* | Index #32 |
| | 06/07/2013 | Granted<br>*as to Request to Appear Telephonically.*<br>*(Garfunkel, J.)* | |
| 06/10/2013 | | Appearance<br>*by Pro se Defendant, Robert Chapman* | Index #33 |
| 06/17/2013 | | Motion to Dismiss<br>*filed by Defendant Hans Hassel* | Index #34 |
| | 06/17/2013 | Obj-Motion to Dismiss<br>*and Cross-Motion for Orders of Notice filed by Plaintiff* | Index #35 |

*Printed on 10/25/2013 at 10:35 AM*

HILLSBOROUGH SUPERIOR COURT NORTHERN DISTRICT

# CASE SUMMARY
## CASE NO. 216-2009-CV-00522

| | | |
|---|---|---|
| 08/22/2013 | Granted | |
| | *see Index # 40. 6/24/13 Heard; Garfunkel, J.* | |
| 06/20/2013 | Motion to Dismiss | *Index #36* |
| | *filed by Defendant Robert Chapman* | |
| 07/10/2013 | Obj-Motion to Dismiss | *Index #38* |
| | *filed by Paintiffs* | |
| 08/22/2013 | Denied | |
| | *See Index # 40. 6/24/13 Heard; Garfunkel, J.* | |
| 06/24/2013 | **Hearing on Pending Motions** (Judicial Officer: Garfunkel, David A) | |
| | *Dft Chapman will physically appear despite his request to appear telephonically (6/19/13)* | |
| | *Hearing Held* | |
| 08/22/2013 | Court Order | *Index #40* |
| | *on Pending Motions (Index #s 19, 20, 34 and 36) 6/24/13 Heard; Garfunkel, J.* | |
| 08/27/2013 | Court Order | *Index #41* |
| | *AMENDED ORDER from 6/24/13 Hearing to Address Shelzi's Motion to Dismiss (Granted) and Requests for New Orders of Notice (Granted) - Garfunkel, J.* | |
| 08/29/2013 | *CANCELED* **Trial Management Conference** | |
| | *Not Ready* | |
| 09/09/2013 | *CANCELED* **Jury Trial** | |
| | *Not Ready* | |
| 09/11/2013 | Orders of Notice | *Index #43* |
| | *Issued for Service on Antonia Shelzi and Han Harro Hassel Returnable 1st Tuesday of November, 2013 - 2 service; 2 returns* | |
| 09/23/2013 | Returned Mail | *Index #44* |
| | *to Joseph A. Foistner, Esq.* | |
| 10/15/2013 | Other | *Index #45* |
| | *Notice of Filing of Notice of Removal to US District Court filed by FDIC* | |
| 10/15/2013 | Notice-Removal to Federal Dist Ct | *Index #46* |
| | *filed by FDIC* | |

*Printed on 10/25/2013 at 10.35 AM*

# The State of New Hampshire

## SUPERIOR COURT

HILLSBOROUGH COUNTY
NORTHERN DISTRICT

( ) COURT
(X) JURY

### WRIT OF SUMMONS

Seff Enterprises & Holdings, LLC
3 Foxberry Drive
New Boston, NH   03070

Laurie Foistner
3 Foxberry Drive
New Boston, NH   03070

v.

Butler Bank
3 George Street, Lowell, MA   01852

Robert Chapman, Senior VP, Butler Bk
26 Luz Drive, Lowell, MA   01854

Antonia Shelzi
10 Townsend Road, Belmont, MA 02478

Hans Harro Hassel
31 Lee Street, Cambridge,MA   02139

The Sheriff or Deputy of any County is ordered to summon each defendant to file a written appearance with the Superior Court at the address listed below by the return day of this writ which is the first Tuesday of <u>October</u>,
<u>2009</u>.

YEAR          MONTH

The PLAINTIFF(S) state(s):

SEE ATTACHED.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

INDORSER (sign and print name)   Manager of Seff Enterprises
& Holdings, LLC

9/1/09

DATE OF WRIT

NOTICE TO THE DEFENDANT

The Plaintiff listed above has begun legal action against you. You do not have to physically appear in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you will then be obligated to pay.

Witness, Robert J. Lynn, Chief Justice, Superior Court.

John M. Safford, Clerk
NH Superior Court Hillsborough County
Northern District
300 Chestnut St
Manchester NH 03101-2490
(603) 669-7410
213-003-3

SIGNATURE OF PLAINTIFF/ATTORNEY

William Aivalikles
PRINTED/TYPED NAME
60 Main Street, Suite 230
ADDRESS
Nashua, NH   03060        603-880-0303
PHONE

# INTRODUCTION

This Writ is brought by Seff Enterprises and Holdings, LLC (hereinafter sometimes referred to as "LLC" or "Plaintiffs") and Laurie Foistner (hereinafter sometimes referred to as "L. Foistner" or "Plaintiffs"), a former owner of a 50% interest in the LLC and the Guarantor of a Promissory Note with the Butler Bank against the Butler Bank of Lowell Massachusetts and a group of individuals ("Defendants") for their ongoing alleged conspiracy to run their bank and business as a criminal enterprise as that term is used under the Federal Racketeering Influence Corrupt Organizations Act, RICO, 18 U.S.C. § 96, *et seq.*, depriving Plaintiffs of the intangible right of honest services through fraud and criminal means.

Plaintiffs also complain that the Bank and the Individual Defendants, acting as one, deprived them of their fundamental rights to conduct their businesses and to enjoy their quiet right to life, liberty, freedom and pursuit of happiness, by allegedly committing criminal felony acts against the Plaintiffs' persons, properties and businesses. These crimes include, but are not limited to Felony Perjury, U.S.C. § 1621, *et seq.*, Felony Forgery U.S.C. § 513 – Securities of the States and Private Entities, Mail Fraud 18 U.S.C. § 1343 – Fraud by Wire, 18 U.S.C. § 1349 – Attempt and Conspiracy, Stolen Goods 18 U.S.C. § 2314 – Interstate Transportation of Stolen Goods, Securities and Money, Fraud 18 U.S.C. § 1028 – Forging Corporate Records, 18 U.S.C. §1028A – Aggravated Identity Theft, Tax Fraud 26 U.S.C. § 7201 – Attempts to Evade or Defeat Tax, 26 U.S.C. § 7206 – Fraud and False Statements, 26 U.S.C. § 7207 – Fraudulent Returns, Statements Other Documents, 26 U.S.C. § 7212 – Attempts to Interfere with Administration of Internal Revenue Laws and IRS audit, and, Conspiracy – Crime against the United States of America, 18 U.S.C. § 371 – Conspiracy, Bank Fraud 18 U.S.C. § 1344, §1344(2), Extortion 18 U.S.C. § 1951 and other crimes as defined in Federal and New Hampshire law.

## PARTIES

1.     Seff Enterprises & Holdings, LLC, Plaintiff, of 3 Foxberry Drive, New Boston, New Hampshire  03070.

2.     Laurie Foistner of 3 Foxberry Drive, Plaintiff, New Boston, New Hampshire 03070.

3.     Defendant Butler Bank, Inc., ("Butler Bank" or "the Bank"), is a Commercial Banking Corporation, conducting business at 3 George Street, Lowell, Massachusetts 01852.

4.     Defendant Robert Chapman, ("Chapman"), Butler Bank Senior Vice President, resides at 26 Luz Drive, Lowell, Massachusetts 01854.

5.     Defendant Antonia Shelzi, ("Shelzi"), resides at 10 Townsend Road, Belmont, Massachusetts 02478.

6.     Defendant Hans Harro Hassel, ("Hassel"), resides at 31 Lee Street, Cambridge, Massachusetts 02139.

## FACTS

7.     The LLC was formed on or about August 28, 2000, pursuant to the New Hampshire Limited Liability Act, as a "Single Manager Managed - Limited Liability Company, by Laurie J. Foistner, 50% Member, Louis A. Maynard (Maynard), 50% Member, and Joseph A. Foistner, Esq. (J. Foistner), its sole and only manager.

8.     In order to begin operations, L. Foistner contributed $1.24-million to the company and L. Maynard contributed $150-thousand, to be recorded on the books of the company, as well as on the Operating Agreement signed and executed between the Members and Sole Manager.

9.     The LLC's primary purpose for formation, as shown on the Operating Agreement, was to fund and file a Federal RICO Law Suit, 18 U.S.C. § 96, against the Town of New Boston and many of its Public Officials, who allegedly had been using their position with the Town, under Color of Statute, for Criminal Enterprise, for more than thirty (30) years.

10.     It is averred that these Public Servants had intentionally and with malice, bankrupted four real estate developers in town, from 1980 through 2000.

11.     These alleged Racketeers had embezzled more than $17-million out of the town's treasury, containing federal funds, over a period of thirty (30) years, while they, as Public Officials, were the guardians of that treasury.

12.     In order to fund and pay for the New Boston RICO Law Suit, containing more than 13,000 individual documents as evidence, anticipated to cost between $2.5-million and $4-million in legal fees, L. Maynard agreed to re-mortgage his only business and home, the Molly Stark Restaurant, a well established land mark in Southern New Hampshire. His home and business, appraised in 2000, had a market value of $1.1-million, with an outstanding mortgage in 2000, in the amount of $23-thousand.

13.     L. Foistner and J. Foistner agreed that they would complete the development of their Waldorf Estates Subdivision, Phase III, 20 lots, the LLC's only asset, appraised in 2000 at $2.7-million, with an outstanding mortgage lien, recorded against the title, in the amount of $850-thousand.  $16.5-million (25% profit) from home construction and sales was anticipated from the 20 lots remaining in phase III of the project.

14.     In fact, both L. Maynard and the Foistners borrowed $850-thousand from several Hard Money Lenders, (the Muffaletto Note), at 38% percent annual interest, in 2000, pledging the Molly Stark Restaurant and the Phase III, 20, lot subdivision, as collateral.

3

15.     This high annual interest was required to be paid to Street Lenders, because ordinary bank financing was not available to the LLC, while it was litigating several civil claims, then pending in 2000 and 2001, in the Hillsborough County Superior Court, against the Town of New Boston.

16.     The LLC's Operating Agreement, Article III. Management of the Company provided unlimited and unrestricted, total and final authority on all matters to its only Sole Manager, J. Foistner. "Full and Complete Authority" was vested in the only manager.

17.     The development and construction of the Waldorf Estates subdivision, 54 lots began in 1985 by the Foistners. From 1985 through present, 35 estate homes have been constructed and sold, some with more than 28,000 square feet of living space, located on 15 mountain-view acre house lots, with some of the highest views and elevations located in Southern New Hampshire.

18.     The Foistners, through their companies, have been the continuous owners of this project and its copyrighted approvals and drawings and engineering documents, since 1985, now for 24 years.  During these 24 years, the Foistner's continuously suffered many millions of dollars in money damages and personal hardship, including human rights violations, constitutional violations, crimes against their persons and property, at the hands of these alleged Town of New Boston Racketeers.

19.     L. Maynard, an "Outsider", like the Foistners, allegedly suffered the same damages and harm, at the hands of the very same individuals, the Dodges, whom by 1985, had driven all businesses owned by "Outsiders", out of Town, effectively bankrupting all "Outsiders", while they, the Dodges, subdivided their lands without having to adhere to local

4

subdivision regulations and without having to construct roads, on their lands, when other LLCs and Outsiders were required to do so.

20.     Upon formation of the LLC, L. Maynard, L. Foistner and J. Foistner established by Company Votes as evidenced by Minutes, which established that J. Foistner, the sole manager, was not required, in fact would intentionally refuse, to be required to perform any of the bookkeeping and accounting functions, or to manage any money payments, check writing and invoicing functions of the company.  It was voted that Foistner was to receive a monthly Fee, in the amount of $10-thousand, for his required services as the manager.

21.     L. Maynard maintained all checkbooks, bookkeeping records, check writing and creation and record keeping of the accounting records for the LLC, from inception, August 2000 through December 22, 2002.  Maynard was the only authorized signor on any and all checking accounts, owned by the LLC, from 2000 through 2002.  Foistner refused all check writing authorities. Foistner managed all business and development management requirements, such as financing, road construction, surveying, engineering, sales, and primarily, the hiring of RICO Experts and Lawyers, to include the gathering of evidence, managing the many attorneys, at the time litigating the Town of New Boston litigation, preparing for the upcoming RICO Law Suit.

22.     On or about December 2002, L. Maynard informed the Foistners that he was running out of cash, because the Town of New Boston had intentionally and unlawfully delayed the Waldorf Estates subdivision, for another 28 months, August 2000 through December 2002. All this time, both L. Maynard and the Foistner were paying the 38 percent monthly interest to their Street Lenders, while the town systematically and with a plan and design bankrupted both in order to stop the forthcoming RICO litigation against them and the town.

23.     It became crystal clear, to all involved, by December 2002, attorneys, engineers and road builders that without a RICO Law Suit in the Federal Court, holding the Town of New Boston accountable for its alleged criminal, unconstitutional, unlawful and corrupt acts, used against the Plaintiffs, the Waldorf Estates subdivision and other "Outsiders" that the land development and road construction could never be completed and the subdivision approvals could never be obtained through legal means.

24.     By 2002, the Plaintiffs had hired Attorney Morgan Hollis, ("Hollis"), after dismissing all four of its earlier hired law firms, managing the ongoing New Boston litigations and all municipal legal issues. The Law Firm of Orr & Reno, P.A. (Orr & Reno), have been the Foistner's lawyers since 1995, on the same Waldorf Project. Orr & Reno has been the Plaintiffs', L. Maynard's and the remaining LLC member's lawyers since 2003, on the same Waldorf Estates Project.

25.     In fact, by December 2002, Hollis had completely stopped the town's unlawful acts, settled most of the outstanding disputes and even accomplished to force the town to preliminarily approve the subdivision, changing the Phase III portion of the land from 18 lots to 20 lots. Maynard however was out of money and simply wanted out.

26.     On or about December 23, 2002, Antonia Shelzi ("Shelzi") purchased L. Maynard's 50% Ownership Interest of Seff, by paying Maynard the sum of $250,000.00. Shelzi joined Seff after conducting her Due Diligence. Shelzi was represented by Attorney and CPA Michael Di Iulio ("Di Iulio"), CPA Brian Becks, ("Becks") and Attorney Gregory Oberhauser, ("Oberhauser"). Shelzi, while she was represented by two (2) CPA's and two (2) lawyers, provided the LLC with her Financial Statements, depicting her total assets to exceed $27,115,000.00. Her Owners Equity was shown to be $18,753,010.

6

27.     When Shelzi purchased Maynard's Ownership Interest, she stepped into Maynard's shoes as to the accounting and bookkeeping responsibilities.

28.     Seff's Operating Agreement and Corporate Votes, all reviewed By Shelzi and Oberhauser, remained in force as company policy.

29.     Attorney Oberhauser managed the closing for Shelzi. All signed, accepted and executed written contracts, their specific terms known as: "PURCHASE CONTRACT", "PARTICIPATION AGREEMENT", "ASSIGNMENT AND BILL OF SALE", "GENERAL AND MUTUAL RELEASES", and "MUTUAL RELEASE SETTLEMENT AGREEMENT", (hereinafter referred to as ("Purchase Contracts").

30.     Specifically, Shelzi contractually obligated herself to become the Financier of the LLC.  Shelzi received her Ownership Transfer Certificate, ownership now, as of December 23, 2002, for her promise to pay, finance and match L. Foistner's contribution as recorded on the books of the company.

31.     Shelzi knew that the upcoming RICO litigation was needed in order to continue forward with the Waldorf Estates development.  Shelzi also knew and fully understood that several million dollars in cash contributions, were required from her to fund the needs of the LLC and to match the other 50% Member.

32.     Specifically, Shelzi contractually obligated herself to establish financing with a local bank, within six months, no later than June 23, 2003, now that the New Boston litigation had ended and the town approvals had been obtained, by Hollis, for the Waldorf Development. Bank financing would lower the monthly interest rate of 38 percent paid to the Street Lenders, to 8.5% to be paid to a Commercial Bank.  The mortgage lien on Maynard's Molly Stark

Restaurant, now that Maynard was no longer a member of the company, was contractually
required to be released by June 23, 2003.

33.      Shelzi contractually agreed to finance the RICO litigation for the first six months,
immediately hire lawyers, paralegals and other employees, a bookkeeper, an accountant, sales
staff and other, all listed in the Purchase Contracts.  Shelzi also agreed to lease office space to
house the RICO team, purchase equipment and vehicles to complete the Waldorf Project, market
and sell the same.

34.      Shelzi's sole intent and reason for joining the LLC, as its new 50%Member, was
her absolute requirement, and contractual stipulation, allowing her to capitalize on the LLC's
losses, for tax years 2000, 2001, 2002, 2003 and 2004, all resulting and reporting, millions of
dollars of legal business expenses, as losses, to develop the project, along with its many law suits
and legal requirements. During those tax years, while the Waldorf Estates subdivision was
constructing roads and seeking town and state approvals to sell lots, no sales or other income was
realized by the LLC, resulting in reporting only losses to the IRS.

35.      Shelzi demanded and contracted to receive, millions of dollars in tax savings, by
legally obtaining the LLC's losses for those years.  In fact, Shelzi spent her tax dollars owed to
the IRS, at the advice of her Counsel and CPA's, to purchase L. Maynard's Ownership Interest.

36.      Shelzi's Purchase Contracts, fine tuned into its final version, by her two CPA's,
DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or
about December 23, 2002, reads as follows:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and
> between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a
> resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI),
> represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

8

37.     Prior to December 23, 2002, during Shelzi's due diligence, her CPA and Lawyer, DeIulio gave notice to J. Foistner by saying, "If things don't go as planned in the future for Toni, we will be filing a law suit for an accounting".

38.     Prior to Shelzi becoming a Member of the LLC, on or about May 2002, Shelzi sent two of her employees / contractors to the offices of the LLC, located at 100 State Street, Boston, Massachusetts in order to move the LLC's property, computers, furniture and 30 years of evidentiary documents, approximately 13,000 documents, to the company's new offices in Lowell, Massachusetts.  These two employees were Hans Harro Hassel ("Hassel") and Jim Chubb ("Chubb"), both former Massachusetts Prison Inmates and Criminals.  Chubb, a convicted Felon and Drug Dealer, freshly released from the Massachusetts Prison System in 2002.  Hassel was imprisoned in 1993, as Massachusetts Dead Beat Dad Number Two, employed by Shelzi since his release from prison in 1994.

39.     Chubb explained to J. Foistner, in front of witnesses, one, another licensed Massachusetts Attorney that he had agreed, to serve a prison term for Shelzi, the actual Drug Dealer and guilty party, for her promise to pay him $10-thousand dollars, when he got out of prison.  He further explained that Shelzi was now employing him and had reneged on the $10-thousand she had promised. Both Hassel and Chubb explained that Shelzi's business in Cambridge employed newly released Felons on a regular basis – part of the Commonwealths Justice System. Hassel further explained that Shelzi's Brother, a Rhode Island Attorney, had left the Country and traveled to the Orient in order to escape prosecution for this Drug Deal gone bad.

40.     Shelzi's alleged racketeering enterprises, her businesses in Massachusetts, employs, as a mode of operation, known felons and illegal aliens. Individuals and undesirables

which the law defines and labels as "Convicted Felons", the identical legal status, given by our criminal justice system, to Shelzi.

41.     Her criminal status as a Convicted Felon was unknown to the Plaintiffs when Shelzi joined the LLC. The Andover facility was specifically rented and constructed to house the new RICO Lawyers, the RICO Team along with all the evidentiary documents and office equipment. Shelzi in fact maintained an office in that facility in Andover, occupied by Hassel, her Financial and Business Manager. This office occupied by Hassel and Shelzi, maintained all accounting records, cancelled checks, bank statements, invoices, contracts, deposit slips, engineering documents and any and all documents owned by the Plaintiffs, pertaining to the Waldorf Project and the Rico Law Suit.

42.     Shelzi and Hassel had unrestricted access to all the documents and the computer located in their office. The computer in their office maintained all electronic data, including Peachtree Accounting data. Shelzi and Hassel had the only password for that computer. The computer was part of a Peer to Peer, Windows Network (without a server).

43.     By January 2003 Shelzi and J. Foistner prepared and approved a detailed Operating Budget depicting the employees to be hired, the equipment to be purchased and the future RICO Attorneys to be hired to bring the RICO Claim, until that time, managed by Oberhauser. This Operating Budget was approved, voted and recorded by Minutes, as the LLC's Operating Budget and became approved company policy.

44.     By January 2003, J. Foistner hired a full time Bookkeeper, Office Manager, Accountant and Sales Staff. Additionally J. Foistner signed and executed the lease for the Andover RICO Office and contracted to complete the leasehold improvements to install walls, wiring, doors and ceilings. Foistner Law Offices P.C. (Foistner Law) began purchasing

10

computers, office equipment and furniture and hired paralegals to manage the upcoming RICO Suit.

45.     From March 2001 through January 2004, Foistner Law interviewed lawyers in Boston, Massachusetts and New Hampshire, attempting to find an experienced law firm to manage the RICO litigation. More than 13 separate lawyers and their firms were interviewed. Each interview, requiring a total review of 30 years of documented evidence and damages, depicting hundreds of RICO Crimes allegedly committed by the Town of New Boston and its corrupt Public Servants.

46.     Shelzi fully funded the financial requirements depicted and approved in the Budget for the months of January, February and March 2003 only.  She partially paid the April and May invoices and by June stopped funding all requirements for which she was contractually obligated.

47.     By May 2003, Foistner was required to dismiss all employees since Shelzi would not fund their salaries nor her promised bank financing was not received.

48.     By May 2003, J. Foistner had been employed as a manager since August 2000. Foistner was entitled to be paid for forty (40) months at the rate of $10,000.00 per month.  By May 2003, Foistner had not drawn a single Penny for his fees, by then amounting to more than $ 400,000.00, with interest.  In fact, Foistner never received a Penny for his labor and services, from 2000 through present, 2009, at all times required to provide legal services and services as the LLC's manager.

49.     Instead of receiving compensation for his services, Foistner was made to contribute more than $5.5-million in the form of Cash and Invoices, for legal services, provided by Foistner Law, supporting the RICO Claim and civil litigation, from 2000 to 2009.

50.     Shelzi materially breached her contractual obligation to establish bank financing by June 23, 2003, failing to have the Street Lenders mortgage liens released from L. Maynard's Molly Stark Restaurant and home, causing Maynard to eventually become homeless.

51.     As Shelzi struggled to fund the operations of the LLC, only paying the absolute minimum invoices, usually 90 to 120 days behind, the LLC's business reputation began to suffer. Shelzi, on more than three occasions, wrote, issued and signed bank drafts, made payable to the LLC, deposited into the LLC's bank, Citizens Bank, amounts as high as $100-thousand, which bounced, due to insufficient funds.

52.     Vehicle payments were not made, lease payments defaulted, employee employment contracts were breached, several legal claims were lost, the Statute of Limitation deadline expired on those claims, because Shelzi failed to fund their legal fees. The RICO litigation was not being funded.

53.     Shelzi's key financial manger, Hassel, was so disgusted with Shelzi's material breaches that he wrote a sworn Affidavit, dated October 31, 2003.  In that Affidavit Hassel stated that Shelzi usually buys into businesses and <u>always</u> financially abandons her partners, in an attempt to bankrupt the business and to swallow up her partners.  In the manager's opinion, it became clear that Shelzi was a Fraud, intending only to bankrupt the LLC, in order to gain control of the assets and the tax losses.

54.     On or about August 2003, Shelzi introduced her close friend and banker, Senior Vice President of the Butler Bank, Mr. Robert Chapman ("Chapman") to the LLC and personally guaranteed a $1.5-million commercial loan from the Butler Bank, earmarked for the construction of Roads and to complete the development of the Waldorf Project, now without employees, staff, and accountants.

55.     The only Borrower on this loan was the LLC.  The two members Shelzi and L. Foistner were obligated to personally guarantee the loan.  Only J. Foistner, the LLC's only Manager was authorized to manage the loan, draw funds, disburse funds, make interest payments and manage the repayment.  Shelzi and L. Foistner had no authority to make any decision on this $1.5-million loan.

56.     The $1.5-million Butler Bank loan was inadequate from the start, late and underfunded, due to the fact that Shelzi had missed and breached the June 23, 2003 deadline date, to pay off the Street Lenders, thereby causing more than a $160-thousand Roll Over Fee, to be paid out of the Butler Bank loan proceeds originally earmarked for road construction.  The road was contracted to costs $1.2-million, including engineering, road construction, pavement, erosion controls, supervisory labor and interest.

57.     Hollis and Foistner were told at the closing, without any advance notice by Butler's Closing Attorney that they were short by $160,000.  These Roll-Over Fee damages were caused by Shelzi's material breaches of the Purchase Contract.

58.     During a meeting held at Hollis Law Offices, on or about November 11, 2003, Shelzi admitted that she had no money left, as she had promised, to pay her consideration for her 50% Ownership.

59.     In order to continue operations, now without employees and staff, the LLC was required to borrow money from other Street Lenders, Shelzi's Brother, Attorney Domenic Shelzi, and others.  Because of Shelzi's alleged fraud and material breaches, the LLC was now required to borrow money and pay interest and points for money that was originally contracted, to be received as a contribution from Shelzi, interest free, without points, Shelzi's Consideration, for receiving her Ownership Interest.

13

60.     For the LLC and the Foistners to borrow money to cover Shelzi's breaches, was not a contract requirement in the Purchase Documents.  Shelzi received up to a 50% Ownership, 10 house lots for her written promises to finance and fund the operations. Now Shelzi wanted to own her 50% of the project and have the remaining members finance the project out of their pockets.

61.     Because of Shelzi's alleged fraud and material breaches, J. Foistner borrowed $350-thousand from Maynard, in order to pay for the road construction of the project, because the funds remaining at the Butler Bank were inadequate.  Butler Bank was aware of this.

62.     J. Foistner was required to manage the LLC, full time – 65 plus hours each week, from 2002 through 2009, without receiving any compensation, while Shelzi, demanding her 50% Ownership, did not produce a single labor hour for the benefit of the RICO Suit or the completion of the project.

63.     Foistner managed all RICO litigation requirements, 2000 through 2006, managed 108 months, nine years of Planning Board, Selectmen and Town meetings, surveyed the project, engineered the roads and driveways, supervised on a daily basis, six day per week, from 5:00 AM each day till 8:00 PM, the construction of the 3,000 ft. road, the financing and financial management (not the accounting) of the Company,  the IRS Audits for the LLC, marketing, home construction and 50 months of civil litigation against Shelzi, 2005 through 2009.

64.     Because of Shelzi's Fraud and material breaches, the Foistners borrowed an additional $2.1-million, from Banks and Relatives, to pay for the funding requirements of the LLC.

65.     On or about July 2003, J. Foistner and L. Maynard visited the law Offices of Orr & Reno, P.A. (Orr & Reno), in order to hire Orr & Reno as their RICO Lawyers.  Foistner and

the Waldorf Estates Subdivision Project, along with its many complicated legal issues, law suits and claims, were already Clients of Orr & Reno, in light of the fact that Foistner and the predecessor company which owned Waldorf Estates, owned by J. Foistner, had hired and paid Orr & Reno in 1995. This has been admitted by Orr & Reno in their Sworn Statements / Affidavits.

66.    When J. Foistner and L. Maynard, as owners, managers and members of the LLC, visited Orr & Reno, in Concord New Hampshire, representing the LLC, the then only owner of the project, Shelzi was already a member of the LLC. Only the LLC had the authority to bring a RICO Claim against the Town of New Boston, and all of the LLC's members and manager, including Shelzi, were asking Orr & Reno to review the many documents and evidence to bring the RICO Claim.

67.    Confidential information was communicated to Attorney Martha Van Oot, ("Van Oot") regarding Waldorf Estates, the LLC its members and manager, Seff's legal issues, its finances, its accounting and damages caused by the Town of New Boston. Although Orr & Reno did not accept to be Advocates on the RICO Claim, and in fact refused to invoice for their services and did not receive or invoice any fees, Van Oot provided legal advice to the LLC, L. Maynard, L. Foistner, and Shelzi, creating a valid Attorney Client Relationship, to the already existing Attorney Client Relationship, formed in 2003.

68.    On or about December 2004, the law firm of Debruckeyre, Patrillo and Fulton of Salem, New Hampshire, were retained to become the Advocates for the RICO Claim. Attorney Peter Fulton ("Fulton") accepted the assignment after completing a six months evaluation of the claims. The LLC paid more than $130-thousand for this Evaluation and the RICO Claim was filed in Federal Court on or about June 04, 2004. Shelzi paid nothing.

15

69.     In 2004, Shelzi signed a Fee Agreement with Fulton, becoming a named Plaintiff. Under this fee Agreement Shelzi is wholly and severally liable for all legal fees to Fulton, including the legal fees and costs of all contract lawyers under Fulton's control. This included Foistner Law, who has been employed for this effort since 2001 without compensation.

70.     By the time the RICO Claim was filed in the Federal Court, Foistner Law, J. Foistner, L. Foistner and L. Maynard had paid more then $760-thousand to fund this law suit. Shelzi never paid a single Penny for her legal representation, materially breaching her contract.

71.     Instead of honoring her contractual agreements and obligations set forth in the Fee Agreement, Shelzi materially breached that contract as well. Shelzi's alleged fraud and material breach of her contractual obligations, set forth in the Purchase Contract, as well as the Fulton Fee Agreement, were the sole cause for the RICO Claim being voluntarily dismissed in 2006, after J. Foistner was forced to file a Motion for Voluntary Non-Suit, because Shelzi was not paying her share of the legal fees.

72.     On or about July 2004, the LLC, Maynard and the Foistners gained knowledge from Hassel and a local bank that Shelzi was a Convicted Felon, Convicted Drug Dealer and former Massachusetts Prison Inmate, having served time in the Massachusetts prison system.

73.     Shelzi's status as a Convicted Felon, voided her ownership in the LLC, required, at the managers sole discretion, by the Operating Agreement, Articles III, and Exhibit C. No American Business is required to conduct business with Felons and Drug Dealers. Instead of disclosing this information, her status as a Convicted Felon, to the LLC, its remaining members and L. Maynard, Shelzi attempted to gain her 50% Ownership Interest, through fraud, deception, misrepresentation and criminal conduct.

74.     Although Shelzi materially breached all of her contractual obligations and brought much harm, millions of dollars in losses, caused by the delay of the Waldorf subdivision from 2002 through 2009, 84 months, to the LLC, failing to finance the contractual obligations set forth in the Purchase Contracts and the Fulton Fee Agreement, Shelzi and her CPA, still insisted that she had the right, to write off the millions of dollars in business expenses, as losses, starting with tax year 2001.

75.     On or about April 2003, after Shelzi became a member of the LLC on December 23, 2002, Shelzi's CPA, Brian Becks (Becks) and Shelzi contacted J. Foistner, instructing him to prepare the LLC's Federal Tax Returns in order for Shelzi to receive her deductions on her personal tax returns.

76.     L. Maynard and J. Foistner, were not required to file, and had not prepared and filed any tax returns for tax years 2000, 2001, 2002, and 2003 since no income was realized, by the LLC in those years, only expenses.  Millions of Dollars in losses.

77.     In 2003, J. Foistner provided the bookkeeping records and financial data, maintained and generated by Keith Prive, (Prive), under Shelzi's supervision, generated by Peachtree Accounting, 2003 Complete Accounting, to Becks for tax years 2001, 2002 and 2003, along with a preliminary 1065 Federal IRS tax return for tax years 2001, 2002, and 2003.  J. Foistner and Keith Prive, were never paid or compensated by Shelzi for this work.  Their invoices remain unpaid to this date.

78.     On or about May 2003, upon receipt of this accounting information, Becks acknowledging, on behalf of his Client Shelzi, that he was in receipt, of the LLC's accounting records for 2001, 2002 and 2003, ordered changes to be made to the tax returns.

79.     Shelzi was the Keeper of these records. These records were contractually required to be kept, maintained and paid for by Shelzi, the owner / member, not J. Foistner the non-owner / manager, and certainly not Keith Prive, the unpaid office manager, as mandated by the LLC's corporate votes. Becks demanded that Shelzi's share of losses would be changed from 50% to 85%, allowing Shelzi more losses, or funds that would not be received from Shelzi.

80.     After Becks was satisfied with the LLC's tax returns and Shelzi's share of the losses, Becks amended Shelzi's personal, 1040 Federal tax return, for tax year 2001 and increased Shelzi's write-offs by more than $800-thousand dollars, from the original return, prepared, signed and filed by Becks, as the "Paid Tax Preparer".  Becks also reported the losses for 2002, 2003 and 2004, in a similar manner as Shelzi's "Paid Tax Preparer", acknowledging that he was in receipt of all accounting records, on behalf of his client Shelzi, for those tax years.

81.     In order for Shelzi to satisfy the "Recourse Liabilities" requirement, allowing her to legally write off the losses, Becks claimed and demanded for her, on her 2001 personal tax returns that Shelzi sign and execute two (2) separate Promissory Notes with Personal Guarantees, agreeing to pay and guaranteeing Foistner Law Offices and JFL Trust $459,856.00 and $673,303.00.

82.     In fact, Shelzi, under counsel by CPA Becks insisted to receive these Recourse Liabilities. The signing and execution of these Promissory Notes was witnessed, by now, Attorney Prive, then forwarded in writing to Becks, in order to satisfy Shelzi's "Material Participation and Recourse Liabilities", questioned by the IRS, who was by 2004, auditing Shelzi and Becks alleged fraudulent 2001 amended tax return.

83.     In 2005 Butler Bank modified its original $1.5-million loan and agreed to a new $1.8-million loan for the completion of the Waldorf Estates Phase III road construction.  This

$1.8-million loan, again personally guaranteed by Shelzi and L. Foistner, required a special allocation, in the amount of $100-thousand, to be held back from disbursement until the 20th lot, lot 8-84-31-1 was subdivided and recorded at the Hillsborough County Registry of Deeds.

84.    This $100-thousand hold back money was guaranteed and promised in writing, on Butler Bank's Commitment Letter and loan documents, to the Bedford Design Consultants, Inc. ("BDC"), the Waldorf project Engineers and Surveyors, actually performing the work to subdivide this 20th lot.

85.    Butler Bank also agreed in writing, to make available two (2) separate construction loans, for "Owner Occupied" residential home construction, $990-thousand each, one loan to Shelzi, the other loan to L. Foistner.  These loans were executed for Butler Bank in 2005 and 2006.  Butler Bank, Robert Chapman, promised to finance the construction of these 20 homes, along with two immediate construction loans, to construct two Models.  Participating loans between Butler Bank and other Massachusetts banks were discussed. The LLC relied upon these representations and closed three (3) separate construction loans with Butler, not counting Shelzi's lot 8-84-44 loan.

86.    In order to accomplish this, prior to closing the two Owner Occupied home construction, model loans, Butler Bank and Shelzi instructed Prive and J. Foistner that Butler Bank wanted two separate business entities established and qualified by Butler Bank, as "Qualified Authorized Builders" to construct both homes. Prive submitted these documents to Butler, supervised by J. Foistner.

87.    No longer trusting Shelzi, after witnessing the many frauds and misrepresentations made by her, and after experiencing million of dollars in losses caused by her breaches and her unwillingness to show up at work, for at least one hour per week, in order to

perform her duties as an owner, it was agreed that Shelzi and L. Foistner would not take on any

new business together, especially, not the construction of multi-million dollar estate homes.

88.     By 2005, the Foistners had constructed, hands on, and participated in the ground

work, of more than 64 separate homes, in two subdivisions located in New Boston and Amherst,

New Hampshire. The Foistners could demonstrate more than 20 years, direct hands-on

experience as "Qualified Builders".

89.     Shelzi had never constructed a single home with her very own hands and

possessed no construction skills as a "Qualified Builder".  In fact, Shelzi failed to show up for

work, one hundred percent, (100%) of the time, not even on one full day, from December 2002

through present.

90.     In order for Shelzi to qualify for the Butler Bank $990-thousand, "Owner

Occupied Home Construction Loan", Shelzi personally supervised Prive, by now in 2005, the

LLC's only remaining unpaid employee and office manager, from her home in Belmont,

Massachusetts by telephone. She never paid Prive for his labor.

91.     The only compensation received by Prive came from the L. Foistner's and L.

Maynard.

92.     On or about October 10, 2004, J. Foistner created two (2) new Limited Liability

Companies as mandated by the Butler Bank.  One known as New Boston Estates, LLC, ("NBE

LLC"), originally planned to be used for the $990-thousand L. Foistner, Lot 8-84-38 loan.  The

other known as Waldorf Estates Builders, LLC, ("WEB LLC"), originally planned to be used for

the $990-thousand Shelzi, lot 8-84-44 loan.

93.     Separate loan applications were filed and submitted to Butler Bank by Prive and J.

Foistner, as instructed by the Butler Bank's loan Officers, Chapman and Donna Hauswirth,

("Hauswirth"). Butler Bank instructed Prive and J. Foistner, to submit builders information and

Builders Resumes for the Foistners, attempting to qualify their New Boston Estates, LLC as a

"Qualified Builder" for the Lot 38 loan.

94.     Butler Bank also instructed Prive and J. Foistner to submit Waldorf Estates

Builders information on behalf of Shelzi. This was impossible for Shelzi had no experiences and

was not a New Hampshire Builder. Prive and J. Foistner could not and did not submit any

"Qualified Builders" information or Builders Resume, on behalf of Shelzi to Butler Bank.

95.     Lacking the Shelzi "Qualified Builders" information, Butler Bank instructed Prive

and Foistner to change all construction contracts to reflect J. Foistner as the Builder and General

Contractor for the lot-44 Shelzi loan and all future loans, thereby changing all loan documents to

reflect New Boston Estates, LLC, solely owned and managed by the Foistners. Shelzi was never

approved as a Qualified Builder by Butler Bank.

96.     Waldorf Estates Builders, LLC, the second company, incorporated and owned by

J. Foistner, was never transferred to Shelzi because of Butler Banks refusal, to qualify the

company as a "Qualified Builder".  No Ownership Transfer Certificate was ever issued to Shelzi,

for any amount of ownership, by Waldorf Estates Builders, LLC or New Boston Estates, LLC.

Shelzi was never a member, manager, agent, employee or authorized representative of either

construction company.  J. Foistner was the only and sole founder, manager and member of both

companies.

97.     Since Butler Bank would not authorize Shelzi, or any business entity owned by

Shelzi, to be certified as a "Qualified Builder", Prive was instructed by Butler Bank to change

all contracts and loan application documents, on behalf of Shelzi, for the lot 44- Shelzi loan, to

New Boston Estates, LLC.  By then, certified by Butler Bank, as a "Qualified Builder".  Only after those changes were made, did  Butler and Shelzi both agree to close the loan for lot 44.

98.     The Shelzi lot-44 construction loan closed on or about September 2005, for $990-thousand.  New Boston Estates, LLC was the only authorized General Contractor on the loan.

99.     Prior to the lot-44, Shelzi loan closing, Prive, J. Foistner, Brown Excavation (Brown), the Road Builder, now the Excavator for Shelzi's construction site, BDC, Engineers and Surveyors and other subcontractors, performed contract work on behalf of Shelzi, with Shelzi's knowledge and invoiced Shelzi and Butler Bank, $65,003.26, for their work in order to receive a Building Permit from the town.  The invoice amounts were part of the Construction Agreement approved by Butler Bank and Shelzi.

100.    Butler Bank's loan officer, Hauswirth, personally instructed Prive and J. Foistner, how to complete the first money requisition and draw to pay this invoice.  Several phone calls and fax transmissions were initiated by Butler Bank, which approved this requisition, after making several changes and after receiving Shelzi's signature. This first requisition, took three individuals, seven hours each, to be correctly submitted and accepted by Butler Bank.

101.    Butler issued this one and only draw, Cashiers Check, in the amount unknown, made payable to, Antonia Shelzi, the Borrower, and New Boston Estates, LLC, the only "Qualified General Contractor".  Butler Bank then delivered this first bank draft into Shelzi's hands.

102.    Butler Bank was fully aware that New Boston Estates, LLC had the only Mechanic Lien Rights on that project and loan, and were required to be paid. NBE LLC was never paid by Shelzi and Butler Bank.

103.    By July 05, 2005, the IRS announced its audit of the LLCs 2001, Federal Tax Return, filed and submitted, by the LLC in 2003.  Agent Quang Trieau (Quang) was conducting this audit for the Boston IRS Office.

104.    During the first meeting, on or about August 2005, Quang informed J. Foistner that he was only auditing the LLC's 2001, Federal Tax Return, because he wanted to disallow Shelzi's 2001, Amended Personal Tax Return, filed by CPA Becks in 2003, which he had been auditing since 2004.  Quang made it perfectly clear that he was fully aware of Shelzi's tax frauds.  Quang explained to J. Foistner that he was only auditing the LLC because of Shelzi's fraudulent 2001, 1040 Amended Return.

105.    During the first audit appointment, at the LLC's Bedford, New Hampshire offices, on or about September 2005, Quang opened his Shelzi, 1040, 2001 personal audit file, which contained all accounting information, from the LLC for tax years 2001, 2002, 2003, and 2004, originally provided by the LLC to CPA Becks and Shelzi. Quang explained that all these accounting records and tax returns were provided to him by Becks.  This clearly evidences that Shelzi and CPA Becks, were in possession of all accounting information at all times.  Shelzi sued the LLC in 2005, falsely claiming that she never received "any accounting records from the LLC", her basis for a frivolous law suit, abusing the legal system.

106.    Prior to the IRS audit for the LLCs 2001 Federal 1065, Income Tax Return was announced by Quang, in 2005, Shelzi had contacted J. Foistner by telephone, on or about December 2004, asking Foistner to help her establish her "Material Participation and Recourse Liabilities" in the LLC's business operations for 2001. Shelzi specifically asked J. Foistner to help her create a "Meeting Log" for meetings that took place between Shelzi and J. Foistner, in

23

2001, showing that Shelzi "Materially Participated" in the LLCs business management and work performance.

107.   J. Foistner became keenly aware that Shelzi, "Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to join a criminal conspiracy to aid her, to falsify, Federal IRS Forms, during an IRS Audit.

108.   J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, by providing wrongful information during an IRS Audit.

109.   J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, to establish a false record, of meetings that never took place, attempting to commit the Felony Crime, IRS Tax Fraud and IRS Tax Evasion.

110.   After this initial call from Shelzi; additional calls were received from Shelzi, Hassel, and CPA Becks, all soliciting J. Foistner's criminal solicitation to defraud the IRS, J. Foistner called Becks, inquiring about Shelzi's criminal request to manufacture a "False Meeting Log". Becks informed J. Foistner that he would not complete such a "False Meeting Log" and that he did not require, or want any help from J. Foistner. Becks instructed Foistner not to get involved in the audit that he was managing for Shelzi.

111.   Within a few days from Shelzi's criminal solicitation attempt, Attorney Hollis called J. Foistner, inquiring as to Foistner's knowledge or possible authority to allow Shelzi to receive and pick-up a $100-thousand Butler Bank Cashiers Check, on behalf of the LLC.

112.   J. Foistner informed Hollis that he had no knowledge of such a transaction and that he had not authorized, Shelzi, to draw any funds from the Butler Bank. Both Hollis and J.

24

Foistner were fully aware that Shelzi had written authority to pickup checks from the Butler Bank, in light of the fact, that she was a personal guarantor and co-borrower. However, in order to draw funds, a company vote, and company signed requisition was still required to be submitted to the Butler Bank.

113.    Hollis informed Foistner that Butler Bank's Senior Vice President of Commercial Lending, Robert Chapman, Shelzi's personal friend, had issued a check to Shelzi, from the $1.8-million loan. Hollis informed Foistner that it appeared that Shelzi and Hassel had negotiated this $100- Cashiers Check, issued by Chapman to Shelzi. Hollis informed J. Foistner that he was awaiting receipt of a copy of that check from Chapman. Within days a copy of Check No. 7148, dated August 25, 2005, was received from Butler Bank.

114.    Upon close examination of Check No. 7148 the LLC and J. Foistner realized that the endorsements, on the check, had been forged. Check No. 7148 was made payable to "Seff Enterprises & Holdings, LLC" for which Joseph A. Foistner, Esquire, sole manager, was the only authorized signatory, "Antonia Shelzi and Laurie Foistner, Members". The check showed the following Memo: "75045479-Lot 30-1 Waldorf Estates Phase III". The banks intent was to pay for Lot 30-1 with this $100,000 check is evident.

115.    Shelzi was the only person in possession of check no. 7148, after Chapman and other Butler Bank employees, handed her the check. She testified and admitted to these facts in front of witnesses, all licensed lawyers.

116.    By September 2005, the LLC, Prive, and Hollis, discovered that Shelzi, the only individual, in possession, of check no. 7148, had forged, or caused to have forged, The LLC's endorsement on the back of the check. She also forged or caused to have forged, Laurie Foistner's endorsement on the back of the check, spelling it "LORI" instead of Laurie. After

committing the two (2) counts of Felony Forgery, this Convicted Felon, allegedly signed and endorsed check no. 7148, with her very own signature, thereby attesting to her knowledge and specific intent to appropriate these funds, with forged endorsements.

117.    Shelzi then wrote the following words on this falsified bank draft, "*Pay to the order of Domenic Shelzi*", her brother, a Rhode Island Attorney. He endorsed the check with his signature, failing, as required by law, the Uniform Commercial Code (UCC), as a Holder in Due Course, to inspect the bank draft for the required – matching endorsement, matching the front of the check, prior to affixing his very own endorsement.  Domenic Shelzi then deposited the forged funds into his account at the Citizens Bank. The appropriation of the check, by Shelzi, constituted the felony crime of Attempted Larceny and/or Larceny. Attorney Domenic Shelzi's participation in these alleged crimes, have been reported to Rhode Island Supreme Court, Board of Bar Overseers, and various law enforcement agencies.

118.    Butler Bank and Chapman had an obligation to protect the LLC and Laurie Foistner from these alleged crimes, once Chapman became aware of these unlawful acts.  A simple telephone call from Chapman would have stopped these alleged crimes, before they were ever started.  This was not the case, Chapman had knowledge of these alleged criminal acts at all times.  Chapman's criminal involvement, alleged as a co-conspirator, continues to harm the LLC and the Foistners.

119.    Shelzi admitted in front of witnesses, *"Chapman has been a very close friend of mine for many years.  His wife is from South America, we both speak Portuguese.  Last week Chapman and I went out on a dinner date.  He was drunk and his hands were all over me.  All this, in front of his wife, she was there.  I have him right where I want him.  This was not his first time".*

120.    In 2005, the Plaintiffs were under the belief that a bank teller, employed by Citizens Bank, discovered the forged endorsements, stamped the instrument, "MISSING ENDORSEMENT" and returned it either to Shelzi or Butler Bank, effectively rendering the crime of Attempted Larceny.

121.    Chapman, as a Fiduciary, was required at all times to inform the LLC and L. Foistner of Shelzi's alleged criminal conduct and he certainly was under a duty to report these crimes to law enforcement.  Chapman intentionally failed to fulfill his obligation.  It is alleged that Chapman was a member of this criminal conspiracy that issued the check, delivered it to Shelzi, and then covered up these crimes with silence.

122.    After the check was returned, the LLC, Foistner, Hollis and Prive gained knowledge of Shelzi's and Chapman's alleged criminal conduct.  Robert Baskerville, the Engineer and Surveyor, who was promised the $100,000.00 payment for his services was promptly notified.

123.    In a meeting held, on or about September 2005, at the law offices of Gottesman & Hollis, P.A., Shelzi admitted, in front of witnesses, to the forgeries and conversion of the $100,000.00 Butler Bank Draft, implicating Chapman. Shelzi and Butler Bank; transported this stolen instrument across Interstate Lines affecting Interstate Commerce; and used the wire and mail to allegedly promote the criminal conspiracy.

124.    When Chapman gained possession of check no. 7148, he, as a professional banker, recognized that the ledger on the instrument " MISSING ENDORSEMENT", that the endorsements on the back of the check were forgeries and that some endorsement where missing.

125.    Instead of performing his legal and/or fiduciary duties to the Plaintiffs, Chapman moved swiftly to help Shelzi, thereby allegedly defrauding the Plaintiffs and the Foistners.

27

Instead of performing his duties as a bank official, Chapman issued Hollis, on behalf of Shelzi, a

second bank draft for $100,000.00. Again, without the Plaintiffs expressed written approval.

126.    Butler Bank and Chapman intentionally refused to protect their borrowers, and

both decided, not to respond, or talk to their Borrowers, until September 2008. In fact, Butler

Bank and Chapman have not returned one single telephone call, or responded to one of more

than ten (10) written notices, in more than 48 months. All the while, Butler Bank collected more

than $15,000.00 each month, from the LLC as interest.

127.    When Shelzi needed Chapman's help to receive a second check, she wrote to him,

"please issue new check, because of stockholder problems". She received check no. 7324 in the

amount of $100,000.00, constituting another alleged act of felony fraud and larceny.

128.    Joseph Foistner, Esquire, the LLC's only manager, called Chapman and the Butler

Bank, informing both of the alleged crimes that had been committed by Shelzi and ordered

Chapman, "Not to release any additional funds or issue any additional checks to Shelzi".

129.    Chapman and the Butler Bank were given NOTICE, that only "Attorney Foistner,

the LLC's only Manager could order or release funds from their loan". Chapman and the Butler

Bank received notice from Attorney Foistner that Shelzi was no longer a Member of The LLC

and that her membership had been revoked, as authorized by The LLC's Operating Agreement,

which allowed for the removal of convicted criminals, at the sole discretion of The LLC's only

manager, Attorney Joseph A. Foistner, Esq.

130.    On or about September 15, 2005, Attorney Morgan Hollis provided a written

notice to the President of Butler Bank, informing him of the misconduct and crimes allegedly

committed by his bank and its personnel. Attorney Hollis' letter to Butler Bank received no

reply. Instead of correcting these problems and protecting their borrowers, the Butler Bank and

Chapman issued more checks to Shelzi, constituting additional alleged felony crimes, causing the LLC and the Foistners millions in damages.

131.    On or about September 12, 2005, Butler Bank and Chapman issued Check No. 7324, in the amount of $100,000.00 to Shelzi, in total disregard of their borrowers written notices, thereby allegedly committing felony bank fraud, this time, with full knowledge, intending to defraud the LLC and the Foistners.  Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and did use the mail and/or wire to commit these acts.

132.    Check no. 7324, was ordered by Shelzi, mailed or delivered by Butler Bank, Chapman or Shelzi, to Morgan Hollis, without the express written approval or knowledge of the LLC the borrower or Laurie Foistner, the Member/Guarantor.

133.    Instead of paying the Bedford Design Consultants for subdividing lot 30-1, the written purpose for the $100,000.00, held back by Butler Bank, as part of the loan agreement, stated in writing on the loan documents, the money ended up in Attorney Domenic Shelzi's checking account.  The very same checking account, that was to originally, receive the forged and stolen funds, via Check no. 7148.

134.    After Butler Bank and Chapman closed and funded the Shelzi Lot – 44, Owner Occupied construction loan, in the amount of $990-Thousand, and after receiving the first invoice from New Boston Estates, LLC, the  only "Qualified Builder" and approved "General Contractor", on or about September 2005, in the amount of $65-thousand, and after Hauswirth, Butler's Loan Administrator, personally supervised, Prive, in the drafting and submittal of the draw and invoices, and after Butler Bank issued a check to Shelzi, made payable to New Boston

29

Estates, LLC and Shelzi, in the amount of $65-Thousand, Butler Bank and Chapman allegedly committed their third alleged criminal act.

135.    Butler Bank issued a check, check number unknown (Butler Bank has refused to provide a copy of both checks to NBE LLC), to Shelzi, made payable to NBE LLC and Antonia Shelzi, for services performed under the construction agreement. This NBE LLC check was issued at the very same time, just prior to discovering the alleged crimes committed by Butler, Chapman and Shelzi, pertaining to check no. 7148 and check no. 7324. Knowing that Shelzi and Chapman were committing fraud against the LLC and the Foistners, including the switching of checks, Prive and Foistner refused to endorse the $65,000 NBE check in Shelzi's possession.

136.    Instead, Prive and Foistner insisted that Shelzi endorse the NBE LLC check, so that the funds could be used for its intended and lawful purpose, to pay the contractors in full.

137.    The payment of the contractors in full, should have been Shelzi's and Chapman's intent, when Chapman issued the check to Shelzi, after Shelzi signed and executed bank forms, "the Bank Requisition for Funds". The only authorized purpose for these funds was to pay NBE LLC, the authorized builder on the loan, and its contractors.

138.    This did not occur. When Prive and NBE LLC refused to endorse the back of the $65,000.00 check, knowing that Shelzi would never pay them, Shelzi again visited her friend Chapman, in order to conspire to commit additional acts of bank fraud and felony larceny.

139.    Chapman unlawfully cancelled out and voided the original $65,000.00 check made payable to NBE LLC and issued Shelzi a new check, made payable to Shelzi and another New Boston Estates Limited Liability Company, called Waldorf Estates Builders, LLC ("WEB LLC").

140.    Chapman issued a second check to a Company, WEB LLC, which was not an authorized builder with the Bank.  Additionally, WEB LLC, was not a party to the signed and executed construction agreements required by Butler, to issue the loan.  WEB LLC had not performed any work what-so-ever and was not entitled to any payment from Butler.  Chapman knew this when he allegedly committed this 3rd felony act of bank fraud.

141.    Hauswirth did not work with anyone at WEB LLC to generate an invoice or the required bank forms, mechanic lien affidavits, invoice submittals, money requisition and supporting documents.

142.    Chapman knowingly and intelligently switched the two checks and allegedly committed felony bank fraud. Shelzi represented to Chapman that she was the Owner and Manager of WEB LLC.  This representation was false with the intent to provide the Bank and Chapman with a pretext to issue the check.

143.    Shelzi did not own any rights or ownership in WEB LLC.  Chapman knew this.  If not, he was under an obligation as a fiduciary and banker to investigate the rightful owners of WEB LLC.  This he failed to do.

144.    Had Chapman and the Bank performed their duties as a loan officer/lender, they would know that Joseph A. Foistner, Esquire, was the only founder, owner, member, and manager of WEB LLC.  Chapman's changing of the $65,000 check defrauded NBE LLC and its subcontractors, by issuing a new check, through fraud, not supported by invoices, a requisition, to a Limited Liability Company owned by the very same individual that was being defrauded.

145.    Shelzi took the new check, issued to WEB LLC, opened a false and fraudulent checking account with the Citizens Bank, allegedly forging and falsifying federal bank forms and power of attorney forms to open such an account.  She then allegedly forged the new check by

endorsing her name onto the back of the check representing to be an owner, manager or authorized signor of WEB LLC and then converted the funds.

146.    These alleged acts constitute the commission of felony forgery, felony identity theft, felony larceny and Chapman along with Butler Bank, are liable as co-conspirators for these alleged crimes. Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and used the mail and wire to commit these acts.

147.    The LLC and the Foistners reported this to the Citizens Bank Security Staff which provided copies of the falsified checking account documents as well as copies of forged and falsified checks from that Citizens Bank Account.

148.    Upon gaining knowledge of the alleged crimes and fraud, Foistner, the LLC, NBE LLC and WEB LLC, provided written notices to the President and Chief Executive Officer of the Butler Bank, Chapman and Hauswirth.  Instead of correcting and stopping these many alleged crimes, Butler Bank, in contravention of their duties as a Fiduciary/Lender, chose to hide their involvement with silence and not answer a single telephone call or written notice from the LLC in 49 months.  Butler Bank not only facilitated the commission of the alleged crimes, but by their conduct allowed it to continue harming their borrowers.  Chapman and the Bank became members of this alleged criminal conspiracy, aiding and abetting Shelzi in the performance of these alleged crimes.

149.    Instead of performing its fiduciary duties, Chapman and Butler Bank, falsely and through fraud, schemed to destroy the LLC and the Foistners by reporting negative credit information to various Credit Bureaus.

150.    In fact, Butler Bank's false reporting, of the LLC's late payments to Butler Bank, caused the Guarantor's Credit Score to plummet. This was done by Chapman, to intentionally destroy Laurie Foistner and to aid and abet his friend Shelzi.

151.    The Butler Bank was fully aware that the New Hampshire Courts had ordered Shelzi to make half the interest payments to Butler, the other half, was ordered to be made by Laurie Foistner. Butler Bank and Chapman had received written notices from Attorney Morgan Hollis that Shelzi, living in Belmont, Massachusetts, was not making her share of the court ordered payment to Butler, while she was carrying on in her alleged personal and criminal affairs with Chapman.

152.    Numerous notices, from 2005 through present, now for 49 months, had been provided, to Butler Bank, that Shelzi did not reside at 3 Foxberry Drive, New Boston, New Hampshire, and that Shelzi should receive Butler Bank's false and threatening letters, at her home in Belmont, Massachusetts, always declaring a default, when there was, in fact, no default.

153.    Butler Bank intentionally did not provide these notices to Shelzi. Instead, Butler Bank reported Shelzi's late payments onto Laurie Foistners' Credit report.

154.    Upon information and belief, a detailed review and comparison of Shelzi's Credit Report and Laurie Foistner's Credit Report documents this fact.

155.    On each occasion, when Butler Bank mailed a Default Notice to Laurie Foistner at 3 Foxberry Drive only and not to Shelzi at her Belmont address, Butler Bank erroneously declared a default at the stated date on the letter. In effect, Butler each time declared a default at a given date in the future, the date that had not occurred as of the date of the writing. Therefore, there never was a default. Only threatening letters designed to harass the LLC and the Foistners were issued.

156.    After the commissions of these alleged crimes and fraud committed by the employees of Butler Bank, and after millions of dollars in damages, J. Foistner personally wrote to Butler Bank, as did Attorney Hollis, asking to have Chapman removed as the loan officer of the loan.  The LLC and Hollis specifically wrote to Butler Bank, informing the Bank of all the alleged crimes and fraud, harassment and racketeering, committed by the bank and its employees in aiding and abetting Shelzi's commission of the alleged crimes.  Butler Bank did not respond and chose to allow these alleged crimes to continue.  Chapman continued to manage, control and administer the LLC's loan until 2009.

157.    In order for Shelzi to keep her reported losses for tax years 2001, 2002, and 2003, and, in light of the fact that Shelzi did not become part of the LLC until tax year 2003, the IRS required Shelzi to demonstrate that she was materially involved as a member of the LLC in 2001 – this Shelzi and her CPA were not able to do.  Shelzi had an assignment clause from Maynard, purchasing his losses for tax years 2001 and 2002, in the Ownership Transfer Agreement.  This clause however, would not and could not, allow Shelzi and Becks to claim material participation.

158.    In order to mislead the IRS Auditor, Quang, who had requested for Shelzi and Becks to complete and submit meeting logs and records showing her involvement in 2001, Shelzi prepared a letter, dated August 1, 2005, to Brian Beck stating, " *... please note that I do not keep logs on meetings I conduct with business associates, managers, and staff at any one of the companies that I own.* "  In this letter, Shelzi attempts to falsely, and with fraudulent intent, mislead the IRS, by creating her own fictional participation history; all of which is not true.  Shelzi never materially participated in the LLC's operations until January 2003.

159.    On or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and Becks, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax

No. 617-776-5690, pages 1, 2 and 3.  Page 2 of the fax consisted of an IRS Form 4564, depicting

Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu,

dated July 15, 2005.  This IRS Form set forth the following Information and Documentation

Request:

> "Please provide additional information regarding to Seff Enterprises & Holdings, LLC
> nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

> 1.  Proof of material participation in the Seff Enterprises & Holding LLC in a
>     regular, continuous, and substantial manner by Antonia Shelzi under IRC 469
>     (b)(i) & (5).
> 2.  Complete the attached activities log which complies with your record keeping
>     requirements in Reg. 1.469-5T(f)(4).
> 3.  Provide a copy of your appointment book or calendar for the year 200112 to
>     support the information provided in the activities log .....
> 4.  Did you perform most of the work in Seff Enterprises & Holdings, LLC?
> 5.  Did you work more than 100 hours and no one (including non-owners or
>     employees) works more hours?
> 6.  Did any person receive compensation in connection with managing Seff
>     Enterprises & Holdings, LLC?

> If you would like to meet with me to discuss this issue at depth, please give me a call ...."

Page 3 of the fax was a blank IRS Form, entitled "Activity Log".

160.    Hassel followed up his fax transmission with a telephone call to J. Foistner,

asking him to help him defraud the IRS by falsifying this Activity Log". Hassel allegedly

committed Felony Solicitation, to defraud the IRS, when he asked J. Foistner for his involvement

to falsify this IRS Form and to provide fraudulent and false information to the IRS Auditor.

161.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law

Offices writing, ***"IRS ... Per accountant need to keep log and therefore review copy of log***

***prepared for Toni."*** Hassel submitted along with his fax document, a two page document

depicting a false meeting schedule log that he had prepared for Shelzi.  The document contained

a list of falsified meeting dates that were supposed to have taken place between Shelzi and J.

Foistner in 2001.

162.    All were manufactured by Hassel and Shelzi in an attempt to defraud the IRS.

None of the meetings ever took place.  Prior to submitting this fax transmission from his Avid

office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on

behalf of Shelzi and Becks.

163.    When Hassel submitted this second fax transmission to Attorney Foistner, he

again allegedly committed the felony crimes of Criminal Solicitation, IRS Tax Fraud, Criminal

Conspiracy to provide false information to the IRS.

164.    On or about August 1, 2005, Hassel and Shelzi prepared a letter to CPA Becks in

which Shelzi, attempting to defraud the IRS by providing the IRS with false and fraudulent

information, attempting to evade or defeat her owed taxes, attempting to file fraudulent returns,

statements, or other documents, furthering the alleged criminal conspiracy with Hassel and

Becks, and others to allegedly defraud the United States of America.  Shelzi made the following

untrue statements:


"In July 2001 I was approached by Attorney Foistner to discuss my participation in the
purchase of the development ... I spent most of the following 10 days on due diligence
.... Overall I would conservatively estimate my time spent in 2001 on Seff Enterprise
business to be well in excess of 200 hours.  Sincerely yours,   Antonia Shelzi".


165.    Shelzi never joined the LLC until December 2002, she performed her due

diligence from October 2002 through December 2002 and never performed any work on behalf

of the LLC.  Shelzi's written statements and misrepresentations are a testament of her felonious

character and clearly demonstrate her criminal intent to defraud the IRS and others.

166.    During Hassel's August 8, 2005 telephone call to the Foistner Law Offices, his second attempt to criminally solicit J. Foistner's participation in the IRS Tax Fraud, Hassel explained that he was forwarding the August 01, 2005 Shelzi letter to CPA Becks, which he had prepared for Shelzi.

167.    Instead of helping Hassel and Shelzi commit this IRS Tax Fraud, refusing to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS Auditor, J. Foistner reported all of these crimes to Agent Quang. Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi Tax Fraud.

168.    J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.  Butler Bank received written notices of these alleged crimes along with copes all evidentiary exhibits, the FBI Complaint, the forged checks, the IRS meeting logs and the original the LLC tax returns, as well as the amended the LLC, tax returns, tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008. These tax returns depict Shelzi as being ousted from the LLC, because of her status as a Convicted Felon. Butler was kept informed by J. Foistner and his lawyers, in writing, at all times.  Butler Bank was given every opportunity to renounce its involvement in the alleged conspiracy but refused to do so.

169.    Upon information and belief, Attorney Laboe and Orr & Reno had full knowledge of Shelzi's unlawful activities, forgeries and larcenies pertaining to the IRS Tax Fraud and the stolen Butler Bank checks as evidenced by the many written letters submitted by Attorney Laboe

37

to Hassel in an attempt to coerce J. Foistner not to comply with the IRS audit and further attempting to cover up the stolen and forged checks.

170.    On or about September 26, 2005, Shelzi's lawyer, Attorney Laboe, attempted to coerce J. Foistner, not to cooperate, with the IRS Audit in writing, in a letter to Attorney Hollis. He wrote, ***"Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001.  Mr. Foistner has characterized these schedules as 'fraud'."***

171.    Attorney Laboe wrote in his September 26, 2005, letter to Hollis, page 2:

> "However, unilaterally expanding the scope of the current IRS
> audit outside tax year 2001, could potentially expand liability for
> Seff, as well as Mr. Foistner and Ms. Shelzi.  Therefore, we ask
> that you caution Mr. Foistner from taking such action. Granted, if
> the IRS requests the information, Mr. Foistner has no other choice
> but full disclosure. However, it is in nobody's best interest to bog
> this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions described above and below certainly interfered in the company's participation in the audit in the opinion of the Plaintiff.  Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities."  Upon information and belief, Attorney Laboe cautioned Mr. Foistner not to cooperate with the IRS.

172.    Upon information and belief, Attorney Laboe assisted Shelzi by filing a frivolous law suit against the LLC, his First Petition, asking the State Court to remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit.   This first Petition, falsely claimed:

38

1. That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2. That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3. That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4. To have all of the LLC's checking accounts attached.

173.    Prior to filing this frivolous law suit, allegedly abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis Law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

174.    This solution would not work for Shelzi since she needed to remove all accounting records and evidence of the Shelzi IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to stop Foistner from providing this evidence to Auditor Quang.

175.    In fact, Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  This conduct was perfectly timed to interfere with the IRS Audit.

176.    J. Foistner completed the IRS audit with Agent Quang successfully. Agent Quang and J. Foistner agreed to amend all of the LLC's Federal Tax Returns for calendar years 2001, 2002, 2003, 2004 and 2005, effectively reducing all deduction to Zero for those tax years, by moving millions of dollars into the LLC's "Inventory Account", thereby capitalizing all expenses.

39

177.    This was requested by the IRS in writing and J. Foistner complied, amending all tax returns as requested.  This however caused Shelzi millions of dollars in additional income taxes for those tax years, effectively removing all of the losses that she and Becks had improperly written off.

178.    After amending the tax returns, J. Foistner, as sole manager of the company and then, as 100% owner / member as defined by Seff's Operating Agreement, ousted Shelzi as a member, effective February 14, 2006, from the company, citing the many alleged Felony Crimes she, Butler Bank and their accomplices had committed.

179.    After Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, then the LLC's attorney, her alleged criminal conduct increased.  It was not enough for Shelzi and her representatives to allegedly criminally interfere with the administration of Internal Revenue Laws, the IRS audit, by removing the accounting records from J. Foistner, during the audit, they also stole, removed and converted Seff's only Notebook Computer, maintaining and storing the only copy of the LLC's accounting data, tax data and company data.

180.    This computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2008.  Additionally, Hassel destroyed and sabotaged Seff's only back-up copy of this data and software, housed on Foistner Law Offices, new server.  This server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only backup electronic data.  These alleged acts constituted crimes of Larceny, Criminal Mischief and other crimes as defined in New Hampshire and Massachusetts.  Hassel transported the computer, data and software, without authority, across interstate lines and used the mail and wire to perpetrate the alleged crimes.

40

181.    On or about March 2009, Attorney Laboe, now Hassel's new Lawyer's, having full knowledge that a law suit had been filed in Massachusetts, by the LLC, against Hassel, his client, complaining of the computer and data theft by Hassel, and, that Hassel had admitted having possession of the computer and the LLC's data since 2004, filed a Motion for Spoliation against the LLC, claiming that the LLC had destroyed computer data, when in fact, it was his very own clients, Hassel and Shelzi, that committed the spoliation, in order for the IRS <u>not to</u> receive any amended tax returns.

182.    When Shelzi realized that her tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, that Attorney Laboe's and Shelzi's attempts to stop Foistner from meeting with IRS had failed, Shelzi allegedly initiated Phase II, of their criminal conspiracy to defraud the IRS.

183.    Attorney Laboe, representing Shelzi in retaliation, on February 15, 2006 and February 22, 2006, respectively, while Shelzi was no longer a member / owner of Seff, LLC filed a Petition to have Foistner, by then the 100% owner / member removed as manager.  This was designed to interfere with the IRS Audit and the successful amendment of the tax returns.

184.    Upon completion of the IRS audit, an audit performed without accounting records since Shelzi had the LLC's accounting records removed from the company by Court Order, in an attempt to interfere with the audit, J. Foistner provided notice, as sole manager of the LLC, to Shelzi and Attorney Laboe that J. Foistner, had reached an agreement with the IRS, to amend the 2001 2002, 2003, 2004, and 2005 tax returns, as suggested by the IRS, to ZERO.  Foistner, in fact, amended the returns within a few days after the audit and forwarded same to Shelzi, Attorney Laboe and Butler Bank.

185.    After Foistner reported Shelzi's and Attorney Laboe's alleged tax fraud to the Auditor and the IRS Criminal Investigation Division, and provided Shelzi and Attorney Laboe with the notices of his actions taken in regard to the IRS Settlement, Attorney Laboe and Shelzi realized that by capitalizing close to $6-million worth of expenses that Shelzi had planned to write off, or in fact, already had partially written off, his client, Shelzi would now owe millions more on owed taxes and penalties. Attorney Laboe filed another Petition to remove J. Foistner, as a Manager, by allegedly making misrepresentations and false statements to the Court in an attempt to mislead the Court that Foistner was acting unlawfully as manager of the LLC.

186.    Attorney Laboe and Shelzi also asked the Court to remove J. Foistner as the "Tax Matter Person" for LLC.  This, an impossibility, because Foistner, remained the only owner, of the company.

187.    Upon information and belief, Attorney Laboe, at all times, was J. Foistner's and the LLC's attorney, under a duty to keep his client's information confidential.  Instead, Attorney Laboe zealously advocated his client's (Shelzi's) position contrary to the best interest of his former clients.

188.    The acts of Shelzi were designed to interfere with the IRS Audit by intentionally misrepresenting facts and withholding information, intending to further her cause in allegedly defrauding the IRS out of millions of dollars.

189.    Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

190.    On or about June 2006 Shelzi called Robert Baskerville, the Projects Engineer and Oberhauser, the LLC's attorney. Baskerville's sworn statement and signed affidavit states

42

that Shelzi had asked him, if he would be willing to help her bankrupt the LLC and the project. Oberhauser contacted J. Foistner, warning him of Shelzi's alleged criminal motives, to bankrupt her very own company, the LLC.

191.    The LLC has attempted to litigate these claims in the State Court against Shelzi and others for more than 49 months, realizing more than $16.5-million in damages.

192.    On or about January 2007,  The LLC hired a Forensic CPA, Mr. Antony Albright and required that Mr. Albright generate a new set of accounting records, for tax years 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 in preparation for the civil trial against Shelzi and others.  Albright was asked to re-enter all accounting and bookkeeping data, from the LLC's original documents into his CPA Firm accounting computers, in order to present accurate and complete accounting information and tax information for the Court.

193.    On or about March 27, 2007, CPA Albright stated in his sworn statement and Affidavit to the Court:

> *" I understand that aspects of this litigation pertain to various loans and/or capital contribution of Laurie Foistner, as member. My analysis to date indicates that Ms. Foistner's loan and or capital funding (exclusive of original capitalization) has exceeded all loan repayments and/or capital withdrawals since inception".*

What Albright was stating, simply said, was that L. Foistner had never withdrawn more money from the Company, at any time, than what she had deposited into the company as loans, the original $1.3-million capitalization excluded. L. Foistner was at all times entitled to remove another $1.3-million, at her discretion, before she would have overdrawn her account and actually taken money from the LLC.  Shelzi knew this.

194.    Instead of promoting his client's best interest and aiding his clients well being, Attorney Laboe claimed to the State Court that Foistner had removed money from the company

43

without Shelzi's authorization – asserting that the Foistner's were embezzling money from their very own Company, which owed them several million dollars. This representation was not true.

195.    By 2009, the time of this bankruptcy filing, the Foistners had contributed more than $3-million, to pay for the operations of the LLC, abandoned by Shelzi in 2003. After Shelzi was ousted from the LLC, in 2006, the Foistners paid for the construction and completion of the 3,000 ft. long road, installed final pavement and completed all contractual subdivision condition set forth by the Town of New Boston.

196.    The Town accepted the road in October 2008, after the Foistners provided all road maintenance and snow removal from 2003 through 2008. Shelzi never allocated a single hour to the LLC's Waldorf Project or the RICO Claim, the only reasons for the LLC's existence.

197.    Shelzi accomplished her original promise made by CPA / Attorney Di Iulio, to sue for an accounting, while she was under an obligation to perform and pay for the accounting, while Shelzi, at all times was in possession of all the accounting records. Shelzi, by her conduct and the use of the Court, finally bankrupted the LLC, causing more than $16.5-mllion in damages, excluding the loss of the future construction of the remaining 18 homes, estimated cost to construct $36.8-million.

198.    In summary, Shelzi's, Hassel's, Chapman's and the Butler Bank's planned and executed alleged criminal conduct began on or about July 2005. These alleged co-conspirators, were aided and abetted by the Butler Bank. This harmed the LLC financially, (1) by interfering with the contractual relations of the Waldorf project, the Creditors and its Financiers; (2) by intentionally destroying a valid RICO Case and the millions of dollars in costs associated with this claim; (3) by interfering with the business activities, sales, construction of homes, delaying the project from 2002 through 2009 and finally bankrupting the project in 2009; (4) by forging

44

endorsement on $100-thousand dollar bank drafts and converting same, transporting these stolen goods over interstate lines; (5) by intentionally implicating and attempting to criminally solicit the LLC, its agents, employees, members and manager, to help commit criminal IRS Tax Fraud, to falsify IRS Tax Forms and to provide false information during an IRS Audit; (6) interfering with the administration of an IRS Audit, by removing accounting records and destroying computer servers, in order to further the alleged criminal conspiracy to defraud the IRS, at all times attempting to aid and abet Shelzi in evading her payment of owed income taxes; (7) transporting stolen computers over interstate lines, affecting Interstate Commerce; (8) committing the crime of Identity Theft by opening up a false checking account in Massachusetts and then converting the stolen funds; (9) committing the crime of Larceny, Attempted Larceny, Theft by Deception, Criminal Mischief and other criminal conduct; (10) abusing the legal system, bringing frivolous claims, misrepresenting the truth to a tribunal, and allegedly committing many counts of material, felony perjury, using the legal system to further their criminal enterprise; and, (11) at all times using telephone lines and the US Mail to conduct their criminal acts, committing Mail and Wire Fraud.

199.    Shelzi, through her lawyer, did intentionally prepare and file more than forty (40) separate motions and legal action, at all times intending to bankrupt the LLC, causing the LLC millions of dollars in damages.

200.    The Defendants, by their conduct, intentionally bankrupted the LLC by appropriating and wasting the LLC property, at all times affecting commerce, by alleged larceny, extortion, attempts to conspire to perform larceny and extortion, through intimidation and coercion, placing immediate fear of injury to the LLC's property and well-being, including the taking of the LLC's property without its consent, as defined in 18 U.S.C. § 1951.

45

201.    On or about February 19, 2008, the LLC filed a civil action, in the Hillsborough County Superior Court, Docket No.08-C-83, against their Lawyers Orr & Reno, P.A. and Attorney James Laboe for allegedly violating the Plaintiff's confidential information, breaching their fiduciary duties, violating the Attorney Client Rules of Professional Conduct.

202.    Orr & Reno's conduct was also reported to the FBI, the New Hampshire Attorney General's Office, the United States Attorney, District of New Hampshire and other law enforcement agencies.

203.    Butler Bank's alleged criminal conduct, criminal and civil conspiracies in aiding and abetting Shelzi was reported to the FBI, the IRS, the FDIC, the New Hampshire Banking Commissioner, the Massachusetts Banking Commissioner, the New Hampshire and Massachusetts Attorney Generals, the United States Attorneys for New Hampshire and Massachusetts and other law enforcement agencies.

204.    In 2008, the LLC, through their attorneys, filed a Writ of Certiorari to the New Hampshire Supreme Court, accompanied by their Expert's Opinion, regarding the alleged unethical conduct of Orr & Reno, P.A.  The New Hampshire Supreme Court refused to hear the Writ.

205.    On or about August 2007, the LLC filed a civil suit against Hans Hassel, for the theft and conversion of the Computer System, its operating software, its accounting software and its accounting and financial data, in the Commonwealth of Massachusetts, Middlesex Superior Court, Docket No. 2007-01627-C.  Hassel intentionally converted this computer that contained the LLC's only electronic accounting data, in order to interfere, hinder and delay the ongoing IRS audit, attempting to destroy the evidence contained in the computer from reaching the IRS auditor and the IRS Criminal Investigation Division.  The LLC has substantial and compelling

evidence, to show that Hassel also physically destroyed the LLC computer server, maintaining the only backup electronic copy of the accounting data, in 2006, believing that the LLC could not provide any evidence concerning the Defendants ongoing alleged IRS tax fraud and falsification of tax forms to the IRS.

206.    The Defendants allegedly coerced and abused the legal system by filing frivolous claims, committing countless acts of Perjury and provided false information to a Tribunal. Defendants violated and conspired to violate the LLC's rights to free association, to petition government, procedural due process and equal protection of the laws under the United States Constitution and have engaged in seeking selective enforcement of the law, to serve their criminal enterprise.

## A RICO CLAIM'S 18 U.S.C. § 96, et seq
## COUNT ONE: RACKETEERING

207.    The Plaintiffs re-allege paragraphs 1-206 as though restated in full herein and not inconsistent herein.

208.    At all times, the Butler Bank and the Individual Defendants constituted an "enterprise," within the meaning of U.S.C. §§ 1961(4) and 1962(c), as a body corporate pursuant to RSA 31:1.

209.    Defendants were individual "persons" within the meaning of U.S.C. §§ 1961(3) and 1962 (c), who associated with and/or participated in the conduct of the enterprise's affairs.

210.    Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

211.    Defendants conspired with each other to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering

activity in violation of 18 U.S.C. § 1962(d). Each intended to further an endeavor of Shelzi and Hassel, which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor.

212.    Defendants carried out a scheme to defraud the Plaintiffs that was knowingly and intentionally devised and carried out in concert to financially damage the Plaintiffs for their own economic gain and to deprive the Plaintiffs of the intangible right of honest services under 18 USC § 1346 by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

213.    Defendants placed, or foreseeably caused to be placed in a post office or authorized depository for mail, matter that furthered the scheme to defraud thereby committed mail fraud, in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

2 14.    These alleged acts all occurred after the effective date of the enactment of the RICO statute and more than two such acts occurred within ten years of one another. At all relevant times, the enterprise engaged in, and its activities affected interstate commerce and foreign commerce.

215.    All of the predicate acts described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to extort and defraud the Plaintiffs; their common result was to extort and deprive the Plaintiffs of civil rights, money and the intangible right of honest services under 18 USC § 1346.

216.     Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth, each personally or through their agents or servants, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission.

217.     The Plaintiffs were the victims of the acts of racketeering and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

218.     All of the predicate acts described were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts over a substantial period of time.

219.     The patterns of racketeering activity engaged in by Defendants continues, because such conduct has become a regular way of conducting on-going business activities.

220.     As a direct and proximate result of, and by reason of, the activities of the Defendants and their conduct in violation of 18 U.S.C. §§ 1962(c) and 18 U.S.C. § 1964(c), LLC have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The Defendants appropriated from the Plaintiffs of their property, affecting commerce, by larceny, forgery and extortion, and attempts to conspire to commit larceny, extortion and other crimes through immediate fear of injury to the Plaintiff's property and well being, including the taking of the Plaintiff's property without its consents as defined in 18 U.S.C. § 1951.

221.     Among other things, the Plaintiffs have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages and physical harm to their persons,

49

property and reputation, intentionally caused by the Defendant's alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present. The alleged fraud, crimes, conspiracies, thefts and wrongful acts committed by the Defendants, harming the LLC detailed herein entitles the LLC to recover threefold the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT TWO
## RICO - AIDING AND ABETTING

222.    The Plaintiffs re-allege paragraphs 1-221 as though restated in full herein and not inconsistent herein.

223.    In the alternative and without waiving the forgoing, Defendants aided and abetted one another in carrying out their alleged schemes to defraud through criminal conduct. As set forth herein, Defendants engaged in various schemes to defraud LLC as defined and set forth in 18 U.S.C. § 1341: 18 U.S.C. § 1344; and 18 U.S.C. § 1962(c).

224.    Defendants knew that Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth were engaged in various schemes to defraud and harm the Plaintiffs. The Defendants received written notices from the LLC attorneys informing them of the alleged crimes, said crimes are individually and separately alleged herein.

225.    Defendants engaged in actions that were intended to and, in fact, did facilitate and advance Antonia Shelzi's and Hans Hassel's schemes to defraud and harm the Plaintiffs.

226.    As a direct and proximate result of Defendants' aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth to defraud the Plaintiffs. The Plaintiffs have incurred and/or will incur loss and damages in excess of the minimal jurisdictional limits of the Court.

227.    Defendants conduct by aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth's alleged schemes to defraud and harm the Plaintiffs was committed with fraud, and/or actual malice, and/or deliberate acts, and/or oppression, and/or willfulness, and/or such gross negligence as to indicate a wanton disregard for the rights of the Plaintiffs. As a result, the Plaintiffs are entitled to an award of punitive damages against the Defendants.

## COUNT THREE
## CONSPIRACY TO COMMIT BANK FRAUD AND OTHER CRIMES

228.    The Plaintiffs re-allege paragraphs 1-227 as though restated in full herein and not inconsistent herein.

229.    In the alternative and without waiving the forgoing, Defendants allegedly committed fraud in making false statements of material fact and engaging in fraudulent acts that they knew were false at the time they made them, which statements and acts were intended to be relied upon by the Plaintiffs. The Plaintiffs reasonably relied upon them to their detriment.

230.    These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages to their property and reputation, intentionally caused by the Defendants' alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present, (2009). The alleged fraud, crimes, conspiracies, thefts and wrongful

51

acts, individually and collectively identified and alleged herein committed by the Defendants

harming the Plaintiffs caused the LLC to file for Chapter 7 Bankruptcy protection.

231.    This fraud was adopted, aided, abetted, furthered and approved by the Butler

Bank.

**COUNT FOUR**
**BANK FRAUD AND FELONY FORGERY**
**THE FIRST $100-THOUSAND CHECK FORGED BY THE DEFENDANTS**

232.    The Plaintiffs re-allege paragraphs 1-231 as though restated in full herein and not

inconsistent herein.

233.    On or about October 2005, Shelzi admitted to Attorney Foistner, Attorney Hollis

and Attorney Prive, after she was caught, in the actual commission of these alleged crimes, that

she alone, traveled to the Butler Bank, in Lowell, Massachusetts to pick up the $100-thousand

and Butler Bank construction loan check, No. 7148.  Shelzi admitted that after she gained

possession of the checks, without the Plaintiffs consent and/or knowledge, she and her employee

Hans Hassel, being the only persons in possession of the check, she, Shelzi, endorsed the check

with her signature and attempted to negotiate it knowing that one of the signatures was a forgery.

234.    Shelzi further admitted that she endorsed the check over to her Brother, Attorney

Domenic Shelzi, who deposited this forged instrument into his Citizens Bank checking account

in Rhode Island.

235.    Check No. 7148, depicts the LLC forged signatures "LORI FOISTNER" and

"The LLC" above Shelzi's endorsements.  These forged endorsements could only have been

affixed onto the paper draft by Shelzi and/or her agent and employee, Hans Hassel. Hassel had,

in the past, written the name Laurie, as "LORI", on his written communications, given to the

LLC.

52

236. When Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005, received the check from Butler Bank's, Robert Chapman, without the LLC – Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC', two (2) endorsements on the back of the check, the Defendants allegedly committed two (2) separate and distinct counts of Felony Forgery, as defined within the meaning of "Forgery" in 18 U.S.C. § 513 and State Law, Securities of the States and Private Entities and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

237. The only individuals to possess the loan disbursement check, as admitted by Shelzi, were Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi. Upon information and belief, no other person could have forged the signatures other than Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi.

238. The LLC and Guarantor Laurie Foistner, the named Payees on this Butler Bank Draft, the business entity and individuals, the victims of the alleged crimes, became aware of their damages, only after this $100-thousand check was returned, stamped and marked "MISSING ENDORSEMENT".

239. The LLC reported this alleged crime to the FBI in 2006, assuming that a Citizens Bank employee stopped the clearing of this forged instrument, since the check was marked as deposited, by Attorney Shelzi, into his "Riverside, Rhode Island" Citizens Bank account.

240. Riverside, Rhode Island is the primary check clearing facility for all checks deposited into Citizens Bank. On or about September 2008, approximately thirty six (36) months after the LLC discovered that the Defendants had forged the endorsement on this check and allegedly committed the felony crime of Larceny, reduced to the felony crime of Attempted Larceny, since the check was stopped from clearing, Robert Chapman claimed to Attorney

Foistner that it was he, Chapman, not the Citizens Bank that marked and stamped the check "MISSING ENDORSEMENT".

241.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests.  Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to conduct their Racketeering activities.

242.    Butler Bank sanctioned and facilitated the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

243.    Butler Bank intentionally and knowingly helped the furtherance of these alleged, unlawful acts which destroyed the LLC business and caused the LLC's bankruptcy.

## COUNT FIVE
## BANK FRAUD AND ATTEMPTED LARCENY
## THE FIRST $100-THOUSAND CHECK ATTEMPTED TO BE CONVERTED BY THE DEFENDANTS

244.    The Plaintiffs re-allege paragraphs 1-243 as though restated in full herein and not inconsistent herein.

245.    Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005 and received the check from Butler Bank's employee, Robert Chapman, without the LLC, Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC two (2) endorsements on the back of the check, then endorsed the check and deposited the check, across interstate lines.  The Defendants committed Felony Attempted Larceny, attempting to convert the money, transporting a negotiable instrument across State Lines, thereby affecting Interstate Commerce, as defined within the meaning of "Stolen Goods" in 18 U.S.C. § 2314,

Transportation of Stolen Goods, Securities and Money and Bank Fraud, 18 U.S.C. § 1344,

§1344(2).

246.    Butler Bank and Chapman knew of these alleged crimes as early as September

2005 and did absolutely nothing to protect their Borrowers interests or report the alleged crimes

to Law Enforcement.  Instead of reporting these crimes to the LLC and/or law enforcement,

Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi

and Hassel to complete their alleged Racketeering activities.

247.    Butler Bank approved the Defendants actions, aided and abetted the Defendants,

and  received financial gain from this fraud, by being able to charge and collect, a higher

monthly interest rate from the LLC.

**COUNT SIX**
**BANK FRAUD AND LARCENY**
**THE SECOND $100-THOUSAND CHECK AND THIRD $65-THOUSAND CHECK**
**CONVERTED BY THE DEFENDANTS**

248.    The Plaintiffs re-allege paragraphs 1-247 as though restated in full herein and not

inconsistent herein.

249.    On or about September 12, 2005, the Butler Bank, directly contravening the

instructions they had previously received from the LLC, issued check no. 7324, in the amount of

$100,000, at the direction of Shelzi.  Upon information and belief, Shelzi approached her good

friend, Chapman, and told him because of the dispute between the LLC and herself, she needed

these funds released by her authorization (as she was still trying to pay her brother this money

when the LLC had informed her that engineering costs would be paid from these proceeds, not

her brother).  The Butler Bank delivered this check, without the approval, knowledge, or consent

of the LLC to Attorney Hollis.

250.    Despite the fact that the conditions set forth in the commercial loan <u>had not</u> been satisfied, Chapman, released the proceeds that were to be held back to pay for engineering costs. The check was delivered to Shelzi's brother, Domenic Shelzi, and the funds were used not for their intended purpose to pay engineering expenses.

251.    The Butler Bank aided and abetted in Shelzi's brother being paid and further damaged the Plaintiffs.  Specifically, in light of the fact that the engineering firm, by virtue of not receiving the $100,000 promised to it, now had lien rights against the LLC– the creation of which is directly attributable to the Butler Bank.

252.    The Defendant's used undue influence to force the LLC, under threat of causing a lawsuit and the calling the loan, to endorse this second $100-thousand check and forwarding it to Attorney Shelzi.

253.    As stated in herein, Shelzi had received a $990,000 loan to construct an "Owner Occupied" home on Lot 8-84-44 in Phase III of the Waldorf Estates subdivision.  The Butler Bank had gone through great lengths to qualify NBE, LLC as the builder of this home (a process that involved several months and substantial communication between the Butler Bank and NBE, LLC).  At the time, NBE, LLC was solely owned and managed by Joseph Foistner.

254.    In September 2005, NBE, LLC submitted an invoice in the amount of $65,000 directly to the Butler Bank for work done in the construction of Shelzi's house on lot 8-84-44.  The invoice was properly created and was accompanied by all necessary supporting documentation.

255.    The invoice was for surveying services provided by several contractors and a reimbursement of costs incurred in obtaining municipal permits, building plans, and other

necessary approvals (i.e. NH Public Utilities Commission energy rating approval).

Subsequently, the Butler Bank issued a check payable to NBE, LLC and Shelzi.

256.   At the time that the Butler Bank issued the $65,000 check, the LLC had learned of

Shelzi's forgery of the $100,000 check on the LLC' bank account and other criminal acts being

committed by Shelzi and Chapman.

257.   Consequently, the LLC refused to endorse the $65,000 check on behalf of NBE,

LLC, until Shelzi provided assurances that all criminal acts she had committed would be

rectified and she would insure that the Plaintiffs were restored to the position they were in prior

to when the Defendants committed these acts..

258.   NBE, LLC and Shelzi were at an impasse.  Shelzi was in possession of the

$65,000 check and was demanding that NBE, LLC endorse it so that she could use it to pay other

expenses she had on other housing projects she owned.  NBE, LLC, was refusing to endorse the

check and demanding that Shelzi endorse it and give it to NBE, LLC, so that NBE, LLC could

pay the construction expenses – the legitimate basis for which the check was issued.

259.   Upon information and belief, Shelzi, realizing that NBE, LLC would not endorse

the check and allow her to retain the funds, contacted her close friend Chapman to do her another

act of misconduct.  Shelzi returned the original check to Chapman, which was promptly voided,

and had a new check, in the same amount reissued to WEB, LLC.

260.   Upon information and belief, Shelzi insisted that she was the owner of WEB,

LLC, despite the fact that this company was also solely owned and managed by Joseph Foistner.

Chapman knew or should have known that Shelzi was not the owner of WEB, LLC.

261.   Chapman had absolutely no authority or legitimate reason to issue the new

$65,000 check payable to WEB, LLC.  WEB, LLC was not the qualified builder on lot 8-84-44;

WEB, LLC was not the builder of record in the loan documents; and WEB, LLC was not owed the $65,000 – as they did not perform any services on the lot or submit any invoices to the Butler Bank. Chapman's only reason for issuing the check to WEB, LLC was because he wanted to aid and abet Shelzi's misconduct of intentionally conspiring to defraud NBE, LLC.

262.   The only reason Chapman issued the check to WEB, LLC was to assist Shelzi in diverting $65,000 from NBE, LLC and defraud this company. Chapman's and Shelzi's alleged actions constitute additional counts of felony larceny as defined by 18 U.S.C. § 2314, Transportation of Stolen Goods, Felony Forgery as defined by 18 U.S.C. § 513, Securities of the State and Private Entities, Bank Fraud as defined by 18 U.S.C. § 1028, Forging Corporate Records, and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

263.   No other person had possession of the forged construction loan disbursement check, as admitted by Shelzi, except for Robert Chapman, Antonia Shelzi, and Hans Hassel. No other person could have committed the forgery crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

264.   The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

265.   Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

266.    Butler bank did benefit from these alleged crimes as they remained silent. Butler

Bank also intentionally and knowingly aided and abetted these unlawful acts which destroyed the

LLC business and caused the LLC bankruptcy and harmed L. Foistner.

**COUNT SEVEN**
**BANK FRAUD IDENTITY THEFT OPENING UP FALSE CHECKING ACCOUNT BY**
**THE DEFENDANTS**

267.    The Plaintiffs re-allege paragraphs 1-266 as though restated in full herein and not

inconsistent herein.

268.    These and other fraudulent acts caused in fact and proximately caused LLC to

suffer monetary damages.

269.    Shelzi took the $65,000 check to a Citizens Bank branch where she fraudulently

opened a business checking account for WEB, LLC (using falsified business records).  Shelzi

then cashed the new $65,000 check and converted the funds for her own personal use.  Chapman

provided substantial assistance in aide to this alleged criminal conduct.

270.    When the Defendants opened a business checking account at the Citizens Bank,

without authority and through fraud and deceit, all Defendants committed the felony crimes of

Aggravated Identity Theft as defined by 18 U.S.C.  § 1028 and § 1028 A, Forging Corporate

Records, Aggravated Identity Theft  and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other

Federal and State Crimes.

271.    The Defendants forged Federal Forms, corporate votes and other bank forms and

falsely represented themselves as Owner / Members or Managers of WEB, LLC, in order to open

up their fraudulent checking account.

272.    No one possessed these forged documents, the forged check, the forged corporate

votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank

59

personnel of Butler Bank.  Upon information and belief, no other person could have committed

these alleged crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

273.    In 2006, the LLC reported these alleged crimes to the FBI and law enforcement.

274.    The Butler Bank and Chapman acquired knowledge of these crimes as early as

September 2005 and did absolutely nothing to protect their Borrowers and the Creditors'

interests.  Instead of informing the LLC and/or law enforcement of these alleged crimes, Butler's

President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and

Hassel to accomplish their alleged Racketeering activities.

275.    Butler Bank approved the Defendants actions, aided and abetted the Defendants,

and received financial gain from this fraud.

**COUNT EIGHT**
**BANK FRAUD AND FORGERY OF CORPORATE RECORDS**
**FORGING FEDERAL BANK FORMS AND CORPORATE FORMS TO OPEN**
**FRAUDULENT CHECKING ACCOUNT BY THE DEFENDANTS**

276.    The Plaintiffs re-allege paragraphs 1-275 as though restated in full herein and not

inconsistent herein.

277.    When the Defendants opened a business checking account at the Citizens Bank,

without authority and through fraud and deceit, all Defendants committed the felony crimes of

Fraud and Forgery of Corporate Records as defined by 18 U.S.C. § 1028 and § 1028A, Forging

Corporate Records and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State

Crimes.

278.    The Defendants forged Federal forms, corporate votes and other bank forms and

falsely represented themselves as owner / members or managers of WEB LLC, in order to open

up the checking account.

279.   No one had possession of these falsified documents, the forger check, the forged corporate votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank personnel of the Butler Bank.

280.   Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

## COUNT NINE
## BANK FRAUD ,STOLEN GOODS TRANSPORTATION OF STOLEN GOODS SECURITIES AND MONEY – THE FORGED CHECKS AND MONEY

281.   The Plaintiffs re-allege paragraphs 1-280 as though restated in full herein and not inconsistent herein.

282.   In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material facts and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by LLC and reasonably relied upon by the LLC to their detriment.

283.   These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages.

284.   When the Defendants caused Check No. 7148, Check No. 7324 and the $65,000 check, Check No. "unknown" to be deposited into the United States Mail System and employed other modes of transportation to move the stolen funds and negotiable instruments from Lowell, Massachusetts to Riverside, Rhode Island and Bedford, New Hampshire, they committed the crimes of Transportation of Stolen Goods – Money, as defined in 18 U.S.C. § 2314 and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State defined crimes. This affected Interstate Commerce.

285.    Butler Bank and Chapman knowingly participated in these alleged crimes by using the mail and wires to transport these stolen funds and negotiable instruments from Massachusetts, thereby aiding and abetting the Defendants as they allegedly criminally conspired with Shelzi and Hassel, as defined in 18 U.S.C. 1349, Attempt and Conspiracy and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

286.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

287.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harmed L. Foistner.

## COUNT TEN
## FRAUD AND CRIMINAL SOLICITATION BY THE DEFENDANTS TO COMMIT IRS TAX FRAUD

288.    The Plaintiffs re-allege paragraphs 1-287 as though restated in full herein and not inconsistent herein.

289.    As stated herein, Shelzi, her agent CPA Becks, and Hassel contacted the LLC' office in Bedford, New Hampshire by telephone and via Facsimile, asking Attorney Foistner to join their alleged criminal conspiracy and fraudulent efforts to defraud the United States of America, the Internal revenue Service, out of millions of dollars, consisting of owed income taxes, interest and penalties, owed by Shelzi. The alleged premeditated, intentional and unlawful acts of the Defendants, soliciting Foistner's criminal conspiracy to commit offenses against the United States of America, to defraud the United States of America, constitute the crimes of Conspiracy to commit Tax Fraud as defined in 18 U.S.C. § 371.

290.     Shelzi's sole purpose and motive for joining the LLC in 2002, was her need to receive the LLC's "Business Deductions" in order to use the money she owed to the IRS, to purchase her fifty percent Ownership Interest from Maynard.  Her written contract, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, clearly states:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

291.     When the IRS audited Shelzi in 2005, demanding from Shelzi that she substantiate her "Material Participation" in the business of the LLC, as early as 2001 when, in fact, Shelzi never physically appeared or participated until December 2002 in the LLC's affairs. The Defendants, specifically Shelzi and Hassel, with the support, knowledge and consent of her agent directly, knowingly and with criminal intent, asked Attorney Foistner to help and aid them, to prepare, falsify and substantiate a false and untrue "Meeting Log", for tax year 2001, which was requested by the IRS.

292.     The form that the Defendant's wanted falsified was IRS Form 4564, which Quang Trieu demanded from Shelzi to justify and prove her material participation. The IRS specifically demanded that Shelzi would provide the following information:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

1.  Proof of material participation in the Seff Enterprises & Holdings, LLC in a regular, continuous, and substantial manner by Antonia Shelzi under IRC 469 (b)(i) & (5).
2.  Complete the attached activities log which complies with your record keeping requirements in Reg. 1.469-5T(f)(4).
3.  Provide a copy of your appointment book or calendar for the year 200112 to support the information provided in the activities log .....
4.  Did you perform most of the work in Seff Enterprises & Holdings, LLC?

    5.   Did you work more than 100 hours and no one (including non-owners or employees) works more hours?

    6.   Did any person receive compensation in connection with managing Seff Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call …. "

293.    In fact after Shelzi, her representatives and Hassel's alleged criminal solicitation of Attorney Foistner's participation in these alleged crimes, the Defendants followed up their verbal solicitation in two separate writings. The first, on or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and her agent, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax No. 617-776-5690, pages 1, 2 and 3. Page 2 of the fax consisted of an IRS Form 4564, setting forth Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu, dated July 15, 2005.

294.    Hassel followed up his fax transmission with a telephone call to J. Foistner, asking him to help him defraud the IRS by falsifying this Activity Log".

295.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law Offices writing, "IRS … Per accountant need to keep log and therefore review copy of log prepared for Toni." Hassel submitted along with his fax document, a two page document depicting a false meeting schedule log that he had prepared for Shelzi. The document contained a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner, in 2001. These documents were created by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place. Prior to submitting this fax transmission from Shelzi's Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf Shelzi and her agent.

296.    Instead of helping Hassel and Shelzi commit IRS Tax Fraud, J. Foistner refused to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS, J. Foistner reported all of these alleged crimes to Agent Quang.

Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi's alleged Tax Fraud.

297. J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.

298. The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

299. Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

**COUNT ELEVEN**
**FRAUD AND ATTEMPTS TO EVADE OR DEFEAT TAXES**

300. The Plaintiffs re-allege paragraphs 1-299 as though restated in full herein and not inconsistent herein.

301. The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Attempt to Evade or Defeat Taxes, as defined in 26 U.S.C. § 7201.

302. The Butler Bank and Chapman gained knowledge of these alleged crimes as early as September since Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

## COUNT TWELVE
## FRAUD AND MAKING FALSE STATEMENTS

303.     The Plaintiffs re-allege paragraphs 1-302 as though restated in full herein and not inconsistent herein.

304.     The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, demonstrated that these documents were submitted by Hassel from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Fraud and Making False Statements, as defined in 26 U.S.C. § 7206.

305.     Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

306.     Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner.

## COUNT THIRTEEN
## FRAUD AND FILING FRAUDULENT RETURNS, STATEMENTS AND DOCUMENTS

307.     The Plaintiffs re-allege paragraphs 1-306 as though restated in full herein and not inconsistent herein.

308.     The written, falsified, forged and signed documents submitted by the Defendants specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of filing Fraudulent Returns, Statements, Or Other Documents, as defined in 26 U.S.C. § 7207.

309.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

310.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner

## COUNT FOURTEEN
## FRAUD COERCION TO INTERFERE WITH ADMINISTATION OF IRS LAWS

311.    The Plaintiffs re-allege paragraphs 1-310 as though restated in full herein and not inconsistent herein.

312.    In order to interfere in the IRS Audit and to interfere in the Administration of Internal Revenue Laws, the Defendants, with the help of her agent, attempted to coerce Attorney Foistner, not to cooperate with IRS Auditor. Attorney Laboe wrote to Attorney Morgan Hollis on or about September 26, 2005:

"Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001. Mr. Foistner has characterized these schedules as 'fraud'."

"However, unilaterally expanding the scope of the current IRS audit outside tax year 2001, could potentially expand liability for Seff, as well as Mr. Foistner and Ms. Shelzi. Therefore, we ask that you caution Mr. Foistner from taking such action. Granted, if the IRS requests the information, Mr. Foistner has no other choice but full disclosure. However, it is in nobody's best interest to bog this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions as set forth herein interfered in the LLC participation in the audit.  Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities."  Attorney Laboe intimated that Mr. Foistner should not cooperate with the IRS.

313.    Attorney Laboe's did create, publish and file a frivolous law suit against the LLC requesting that the State Court remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit.   This first Petition, falsely claimed:

    1.  That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

    2.  That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

    3.  That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

    4.  To have all of the LLC's checking accounts attached.

314.    Prior to filing this frivolous law suit and abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

315.    This procedure would not permit Shelzi to remove all accounting records and evidence of Shelzi's alleged IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to prevent Foistner from providing this evidence to Auditor Quang.

316.    Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  All this, perfectly timed to interfere in the IRS Audit.

317.    Shelzi sued her own company, the LLC, by only requesting an Accounting that she had received years earlier, allowing her to write off the LLC' business losses. Her request for an accounting was motivated by her desire to interfere in the IRS Audit and to remove all evidence of her alleged criminal activities from the purview of the IRS.

318.    The Defendants intentional unlawful acts by writing letters attempting to coerce the LLC not cooperating with the IRS, abusing the legal system by filing a frivolous Petition, in order to remove accounting records and evidence, during an IRS audit, in order to hide incriminating evidence, and finally, the physical destruction of the only Computer System used by the LLC, containing LLC only electronic copy of the accounting data, clearly met the requisite elements of the crime of Attempts To Interfere With the Administration of Internal Revenue Laws, 26 U.S.C. § 7212.

319.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005.

## COUNT FIFTEEN
## STOLEN GOODS TRANSPORTATION OF STOLEN GOODS – COMPUTERS AND DATA AND SOFTWARE

320.    The Plaintiffs re-allege paragraphs 1-319 as though restated in full herein and not inconsistent herein.

321.    As stated herein, after Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, the LLC' attorney, her alleged criminal conduct increased. Not only did Shelzi and her representative criminally interfere with the administration of internal revenue laws, the IRS audit by removing the accounting records from J. Foistner, during the audit, they, as alleged criminal conspirators, stole, removed and converted the LLC 's only Notebook

Computer that maintained and stored the only electronic copy of the LLC's accounting data, tax data and company data.

322.    The computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2009.  Additionally, Hassel destroyed and sabotaged the LLC's only back-up electronic copy of this data and software housed at Foistner Law Offices.  The Server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only LLC electronic data backup was destroyed.  These were criminal acts committed by Hassel.  Hassel transported the computer, data and software without authority across State lines.

323.    When Shelzi and Hassel realized that Shelzi's tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, when the Defendants realized that their unlawful acts to interfere in the IRS Audit had failed, and after Attorney Laboe and Shelzi successfully removed all accounting records, during the audit, these alleged Racketeers completed their final act of conspiracy by destroying the electronic equipment thereby destroying all electronic data.

324.    The evidence, stored on the LLC's computer system and at Foistner Law Offices Computer Server, was destroyed so that the incriminating evidence could not be used by the IRS.

325.    The Defendants criminal actions to convert and destroy the LLC's only computer, the LLC's only set of electronic accounting records, and Foistner Law Offices only Server, constitute the crimes of Grant Larceny and Transportation of Stolen Goods, 18 U.S.C. § 2314 and other Federal and State crimes with the intent to defraud the IRS.

326.    After Foistner reported Shelzi's alleged tax fraud to the Auditor and also the IRS Criminal Investigation Division and provided Shelzi and her representative with the notice of his actions taken in regard to the IRS Settlement, as manager of the LLC, Shelzi realized that by

70

capitalizing close to $6-million worth of expenses that Shelzi had, or was going to write-off, as losses, his client would now owe millions on taxes and penalties.

327.    Shelzi's representative filed another Petition to remove J. Foistner, as a Manager by making misrepresentations and knowingly making false statements to the Court in an attempt to mislead the Court, that Foistner was unlawfully and without authorization acting as Manager of LLC. Shelzi also asked the court to remove J. Foistner as the "Tax Matter Person" for LLC. This, an impossibility, because Foistner, remained the only owner, of the company.

328.    Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

**COMMON LAW CAUSE OF ACTIONS**
**COUNT SIXTEEN**
**BREACH OF FIDUCIARY DUTIES**
**BUTLER BANK**

329.    The Plaintiffs re-allege paragraphs 1-328 as though restated in full herein and not inconsistent herein.

330.    In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them.

331.    As a commercial lender and bank, Butler Bank had a fiduciary relationship with the LLC, its borrower, and Plaintiff, L. Foistner, its borrower and personal guarantor and other LLC members and the manager under these circumstances and conditions alleged herein.

332.    Butler Bank breached its fiduciary duties to take all reasonable steps that were fair and reasonable as a commercial lender. Butler Bank, in concert with Shelzi and others, aided and abetted the many alleged felony crimes set forth herein for its financial gain.

333.    Butler Bank's fiduciary duties included a duty to act fairly and in good faith and a duty of care, regarding their level of attention and diligence in the business and operations of the LLC. Butler Bank breached its duty by not informing the LLC and Guarantor of Shelzi's fraudulent conduct, forgery and other crimes.

334.    Butler Bank also breached its fiduciary duty of loyalty by aiding and abetting Shelzi in the commission of the alleged crimes. Butler also failed to work honestly with the other member and manager and to provide timely notices of Shelzi's alleged crimes, the forged checks and exchanged checks, necessary information and protection for its borrowers.

335.    Butler Bank's intentional silence and refusal to protect its borrower's interests and rights from the many alleged criminal and fraudulent acts committed by the Defendants, once Butler Bank became aware of these crimes, further breached its duties, as a fiduciary, to the LLC.

336.    All of these actions, individually and as a concerted scheme, have harmed and damaged the LLC for which they are entitled to damages as a result of Butler Bank's breaches of its fiduciary duties.

337.    That the Defendants breach of duty has caused the Plaintiffs damages, whereby the Plaintiffs seek enhanced compensatory damages, attorney fees and costs.

## COUNT SEVENTEEN
### BREACH OF CONTRACT – BUTLER BANK LOAN
### AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

338.    The Plaintiffs re-allege paragraphs 1-337 as though restated in full herein and not inconsistent herein.

339.    In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by the LLC. The LLC reasonably relied upon them to their detriment.

340.    On or about April 12, 2005, Butler Bank entered into a real estate development loan agreement, the $1.8-million construction loan with the LLC.  This agreement established that $100,000 would be kept in reserve, not to be released, until the LLC had subdivided and recorded the 20th lot in the project. This $100,000 was earmarked to be paid to the Bedford design Consultants.

341.    On or about September 2005, Butler Bank entered into a contractual loan agreement with Shelzi and New Boston Estates LLC, as a 3rd party beneficiary and pre-approved contractor, for the lot 8-84-44, home construction project.

342.    Butler Bank breached its obligations and duties, express and implied, in the $1.8-million development loan contract and the lot 8-84-44 home construction contract.

343.    Butler bank breached its written contract when it allowed Shelzi to forge and convert the $100,000 earmarked for the Bedford design Consultants.

345.    Butler breached its written contract and committed fraud when it reissued checks from New Boston Estates LLC to Waldorf Estates Builders, LLC on lot 8-84-44, aiding and abetting Shelzi to forge and embezzle these loan funds.

346.    The LLC, specifically J. Foistner and K. Prive, made repeated requests for Butler Bank to meet its contractual obligations but Butler had refused to do so.

347.    As set forth above, Butler Bank has breached its contractual obligations which has caused harm for which the LLC seek damages.

348.    That as a direct result of the Defendants breach, the LLC have been damaged and are seeking, in addition, attorney fees and costs.

349.    The Butler Bank did breach the Implied Covenant of Good Faith and Fair Dealing as set forth herein.

## COUNT EIGHTEEN
## NEGLIGENCE – BUTLER BANK

350.    The Plaintiffs re-allege paragraphs 1-349 as though restated in full herein and not inconsistent herein.

351.    The Defendant, Butler Bank owed the LLC a duty to conduct its business operation in a commercially reasonable manner and to exercise due diligence and care.

352.    Butler Bank did breach the duty it owed to the LLC as follows but without limiting the foregoing:

a.    Did negligently administer the loan in a commercially unreasonable manner by allowing Shelzi to embezzle money;

b.    Did fail to properly and timely administer the $1.8-million construction loan;

c.    Did fail to properly and timely administer the $990,000, lot 8-84-44, home construction loan;

d.    Did negatively and fraudulently impact the Plaintiff's credit score, credit standing and reputation;

e.    Did fail to administer the requisition and disbursements of the $1.8-million development loan;

f.    Did fail to administer the requisition and disbursements of the $990,000, lot 8-84-44, construction loan; and

g.    Did fail to report the Shelzi crimes to law enforcement and Plaintiffs.

353.    That as a direct and proximate cause of the Defendants negligence, the Plaintiffs have been damaged.

74

354.    The Plaintiffs are seeking enhanced compensatory damages as a result of the Defendants wanton, willful, malicious or oppressive conduct.

## COUNT NINETEEN
## NEGLIGENT MISREPRESENTATION

355.    The Plaintiffs re-allege paragraphs 1-354 as though restated in full herein and not inconsistent herein.

356.    Butler Bank made certain representation concerning the $1.8-million development loan, the $990,000, Shelzi lot 8-84-44, home construction loan, and the $990,000, L. Foistner, lot 8-84-38, home construction loan, the new loans, the loan process, and what the Defendants could do, for the Waldorf Estates, 20 lot, Phase III project, owned by the LLC, which were uttered in an effort to induce the LLC to become bank customers.

357.    The representations were material and were false.

358.    The LLC justifiably relied upon the representations.

359.    That as a result of the negligent representations, the Plaintiffs have sustained substantial damages and are seeking enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY
## FRAUDULENT MISREPRESENTATION

360.    The Plaintiffs re-allege paragraphs 1-359 as though restated in full herein and not inconsistent herein.

361.    The Defendants representations were material facts relied upon by the LLC. Specifically that the loan proceeds of the $1.8-million loan would only be used for the development of the project and construction of the roads, not the personal use of Shelzi.

362. Specifically that the loan funds for the lot 8-84-44, construction loan, would only be used for the construction of the home and payment of approved contractors, not for the benefit of Shelzi.

363. Butler Bank promised to provide construction loans, for all 20 lots of the project, two at the time, after the construction of the two model homes on lot 8-84-44 and 8-84-38 which it failed to do.

364. The representations were made with fraudulent intent to induce the LLC to become bank customers.

365. That the LLC honestly believed the representations and justifiably relied upon them.

366. That as a result of the LLC reliance on the misrepresentations, the LLC has sustained damages including enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY ONE
## CONVERSION BUTLER BANK

367. The Plaintiffs re-allege paragraphs 1-366 as though restated in full herein and not inconsistent herein.

368. Butler Bank had exercised dominion and control over the stolen and forged money, all checks, with the intent to deprive the LLC and 3rd parties of their ownership interest. Upon information and belief, Butler Bank provided the checks and stolen money to Shelzi and her alleged Racketeers.

369. Butler Banks has and is interfering with the LLC rights of possession of these loan funds.

370. The LLC is entitled to an immediate right of possession of the loan funds.

371.    The LLC is demanding that Butler Bank pay these loan funds, for which they collected and received monthly interest payments together with enhanced compensatory damages as a result of Butler Bank's willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY TWO
## CONVERSION- COMPUTERS

372.    The Plaintiffs re-allege paragraphs 1-371 as though restated in full herein and not inconsistent herein.

373.    Shelzi had exercised dominion and control over the stolen computer, its software and accounting data, with the intent to deprive the LLC and 3rd parties of their ownership interest.  Upon information and belief, her agent and/or representative Hassel, destroyed the Foistner Law Offices computer server, the LLC notebook computer, the operating and accounting software licenses and the accounting data in order to aid Shelzi in defrauding the IRS and to destroy evidence during the IRS audit.

374.    The Defendants have interfered with the LLC's rights of possession of these computers and intellectual property.

375.    The LLC is entitled to an immediate right of possession of these chattels.

376.    The LLC is demanding that the Defendants pay for the value of these computers, electronic recovery cost and chattel of the LLC together with enhanced compensatory damages as a result of Defendants willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY THREE
## CIVIL CONSPIRACY

377.    The Plaintiffs re-allege paragraphs 1-376 as though restated in full herein and not inconsistent herein.

378.    The Defendants collectively did engage in acts as set forth herein constituting a conspiracy.

379.    Each Defendant, by his/her/its conduct, aided and abetted the conspiracy to defraud and render the LLC bankrupt and harm the Plaintiffs.

380.    As a result of the Defendants concerted acts, the Plaintiffs have been damaged as set forth herein.

**WHEREFORE**, the Plaintiffs demand trial by jury and judgment as follows:

1.    Damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank, jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of their racketeering activities, conspiracy and aiding and abetting in racketeering activities;

2.    Treble damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank pursuant to 18 U.S.C. § 1964(c);

3.    Damages against Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of the Defendants' conspiracy to commit common law fraud and other cause of actions along with enhanced compensatory damages to the extent allowed by New Hampshire law;

4.    Prejudgment interest on the amount of damages and/or losses that the Plaintiffs have sustained; and

5.  All costs of litigation incurred by the Plaintiffs including its reasonable attorneys' fees and experts' fees, pursuant to 42 U.S.C. § 1988 and/or 18 U.S.C. § 964(c);

# HILLSBOROUGH COUNTY SUPERIOR COURT
## NORTHERN DISTRICT

300 Chestnut Street
Manchester, N.H.  03101
(603) 669-7410


**RECEIPT OF WRIT**


Date:  September 3, 2009


Docket Number  09-C-522

Seff Enterprises & Holdings, LLC  v.   Butler Bank
Laurie Foistner                    Robert Chapman, Senior VP,
                                     Butler Bank
                                   Antonia Shelzi
                                   Hans Harro Hassel

     The writ in the above-captioned matter was filed with the
Clerk of this Court on September 3, 2009.

     The Plaintiff or his/her attorney is to attach a copy
of this receipt to identical copies of the original writ
and deliver them to the Sheriff or other legally authorized
entity for service on each named defendant.  Sufficient
copies shall be provided to allow for a service copy for
each named defendant and a copy for each officer completing
service to complete the return. The return copies shall be
filed with the court in accordance with Superior Court Rule 3.

                         By Order of the Court



                         John M. Safford, Clerk

JMS/jel

cc: William Aivalikles, Esq.
    60 Main Street
    Nashua, NH  03060

**M    imack County Sheriff's Offi**
SHERIFF SCOTT E. HILLIARD
163 North Main Street
Concord, NH 03301
Phone: 603-225-5583

BUTLER BANK
3 GEORGE STREET
LOWELL, MA 01852

AFFIDAVIT OF SERVICE

MERRIMACK, SS.                          September 8, 2009

    I, Deputy GLENN E LARAMIE JR, this date at _9:45_ a.m./p.m., summoned
the within named defendant BUTLER BANK as within commanded by leaving at
the office of William M. Gardner, Secretary of State of New Hampshire, its
true and lawful Attorney for the service of process under, and by virtue
of, Chapter 510:4, New Hampshire Revised Statutes Annotated, as amended, a
true and attested copy of this RECEIPT OF WRIT, and I paid the Secretary of
State ten ($10.00) dollars as his fee for accepting service.


FEES

Service      $15.00
  PD to SOS   10.00
  Postage      1.00
  Travel       2.00

TOTAL        $28.00


                              _____
                              Deputy GLENN E LARAMIE JR
                              Merrimack County Sheriff's Office

**Merrimack County Sheriff's Office**
SHERIFF SCOTT E. HILLIARD
163 North Main Street
Concord, NH 03301
Phone: 603-225-5583

ROBERT CHAPMAN
26 LUZ DRIVE
LOWELL, MA 01854

(CORRECTED) AFFIDAVIT OF SERVICE

MERRIMACK, SS.                                        September 22, 2009

I, Deputy GLENN E LARAMIE JR, this date at *9:45* (a.m.)/p.m., summoned the within named defendant ROBERT CHAPMAN, Senior VP, Butler Bank, as within commanded by leaving at the office of William M. Gardner, Secretary of State of New Hampshire, its true and lawful Attorney for the service of process under, and by virtue of, Chapter 510:4, New Hampshire Revised Statutes Annotated, as amended, a true and attested copy of this RECEIPT OF WRIT, and I paid the Secretary of State ten ($10.00) dollars as his fee for accepting service.

Due to a scrivner's error, this was previously submitted (9/09/09) under the name Robert Butler.

FEES

| | | |
|---|---|---|
| Service | $ | .00 |
| PD to SOS | | .00 |
| Postage | | .00 |
| Travel | | .00 |
| TOTAL | $ | .00 |

Deputy GLENN E LARAMIE JR
Merrimack County Sheriff's Office

HILLSBOROUGH COUNTY
SUPERIOR COURT NORTH
2009 SEP 30 P 12: 23

**Merrimack County Sheriff's Office**

SHERIFF SCOTT E. HILLIARD
163 North Main Street
Concord, NH 03301
Phone: 603-225-5583

ROBERT BUTLER
26 LUZ DRIVE
LOWELL, MA 01854

## AFFIDAVIT OF SERVICE

MERRIMACK, SS.                                    September 8, 2009

I, Deputy GLENN E LARAMIE JR, this date at _9:45 (a.m.)/p.m._, summoned the within named defendant ROBERT BUTLER, Senior VP, Butler Bank, as within commanded by leaving at the office of William M. Gardner, Secretary of State of New Hampshire, its true and lawful Attorney for the service of process under, and by virtue of, Chapter 510:4, New Hampshire Revised Statutes Annotated, as amended, a true and attested copy of this RECEIPT OF WRIT, and I paid the Secretary of State ten ($10.00) dollars as his fee for accepting service.

FEES

| | |
|---|---|
| Service | $15.00 |
| PD to SOS | 10.00 |
| Postage | 1.00 |
| Travel | .00 |
| TOTAL | $26.00 |

Deputy GLENN E LARAMIE JR
Merrimack County Sheriff's Office

HILLSBOROUGH COUNTY
SUPERIOR COURT/SOUTH
2009 SEP 30 P 12:23

# Merrimack County Sheriff's Office
SHERIFF SCOTT E. HILLIARD
163 North Main Street
Concord, NH 03301
Phone: 603-225-5583

ANTONIA SHELZI
10 TOWNSEND ROAD
BELMONT, MA 02478

## AFFIDAVIT OF SERVICE

MERRIMACK, SS.                               September 8, 2009

I, Deputy GLENN E LARAMIE JR, this date at *9:45* a.m./p.m., summoned
the within named defendant ANTONIA SHELZI as within commanded by leaving at
the office of William M. Gardner, Secretary of State of New Hampshire, its
true and lawful Attorney for the service of process under, and by virtue
of, Chapter 510:4, New Hampshire Revised Statutes Annotated, as amended, a
true and attested copy of this RECEIPT OF WRIT, and I paid the Secretary of
State ten ($10.00) dollars as his fee for accepting service.

FEES

| | |
|---|---|
| Service | $15.00 |
| PD to SOS | 10.00 |
| Postage | 1.00 |
| Travel | .00 |
| TOTAL | $26.00 |

Deputy GLENN E LARAMIE JR
Merrimack County Sheriff's Office

**Merrimack County Sheriff's Office**
SHERIFF SCOTT E. HILLIARD
163 North Main Street
Concord, NH 03301
Phone: 603-225-5583

HANS H HASSEL
31 LEE STREET
CAMBRIDGE, MA 02139

AFFIDAVIT OF SERVICE

MERRIMACK, SS.                                    September 8, 2009

I, Deputy GLENN E LARAMIE JR, this date at *9:45* (a.m)/p.m., summoned
the within named defendant HANS HARRO HASSEL as within commanded by leaving
at the office of William M. Gardner, Secretary of State of New Hampshire,
its true and lawful Attorney for the service of process under, and by
virtue of, Chapter 510:4, New Hampshire Revised Statutes Annotated, as
amended, a true and attested copy of this RECEIPT OF WRIT, and I paid the
Secretary of State ten ($10.00) dollars as his fee for accepting service.

FEES

Service        $15.00
  PD to SOS     10.00
  Postage        1.00
  Travel          .00

TOTAL          $26.00

_____
Deputy GLENN E LARAMIE JR
Merrimack County Sheriff's Office

**A True Copy Attest**

_____
Deputy Sheriff

# HILLSBOROUGH COUNTY SUPERIOR COURT
## NORTHERN DISTRICT

300 Chestnut Street
Manchester, N.H.  03101
(603) 669-7410


## RECEIPT OF WRIT


Date:  September 3, 2009


Docket Number   09-C-522

Seff Enterprises & Holdings, LLC   v.   Butler Bank
Laurie Foistner                          Robert Chapman, Senior VP,
                                            Butler Bank
                                         Antonia Shelzi
                                         Hans Harro Hassel

     The writ in the above-captioned matter was filed with the
Clerk of this Court on September 3, 2009.

     The Plaintiff or his/her attorney is to attach a copy
of this receipt to identical copies of the original writ
and deliver them to the Sheriff or other legally authorized
entity for service on each named defendant.  Sufficient
copies shall be provided to allow for a service copy for
each named defendant and a copy for each officer completing
service to complete the return. The return copies shall be
filed with the court in accordance with Superior Court Rule 3.

                              By Order of the Court



                              John M. Safford, Clerk


JMS/jel

cc: William Aivalikles, Esq.
    60 Main Street
    Nashua, NH  03060

# The State of New Hampshire

## SUPERIOR COURT

HILLSBOROUGH COUNTY
NORTHERN DISTRICT

(  ) COURT
(X ) JURY

### WRIT OF SUMMONS

Seff Enterprises & Holdings, LLC
3 Foxberry Drive
New Boston, NH  03070

v.

Laurie Foistner
3 Foxberry Drive
New Boston, NH  03070

Butler Bank
3 George Street, Lowell, MA  01852

Robert Chapman, Senior VP, Butler Bk
26 Luz Drive, Lowell, MA  01854

Antonia Shelzi
10 Townsend Road, Belmont, MA 02478

Hans Harro Ha~ ~l
31 Lee Street  Cam~ridge,MA  02139

The Sheriff or Deputy of any County is ordered to summon each defendant to file a ~ritte~ ~ppearance with the Superior Court at the address listed below by the return day of this writ which is th~ first ~esday of <u>October</u> , <u>2009</u> .

YEAR

MONTH

The PLAINTIFF(S) state(s):

SEE ATTACHED.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

9/1/09

INDORSER (sign and print name)

DATE OF WRIT

Manager of Seff Enterprises
& Holdings, LLC

**NOTICE TO THE DEFENDANT**

The Plaintiff listed above has begun legal action against you. **You do not have to physically appear** in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you will then be obligated to pay.

Witness, Robert J. Lynn, Chief Justice, Superior Court.

John M. Safford, Clerk
NH Superior Court Hillsborough County
Northern District
300 Chestnut St
Manchester NH 03101-2490
(603) 669-7410

213-003-3

SIGNATURE OF PLAINTIFF/ATTORNEY

William Aivalikles

PRINTED/TYPED NAME

60 Main Street, Suite 230

ADDRESS

Nashua, NH  03060    /603-880-0303

PHONE

# INTRODUCTION

This Writ is brought by Seff Enterprises and Holdings, LLC (hereinafter sometimes referred to as "LLC" or "Plaintiffs") and Laurie Foistner (hereinafter sometimes referred to as "L. Foistner" or "Plaintiffs"), a former owner of a 50% interest in the LLC and the Guarantor of a Promissory Note with the Butler Bank against the Butler Bank of Lowell Massachusetts and a group of individuals ("Defendants") for their ongoing alleged conspiracy to run their bank and business as a criminal enterprise as that term is used under the Federal Racketeering Influence Corrupt Organizations Act, RICO, 18 U.S.C. § 96, *et seq*., depriving Plaintiffs of the intangible right of honest services through fraud and criminal means.

Plaintiffs also complain that the Bank and the Individual Defendants, acting as one, deprived them of their fundamental rights to conduct their businesses and to enjoy their quiet right to life, liberty, freedom and pursuit of happiness, by allegedly committing criminal felony acts against the Plaintiffs' persons, properties and businesses. These crimes include, but are not limited to Felony Perjury, U.S.C. § 1621, *et seq.*, Felony Forgery U.S.C. § 513 – Securities of the States and Private Entities, Mail Fraud 18 U.S.C. § 1343 – Fraud by Wire, 18 U.S.C. § 1349 – Attempt and Conspiracy, Stolen Goods 18 U.S.C. § 2314 – Interstate Transportation of Stolen Goods, Securities and Money, Fraud 18 U.S.C. § 1028 – Forging Corporate Records, 18 U.S.C. §1028A – Aggravated Identity Theft, Tax Fraud 26 U.S.C. § 7201 – Attempts to Evade or Defeat Tax, 26 U.S.C. § 7206 – Fraud and False Statements, 26 U.S.C. § 7207 – Fraudulent Returns, Statements Other Documents, 26 U.S.C. § 7212 – Attempts to Interfere with Administration of Internal Revenue Laws and IRS audit, and, Conspiracy – Crime against the United States of America, 18 U.S.C. § 371 – Conspiracy, Bank Fraud 18 U.S.C. § 1344, §1344(2), Extortion 18 U.S.C. § 1951 and other crimes as defined in Federal and New Hampshire law.

## PARTIES

1.      Seff Enterprises & Holdings, LLC, Plaintiff, of 3 Foxberry Drive, New Boston, New Hampshire  03070.

2.      Laurie Foistner of 3 Foxberry Drive, Plaintiff, New Boston, New Hampshire 03070.

3.      Defendant Butler Bank, Inc., ("Butler Bank" or "the Bank"), is a Commercial Banking Corporation, conducting business at 3 George Street, Lowell, Massachusetts 01852.

4.      Defendant Robert Chapman, ("Chapman"), Butler Bank Senior Vice President, resides at 26 Luz Drive, Lowell, Massachusetts 01854.

5.      Defendant Antonia Shelzi, ("Shelzi"), resides at 10 Townsend Road, Belmont, Massachusetts 02478.

6.      Defendant Hans Harro Hassel, ("Hassel"), resides at 31 Lee Street, Cambridge, Massachusetts 02139.

## FACTS

7.      The LLC was formed on or about August 28, 2000, pursuant to the New Hampshire Limited Liability Act, as a "Single Manager Managed - Limited Liability Company, by Laurie J. Foistner, 50% Member, Louis A. Maynard (Maynard), 50% Member, and Joseph A. Foistner, Esq. (J. Foistner), its sole and only manager.

8.      In order to begin operations, L. Foistner contributed $1.24-million to the company and L. Maynard contributed $150-thousand, to be recorded on the books of the company, as well as on the Operating Agreement signed and executed between the Members and Sole Manager.

9.     The LLC's primary purpose for formation, as shown on the Operating Agreement, was to fund and file a Federal RICO Law Suit, 18 U.S.C. § 96, against the Town of New Boston and many of its Public Officials, who allegedly had been using their position with the Town, under Color of Statute, for Criminal Enterprise, for more than thirty (30) years.

10.    It is averred that these Public Servants had intentionally and with malice, bankrupted four real estate developers in town, from 1980 through 2000.

11.    These alleged Racketeers had embezzled more than $17-million out of the town's treasury, containing federal funds, over a period of thirty (30) years, while they, as Public Officials, were the guardians of that treasury.

12.    In order to fund and pay for the New Boston RICO Law Suit, containing more than 13,000 individual documents as evidence, anticipated to cost between $2.5-million and $4-million in legal fees, L. Maynard agreed to re-mortgage his only business and home, the Molly Stark Restaurant, a well established land mark in Southern New Hampshire. His home and business, appraised in 2000, had a market value of $1.1-million, with an outstanding mortgage in 2000, in the amount of $23-thousand.

13.    L. Foistner and J. Foistner agreed that they would complete the development of their Waldorf Estates Subdivision, Phase III, 20 lots, the LLC's only asset, appraised in 2000 at $2.7-million, with an outstanding mortgage lien, recorded against the title, in the amount of $850-thousand. $16.5-million (25% profit) from home construction and sales was anticipated from the 20 lots remaining in phase III of the project.

14.    In fact, both L. Maynard and the Foistners borrowed $850-thousand from several Hard Money Lenders, (the Muffaletto Note), at 38% percent annual interest, in 2000, pledging the Molly Stark Restaurant and the Phase III, 20, lot subdivision, as collateral.

3

15.     This high annual interest was required to be paid to Street Lenders, because ordinary bank financing was not available to the LLC, while it was litigating several civil claims, then pending in 2000 and 2001, in the Hillsborough County Superior Court, against the Town of New Boston.

16.     The LLC's Operating Agreement, Article III. Management of the Company provided unlimited and unrestricted, total and final authority on all matters to its only Sole Manager, J. Foistner. "Full and Complete Authority" was vested in the only manager.

17.     The development and construction of the Waldorf Estates subdivision, 54 lots began in 1985 by the Foistners. From 1985 through present, 35 estate homes have been constructed and sold, some with more than 28,000 square feet of living space, located on 15 mountain-view acre house lots, with some of the highest views and elevations located in Southern New Hampshire.

18.     The Foistners, through their companies, have been the continuous owners of this project and its copyrighted approvals and drawings and engineering documents, since 1985, now for 24 years.  During these 24 years, the Foistner's continuously suffered many millions of dollars in money damages and personal hardship, including human rights violations, constitutional violations, crimes against their persons and property, at the hands of these alleged Town of New Boston Racketeers.

19.     L. Maynard, an "Outsider", like the Foistners, allegedly suffered the same damages and harm, at the hands of the very same individuals, the Dodges, whom by 1985, had driven all businesses owned by "Outsiders", out of Town, effectively bankrupting all "Outsiders", while they, the Dodges, subdivided their lands without having to adhere to local

subdivision regulations and without having to construct roads, on their lands, when other LLCs and Outsiders were required to do so.

20.     Upon formation of the LLC, L. Maynard, L. Foistner and J. Foistner established by Company Votes as evidenced by Minutes, which established that J. Foistner, the sole manager, was not required, in fact would intentionally refuse, to be required to perform any of the bookkeeping and accounting functions, or to manage any money payments, check writing and invoicing functions of the company.  It was voted that Foistner was to receive a monthly Fee, in the amount of $10-thousand, for his required services as the manager.

21.     L. Maynard maintained all checkbooks, bookkeeping records, check writing and creation and record keeping of the accounting records for the LLC, from inception, August 2000 through December 22, 2002.  Maynard was the only authorized signor on any and all checking accounts, owned by the LLC, from 2000 through 2002.  Foistner refused all check writing authorities. Foistner managed all business and development management requirements, such as financing, road construction, surveying, engineering, sales, and primarily, the hiring of RICO Experts and Lawyers, to include the gathering of evidence, managing the many attorneys, at the time litigating the Town of New Boston litigation, preparing for the upcoming RICO Law Suit.

22.     On or about December 2002, L. Maynard informed the Foistners that he was running out of cash, because the Town of New Boston had intentionally and unlawfully delayed the Waldorf Estates subdivision, for another 28 months, August 2000 through December 2002. All this time, both L. Maynard and the Foistner were paying the 38 percent monthly interest to their Street Lenders, while the town systematically and with a plan and design bankrupted both in order to stop the forthcoming RICO litigation against them and the town.

23.    It became crystal clear, to all involved, by December 2002, attorneys, engineers and road builders that without a RICO Law Suit in the Federal Court, holding the Town of New Boston accountable for its alleged criminal, unconstitutional, unlawful and corrupt acts, used against the Plaintiffs, the Waldorf Estates subdivision and other "Outsiders" that the land development and road construction could never be completed and the subdivision approvals could never be obtained through legal means.

24.    By 2002, the Plaintiffs had hired Attorney Morgan Hollis, ("Hollis"), after dismissing all four of its earlier hired law firms, managing the ongoing New Boston litigations and all municipal legal issues. The Law Firm of Orr & Reno, P.A. (Orr & Reno), have been the Foistner's lawyers since 1995, on the same Waldorf Project.  Orr & Reno has been the Plaintiffs', L. Maynard's and the remaining LLC member's lawyers since 2003, on the same Waldorf Estates Project.

25.    In fact, by December 2002, Hollis had completely stopped the town's unlawful acts, settled most of the outstanding disputes and even accomplished to force the town to preliminarily approve the subdivision, changing the Phase III portion of the land from 18 lots to 20 lots. Maynard however was out of money and simply wanted out.

26.    On or about December 23, 2002, Antonia Shelzi ("Shelzi") purchased L. Maynard's 50% Ownership Interest of Seff, by paying Maynard the sum of $250,000.00.  Shelzi joined Seff after conducting her Due Diligence.  Shelzi was represented by Attorney and CPA Michael Di Iulio ("Di Iulio"), CPA Brian Becks, ("Becks") and Attorney Gregory Oberhauser, ("Oberhauser").  Shelzi, while she was represented by two (2) CPA's and two (2) lawyers, provided the LLC with her Financial Statements, depicting her total assets to exceed $27,115,000.00. Her Owners Equity was shown to be $18,753,010.

6

27.    When Shelzi purchased Maynard's Ownership Interest, she stepped into Maynard's shoes as to the accounting and bookkeeping responsibilities.

28.    Seff's Operating Agreement and Corporate Votes, all reviewed By Shelzi and Oberhauser, remained in force as company policy.

29.    Attorney Oberhauser managed the closing for Shelzi. All signed, accepted and executed written contracts, their specific terms known as: "PURCHASE CONTRACT", "PARTICIPATION AGREEMENT", "ASSIGNMENT AND BILL OF SALE", "GENERAL AND MUTUAL RELEASES", and "MUTUAL RELEASE SETTLEMENT AGREEMENT", (hereinafter referred to as ("Purchase Contracts").

30.    Specifically, Shelzi contractually obligated herself to become the Financier of the LLC.  Shelzi received her Ownership Transfer Certificate, ownership now, as of December 23, 2002, for her promise to pay, finance and match L. Foistner's contribution as recorded on the books of the company.

31.    Shelzi knew that the upcoming RICO litigation was needed in order to continue forward with the Waldorf Estates development.  Shelzi also knew and fully understood that several million dollars in cash contributions, were required from her to fund the needs of the LLC and to match the other 50% Member.

32.    Specifically, Shelzi contractually obligated herself to establish financing with a local bank, within six months, no later than June 23, 2003, now that the New Boston litigation had ended and the town approvals had been obtained, by Hollis, for the Waldorf Development. Bank financing would lower the monthly interest rate of 38 percent paid to the Street Lenders, to 8.5% to be paid to a Commercial Bank.  The mortgage lien on Maynard's Molly Stark

Restaurant, now that Maynard was no longer a member of the company, was contractually required to be released by June 23, 2003.

33.     Shelzi contractually agreed to finance the RICO litigation for the first six months, immediately hire lawyers, paralegals and other employees, a bookkeeper, an accountant, sales staff and other, all listed in the Purchase Contracts.  Shelzi also agreed to lease office space to house the RICO team, purchase equipment and vehicles to complete the Waldorf Project, market and sell the same.

34.     Shelzi's sole intent and reason for joining the LLC, as its new 50%Member, was her absolute requirement, and contractual stipulation, allowing her to capitalize on the LLC's losses, for tax years 2000, 2001, 2002, 2003 and 2004, all resulting and reporting, millions of dollars of legal business expenses, as losses, to develop the project, along with its many law suits and legal requirements. During those tax years, while the Waldorf Estates subdivision was constructing roads and seeking town and state approvals to sell lots, no sales or other income was realized by the LLC, resulting in reporting only losses to the IRS.

35.     Shelzi demanded and contracted to receive, millions of dollars in tax savings, by legally obtaining the LLC's losses for those years.  In fact, Shelzi spent her tax dollars owed to the IRS, at the advice of her Counsel and CPA's, to purchase L. Maynard's Ownership Interest.

36.     Shelzi's Purchase Contracts, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, reads as follows:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

37.     Prior to December 23, 2002, during Shelzi's due diligence, her CPA and Lawyer, DeIulio gave notice to J. Foistner by saying, "If things don't go as planned in the future for Toni, we will be filing a law suit for an accounting".

38.     Prior to Shelzi becoming a Member of the LLC, on or about May 2002, Shelzi sent two of her employees / contractors to the offices of the LLC, located at 100 State Street, Boston, Massachusetts in order to move the LLC's property, computers, furniture and 30 years of evidentiary documents, approximately 13,000 documents, to the company's new offices in Lowell, Massachusetts.  These two employees were Hans Harro Hassel ("Hassel") and Jim Chubb ("Chubb"), both former Massachusetts Prison Inmates and Criminals.  Chubb, a convicted Felon and Drug Dealer, freshly released from the Massachusetts Prison System in 2002.  Hassel was imprisoned in 1993, as Massachusetts Dead Beat Dad Number Two, employed by Shelzi since his release from prison in 1994.

39.     Chubb explained to J. Foistner, in front of witnesses, one, another licensed Massachusetts Attorney that he had agreed, to serve a prison term for Shelzi, the actual Drug Dealer and guilty party, for her promise to pay him $10-thousand dollars, when he got out of prison.  He further explained that Shelzi was now employing him and had reneged on the $10-thousand she had promised. Both Hassel and Chubb explained that Shelzi's business in Cambridge employed newly released Felons on a regular basis – part of the Commonwealths Justice System. Hassel further explained that Shelzi's Brother, a Rhode Island Attorney, had left the Country and traveled to the Orient in order to escape prosecution for this Drug Deal gone bad.

40.     Shelzi's alleged racketeering enterprises, her businesses in Massachusetts, employs, as a mode of operation, known felons and illegal aliens. Individuals and undesirables

which the law defines and labels as "Convicted Felons", the identical legal status, given by our criminal justice system, to Shelzi.

41.    Her criminal status as a Convicted Felon was unknown to the Plaintiffs when Shelzi joined the LLC. The Andover facility was specifically rented and constructed to house the new RICO Lawyers, the RICO Team along with all the evidentiary documents and office equipment. Shelzi in fact maintained an office in that facility in Andover, occupied by Hassel, her Financial and Business Manager. This office occupied by Hassel and Shelzi, maintained all accounting records, cancelled checks, bank statements, invoices, contracts, deposit slips, engineering documents and any and all documents owned by the Plaintiffs, pertaining to the Waldorf Project and the Rico Law Suit.

42.    Shelzi and Hassel had unrestricted access to all the documents and the computer located in their office. The computer in their office maintained all electronic data, including Peachtree Accounting data. Shelzi and Hassel had the only password for that computer. The computer was part of a Peer to Peer, Windows Network (without a server).

43.    By January 2003 Shelzi and J. Foistner prepared and approved a detailed Operating Budget depicting the employees to be hired, the equipment to be purchased and the future RICO Attorneys to be hired to bring the RICO Claim, until that time, managed by Oberhauser. This Operating Budget was approved, voted and recorded by Minutes, as the LLC's Operating Budget and became approved company policy.

44.    By January 2003, J. Foistner hired a full time Bookkeeper, Office Manager, Accountant and Sales Staff. Additionally J. Foistner signed and executed the lease for the Andover RICO Office and contracted to complete the leasehold improvements to install walls, wiring, doors and ceilings. Foistner Law Offices P.C. (Foistner Law) began purchasing

10

computers, office equipment and furniture and hired paralegals to manage the upcoming RICO Suit.

45. From March 2001 through January 2004, Foistner Law interviewed lawyers in Boston, Massachusetts and New Hampshire, attempting to find an experienced law firm to manage the RICO litigation. More than 13 separate lawyers and their firms were interviewed. Each interview, requiring a total review of 30 years of documented evidence and damages, depicting hundreds of RICO Crimes allegedly committed by the Town of New Boston and its corrupt Public Servants.

46. Shelzi fully funded the financial requirements depicted and approved in the Budget for the months of January, February and March 2003 only. She partially paid the April and May invoices and by June stopped funding all requirements for which she was contractually obligated.

47. By May 2003, Foistner was required to dismiss all employees since Shelzi would not fund their salaries nor her promised bank financing was not received.

48. By May 2003, J. Foistner had been employed as a manager since August 2000. Foistner was entitled to be paid for forty (40) months at the rate of $10,000.00 per month. By May 2003, Foistner had not drawn a single Penny for his fees, by then amounting to more than $ 400,000.00, with interest. In fact, Foistner never received a Penny for his labor and services, from 2000 through present, 2009, at all times required to provide legal services and services as the LLC's manager.

49. Instead of receiving compensation for his services, Foistner was made to contribute more than $5.5-million in the form of Cash and Invoices, for legal services, provided by Foistner Law, supporting the RICO Claim and civil litigation, from 2000 to 2009.

50.     Shelzi materially breached her contractual obligation to establish bank financing by June 23, 2003, failing to have the Street Lenders mortgage liens released from L. Maynard's Molly Stark Restaurant and home, causing Maynard to eventually become homeless.

51.     As Shelzi struggled to fund the operations of the LLC, only paying the absolute minimum invoices, usually 90 to 120 days behind, the LLC's business reputation began to suffer. Shelzi, on more than three occasions, wrote, issued and signed bank drafts, made payable to the LLC, deposited into the LLC's bank, Citizens Bank, amounts as high as $100-thousand, which bounced, due to insufficient funds.

52.     Vehicle payments were not made, lease payments defaulted, employee employment contracts were breached, several legal claims were lost, the Statute of Limitation deadline expired on those claims, because Shelzi failed to fund their legal fees. The RICO litigation was not being funded.

53.     Shelzi's key financial manger, Hassel, was so disgusted with Shelzi's material breaches that he wrote a sworn Affidavit, dated October 31, 2003.  In that Affidavit Hassel stated that Shelzi usually buys into businesses and always financially abandons her partners, in an attempt to bankrupt the business and to swallow up her partners.  In the manager's opinion, it became clear that Shelzi was a Fraud, intending only to bankrupt the LLC, in order to gain control of the assets and the tax losses.

54.     On or about August 2003, Shelzi introduced her close friend and banker, Senior Vice President of the Butler Bank, Mr. Robert Chapman ("Chapman") to the LLC and personally guaranteed a $1.5-million commercial loan from the Butler Bank, earmarked for the construction of Roads and to complete the development of the Waldorf Project, now without employees, staff, and accountants.

12

55.     The only Borrower on this loan was the LLC.  The two members Shelzi and L. Foistner were obligated to personally guarantee the loan.  Only J. Foistner, the LLC's only Manager was authorized to manage the loan, draw funds, disburse funds, make interest payments, and manage the repayment.  Shelzi and L. Foistner had no authority to make any decision on this $1.5-million loan.

56.     The $1.5-million Butler Bank loan was inadequate from the start, late and underfunded, due to the fact that Shelzi had missed and breached the June 23, 2003 deadline date, to pay off the Street Lenders, thereby causing more than a $160-thousand Roll Over Fee, to be paid out of the Butler Bank loan proceeds originally earmarked for road construction.  The road was contracted to costs $1.2-million, including engineering, road construction, pavement, erosion controls, supervisory labor and interest.

57.     Hollis and Foistner were told at the closing, without any advance notice by Butler's Closing Attorney that they were short by $160,000.  These Roll-Over Fee damages were caused by Shelzi's material breaches of the Purchase Contract.

58.     During a meeting held at Hollis Law Offices, on or about November 11, 2003, Shelzi admitted that she had no money left, as she had promised, to pay her consideration for her 50% Ownership.

59.     In order to continue operations, now without employees and staff, the LLC was required to borrow money from other Street Lenders, Shelzi's Brother, Attorney Domenic Shelzi, and others.  Because of Shelzi's alleged fraud and material breaches, the LLC was now required to borrow money and pay interest and points for money that was originally contracted, to be received as a contribution from Shelzi, interest free, without points, Shelzi's Consideration, for receiving her Ownership Interest.

13

60.     For the LLC and the Foistners to borrow money to cover Shelzi's breaches, was not a contract requirement in the Purchase Documents.  Shelzi received up to a 50% Ownership, 10 house lots for her written promises to finance and fund the operations. Now Shelzi wanted to own her 50% of the project and have the remaining members finance the project out of their pockets.

61.     Because of Shelzi's alleged fraud and material breaches, J. Foistner borrowed $350-thousand from Maynard, in order to pay for the road construction of the project, because the funds remaining at the Butler Bank were inadequate.  Butler Bank was aware of this.

62.     J. Foistner was required to manage the LLC, full time – 65 plus hours each week, from 2002 through 2009, without receiving any compensation, while Shelzi, demanding her 50% Ownership, did not produce a single labor hour for the benefit of the RICO Suit or the completion of the project.

63.     Foistner managed all RICO litigation requirements, 2000 through 2006, managed 108 months, nine years of Planning Board, Selectmen and Town meetings, surveyed the project, engineered the roads and driveways, supervised on a daily basis, six day per week, from 5:00 AM each day till 8:00 PM, the construction of the 3,000 ft. road, the financing and financial management (not the accounting) of the Company,  the IRS Audits for the LLC, marketing, home construction and 50 months of civil litigation against Shelzi, 2005 through 2009.

64.     Because of Shelzi's Fraud and material breaches, the Foistners borrowed an additional $2.1-million, from Banks and Relatives, to pay for the funding requirements of the LLC.

65.     On or about July 2003, J. Foistner and L. Maynard visited the law Offices of Orr & Reno, P.A. (Orr & Reno), in order to hire Orr & Reno as their RICO Lawyers.  Foistner and

14

the Waldorf Estates Subdivision Project, along with its many complicated legal issues, law suits and claims, were already Clients of Orr & Reno, in light of the fact that Foistner and the predecessor company which owned Waldorf Estates, owned by J. Foistner, had hired and paid Orr & Reno in 1995. This has been admitted by Orr & Reno in their Sworn Statements / Affidavits.

66.    When J. Foistner and L. Maynard, as owners, managers and members of the LLC, visited Orr & Reno, in Concord New Hampshire, representing the LLC, the then only owner of the project, Shelzi was already a member of the LLC. Only the LLC had the authority to bring a RICO Claim against the Town of New Boston, and all of the LLC's members and manager, including Shelzi, were asking Orr & Reno to review the many documents and evidence to bring the RICO Claim.

67.    Confidential information was communicated to Attorney Martha Van Oot, ("Van Oot") regarding Waldorf Estates, the LLC its members and manager, Seff's legal issues, its finances, its accounting and damages caused by the Town of New Boston. Although Orr & Reno did not accept to be Advocates on the RICO Claim, and in fact refused to invoice for their services and did not receive or invoice any fees, Van Oot provided legal advice to the LLC, L. Maynard, L. Foistner, and Shelzi, creating a valid Attorney Client Relationship, to the already existing Attorney Client Relationship, formed in 2003.

68.    On or about December 2004, the law firm of Debruckeyre, Patrillo and Fulton of Salem, New Hampshire, were retained to become the Advocates for the RICO Claim. Attorney Peter Fulton ("Fulton") accepted the assignment after completing a six months evaluation of the claims. The LLC paid more than $130-thousand for this Evaluation and the RICO Claim was filed in Federal Court on or about June 04, 2004. Shelzi paid nothing.

15

69.     In 2004, Shelzi signed a Fee Agreement with Fulton, becoming a named Plaintiff. Under this fee Agreement Shelzi is wholly and severally liable for all legal fees to Fulton, including the legal fees and costs of all contract lawyers under Fulton's control. This included Foistner Law, who has been employed for this effort since 2001 without compensation.

70.     By the time the RICO Claim was filed in the Federal Court, Foistner Law, J. Foistner, L. Foistner and L. Maynard had paid more then $760-thousand to fund this law suit. Shelzi never paid a single Penny for her legal representation, materially breaching her contract.

71.     Instead of honoring her contractual agreements and obligations set forth in the Fee Agreement, Shelzi materially breached that contract as well. Shelzi's alleged fraud and material breach of her contractual obligations, set forth in the Purchase Contract, as well as the Fulton Fee Agreement, were the sole cause for the RICO Claim being voluntarily dismissed in 2006, after J. Foistner was forced to file a Motion for Voluntary Non-Suit, because Shelzi was not paying her share of the legal fees.

72.     On or about July 2004, the LLC, Maynard and the Foistners gained knowledge from Hassel and a local bank that Shelzi was a Convicted Felon, Convicted Drug Dealer and former Massachusetts Prison Inmate, having served time in the Massachusetts prison system.

73.     Shelzi's status as a Convicted Felon, voided her ownership in the LLC, required, at the managers sole discretion, by the Operating Agreement, Articles III, and Exhibit C. No American Business is required to conduct business with Felons and Drug Dealers. Instead of disclosing this information, her status as a Convicted Felon, to the LLC, its remaining members and L. Maynard, Shelzi attempted to gain her 50% Ownership Interest, through fraud, deception, misrepresentation and criminal conduct.

74.     Although Shelzi materially breached all of her contractual obligations and brought much harm, millions of dollars in losses, caused by the delay of the Waldorf subdivision from 2002 through 2009, 84 months, to the LLC, failing to finance the contractual obligations set forth in the Purchase Contracts and the Fulton Fee Agreement, Shelzi and her CPA, still insisted that she had the right, to write off the millions of dollars in business expenses, as losses, starting with tax year 2001.

75.     On or about April 2003, after Shelzi became a member of the LLC on December 23, 2002, Shelzi's CPA, Brian Becks (Becks) and Shelzi contacted J. Foistner, instructing him to prepare the LLC's Federal Tax Returns in order for Shelzi to receive her deductions on her personal tax returns.

76.     L. Maynard and J. Foistner, were not required to file, and had not prepared and filed any tax returns for tax years 2000, 2001, 2002, and 2003 since no income was realized, by the LLC in those years, only expenses.  Millions of Dollars in losses.

77.     In 2003, J. Foistner provided the bookkeeping records and financial data, maintained and generated by Keith Prive, (Prive), under Shelzi's supervision, generated by Peachtree Accounting, 2003 Complete Accounting, to Becks for tax years 2001, 2002 and 2003, along with a preliminary 1065 Federal IRS tax return for tax years 2001, 2002, and 2003.  J. Foistner and Keith Prive, were never paid or compensated by Shelzi for this work.  Their invoices remain unpaid to this date.

78.     On or about May 2003, upon receipt of this accounting information, Becks acknowledging, on behalf of his Client Shelzi, that he was in receipt, of the LLC's accounting records for 2001, 2002 and 2003, ordered changes to be made to the tax returns.

79.     Shelzi was the Keeper of these records. These records were contractually required to be kept, maintained and paid for by Shelzi, the owner / member, not J. Foistner the non-owner / manager, and certainly not Keith Prive, the unpaid office manager, as mandated by the LLC's corporate votes. Becks demanded that Shelzi's share of losses would be changed from 50% to 85%, allowing Shelzi more losses, or funds that would not be received from Shelzi.

80.     After Becks was satisfied with the LLC's tax returns and Shelzi's share of the losses, Becks amended Shelzi's personal, 1040 Federal tax return, for tax year 2001 and increased Shelzi's write-offs by more than $800-thousand dollars, from the original return, prepared, signed and filed by Becks, as the "Paid Tax Preparer". Becks also reported the losses for 2002, 2003 and 2004, in a similar manner as Shelzi's "Paid Tax Preparer", acknowledging that he was in receipt of all accounting records, on behalf of his client Shelzi, for those tax years.

81.     In order for Shelzi to satisfy the "Recourse Liabilities" requirement, allowing her to legally write off the losses, Becks claimed and demanded for her, on her 2001 personal tax returns that Shelzi sign and execute two (2) separate Promissory Notes with Personal Guarantees, agreeing to pay and guaranteeing Foistner Law Offices and JFL Trust $459,856.00 and $673,303.00.

82.     In fact, Shelzi, under counsel by CPA Becks insisted to receive these Recourse Liabilities. The signing and execution of these Promissory Notes was witnessed, by now, Attorney Prive, then forwarded in writing to Becks, in order to satisfy Shelzi's "Material Participation and Recourse Liabilities", questioned by the IRS, who was by 2004, auditing Shelzi and Becks alleged fraudulent 2001 amended tax return.

83.     In 2005 Butler Bank modified its original $1.5-million loan and agreed to a new $1.8-million loan for the completion of the Waldorf Estates Phase III road construction. This

18

$1.8-million loan, again personally guaranteed by Shelzi and L. Foistner, required a special

allocation, in the amount of $100-thousand, to be held back from disbursement until the 20th lot,

lot 8-84-31-1 was subdivided and recorded at the Hillsborough County Registry of Deeds.

84.     This $100-thousand hold back money was guaranteed and promised in writing, on

Butler Bank's Commitment Letter and loan documents, to the Bedford Design Consultants, Inc.

("BDC"), the Waldorf project Engineers and Surveyors, actually performing the work to

subdivide this 20th lot.

85.     Butler Bank also agreed in writing, to make available two (2) separate

construction loans, for "Owner Occupied" residential home construction, $990-thousand each,

one loan to Shelzi, the other loan to L. Foistner.  These loans were executed for Butler Bank in

2005 and 2006.  Butler Bank, Robert Chapman, promised to finance the construction of these 20

homes, along with two immediate construction loans, to construct two Models.  Participating

loans between Butler Bank and other Massachusetts banks were discussed. The LLC relied upon

these representations and closed three (3) separate construction loans with Butler, not counting

Shelzi's lot 8-84-44 loan.

86.     In order to accomplish this, prior to closing the two Owner Occupied home

construction, model loans, Butler Bank and Shelzi instructed Prive and J. Foistner that Butler

Bank wanted two separate business entities established and qualified by Butler Bank, as

"Qualified Authorized Builders" to construct both homes. Prive submitted these documents to

Butler, supervised by J. Foistner.

87.     No longer trusting Shelzi, after witnessing the many frauds and

misrepresentations made by her, and after experiencing million of dollars in losses caused by her

breaches and her unwillingness to show up at work, for at least one hour per week, in order to

perform her duties as an owner, it was agreed that Shelzi and L. Foistner would not take on any new business together, especially, not the construction of multi-million dollar estate homes.

88.     By 2005, the Foistners had constructed, hands on, and participated in the ground work, of more than 64 separate homes, in two subdivisions located in New Boston and Amherst, New Hampshire. The Foistners could demonstrate more than 20 years, direct hands-on experience as "Qualified Builders".

89.     Shelzi had never constructed a single home with her very own hands and possessed no construction skills as a "Qualified Builder". In fact, Shelzi failed to show up for work, one hundred percent, (100%) of the time, not even on one full day, from December 2002 through present.

90.     In order for Shelzi to qualify for the Butler Bank $990-thousand, "Owner Occupied Home Construction Loan", Shelzi personally supervised Prive, by now in 2005, the LLC's only remaining unpaid employee and office manager, from her home in Belmont, Massachusetts by telephone. She never paid Prive for his labor.

91.     The only compensation received by Prive came from the L. Foistner's and L. Maynard.

92.     On or about October 10, 2004, J. Foistner created two (2) new Limited Liability Companies as mandated by the Butler Bank.  One known as New Boston Estates, LLC, ("NBE LLC"), originally planned to be used for the $990-thousand L. Foistner, Lot 8-84-38 loan.  The other known as Waldorf Estates Builders, LLC, ("WEB LLC"), originally planned to be used for the $990-thousand Shelzi, lot 8-84-44 loan.

93.     Separate loan applications were filed and submitted to Butler Bank by Prive and J. Foistner, as instructed by the Butler Bank's loan Officers, Chapman and Donna Hauswirth,

20

("Hauswirth"). Butler Bank instructed Prive and J. Foistner, to submit builders information and Builders Resumes for the Foistners, attempting to qualify their New Boston Estates, LLC as a "Qualified Builder" for the Lot 38 loan.

94.     Butler Bank also instructed Prive and J. Foistner to submit Waldorf Estates Builders information on behalf of Shelzi. This was impossible for Shelzi had no experiences and was not a New Hampshire Builder. Prive and J. Foistner could not and did not submit any "Qualified Builders" information or Builders Resume, on behalf of Shelzi to Butler Bank.

95.     Lacking the Shelzi "Qualified Builders" information, Butler Bank instructed Prive and Foistner to change all construction contracts to reflect J. Foistner as the Builder and General Contractor for the lot-44 Shelzi loan and all future loans, thereby changing all loan documents to reflect New Boston Estates, LLC, solely owned and managed by the Foistners. Shelzi was never approved as a Qualified Builder by Butler Bank.

96.     Waldorf Estates Builders, LLC, the second company, incorporated and owned by J. Foistner, was never transferred to Shelzi because of Butler Banks refusal, to qualify the company as a "Qualified Builder".  No Ownership Transfer Certificate was ever issued to Shelzi, for any amount of ownership, by Waldorf Estates Builders, LLC or New Boston Estates, LLC. Shelzi was never a member, manager, agent, employee or authorized representative of either construction company.  J. Foistner was the only and sole founder, manager and member of both companies.

97.     Since Butler Bank would not authorize Shelzi, or any business entity owned by Shelzi, to be certified as a "Qualified Builder",  Prive was instructed by Butler Bank to change all contracts and loan application documents, on behalf of Shelzi, for the lot 44- Shelzi loan, to

New Boston Estates, LLC.  By then, certified by Butler Bank, as a "Qualified Builder".  Only after those changes were made, did  Butler and Shelzi both agree to close the loan for lot 44.

98.     The Shelzi lot-44 construction loan closed on or about September 2005, for $990-thousand.  New Boston Estates, LLC was the only authorized General Contractor on the loan.

99.     Prior to the lot-44, Shelzi loan closing, Prive, J. Foistner, Brown Excavation (Brown), the Road Builder, now the Excavator for Shelzi's construction site, BDC, Engineers and Surveyors and other subcontractors, performed contract work on behalf of Shelzi, with Shelzi's knowledge and invoiced Shelzi and Butler Bank, $65,003.26, for their work in order to receive a Building Permit from the town.  The invoice amounts were part of the Construction Agreement approved by Butler Bank and Shelzi.

100.    Butler Bank's loan officer, Hauswirth, personally instructed Prive and J. Foistner, how to complete the first money requisition and draw to pay this invoice.  Several phone calls and fax transmissions were initiated by Butler Bank, which approved this requisition, after making several changes and after receiving Shelzi's signature. This first requisition, took three individuals, seven hours each, to be correctly submitted and accepted by Butler Bank.

101.    Butler issued this one and only draw, Cashiers Check, in the amount unknown, made payable to, Antonia Shelzi, the Borrower, and New Boston Estates, LLC, the only "Qualified General Contractor".  Butler Bank then delivered this first bank draft into Shelzi's hands.

102.    Butler Bank was fully aware that New Boston Estates, LLC had the only Mechanic Lien Rights on that project and loan, and were required to be paid. NBE LLC was never paid by Shelzi and Butler Bank.

103.    By July 05, 2005, the IRS announced its audit of the LLCs 2001, Federal Tax Return, filed and submitted, by the LLC in 2003.  Agent Quang Trieau (Quang) was conducting this audit for the Boston IRS Office.

104.    During the first meeting, on or about August 2005, Quang informed J. Foistner that he was only auditing the LLC's 2001, Federal Tax Return, because he wanted to disallow Shelzi's 2001, Amended Personal Tax Return, filed by CPA Becks in 2003, which he had been auditing since 2004.  Quang made it perfectly clear that he was fully aware of Shelzi's tax frauds.  Quang explained to J. Foistner that he was only auditing the LLC because of Shelzi's fraudulent 2001, 1040 Amended Return.

105.    During the first audit appointment, at the LLC's Bedford, New Hampshire offices, on or about September 2005, Quang opened his Shelzi, 1040, 2001 personal audit file, which contained all accounting information, from the LLC for tax years 2001, 2002, 2003, and 2004, originally provided by the LLC to CPA Becks and Shelzi. Quang explained that all these accounting records and tax returns were provided to him by Becks.  This clearly evidences that Shelzi and CPA Becks, were in possession of all accounting information at all times.  Shelzi sued the LLC in 2005, falsely claiming that she never received "any accounting records from the LLC", her basis for a frivolous law suit, abusing the legal system.

106.    Prior to the IRS audit for the LLCs 2001 Federal 1065, Income Tax Return was announced by Quang, in 2005, Shelzi had contacted J. Foistner by telephone, on or about December 2004, asking Foistner to help her establish her "Material Participation and Recourse Liabilities" in the LLC's business operations for 2001. Shelzi specifically asked J. Foistner to help her create a "Meeting Log" for meetings that took place between Shelzi and J. Foistner, in

2001, showing that Shelzi "Materially Participated" in the LLCs business management and work performance.

107.    J. Foistner became keenly aware that Shelzi, "Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to join a criminal conspiracy to aid her, to falsify, Federal IRS Forms, during an IRS Audit.

108.    J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, by providing wrongful information during an IRS Audit.

109.    J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, to establish a false record, of meetings that never took place, attempting to commit the Felony Crime, IRS Tax Fraud and IRS Tax Evasion.

110.    After this initial call from Shelzi, additional calls were received from Shelzi, Hassel, and CPA Becks, all soliciting J. Foistner's criminal solicitation to defraud the IRS, J. Foistner called Becks, inquiring about Shelzi's criminal request to manufacture a "False Meeting Log". Becks informed J. Foistner that he would not complete such a "False Meeting Log" and that he did not require, or want any help from J. Foistner. Becks instructed Foistner not to get involved in the audit that he was managing for Shelzi.

111.    Within a few days from Shelzi's criminal solicitation attempt, Attorney Hollis called J. Foistner, inquiring as to Foistner's knowledge or possible authority to allow Shelzi to receive and pick-up a $100-thousand Butler Bank Cashiers Check, on behalf of the LLC.

112.    J. Foistner informed Hollis that he had no knowledge of such a transaction and that he had not authorized, Shelzi, to draw any funds from the Butler Bank. Both Hollis and J.

Foistner were fully aware that Shelzi had written authority to pickup checks from the Butler

Bank, in light of the fact, that she was a personal guarantor and co-borrower.  However, in order

to draw funds, a company vote, and company signed requisition was still required to be

submitted to the Butler Bank.

113.    Hollis informed Foistner that Butler Bank's Senior Vice President of Commercial

Lending, Robert Chapman, Shelzi's personal friend, had issued a check to Shelzi, from the $1.8-

million loan.  Hollis informed Foistner that it appeared that Shelzi and Hassel had negotiated this

$100- Cashiers Check, issued by Chapman to Shelzi. Hollis informed J. Foistner that he was

awaiting receipt of a copy of that check from Chapman.  Within days a copy of Check No. 7148,

dated August 25, 2005, was received from Butler Bank.

114.    Upon close examination of Check No. 7148 the LLC and J. Foistner realized that

the endorsements, on the check, had been forged. Check No. 7148 was made payable to "Seff

Enterprises & Holdings, LLC" for which Joseph A. Foistner, Esquire, sole manager, was the

only authorized signatory, "Antonia Shelzi and Laurie Foistner, Members". The check showed

the following Memo: "75045479-Lot 30-1 Waldorf Estates Phase III".  The banks intent was to

pay for Lot 30-1 with this $100,000 check is evident.

115.    Shelzi was the only person in possession of check no. 7148, after Chapman and

other Butler Bank employees, handed her the check.  She testified and admitted to these facts in

front of witnesses, all licensed lawyers.

116.    By September 2005, the LLC, Prive, and Hollis, discovered that Shelzi, the only

individual, in possession, of check no. 7148, had forged, or caused to have forged, The LLC's

endorsement on the back of the check.  She also forged or caused to have forged, Laurie

Foistner's endorsement on the back of the check, spelling it "LORI" instead of Laurie.  After

committing the two (2) counts of Felony Forgery, this Convicted Felon, allegedly signed and endorsed check no. 7148, with her very own signature, thereby attesting to her knowledge and specific intent to appropriate these funds, with forged endorsements.

117.    Shelzi then wrote the following words on this falsified bank draft, *"Pay to the order of Domenic Shelzi"*, her brother, a Rhode Island Attorney. He endorsed the check with his signature, failing, as required by law, the Uniform Commercial Code (UCC), as a Holder in Due Course, to inspect the bank draft for the required – matching endorsement, matching the front of the check, prior to affixing his very own endorsement.   Domenic Shelzi then deposited the forged funds into his account at the Citizens Bank. The appropriation of the check, by Shelzi, constituted the felony crime of Attempted Larceny and/or Larceny. Attorney Domenic Shelzi's participation in these alleged crimes, have been reported to Rhode Island Supreme Court, Board of Bar Overseers, and various law enforcement agencies.

118.    Butler Bank and Chapman had an obligation to protect the LLC and Laurie Foistner from these alleged crimes, once Chapman became aware of these unlawful acts.  A simple telephone call from Chapman would have stopped these alleged crimes, before they were ever started.  This was not the case, Chapman had knowledge of these alleged criminal acts at all times.  Chapman's criminal involvement, alleged as a co-conspirator, continues to harm the LLC and the Foistners.

119.    Shelzi admitted in front of witnesses, *"Chapman has been a very close friend of mine for many years.  His wife is from South America, we both speak Portuguese.  Last week Chapman and I went out on a dinner date.  He was drunk and his hands were all over me. All this, in front of his wife, she was there. I have him right where I want him.  This was not his first time"*.

120.    In 2005, the Plaintiffs were under the belief that a bank teller, employed by Citizens Bank, discovered the forged endorsements, stamped the instrument, "MISSING ENDORSEMENT" and returned it either to Shelzi or Butler Bank, effectively rendering the crime of Attempted Larceny.

121.    Chapman, as a Fiduciary, was required at all times to inform the LLC and L. Foistner of Shelzi's alleged criminal conduct and he certainly was under a duty to report these crimes to law enforcement.  Chapman intentionally failed to fulfill his obligation.  It is alleged that Chapman was a member of this criminal conspiracy that issued the check, delivered it to Shelzi, and then covered up these crimes with silence.

122.    After the check was returned, the LLC, Foistner, Hollis and Prive gained knowledge of Shelzi's and Chapman's alleged criminal conduct.  Robert Baskerville, the Engineer and Surveyor, who was promised the $100,000.00 payment for his services was promptly notified.

123.    In a meeting held, on or about September 2005, at the law offices of Gottesman & Hollis, P.A., Shelzi admitted, in front of witnesses, to the forgeries and conversion of the $100,000.00 Butler Bank Draft, implicating Chapman. Shelzi and Butler Bank; transported this stolen instrument across Interstate Lines affecting Interstate Commerce; and used the wire and mail to allegedly promote the criminal conspiracy.

124.    When Chapman gained possession of check no. 7148, he, as a professional banker, recognized that the ledger on the instrument " MISSING ENDORSEMENT", that the endorsements on the back of the check were forgeries and that some endorsement where missing.

125.    Instead of performing his legal and/or fiduciary duties to the Plaintiffs, Chapman moved swiftly to help Shelzi, thereby allegedly defrauding the Plaintiffs and the Foistners.

27

Instead of performing his duties as a bank official, Chapman issued Hollis, on behalf of Shelzi, a second bank draft for $100,000.00. Again, without the Plaintiffs expressed written approval.

126.    Butler Bank and Chapman intentionally refused to protect their borrowers, and both decided, not to respond, or talk to their Borrowers, until September 2008. In fact, Butler Bank and Chapman have not returned one single telephone call, or responded to one of more than ten (10) written notices, in more than 48 months. All the while, Butler Bank collected more than $15,000.00 each month, from the LLC as interest.

127.    When Shelzi needed Chapman's help to receive a second check, she wrote to him, "please issue new check, because of stockholder problems". She received check no. 7324 in the amount of $100,000.00, constituting another alleged act of felony fraud and larceny.

128.    Joseph Foistner, Esquire, the LLC's only manager, called Chapman and the Butler Bank, informing both of the alleged crimes that had been committed by Shelzi and ordered Chapman, "Not to release any additional funds or issue any additional checks to Shelzi".

129.    Chapman and the Butler Bank were given NOTICE, that only "Attorney Foistner, the LLC's only Manager could order or release funds from their loan". Chapman and the Butler Bank received notice from Attorney Foistner that Shelzi was no longer a Member of The LLC and that her membership had been revoked, as authorized by The LLC's Operating Agreement, which allowed for the removal of convicted criminals, at the sole discretion of The LLC's only manager, Attorney Joseph A. Foistner, Esq.

130.    On or about September 15, 2005, Attorney Morgan Hollis provided a written notice to the President of Butler Bank, informing him of the misconduct and crimes allegedly committed by his bank and its personnel. Attorney Hollis' letter to Butler Bank received no reply. Instead of correcting these problems and protecting their borrowers, the Butler Bank and

28

Chapman issued more checks to Shelzi, constituting additional alleged felony crimes, causing the

LLC and the Foistners millions in damages.

131.    On or about September 12, 2005, Butler Bank and Chapman issued Check No.

7324, in the amount of $100,000.00 to Shelzi, in total disregard of their borrowers written

notices, thereby allegedly committing felony bank fraud, this time, with full knowledge,

intending to defraud the LLC and the Foistners.  Shelzi and Butler Bank transported these stolen

funds across Interstate Lines, affecting Interstate Commerce and did use the mail and/or wire to

commit these acts.

132.    Check no. 7324, was ordered by Shelzi, mailed or delivered by Butler Bank,

Chapman or Shelzi, to Morgan Hollis, without the express written approval or knowledge of the

LLC the borrower or Laurie Foistner, the Member/Guarantor.

133.    Instead of paying the Bedford Design Consultants for subdividing lot 30-1, the

written purpose for the $100,000.00, held back by Butler Bank, as part of the loan agreement,

stated in writing on the loan documents, the money ended up in Attorney Domenic Shelzi's

checking account.  The very same checking account, that was to originally, receive the forged

and stolen funds, via Check no. 7148.

134.    After Butler Bank and Chapman closed and funded the Shelzi Lot – 44, Owner

Occupied construction loan, in the amount of $990-Thousand, and after receiving the first

invoice from New Boston Estates, LLC, the  only "Qualified Builder" and approved "General

Contractor", on or about September 2005, in the amount of $65-thousand, and after Hauswirth,

Butler's Loan Administrator, personally supervised, Prive, in the drafting and submittal of the

draw and invoices, and after Butler Bank issued a check to Shelzi, made payable to New Boston

Estates, LLC and Shelzi, in the amount of $65-Thousand, Butler Bank and Chapman allegedly committed their third alleged criminal act.

135.    Butler Bank issued a check, check number unknown (Butler Bank has refused to provide a copy of both checks to NBE LLC), to Shelzi, made payable to NBE LLC and Antonia Shelzi, for services performed under the construction agreement. This NBE LLC check was issued at the very same time, just prior to discovering the alleged crimes committed by Butler, Chapman and Shelzi, pertaining to check no. 7148 and check no. 7324.  Knowing that Shelzi and Chapman were committing fraud against the LLC and the Foistners, including the switching of checks, Prive and Foistner refused to endorse the $65,000 NBE check in Shelzi's possession.

136.    Instead, Prive and Foistner insisted that Shelzi endorse the NBE LLC check, so that the funds could be used for its intended and lawful purpose, to pay the contractors in full.

137.    The payment of the contractors in full, should have been Shelzi's and Chapman's intent, when Chapman issued the check to Shelzi, after Shelzi signed and executed bank forms, "the Bank Requisition for Funds".  The only authorized purpose for these funds was to pay NBE LLC, the authorized builder on the loan, and its contractors.

138.    This did not occur.  When Prive and NBE LLC refused to endorse the back of the $65,000.00 check, knowing that Shelzi would never pay them, Shelzi again visited her friend Chapman, in order to conspire to commit additional acts of bank fraud and felony larceny.

139.    Chapman unlawfully cancelled out and voided the original $65,000.00 check made payable to NBE LLC and issued Shelzi a new check, made payable to Shelzi and another New Boston Estates Limited Liability Company, called Waldorf Estates Builders, LLC ("WEB LLC").

140.    Chapman issued a second check to a Company, WEB LLC, which was not an authorized builder with the Bank.  Additionally, WEB LLC, was not a party to the signed and executed construction agreements required by Butler, to issue the loan.  WEB LLC had not performed any work what-so-ever and was not entitled to any payment from Butler.  Chapman knew this when he allegedly committed this 3rd felony act of bank fraud.

141.    Hauswirth did not work with anyone at WEB LLC to generate an invoice or the required bank forms, mechanic lien affidavits, invoice submittals, money requisition and supporting documents.

142.    Chapman knowingly and intelligently switched the two checks and allegedly committed felony bank fraud. Shelzi represented to Chapman that she was the Owner and Manager of WEB LLC.  This representation was false with the intent to provide the Bank and Chapman with a pretext to issue the check.

143.    Shelzi did not own any rights or ownership in WEB LLC.  Chapman knew this.  If not, he was under an obligation as a fiduciary and banker to investigate the rightful owners of WEB LLC.  This he failed to do.

144.    Had Chapman and the Bank performed their duties as a loan officer/lender, they would know that Joseph A. Foistner, Esquire, was the only founder, owner, member, and manager of WEB LLC.  Chapman's changing of the $65,000 check defrauded NBE LLC and its subcontractors, by issuing a new check, through fraud, not supported by invoices, a requisition, to a Limited Liability Company owned by the very same individual that was being defrauded.

145.    Shelzi took the new check, issued to WEB LLC, opened a false and fraudulent checking account with the Citizens Bank, allegedly forging and falsifying federal bank forms and power of attorney forms to open such an account.  She then allegedly forged the new check by

endorsing her name onto the back of the check representing to be an owner, manager or authorized signor of WEB LLC and then converted the funds.

146.    These alleged acts constitute the commission of felony forgery, felony identity theft, felony larceny and Chapman along with Butler Bank, are liable as co-conspirators for these alleged crimes. Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and used the mail and wire to commit these acts.

147.    The LLC and the Foistners reported this to the Citizens Bank Security Staff which provided copies of the falsified checking account documents as well as copies of forged and falsified checks from that Citizens Bank Account.

148.    Upon gaining knowledge of the alleged crimes and fraud, Foistner, the LLC, NBE LLC and WEB LLC, provided written notices to the President and Chief Executive Officer of the Butler Bank, Chapman and Hauswirth.  Instead of correcting and stopping these many alleged crimes, Butler Bank, in contravention of their duties as a Fiduciary/Lender, chose to hide their involvement with silence and not answer a single telephone call or written notice from the LLC in 49 months.  Butler Bank not only facilitated the commission of the alleged crimes, but by their conduct allowed it to continue harming their borrowers.  Chapman and the Bank became members of this alleged criminal conspiracy, aiding and abetting Shelzi in the performance of these alleged crimes.

149.    Instead of performing its fiduciary duties, Chapman and Butler Bank, falsely and through fraud, schemed to destroy the LLC and the Foistners by reporting negative credit information to various Credit Bureaus.

150.    In fact, Butler Bank's false reporting, of the LLC's late payments to Butler Bank, caused the Guarantor's Credit Score to plummet.  This was done by Chapman, to intentionally destroy Laurie Foistner and to aid and abet his friend Shelzi.

151.    The Butler Bank was fully aware that the New Hampshire Courts had ordered Shelzi to make half the interest payments to Butler, the other half, was ordered to be made by Laurie Foistner.  Butler Bank and Chapman had received written notices from Attorney Morgan Hollis that Shelzi, living in Belmont, Massachusetts, was not making her share of the court ordered payment to Butler, while she was carrying on in her alleged personal and criminal affairs with Chapman.

152.    Numerous notices, from 2005 through present, now for 49 months, had been provided, to Butler Bank, that Shelzi did not reside at 3 Foxberry Drive, New Boston, New Hampshire, and that Shelzi should receive Butler Bank's false and threatening letters, at her home in Belmont, Massachusetts, always declaring a default, when there was, in fact, no default.

153.    Butler Bank intentionally did not provide these notices to Shelzi.  Instead, Butler Bank reported Shelzi's late payments onto Laurie Foistners' Credit report.

154.    Upon information and belief, a detailed review and comparison of Shelzi's Credit Report and Laurie Foistner's Credit Report documents this fact.

155.    On each occasion, when Butler Bank mailed a Default Notice to Laurie Foistner at 3 Foxberry Drive only and not to Shelzi at her Belmont address, Butler Bank erroneously declared a default at the stated date on the letter. In effect, Butler each time declared a default at a given date in the future, the date that had not occurred as of the date of the writing.  Therefore, there never was a default.  Only threatening letters designed to harass the LLC and the Foistners were issued.

156.   After the commissions of these alleged crimes and fraud committed by the employees of Butler Bank, and after millions of dollars in damages, J. Foistner personally wrote to Butler Bank, as did Attorney Hollis, asking to have Chapman removed as the loan officer of the loan.  The LLC and Hollis specifically wrote to Butler Bank, informing the Bank of all the alleged crimes and fraud, harassment and racketeering, committed by the bank and its employees in aiding and abetting Shelzi's commission of the alleged crimes.  Butler Bank did not respond and chose to allow these alleged crimes to continue.  Chapman continued to manage, control and administer the LLC's loan until 2009.

157.   In order for Shelzi to keep her reported losses for tax years 2001, 2002, and 2003, and, in light of the fact that Shelzi did not become part of the LLC until tax year 2003, the IRS required Shelzi to demonstrate that she was materially involved as a member of the LLC in 2001 – this Shelzi and her CPA were not able to do.  Shelzi had an assignment clause from Maynard, purchasing his losses for tax years 2001 and 2002, in the Ownership Transfer Agreement.  This clause however, would not and could not, allow Shelzi and Becks to claim material participation.

158.   In order to mislead the IRS Auditor, Quang, who had requested for Shelzi and Becks to complete and submit meeting logs and records showing her involvement in 2001, Shelzi prepared a letter, dated August 1, 2005, to Brian Beck stating, " *... please note that I do not keep logs on meetings I conduct with business associates, managers, and staff at any one of the companies that I own.*"  In this letter, Shelzi attempts to falsely, and with fraudulent intent, mislead the IRS, by creating her own fictional participation history; all of which is not true.  Shelzi never materially participated in the LLC's operations until January 2003.

159.   On or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and Becks, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax

34

No. 617-776-5690, pages 1, 2 and 3. Page 2 of the fax consisted of an IRS Form 4564, depicting

Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu,

dated July 15, 2005. This IRS Form set forth the following Information and Documentation

Request:

> "Please provide additional information regarding to Seff Enterprises & Holdings, LLC
> nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:
>
> 1.   Proof of material participation in the Seff Enterprises & Holding LLC in a
>      regular, continuous, and substantial manner by Antonia Shelzi under IRC 469
>      (b)(i) & (5).
> 2.   Complete the attached activities log which complies with your record keeping
>      requirements in Reg. 1.469-5T(f)(4).
> 3.   Provide a copy of your appointment book or calendar for the year 200112 to
>      support the information provided in the activities log .....
> 4.   Did you perform most of the work in Seff Enterprises & Holdings, LLC?
> 5.   Did you work more than 100 hours and no one (including non-owners or
>      employees) works more hours?
> 6.   Did any person receive compensation in connection with managing Seff
>      Enterprises & Holdings, LLC?
>
> If you would like to meet with me to discuss this issue at depth, please give me a call ...."

Page 3 of the fax was a blank IRS Form, entitled "Activity Log".

160.    Hassel followed up his fax transmission with a telephone call to J. Foistner,

asking him to help him defraud the IRS by falsifying this Activity Log". Hassel allegedly

committed Felony Solicitation, to defraud the IRS, when he asked J. Foistner for his involvement

to falsify this IRS Form and to provide fraudulent and false information to the IRS Auditor.

161.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law

Offices writing, *"IRS ... Per accountant need to keep log and therefore review copy of log*

*prepared for Toni."* Hassel submitted along with his fax document, a two page document

depicting a false meeting schedule log that he had prepared for Shelzi. The document contained

a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner in 2001.

162.    All were manufactured by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place.  Prior to submitting this fax transmission from his Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf of Shelzi and Becks.

163.    When Hassel submitted this second fax transmission to Attorney Foistner, he again allegedly committed the felony crimes of Criminal Solicitation, IRS Tax Fraud, Criminal Conspiracy to provide false information to the IRS.

164.    On or about August 1, 2005, Hassel and Shelzi prepared a letter to CPA Becks in which Shelzi, attempting to defraud the IRS by providing the IRS with false and fraudulent information, attempting to evade or defeat her owed taxes, attempting to file fraudulent returns, statements, or other documents, furthering the alleged criminal conspiracy with Hassel and Becks, and others to allegedly defraud the United States of America.  Shelzi made the following untrue statements:

> "In July 2001 I was approached by Attorney Foistner to discuss my participation in the purchase of the development … I spent most of the following 10 days on due diligence …. Overall I would conservatively estimate my time spent in 2001 on Seff Enterprise business to be well in excess of 200 hours.  Sincerely yours,  Antonia Shelzi".

165.    Shelzi never joined the LLC until December 2002, she performed her due diligence from October 2002 through December 2002 and never performed any work on behalf of the LLC.  Shelzi's written statements and misrepresentations are a testament of her felonious character and clearly demonstrate her criminal intent to defraud the IRS and others.

166.    During Hassel's August 8, 2005 telephone call to the Foistner Law Offices, his second attempt to criminally solicit J. Foistner's participation in the IRS Tax Fraud, Hassel explained that he was forwarding the August 01, 2005 Shelzi letter to CPA Becks, which he had prepared for Shelzi.

167.    Instead of helping Hassel and Shelzi commit this IRS Tax Fraud, refusing to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS Auditor, J. Foistner reported all of these crimes to Agent Quang. Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi Tax Fraud.

168.    J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI. Butler Bank received written notices of these alleged crimes along with copes all evidentiary exhibits, the FBI Complaint, the forged checks, the IRS meeting logs and the original the LLC tax returns, as well as the amended the LLC, tax returns, tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008. These tax returns depict Shelzi as being ousted from the LLC, because of her status as a Convicted Felon. Butler was kept informed by J. Foistner and his lawyers, in writing, at all times. Butler Bank was given every opportunity to renounce its involvement in the alleged conspiracy but refused to do so.

169.    Upon information and belief, Attorney Laboe and Orr & Reno had full knowledge of Shelzi's unlawful activities, forgeries and larcenies pertaining to the IRS Tax Fraud and the stolen Butler Bank checks as evidenced by the many written letters submitted by Attorney Laboe

to Hassel in an attempt to coerce J. Foistner not to comply with the IRS audit and further

attempting to cover up the stolen and forged checks.

170.    On or about September 26, 2005, Shelzi's lawyer, Attorney Laboe, attempted to

coerce J. Foistner, not to cooperate, with the IRS Audit in writing, in a letter to Attorney Hollis.

He wrote, ***"Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr.***

***Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001.  Mr. Foistner has***

***characterized these schedules as 'fraud'."***

171.    Attorney Laboe wrote in his September 26, 2005, letter to Hollis, page 2:

> "However, unilaterally expanding the scope of the current IRS
> audit outside tax year 2001, could potentially expand liability for
> Seff, as well as Mr. Foistner and Ms. Shelzi.  Therefore, we ask
> that you caution Mr. Foistner from taking such action. Granted, if
> the IRS requests the information, Mr. Foistner has no other choice
> but full disclosure. However, it is in nobody's best interest to bog
> this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions described above and below certainly interfered in the company's

participation in the audit in the opinion of the Plaintiff.  Not giving the IRS the falsified meeting

schedules had nothing to do, or had no impact, on the "project being bogged down, or

establishing further debt or liabilities." Upon information and belief, Attorney Laboe cautioned

Mr. Foistner not to cooperate with the IRS.

172.    Upon information and belief, Attorney Laboe assisted Shelzi by filing a frivolous

law suit against the LLC, his First Petition, asking the State Court to remove all accounting

records, cancelled checks and bank statements from J. Foistner, in order to materially interfere

with the ongoing IRS audit.   This first Petition, falsely claimed:

1. That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2. That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3. That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4. To have all of the LLC's checking accounts attached.

173.    Prior to filing this frivolous law suit, allegedly abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis Law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

174.    This solution would not work for Shelzi since she needed to remove all accounting records and evidence of the Shelzi IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to stop Foistner from providing this evidence to Auditor Quang.

175.    In fact, Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  This conduct was perfectly timed to interfere with the IRS Audit.

176.    J. Foistner completed the IRS audit with Agent Quang successfully. Agent Quang and J. Foistner agreed to amend all of the LLC's Federal Tax Returns for calendar years 2001, 2002, 2003, 2004 and 2005, effectively reducing all deduction to Zero for those tax years, by moving millions of dollars into the LLC's "Inventory Account", thereby capitalizing all expenses.

177.   This was requested by the IRS in writing and J. Foistner complied, amending all tax returns as requested. This however caused Shelzi millions of dollars in additional income taxes for those tax years, effectively removing all of the losses that she and Becks had improperly written off.

178.   After amending the tax returns, J. Foistner, as sole manager of the company and then, as 100% owner / member as defined by Seff's Operating Agreement, ousted Shelzi as a member, effective February 14, 2006, from the company, citing the many alleged Felony Crimes she, Butler Bank and their accomplices had committed.

179.   After Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, then the LLC's attorney, her alleged criminal conduct increased.  It was not enough for Shelzi and her representatives to allegedly criminally interfere with the administration of Internal Revenue Laws, the IRS audit, by removing the accounting records from J. Foistner, during the audit, they also stole, removed and converted Seff's only Notebook Computer, maintaining and storing the only copy of the LLC's accounting data, tax data and company data.

180.   This computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2008.  Additionally, Hassel destroyed and sabotaged Seff's only back-up copy of this data and software, housed on Foistner Law Offices, new server.  This server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only backup electronic data.  These alleged acts constituted crimes of Larceny, Criminal Mischief and other crimes as defined in New Hampshire and Massachusetts.  Hassel transported the computer, data and software, without authority, across interstate lines and used the mail and wire to perpetrate the alleged crimes.

181.    On or about March 2009, Attorney Laboe, now Hassel's new Lawyer's, having full knowledge that a law suit had been filed in Massachusetts, by the LLC, against Hassel, his client, complaining of the computer and data theft by Hassel, and, that Hassel had admitted having possession of the computer and the LLC's data since 2004, filed a Motion for Spoliation against the LLC, claiming that the LLC had destroyed computer data, when in fact, it was his very own clients, Hassel and Shelzi, that committed the spoliation, in order for the IRS not to receive any amended tax returns.

182.    When Shelzi realized that her tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, that Attorney Laboe's and Shelzi's attempts to stop Foistner from meeting with IRS had failed, Shelzi allegedly initiated Phase II, of their criminal conspiracy to defraud the IRS.

183.    Attorney Laboe, representing Shelzi in retaliation, on February 15, 2006 and February 22, 2006, respectively, while Shelzi was no longer a member / owner of Seff, LLC filed a Petition to have Foistner, by then the 100% owner / member removed as manager. This was designed to interfere with the IRS Audit and the successful amendment of the tax returns.

184.    Upon completion of the IRS audit, an audit performed without accounting records since Shelzi had the LLC's accounting records removed from the company by Court Order, in an attempt to interfere with the audit, J. Foistner provided notice, as sole manager of the LLC, to Shelzi and Attorney Laboe that J. Foistner, had reached an agreement with the IRS, to amend the 2001 2002, 2003, 2004, and 2005 tax returns, as suggested by the IRS, to ZERO. Foistner, in fact, amended the returns within a few days after the audit and forwarded same to Shelzi, Attorney Laboe and Butler Bank.

185.    After Foistner reported Shelzi's and Attorney Laboe's alleged tax fraud to the Auditor and the IRS Criminal Investigation Division, and provided Shelzi and Attorney Laboe with the notices of his actions taken in regard to the IRS Settlement, Attorney Laboe and Shelzi realized that by capitalizing close to $6-million worth of expenses that Shelzi had planned to write off, or in fact, already had partially written off, his client, Shelzi would now owe millions more on owed taxes and penalties. Attorney Laboe filed another Petition to remove J. Foistner, as a Manager, by allegedly making misrepresentations and false statements to the Court in an attempt to mislead the Court that Foistner was acting unlawfully as manager of the LLC.

186.    Attorney Laboe and Shelzi also asked the Court to remove J. Foistner as the "Tax Matter Person" for LLC.  This, an impossibility, because Foistner, remained the only owner, of the company.

187.    Upon information and belief, Attorney Laboe, at all times, was J. Foistner's and the LLC's attorney, under a duty to keep his client's information confidential.  Instead, Attorney Laboe zealously advocated his client's (Shelzi's) position contrary to the best interest of his former clients.

188.    The acts of Shelzi were designed to interfere with the IRS Audit by intentionally misrepresenting facts and withholding information, intending to further her cause in allegedly defrauding the IRS out of millions of dollars.

189.    Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

190.    On or about June 2006 Shelzi called Robert Baskerville, the Projects Engineer and Oberhauser, the LLC's attorney. Baskerville's sworn statement and signed affidavit states

42

that Shelzi had asked him, if he would be willing to help her bankrupt the LLC and the project. Oberhauser contacted J. Foistner, warning him of Shelzi's alleged criminal motives, to bankrupt her very own company, the LLC.

191.    The LLC has attempted to litigate these claims in the State Court against Shelzi and others for more than 49 months, realizing more than $16.5-million in damages.

192.    On or about January 2007,   The LLC hired a Forensic CPA, Mr. Antony Albright and required that Mr. Albright generate a new set of accounting records, for tax years 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 in preparation for the civil trial against Shelzi and others.  Albright was asked to re-enter all accounting and bookkeeping data, from the LLC's original documents into his CPA Firm accounting computers, in order to present accurate and complete accounting information and tax information for the Court.

193.    On or about March 27, 2007, CPA Albright stated in his sworn statement and Affidavit to the Court:

> *" I understand that aspects of this litigation pertain to various loans and/or capital contribution of Laurie Foistner, as member. My analysis to date indicates that Ms. Foistner's loan and or capital funding (exclusive of original capitalization) has exceeded all loan repayments and/or capital withdrawals since inception".*

What Albright was stating, simply said, was that L. Foistner had never withdrawn more money from the Company, at any time, than what she had deposited into the company as loans, the original $1.3-million capitalization excluded. L. Foistner was at all times entitled to remove another $1.3-million, at her discretion, before she would have overdrawn her account and actually taken money from the LLC.  Shelzi knew this.

194.    Instead of promoting his client's best interest and aiding his clients well being, Attorney Laboe claimed to the State Court that Foistner had removed money from the company

43

without Shelzi's authorization – asserting that the Foistner's were embezzling money from their very own Company, which owed them several million dollars.  This representation was not true.

195.    By 2009, the time of this bankruptcy filing, the Foistners had contributed more than $3-million, to pay for the operations of the LLC, abandoned by Shelzi in 2003.  After Shelzi was ousted from the LLC, in 2006, the Foistners paid for the construction and completion of the 3,000 ft. long road, installed final pavement and completed all contractual subdivision condition set forth by the Town of New Boston.

196.    The Town accepted the road in October 2008, after the Foistners provided all road maintenance and snow removal from 2003 through 2008.  Shelzi never allocated a single hour to the LLC's Waldorf Project or the RICO Claim, the only reasons for the LLC's existence.

197.    Shelzi accomplished her original promise made by CPA / Attorney Di Iulio, to sue for an accounting, while she was under an obligation to perform and pay for the accounting, while Shelzi, at all times was in possession of all the accounting records.  Shelzi, by her conduct and the use of the Court, finally bankrupted the LLC, causing more than $16.5-mllion in damages, excluding the loss of the future construction of the remaining 18 homes, estimated cost to construct $36.8-million.

198.    In summary, Shelzi's, Hassel's, Chapman's and the Butler Bank's planned and executed alleged criminal conduct began on or about July 2005.  These alleged co-conspirators, were aided and abetted by the Butler Bank.  This harmed the LLC financially, (1) by interfering with the contractual relations of the Waldorf project, the Creditors and its Financiers; (2) by intentionally destroying a valid RICO Case and the millions of dollars in costs associated with this claim; (3) by interfering with the business activities, sales, construction of homes, delaying the project from 2002 through 2009 and finally bankrupting the project in 2009; (4) by forging

44

endorsement on $100-thousand dollar bank drafts and converting same, transporting these stolen goods over interstate lines; (5) by intentionally implicating and attempting to criminally solicit the LLC, its agents, employees, members and manager, to help commit criminal IRS Tax Fraud, to falsify IRS Tax Forms and to provide false information during an IRS Audit; (6) interfering with the administration of an IRS Audit, by removing accounting records and destroying computer servers, in order to further the alleged criminal conspiracy to defraud the IRS, at all times attempting to aid and abet Shelzi in evading her payment of owed income taxes; (7) transporting stolen computers over interstate lines, affecting Interstate Commerce; (8) committing the crime of Identity Theft by opening up a false checking account in Massachusetts and then converting the stolen funds; (9) committing the crime of Larceny, Attempted Larceny, Theft by Deception, Criminal Mischief and other criminal conduct; (10) abusing the legal system, bringing frivolous claims, misrepresenting the truth to a tribunal, and allegedly committing many counts of material, felony perjury, using the legal system to further their criminal enterprise; and, (11) at all times using telephone lines and the US Mail to conduct their criminal acts, committing Mail and Wire Fraud.

199.    Shelzi, through her lawyer, did intentionally prepare and file more than forty (40) separate motions and legal action, at all times intending to bankrupt the LLC, causing the LLC millions of dollars in damages.

200.    The Defendants, by their conduct, intentionally bankrupted the LLC by appropriating and wasting the LLC property, at all times affecting commerce, by alleged larceny, extortion, attempts to conspire to perform larceny and extortion, through intimidation and coercion, placing immediate fear of injury to the LLC's property and well-being, including the taking of the LLC's property without its consent, as defined in 18 U.S.C. § 1951.

45

201.    On or about February 19, 2008, the LLC filed a civil action, in the Hillsborough County Superior Court, Docket No.08-C-83, against their Lawyers Orr & Reno, P.A. and Attorney James Laboe for allegedly violating the Plaintiff's confidential information, breaching their fiduciary duties, violating the Attorney Client Rules of Professional Conduct.

202.    Orr & Reno's conduct was also reported to the FBI, the New Hampshire Attorney General's Office, the United States Attorney, District of New Hampshire and other law enforcement agencies.

203.    Butler Bank's alleged criminal conduct, criminal and civil conspiracies in aiding and abetting Shelzi was reported to the FBI, the IRS, the FDIC, the New Hampshire Banking Commissioner, the Massachusetts Banking Commissioner, the New Hampshire and Massachusetts Attorney Generals, the United States Attorneys for New Hampshire and Massachusetts and other law enforcement agencies.

204.    In 2008, the LLC, through their attorneys, filed a Writ of Certiorari to the New Hampshire Supreme Court, accompanied by their Expert's Opinion, regarding the alleged unethical conduct of Orr & Reno, P.A.  The New Hampshire Supreme Court refused to hear the Writ.

205.    On or about August 2007, the LLC filed a civil suit against Hans Hassel, for the theft and conversion of the Computer System, its operating software, its accounting software and its accounting and financial data, in the Commonwealth of Massachusetts, Middlesex Superior Court, Docket No. 2007-01627-C.  Hassel intentionally converted this computer that contained the LLC's only electronic accounting data, in order to interfere, hinder and delay the ongoing IRS audit, attempting to destroy the evidence contained in the computer from reaching the IRS auditor and the IRS Criminal Investigation Division.  The LLC has substantial and compelling

46

evidence, to show that Hassel also physically destroyed the LLC computer server, maintaining the only backup electronic copy of the accounting data, in 2006, believing that the LLC could not provide any evidence concerning the Defendants ongoing alleged IRS tax fraud and falsification of tax forms to the IRS.

206.    The Defendants allegedly coerced and abused the legal system by filing frivolous claims, committing countless acts of Perjury and provided false information to a Tribunal. Defendants violated and conspired to violate the LLC's rights to free association, to petition government, procedural due process and equal protection of the laws under the United States Constitution and have engaged in seeking selective enforcement of the law, to serve their criminal enterprise.

## A RICO CLAIM'S 18 U.S.C. § 96, et seq
## COUNT ONE: RACKETEERING

207.    The Plaintiffs re-allege paragraphs 1-206 as though restated in full herein and not inconsistent herein.

208.    At all times, the Butler Bank and the Individual Defendants constituted an "enterprise," within the meaning of U.S.C. §§ 1961(4) and 1962(c), as a body corporate pursuant to RSA 31:1.

209.    Defendants were individual "persons" within the meaning of U.S.C. §§ 1961(3) and 1962 (c), who associated with and/or participated in the conduct of the enterprise's affairs.

210.    Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

211.    Defendants conspired with each other to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering

47

activity in violation of 18 U.S.C. § 1962(d). Each intended to further an endeavor of Shelzi and Hassel, which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor.

212.    Defendants carried out a scheme to defraud the Plaintiffs that was knowingly and intentionally devised and carried out in concert to financially damage the Plaintiffs for their own economic gain and to deprive the Plaintiffs of the intangible right of honest services under 18 USC § 1346 by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

213.    Defendants placed, or foreseeably caused to be placed in a post office or authorized depository for mail, matter that furthered the scheme to defraud thereby committed mail fraud, in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

2 14.    These alleged acts all occurred after the effective date of the enactment of the RICO statute and more than two such acts occurred within ten years of one another. At all relevant times, the enterprise engaged in, and its activities affected interstate commerce and foreign commerce.

215.    All of the predicate acts described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to extort and defraud the Plaintiffs; their common result was to extort and deprive the Plaintiffs of civil rights, money and the intangible right of honest services under 18 USC § 1346.

216.    Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth, each personally or through their agents or servants, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission.

217.    The Plaintiffs were the victims of the acts of racketeering and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

218.    All of the predicate acts described were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts over a substantial period of time.

219.    The patterns of racketeering activity engaged in by Defendants continues, because such conduct has become a regular way of conducting on-going business activities.

220.    As a direct and proximate result of, and by reason of, the activities of the Defendants and their conduct in violation of 18 U.S.C. §§ 1962(c) and 18 U.S.C. § 1964(c), LLC have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The Defendants appropriated from the Plaintiffs of their property, affecting commerce, by larceny, forgery and extortion, and attempts to conspire to commit larceny, extortion and other crimes through immediate fear of injury to the Plaintiff's property and well being, including the taking of the Plaintiff's property without its consents as defined in 18 U.S.C. § 1951.

221.    Among other things, the Plaintiffs have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009).  The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages and physical harm to their persons,

property and reputation, intentionally caused by the Defendant's alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present. The alleged fraud, crimes, conspiracies, thefts and wrongful acts committed by the Defendants, harming the LLC detailed herein entitles the LLC to recover threefold the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT TWO
## RICO - AIDING AND ABETTING

222. The Plaintiffs re-allege paragraphs 1-221 as though restated in full herein and not inconsistent herein.

223. In the alternative and without waiving the forgoing, Defendants aided and abetted one another in carrying out their alleged schemes to defraud through criminal conduct. As set forth herein, Defendants engaged in various schemes to defraud LLC as defined and set forth in 18 U.S.C. § 1341: 18 U.S.C. § 1344; and 18 U.S.C. § 1962(c).

224. Defendants knew that Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth were engaged in various schemes to defraud and harm the Plaintiffs. The Defendants received written notices from the LLC attorneys informing them of the alleged crimes, said crimes are individually and separately alleged herein.

225. Defendants engaged in actions that were intended to and, in fact, did facilitate and advance Antonia Shelzi's and Hans Hassel's schemes to defraud and harm the Plaintiffs.

226. As a direct and proximate result of Defendants' aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth to defraud the Plaintiffs. The Plaintiffs have incurred and/or will incur loss and damages in excess of the minimal jurisdictional limits of the Court.

50

227.    Defendants conduct by aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth's alleged schemes to defraud and harm the Plaintiffs was committed with fraud, and/or actual malice, and/or deliberate acts, and/or oppression, and/or willfulness, and/or such gross negligence as to indicate a wanton disregard for the rights of the Plaintiffs. As a result, the Plaintiffs are entitled to an award of punitive damages against the Defendants.

## COUNT THREE
## CONSPIRACY TO COMMIT BANK FRAUD AND OTHER CRIMES

228.    The Plaintiffs re-allege paragraphs 1-227 as though restated in full herein and not inconsistent herein.

229.    In the alternative and without waiving the forgoing, Defendants allegedly committed fraud in making false statements of material fact and engaging in fraudulent acts that they knew were false at the time they made them, which statements and acts were intended to be relied upon by the Plaintiffs.  The Plaintiffs reasonably relied upon them to their detriment.

230.    These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009).  The Plaintiff's have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009).  The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages to their property and reputation, intentionally caused by the Defendants' alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present, (2009).  The alleged fraud, crimes, conspiracies, thefts and wrongful

51

acts, individually and collectively identified and alleged herein committed by the Defendants harming the Plaintiffs caused the LLC to file for Chapter 7 Bankruptcy protection.

231.    This fraud was adopted, aided, abetted, furthered and approved by the Butler Bank.

## COUNT FOUR
## BANK FRAUD AND FELONY FORGERY
### THE FIRST $100-THOUSAND CHECK FORGED BY THE DEFENDANTS

232.    The Plaintiffs re-allege paragraphs 1-231 as though restated in full herein and not inconsistent herein.

233.    On or about October 2005, Shelzi admitted to Attorney Foistner, Attorney Hollis and Attorney Prive, after she was caught, in the actual commission of these alleged crimes, that she alone, traveled to the Butler Bank, in Lowell, Massachusetts to pick up the $100-thousand and Butler Bank construction loan check, No. 7148.  Shelzi admitted that after she gained possession of the checks, without the Plaintiffs consent and/or knowledge, she and her employee Hans Hassel, being the only persons in possession of the check, she, Shelzi, endorsed the check with her signature and attempted to negotiate it knowing that one of the signatures was a forgery.

234.    Shelzi further admitted that she endorsed the check over to her Brother, Attorney Domenic Shelzi, who deposited this forged instrument into his Citizens Bank checking account in Rhode Island.

235.    Check No. 7148, depicts the LLC forged signatures "LORI FOISTNER" and "The LLC" above Shelzi's endorsements.  These forged endorsements could only have been affixed onto the paper draft by Shelzi and/or her agent and employee, Hans Hassel. Hassel had, in the past, written the name Laurie, as "LORI", on his written communications, given to the LLC.

52

236.    When Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005, received the check from Butler Bank's, Robert Chapman, without the LLC – Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC', two (2) endorsements on the back of the check, the Defendants allegedly committed two (2) separate and distinct counts of Felony Forgery, as defined within the meaning of "Forgery" in 18 U.S.C. § 513 and State Law, Securities of the States and Private Entities and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

237.    The only individuals to possess the loan disbursement check, as admitted by Shelzi, were Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi. Upon information and belief, no other person could have forged the signatures other than Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi.

238.    The LLC and Guarantor Laurie Foistner, the named Payees on this Butler Bank Draft, the business entity and individuals, the victims of the alleged crimes, became aware of their damages, only after this $100-thousand check was returned, stamped and marked "MISSING ENDORSEMENT".

239.    The LLC reported this alleged crime to the FBI in 2006, assuming that a Citizens Bank employee stopped the clearing of this forged instrument, since the check was marked as deposited, by Attorney Shelzi, into his "Riverside, Rhode Island" Citizens Bank account.

240.    Riverside, Rhode Island is the primary check clearing facility for all checks deposited into Citizens Bank. On or about September 2008, approximately thirty six (36) months after the LLC discovered that the Defendants had forged the endorsement on this check and allegedly committed the felony crime of Larceny, reduced to the felony crime of Attempted Larceny, since the check was stopped from clearing, Robert Chapman claimed to Attorney

53

Foistner that it was he, Chapman, not the Citizens Bank that marked and stamped the check "MISSING ENDORSEMENT".

241.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests. Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to conduct their Racketeering activities.

242.    Butler Bank sanctioned and facilitated the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

243.    Butler Bank intentionally and knowingly helped the furtherance of these alleged, unlawful acts which destroyed the LLC business and caused the LLC's bankruptcy.

## COUNT FIVE
## BANK FRAUD AND ATTEMPTED LARCENY
## THE FIRST $100-THOUSAND CHECK ATTEMPTED TO BE CONVERTED BY THE DEFENDANTS

244.    The Plaintiffs re-allege paragraphs 1-243 as though restated in full herein and not inconsistent herein.

245.    Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005 and received the check from Butler Bank's employee, Robert Chapman, without the LLC, Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC two (2) endorsements on the back of the check, then endorsed the check and deposited the check, across interstate lines. The Defendants committed Felony Attempted Larceny, attempting to convert the money, transporting a negotiable instrument across State Lines, thereby affecting Interstate Commerce, as defined within the meaning of "Stolen Goods" in 18 U.S.C. § 2314,

Transportation of Stolen Goods, Securities and Money and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

246.    Butler Bank and Chapman knew of these alleged crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests or report the alleged crimes to Law Enforcement.  Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

247.    Butler Bank approved the Defendants actions, aided and abetted the Defendants, and  received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

### COUNT SIX
### BANK FRAUD AND LARCENY
### THE SECOND $100-THOUSAND CHECK AND THIRD $65-THOUSAND CHECK
### CONVERTED BY THE DEFENDANTS

248.    The Plaintiffs re-allege paragraphs 1-247 as though restated in full herein and not inconsistent herein.

249.    On or about September 12, 2005, the Butler Bank, directly contravening the instructions they had previously received from the LLC, issued check no. 7324, in the amount of $100,000, at the direction of Shelzi.  Upon information and belief, Shelzi approached her good friend, Chapman, and told him because of the dispute between the LLC and herself, she needed these funds released by her authorization (as she was still trying to pay her brother this money when the LLC had informed her that engineering costs would be paid from these proceeds, not her brother).  The Butler Bank delivered this check, without the approval, knowledge, or consent of the LLC to Attorney Hollis.

250.    Despite the fact that the conditions set forth in the commercial loan had not been satisfied, Chapman, released the proceeds that were to be held back to pay for engineering costs. The check was delivered to Shelzi's brother, Domenic Shelzi, and the funds were used not for their intended purpose to pay engineering expenses.

251.    The Butler Bank aided and abetted in Shelzi's brother being paid and further damaged the Plaintiffs.  Specifically, in light of the fact that the engineering firm, by virtue of not receiving the $100,000 promised to it, now had lien rights against the LLC– the creation of which is directly attributable to the Butler Bank.

252.    The Defendant's used undue influence to force the LLC, under threat of causing a lawsuit and the calling the loan, to endorse this second $100-thousand check and forwarding it to Attorney Shelzi.

253.    As stated in herein, Shelzi had received a $990,000 loan to construct an "Owner Occupied" home on Lot 8-84-44 in Phase III of the Waldorf Estates subdivision.  The Butler Bank had gone through great lengths to qualify NBE, LLC as the builder of this home (a process that involved several months and substantial communication between the Butler Bank and NBE, LLC).  At the time, NBE, LLC was solely owned and managed by Joseph Foistner.

254.    In September 2005, NBE, LLC submitted an invoice in the amount of $65,000 directly to the Butler Bank for work done in the construction of Shelzi's house on lot 8-84-44. The invoice was properly created and was accompanied by all necessary supporting documentation.

255.    The invoice was for surveying services provided by several contractors and a reimbursement of costs incurred in obtaining municipal permits, building plans, and other

necessary approvals (i.e. NH Public Utilities Commission energy rating approval).
Subsequently, the Butler Bank issued a check payable to NBE, LLC and Shelzi.

256.    At the time that the Butler Bank issued the $65,000 check, the LLC had learned of
Shelzi's forgery of the $100,000 check on the LLC' bank account and other criminal acts being
committed by Shelzi and Chapman.

257.    Consequently, the LLC refused to endorse the $65,000 check on behalf of NBE,
LLC, until Shelzi provided assurances that all criminal acts she had committed would be
rectified and she would insure that the Plaintiffs were restored to the position they were in prior
to when the Defendants committed these acts..

258.    NBE, LLC and Shelzi were at an impasse.  Shelzi was in possession of the
$65,000 check and was demanding that NBE, LLC endorse it so that she could use it to pay other
expenses she had on other housing projects she owned.  NBE, LLC, was refusing to endorse the
check and demanding that Shelzi endorse it and give it to NBE, LLC, so that NBE, LLC could
pay the construction expenses – the legitimate basis for which the check was issued.

259.    Upon information and belief, Shelzi, realizing that NBE, LLC would not endorse
the check and allow her to retain the funds, contacted her close friend Chapman to do her another
act of misconduct.  Shelzi returned the original check to Chapman, which was promptly voided,
and had a new check, in the same amount reissued to WEB, LLC.

260.    Upon information and belief, Shelzi insisted that she was the owner of WEB,
LLC, despite the fact that this company was also solely owned and managed by Joseph Foistner.
Chapman knew or should have known that Shelzi was not the owner of WEB, LLC.

261.    Chapman had absolutely no authority or legitimate reason to issue the new
$65,000 check payable to WEB, LLC.  WEB, LLC was not the qualified builder on lot 8-84-44;

WEB, LLC was not the builder of record in the loan documents; and WEB, LLC was not owed the $65,000 – as they did not perform any services on the lot or submit any invoices to the Butler Bank. Chapman's only reason for issuing the check to WEB, LLC was because he wanted to aid and abet Shelzi's misconduct of intentionally conspiring to defraud NBE, LLC.

262.    The only reason Chapman issued the check to WEB, LLC was to assist Shelzi in diverting $65,000 from NBE, LLC and defraud this company.  Chapman's and Shelzi's alleged actions constitute additional counts of felony larceny as defined by 18 U.S.C. § 2314, Transportation of Stolen Goods, Felony Forgery as defined by 18 U.S.C. § 513, Securities of the State and Private Entities, Bank Fraud as defined by 18 U.S.C. § 1028, Forging Corporate Records, and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

263.    No other person had possession of the forged construction loan disbursement check, as admitted by Shelzi, except for Robert Chapman, Antonia Shelzi, and Hans Hassel. No other person could have committed the forgery crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

264.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests.  Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

265.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and  received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

266.     Butler bank did benefit from these alleged crimes as they remained silent. Butler

Bank also intentionally and knowingly aided and abetted these unlawful acts which destroyed the

LLC business and caused the LLC bankruptcy and harmed L. Foistner.

**COUNT SEVEN**
**BANK FRAUD IDENTITY THEFT OPENING UP FALSE CHECKING ACCOUNT BY THE DEFENDANTS**

267.     The Plaintiffs re-allege paragraphs 1-266 as though restated in full herein and not

inconsistent herein.

268.     These and other fraudulent acts caused in fact and proximately caused LLC to

suffer monetary damages.

269.     Shelzi took the $65,000 check to a Citizens Bank branch where she fraudulently

opened a business checking account for WEB, LLC (using falsified business records).  Shelzi

then cashed the new $65,000 check and converted the funds for her own personal use.  Chapman

provided substantial assistance in aide to this alleged criminal conduct.

270.     When the Defendants opened a business checking account at the Citizens Bank,

without authority and through fraud and deceit, all Defendants committed the felony crimes of

Aggravated Identity Theft as defined by 18 U.S.C.  § 1028 and § 1028 A, Forging Corporate

Records, Aggravated Identity Theft  and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other

Federal and State Crimes.

271.     The Defendants forged Federal Forms, corporate votes and other bank forms and

falsely represented themselves as Owner / Members or Managers of WEB, LLC, in order to open

up their fraudulent checking account.

272.     No one possessed these forged documents, the forged check, the forged corporate

votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank

personnel of Butler Bank.  Upon information and belief, no other person could have committed these alleged crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

273.    In 2006, the LLC reported these alleged crimes to the FBI and law enforcement.

274.    The Butler Bank and Chapman acquired knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests.  Instead of informing the LLC and/or law enforcement of these alleged crimes, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to accomplish their alleged Racketeering activities.

275.    Butler Bank approved the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

**COUNT EIGHT**
**BANK FRAUD AND FORGERY OF CORPORATE RECORDS**
**FORGING FEDERAL BANK FORMS AND CORPORATE FORMS TO OPEN**
**FRAUDULENT CHECKING ACCOUNT BY THE DEFENDANTS**

276.    The Plaintiffs re-allege paragraphs 1-275 as though restated in full herein and not inconsistent herein.

277.    When the Defendants opened a business checking account at the Citizens Bank, without authority and through fraud and deceit, all Defendants committed the felony crimes of Fraud and Forgery of Corporate Records as defined by 18 U.S.C. § 1028 and § 1028A, Forging Corporate Records and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

278.    The Defendants forged Federal forms, corporate votes and other bank forms and falsely represented themselves as owner / members or managers of WEB LLC, in order to open up the checking account.

279.     No one had possession of these falsified documents, the forger check, the forged

corporate votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans

Hassel and bank personnel of the Butler Bank.

280.     Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants,

and received financial gain from this fraud.

## COUNT NINE
## BANK FRAUD ,STOLEN GOODS TRANSPORTATION OF STOLEN GOODS SECURITIES AND MONEY – THE FORGED CHECKS AND MONEY

281.     The Plaintiffs re-allege paragraphs 1-280 as though restated in full herein and not

inconsistent herein.

282.     In the alternative and without waiving the forgoing, Defendants committed fraud

in making false statements of material facts and engaging in false acts that they knew were false

at the time they made them and did them, which statements and acts were intended to be relied

upon by LLC and reasonably relied upon by the LLC to their detriment.

283.     These and other fraudulent acts caused in fact and proximately caused the

Plaintiffs to suffer monetary damages.

284.     When the Defendants caused Check No. 7148, Check No. 7324 and the $65,000

check, Check No. "unknown" to be deposited into the United States Mail System and employed

other modes of transportation to move the stolen funds and negotiable instruments from Lowell,

Massachusetts to Riverside, Rhode Island and Bedford, New Hampshire, they committed the

crimes of Transportation of Stolen Goods – Money, as defined in 18 U.S.C. § 2314 and Bank

Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State defined crimes.  This affected

Interstate Commerce.

61

285.    Butler Bank and Chapman knowingly participated in these alleged crimes by using the mail and wires to transport these stolen funds and negotiable instruments from Massachusetts, thereby aiding and abetting the Defendants as they allegedly criminally conspired with Shelzi and Hassel, as defined in 18 U.S.C. 1349, Attempt and Conspiracy and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

286.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

287.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harmed L. Foistner.

## COUNT TEN
## FRAUD AND CRIMINAL SOLICITATION BY THE DEFENDANTS TO COMMIT IRS TAX FRAUD

288.    The Plaintiffs re-allege paragraphs 1-287 as though restated in full herein and not inconsistent herein.

289.    As stated herein, Shelzi, her agent CPA Becks, and Hassel contacted the LLC' office in Bedford, New Hampshire by telephone and via Facsimile, asking Attorney Foistner to join their alleged criminal conspiracy and fraudulent efforts to defraud the United States of America, the Internal revenue Service, out of millions of dollars, consisting of owed income taxes, interest and penalties, owed by Shelzi. The alleged premeditated, intentional and unlawful acts of the Defendants, soliciting Foistner's criminal conspiracy to commit offenses against the United States of America, to defraud the United States of America, constitute the crimes of Conspiracy to commit Tax Fraud as defined in 18 U.S.C. § 371.

290.    Shelzi's sole purpose and motive for joining the LLC in 2002, was her need to receive the LLC's "Business Deductions" in order to use the money she owed to the IRS, to purchase her fifty percent Ownership Interest from Maynard.  Her written contract, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, clearly states:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

291.    When the IRS audited Shelzi in 2005, demanding from Shelzi that she substantiate her "Material Participation" in the business of the LLC, as early as 2001 when, in fact, Shelzi never physically appeared or participated until December 2002 in the LLC's affairs. The Defendants, specifically Shelzi and Hassel, with the support, knowledge and consent of her agent directly, knowingly and with criminal intent, asked Attorney Foistner to help and aid them, to prepare, falsify and substantiate a false and untrue "Meeting Log", for tax year 2001, which was requested by the IRS.

292.    The form that the Defendant's wanted falsified was IRS Form 4564, which Quang Trieu demanded from Shelzi to justify and prove her material participation. The IRS specifically demanded that Shelzi would provide the following information:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

1. Proof of material participation in the Seff Enterprises & Holdings, LLC in a regular, continuous, and substantial manner by Antonia Shelzi under IRC 469 (b)(i) & (5).
2. Complete the attached activities log which complies with your record keeping requirements in Reg. 1.469-5T(f)(4).
3. Provide a copy of your appointment book or calendar for the year 200112 to support the information provided in the activities log .....
4. Did you perform most of the work in Seff Enterprises & Holdings, LLC?

63

5.  Did you work more than 100 hours and no one (including non-owners or employees) works more hours?
6.  Did any person receive compensation in connection with managing Seff Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call …. "

293.   In fact after Shelzi, her representatives and Hassel's alleged criminal solicitation of Attorney Foistner's participation in these alleged crimes, the Defendants followed up their verbal solicitation in two separate writings. The first, on or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and her agent, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax No. 617-776-5690, pages 1, 2 and 3.  Page 2 of the fax consisted of an IRS Form 4564, setting forth Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu, dated July 15, 2005.

294.   Hassel followed up his fax transmission with a telephone call to J. Foistner, asking him to help him defraud the IRS by falsifying this Activity Log".

295.   On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law Offices writing, "IRS … Per accountant need to keep log and therefore review copy of log prepared for Toni." Hassel submitted along with his fax document, a two page document depicting a false meeting schedule log that he had prepared for Shelzi.  The document contained a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner, in 2001.  These documents were created by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place.  Prior to submitting this fax transmission from Shelzi's Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf Shelzi and her agent.

296.   Instead of helping Hassel and Shelzi commit IRS Tax Fraud, J. Foistner refused to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS, J. Foistner reported all of these alleged crimes to Agent Quang.

64

Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi's alleged Tax Fraud.

297.    J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.

298.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests.  Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

299.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

**COUNT ELEVEN**
**FRAUD AND ATTEMPTS TO EVADE OR DEFEAT TAXES**

300.    The Plaintiffs re-allege paragraphs 1-299 as though restated in full herein and not inconsistent herein.

301.    The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Attempt to Evade or Defeat Taxes, as defined in 26 U.S.C. § 7201.

302.    The Butler Bank and Chapman gained knowledge of these alleged crimes as early as September since Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

65

## COUNT TWELVE
## FRAUD AND MAKING FALSE STATEMENTS

303. The Plaintiffs re-allege paragraphs 1-302 as though restated in full herein and not inconsistent herein.

304. The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, demonstrated that these documents were submitted by Hassel from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Fraud and Making False Statements, as defined in 26 U.S.C. § 7206.

305. Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

306. Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner.

## COUNT THIRTEEN
## FRAUD AND FILING FRAUDULENT RETURNS, STATEMENTS AND DOCUMENTS

307. The Plaintiffs re-allege paragraphs 1-306 as though restated in full herein and not inconsistent herein.

308. The written, falsified, forged and signed documents submitted by the Defendants specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of filing Fraudulent Returns, Statements, Or Other Documents, as defined in 26 U.S.C. § 7207.

309.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

310.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner

## COUNT FOURTEEN
## FRAUD COERCION TO INTERFERE WITH ADMINISTATION OF IRS LAWS

311.    The Plaintiffs re-allege paragraphs 1-310 as though restated in full herein and not inconsistent herein.

312.    In order to interfere in the IRS Audit and to interfere in the Administration of Internal Revenue Laws, the Defendants, with the help of her agent, attempted to coerce Attorney Foistner, not to cooperate with IRS Auditor. Attorney Laboe wrote to Attorney Morgan Hollis on or about September 26, 2005:

> "Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001. Mr. Foistner has characterized these schedules as 'fraud'."

> "However, unilaterally expanding the scope of the current IRS audit outside tax year 2001, could potentially expand liability for Seff, as well as Mr. Foistner and Ms. Shelzi. Therefore, we ask that you caution Mr. Foistner from taking such action. Granted, if the IRS requests the information, Mr. Foistner has no other choice but full disclosure. However, it is in nobody's best interest to bog this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions as set forth herein interfered in the LLC participation in the audit. Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities." Attorney Laboe intimated that Mr. Foistner should not cooperate with the IRS.

313.    Attorney Laboe's did create, publish and file a frivolous law suit against the LLC requesting that the State Court remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit.   This first Petition, falsely claimed:

1.  That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2.  That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3.  That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4.  To have all of the LLC's checking accounts attached.

314.    Prior to filing this frivolous law suit and abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

315.    This procedure would not permit Shelzi to remove all accounting records and evidence of Shelzi's alleged IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to prevent Foistner from providing this evidence to Auditor Quang.

316.    Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  All this, perfectly timed to interfere in the IRS Audit.

317.    Shelzi sued her own company, the LLC, by only requesting an Accounting that she had received years earlier, allowing her to write off the LLC' business losses.  Her request for an accounting was motivated by her desire to interfere in the IRS Audit and to remove all evidence of her alleged criminal activities from the purview of the IRS.

318.    The Defendants intentional unlawful acts by writing letters attempting to coerce the LLC not cooperating with the IRS, abusing the legal system by filing a frivolous Petition, in order to remove accounting records and evidence, during an IRS audit, in order to hide incriminating evidence, and finally, the physical destruction of the only Computer System used by the LLC, containing LLC only electronic copy of the accounting data, clearly met the requisite elements of the crime of Attempts To Interfere With the Administration of Internal Revenue Laws,  26 U.S.C. § 7212.

319.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005.

## COUNT FIFTEEN
## STOLEN GOODS TRANSPORTATION OF STOLEN GOODS – COMPUTERS AND DATA AND SOFTWARE

320.    The Plaintiffs re-allege paragraphs 1-319 as though restated in full herein and not inconsistent herein.

321.    As stated herein, after Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, the LLC' attorney, her alleged criminal conduct increased.  Not only did Shelzi and her representative criminally interfere with the administration of internal revenue laws, the IRS audit by removing the accounting records from J. Foistner, during the audit, they, as alleged criminal conspirators, stole, removed and converted the LLC 's only Notebook

Computer that maintained and stored the only electronic copy of the LLC's accounting data, tax data and company data.

322.    The computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2009.  Additionally, Hassel destroyed and sabotaged the LLC's only back-up electronic copy of this data and software housed at Foistner Law Offices.  The Server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only LLC electronic data backup was destroyed.  These were criminal acts committed by Hassel.  Hassel transported the computer, data and software without authority across State lines.

323.    When Shelzi and Hassel realized that Shelzi's tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, when the Defendants realized that their unlawful acts to interfere in the IRS Audit had failed, and after Attorney Laboe and Shelzi successfully removed all accounting records, during the audit, these alleged Racketeers completed their final act of conspiracy by destroying the electronic equipment thereby destroying all electronic data.

324.    The evidence, stored on the LLC's computer system and at Foistner Law Offices Computer Server, was destroyed so that the incriminating evidence could not be used by the IRS.

325.    The Defendants criminal actions to convert and destroy the LLC's only computer, the LLC's only set of electronic accounting records, and Foistner Law Offices only Server, constitute the crimes of Grant Larceny and Transportation of Stolen Goods, 18 U.S.C. § 2314 and other Federal and State crimes with the intent to defraud the IRS.

326.    After Foistner reported Shelzi's alleged tax fraud to the Auditor and also the IRS Criminal Investigation Division and provided Shelzi and her representative with the notice of his actions taken in regard to the IRS Settlement, as manager of the LLC, Shelzi realized that by

70

capitalizing close to $6-million worth of expenses that Shelzi had, or was going to write-off, as losses, his client would now owe millions on taxes and penalties.

327.     Shelzi's representative filed another Petition to remove J. Foistner, as a Manager by making misrepresentations and knowingly making false statements to the Court in an attempt to mislead the Court, that Foistner was unlawfully and without authorization acting as Manager of LLC.  Shelzi also asked the court to remove J. Foistner as the "Tax Matter Person" for LLC. This, an impossibility, because Foistner, remained the only owner, of the company.

328.     Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

## COMMON LAW CAUSE OF ACTIONS
## COUNT SIXTEEN
## BREACH OF FIDUCIARY DUTIES
## BUTLER BANK

329.     The Plaintiffs re-allege paragraphs 1-328 as though restated in full herein and not inconsistent herein.

330.     In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them.

331.     As a commercial lender and bank, Butler Bank had a fiduciary relationship with the LLC, its borrower, and Plaintiff, L. Foistner, its borrower and personal guarantor and other LLC members and the manager under these circumstances and conditions alleged herein.

332.     Butler Bank breached its fiduciary duties to take all reasonable steps that were fair and reasonable as a commercial lender.  Butler Bank, in concert with Shelzi and others, aided and abetted the many alleged felony crimes set forth herein for its financial gain.

333.     Butler Bank's fiduciary duties included a duty to act fairly and in good faith and a duty of care, regarding their level of attention and diligence in the business and operations of the LLC.  Butler Bank breached its duty by not informing the LLC and Guarantor of Shelzi's fraudulent conduct, forgery and other crimes.

334.     Butler Bank also breached its fiduciary duty of loyalty by aiding and abetting Shelzi in the commission of the alleged crimes.  Butler also failed to work honestly with the other member and manager and to provide timely notices of Shelzi's alleged crimes, the forged checks and exchanged checks, necessary information and protection for its borrowers.

335.     Butler Bank's intentional silence and refusal to protect its borrower's interests and rights from the many alleged criminal and fraudulent acts committed by the Defendants, once Butler Bank became aware of these crimes, further breached its duties, as a fiduciary, to the LLC.

336.     All of these actions, individually and as a concerted scheme, have harmed and damaged the LLC for which they are entitled to damages as a result of Butler Bank's breaches of its fiduciary duties.

337.     That the Defendants breach of duty has caused the Plaintiffs damages, whereby the Plaintiffs seek enhanced compensatory damages, attorney fees and costs.

## COUNT SEVENTEEN
## BREACH OF CONTRACT – BUTLER BANK LOAN
## AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

338.     The Plaintiffs re-allege paragraphs 1-337 as though restated in full herein and not inconsistent herein.

339.    In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by the LLC. The LLC reasonably relied upon them to their detriment.

340.    On or about April 12, 2005, Butler Bank entered into a real estate development loan agreement, the $1.8-million construction loan with the LLC.  This agreement established that $100,000 would be kept in reserve, not to be released, until the LLC had subdivided and recorded the 20th lot in the project. This $100,000 was earmarked to be paid to the Bedford design Consultants.

341.    On or about September 2005, Butler Bank entered into a contractual loan agreement with Shelzi and New Boston Estates LLC, as a 3rd party beneficiary and pre-approved contractor, for the lot 8-84-44, home construction project.

342.    Butler Bank breached its obligations and duties, express and implied, in the $1.8-million development loan contract and the lot 8-84-44 home construction contract.

343.    Butler bank breached its written contract when it allowed Shelzi to forge and convert the $100,000 earmarked for the Bedford design Consultants.

345.    Butler breached its written contract and committed fraud when it reissued checks from New Boston Estates LLC to Waldorf Estates Builders, LLC on lot 8-84-44, aiding and abetting Shelzi to forge and embezzle these loan funds.

346.    The LLC, specifically J. Foistner and K. Prive, made repeated requests for Butler Bank to meet its contractual obligations but Butler had refused to do so.

347.    As set forth above, Butler Bank has breached its contractual obligations which has caused harm for which the LLC seek damages.

73

348.    That as a direct result of the Defendants breach, the LLC have been damaged and are seeking, in addition, attorney fees and costs.

349.    The Butler Bank did breach the Implied Covenant of Good Faith and Fair Dealing as set forth herein.

**COUNT EIGHTEEN**
**NEGLIGENCE – BUTLER BANK**

350.    The Plaintiffs re-allege paragraphs 1-349 as though restated in full herein and not inconsistent herein.

351.    The Defendant, Butler Bank owed the LLC a duty to conduct its business operation in a commercially reasonable manner and to exercise due diligence and care.

352.    Butler Bank did breach the duty it owed to the LLC as follows but without limiting the foregoing:

a.    Did negligently administer the loan in a commercially unreasonable manner by allowing Shelzi to embezzle money;

b.    Did fail to properly and timely administer the $1.8-million construction loan;

c.    Did fail to properly and timely administer the $990,000, lot 8-84-44, home construction loan;

d.    Did negatively and fraudulently impact the Plaintiff's credit score, credit standing and reputation;

e.    Did fail to administer the requisition and disbursements of the $1.8-million development loan;

f.    Did fail to administer the requisition and disbursements of the $990,000, lot 8-84-44, construction loan; and

g.    Did fail to report the Shelzi crimes to law enforcement and Plaintiffs.

353.    That as a direct and proximate cause of the Defendants negligence, the Plaintiffs have been damaged.

354.     The Plaintiffs are seeking enhanced compensatory damages as a result of the Defendants wanton, willful, malicious or oppressive conduct.

## COUNT NINETEEN
## NEGLIGENT MISREPRESENTATION

355.     The Plaintiffs re-allege paragraphs 1-354 as though restated in full herein and not inconsistent herein.

356.     Butler Bank made certain representation concerning the $1.8-million development loan, the $990,000, Shelzi lot 8-84-44, home construction loan, and the $990,000, L. Foistner, lot 8-84-38, home construction loan, the new loans, the loan process, and what the Defendants could do, for the Waldorf Estates, 20 lot, Phase III project, owned by the LLC, which were uttered in an effort to induce the LLC to become bank customers.

357.     The representations were material and were false.

358.     The LLC justifiably relied upon the representations.

359.     That as a result of the negligent representations, the Plaintiffs have sustained substantial damages and are seeking enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY
## FRAUDULENT MISREPRESENTATION

360.     The Plaintiffs re-allege paragraphs 1-359 as though restated in full herein and not inconsistent herein.

361.     The Defendants representations were material facts relied upon by the LLC. Specifically that the loan proceeds of the $1.8-million loan would only be used for the development of the project and construction of the roads, not the personal use of Shelzi.

362.   Specifically that the loan funds for the lot 8-84-44, construction loan, would only be used for the construction of the home and payment of approved contractors, not for the benefit of Shelzi.

363.   Butler Bank promised to provide construction loans, for all 20 lots of the project, two at the time, after the construction of the two model homes on lot 8-84-44 and 8-84-38 which it failed to do.

364.   The representations were made with fraudulent intent to induce the LLC to become bank customers.

365.   That the LLC honestly believed the representations and justifiably relied upon them.

366.   That as a result of the LLC reliance on the misrepresentations, the LLC has sustained damages including enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY ONE
## CONVERSION BUTLER BANK

367.   The Plaintiffs re-allege paragraphs 1-366 as though restated in full herein and not inconsistent herein.

368.   Butler Bank had exercised dominion and control over the stolen and forged money, all checks, with the intent to deprive the LLC and 3rd parties of their ownership interest. Upon information and belief, Butler Bank provided the checks and stolen money to Shelzi and her alleged Racketeers.

369.   Butler Banks has and is interfering with the LLC rights of possession of these loan funds.

370.   The LLC is entitled to an immediate right of possession of the loan funds.

371.   The LLC is demanding that Butler Bank pay these loan funds, for which they collected and received monthly interest payments together with enhanced compensatory damages as a result of Butler Bank's willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY TWO
## CONVERSION- COMPUTERS

372.   The Plaintiffs re-allege paragraphs 1-371 as though restated in full herein and not inconsistent herein.

373.   Shelzi had exercised dominion and control over the stolen computer, its software and accounting data, with the intent to deprive the LLC and 3rd parties of their ownership interest.  Upon information and belief, her agent and/or representative Hassel, destroyed the Foistner Law Offices computer server, the LLC notebook computer, the operating and accounting software licenses and the accounting data in order to aid Shelzi in defrauding the IRS and to destroy evidence during the IRS audit.

374.   The Defendants have interfered with the LLC's rights of possession of these computers and intellectual property.

375.   The LLC is entitled to an immediate right of possession of these chattels.

376.   The LLC is demanding that the Defendants pay for the value of these computers, electronic recovery cost and chattel of the LLC together with enhanced compensatory damages as a result of Defendants willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY THREE
## CIVIL CONSPIRACY

377.  The Plaintiffs re-allege paragraphs 1-376 as though restated in full herein and not inconsistent herein.

378.  The Defendants collectively did engage in acts as set forth herein constituting a conspiracy.

379.  Each Defendant, by his/her/its conduct, aided and abetted the conspiracy to defraud and render the LLC bankrupt and harm the Plaintiffs.

380.  As a result of the Defendants concerted acts, the Plaintiffs have been damaged as set forth herein.

**WHEREFORE**, the Plaintiffs demand trial by jury and judgment as follows:

1.  Damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank, jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of their racketeering activities, conspiracy and aiding and abetting in racketeering activities;

2.  Treble damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank pursuant to 18 U.S.C. § 1964(c);

3.  Damages against Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of the Defendants' conspiracy to commit common law fraud and other cause of actions along with enhanced compensatory damages to the extent allowed by New Hampshire law;

4.    Prejudgment interest on the amount of damages and/or losses that the Plaintiffs have sustained; and

5.  All costs of litigation incurred by the Plaintiffs including its reasonable attorneys' fees and experts' fees, pursuant to 42 U.S.C. § 1988 and/or 18 U.S.C. § 964(c);

## THE STATE OF NEW HAMPSHIRE

### APPEARANCE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
NORTHERN DISTRICT                                    DOCKET #09-C-0522

_____COURT
 X   JURY

Seff Enterprises & Holdings, LLC & Laurie Foistner
Plaintiffs,

v.

Butler Bank, Robert Chapman,
Antonia Shelzi and Hans Harro Hassel,
Defendants.

| **APPEARANCE** | **WITHDRAWAL** |
|---|---|

Please enter my Appearance as               Please withdraw my Appearance as
counsel for:                                 counsel for:

 X     Butler Bank and Robert Chapman         _____ Defendant

__     Pro se                                 Notice of withdrawal sent to my
                                              client on

                                              At the following address:

                                              _____

I hereby certify that a duplicate
of this notice was mailed to:

William Aivalikles, Esq.
60 Main Street, Suite 230
Nashua, NH 03060

On:  September 30, 2009

Signed      _____
            Stephen A. Duggan, Esq.
            NH Bar #11280
            SHAHEEN & GORDON
            P.O. Box 2703
            Concord, NH 03302
            (603) 225-7262

THE STATE OF NEW HAMPSHIRE

**APPEARANCE**

HILLSBOROUGH, SS.                                    SUPERIOR COURT
NORTHERN DISTRICT                                    DOCKET #09-C-0522

_____COURT
 X   JURY

Seff Enterprises & Holdings, LLC & Laurie Foistner
Plaintiffs,

v.

Butler Bank, Robert Chapman,
Antonia Shelzi and Hans Harro Hassel,
Defendants.

| **APPEARANCE** | **WITHDRAWAL** |
|---|---|

Please enter my Appearance as              Please withdraw my Appearance as
counsel for:                               counsel for:

 X    Butler Bank and Robert Chapman        _____ Defendant

_    Pro se                                 Notice of withdrawal sent to my
                                            client on

                                            At the following address:

                                            _____

I hereby certify that a duplicate
of this notice was mailed to:

William Aivalikles, Esq.
60 Main Street, Suite 230
Nashua, NH 03060

On:  September 30, 2009

Signed    _____
          Karyn P. Forbes, Esq.
          NH Bar #834
          SHAHEEN & GORDON
          P.O. Box 2703
          Concord, NH 03302
          (603) 225-7262

5