THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                        NORTHERN DISTRICT

Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522

**ANSWER OF THE DEFENDANTS, BUTLER BANK
AND ROBERT CHAPMAN**

NOW COME the Defendants, Butler Bank and Robert Chapman, by and through

counsel, Shaheen & Gordon, P.A. and Answers the Plaintiffs' Complaint as follows:

**INTRODUCTION**

Defendants Butler Bank and Robert Chapman (hereinafter "Defendants") deny the allegations in

the Introduction of the Complaint.

**PARTIES**

1.    The Defendants Butler Bank and Robert Chapman admit the allegations in

Paragraph 1 of the Complaint.

2.    The Defendants Butler Bank and Robert Chapman admit the allegations in

Paragraph 2 of the Complaint.

3.    The Defendants Butler Bank and Robert Chapman admit the allegations in

Paragraph 3 of the Complaint.

4.    The Defendants Butler Bank and Robert Chapman admit the allegations in

Paragraph 3 of the Complaint except that Robert Chapman is a former employee

of Butler Bank.

5.      The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 5 of the Complaint and therefore those allegations are denied.

6.      The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 5 of the Complaint and therefore those allegations are denied.

### FACTS

7.      The Defendants Butler Bank and Robert Chapman admit that Seff Enterprises & Holdings, LLC "LLC" was formed in 2000.  Defendants are without sufficient information to either admit or deny the remaining allegations in Paragraph 7 of the Complaint and, therefore, these allegations are denied.

8.      The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 8 of the Complaint and, therefore, these allegations are denied.

9.      The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 9 of the Complaint and, therefore, these allegations are denied.

10.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 10 of the Complaint and, therefore, these allegations are denied

11.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 11 of the Complaint and, therefore, these allegations are denied

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

12.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 12 of the Complaint and, therefore, these allegations are denied.

13.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 13 of the Complaint and, therefore, these allegations are denied.

14.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 14 of the Complaint and, therefore, these allegations are denied.

15.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 15 of the Complaint and, therefore, these allegations are denied.

16.     The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 16 of the Complaint.

17.     The Defendants Butler Bank and Robert Chapman admit the allegations in Paragraph 17 of the Complaint.

18.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 18 of the Complaint and, therefore, these allegations are denied.

19.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 19 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

20.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 20 of the Complaint and, therefore, these allegations are denied.

21.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 21 of the Complaint and therefore those allegations are denied.

22.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 21 of the Complaint and therefore those allegations are denied.

23.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 23 of the Complaint and, therefore, these allegations are denied.

24.    The Defendants Butler Bank and Robert Chapman admit Attorney Morgan Hollis was hired.  Defendants are without sufficient information to either admit or deny the remaining allegations in Paragraph 24 of the Complaint and, therefore, these allegations are denied.

25.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 25 of the Complaint and, therefore, these allegations are denied.

26.    The Defendants Butler Bank and Robert Chapman admit that Antonia Shelzi apparently purchased L. Maynard's 50% ownership interest in the LLC, that Ms. Shelzi was associated with Di Iulio, Becks and Oberhauser and that her at least one of her financial statements depicted her total assets to exceed $27,115,000.  Defendants are without sufficient

4

information to either admit or deny the remaining allegations in Paragraph 26 of the Complaint and, therefore, these allegations are denied.

27.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 27 of the Complaint and, therefore, these allegations are denied.

28.     Paragraph 28 of the Complaint consists of purely legal allegations and legal conclusions. As such, it calls for no response by Butler Bank or Robert Chapman. To the extent any response is required Defendants deny the allegations in Paragraph 28 of the Complaint.

29.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 29 of the Complaint and, therefore, these allegations are denied.

30.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 30 of the Complaint and, therefore, these allegations are denied.

31.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 31 of the Complaint and, therefore, these allegations are denied.

32.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 32 of the Complaint and, therefore, these allegations are denied.

33.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 33 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

34.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 34 of the Complaint and, therefore, these allegations are denied.

35.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 35 of the Complaint and, therefore, these allegations are denied.

36.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 36 of the Complaint and, therefore, these allegations are denied.

37.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 37 of the Complaint and, therefore, these allegations are denied.

38.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 38 of the Complaint and, therefore, these allegations are denied.

39.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 39 of the Complaint and, therefore, these allegations are denied.

40.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 40 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

41.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 41 of the Complaint and, therefore, these allegations are denied.

42.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 42 of the Complaint and, therefore, these allegations are denied.

43.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 43 of the Complaint and, therefore, these allegations are denied.

44.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 44 of the Complaint and, therefore, these allegations are denied.

45.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 45 of the Complaint and, therefore, these allegations are denied.

46.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 46 of the Complaint and, therefore, these allegations are denied.

47.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 47 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

48.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 48 of the Complaint and, therefore, these allegations are denied.

49.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 49 of the Complaint and, therefore, these allegations are denied.

50.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 50 of the Complaint and, therefore, these allegations are denied.

51.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 51 of the Complaint and, therefore, these allegations are denied.

52.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 52 of the Complaint and, therefore, these allegations are denied.

53.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 53 of the Complaint and, therefore, these allegations are denied.

54.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 54 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

55.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 55 of the Complaint and, therefore, these allegations are denied.

56.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 56 of the Complaint and, therefore, these allegations are denied.

57.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 57 of the Complaint and, therefore, these allegations are denied.

58.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 58 of the Complaint and, therefore, these allegations are denied.

59.  The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 59 of the Complaint and, therefore, these allegations are denied.

60.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 60 of the Complaint and, therefore, these allegations are denied.

61.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 61 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

62.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 62 of the Complaint and, therefore, these allegations are denied.

63.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 63 of the Complaint and, therefore, these allegations are denied.

64.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 64 of the Complaint and, therefore, these allegations are denied.

65.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 65 of the Complaint and, therefore, these allegations are denied.

66.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 66 of the Complaint and, therefore, these allegations are denied.

67.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 67 of the Complaint and, therefore, these allegations are denied.

68.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 68 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

69.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 69 of the Complaint and, therefore, these allegations are denied.

70.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 70 of the Complaint and, therefore, these allegations are denied.

71.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 71 of the Complaint and, therefore, these allegations are denied.

72.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 72 of the Complaint and, therefore, these allegations are denied.

73.     Paragraph 73 of the Complaint consists of purely legal allegations and legal conclusions. As such, it calls for no response by Butler Bank or Robert Chapman. To the extent any response is required the Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 73 of the Complaint and, therefore, these allegations are denied.

74.     The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 74 of the Complaint and, therefore, these allegations are denied.

75.     The Defendants Butler Bank and Robert Chapman admit that Shelzi became a member of the LLC in 2002. Defendants are without sufficient information to either admit or

11

deny the allegations in Paragraph 75 of the Complaint and, therefore, these allegations are denied.

76.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 76 of the Complaint and, therefore, these allegations are denied.

77.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 77 of the Complaint and, therefore, these allegations are denied.

78.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 78 of the Complaint and, therefore, these allegations are denied.

79.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 79 of the Complaint and, therefore, these allegations are denied.

80.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 80 of the Complaint and, therefore, these allegations are denied.

81.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 81 of the Complaint and, therefore, these allegations are denied.

82.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 82 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

83.    The Defendants Butler Bank and Robert Chapman admit the allegations in Paragraph 83 of the Complaint.

84.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 84 of the Complaint and, therefore, these allegations are denied.

85.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 85 of the Complaint and, therefore, these allegations are denied.

86.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 86 of the Complaint and, therefore, these allegations are denied

87.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 87 of the Complaint and, therefore, these allegations are denied.

88.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 88 of the Complaint and, therefore, these allegations are denied.

89.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 89 of the Complaint and, therefore, these allegations are denied.

90.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 90 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

91.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 91 of the Complaint and, therefore, these allegations are denied.

92.    The Defendants Butler Bank and Robert Chapman admit that New Boston Estates, LLC and Waldorf Estates Builders, LLC were created.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the remaining allegations in Paragraph 92 of the Complaint and, therefore, these allegations are denied.

93.    The Defendants Butler Bank and Robert Chapman admit that loan applications were submitted by Prive and J. Foistner. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the remaining allegations in Paragraph 93 of the Complaint and, therefore, these allegations are denied.

94.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 94 of the Complaint and, therefore, these allegations are denied

95.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 95 of the Complaint and, therefore, these allegations are denied.

96.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 96 of the Complaint and, therefore, these allegations are denied.

97.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 97 of the Complaint and, therefore, these allegations are denied.

14

98.     The Defendants Butler Bank and Robert Chapman admit the loan closed in September of 2005 for $990,000.  The Defendants are without sufficient information to admit or deny the remaining allegations in Paragraph 98 of the Complaint and, therefore, these allegations are denied.

99.     The Defendants Butler Bank and Robert Chapman admit that Brown Excavation performed work on the Property and invoiced $65,003.06 for their work.   The Defendants are without sufficient information to admit or deny the remaining allegations in Paragraph 99 of the Complaint and, therefore, these allegations are denied.

100.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 100 of the Complaint and, therefore, these allegations are denied.

101.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 101 of the Complaint and, therefore, these allegations are denied.

102.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 102 of the Complaint and, therefore, these allegations are denied.

103.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 103 of the Complaint and, therefore, these allegations are denied.

104.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 104 of the Complaint and, therefore, these allegations are denied.

15

105.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 105 of the Complaint and, therefore, these allegations are denied.

106.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 106 of the Complaint and, therefore, these allegations are denied.

107.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 107 of the Complaint and, therefore, these allegations are denied.

108.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 108 of the Complaint and, therefore, these allegations are denied.

109.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 109 of the Complaint and, therefore, these allegations are denied.

110.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 110 of the Complaint and, therefore, these allegations are denied.

111.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 111 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

112.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 112 of the Complaint and, therefore, these allegations are denied.

113.    The Defendants Butler Bank and Robert Chapman admit that Butler Bank sent check number 7148 and that Shelzi apparently received it.  Defendants are without sufficient information to either admit or deny the remaining allegations in Paragraph 113 of the Complaint and, therefore, these allegations are denied.

114.    The Defendants Butler Bank and Robert Chapman admit that the check was made payable to "Seff Enterprises & Holdings LLC, Antonia Shelzi and Laurie Foistner, Members." Defendants are without sufficient information to either admit or deny the remaining allegations in Paragraph 114 of the Complaint and, therefore, these allegations are denied.

115.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 115 of the Complaint and, therefore, these allegations are denied.

116.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 116 of the Complaint and, therefore, these allegations are denied.

117.    The Defendants Butler Bank and Robert Chapman admit that the words "Pay to the order of Domenic Shelzi" were written on the check.  The remaining portions of Paragraph 117 of the Complaint consist of purely legal allegations and legal conclusions.  As such, it calls for no response by Butler Bank or Robert Chapman.  To the extent any response is required the Defendants are without sufficient information to either admit or deny the allegations in the

17

remaining portions of Paragraph 117 of the Complaint and, therefore, these allegations are denied.

118.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 118 of the Complaint.

119.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 119 of the Complaint and, therefore, these allegations are denied.

120.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 120 of the Complaint and, therefore, these allegations are denied.

121.    Paragraph 121 of the Complaint consists of purely legal allegations and legal conclusions. As such, it calls for no response by Butler Bank or Robert Chapman. To the extent any response is required, the Defendants are without sufficient information to either admit or deny the allegations in the remaining portions of Paragraph 121 of the Complaint and, therefore, these allegations are denied.

122.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 122 of the Complaint and, therefore, these allegations are denied. The Defendants deny that Butler Bank and/or Robert Chapman violated any State or federal laws.

123.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 123 of the Complaint and, therefore, these allegations are denied.

18

124.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 124 of the Complaint.

125.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 125 of the Complaint.

126.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 126 of the Complaint.

127.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 127 of the Complaint.

128.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 128 of the Complaint and, therefore, these allegations are denied.

129.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 129 of the Complaint and, therefore, these allegations are denied

130.    Admitted that Attorney Hollis wrote a letter dated September 15, 2005 to Butler Bank which speaks for itself.   The Defendants Butler Bank and Robert Chapman deny the remaining allegations in Paragraph 130 of the Complaint.

131.    The Defendants Butler Bank and Robert Chapman admit that Check No. 7324 in the amount of $100,000.00 was reissued on September 12, 2005 to "Seff Enterprises & Holdings LLC, Antonia Shelzi and Laurie Foistner, Member." The Defendants deny the remaining allegations in Paragraph 131 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

132.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 132 of the Complaint and, therefore, these allegations are denied.

133.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 133 of the Complaint and, therefore, these allegations are denied.

134.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 134 of the Complaint and, therefore, these allegations are denied.

135.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 135 of the Complaint and, therefore, these allegations are denied.

136.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 136 of the Complaint and, therefore, these allegations are denied.

137.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 137 of the Complaint and, therefore, these allegations are denied

138.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 138 of the Complaint and, therefore, these allegations are denied

139.    The Defendants Butler Bank and Robert Chapman deny the allegations in paragraph 139 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

140.    The Defendants Butler Bank and Robert Chapman deny that Robert Chapman violated any State or federal law. Defendants are without sufficient information to either admit or deny the allegations in Paragraph 140 of the Complaint and, therefore, these allegations are denied.

141.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 141 of the Complaint and, therefore, these allegations are denied.

142.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 142 of the Complaint.

143.    Paragraph 143 of the Complaint consists of purely legal allegations and legal conclusions. As such, it calls for no response by Butler Bank or Robert Chapman. To the extent any response is required Defendants deny that they have violated any federal or state law. The Defendants Butler Bank and Robert Chapman deny the remaining allegations in Paragraph 143 of the Complaint.

144.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 144 of the Complaint.

145.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 145 of the Complaint and, therefore, these allegations are denied.

146.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 146 of the Complaint.

21

147.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 147 of the Complaint and, therefore, these allegations are denied.

148.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in the first sentence of Paragraph 148 of the Complaint and, therefore, these allegations are denied.   The Defendants Butler Bank and Robert Chapman deny the remaining allegations in Paragraph 148 of the Complaint.

149.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in the first sentence of Paragraph 149 of the Complaint and, therefore, these allegations are denied.

150.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 150 of the Complaint.

151.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 151 of the Complaint.

152.    The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the allegations in Paragraph 152 of the Complaint and, therefore, these allegations are denied

153.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 153 of the Complaint.

154.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 154 of the Complaint and, therefore, these allegations are denied.

22

155.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 155 of the Complaint and, therefore, these allegations are denied.

156.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 156 of the Complaint.

157.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 157 of the Complaint.

158.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 158 of the Complaint and, therefore, these allegations are denied.

159.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 159 of the Complaint and, therefore, these allegations are denied.

160.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 160 of the Complaint and, therefore, these allegations are denied.

161.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 161 of the Complaint and, therefore, these allegations are denied.

162.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 162 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

163.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 163 of the Complaint and, therefore, these allegations are denied.

164.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 164 of the Complaint and, therefore, these allegations are denied.

165.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 165 of the Complaint and, therefore, these allegations are denied.

166.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 166 of the Complaint and, therefore, these allegations are denied.

167.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 167 of the Complaint and, therefore, these allegations are denied.

168.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 168 of the Complaint and, therefore, these allegations are denied.

169.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 169 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

170.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 170 of the Complaint and, therefore, these allegations are denied.

171.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 171 of the Complaint and, therefore, these allegations are denied.

172.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 172 of the Complaint and, therefore, these allegations are denied.

173.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 173 of the Complaint and, therefore, these allegations are denied.

174.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 174 of the Complaint and, therefore, these allegations are denied.

175.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 175 of the Complaint and, therefore, these allegations are denied.

176.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 176 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

177.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 177 of the Complaint and, therefore, these allegations are denied.

178.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 178 of the Complaint and, therefore, these allegations are denied.

179.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 179 of the Complaint and, therefore, these allegations are denied.

180.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 180 of the Complaint and, therefore, these allegations are denied.

181.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 181 of the Complaint and, therefore, these allegations are denied.

182.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 182 of the Complaint and, therefore, these allegations are denied.

183.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 183 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

184.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 184 of the Complaint and, therefore, these allegations are denied.

185.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 185 of the Complaint and, therefore, these allegations are denied.

186.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 186 of the Complaint and, therefore, these allegations are denied.

187.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 187 of the Complaint and, therefore, these allegations are denied.

188.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 188 of the Complaint and, therefore, these allegations are denied.

189.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 189 of the Complaint and, therefore, these allegations are denied.

190.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 190 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

191.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 191 of the Complaint and, therefore, these allegations are denied.

192.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 192 of the Complaint and, therefore, these allegations are denied.

193.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 193 of the Complaint and, therefore, these allegations are denied.

194.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 194 of the Complaint and, therefore, these allegations are denied.

195.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 195 of the Complaint and, therefore, these allegations are denied.

196.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 196 of the Complaint and, therefore, these allegations are denied.

197.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 197 of the Complaint and, therefore, these allegations are denied.

198.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 198 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

199.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 199 of the Complaint and, therefore, these allegations are denied.

200.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 200 of the Complaint.

201.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 201 of the Complaint and, therefore, these allegations are denied.

202.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 202 of the Complaint and, therefore, these allegations are denied.

203.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 203 of the Complaint and, therefore, these allegations are denied.

204.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 204 of the Complaint and, therefore, these allegations are denied.

205.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 205 of the Complaint and, therefore, these allegations are denied.

206.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 206 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## A RICO CLAIM'S 18 U.S.C. §96, ET SEQ
## COUNT ONE: RACKETEERING

207.   The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-206 of the Complaint. .

208.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 208 of the Complaint.

209.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 209 of the Complaint.

210.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 210 of the Complaint.

211.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 211 of the Complaint.

212.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 212 of the Complaint.

213.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 213 of the Complaint.

214.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 214 of the Complaint.

215.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 215 of the Complaint.

216.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 216 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

217.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 217 of the Complaint.

218.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 218 of the Complaint.

219.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 219 of the Complaint.

220.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 220 of the Complaint.

221.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 221 of the Complaint.

## COUNT TWO
## RICO – AIDING AND ABETTING

222.    The Defendants Butler Bank and Robert Chapman answer as stated in Paragraphs 1-221 above.

223.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 223 of the Complaint.

224.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 224 of the Complaint.

225.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 225 of the Complaint.

226.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 226 of the Complaint.

31

227.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 227 of the Complaint.


## COUNT THREE
## CONSPIRACY TO COMMIT BANK FRAUD AND OTHER CRIMES

228.    The Defendants Butler Bank and Robert Chapman answer as stated in Paragraphs 1-228 of the Complaint.

229.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 228 of the Complaint.

230.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 230 of the Complaint.

231.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 231 of the Complaint.


## COUNT FOUR
## BANK FRAUD AND FELONY FORGERY
## THE FIRST $100-THOUSAND CHECK FORGED BY THE DEFENDANTS

232.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-231 of the Complaint.

233.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 232 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

234.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 234 of the Complaint and, therefore, these allegations are denied.

235.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 235 of the Complaint and, therefore, these allegations are denied.

236.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 236 of the Complaint and, therefore, these allegations are denied.

237.   Paragraph 237 of the Complaint consists of purely legal allegations and legal conclusions.  As such, it calls for no response by Butler Bank or Robert Chapman.  To the extent any response is required the Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the remaining allegations in Paragraph 237 of the Complaint and, therefore, these allegations are denied.

238.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 238 of the Complaint and, therefore, these allegations are denied.

239.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 239 of the Complaint and, therefore, these allegations are denied.

240.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 240 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

241.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 241 of the Complaint and, therefore, these allegations are denied.

242.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 242 of the Complaint.

243.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 243 of the Complaint.

### COUNT FIVE
### BANK FRAUD AND ATTEMPTED LARCENY
### THE FIRST $100-THOUSAND CHECK
### ATTEMPTED TO BE CONVERTED BY THE DEFENDANTS

244.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-244. .

245.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 245 of the Complaint.

246.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 246 of the Complaint.

247.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 247 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT SIX
## BANK FRAUD AND LARCENY THE SECOND $100 – THOUSAND CHECK
## AND THIRD $65-THOUSAND CHECK CONVERTED BY THE DEFENDANTS

248.    The Defendants Butler Bank and Robert Chapman answer as stated above in

Paragraphs 1-247 of the Complaint.

249.    The Defendants Butler Bank and Robert Chapman deny the allegations in

Paragraph 249 of the Complaint.

250.    The Defendants Butler Bank and Robert Chapman deny the allegations in

Paragraph 250 of the Complaint.

251.    The Defendants Butler Bank and Robert Chapman deny the allegations in

Paragraph 251 of the Complaint.

252.    The Defendants Butler Bank and Robert Chapman deny the allegations in

Paragraph 252 of the Complaint.

253.    The Defendants Butler Bank and Robert Chapman are without sufficient

information to either admit or deny the remaining allegations in Paragraph 253 of the Complaint

and, therefore, these allegations are denied

254.    The Defendants Butler Bank and Robert Chapman admit the allegations in

sentence one of Paragraph 254 of the Complaint. The Defendants Butler Bank and Robert

Chapman are without sufficient information to either admit or deny the remaining allegations in

Paragraph 254 of the Complaint and, therefore, these allegations are denied.

255.    The Defendants Butler Bank and Robert Chapman are without sufficient

information at this time to either admit or deny the remaining allegations in Paragraph 255 of the

Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

256. The Defendants Butler Bank and Robert Chapman are without sufficient information at this time to either admit or deny the remaining allegations in Paragraph 256 of the Complaint and, therefore, these allegations are denied.

257. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 257 of the Complaint.

258. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 258 of the Complaint and, therefore, these allegations are denied.

259. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 259 of the Complaint and, therefore, these allegations are denied.

260. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 260 of the Complaint and, therefore, these allegations are denied.

261. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 261 of the Complaint.

262. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 262 of the Complaint.

263. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 263 of the Complaint.

264. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 264 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

265.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 265 of the Complaint.

266.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 266 of the Complaint.

## COUNT SEVEN
## BANK FRAUD IDENTITY THEFT OPENING UP FALSE CHECKING ACCOUNT BY THE DEFENDANTS

267.   The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-266 of the Complaint.

268.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 268 of the Complaint.

269.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 269 of the Complaint and, therefore, these allegations are denied.   The Defendants Butler Bank and Robert Chapman deny the remaining allegations in Paragraph 269 of the Complaint.

270.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 270 of the Complaint.

271.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 271 of the Complaint.

272.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 272 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

273.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 273 of the Complaint and, therefore, these allegations are denied.

274.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 274 of the Complaint.

275.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 275 of the Complaint.

## COUNT EIGHT
## BANK FRAUD AND FORGERY OF CORPORATE RECORDS FORGING FEDERAL BANK FORMS AND CORPORATE FORMS TO OPEN FRAUDULENT CHECKING ACCOUNT BY THE DEFENDANTS

276.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-275 of the Complaint.

277.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 279 of the Complaint.

278.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 278 of the Complaint.

279.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 279 of the Complaint and, therefore, these allegations are denied.

280.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 280 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT NINE
### BANK FRAUD, STOLEN GOODS TRANSPORTATION OF STOLEN GOODS SECURITIES AND MONEY – THE FORGED CHECKS AND MONEY

281.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-280 of the Complaint.

282.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 282 of the Complaint.

283.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 283 of the Complaint.

284.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 284 of the Complaint.

285.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 285 of the Complaint.

286.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 286 of the Complaint.

287.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 287 of the Complaint.

## COUNT TEN
### FRAUD AND CRIMINAL SOLICITATION BY THE DFENDANTS TO COMMIT IRS TAX FRAUD

288.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-287 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

289. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 289 of the Complaint and, therefore, these allegations are denied.

290. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 290 of the Complaint and, therefore, these allegations are denied.

291. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 291 of the Complaint and, therefore, these allegations are denied.

292. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 292 of the Complaint and, therefore, these allegations are denied.

293. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 293 of the Complaint and, therefore, these allegations are denied.

294. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 294 of the Complaint and, therefore, these allegations are denied.

295. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 295 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703 603-225-7262

296.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 296 of the Complaint and, therefore, these allegations are denied.

297.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 297 of the Complaint and, therefore, these allegations are denied.

298.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 298 of the Complaint.

299.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 299 of the Complaint.

## COUNT ELEVEN
## FRAUD AND ATTEMPTS TO EVADE OR DEFEAT TAXES

300.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-299 of the Complaint.

301.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 301 of the Complaint and, therefore, these allegations are denied.

302.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 302 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT TWELVE
## FRAUD AND MAKING FALSE STATEMENTS

303.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-302 of the Complaint.

304.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 304 of the Complaint.

305.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 305 of the Complaint.

306.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 306 of the Complaint.

## COUNT THIRTEEN
## FRAUD AND FILING FRAUDULENT RETURNS,
## STATEMENTS AND DOCUMENTS

307.    The Defendants Butler Bank and Robert Chapman answer at stated above in Paragraphs 1-306 of the Complaint.

308.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 308 of the Complaint.

309.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 309 of the Complaint.

310.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 310 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT FOURTEEN
## FRAUD COERCION TO INTERFERE WITH ADMINISTRATION OF IRS LAWS

311.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-310 of the Complaint.

312.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 312 of the Complaint and, therefore, these allegations are denied.

313.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 313 of the Complaint and, therefore, these allegations are denied.

314.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 314 of the Complaint and, therefore, these allegations are denied.

315.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 315 of the Complaint and, therefore, these allegations are denied.

316.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 316 of the Complaint and, therefore, these allegations are denied.

317.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 317 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

318.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 318 of the Complaint and, therefore, these allegations are denied.

319.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 319 of the Complaint.

**COUNT FIFTEEN**
**STOLEN GOODS TRANSPORTATION OF**
**STOLEN GOODS – COMPUTERS AND DATA SOFTWARE**

320.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-319 of the Complaint.

321.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 321 of the Complaint and, therefore, these allegations are denied.

322.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 322 of the Complaint and, therefore, these allegations are denied.

323.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 323 of the Complaint and, therefore, these allegations are denied.

324.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 324 of the Complaint and, therefore, these allegations are denied.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

325.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 325 of the Complaint and, therefore, these allegations are denied.

326.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 326 of the Complaint and, therefore, these allegations are denied.

327.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 327 of the Complaint and, therefore, these allegations are denied.

328.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 328 of the Complaint and, therefore, these allegations are denied.


## COMMON LAW CAUSE OF ACTIONS COUNT-SIXTEEN
## BREACH OF FIDUCIARY DUTIES BUTLER BANK

329.   The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-328 of the Complaint.

330.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 330 of the Complaint.

331.   Paragraph 331 of the Complaint consists of purely legal allegations and legal conclusions.  As such, it calls for no response by Butler Bank or Robert Chapman.  To the extent any response is required Defendants deny the allegations in Paragraph 331 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

332.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 332 of the Complaint.

333.    Paragraph 333 of the Complaint consists of purely legal allegations and legal conclusions. As such, it calls for no response by Butler Bank or Robert Chapman. To the extent any response is required Defendants the allegations in Paragraph 333 of the Complaint.

334.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 334 of the Complaint.

335.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 335 of the Complaint.

336.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 336 of the Complaint.

337.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 337 of the Complaint.

## COUNT SEVENTEEN
### BREACH OF CONTRACT – BUTLER BANK LOAN
### AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

338.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-337 of the Complaint.

339.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 339 of the Complaint.

340. The Defendants Butler Bank and Robert Chapman admit the allegations in paragraph 340 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

341. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 341 of the Complaint and, therefore, these allegations are denied.

342. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 342 of the Complaint.

343. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 343 of the Complaint.

344. **The Complaint does not reflect a number 344**

345. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 345 of the Complaint.

346. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 346 of the Complaint.

347. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 347 of the Complaint.

348. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 348 of the Complaint.

349. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 349 of the Complaint.

## COUNT EIGHTEEN
## NEGLIGENCE – BUTLER BANK

350. The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-349 of the Complaint

47

351.    Paragraph 351 of the Complaint consists of purely legal allegations and legal conclusions.  As such, it calls for no response by Butler Bank or Robert Chapman.  To the extent any response is required Defendants deny the allegations in Paragraph 351 of the Complaint.

352.  The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 352 of the Complaint.

353.  The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 353 of the Complaint.

354.    Paragraph 354 of the Complaint consists of purely legal allegations and legal conclusions.  As such, it calls for no response by Butler Bank or Robert Chapman.  To the extent any response is required Defendants deny the allegations in Paragraph 354 of the Complaint.

## COUNT NINETEEN
## NEGLIGENT MISREPRESENTATION

355.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-354 of the Complaint.

356.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 356 of the Complaint.

357.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 357 of the Complaint.

358.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 358 of the Complaint.

359.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 359 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT – TWENTY FRAUDULENT MISREPRESENTATION

360.  The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-359 of the Complaint.

361.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 361 of the Complaint and, therefore, these allegations are denied. The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 361 of the Complaint.

362.   The Defendants Butler Bank and Robert Chapman admit that the loan funds for the lot 8-84-44 were to be used only for purposes set forth in the loan documents. The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 362 of the Complaint and, therefore, these allegations are denied.

363.   The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 363 of the Complaint and, therefore, these allegations are denied

364.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 364 of the Complaint.

365.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 365 of the Complaint.

366.   The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 366 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

## COUNT TWENTY ONE CONVERSION BUTLER BANK

367.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-366 of the Complaint.

368.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 368 of the Complaint.

369.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 369 of the Complaint.

370.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 370 of the Complaint.

371.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 371 of the Complaint.

## COUNT TWENTY TWO
## CONVERSION – COMPUTERS

372.    The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-371 of the Complaint.

373.    The Defendants Butler Bank and Robert Chapman are without sufficient information to either admit or deny the allegations in Paragraph 373 of the Complaint and, therefore, these allegations are denied.

374.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 374 of the Complaint.

375.    The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 375 of the Complaint.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

376.     The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 376 of the Complaint.

## COUNT TWENTY THREE CIVIL CONSPIRACY

377.     The Defendants Butler Bank and Robert Chapman answer as stated above in Paragraphs 1-376 of the Complaint.

378.     The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 378 of the Complaint.

379.     The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 379 of the Complaint.

380.     The Defendants Butler Bank and Robert Chapman deny the allegations in Paragraph 380 of the Complaint.

## DEFENDANTS DEMAND A JURY TRIAL ON ALL CLAIMS

## BRIEF STATEMENT OF AFFIRMATIVE DEFENSES

## AFFIRMATIVE DEFENSES

1.     Plaintiffs have failed to state a claim upon which relief may be granted.

2.     Plaintiffs' claims are barred, in whole or in part, by the Doctrine of Ratification.

3.     Plaintiffs' claims are barred, in whole or in part, by the Business Judgment Rule.

4.     Plaintiffs' claims are barred, in whole or in part, by the Doctrine of Waiver.

5.     Plaintiffs' claims are barred, in whole or in part, because Defendants were entitled to and did justifiably rely on the material information provided to them by others.

6.     Plaintiffs' claims, in whole or in part, are barred by laches.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

7.   This Court lacks jurisdiction.

8.   The Plaintiffs' claims are barred in whole, or in part, by the applicable Statute of
Limitations.

9.   This Court should abstain from exercising jurisdiction as the claims stated herein
should be adjudicated in state court.

10.  This Court should dismiss this action as the claims stated herein should be
adjudicated in state court.

11.  Plaintiffs' Complaint is barred by the applicable Statute of Limitations.

12.  Plaintiff's claim, in whole or in part, are barred by the Doctrine of Equitable
Estoppel.

13.  Plaintiffs' claims, in whole or in party, are barred by the Doctrine of Unclean
Hands.

14.  The Defendants Butler Bank and Robert Chapman's interactions with Antonia
Shelzi and Hans Harro Hassel, individually or jointly, did not constitute a "pattern
of racketeering activity" or an "enterprise" within the meaning of The Federal
Racketeering Influence Corrupt Organizations Act ("RICO"), 18 U.S.C. §96, et
seq.

15.  Plaintiffs have failed to plead the predicate acts for a RICO claim with sufficient
particularity with respect to their claims of mail fraud and in general.

16.  Plaintiffs' RICO claim is subject to dismissal as Plaintiffs have failed to file a
RICO case statement. See Miranda v. Ponce Fed. Bank, 948 F.2d 41 (1st Cir.
1991)

17.  Plaintiffs lack standing to bring a RICO claim.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD. NH 03302-2703  603-225-7262

18.  Plaintiffs' claims, in whole, or in part, are barred by the Doctrine of Collateral Estoppel.

19.  Plaintiffs have failed to allege fraud with sufficient particularity.

20.  Plaintiffs have failed to allege Bank Fraud under 18 U.S.C. §1344, et seq. with sufficient particularity.

21.  Plaintiffs lack standing to assert violations of state or federal criminal law.

22.  Plaintiffs' failure to state a cause of action, in part, as Defendants did not have a common law or statutory fiduciary duty to Plaintiffs.

23.  Plaintiffs have failed to allege fraudulent misrepresentation with sufficient particularity subjecting this claim to dismissal.

24.  Plaintiff's claims of conversion are barred as Plaintiffs have failed to allege conversion with sufficient particularity or establish that Defendants interfered with any ownership rights possessed by Plaintiffs.

25.  Plaintiffs' claims for attorney's fees are barred.

26.  Plaintiffs' claims for treble damages and enhanced compensatory damages are barred.

27.  Plaintiffs' have not suffered any damages caused by Defendants.

28.  Plaintiffs' claims, in whole or in part, are barred by the doctrine of *res judicata*.

29.  Plaintiffs have failed to mitigate their alleged damages.

30.  Plaintiffs' claims, in whole or in part, are barred by the Doctrine of Judicial Estoppel.

31.  Defendant reserves the right to add additional affirmative defenses in the event that grounds therefore appear after discovery.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

Respectfully submitted,

BUTLER BANK, INC. AND
ROBERT CHAPMAN
By and through counsel,

SHAHEEN & GORDON, PA

Date: November 3, 2009

Karyn P. Forbes, Esq.
Bar Number: ~~01216~~ 8534
107 Storrs Street, PO Box 2703
Concord, NH 03302-2703
Telephone: (603) 225-7262
Facsimile: (603) 225-5112
kforbes@shaheengordon.com

SHAHEEN & GORDON, PA

Date:   November 3, 2009

Stephen A. Duggan
BNH #11280
107 Storrs Street, PO Box 2703
Concord, NH 03302-2703
Telephone: (603) 225-7262
Facsimile: (603) 225-5112
sduggan@shaheengordon.com

## CERTIFICATE OF SERVICE

I do hereby certify that on this 3rd day of November 2009, a true and correct copy of the
Answer of Butler Bank and Robert Chapman were sent by first class mail, postage prepaid, to the
following:

Antonia Shelzi
10 Townsend Road
Belmont, MA 02478

Hans Harro Hassel
31 Lee Street
Cambridge, MA  02139

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
107 STORRS STREET, P.O. BOX 2703, CONCORD, NH 03302-2703  603-225-7262

William Aivalikles, Esquire
60 Main Street, Suite 230
Nashua, NH  03060


Date:   November 3, 2009

Stephen A. Duggan
BNH #11280
107 Storrs Street, PO Box 2703
Concord, NH 03302-2703
Telephone: (603) 225-7262
Facsimile:  (603) 225-5112
kforbes@shaheengordon.com

55

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER OF NEW HAMPSHIRE
AND FLORIDA BAR

PHONE
(603) 880-0303
FAX
(603) 882-0065
EMAIL
William@nhtriallaw.com

November 2, 2009

John M. Safford, Clerk
Hillsborough County Superior Court
Northern District
300 Chestnut Street
Manchester, NH  03101

Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al
        Docket No. 09-C-522

Dear Mr. Safford:

In light of the fact that an involuntary petition for bankruptcy had been filed against Seff Enterprises & Holdings, LLC, the matter should be stayed in the State Court at this time.  In light of the automatic stay, I do not believe that I can request new Orders of Notice to serve Antonia Shelzi and Hans Hassel, however, once the stay is lifted, I will then file an appropriate motion to perfect service.

Very truly yours,

William Aivalikles

WEA/rjb
Cc     Attorney Stephen Duggan
         Attorney Karyn Forbes
         Client

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                              SUPERIOR COURT
NORTHERN DISTRICT                             09-C-522

Seff Enterprises & Holdings, LLC
Laurie Foistner

v.

Butler Bank
Robert Chapman
Antonia Shelzi
Hans Harro Hassell


ORDER

The Court has been advised that a party to this litigation

has filed a Petition with the Federal Bankruptcy Court and has

sought the protection afforded by the bankruptcy laws from pursuit

of this case.  Accordingly, this case is stayed and is

administratively closed subject to reactivation, if appropriate,

upon the filing of a motion by any party.

By Order of the Court.


_____                    _____
Date                                     Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEFF ENTERPRISES & HOLDINGS LLC<br>LAURIE J. FOISTNER<br><br>Plaintiffs,<br><br>v.<br><br>BUTLER BANK<br>PEOPLES BANK<br><br>Defendants | CASE NO.<br><br>Removed From Hillsborough<br>County Superior Court North<br>Docket No. 09-C-522 |

(braces `}` appear between the two columns)

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, and 12 U.S.C. Section 1821(d)(6)(B), Plaintiffs Seff Enterprises & Holdings, LLC and Laurie J. Foistner (collectively, "Plaintiffs") remove this action to the United States District Court, for the District of Massachusetts.

### PROCEDURAL HISTORY

1.      On or about September 3, 2009, the Plaintiffs commenced this action against Butler Bank of Lowell, Massachusetts, and others (collectively, "Defendant"), through their Attorney, William Aivalikles, in the Superior Court for the State of New Hampshire, Hillsborough County, Northern District.

2.      This Removal Action pertains only to the Defendant Butler Bank, now Peoples Bank. The ongoing litigation against the other Defendants, Robert Chapman, Antonia Shelzi, and Hans Hassel, currently Docketed in the Superior Court for the State

of New Hampshire, Hillsborough County, Northern District, Docket No. 09-C-522, is requested to remain at the New Hampshire, Hillsborough County, Northern District Court.

3.      On or about Friday, April 16, 2010, Butler Bank, Lowell, MA was closed by the Massachusetts Division of Banks, and the Federal Deposit Insurance Corporation (FDIC) was named Receiver. No advance notice was given to the public, while all assets were sold and transferred to the Peoples Bank of Lowell, Massachusetts, who now maintains and controls the property of the Plaintiffs.

4.      On or about June 15, 2010, the Plaintiff promptly filed their Claim, in the amount of $26,810,530, to the Creditor Claims Agent, Claims Department of the Federal Deposit Insurance Corporation.

5.      On or about September 27, 2010, the FDIC provided their written **NOTICE OF DISALLOWANCE OF CLAIM**, via Certified Mail, 7010 1060 0002 2564 9485, to the Plaintiffs attorneys, Foistner Law Offices, P.C. of Andover, Massachusetts.

6.      The FDIC provided the following written Notice to the Plaintiffs, please see attached **NOTICE OF DISALLOWANCE OF CLAIM**, Exhibit A**:**

> Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

7.     The date of the FDIC's **NOTICE OF DISALLOWANCE OF CLAIM** is September 27, 2010, the date of this **REMOVAL ACTION** is November 10, 2010, well within the 60 day deadline limit allowed by the FDIC and 12 U.S.C. Section 1821 (d) (6).

8.     Plaintiffs file this Notice of Removal within the 60 day limit allowed by 12 U.S.C. Section 1821 (d) (6). Accordingly, removal is timely.

9.     Promptly after filing this Notice of Removal, Plaintiffs shall give written notice of the removal to the Receiver, the FDIC, and to the Clerk for the Superior Court in and for the Northern District of Hillsborough County, New Hampshire as provided in 28 U.S.C. 1446(d) and 12 U.S.C. Section 1821 (d) (6).  A true and correct copy of the Notice to Defendant / Receiver and to the Clerk of Court of removal of this action (without exhibits) is attached hereto as Exhibit B.

10.     A true and correct copy of the Writs and all other process and pleadings served on the Defendants are attached hereto as Exhibit C. Aside from the materials in Exhibit B, Plaintiffs are not aware of any other process, pleadings, or orders served upon them in this action.

11.     Plaintiffs shall also file a certified attested copy of the state court records, including this Notice of Removal, with this Court within ten (10) days after filing this Notice of Removal.  D.N.H. L.R. 81.1.

### THIS ACTION IS REQUIRED TO BE TRANSFERRED TO THE UNITED STATES DISTRICT COURT, DISTRICT OF MASSACHUSETTS PURSUANT TO 12 U.S.C. SECTION 1821 (d) (6).

12.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964 (c) ("RICO").

13.     12 U.S.C. Section 1821 (d) (6) establishes the authority, as demanded by the FDIC / Receiver, that this case be transferred to this Court.

## VENUE

14.     Removal to the United States District Court for the District of Massachusetts is proper because Butler Bank / Peoples Bank, maintains its primary place of business in Lowell, Massachusetts. 12 U.S.C. Section 1821 (d) (6) requires:

> Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

WHEREFORE, Plaintiffs, give notice that the above-captioned action, pending against Butler Bank / Peoples Bank in the Superior Court in and for the Northern District of Hillsborough County, New Hampshire, is removed to this Court.

Dated:  November 10, 2010                Respectfully submitted,

                                         SEFF ENTERPRISES & HOLDINGS, LLC
                                         LAURIE J. FOISTNER

                                         By their attorneys

                                         The Law Offices of Joseph A. Foistner, Esq.
                                         & Affiliates, P.C.

                           By    /s/ Joseph A. Foistner, Esq.

                                 _____
                                 Joseph A Foistner, Esq. (MABBO# 648871)
                                 800 Turnpike Street, Suite 300
                                 N. Andover, MA 01845
                                 Tel:  978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

_____
Joseph A Foistner, Esq. (MABBO# 648871)

**THE STATE OF NEW HAMPSHIRE**

**HILLSBOROUGH, SS**
**NORTHERN DISTRICT**

**SUPERIOR COURT**

SEFF ENTERPRISES & HOLDINGS LLC
LAURIE J. FOISTNER

v.

BUTLER BANK et al
Docket No. 09-C-0522

## NOTICE OF REMOVAL TO FEDERAL COURT
## DEFENDANT BUTLER BANK ONLY

Please take notice that, pursuant to 12 U.S.C. Section 1821 (d) (6), Plaintiffs Seff

Enterprises & Holdings, LLC and Laurie J. Foistner, (collectively "Plaintiffs") did, on

November 10, 2010, file a Notice of Removal of this action, on behalf of Defendant Butler

Bank only, all remaining Defendants, Robert Chapman, Antonia Shelzi and Hans H. Hassel

are to remain at the Hillsborough County Superior Court, to the United States District Court

for the District of Massachusetts.  A true and correct copy of the Notice of Removal is

attached hereto. This matter, on behalf of Butler Bank only, shall proceed hereafter in the

United States District Court for the District of Massachusetts.

Dated:  November 10, 2010                    Respectfully submitted,

                                             SEFF ENTERPRISES & HOLDINGS, LLC
                                             LAURIE J. FOISTNER

                                             By their attorneys

                                             The Law Offices of Joseph A. Foistner, Esq.
                                             & Affiliates, P.C.

1

By      /s/ Joseph A. Foistner, Esq.

_____
Joseph A Foistner, Esq. (MABBO# 648871)
800 Turnpike Street, Suite 300
N. Andover, MA 01845
Tel:  978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

_____
Joseph A Foistner, Esq. (MABBO# 648871)

**THE STATE OF NEW HAMPSHIRE**

**HILLSBOROUGH, SS**                                    **SUPERIOR COURT**
**NORTHERN DISTRICT**

SEFF ENTERPRISES & HOLDINGS LLC
LAURIE J. FOISTNER

v.

BUTLER BANK et al
Docket No. 09-C-0522

## NOTICE OF FILING OF NOTICE OF REMOVAL
## DEFENDANT BUTLER BANK ONLY

Please take notice that, pursuant to 12 U.S.C. Section 1821 (d) (6), Plaintiffs Seff

Enterprises & Holdings, LLC and Laurie J. Foistner, (collectively "Plaintiffs") did, on

November 10, 2010, file a Notice of Removal of this action, on behalf of Defendant Butler

Bank only, all remaining Defendants, Robert Chapman, Antonia Shelzi and Hans H. Hassel

are to remain at the Hillsborough County Superior Court, to the United States District Court

for the District of Massachusetts. A true and correct copy of the Notice of Removal is

attached hereto. This matter, on behalf of Butler Bank only, shall proceed hereafter in the

United States District Court for the District of Massachusetts.

Dated: November 10, 2010                 Respectfully submitted,

                                         SEFF ENTERPRISES & HOLDINGS, LLC
                                         LAURIE J. FOISTNER

                                         By their attorneys

                                         The Law Offices of Joseph A. Foistner, Esq.

1

& Affiliates, P.C.

By      /s/ Joseph A. Foistner, Esq.

_____

Joseph A Foistner, Esq. (MABBO# 648871)
800 Turnpike Street, Suite 300
N. Andover, MA 01845
Tel:  978-223-1446


## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

_____

Joseph A Foistner, Esq. (MABBO# 648871)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Civil Action
No: 10-11979-PBS

**Seff Enterprises & Holdings LLC, et al**
Plaintiffs

v.

**Butler Bank, et al**
Defendants

## ORDER OF REMAND

SARIS, D.J.

In accordance with the Court's allowance of the Movant's Motion to Remand on 1/5/2011
, it is hereby ORDERED that the above-entitled action be and hereby is remanded to The Superior
Court for the State of New Hampshire, Hillsborough County, Northern District.

By the Court,

/s/ Christine Patch
Deputy Clerk

January 5, 2011

To: All Counsel

I ... by certify on 1/5/11     that the
...going document is true and correct copy of the
electronic docket in the captioned case,
electronically filed orig  al filed on 1/5/1
original filed in my office on
     Sarah A. Thornton
     Clerk, U.S. District Court
     District of Massachusetts
By,
Deputy Clerk

10



**UNITED STATES DISTRICT COURT**
DISTRICT OF MASSACHUSETTS
OFFICE OF THE CLERK
1 COURTHOUSE WAY
BOSTON, MASSACHUSETTS 02210

**Sarah Allison Thornton**
CLERK OF COURT

**TO:**                                        **RE:**

Hillsborough County Superior Court North      CIVIL ACTION #  10-11979-PBS
30 Spring Street
PO Box 2143
Nashua, NH 03061

Dear Clerk:

    Please be advised that an order transferring the above entitled action to your court was entered on  1/5/2011  by the Honorable  Patti B. Saris  .

The following documents are included in our file and transmitted herewith:

( x )   Certified copy of the docket entries;

( x )   Certified copy of the transferral order;

( x )   Original documents numbered  1, 2, and 4

(   )   _____

Kindly acknowledge receipt of the above on the copy of this letter.

Respectfully,

SARAH A. THORNTON
CLERK OF COURT

Date:  1/5/11                              By:  /s/ Christine Patch
                                               Deputy Clerk

---

    The documents listed above were received by me on _____ and assigned the following case number:_____.

By:_____
Deputy Clerk

(Transfer Cover Letter.wpd - 10/17/07)



**UNITED STATES DISTRICT COURT**
DISTRICT OF MASSACHUSETTS
OFFICE OF THE CLERK
1 COURTHOUSE WAY
BOSTON, MASSACHUSETTS 02210

**Sarah Allison Thornton**
CLERK OF COURT

TO:                                          RE:

Hillsborough County Superior Court North       CIVIL ACTION # 10-11979-PBS
30 Spring Street
PO Box 2143
Nashua, NH 03061

Dear Clerk:

     Please be advised that an order transferring the above entitled action to your court was entered

on  1/5/2011                                   by the Honorable   Patti B. Saris                         .

     The following documents are included in our file and transmitted herewith:

        ( x )   Certified copy of the docket entries;

        ( x )   Certified copy of the transferral order;

        ( x )   Original documents numbered  1, 2, and 4

        ( )   _____

     Kindly acknowledge receipt of the above on the copy of this letter.

                              Respectfully,

                              SARAH A. THORNTON
                              CLERK OF COURT

Date:   1/5/11                              By: /s/ Christine Patch
                                    Deputy Clerk

---

     The documents listed above were received by me on _____ and assigned

the following case number:_____.

                          By:_____
                              Deputy Clerk

(Transfer Cover Letter.wpd - 10/17/07)

CLOSED, REMAND

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:10-cv-11979-PBS

Seff Enterprises & Holdings LLC et al v. Butler Bank et al
Assigned to: Judge Patti B. Saris
Case in other court: Hillsborough County Superior Court
           North, 09-C-522
Cause: 28:1441 Notice of Removal

Date Filed: 11/10/2010
Date Terminated: 01/05/2011
Jury Demand: None
Nature of Suit: 430 Banks and Banking
Jurisdiction: Federal Question

### Plaintiff

**Seff Enterprises & Holdings LLC**

represented by **Joseph A. Foistner**
800 Trunpike Street
Suite 300
North Andover, MA 01845
978-223-1446
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Laurie J. Foistner**

represented by **Joseph A. Foistner**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Butler Bank**

### Defendant

**Peoples Bank**

### Movant

**Federal Deposit Insurance
Corporation in its capacity as
Receiver of Butler Bank**

represented by **Robert A. McCall**
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210-2261
617-951-2061
Fax: 617-235-3534
Email: RMcCall@peabodyarnold.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

1/5/2011 4:42 PM

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 11/10/2010 | ❏ 1 | NOTICE OF REMOVAL by Laurie J. Foistner, Seff Enterprises & Holdings LLC from Hillsborough County Superior Court North, case number 09-C-522. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Gaudet, Jennifer) (Additional attachment(s) added on 11/23/2010: # 5 Civil Cover Sheet, # 6 Category Sheet) (Boyce, Kathy). Modified on 11/23/2010 to attach Civil Cover Sheet and Civil Category Sheet (Boyce, Kathy). (Entered: 11/23/2010) |
| 11/23/2010 | ❏ | ELECTRONIC NOTICE of Case Assignment. Judge Patti B. Saris assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Robert B. Collings. (Gaudet, Jennifer) (Entered: 11/23/2010) |
| 11/30/2010 | ❏ | Certified Copy of Notice of Removal Provided to Plaintiff's Counsel by mail (Patch, Christine) Modified on 11/30/2010 (Patch, Christine). (Entered: 11/30/2010) |
| 11/30/2010 | ❏ 2 | Judge Patti B. Saris: STANDING PROCEDURAL ORDER RE: SEALING COURT DOCUMENTS entered. (Patch, Christine) (Entered: 11/30/2010) |
| 11/30/2010 | ❏ 3 | NOTICE issued to Attorney Joseph A. Foistner regarding mandatory use of ECF in compliance with Local Rule 5.4. Failure to comply may result in the imposition of sanctions. (Patch, Christine) (Entered: 11/30/2010) |
| 12/07/2010 | ❏ 4 | Letter to Sarah Thornton from Joseph A. Foistner requesting that the Court return the original pleadings. (Patch, Christine) (Entered: 12/08/2010) |
| 12/10/2010 | ❏ 5 | NOTICE of Appearance by Robert A. McCall on behalf of Federal Deposit Insurance Corporation in its capacity as Receiver of Butler Bank (McCall, Robert) (Entered: 12/10/2010) |
| 12/10/2010 | ❏ 6 | MOTION to Remand to State Court by Federal Deposit Insurance Corporation in its capacity as Receiver of Butler Bank.(McCall, Robert) (Entered: 12/10/2010) |
| 12/10/2010 | ❏ 7 | AFFIDAVIT of Jeffry Quick in Support re 6 MOTION to Remand to State Court filed by Federal Deposit Insurance Corporation in its capacity as Receiver of Butler Bank. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(McCall, Robert) (Entered: 12/10/2010) |
| 12/10/2010 | ❏ 8 | MEMORANDUM in Support re 6 MOTION to Remand to State Court filed by Federal Deposit Insurance Corporation in its capacity as Receiver of Butler Bank. (Attachments: # 1 Exhibit A)(McCall, Robert) (Entered: 12/10/2010) |
| 01/05/2011 | ❏ | Judge Patti B. Saris: ELECTRONIC ORDER entered granting 6 Motion to Remand to State Court. "Allowed without opposition." (Patch, Christine) (Entered: 01/05/2011) |
| 01/05/2011 | ❏ 9 | Judge Patti B. Saris: ORDER entered. ORDER OF REMAND to the State Court(Patch, Christine) (Entered: 01/05/2011) |
| 01/05/2011 | ❏ | Civil Case Terminated. (Patch, Christine) (Entered: 01/05/2011) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SEFF ENTERPRISES & HOLDINGS LLC }  CASE NO.
LAURIE J. FOISTNER }
 }
      Plaintiffs, }
 }
 } Removed From Hillsborough
v. } County Superior Court North
 } Docket No. 09-C-522
BUTLER BANK
PEOPLES BANK

      Defendants

**10 CA 11979 PBS**

MAGISTRATE JUDGE Collings

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, and 12 U.S.C. Section

1821(d)(6)(B), Plaintiffs Seff Enterprises & Holdings, LLC and Laurie J. Foistner

(collectively, "Plaintiffs") remove this action to the United States District Court, for the

District of Massachusetts.

## PROCEDURAL HISTORY

1.      On or about September 3, 2009, the Plaintiffs commenced this action

against Butler Bank of Lowell, Massachusetts, and others (collectively, "Defendant"),

through their Attorney, William Aivalikles, in the Superior Court for the State of New

Hampshire, Hillsborough County, Northern District.

2.      This Removal Action pertains only to the Defendant Butler Bank, now

Peoples Bank. The ongoing litigation against the other Defendants, Robert Chapman,

Antonia Shelzi, and Hans Hassel, currently Docketed in the Superior Court for the State



of New Hampshire, Hillsborough County, Northern District, Docket No. 09-C-522, is requested to remain at the New Hampshire, Hillsborough County, Northern District Court.

3.      On or about Friday, April 16, 2010, Butler Bank, Lowell, MA was closed by the Massachusetts Division of Banks, and the Federal Deposit Insurance Corporation (FDIC) was named Receiver. No advance notice was given to the public, while all assets were sold and transferred to the Peoples Bank of Lowell, Massachusetts, who now maintains and controls the property of the Plaintiffs.

4.      On or about June 15, 2010, the Plaintiff promptly filed their Claim, in the amount of $26,810,530, to the Creditor Claims Agent, Claims Department of the Federal Deposit Insurance Corporation.

5.      On or about September 27, 2010, the FDIC provided their written **NOTICE OF DISALLOWANCE OF CLAIM**, via Certified Mail, 7010 1060 0002 2564 9485, to the Plaintiffs attorneys, Foistner Law Offices, P.C. of Andover, Massachusetts.

6.      The FDIC provided the following written Notice to the Plaintiffs, please see attached **NOTICE OF DISALLOWANCE OF CLAIM**, Exhibit A:

> Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

7.      The date of the FDIC's **NOTICE OF DISALLOWANCE OF CLAIM** is September 27, 2010, the date of this **REMOVAL ACTION** is November 10, 2010, well within the 60 day deadline limit allowed by the FDIC and 12 U.S.C. Section 1821 (d) (6).

8.      Plaintiffs file this Notice of Removal within the 60 day limit allowed by 12 U.S.C. Section 1821 (d) (6). Accordingly, removal is timely.

9.      Promptly after filing this Notice of Removal, Plaintiffs shall give written notice of the removal to the Receiver, the FDIC, and to the Clerk for the Superior Court in and for the Northern District of Hillsborough County, New Hampshire as provided in 28 U.S.C. 1446(d) and 12 U.S.C. Section 1821 (d) (6).  A true and correct copy of the Notice to Defendant / Receiver and to the Clerk of Court of removal of this action (without exhibits) is attached hereto as Exhibit B.

10.     A true and correct copy of the Writs and all other process and pleadings served on the Defendants are attached hereto as Exhibit C. Aside from the materials in Exhibit B, Plaintiffs are not aware of any other process, pleadings, or orders served upon them in this action.

11.     Plaintiffs shall also file a certified attested copy of the state court records, including this Notice of Removal, with this Court within ten (10) days after filing this Notice of Removal.  D.N.H. L.R. 81.1.

**THIS ACTION IS REQUIRED TO BE TRANSFERRED TO THE
UNITED STATES DISTRICT COURT, DISTRICT OF MASSACHUSETTS
PURSUANT TO 12 U.S.C. SECTION 1821 (d) (6).**

12.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964 (c) ("RICO").

13.      12 U.S.C. Section 1821 (d) (6) establishes the authority, as demanded by

the FDIC / Receiver, that this case be transferred to this Court.

**VENUE**

14.      Removal to the United States District Court for the District of

Massachusetts is proper because Butler Bank / Peoples Bank, maintains its primary place

of business in Lowell, Massachusetts. 12 U.S.C. Section 1821 (d) (6) requires:

> Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this
> disallowance, you have the right to file a lawsuit on your claim (or continue any
> lawsuit commenced before the appointment of the Receiver), in the United States
> District (or Territorial) Court for the District within which the failed institution's
> principal place of business was located or the United States District Court for the
> District of Columbia within 60 days from the date of this notice.

WHEREFORE, Plaintiffs, give notice that the above-captioned action, pending against

Butler Bank / Peoples Bank in the Superior Court in and for the Northern District of

Hillsborough County, New Hampshire, is removed to this Court.

Dated:  November 10, 2010                    Respectfully submitted,

                                             SEFF ENTERPRISES & HOLDINGS, LLC
                                             LAURIE J. FOISTNER

                                             By their attorneys

                                             The Law Offices of Joseph A. Foistner, Esq.
                                             & Affiliates, P.C.

                             By      /s/ Joseph A. Foistner, Esq.

                                     Joseph A Foistner, Esq. (MABBO# 648871)
                                     800 Turnpike Street, Suite 300
                                     N. Andover, MA 01845
                                     Tel:  978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

_____

Joseph A Foistner, Esq. (MABBO# 648871)

# EXHIBIT A

# FDIC

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL 7010 1060 0002 2564 9485**
**RETURN RECEIPT REQUESTED**

September 27, 2010

Seff Enterprises & Holdings, LLC
C/O Foistner Law Offices, P.C.
Attorney Joseph A. Foistner, ESQ.
800 Turnpike St., Suite 300
North Andover, MA 01845

SUBJECT:   10211–BUTLER BANK
           LOWELL, MA – In Receivership
           <u>NOTICE OF DISALLOWANCE OF CLAIM</u>

Dear Claimant:

The Receiver of BUTLER BANK has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

> The claim in the amount of $26,810,530 is disallowed because it has not been proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

Creditor Claims Agent
Claims Department

RLS7218

# EXHIBIT B

9·3·09

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH 03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

*HAND DELIVERED*

John M. Safford, Clerk
Hillsborough County Superior Court
Northern District
300 Chestnut Street
Manchester, NH 03101

Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Mr. Safford:

Enclosed please find a Writ of Summons for entry together with a check in the amount of $205.00.

Very truly yours,

William Aivalikles

WEA/rjb
Enclosures
Cc      Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

*VIA REGISTERED MAIL RETURN RECEIPT REQUESTED*

Robert Chapman
26 Luz Drive
Lowell, MA  01854

Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Mr. Chapman:

Enclosed please find a Writ of Summons that has been entered into the Hillsborough County Superior Court and served on the New Hampshire Secretary of State as your agent pursuant to RSA 510:4.  Please provide your attorney with this Writ as soon as possible.

Very truly yours,

William Aivalikles

WEA/rjb
Enclosure
Cc    Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

***VIA REGISTERED MAIL RETURN RECEIPT REQUESTED***

Antonia Shelzi
10 Townsend Road
Belmont, MA  02478

     Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Ms. Shelzi:

     Enclosed please find a Writ of Summons that has been entered into the Hillsborough County Superior Court and served on the New Hampshire Secretary of State as your agent pursuant to RSA 510:4.  Please provide your attorney with this Writ as soon as possible.

     Very truly yours,

William Aivalikles

WEA/rjb
Enclosure
Cc    Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH 03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

***VIA REGISTERED MAIL RETURN RECEIPT REQUESTED***

Hans Harro Hassel
31 Lee Street
Cambridge, MA  02139

     Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Mr. Hassel:

    Enclosed please find a Writ of Summons that has been entered into the Hillsborough County Superior Court and served on the New Hampshire Secretary of State as your agent pursuant to RSA 510:4.  Please provide your attorney with this Writ as soon as possible.

    Very truly yours,

William Aivalikles

WEA/rjb
Enclosure
Cc    Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

*VIA REGISTERED MAIL RETURN RECEIPT REQUESTED*

Butler Bank
3 George Street
Lowell, MA  01852

Re:   Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Sir:

Enclosed please find a Writ of Summons that has been entered into the Hillsborough County Superior Court and served on the New Hampshire Secretary of State as your agent pursuant to RSA 510:4.  Please provide your attorney with this Writ as soon as possible.

Very truly yours,

William Aivalikles

WEA/rjb
Enclosure
Cc     Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH 03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
William@nhtriallaw.com

September 3, 2009

Merrimack County Sheriff's Office
163 N. Main Street
Concord, NH 03301

  Re: Seff Enterprises & Holdings, LLC, et al v. Butler Bank, et al

Dear Sir/Madam:

  Enclosed please find an original Writ and four (4) copies of the Writ to be served on the New Hampshire Secretary of State as agent for Robert Chapman, Antonia Shelzi and Hans Harro Hassel and the Butler Bank.  I am enclosing a check in the amount of $40.00 made payable to the New Hampshire Secretary of State.  I am also enclosing a check in the amount of $66.00 for service of the Writ.

    Very truly yours,

    William Aivalikles

WEA/rjb
Enclosures
Cc  Joseph Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

# The State of New Hampshire

## SUPERIOR COURT

HILLSBOROUGH COUNTY
NORTHERN DISTRICT

( ) COURT
(X ) JURY

### WRIT OF SUMMONS

Seff Enterprises & Holdings, LLC
3 Foxberry Drive
New Boston, NH  03070

Laurie Foistner
3 Foxberry Drive
New Boston, NH  03070

v.

Butler Bank
3 George Street, Lowell, MA  01852

Robert Chapman, Senior VP, Butler Bk
26 Luz Drive, Lowell, MA  01854

Antonia Shelzi
10 Townsend Road, Belmont, MA 02478

Hans Harro Hassel
31 Lee Street, Cambridge,MA  02139

The Sheriff or Deputy of any County is ordered to summon each defendant to file a written appearance with the Superior Court at the address listed below by the return day of this writ which is the first Tuesday of October, 2009.

YEAR                                                                                                                    MONTH

The PLAINTIFF(S) state(s):

SEE ATTACHED.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

9/1/09

INDORSER (sign and print name)   Manager of Seff Enterprises
& Holdings, LLC

DATE OF WRIT

NOTICE TO THE DEFENDANT

The Plaintiff listed above has begun legal action against you. **You do not have to physically appear** in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you will then be obligated to pay.

Witness, Robert J. Lynn, Chief Justice, Superior Court.

John M. Safford, Clerk
NH Superior Court Hillsborough County
Northern District
300 Chestnut St
Manchester NH 03101-2490
(603) 669-7410
213-003-3

SIGNATURE OF PLAINTIFF/ATTORNEY

William Aivalikles
PRINTED/TYPED NAME
60 Main Street, Suite 230
ADDRESS
Nashua, NH  03060    603-880-0303
PHONE

# INTRODUCTION

This Writ is brought by Seff Enterprises and Holdings, LLC (hereinafter sometimes referred to as "LLC" or "Plaintiffs")  and Laurie Foistner (hereinafter sometimes referred to as "L. Foistner" or "Plaintiffs"), a former owner of a 50% interest in the LLC and the Guarantor of a Promissory Note with the Butler Bank against the Butler Bank of Lowell Massachusetts and a group of individuals ("Defendants") for their ongoing alleged conspiracy to run their bank and business as a criminal enterprise as that term is used under the Federal Racketeering Influence Corrupt Organizations Act, RICO, 18 U.S.C. § 96, *et seq*.,  depriving Plaintiffs of the intangible right of honest services through fraud and criminal means.

Plaintiffs also complain that the Bank and the Individual Defendants, acting as one, deprived them of their fundamental rights to conduct their businesses and to enjoy their quiet right to life, liberty, freedom and pursuit of happiness, by allegedly committing criminal felony acts against the Plaintiffs' persons, properties and businesses.  These crimes include, but are not limited to Felony Perjury, U.S.C. § 1621, *et seq.*,  Felony Forgery U.S.C. § 513 – Securities of the States and Private Entities, Mail Fraud 18 U.S.C. § 1343 – Fraud by Wire,  18 U.S.C. § 1349 – Attempt and Conspiracy,  Stolen Goods 18 U.S.C. § 2314 – Interstate Transportation of Stolen Goods, Securities and Money, Fraud 18 U.S.C. § 1028 – Forging Corporate Records,  18 U.S.C. §1028A – Aggravated Identity Theft, Tax Fraud 26 U.S.C. § 7201 – Attempts to Evade or Defeat Tax, 26 U.S.C. § 7206 – Fraud and False Statements, 26 U.S.C. § 7207 – Fraudulent Returns, Statements Other Documents, 26 U.S.C. § 7212 – Attempts to Interfere with Administration of Internal Revenue Laws and IRS audit, and, Conspiracy – Crime against the United States of America, 18 U.S.C. § 371 – Conspiracy, Bank Fraud 18 U.S.C. § 1344, §1344(2),  Extortion 18 U.S.C. § 1951 and other crimes as defined in Federal and New Hampshire law.

1

## PARTIES

1.      Seff Enterprises & Holdings, LLC, Plaintiff, of 3 Foxberry Drive, New Boston,

New Hampshire  03070.

2.      Laurie Foistner of 3 Foxberry Drive, Plaintiff, New Boston, New Hampshire

03070.

3.      Defendant Butler Bank, Inc., ("Butler Bank" or "the Bank"), is a Commercial

Banking Corporation, conducting business at 3 George Street, Lowell, Massachusetts 01852.

4.      Defendant Robert Chapman, ("Chapman"), Butler Bank Senior Vice President,

resides at 26 Luz Drive, Lowell, Massachusetts 01854.

5.      Defendant Antonia Shelzi, ("Shelzi"), resides at 10 Townsend Road, Belmont,

Massachusetts 02478.

6.      Defendant Hans Harro Hassel, ("Hassel"), resides at 31 Lee Street, Cambridge,

Massachusetts 02139.

## FACTS

7.      The LLC was formed on or about August 28, 2000, pursuant to the New

Hampshire Limited Liability Act, as a "Single Manager Managed - Limited Liability Company,

by Laurie J. Foistner, 50% Member, Louis A. Maynard (Maynard), 50% Member, and Joseph A.

Foistner, Esq. (J. Foistner), its sole and only manager.

8.      In order to begin operations, L. Foistner contributed $1.24-million to the company

and L. Maynard contributed $150-thousand, to be recorded on the books of the company, as well

as on the Operating Agreement signed and executed between the Members and Sole Manager.

2

9.     The LLC's primary purpose for formation, as shown on the Operating Agreement, was to fund and file a Federal RICO Law Suit, 18 U.S.C. § 96, against the Town of New Boston and many of its Public Officials, who allegedly had been using their position with the Town, under Color of Statute, for Criminal Enterprise, for more than thirty (30) years.

10.     It is averred that these Public Servants had intentionally and with malice, bankrupted four real estate developers in town, from 1980 through 2000.

11.     These alleged Racketeers had embezzled more than $17-million out of the town's treasury, containing federal funds, over a period of thirty (30) years, while they, as Public Officials, were the guardians of that treasury.

12.     In order to fund and pay for the New Boston RICO Law Suit, containing more than 13,000 individual documents as evidence, anticipated to cost between $2.5-million and $4-million in legal fees, L. Maynard agreed to re-mortgage his only business and home, the Molly Stark Restaurant, a well established land mark in Southern New Hampshire. His home and business, appraised in 2000, had a market value of $1.1-million, with an outstanding mortgage in 2000, in the amount of $23-thousand.

13.     L. Foistner and J. Foistner agreed that they would complete the development of their Waldorf Estates Subdivision, Phase III, 20 lots, the LLC's only asset, appraised in 2000 at $2.7-million, with an outstanding mortgage lien, recorded against the title, in the amount of $850-thousand.  $16.5-million (25% profit) from home construction and sales was anticipated from the 20 lots remaining in phase III of the project.

14.     In fact, both L. Maynard and the Foistners borrowed $850-thousand from several Hard Money Lenders, (the Muffaletto Note), at 38% percent annual interest, in 2000, pledging the Molly Stark Restaurant and the Phase III, 20, lot subdivision, as collateral.

3

15.    This high annual interest was required to be paid to Street Lenders, because ordinary bank financing was not available to the LLC, while it was litigating several civil claims, then pending in 2000 and 2001, in the Hillsborough County Superior Court, against the Town of New Boston.

16.    The LLC's Operating Agreement, Article III. Management of the Company provided unlimited and unrestricted, total and final authority on all matters to its only Sole Manager, J. Foistner.  "Full and Complete Authority" was vested in the only manager.

17.    The development and construction of the Waldorf Estates subdivision, 54 lots began in 1985 by the Foistners. From 1985 through present, 35 estate homes have been constructed and sold, some with more than 28,000 square feet of living space, located on 15 mountain-view acre house lots, with some of the highest views and elevations located in Southern New Hampshire.

18.    The Foistners, through their companies, have been the continuous owners of this project and its copyrighted approvals and drawings and engineering documents, since 1985, now for 24 years.  During these 24 years, the Foistner's continuously suffered many millions of dollars in money damages and personal hardship, including human rights violations, constitutional violations, crimes against their persons and property, at the hands of these alleged Town of New Boston Racketeers.

19.    L. Maynard, an "Outsider", like the Foistners, allegedly suffered the same damages and harm, at the hands of the very same individuals, the Dodges, whom by 1985, had driven all businesses owned by "Outsiders", out of Town, effectively bankrupting all "Outsiders", while they, the Dodges, subdivided their lands without having to adhere to local

subdivision regulations and without having to construct roads, on their lands, when other LLCs and Outsiders were required to do so.

20.     Upon formation of the LLC, L. Maynard, L. Foistner and J. Foistner established by Company Votes as evidenced by Minutes, which established that J. Foistner, the sole manager, was not required, in fact would intentionally refuse, to be required to perform any of the bookkeeping and accounting functions, or to manage any money payments, check writing and invoicing functions of the company. It was voted that Foistner was to receive a monthly Fee, in the amount of $10-thousand, for his required services as the manager.

21.     L. Maynard maintained all checkbooks, bookkeeping records, check writing and creation and record keeping of the accounting records for the LLC, from inception, August 2000 through December 22, 2002. Maynard was the only authorized signor on any and all checking accounts, owned by the LLC, from 2000 through 2002. Foistner refused all check writing authorities. Foistner managed all business and development management requirements, such as financing, road construction, surveying, engineering, sales, and primarily, the hiring of RICO Experts and Lawyers, to include the gathering of evidence, managing the many attorneys, at the time litigating the Town of New Boston litigation, preparing for the upcoming RICO Law Suit.

22.     On or about December 2002, L. Maynard informed the Foistners that he was running out of cash, because the Town of New Boston had intentionally and unlawfully delayed the Waldorf Estates subdivision, for another 28 months, August 2000 through December 2002. All this time, both L. Maynard and the Foistner were paying the 38 percent monthly interest to their Street Lenders, while the town systematically and with a plan and design bankrupted both in order to stop the forthcoming RICO litigation against them and the town.

23.     It became crystal clear, to all involved, by December 2002, attorneys, engineers and road builders that without a RICO Law Suit in the Federal Court, holding the Town of New Boston accountable for its alleged criminal, unconstitutional, unlawful and corrupt acts, used against the Plaintiffs, the Waldorf Estates subdivision and other "Outsiders" that the land development and road construction could never be completed and the subdivision approvals could never be obtained through legal means.

24.     By 2002, the Plaintiffs had hired Attorney Morgan Hollis, ("Hollis"), after dismissing all four of its earlier hired law firms, managing the ongoing New Boston litigations and all municipal legal issues. The Law Firm of Orr & Reno, P.A. (Orr & Reno), have been the Foistner's lawyers since 1995, on the same Waldorf Project.  Orr & Reno has been the Plaintiffs', L. Maynard's and the remaining LLC member's lawyers since 2003, on the same Waldorf Estates Project.

25.     In fact, by December 2002, Hollis had completely stopped the town's unlawful acts, settled most of the outstanding disputes and even accomplished to force the town to preliminarily approve the subdivision, changing the Phase III portion of the land from 18 lots to 20 lots. Maynard however was out of money and simply wanted out.

26.     On or about December 23, 2002, Antonia Shelzi ("Shelzi") purchased L. Maynard's 50% Ownership Interest of Seff, by paying Maynard the sum of $250,000.00.  Shelzi joined Seff after conducting her Due Diligence.  Shelzi was represented by Attorney and CPA Michael Di Iulio ("Di Iulio"), CPA Brian Becks, ("Becks") and Attorney Gregory Oberhauser, ("Oberhauser").  Shelzi, while she was represented by two (2) CPA's and two (2) lawyers, provided the LLC with her Financial Statements, depicting her total assets to exceed $27,115,000.00. Her Owners Equity was shown to be $18,753,010.

6

27.    When Shelzi purchased Maynard's Ownership Interest, she stepped into Maynard's shoes as to the accounting and bookkeeping responsibilities.

28.    Seff's Operating Agreement and Corporate Votes, all reviewed By Shelzi and Oberhauser, remained in force as company policy.

29.    Attorney Oberhauser managed the closing for Shelzi. All signed, accepted and executed written contracts, their specific terms known as: "PURCHASE CONTRACT", "PARTICIPATION AGREEMENT", "ASSIGNMENT AND BILL OF SALE", "GENERAL AND MUTUAL RELEASES", and "MUTUAL RELEASE SETTLEMENT AGREEMENT", (hereinafter referred to as ("Purchase Contracts").

30.    Specifically, Shelzi contractually obligated herself to become the Financier of the LLC. Shelzi received her Ownership Transfer Certificate, ownership now, as of December 23, 2002, for her promise to pay, finance and match L. Foistner's contribution as recorded on the books of the company.

31.    Shelzi knew that the upcoming RICO litigation was needed in order to continue forward with the Waldorf Estates development. Shelzi also knew and fully understood that several million dollars in cash contributions, were required from her to fund the needs of the LLC and to match the other 50% Member.

32.    Specifically, Shelzi contractually obligated herself to establish financing with a local bank, within six months, no later than June 23, 2003, now that the New Boston litigation had ended and the town approvals had been obtained, by Hollis, for the Waldorf Development. Bank financing would lower the monthly interest rate of 38 percent paid to the Street Lenders, to 8.5% to be paid to a Commercial Bank. The mortgage lien on Maynard's Molly Stark

7

Restaurant, now that Maynard was no longer a member of the company, was contractually required to be released by June 23, 2003.

33.   Shelzi contractually agreed to finance the RICO litigation for the first six months, immediately hire lawyers, paralegals and other employees, a bookkeeper, an accountant, sales staff and other, all listed in the Purchase Contracts.  Shelzi also agreed to lease office space to house the RICO team, purchase equipment and vehicles to complete the Waldorf Project, market and sell the same.

34.   Shelzi's sole intent and reason for joining the LLC, as its new 50%Member, was her absolute requirement, and contractual stipulation, allowing her to capitalize on the LLC's losses, for tax years 2000, 2001, 2002, 2003 and 2004, all resulting and reporting, millions of dollars of legal business expenses, as losses, to develop the project, along with its many law suits and legal requirements. During those tax years, while the Waldorf Estates subdivision was constructing roads and seeking town and state approvals to sell lots, no sales or other income was realized by the LLC, resulting in reporting only losses to the IRS.

35.   Shelzi demanded and contracted to receive, millions of dollars in tax savings, by legally obtaining the LLC's losses for those years.  In fact, Shelzi spent her tax dollars owed to the IRS, at the advice of her Counsel and CPA's, to purchase L. Maynard's Ownership Interest.

36.   Shelzi's Purchase Contracts, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, reads as follows:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

8

37.    Prior to December 23, 2002, during Shelzi's due diligence, her CPA and Lawyer, DeIulio gave notice to J. Foistner by saying, "If things don't go as planned in the future for Toni, we will be filing a law suit for an accounting".

38.    Prior to Shelzi becoming a Member of the LLC, on or about May 2002, Shelzi sent two of her employees / contractors to the offices of the LLC, located at 100 State Street, Boston, Massachusetts in order to move the LLC's property, computers, furniture and 30 years of evidentiary documents, approximately 13,000 documents, to the company's new offices in Lowell, Massachusetts.  These two employees were Hans Harro Hassel ("Hassel") and Jim Chubb ("Chubb"), both former Massachusetts Prison Inmates and Criminals.  Chubb, a convicted Felon and Drug Dealer, freshly released from the Massachusetts Prison System in 2002.  Hassel was imprisoned in 1993, as Massachusetts Dead Beat Dad Number Two, employed by Shelzi since his release from prison in 1994.

39.    Chubb explained to J. Foistner, in front of witnesses, one, another licensed Massachusetts Attorney that he had agreed, to serve a prison term for Shelzi, the actual Drug Dealer and guilty party, for her promise to pay him $10-thousand dollars, when he got out of prison. He further explained that Shelzi was now employing him and had reneged on the $10-thousand she had promised. Both Hassel and Chubb explained that Shelzi's business in Cambridge employed newly released Felons on a regular basis – part of the Commonwealths Justice System. Hassel further explained that Shelzi's Brother, a Rhode Island Attorney, had left the Country and traveled to the Orient in order to escape prosecution for this Drug Deal gone bad.

40.    Shelzi's alleged racketeering enterprises, her businesses in Massachusetts, employs, as a mode of operation, known felons and illegal aliens. Individuals and undesirables

which the law defines and labels as "Convicted Felons", the identical legal status, given by our criminal justice system, to Shelzi.

41.     Her criminal status as a Convicted Felon was unknown to the Plaintiffs when Shelzi joined the LLC. The Andover facility was specifically rented and constructed to house the new RICO Lawyers, the RICO Team along with all the evidentiary documents and office equipment. Shelzi in fact maintained an office in that facility in Andover, occupied by Hassel, her Financial and Business Manager. This office occupied by Hassel and Shelzi, maintained all accounting records, cancelled checks, bank statements, invoices, contracts, deposit slips, engineering documents and any and all documents owned by the Plaintiffs, pertaining to the Waldorf Project and the Rico Law Suit.

42.     Shelzi and Hassel had unrestricted access to all the documents and the computer located in their office. The computer in their office maintained all electronic data, including Peachtree Accounting data. Shelzi and Hassel had the only password for that computer. The computer was part of a Peer to Peer, Windows Network (without a server).

43.     By January 2003 Shelzi and J. Foistner prepared and approved a detailed Operating Budget depicting the employees to be hired, the equipment to be purchased and the future RICO Attorneys to be hired to bring the RICO Claim, until that time, managed by Oberhauser. This Operating Budget was approved, voted and recorded by Minutes, as the LLC's Operating Budget and became approved company policy.

44.     By January 2003, J. Foistner hired a full time Bookkeeper, Office Manager, Accountant and Sales Staff. Additionally J. Foistner signed and executed the lease for the Andover RICO Office and contracted to complete the leasehold improvements to install walls, wiring, doors and ceilings. Foistner Law Offices P.C. (Foistner Law) began purchasing

10

computers, office equipment and furniture and hired paralegals to manage the upcoming RICO Suit.

45.    From March 2001 through January 2004, Foistner Law interviewed lawyers in Boston, Massachusetts and New Hampshire, attempting to find an experienced law firm to manage the RICO litigation. More than 13 separate lawyers and their firms were interviewed. Each interview, requiring a total review of 30 years of documented evidence and damages, depicting hundreds of RICO Crimes allegedly committed by the Town of New Boston and its corrupt Public Servants.

46.    Shelzi fully funded the financial requirements depicted and approved in the Budget for the months of January, February and March 2003 only.  She partially paid the April and May invoices and by June stopped funding all requirements for which she was contractually obligated.

47.    By May 2003, Foistner was required to dismiss all employees since Shelzi would not fund their salaries nor her promised bank financing was not received.

48.    By May 2003, J. Foistner had been employed as a manager since August 2000. Foistner was entitled to be paid for forty (40) months at the rate of $10,000.00 per month.  By May 2003, Foistner had not drawn a single Penny for his fees, by then amounting to more than $ 400,000.00, with interest.  In fact, Foistner never received a Penny for his labor and services, from 2000 through present, 2009, at all times required to provide legal services and services as the LLC's manager.

49.    Instead of receiving compensation for his services, Foistner was made to contribute more than $5.5-million in the form of Cash and Invoices, for legal services, provided by Foistner Law, supporting the RICO Claim and civil litigation, from 2000 to 2009.

50.    Shelzi materially breached her contractual obligation to establish bank financing by June 23, 2003, failing to have the Street Lenders mortgage liens released from L. Maynard's Molly Stark Restaurant and home, causing Maynard to eventually become homeless.

51.    As Shelzi struggled to fund the operations of the LLC, only paying the absolute minimum invoices, usually 90 to 120 days behind, the LLC's business reputation began to suffer. Shelzi, on more than three occasions, wrote, issued and signed bank drafts, made payable to the LLC, deposited into the LLC's bank, Citizens Bank, amounts as high as $100-thousand, which bounced, due to insufficient funds.

52.    Vehicle payments were not made, lease payments defaulted, employee employment contracts were breached, several legal claims were lost, the Statute of Limitation deadline expired on those claims, because Shelzi failed to fund their legal fees. The RICO litigation was not being funded.

53.    Shelzi's key financial manger, Hassel, was so disgusted with Shelzi's material breaches that he wrote a sworn Affidavit, dated October 31, 2003. In that Affidavit Hassel stated that Shelzi usually buys into businesses and always financially abandons her partners, in an attempt to bankrupt the business and to swallow up her partners. In the manager's opinion, it became clear that Shelzi was a Fraud, intending only to bankrupt the LLC, in order to gain control of the assets and the tax losses.

54.    On or about August 2003, Shelzi introduced her close friend and banker, Senior Vice President of the Butler Bank, Mr. Robert Chapman ("Chapman") to the LLC and personally guaranteed a $1.5-million commercial loan from the Butler Bank, earmarked for the construction of Roads and to complete the development of the Waldorf Project, now without employees, staff, and accountants.

12

55.    The only Borrower on this loan was the LLC.  The two members Shelzi and L. Foistner were obligated to personally guarantee the loan.  Only J. Foistner, the LLC's only Manager was authorized to manage the loan, draw funds, disburse funds, make interest payments and manage the repayment.  Shelzi and L. Foistner had no authority to make any decision on this $1.5-million loan.

56.    The $1.5-million Butler Bank loan was inadequate from the start, late and underfunded, due to the fact that Shelzi had missed and breached the June 23, 2003 deadline date, to pay off the Street Lenders, thereby causing more than a $160-thousand Roll Over Fee, to be paid out of the Butler Bank loan proceeds originally earmarked for road construction.  The road was contracted to costs $1.2-million, including engineering, road construction, pavement, erosion controls, supervisory labor and interest.

57.    Hollis and Foistner were told at the closing, without any advance notice by Butler's Closing Attorney that they were short by $160,000.  These Roll-Over Fee damages were caused by Shelzi's material breaches of the Purchase Contract.

58.    During a meeting held at Hollis Law Offices, on or about November 11, 2003, Shelzi admitted that she had no money left, as she had promised, to pay her consideration for her 50% Ownership.

59.    In order to continue operations, now without employees and staff, the LLC was required to borrow money from other Street Lenders, Shelzi's Brother, Attorney Domenic Shelzi, and others.  Because of Shelzi's alleged fraud and material breaches, the LLC was now required to borrow money and pay interest and points for money that was originally contracted, to be received as a contribution from Shelzi, interest free, without points, Shelzi's Consideration, for receiving her Ownership Interest.

13

60.     For the LLC and the Foistners to borrow money to cover Shelzi's breaches, was not a contract requirement in the Purchase Documents.  Shelzi received up to a 50% Ownership, 10 house lots for her written promises to finance and fund the operations. Now Shelzi wanted to own her 50% of the project and have the remaining members finance the project out of their pockets.

61.     Because of Shelzi's alleged fraud and material breaches, J. Foistner borrowed $350-thousand from Maynard, in order to pay for the road construction of the project, because the funds remaining at the Butler Bank were inadequate.  Butler Bank was aware of this.

62.     J. Foistner was required to manage the LLC, full time – 65 plus hours each week, from 2002 through 2009, without receiving any compensation, while Shelzi, demanding her 50% Ownership, did not produce a single labor hour for the benefit of the RICO Suit or the completion of the project.

63.     Foistner managed all RICO litigation requirements, 2000 through 2006, managed 108 months, nine years of Planning Board, Selectmen and Town meetings, surveyed the project, engineered the roads and driveways, supervised on a daily basis, six day per week, from 5:00 AM each day till 8:00 PM, the construction of the 3,000 ft. road, the financing and financial management (not the accounting) of the Company,  the IRS Audits for the LLC, marketing, home construction and 50 months of civil litigation against Shelzi, 2005 through 2009.

64.     Because of Shelzi's Fraud and material breaches, the Foistners borrowed an additional $2.1-million, from Banks and Relatives, to pay for the funding requirements of the LLC.

65.     On or about July 2003, J. Foistner and L. Maynard visited the law Offices of Orr & Reno, P.A. (Orr & Reno), in order to hire Orr & Reno as their RICO Lawyers.  Foistner and

the Waldorf Estates Subdivision Project, along with its many complicated legal issues, law suits and claims, were already Clients of Orr & Reno, in light of the fact that Foistner and the predecessor company which owned Waldorf Estates, owned by J. Foistner, had hired and paid Orr & Reno in 1995. This has been admitted by Orr & Reno in their Sworn Statements / Affidavits.

66.    When J. Foistner and L. Maynard, as owners, managers and members of the LLC, visited Orr & Reno, in Concord New Hampshire, representing the LLC, the then only owner of the project, Shelzi was already a member of the LLC.  Only the LLC had the authority to bring a RICO Claim against the Town of New Boston, and all of the LLC's members and manager, including Shelzi, were asking Orr & Reno to review the many documents and evidence to bring the RICO Claim.

67.    Confidential information was communicated to Attorney Martha Van Oot, ("Van Oot") regarding Waldorf Estates, the LLC its members and manager, Seff's legal issues, its finances, its accounting and damages caused by the Town of New Boston.  Although Orr & Reno did not accept to be Advocates on the RICO Claim, and in fact refused to invoice for their services and did not receive or invoice any fees, Van Oot provided legal advice to the LLC, L. Maynard, L. Foistner, and Shelzi, creating a valid Attorney Client Relationship, to the already existing Attorney Client Relationship, formed in 2003.

68.    On or about December 2004, the law firm of Debruckeyre, Patrillo and Fulton of Salem, New Hampshire, were retained to become the Advocates for the RICO Claim.  Attorney Peter Fulton ("Fulton") accepted the assignment after completing a six months evaluation of the claims.  The LLC paid more than $130-thousand for this Evaluation and the RICO Claim was filed in Federal Court on or about June 04, 2004.  Shelzi paid nothing.

15

69.     In 2004, Shelzi signed a Fee Agreement with Fulton, becoming a named Plaintiff. Under this fee Agreement Shelzi is wholly and severally liable for all legal fees to Fulton, including the legal fees and costs of all contract lawyers under Fulton's control.  This included Foistner Law, who has been employed for this effort since 2001 without compensation.

70.     By the time the RICO Claim was filed in the Federal Court, Foistner Law, J. Foistner, L. Foistner and L. Maynard had paid more then $760-thousand to fund this law suit. Shelzi never paid a single Penny for her legal representation, materially breaching her contract.

71.     Instead of honoring her contractual agreements and obligations set forth in the Fee Agreement, Shelzi materially breached that contract as well.  Shelzi's alleged fraud and material breach of her contractual obligations, set forth in the Purchase Contract, as well as the Fulton Fee Agreement, were the sole cause for the RICO Claim being voluntarily dismissed in 2006, after J. Foistner was forced to file a Motion for Voluntary Non-Suit, because Shelzi was not paying her share of the legal fees.

72.     On or about July 2004, the LLC, Maynard and the Foistners gained knowledge from Hassel and a local bank that Shelzi was a Convicted Felon, Convicted Drug Dealer and former Massachusetts Prison Inmate, having served time in the Massachusetts prison system.

73.     Shelzi's status as a Convicted Felon, voided her ownership in the LLC, required, at the managers sole discretion, by the Operating Agreement, Articles III, and Exhibit C.  No American Business is required to conduct business with Felons and Drug Dealers.  Instead of disclosing this information, her status as a Convicted Felon, to the LLC, its remaining members and L. Maynard, Shelzi attempted to gain her 50% Ownership Interest, through fraud, deception, misrepresentation and criminal conduct.

74.     Although Shelzi materially breached all of her contractual obligations and brought much harm, millions of dollars in losses, caused by the delay of the Waldorf subdivision from 2002 through 2009, 84 months, to the LLC, failing to finance the contractual obligations set forth in the Purchase Contracts and the Fulton Fee Agreement, Shelzi and her CPA, still insisted that she had the right, to write off the millions of dollars in business expenses, as losses, starting with tax year 2001.

75.     On or about April 2003, after Shelzi became a member of the LLC on December 23, 2002, Shelzi's CPA, Brian Becks (Becks) and Shelzi contacted J. Foistner, instructing him to prepare the LLC's Federal Tax Returns in order for Shelzi to receive her deductions on her personal tax returns.

76.     L. Maynard and J. Foistner, were not required to file, and had not prepared and filed any tax returns for tax years 2000, 2001, 2002, and 2003 since no income was realized, by the LLC in those years, only expenses.  Millions of Dollars in losses.

77.     In 2003, J. Foistner provided the bookkeeping records and financial data, maintained and generated by Keith Prive, (Prive), under Shelzi's supervision, generated by Peachtree Accounting, 2003 Complete Accounting, to Becks for tax years 2001, 2002 and 2003, along with a preliminary 1065 Federal IRS tax return for tax years 2001, 2002, and 2003.  J. Foistner and Keith Prive, were never paid or compensated by Shelzi for this work.  Their invoices remain unpaid to this date.

78.     On or about May 2003, upon receipt of this accounting information, Becks acknowledging, on behalf of his Client Shelzi, that he was in receipt, of the LLC's accounting records for 2001, 2002 and 2003, ordered changes to be made to the tax returns.

17

79.     Shelzi was the Keeper of these records. These records were contractually required to be kept, maintained and paid for by Shelzi, the owner / member, not J. Foistner the non-owner / manager, and certainly not Keith Prive, the unpaid office manager, as mandated by the LLC's corporate votes. Becks demanded that Shelzi's share of losses would be changed from 50% to 85%, allowing Shelzi more losses, or funds that would not be received from Shelzi.

80.     After Becks was satisfied with the LLC's tax returns and Shelzi's share of the losses, Becks amended Shelzi's personal, 1040 Federal tax return, for tax year 2001 and increased Shelzi's write-offs by more than $800-thousand dollars, from the original return, prepared, signed and filed by Becks, as the "Paid Tax Preparer".  Becks also reported the losses for 2002, 2003 and 2004, in a similar manner as Shelzi's "Paid Tax Preparer", acknowledging that he was in receipt of all accounting records, on behalf of his client Shelzi, for those tax years.

81.     In order for Shelzi to satisfy the "Recourse Liabilities" requirement, allowing her to legally write off the losses, Becks claimed and demanded for her, on her 2001 personal tax returns that Shelzi sign and execute two (2) separate Promissory Notes with Personal Guarantees, agreeing to pay and guaranteeing Foistner Law Offices and JFL Trust $459,856.00 and $673,303.00.

82.     In fact, Shelzi, under counsel by CPA Becks insisted to receive these Recourse Liabilities. The signing and execution of these Promissory Notes was witnessed, by now, Attorney Prive, then forwarded in writing to Becks, in order to satisfy Shelzi's "Material Participation and Recourse Liabilities", questioned by the IRS, who was by 2004, auditing Shelzi and Becks alleged fraudulent 2001 amended tax return.

83.     In 2005 Butler Bank modified its original $1.5-million loan and agreed to a new $1.8-million loan for the completion of the Waldorf Estates Phase III road construction.  This

$1.8-million loan, again personally guaranteed by Shelzi and L. Foistner, required a special allocation, in the amount of $100-thousand, to be held back from disbursement until the 20th lot, lot 8-84-31-1 was subdivided and recorded at the Hillsborough County Registry of Deeds.

84.    This $100-thousand hold back money was guaranteed and promised in writing, on Butler Bank's Commitment Letter and loan documents, to the Bedford Design Consultants, Inc. ("BDC"), the Waldorf project Engineers and Surveyors, actually performing the work to subdivide this 20th lot.

85.    Butler Bank also agreed in writing, to make available two (2) separate construction loans, for "Owner Occupied" residential home construction, $990-thousand each, one loan to Shelzi, the other loan to L. Foistner.  These loans were executed for Butler Bank in 2005 and 2006.  Butler Bank, Robert Chapman, promised to finance the construction of these 20 homes, along with two immediate construction loans, to construct two Models.  Participating loans between Butler Bank and other Massachusetts banks were discussed. The LLC relied upon these representations and closed three (3) separate construction loans with Butler, not counting Shelzi's lot 8-84-44 loan.

86.    In order to accomplish this, prior to closing the two Owner Occupied home construction, model loans, Butler Bank and Shelzi instructed Prive and J. Foistner that Butler Bank wanted two separate business entities established and qualified by Butler Bank, as "Qualified Authorized Builders" to construct both homes. Prive submitted these documents to Butler, supervised by J. Foistner.

87.    No longer trusting Shelzi, after witnessing the many frauds and misrepresentations made by her, and after experiencing million of dollars in losses caused by her breaches and her unwillingness to show up at work, for at least one hour per week, in order to

19

perform her duties as an owner, it was agreed that Shelzi and L. Foistner would not take on any new business together, especially, not the construction of multi-million dollar estate homes.

88.    By 2005, the Foistners had constructed, hands on, and participated in the ground work, of more than 64 separate homes, in two subdivisions located in New Boston and Amherst, New Hampshire. The Foistners could demonstrate more than 20 years, direct hands-on experience as "Qualified Builders".

89.    Shelzi had never constructed a single home with her very own hands and possessed no construction skills as a "Qualified Builder". In fact, Shelzi failed to show up for work, one hundred percent, (100%) of the time, not even on one full day, from December 2002 through present.

90.    In order for Shelzi to qualify for the Butler Bank $990-thousand, "Owner Occupied Home Construction Loan", Shelzi personally supervised Prive, by now in 2005, the LLC's only remaining unpaid employee and office manager, from her home in Belmont, Massachusetts by telephone. She never paid Prive for his labor.

91.    The only compensation received by Prive came from the L. Foistner's and L. Maynard.

92.    On or about October 10, 2004, J. Foistner created two (2) new Limited Liability Companies as mandated by the Butler Bank.  One known as New Boston Estates, LLC, ("NBE LLC"), originally planned to be used for the $990-thousand L. Foistner, Lot 8-84-38 loan.  The other known as Waldorf Estates Builders, LLC, ("WEB LLC"), originally planned to be used for the $990-thousand Shelzi, lot 8-84-44 loan.

93.    Separate loan applications were filed and submitted to Butler Bank by Prive and J. Foistner, as instructed by the Butler Bank's loan Officers, Chapman and Donna Hauswirth,

("Hauswirth"). Butler Bank instructed Prive and J. Foistner, to submit builders information and Builders Resumes for the Foistners, attempting to qualify their New Boston Estates, LLC as a "Qualified Builder" for the Lot 38 loan.

94.    Butler Bank also instructed Prive and J. Foistner to submit Waldorf Estates Builders information on behalf of Shelzi. This was impossible for Shelzi had no experiences and was not a New Hampshire Builder. Prive and J. Foistner could not and did not submit any "Qualified Builders" information or Builders Resume, on behalf of Shelzi to Butler Bank.

95.    Lacking the Shelzi "Qualified Builders" information, Butler Bank instructed Prive and Foistner to change all construction contracts to reflect J. Foistner as the Builder and General Contractor for the lot-44 Shelzi loan and all future loans, thereby changing all loan documents to reflect New Boston Estates, LLC, solely owned and managed by the Foistners. Shelzi was never approved as a Qualified Builder by Butler Bank.

96.    Waldorf Estates Builders, LLC, the second company, incorporated and owned by J. Foistner, was never transferred to Shelzi because of Butler Banks refusal, to qualify the company as a "Qualified Builder". No Ownership Transfer Certificate was ever issued to Shelzi, for any amount of ownership, by Waldorf Estates Builders, LLC or New Boston Estates, LLC. Shelzi was never a member, manager, agent, employee or authorized representative of either construction company. J. Foistner was the only and sole founder, manager and member of both companies.

97.    Since Butler Bank would not authorize Shelzi, or any business entity owned by Shelzi, to be certified as a "Qualified Builder", Prive was instructed by Butler Bank to change all contracts and loan application documents, on behalf of Shelzi, for the lot 44- Shelzi loan, to

New Boston Estates, LLC. By then, certified by Butler Bank, as a "Qualified Builder". Only after those changes were made, did Butler and Shelzi both agree to close the loan for lot 44.

98.     The Shelzi lot-44 construction loan closed on or about September 2005, for $990-thousand. New Boston Estates, LLC was the only authorized General Contractor on the loan.

99.     Prior to the lot-44, Shelzi loan closing, Prive, J. Foistner, Brown Excavation (Brown), the Road Builder, now the Excavator for Shelzi's construction site, BDC, Engineers and Surveyors and other subcontractors, performed contract work on behalf of Shelzi, with Shelzi's knowledge and invoiced Shelzi and Butler Bank, $65,003.26, for their work in order to receive a Building Permit from the town. The invoice amounts were part of the Construction Agreement approved by Butler Bank and Shelzi.

100.     Butler Bank's loan officer, Hauswirth, personally instructed Prive and J. Foistner, how to complete the first money requisition and draw to pay this invoice. Several phone calls and fax transmissions were initiated by Butler Bank, which approved this requisition, after making several changes and after receiving Shelzi's signature. This first requisition, took three individuals, seven hours each, to be correctly submitted and accepted by Butler Bank.

101.     Butler issued this one and only draw, Cashiers Check, in the amount unknown, made payable to, Antonia Shelzi, the Borrower, and New Boston Estates, LLC, the only "Qualified General Contractor". Butler Bank then delivered this first bank draft into Shelzi's hands.

102.     Butler Bank was fully aware that New Boston Estates, LLC had the only Mechanic Lien Rights on that project and loan, and were required to be paid. NBE LLC was never paid by Shelzi and Butler Bank.

103.    By July 05, 2005, the IRS announced its audit of the LLCs 2001, Federal Tax Return, filed and submitted, by the LLC in 2003.  Agent Quang Trieau (Quang) was conducting this audit for the Boston IRS Office.

104.    During the first meeting, on or about August 2005, Quang informed J. Foistner that he was only auditing the LLC's 2001, Federal Tax Return, because he wanted to disallow Shelzi's 2001, Amended Personal Tax Return, filed by CPA Becks in 2003, which he had been auditing since 2004.  Quang made it perfectly clear that he was fully aware of Shelzi's tax frauds.  Quang explained to J. Foistner that he was only auditing the LLC because of Shelzi's fraudulent 2001, 1040 Amended Return.

105.    During the first audit appointment, at the LLC's Bedford, New Hampshire offices, on or about September 2005, Quang opened his Shelzi, 1040, 2001 personal audit file, which contained all accounting information, from the LLC for tax years 2001, 2002, 2003, and 2004, originally provided by the LLC to CPA Becks and Shelzi. Quang explained that all these accounting records and tax returns were provided to him by Becks.  This clearly evidences that Shelzi and CPA Becks, were in possession of all accounting information at all times.  Shelzi sued the LLC in 2005, falsely claiming that she never received "any accounting records from the LLC", her basis for a frivolous law suit, abusing the legal system.

106.    Prior to the IRS audit for the LLCs 2001 Federal 1065, Income Tax Return was announced by Quang, in 2005, Shelzi had contacted J. Foistner by telephone, on or about December 2004, asking Foistner to help her establish her "Material Participation and Recourse Liabilities" in the LLC's business operations for 2001. Shelzi specifically asked J. Foistner to help her create a "Meeting Log" for meetings that took place between Shelzi and J. Foistner, in

23

2001, showing that Shelzi "Materially Participated" in the LLCs business management and work performance.

107.   J. Foistner became keenly aware that Shelzi, "Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to join a criminal conspiracy to aid her, to falsify, Federal IRS Forms, during an IRS Audit.

108.   J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, by providing wrongful information during an IRS Audit.

109.   J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, to establish a false record, of meetings that never took place, attempting to commit the Felony Crime, IRS Tax Fraud and IRS Tax Evasion.

110.   After this initial call from Shelzi, additional calls were received from Shelzi, Hassel, and CPA Becks, all soliciting J. Foistner's criminal solicitation to defraud the IRS, J. Foistner called Becks, inquiring about Shelzi's criminal request to manufacture a "False Meeting Log". Becks informed J. Foistner that he would not complete such a "False Meeting Log" and that he did not require, or want any help from J. Foistner.  Becks instructed Foistner not to get involved in the audit that he was managing for Shelzi.

111.   Within a few days from Shelzi's criminal solicitation attempt, Attorney Hollis called J. Foistner, inquiring as to Foistner's knowledge or possible authority to allow Shelzi to receive and pick-up a $100-thousand Butler Bank Cashiers Check, on behalf of the LLC.

112.   J. Foistner informed Hollis that he had no knowledge of such a transaction and that he had not authorized, Shelzi, to draw any funds from the Butler Bank.  Both Hollis and J.

Foistner were fully aware that Shelzi had written authority to pickup checks from the Butler

Bank, in light of the fact, that she was a personal guarantor and co-borrower. However, in order

to draw funds, a company vote, and company signed requisition was still required to be

submitted to the Butler Bank.

113.   Hollis informed Foistner that Butler Bank's Senior Vice President of Commercial

Lending, Robert Chapman, Shelzi's personal friend, had issued a check to Shelzi, from the $1.8-

million loan.  Hollis informed Foistner that it appeared that Shelzi and Hassel had negotiated this

$100- Cashiers Check, issued by Chapman to Shelzi. Hollis informed J. Foistner that he was

awaiting receipt of a copy of that check from Chapman.  Within days a copy of Check No. 7148,

dated August 25, 2005, was received from Butler Bank.

114.   Upon close examination of Check No. 7148 the LLC and J. Foistner realized that

the endorsements, on the check, had been forged. Check No. 7148 was made payable to "Seff

Enterprises & Holdings, LLC" for which Joseph A. Foistner, Esquire, sole manager, was the

only authorized signatory, "Antonia Shelzi and Laurie Foistner, Members". The check showed

the following Memo: "75045479-Lot 30-1 Waldorf Estates Phase III".  The banks intent was to

pay for Lot 30-1 with this $100,000 check is evident.

115.   Shelzi was the only person in possession of check no. 7148, after Chapman and

other Butler Bank employees, handed her the check.  She testified and admitted to these facts in

front of witnesses, all licensed lawyers.

116.   By September 2005, the LLC, Prive, and Hollis, discovered that Shelzi, the only

individual, in possession, of check no. 7148, had forged, or caused to have forged, The LLC's

endorsement on the back of the check.  She also forged or caused to have forged, Laurie

Foistner's endorsement on the back of the check, spelling it "LORI" instead of Laurie.  After

committing the two (2) counts of Felony Forgery, this Convicted Felon, allegedly signed and endorsed check no. 7148, with her very own signature, thereby attesting to her knowledge and specific intent to appropriate these funds, with forged endorsements.

117.    Shelzi then wrote the following words on this falsified bank draft, *"Pay to the order of Domenic Shelzi"*, her brother, a Rhode Island Attorney. He endorsed the check with his signature, failing, as required by law, the Uniform Commercial Code (UCC), as a Holder in Due Course, to inspect the bank draft for the required – matching endorsement, matching the front of the check, prior to affixing his very own endorsement. Domenic Shelzi then deposited the forged funds into his account at the Citizens Bank. The appropriation of the check, by Shelzi, constituted the felony crime of Attempted Larceny and/or Larceny. Attorney Domenic Shelzi's participation in these alleged crimes, have been reported to Rhode Island Supreme Court, Board of Bar Overseers, and various law enforcement agencies.

118.    Butler Bank and Chapman had an obligation to protect the LLC and Laurie Foistner from these alleged crimes, once Chapman became aware of these unlawful acts. A simple telephone call from Chapman would have stopped these alleged crimes, before they were ever started. This was not the case, Chapman had knowledge of these alleged criminal acts at all times. Chapman's criminal involvement, alleged as a co-conspirator, continues to harm the LLC and the Foistners.

119.    Shelzi admitted in front of witnesses, *"Chapman has been a very close friend of mine for many years. His wife is from South America, we both speak Portuguese. Last week Chapman and I went out on a dinner date. He was drunk and his hands were all over me. All this, in front of his wife, she was there. I have him right where I want him. This was not his first time"*.

26

120.    In 2005, the Plaintiffs were under the belief that a bank teller, employed by Citizens Bank, discovered the forged endorsements, stamped the instrument, "MISSING ENDORSEMENT" and returned it either to Shelzi or Butler Bank, effectively rendering the crime of Attempted Larceny.

121.    Chapman, as a Fiduciary, was required at all times to inform the LLC and L. Foistner of Shelzi's alleged criminal conduct and he certainly was under a duty to report these crimes to law enforcement.  Chapman intentionally failed to fulfill his obligation.  It is alleged that Chapman was a member of this criminal conspiracy that issued the check, delivered it to Shelzi, and then covered up these crimes with silence.

122.    After the check was returned, the LLC, Foistner, Hollis and Prive gained knowledge of Shelzi's and Chapman's alleged criminal conduct.  Robert Baskerville, the Engineer and Surveyor, who was promised the $100,000.00 payment for his services was promptly notified.

123.    In a meeting held, on or about September 2005, at the law offices of Gottesman & Hollis, P.A., Shelzi admitted, in front of witnesses, to the forgeries and conversion of the $100,000.00 Butler Bank Draft, implicating Chapman. Shelzi and Butler Bank; transported this stolen instrument across Interstate Lines affecting Interstate Commerce; and used the wire and mail to allegedly promote the criminal conspiracy.

124.    When Chapman gained possession of check no. 7148, he, as a professional banker, recognized that the ledger on the instrument " MISSING ENDORSEMENT", that the endorsements on the back of the check were forgeries and that some endorsement where missing.

125.    Instead of performing his legal and/or fiduciary duties to the Plaintiffs, Chapman moved swiftly to help Shelzi, thereby allegedly defrauding the Plaintiffs and the Foistners.

27

Instead of performing his duties as a bank official, Chapman issued Hollis, on behalf of Shelzi, a second bank draft for $100,000.00. Again, without the Plaintiffs expressed written approval.

126.   Butler Bank and Chapman intentionally refused to protect their borrowers, and both decided, not to respond, or talk to their Borrowers, until September 2008. In fact, Butler Bank and Chapman have not returned one single telephone call, or responded to one of more than ten (10) written notices, in more than 48 months. All the while, Butler Bank collected more than $15,000.00 each month, from the LLC as interest.

127.   When Shelzi needed Chapman's help to receive a second check, she wrote to him, "please issue new check, because of stockholder problems". She received check no. 7324 in the amount of $100,000.00, constituting another alleged act of felony fraud and larceny.

128.   Joseph Foistner, Esquire, the LLC's only manager, called Chapman and the Butler Bank, informing both of the alleged crimes that had been committed by Shelzi and ordered Chapman, "Not to release any additional funds or issue any additional checks to Shelzi".

129.   Chapman and the Butler Bank were given NOTICE, that only "Attorney Foistner, the LLC's only Manager could order or release funds from their loan". Chapman and the Butler Bank received notice from Attorney Foistner that Shelzi was no longer a Member of The LLC and that her membership had been revoked, as authorized by The LLC's Operating Agreement, which allowed for the removal of convicted criminals, at the sole discretion of The LLC's only manager, Attorney Joseph A. Foistner, Esq.

130.   On or about September 15, 2005, Attorney Morgan Hollis provided a written notice to the President of Butler Bank, informing him of the misconduct and crimes allegedly committed by his bank and its personnel. Attorney Hollis' letter to Butler Bank received no reply. Instead of correcting these problems and protecting their borrowers, the Butler Bank and

Chapman issued more checks to Shelzi, constituting additional alleged felony crimes, causing the LLC and the Foistners millions in damages.

131.    On or about September 12, 2005, Butler Bank and Chapman issued Check No. 7324, in the amount of $100,000.00 to Shelzi, in total disregard of their borrowers written notices, thereby allegedly committing felony bank fraud, this time, with full knowledge, intending to defraud the LLC and the Foistners.  Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and did use the mail and/or wire to commit these acts.

132.    Check no. 7324, was ordered by Shelzi, mailed or delivered by Butler Bank, Chapman or Shelzi, to Morgan Hollis, without the express written approval or knowledge of the LLC the borrower or Laurie Foistner, the Member/Guarantor.

133.    Instead of paying the Bedford Design Consultants for subdividing lot 30-1, the written purpose for the $100,000.00, held back by Butler Bank, as part of the loan agreement, stated in writing on the loan documents, the money ended up in Attorney Domenic Shelzi's checking account.  The very same checking account, that was to originally, receive the forged and stolen funds, via Check no. 7148.

134.    After Butler Bank and Chapman closed and funded the Shelzi Lot – 44, Owner Occupied construction loan, in the amount of $990-Thousand, and after receiving the first invoice from New Boston Estates, LLC, the only "Qualified Builder" and approved "General Contractor", on or about September 2005, in the amount of $65-thousand, and after Hauswirth, Butler's Loan Administrator, personally supervised, Prive, in the drafting and submittal of the draw and invoices, and after Butler Bank issued a check to Shelzi, made payable to New Boston

Estates, LLC and Shelzi, in the amount of $65-Thousand, Butler Bank and Chapman allegedly committed their third alleged criminal act.

135. Butler Bank issued a check, check number unknown (Butler Bank has refused to provide a copy of both checks to NBE LLC), to Shelzi, made payable to NBE LLC and Antonia Shelzi, for services performed under the construction agreement. This NBE LLC check was issued at the very same time, just prior to discovering the alleged crimes committed by Butler, Chapman and Shelzi, pertaining to check no. 7148 and check no. 7324. Knowing that Shelzi and Chapman were committing fraud against the LLC and the Foistners, including the switching of checks, Prive and Foistner refused to endorse the $65,000 NBE check in Shelzi's possession.

136. Instead, Prive and Foistner insisted that Shelzi endorse the NBE LLC check, so that the funds could be used for its intended and lawful purpose, to pay the contractors in full.

137. The payment of the contractors in full, should have been Shelzi's and Chapman's intent, when Chapman issued the check to Shelzi, after Shelzi signed and executed bank forms, "the Bank Requisition for Funds". The only authorized purpose for these funds was to pay NBE LLC, the authorized builder on the loan, and its contractors.

138. This did not occur. When Prive and NBE LLC refused to endorse the back of the $65,000.00 check, knowing that Shelzi would never pay them, Shelzi again visited her friend Chapman, in order to conspire to commit additional acts of bank fraud and felony larceny.

139. Chapman unlawfully cancelled out and voided the original $65,000.00 check made payable to NBE LLC and issued Shelzi a new check, made payable to Shelzi and another New Boston Estates Limited Liability Company, called Waldorf Estates Builders, LLC ("WEB LLC").

140.    Chapman issued a second check to a Company, WEB LLC, which was not an authorized builder with the Bank. Additionally, WEB LLC, was not a party to the signed and executed construction agreements required by Butler, to issue the loan. WEB LLC had not performed any work what-so-ever and was not entitled to any payment from Butler. Chapman knew this when he allegedly committed this 3rd felony act of bank fraud.

141.    Hauswirth did not work with anyone at WEB LLC to generate an invoice or the required bank forms, mechanic lien affidavits, invoice submittals, money requisition and supporting documents.

142.    Chapman knowingly and intelligently switched the two checks and allegedly committed felony bank fraud. Shelzi represented to Chapman that she was the Owner and Manager of WEB LLC. This representation was false with the intent to provide the Bank and Chapman with a pretext to issue the check.

143.    Shelzi did not own any rights or ownership in WEB LLC. Chapman knew this. If not, he was under an obligation as a fiduciary and banker to investigate the rightful owners of WEB LLC. This he failed to do.

144.    Had Chapman and the Bank performed their duties as a loan officer/lender, they would know that Joseph A. Foistner, Esquire, was the only founder, owner, member, and manager of WEB LLC. Chapman's changing of the $65,000 check defrauded NBE LLC and its subcontractors, by issuing a new check, through fraud, not supported by invoices, a requisition, to a Limited Liability Company owned by the very same individual that was being defrauded.

145.    Shelzi took the new check, issued to WEB LLC, opened a false and fraudulent checking account with the Citizens Bank, allegedly forging and falsifying federal bank forms and power of attorney forms to open such an account. She then allegedly forged the new check by

31

endorsing her name onto the back of the check representing to be an owner, manager or authorized signor of WEB LLC and then converted the funds.

146.    These alleged acts constitute the commission of felony forgery, felony identity theft, felony larceny and Chapman along with Butler Bank, are liable as co-conspirators for these alleged crimes. Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and used the mail and wire to commit these acts.

147.    The LLC and the Foistners reported this to the Citizens Bank Security Staff which provided copies of the falsified checking account documents as well as copies of forged and falsified checks from that Citizens Bank Account.

148.    Upon gaining knowledge of the alleged crimes and fraud, Foistner, the LLC, NBE LLC and WEB LLC, provided written notices to the President and Chief Executive Officer of the Butler Bank, Chapman and Hauswirth.  Instead of correcting and stopping these many alleged crimes, Butler Bank, in contravention of their duties as a Fiduciary/Lender, chose to hide their involvement with silence and not answer a single telephone call or written notice from the LLC in 49 months.  Butler Bank not only facilitated the commission of the alleged crimes, but by their conduct allowed it to continue harming their borrowers.  Chapman and the Bank became members of this alleged criminal conspiracy, aiding and abetting Shelzi in the performance of these alleged crimes.

149.    Instead of performing its fiduciary duties, Chapman and Butler Bank, falsely and through fraud, schemed to destroy the LLC and the Foistners by reporting negative credit information to various Credit Bureaus.

150.    In fact, Butler Bank's false reporting, of the LLC's late payments to Butler Bank, caused the Guarantor's Credit Score to plummet. This was done by Chapman, to intentionally destroy Laurie Foistner and to aid and abet his friend Shelzi.

151.    The Butler Bank was fully aware that the New Hampshire Courts had ordered Shelzi to make half the interest payments to Butler, the other half, was ordered to be made by Laurie Foistner. Butler Bank and Chapman had received written notices from Attorney Morgan Hollis that Shelzi, living in Belmont, Massachusetts, was not making her share of the court ordered payment to Butler, while she was carrying on in her alleged personal and criminal affairs with Chapman.

152.    Numerous notices, from 2005 through present, now for 49 months, had been provided, to Butler Bank, that Shelzi did not reside at 3 Foxberry Drive, New Boston, New Hampshire, and that Shelzi should receive Butler Bank's false and threatening letters, at her home in Belmont, Massachusetts, always declaring a default, when there was, in fact, no default.

153.    Butler Bank intentionally did not provide these notices to Shelzi. Instead, Butler Bank reported Shelzi's late payments onto Laurie Foistners' Credit report.

154.    Upon information and belief, a detailed review and comparison of Shelzi's Credit Report and Laurie Foistner's Credit Report documents this fact.

155.    On each occasion, when Butler Bank mailed a Default Notice to Laurie Foistner at 3 Foxberry Drive only and not to Shelzi at her Belmont address, Butler Bank erroneously declared a default at the stated date on the letter. In effect, Butler each time declared a default at a given date in the future, the date that had not occurred as of the date of the writing. Therefore, there never was a default. Only threatening letters designed to harass the LLC and the Foistners were issued.

156.    After the commissions of these alleged crimes and fraud committed by the employees of Butler Bank, and after millions of dollars in damages, J. Foistner personally wrote to Butler Bank, as did Attorney Hollis, asking to have Chapman removed as the loan officer of the loan.  The LLC and Hollis specifically wrote to Butler Bank, informing the Bank of all the alleged crimes and fraud, harassment and racketeering, committed by the bank and its employees in aiding and abetting Shelzi's commission of the alleged crimes.  Butler Bank did not respond and chose to allow these alleged crimes to continue.  Chapman continued to manage, control and administer the LLC's loan until 2009.

157.    In order for Shelzi to keep her reported losses for tax years 2001, 2002, and 2003, and, in light of the fact that Shelzi did not become part of the LLC until tax year 2003, the IRS required Shelzi to demonstrate that she was materially involved as a member of the LLC in 2001 – this Shelzi and her CPA were not able to do.  Shelzi had an assignment clause from Maynard, purchasing his losses for tax years 2001 and 2002, in the Ownership Transfer Agreement.  This clause however, would not and could not, allow Shelzi and Becks to claim material participation.

158.    In order to mislead the IRS Auditor, Quang, who had requested for Shelzi and Becks to complete and submit meeting logs and records showing her involvement in 2001, Shelzi prepared a letter, dated August 1, 2005, to Brian Beck stating, " *... please note that I do not keep logs on meetings I conduct with business associates, managers, and staff at any one of the companies that I own.*"  In this letter, Shelzi attempts to falsely, and with fraudulent intent, mislead the IRS, by creating her own fictional participation history; all of which is not true.  Shelzi never materially participated in the LLC's operations until January 2003.

159.    On or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and Becks, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax

34

No. 617-776-5690, pages 1, 2 and 3. Page 2 of the fax consisted of an IRS Form 4564, depicting

Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu,

dated July 15, 2005. This IRS Form set forth the following Information and Documentation

Request:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC
nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

1. Proof of material participation in the Seff Enterprises & Holding LLC in a
   regular, continuous, and substantial manner by Antonia Shelzi under IRC 469
   (b)(i) & (5).
2. Complete the attached activities log which complies with your record keeping
   requirements in Reg. 1.469-5T(f)(4).
3. Provide a copy of your appointment book or calendar for the year 200112 to
   support the information provided in the activities log .....
4. Did you perform most of the work in Seff Enterprises & Holdings, LLC?
5. Did you work more than 100 hours and no one (including non-owners or
   employees) works more hours?
6. Did any person receive compensation in connection with managing Seff
   Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call ...."

Page 3 of the fax was a blank IRS Form, entitled "Activity Log".

160.    Hassel followed up his fax transmission with a telephone call to J. Foistner,

asking him to help him defraud the IRS by falsifying this Activity Log". Hassel allegedly

committed Felony Solicitation, to defraud the IRS, when he asked J. Foistner for his involvement

to falsify this IRS Form and to provide fraudulent and false information to the IRS Auditor.

161.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law

Offices writing, *"IRS ... Per accountant need to keep log and therefore review copy of log

prepared for Toni."* Hassel submitted along with his fax document, a two page document

depicting a false meeting schedule log that he had prepared for Shelzi. The document contained

a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner in 2001.

162.    All were manufactured by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place.  Prior to submitting this fax transmission from his Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf of Shelzi and Becks.

163.    When Hassel submitted this second fax transmission to Attorney Foistner, he again allegedly committed the felony crimes of Criminal Solicitation, IRS Tax Fraud, Criminal Conspiracy to provide false information to the IRS.

164.    On or about August 1, 2005, Hassel and Shelzi prepared a letter to CPA Becks in which Shelzi, attempting to defraud the IRS by providing the IRS with false and fraudulent information, attempting to evade or defeat her owed taxes, attempting to file fraudulent returns, statements, or other documents, furthering the alleged criminal conspiracy with Hassel and Becks, and others to allegedly defraud the United States of America.  Shelzi made the following untrue statements:

> "In July 2001 I was approached by Attorney Foistner to discuss my participation in the purchase of the development …  I spent most of the following 10 days on due diligence …. Overall I would conservatively estimate my time spent in 2001 on Seff Enterprise business to be well in excess of 200 hours.  Sincerely yours,   Antonia Shelzi".

165.    Shelzi never joined the LLC until December 2002, she performed her due diligence from October 2002 through December 2002 and never performed any work on behalf of the LLC.  Shelzi's written statements and misrepresentations are a testament of her felonious character and clearly demonstrate her criminal intent to defraud the IRS and others.

166.    During Hassel's August 8, 2005 telephone call to the Foistner Law Offices, his second attempt to criminally solicit J. Foistner's participation in the IRS Tax Fraud, Hassel explained that he was forwarding the August 01, 2005 Shelzi letter to CPA Becks, which he had prepared for Shelzi.

167.    Instead of helping Hassel and Shelzi commit this IRS Tax Fraud, refusing to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS Auditor, J. Foistner reported all of these crimes to Agent Quang.  Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with  his sworn statement of Shelzi Tax Fraud.

168.    J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.  Butler Bank received written notices of these alleged crimes along with copes all evidentiary exhibits, the FBI Complaint, the forged checks, the IRS meeting logs and the original the LLC tax returns, as well as the amended the LLC, tax returns, tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.  These tax returns depict Shelzi as being ousted from the LLC, because of her status as a Convicted Felon.  Butler was kept informed by J. Foistner and his lawyers, in writing, at all times.  Butler Bank was given every opportunity to renounce its involvement in the alleged conspiracy but refused to do so.

169.    Upon information and belief, Attorney Laboe and Orr & Reno had full knowledge of Shelzi's unlawful activities, forgeries and larcenies pertaining to the IRS Tax Fraud and the stolen Butler Bank checks as evidenced by the many written letters submitted by Attorney Laboe

to Hassel in an attempt to coerce J. Foistner not to comply with the IRS audit and further

attempting to cover up the stolen and forged checks.

170.    On or about September 26, 2005, Shelzi's lawyer, Attorney Laboe, attempted to

coerce J. Foistner, not to cooperate, with the IRS Audit in writing, in a letter to Attorney Hollis.

He wrote, *"Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr.

Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001.  Mr. Foistner has

characterized these schedules as 'fraud'."*

171.    Attorney Laboe wrote in his September 26, 2005, letter to Hollis, page 2:

> "However, unilaterally expanding the scope of the current IRS
> audit outside tax year 2001, could potentially expand liability for
> Seff, as well as Mr. Foistner and Ms. Shelzi.  Therefore, we ask
> that you caution Mr. Foistner from taking such action. Granted, if
> the IRS requests the information, Mr. Foistner has no other choice
> but full disclosure. However, it is in nobody's best interest to bog
> this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions described above and below certainly interfered in the company's

participation in the audit in the opinion of the Plaintiff.  Not giving the IRS the falsified meeting

schedules had nothing to do, or had no impact, on the "project being bogged down, or

establishing further debt or liabilities."  Upon information and belief, Attorney Laboe cautioned

Mr. Foistner not to cooperate with the IRS.

172.    Upon information and belief, Attorney Laboe assisted Shelzi by filing a frivolous

law suit against the LLC, his First Petition, asking the State Court to remove all accounting

records, cancelled checks and bank statements from J. Foistner, in order to materially interfere

with the ongoing IRS audit.   This first Petition, falsely claimed:

1. That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2. That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3. That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4. To have all of the LLC's checking accounts attached.

173.   Prior to filing this frivolous law suit, allegedly abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis Law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

174.   This solution would not work for Shelzi since she needed to remove all accounting records and evidence of the Shelzi IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to stop Foistner from providing this evidence to Auditor Quang.

175.   In fact, Shelzi was instrumental in removing all accounting records from the Company's possession for three months. This conduct was perfectly timed to interfere with the IRS Audit.

176.   J. Foistner completed the IRS audit with Agent Quang successfully. Agent Quang and J. Foistner agreed to amend all of the LLC's Federal Tax Returns for calendar years 2001, 2002, 2003, 2004 and 2005, effectively reducing all deduction to Zero for those tax years, by moving millions of dollars into the LLC's "Inventory Account", thereby capitalizing all expenses.

177.    This was requested by the IRS in writing and J. Foistner complied, amending all tax returns as requested.  This however caused Shelzi millions of dollars in additional income taxes for those tax years, effectively removing all of the losses that she and Becks had improperly written off.

178.    After amending the tax returns, J. Foistner, as sole manager of the company and then, as 100% owner / member as defined by Seff's Operating Agreement, ousted Shelzi as a member, effective February 14, 2006, from the company, citing the many alleged Felony Crimes she, Butler Bank and their accomplices had committed.

179.    After Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, then the LLC's attorney, her alleged criminal conduct increased.  It was not enough for Shelzi and her representatives to allegedly criminally interfere with the administration of Internal Revenue Laws, the IRS audit, by removing the accounting records from J. Foistner, during the audit, they also stole, removed and converted Seff's only Notebook Computer, maintaining and storing the only copy of the LLC's accounting data, tax data and company data.

180.    This computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2008.  Additionally, Hassel destroyed and sabotaged Seff's only back-up copy of this data and software, housed on Foistner Law Offices, new server.  This server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only backup electronic data.  These alleged acts constituted crimes of Larceny, Criminal Mischief and other crimes as defined in New Hampshire and Massachusetts.  Hassel transported the computer, data and software, without authority, across interstate lines and used the mail and wire to perpetrate the alleged crimes.

181.    On or about March 2009, Attorney Laboe, now Hassel's new Lawyer's, having full knowledge that a law suit had been filed in Massachusetts,  by the LLC, against Hassel, his client, complaining of the computer and data theft by Hassel, and, that Hassel had admitted having possession of the computer and the LLC's data since 2004, filed a Motion for Spoliation against the LLC, claiming that the LLC had destroyed computer data, when in fact, it was his very own clients, Hassel and Shelzi, that committed the spoliation, in order for the IRS <u>not to</u> receive any amended tax returns.

182.    When Shelzi realized that her tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, that Attorney Laboe's and Shelzi's attempts to stop Foistner from meeting with IRS had failed, Shelzi allegedly initiated Phase II, of their criminal conspiracy to defraud the IRS.

183.    Attorney Laboe, representing Shelzi in retaliation, on February 15, 2006 and February 22, 2006, respectively, while Shelzi was no longer a member / owner of Seff, LLC filed a Petition to have Foistner, by then the 100% owner / member removed as manager.  This was designed to interfere with the IRS Audit and the successful amendment of the tax returns.

184.    Upon completion of the IRS audit, an audit performed without accounting records since Shelzi had the LLC's accounting records removed from the company by Court Order, in an attempt to interfere with the audit, J. Foistner provided notice, as sole manager of the LLC, to Shelzi and Attorney Laboe that J. Foistner, had reached an agreement with the IRS, to amend the 2001 2002, 2003, 2004, and 2005 tax returns, as suggested by the IRS, to ZERO.  Foistner, in fact, amended the returns within a few days after the audit and forwarded same to Shelzi, Attorney Laboe and Butler Bank.

185.   After Foistner reported Shelzi's and Attorney Laboe's alleged tax fraud to the Auditor and the IRS Criminal Investigation Division, and provided Shelzi and Attorney Laboe with the notices of his actions taken in regard to the IRS Settlement, Attorney Laboe and Shelzi realized that by capitalizing close to $6-million worth of expenses that Shelzi had planned to write off, or in fact, already had partially written off, his client, Shelzi would now owe millions more on owed taxes and penalties. Attorney Laboe filed another Petition to remove J. Foistner, as a Manager, by allegedly making misrepresentations and false statements to the Court in an attempt to mislead the Court that Foistner was acting unlawfully as manager of the LLC.

186.   Attorney Laboe and Shelzi also asked the Court to remove J. Foistner as the "Tax Matter Person" for LLC.  This, an impossibility, because Foistner, remained the only owner, of the company.

187.   Upon information and belief, Attorney Laboe, at all times, was J. Foistner's and the LLC's attorney, under a duty to keep his client's information confidential.  Instead, Attorney Laboe zealously advocated his client's (Shelzi's) position contrary to the best interest of his former clients.

188.   The acts of Shelzi were designed to interfere with the IRS Audit by intentionally misrepresenting facts and withholding information, intending to further her cause in allegedly defrauding the IRS out of millions of dollars.

189.   Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

190.   On or about June 2006 Shelzi called Robert Baskerville, the Projects Engineer and Oberhauser, the LLC's attorney. Baskerville's sworn statement and signed affidavit states

42

that Shelzi had asked him, if he would be willing to help her bankrupt the LLC and the project. Oberhauser contacted J. Foistner, warning him of Shelzi's alleged criminal motives, to bankrupt her very own company, the LLC.

191.    The LLC has attempted to litigate these claims in the State Court against Shelzi and others for more than 49 months, realizing more than $16.5-million in damages.

192.    On or about January 2007,   The LLC hired a Forensic CPA, Mr. Antony Albright and required that Mr. Albright generate a new set of accounting records, for tax years 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 in preparation for the civil trial against Shelzi and others.  Albright was asked to re-enter all accounting and bookkeeping data, from the LLC's original documents into his CPA Firm accounting computers, in order to present accurate and complete accounting information and tax information for the Court.

193.    On or about March 27, 2007, CPA Albright stated in his sworn statement and Affidavit to the Court:

> " *I understand that aspects of this litigation pertain to various loans and/or capital contribution of Laurie Foistner, as member. My analysis to date indicates that Ms. Foistner's loan and or capital funding (exclusive of original capitalization) has exceeded all loan repayments and/or capital withdrawals since inception".*

What Albright was stating, simply said, was that L. Foistner had never withdrawn more money from the Company, at any time, than what she had deposited into the company as loans, the original $1.3-million capitalization excluded. L. Foistner was at all times entitled to remove another $1.3-million, at her discretion, before she would have overdrawn her account and actually taken money from the LLC.  Shelzi knew this.

194.    Instead of promoting his client's best interest and aiding his clients well being, Attorney Laboe claimed to the State Court that Foistner had removed money from the company

43

without Shelzi's authorization – asserting that the Foistner's were embezzling money from their very own Company, which owed them several million dollars. This representation was not true.

195.    By 2009, the time of this bankruptcy filing, the Foistners had contributed more than $3-million, to pay for the operations of the LLC, abandoned by Shelzi in 2003. After Shelzi was ousted from the LLC, in 2006, the Foistners paid for the construction and completion of the 3,000 ft. long road, installed final pavement and completed all contractual subdivision condition set forth by the Town of New Boston.

196.    The Town accepted the road in October 2008, after the Foistners provided all road maintenance and snow removal from 2003 through 2008. Shelzi never allocated a single hour to the LLC's Waldorf Project or the RICO Claim, the only reasons for the LLC's existence.

197.    Shelzi accomplished her original promise made by CPA / Attorney Di Iulio, to sue for an accounting, while she was under an obligation to perform and pay for the accounting, while Shelzi, at all times was in possession of all the accounting records. Shelzi, by her conduct and the use of the Court, finally bankrupted the LLC, causing more than $16.5-mllion in damages, excluding the loss of the future construction of the remaining 18 homes, estimated cost to construct $36.8-million.

198.    In summary, Shelzi's, Hassel's, Chapman's and the Butler Bank's planned and executed alleged criminal conduct began on or about July 2005. These alleged co-conspirators, were aided and abetted by the Butler Bank. This harmed the LLC financially, (1) by interfering with the contractual relations of the Waldorf project, the Creditors and its Financiers; (2) by intentionally destroying a valid RICO Case and the millions of dollars in costs associated with this claim; (3) by interfering with the business activities, sales, construction of homes, delaying the project from 2002 through 2009 and finally bankrupting the project in 2009; (4) by forging

44

endorsement on $100-thousand dollar bank drafts and converting same, transporting these stolen

goods over interstate lines; (5) by intentionally implicating and attempting to criminally solicit

the LLC, its agents, employees, members and manager, to help commit criminal IRS Tax Fraud,

to falsify IRS Tax Forms and to provide false information during an IRS Audit; (6)  interfering

with the administration of an IRS Audit, by removing accounting records and destroying

computer servers, in order to further the alleged criminal conspiracy to defraud the IRS, at all

times attempting to aid and abet Shelzi in evading her payment of owed income taxes; (7)

transporting stolen computers over interstate lines, affecting Interstate Commerce; (8)

committing the crime of Identity Theft by opening up a false checking account in Massachusetts

and then converting the stolen funds; (9) committing the crime of Larceny, Attempted Larceny,

Theft by Deception, Criminal Mischief and other criminal conduct; (10) abusing the legal

system, bringing frivolous claims, misrepresenting the truth to a tribunal, and allegedly

committing many counts of material, felony perjury, using the legal system to further their

criminal enterprise; and, (11) at all times using telephone lines and the US Mail to conduct their

criminal acts, committing Mail and Wire Fraud.

 199. Shelzi, through her lawyer, did intentionally prepare and file more than forty (40)

separate motions and legal action, at all times intending to bankrupt the LLC, causing the LLC

millions of dollars in damages.

 200. The Defendants, by their conduct, intentionally bankrupted the LLC by

appropriating and wasting the LLC property, at all times affecting commerce, by alleged larceny,

extortion, attempts to conspire to perform larceny and extortion, through intimidation and

coercion, placing immediate fear of injury to the LLC's property and well-being, including the

taking of the LLC's property without its consent, as defined in 18 U.S.C. § 1951.

201.    On or about February 19, 2008, the LLC filed a civil action, in the Hillsborough County Superior Court, Docket No.08-C-83, against their Lawyers Orr & Reno, P.A. and Attorney James Laboe for allegedly violating the Plaintiff's confidential information, breaching their fiduciary duties, violating the Attorney Client Rules of Professional Conduct.

202.    Orr & Reno's conduct was also reported to the FBI, the New Hampshire Attorney General's Office, the United States Attorney, District of New Hampshire and other law enforcement agencies.

203.    Butler Bank's alleged criminal conduct, criminal and civil conspiracies in aiding and abetting Shelzi was reported to the FBI, the IRS, the FDIC, the New Hampshire Banking Commissioner, the Massachusetts Banking Commissioner, the New Hampshire and Massachusetts Attorney Generals, the United States Attorneys for New Hampshire and Massachusetts and other law enforcement agencies.

204.    In 2008, the LLC, through their attorneys, filed a Writ of Certiorari to the New Hampshire Supreme Court, accompanied by their Expert's Opinion, regarding the alleged unethical conduct of Orr & Reno, P.A.  The New Hampshire Supreme Court refused to hear the Writ.

205.    On or about August 2007, the LLC filed a civil suit against Hans Hassel, for the theft and conversion of the Computer System, its operating software, its accounting software and its accounting and financial data, in the Commonwealth of Massachusetts, Middlesex Superior Court, Docket No. 2007-01627-C.  Hassel intentionally converted this computer that contained the LLC's only electronic accounting data, in order to interfere, hinder and delay the ongoing IRS audit, attempting to destroy the evidence contained in the computer from reaching the IRS auditor and the IRS Criminal Investigation Division.  The LLC has substantial and compelling

46

evidence, to show that Hassel also physically destroyed the LLC computer server, maintaining the only backup electronic copy of the accounting data, in 2006, believing that the LLC could not provide any evidence concerning the Defendants ongoing alleged IRS tax fraud and falsification of tax forms to the IRS.

206.    The Defendants allegedly coerced and abused the legal system by filing frivolous claims, committing countless acts of Perjury and provided false information to a Tribunal. Defendants violated and conspired to violate the LLC's rights to free association, to petition government, procedural due process and equal protection of the laws under the United States Constitution and have engaged in seeking selective enforcement of the law, to serve their criminal enterprise.

## A RICO CLAIM'S 18 U.S.C. § 96, et seq
## COUNT ONE: RACKETEERING

207.    The Plaintiffs re-allege paragraphs 1-206 as though restated in full herein and not inconsistent herein.

208.    At all times, the Butler Bank and the Individual Defendants constituted an "enterprise," within the meaning of U.S.C. §§ 1961(4) and 1962(c), as a body corporate pursuant to RSA 31:1.

209.    Defendants were individual "persons" within the meaning of U.S.C. §§ 1961(3) and 1962 (c), who associated with and/or participated in the conduct of the enterprise's affairs.

210.    Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

211.    Defendants conspired with each other to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering

activity in violation of 18 U.S.C. § 1962(d). Each intended to further an endeavor of Shelzi and Hassel, which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor.

212.    Defendants carried out a scheme to defraud the Plaintiffs that was knowingly and intentionally devised and carried out in concert to financially damage the Plaintiffs for their own economic gain and to deprive the Plaintiffs of the intangible right of honest services under 18 USC § 1346 by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

213.    Defendants placed, or foreseeably caused to be placed in a post office or authorized depository for mail, matter that furthered the scheme to defraud thereby committed mail fraud, in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

2 14.    These alleged acts all occurred after the effective date of the enactment of the RICO statute and more than two such acts occurred within ten years of one another. At all relevant times, the enterprise engaged in, and its activities affected interstate commerce and foreign commerce.

215.    All of the predicate acts described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to extort and defraud the Plaintiffs; their common result was to extort and deprive the Plaintiffs of civil rights, money and the intangible right of honest services under 18 USC § 1346.

216.    Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth, each personally or through their agents or servants, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission.

217.    The Plaintiffs were the victims of the acts of racketeering and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

218.    All of the predicate acts described were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts over a substantial period of time.

219.    The patterns of racketeering activity engaged in by Defendants continues, because such conduct has become a regular way of conducting on-going business activities.

220.    As a direct and proximate result of, and by reason of, the activities of the Defendants and their conduct in violation of 18 U.S.C. §§ 1962(c) and 18 U.S.C. § 1964(c), LLC have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The Defendants appropriated from the Plaintiffs of their property, affecting commerce, by larceny, forgery and extortion, and attempts to conspire to commit larceny, extortion and other crimes through immediate fear of injury to the Plaintiff's property and well being, including the taking of the Plaintiff's property without its consents as defined in 18 U.S.C. § 1951.

221.    Among other things, the Plaintiffs have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages and physical harm to their persons,

property and reputation, intentionally caused by the Defendant's alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present. The alleged fraud, crimes, conspiracies, thefts and wrongful acts committed by the Defendants, harming the LLC detailed herein entitles the LLC to recover threefold the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT TWO
### RICO - AIDING AND ABETTING

222.    The Plaintiffs re-allege paragraphs 1-221 as though restated in full herein and not inconsistent herein.

223.    In the alternative and without waiving the forgoing, Defendants aided and abetted one another in carrying out their alleged schemes to defraud through criminal conduct. As set forth herein, Defendants engaged in various schemes to defraud LLC as defined and set forth in 18 U.S.C. § 1341: 18 U.S.C. § 1344; and 18 U.S.C. § 1962(c).

224.    Defendants knew that Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth were engaged in various schemes to defraud and harm the Plaintiffs. The Defendants received written notices from the LLC attorneys informing them of the alleged crimes, said crimes are individually and separately alleged herein.

225.    Defendants engaged in actions that were intended to and, in fact, did facilitate and advance Antonia Shelzi's and Hans Hassel's schemes to defraud and harm the Plaintiffs.

226.    As a direct and proximate result of Defendants' aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth to defraud the Plaintiffs. The Plaintiffs have incurred and/or will incur loss and damages in excess of the minimal jurisdictional limits of the Court.

227.   Defendants conduct by aiding and abetting of Antonia Shelzi, Hans Hassel, Butler

Bank, Robert Chapman and Dona Hauswirth's alleged schemes to defraud and harm the

Plaintiffs was committed with fraud, and/or actual malice, and/or deliberate acts, and/or

oppression, and/or willfulness, and/or such gross negligence as to indicate a wanton disregard for

the rights of the Plaintiffs. As a result, the Plaintiffs are entitled to an award of punitive damages

against the Defendants.

### COUNT THREE
### CONSPIRACY TO COMMIT BANK FRAUD AND OTHER CRIMES

228.   The Plaintiffs re-allege paragraphs 1-227 as though restated in full herein and not

inconsistent herein.

229.   In the alternative and without waiving the forgoing, Defendants allegedly

committed fraud in making false statements of material fact and engaging in fraudulent acts that

they knew were false at the time they made them, which statements and acts were intended to be

relied upon by the Plaintiffs.  The Plaintiffs reasonably relied upon them to their detriment.

230.   These and other fraudulent acts caused in fact and proximately caused the

Plaintiffs to suffer monetary damages including the cost of the delay in the approval, completion

and sale of their Waldorf Estates land and homes, from 2002 through present (2009).  The

Plaintiff's have suffered damages including the cost of the delay in the approval, completion and

sale of their Waldorf Estates land and homes, from 2002 through present (2009).  The Plaintiff's

have suffered damages by the Defendant's intentional destruction and interference of the Town

of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary

damages to their property and reputation, intentionally caused by the Defendants' alleged

"felony crime spree", planned, conspired, executed and completed by these alleged Racketeers,

from 2003 through present, (2009).  The alleged fraud, crimes, conspiracies, thefts and wrongful

acts, individually and collectively identified and alleged herein committed by the Defendants

harming the Plaintiffs caused the LLC to file for Chapter 7 Bankruptcy protection.

231.   This fraud was adopted, aided, abetted, furthered and approved by the Butler

Bank.

**COUNT FOUR**
**BANK FRAUD AND FELONY FORGERY**
**THE FIRST $100-THOUSAND CHECK FORGED BY THE DEFENDANTS**

232.   The Plaintiffs re-allege paragraphs 1-231 as though restated in full herein and not

inconsistent herein.

233.   On or about October 2005, Shelzi admitted to Attorney Foistner, Attorney Hollis

and Attorney Prive, after she was caught, in the actual commission of these alleged crimes, that

she alone, traveled to the Butler Bank, in Lowell, Massachusetts to pick up the $100-thousand

and Butler Bank construction loan check, No. 7148.  Shelzi admitted that after she gained

possession of the checks, without the Plaintiffs consent and/or knowledge, she and her employee

Hans Hassel, being the only persons in possession of the check, she, Shelzi, endorsed the check

with her signature and attempted to negotiate it knowing that one of the signatures was a forgery.

234.   Shelzi further admitted that she endorsed the check over to her Brother, Attorney

Domenic Shelzi, who deposited this forged instrument into his Citizens Bank checking account

in Rhode Island.

235.   Check No. 7148, depicts the LLC forged signatures "LORI FOISTNER" and

"The LLC" above Shelzi's endorsements.  These forged endorsements could only have been

affixed onto the paper draft by Shelzi and/or her agent and employee, Hans Hassel. Hassel had,

in the past, written the name Laurie, as "LORI", on his written communications, given to the

LLC.

236.    When Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005, received the check from Butler Bank's, Robert Chapman, without the LLC – Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC', two (2) endorsements on the back of the check, the Defendants allegedly committed two (2) separate and distinct counts of Felony Forgery, as defined within the meaning of "Forgery" in 18 U.S.C. § 513 and State Law, Securities of the States and Private Entities and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

237.    The only individuals to possess the loan disbursement check, as admitted by Shelzi, were Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi.  Upon information and belief, no other person could have forged the signatures other than Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi.

238.    The LLC  and Guarantor Laurie Foistner, the named Payees on this Butler Bank Draft, the business entity and individuals, the victims of the alleged crimes, became aware of their damages, only after this $100-thousand check was returned, stamped and marked "MISSING ENDORSEMENT".

239.    The LLC reported this alleged crime to the FBI in 2006, assuming that a Citizens Bank employee stopped the clearing of this forged instrument, since the check was marked as deposited, by Attorney Shelzi, into his "Riverside, Rhode Island" Citizens Bank account.

240.    Riverside, Rhode Island is the primary check clearing facility for all checks deposited into Citizens Bank. On or about September 2008, approximately thirty six (36) months after the LLC discovered that the Defendants had forged the endorsement on this check and allegedly committed the felony crime of Larceny, reduced to the felony crime of Attempted Larceny, since the check was stopped from clearing, Robert Chapman claimed to Attorney

Foistner that it was he, Chapman, not the Citizens Bank that marked and stamped the check "MISSING ENDORSEMENT".

241.     The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests. Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to conduct their Racketeering activities.

242.     Butler Bank sanctioned and facilitated the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

243.     Butler Bank intentionally and knowingly helped the furtherance of these alleged, unlawful acts which destroyed the LLC business and caused the LLC's bankruptcy.

## COUNT FIVE
## BANK FRAUD AND ATTEMPTED LARCENY
## THE FIRST $100-THOUSAND CHECK ATTEMPTED TO BE CONVERTED BY THE DEFENDANTS

244.     The Plaintiffs re-allege paragraphs 1-243 as though restated in full herein and not inconsistent herein.

245.     Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005 and received the check from Butler Bank's employee, Robert Chapman, without the LLC, Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC two (2) endorsements on the back of the check, then endorsed the check and deposited the check, across interstate lines.  The Defendants committed Felony Attempted Larceny, attempting to convert the money, transporting a negotiable instrument across State Lines, thereby affecting Interstate Commerce, as defined within the meaning of "Stolen Goods" in 18 U.S.C. § 2314,

Transportation of Stolen Goods, Securities and Money and Bank Fraud, 18 U.S.C. § 1344,

§1344(2).

246.    Butler Bank and Chapman knew of these alleged crimes as early as September

2005 and did absolutely nothing to protect their Borrowers interests or report the alleged crimes

to Law Enforcement.  Instead of reporting these crimes to the LLC and/or law enforcement,

Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi

and Hassel to complete their alleged Racketeering activities.

247.    Butler Bank approved the Defendants actions, aided and abetted the Defendants,

and  received financial gain from this fraud, by being able to charge and collect, a higher

monthly interest rate from the LLC.

**COUNT SIX**
**BANK FRAUD AND LARCENY**
**THE SECOND $100-THOUSAND CHECK AND THIRD $65-THOUSAND CHECK**
**CONVERTED BY THE DEFENDANTS**

248.    The Plaintiffs re-allege paragraphs 1-247 as though restated in full herein and not

inconsistent herein.

249.    On or about September 12, 2005, the Butler Bank, directly contravening the

instructions they had previously received from the LLC, issued check no. 7324, in the amount of

$100,000, at the direction of Shelzi.  Upon information and belief, Shelzi approached her good

friend, Chapman, and told him because of the dispute between the LLC and herself, she needed

these funds released by her authorization (as she was still trying to pay her brother this money

when the LLC had informed her that engineering costs would be paid from these proceeds, not

her brother).  The Butler Bank delivered this check, without the approval, knowledge, or consent

of the LLC to Attorney Hollis.

250.    Despite the fact that the conditions set forth in the commercial loan had not been satisfied, Chapman, released the proceeds that were to be held back to pay for engineering costs. The check was delivered to Shelzi's brother, Domenic Shelzi, and the funds were used not for their intended purpose to pay engineering expenses.

251.    The Butler Bank aided and abetted in Shelzi's brother being paid and further damaged the Plaintiffs.  Specifically, in light of the fact that the engineering firm, by virtue of not receiving the $100,000 promised to it, now had lien rights against the LLC– the creation of which is directly attributable to the Butler Bank.

252.    The Defendant's used undue influence to force the LLC, under threat of causing a lawsuit and the calling the loan, to endorse this second $100-thousand check and forwarding it to Attorney Shelzi.

253.    As stated in herein, Shelzi had received a $990,000 loan to construct an "Owner Occupied" home on Lot 8-84-44 in Phase III of the Waldorf Estates subdivision.  The Butler Bank had gone through great lengths to qualify NBE, LLC as the builder of this home (a process that involved several months and substantial communication between the Butler Bank and NBE, LLC).  At the time, NBE, LLC was solely owned and managed by Joseph Foistner.

254.    In September 2005, NBE, LLC submitted an invoice in the amount of $65,000 directly to the Butler Bank for work done in the construction of Shelzi's house on lot 8-84-44. The invoice was properly created and was accompanied by all necessary supporting documentation.

255.    The invoice was for surveying services provided by several contractors and a reimbursement of costs incurred in obtaining municipal permits, building plans, and other

necessary approvals (i.e. NH Public Utilities Commission energy rating approval).

Subsequently, the Butler Bank issued a check payable to NBE, LLC and Shelzi.

256.   At the time that the Butler Bank issued the $65,000 check, the LLC had learned of

Shelzi's forgery of the $100,000 check on the LLC' bank account and other criminal acts being

committed by Shelzi and Chapman.

257.   Consequently, the LLC refused to endorse the $65,000 check on behalf of NBE,

LLC, until Shelzi provided assurances that all criminal acts she had committed would be

rectified and she would insure that the Plaintiffs were restored to the position they were in prior

to when the Defendants committed these acts..

258.   NBE, LLC and Shelzi were at an impasse.  Shelzi was in possession of the

$65,000 check and was demanding that NBE, LLC endorse it so that she could use it to pay other

expenses she had on other housing projects she owned.  NBE, LLC, was refusing to endorse the

check and demanding that Shelzi endorse it and give it to NBE, LLC, so that NBE, LLC could

pay the construction expenses – the legitimate basis for which the check was issued.

259.   Upon information and belief, Shelzi, realizing that NBE, LLC would not endorse

the check and allow her to retain the funds, contacted her close friend Chapman to do her another

act of misconduct.  Shelzi returned the original check to Chapman, which was promptly voided,

and had a new check, in the same amount reissued to WEB, LLC.

260.   Upon information and belief, Shelzi insisted that she was the owner of WEB,

LLC, despite the fact that this company was also solely owned and managed by Joseph Foistner.

Chapman knew or should have known that Shelzi was not the owner of WEB, LLC.

261.   Chapman had absolutely no authority or legitimate reason to issue the new

$65,000 check payable to WEB, LLC.  WEB, LLC was not the qualified builder on lot 8-84-44;

WEB, LLC was not the builder of record in the loan documents; and WEB, LLC was not owed the $65,000 – as they did not perform any services on the lot or submit any invoices to the Butler Bank. Chapman's only reason for issuing the check to WEB, LLC was because he wanted to aid and abet Shelzi's misconduct of intentionally conspiring to defraud NBE, LLC.

262.    The only reason Chapman issued the check to WEB, LLC was to assist Shelzi in diverting $65,000 from NBE, LLC and defraud this company. Chapman's and Shelzi's alleged actions constitute additional counts of felony larceny as defined by 18 U.S.C. § 2314, Transportation of Stolen Goods, Felony Forgery as defined by 18 U.S.C. § 513, Securities of the State and Private Entities, Bank Fraud as defined by 18 U.S.C. § 1028, Forging Corporate Records, and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

263.    No other person had possession of the forged construction loan disbursement check, as admitted by Shelzi, except for Robert Chapman, Antonia Shelzi, and Hans Hassel. No other person could have committed the forgery crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

264.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

265.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and  received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

58

266.    Butler bank did benefit from these alleged crimes as they remained silent. Butler

Bank also intentionally and knowingly aided and abetted these unlawful acts which destroyed the

LLC business and caused the LLC bankruptcy and harmed L. Foistner.

## COUNT SEVEN
## BANK FRAUD IDENTITY THEFT OPENING UP FALSE CHECKING ACCOUNT BY THE DEFENDANTS

267.    The Plaintiffs re-allege paragraphs 1-266 as though restated in full herein and not

inconsistent herein.

268.    These and other fraudulent acts caused in fact and proximately caused LLC to

suffer monetary damages.

269.    Shelzi took the $65,000 check to a Citizens Bank branch where she fraudulently

opened a business checking account for WEB, LLC (using falsified business records).  Shelzi

then cashed the new $65,000 check and converted the funds for her own personal use.  Chapman

provided substantial assistance in aide to this alleged criminal conduct.

270.    When the Defendants opened a business checking account at the Citizens Bank,

without authority and through fraud and deceit, all Defendants committed the felony crimes of

Aggravated Identity Theft as defined by 18 U.S.C.  § 1028 and § 1028 A, Forging Corporate

Records, Aggravated Identity Theft  and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other

Federal and State Crimes.

271.    The Defendants forged Federal Forms, corporate votes and other bank forms and

falsely represented themselves as Owner / Members or Managers of WEB, LLC, in order to open

up their fraudulent checking account.

272.    No one possessed these forged documents, the forged check, the forged corporate

votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank

59

personnel of Butler Bank.  Upon information and belief, no other person could have committed these alleged crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

273.    In 2006, the LLC reported these alleged crimes to the FBI and law enforcement.

274.    The Butler Bank and Chapman acquired knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests.  Instead of informing the LLC and/or law enforcement of these alleged crimes, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to accomplish their alleged Racketeering activities.

275.    Butler Bank approved the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

## COUNT EIGHT
## BANK FRAUD AND FORGERY OF CORPORATE RECORDS
## FORGING FEDERAL BANK FORMS AND CORPORATE FORMS TO OPEN
## FRAUDULENT CHECKING ACCOUNT BY THE DEFENDANTS

276.    The Plaintiffs re-allege paragraphs 1-275 as though restated in full herein and not inconsistent herein.

277.    When the Defendants opened a business checking account at the Citizens Bank, without authority and through fraud and deceit, all Defendants committed the felony crimes of Fraud and Forgery of Corporate Records as defined by 18 U.S.C. § 1028 and § 1028A, Forging Corporate Records and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

278.    The Defendants forged Federal forms, corporate votes and other bank forms and falsely represented themselves as owner / members or managers of WEB LLC, in order to open up the checking account.

279. No one had possession of these falsified documents, the forger check, the forged corporate votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank personnel of the Butler Bank.

280. Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

## COUNT NINE
## BANK FRAUD ,STOLEN GOODS TRANSPORTATION OF STOLEN GOODS SECURITIES AND MONEY – THE FORGED CHECKS AND MONEY

281. The Plaintiffs re-allege paragraphs 1-280 as though restated in full herein and not inconsistent herein.

282. In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material facts and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by LLC and reasonably relied upon by the LLC to their detriment.

283. These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages.

284. When the Defendants caused Check No. 7148, Check No. 7324 and the $65,000 check, Check No. "unknown" to be deposited into the United States Mail System and employed other modes of transportation to move the stolen funds and negotiable instruments from Lowell, Massachusetts to Riverside, Rhode Island and Bedford, New Hampshire, they committed the crimes of Transportation of Stolen Goods – Money, as defined in 18 U.S.C. § 2314 and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State defined crimes.  This affected Interstate Commerce.

285.    Butler Bank and Chapman knowingly participated in these alleged crimes by using the mail and wires to transport these stolen funds and negotiable instruments from Massachusetts, thereby aiding and abetting the Defendants as they allegedly criminally conspired with Shelzi and Hassel, as defined in 18 U.S.C. 1349, Attempt and Conspiracy and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

286.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

287.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harmed L. Foistner.

**COUNT TEN**
**FRAUD AND CRIMINAL SOLICITATION BY THE DEFENDANTS TO COMMIT**
**IRS TAX FRAUD**

288.    The Plaintiffs re-allege paragraphs 1-287 as though restated in full herein and not inconsistent herein.

289.    As stated herein, Shelzi, her agent CPA Becks, and Hassel contacted the LLC' office in Bedford, New Hampshire by telephone and via Facsimile, asking Attorney Foistner to join their alleged criminal conspiracy and fraudulent efforts to defraud the United States of America, the Internal revenue Service, out of millions of dollars, consisting of owed income taxes, interest and penalties, owed by Shelzi. The alleged premeditated, intentional and unlawful acts of the Defendants, soliciting Foistner's criminal conspiracy to commit offenses against the United States of America, to defraud the United States of America, constitute the crimes of Conspiracy to commit Tax Fraud as defined in 18 U.S.C. § 371.

290.    Shelzi's sole purpose and motive for joining the LLC in 2002, was her need to receive the

LLC's "Business Deductions" in order to use the money she owed to the IRS, to purchase her fifty

percent Ownership Interest from Maynard. Her written contract, fine tuned into its final version, by her

two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on

or about December 23, 2002, clearly states:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between
> LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New
> Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by
> Counsel, a resident of Belmont, Massachusetts …."

291.    When the IRS audited Shelzi in 2005, demanding from Shelzi that she

substantiate her "Material Participation" in the business of the LLC, as early as 2001 when, in

fact, Shelzi never physically appeared or participated until December 2002 in the LLC's affairs.

The Defendants, specifically Shelzi and Hassel, with the support, knowledge and consent of her

agent directly, knowingly and with criminal intent, asked Attorney Foistner to help and aid them,

to prepare, falsify and substantiate a false and untrue "Meeting Log", for tax year 2001, which

was requested by the IRS.

292.    The form that the Defendant's wanted falsified was IRS Form 4564, which Quang Trieu

demanded from Shelzi to justify and prove her material participation. The IRS specifically demanded

that Shelzi would provide the following information:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC nonpassive K-1
loss of ($508,143) claimed on your F1040X as follows:

1.  Proof of material participation in the Seff Enterprises & Holdings, LLC in a regular,
    continuous, and substantial manner by Antonia Shelzi under IRC 469 (b)(i) & (5).
2.  Complete the attached activities log which complies with your record keeping
    requirements in Reg. 1.469-5T(f)(4).
3.  Provide a copy of your appointment book or calendar for the year 200112 to support the
    information provided in the activities log …..
4.  Did you perform most of the work in Seff Enterprises & Holdings, LLC?

63

5. Did you work more than 100 hours and no one (including non-owners or employees) works more hours?
6. Did any person receive compensation in connection with managing Seff Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call .... "

293.   In fact after Shelzi, her representatives and Hassel's alleged criminal solicitation of Attorney Foistner's participation in these alleged crimes, the Defendants followed up their verbal solicitation in two separate writings. The first, on or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and her agent, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax No. 617-776-5690, pages 1, 2 and 3. Page 2 of the fax consisted of an IRS Form 4564, setting forth Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu, dated July 15, 2005.

294.   Hassel followed up his fax transmission with a telephone call to J. Foistner, asking him to help him defraud the IRS by falsifying this Activity Log".

295.   On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law Offices writing, "IRS ... Per accountant need to keep log and therefore review copy of log prepared for Toni." Hassel submitted along with his fax document, a two page document depicting a false meeting schedule log that he had prepared for Shelzi. The document contained a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner, in 2001. These documents were created by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place. Prior to submitting this fax transmission from Shelzi's Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf Shelzi and her agent.

296.   Instead of helping Hassel and Shelzi commit IRS Tax Fraud, J. Foistner refused to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS, J. Foistner reported all of these alleged crimes to Agent Quang.

Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi's alleged Tax Fraud.

297.   J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.

298.   The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests.  Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

299.   Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

## COUNT ELEVEN
## FRAUD AND ATTEMPTS TO EVADE OR DEFEAT TAXES

300.   The Plaintiffs re-allege paragraphs 1-299 as though restated in full herein and not inconsistent herein.

301.   The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Attempt to Evade or Defeat Taxes, as defined in 26 U.S.C. § 7201.

302.   The Butler Bank and Chapman gained knowledge of these alleged crimes as early as September since Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

## COUNT TWELVE
### FRAUD AND MAKING FALSE STATEMENTS

303.    The Plaintiffs re-allege paragraphs 1-302 as though restated in full herein and not inconsistent herein.

304.    The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, demonstrated that these documents were submitted by Hassel from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Fraud and Making False Statements, as defined in 26 U.S.C. § 7206.

305.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

306.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner.

## COUNT THIRTEEN
### FRAUD AND FILING FRAUDULENT RETURNS, STATEMENTS AND DOCUMENTS

307.    The Plaintiffs re-allege paragraphs 1-306 as though restated in full herein and not inconsistent herein.

308.    The written, falsified, forged and signed documents submitted by the Defendants specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of filing Fraudulent Returns, Statements, Or Other Documents, as defined in 26 U.S.C. § 7207.

309.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

310.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner

## COUNT FOURTEEN
### FRAUD COERCION TO INTERFERE WITH ADMINISTATION OF IRS LAWS

311.    The Plaintiffs re-allege paragraphs 1-310 as though restated in full herein and not inconsistent herein.

312.    In order to interfere in the IRS Audit and to interfere in the Administration of Internal Revenue Laws, the Defendants, with the help of her agent, attempted to coerce Attorney Foistner, not to cooperate with IRS Auditor. Attorney Laboe wrote to Attorney Morgan Hollis on or about September 26, 2005:

> "Mr. Foistner intends to provide meeting schedules allegedly prepared by
> Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001.
> Mr. Foistner has characterized these schedules as 'fraud'."

> "However, unilaterally expanding the scope of the current IRS audit outside tax year
> 2001, could potentially expand liability for Seff, as well as Mr. Foistner and Ms. Shelzi.
> Therefore, we ask that you caution Mr. Foistner from taking such action. Granted, if the
> IRS requests the information, Mr. Foistner has no other choice but full disclosure.
> However, it is in nobody's best interest to bog this project down in further debt and
> liability if it can be avoided."

Attorney Laboe's actions as set forth herein interfered in the LLC participation in the audit.  Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities."  Attorney Laboe intimated that Mr. Foistner should not cooperate with the IRS.

67

313. Attorney Laboe's did create, publish and file a frivolous law suit against the LLC requesting that the State Court remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit. This first Petition, falsely claimed:

1. That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2. That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3. That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4. To have all of the LLC's checking accounts attached.

314. Prior to filing this frivolous law suit and abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

315. This procedure would not permit Shelzi to remove all accounting records and evidence of Shelzi's alleged IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to prevent Foistner from providing this evidence to Auditor Quang.

316. Shelzi was instrumental in removing all accounting records from the Company's possession for three months. All this, perfectly timed to interfere in the IRS Audit.

317.    Shelzi sued her own company, the LLC, by only requesting an Accounting that she had received years earlier, allowing her to write off the LLC' business losses.  Her request for an accounting was motivated by her desire to interfere in the IRS Audit and to remove all evidence of her alleged criminal activities from the purview of the IRS.

318.    The Defendants intentional unlawful acts by writing letters attempting to coerce the LLC not cooperating with the IRS, abusing the legal system by filing a frivolous Petition, in order to remove accounting records and evidence, during an IRS audit, in order to hide incriminating evidence, and finally, the physical destruction of the only Computer System used by the LLC, containing LLC only electronic copy of the accounting data, clearly met the requisite elements of the crime of Attempts To Interfere With the Administration of Internal Revenue Laws,  26 U.S.C. § 7212.

319.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005.

## COUNT FIFTEEN
## STOLEN GOODS TRANSPORTATION OF STOLEN GOODS – COMPUTERS AND DATA AND SOFTWARE

320.    The Plaintiffs re-allege paragraphs 1-319 as though restated in full herein and not inconsistent herein.

321.    As stated herein, after Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, the LLC' attorney, her alleged criminal conduct increased.  Not only did Shelzi and her representative criminally interfere with the administration of internal revenue laws, the IRS audit by removing the accounting records from J. Foistner, during the audit, they, as alleged criminal conspirators, stole, removed and converted the LLC 's only Notebook

69

Computer that maintained and stored the only electronic copy of the LLC's accounting data, tax data and company data.

322.    The computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2009.  Additionally, Hassel destroyed and sabotaged the LLC's only back-up electronic copy of this data and software housed at Foistner Law Offices.  The Server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only LLC electronic data backup was destroyed.  These were criminal acts committed by Hassel.  Hassel transported the computer, data and software without authority across State lines.

323.    When Shelzi and Hassel realized that Shelzi's tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, when the Defendants realized that their unlawful acts to interfere in the IRS Audit had failed, and after Attorney Laboe and Shelzi successfully removed all accounting records, during the audit, these alleged Racketeers completed their final act of conspiracy by destroying the electronic equipment thereby destroying all electronic data.

324.    The evidence, stored on the LLC's computer system and at Foistner Law Offices Computer Server, was destroyed so that the incriminating evidence could not be used by the IRS.

325.    The Defendants criminal actions to convert and destroy the LLC's only computer, the LLC's only set of electronic accounting records, and Foistner Law Offices only Server, constitute the crimes of Grant Larceny and Transportation of Stolen Goods, 18 U.S.C. § 2314 and other Federal and State crimes with the intent to defraud the IRS.

326.    After Foistner reported Shelzi's alleged tax fraud to the Auditor and also the IRS Criminal Investigation Division and provided Shelzi and her representative with the notice of his actions taken in regard to the IRS Settlement, as manager of the LLC, Shelzi realized that by

capitalizing close to $6-million worth of expenses that Shelzi had, or was going to write-off, as losses, his client would now owe millions on taxes and penalties.

327.     Shelzi's representative filed another Petition to remove J. Foistner, as a Manager by making misrepresentations and knowingly making false statements to the Court in an attempt to mislead the Court, that Foistner was unlawfully and without authorization acting as Manager of LLC.  Shelzi also asked the court to remove J. Foistner as the "Tax Matter Person" for LLC. This, an impossibility, because Foistner, remained the only owner, of the company.

328.     Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

## COMMON LAW CAUSE OF ACTIONS
## COUNT SIXTEEN
## BREACH OF FIDUCIARY DUTIES
## BUTLER BANK

329.     The Plaintiffs re-allege paragraphs 1-328 as though restated in full herein and not inconsistent herein.

330.     In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them.

331.     As a commercial lender and bank, Butler Bank had a fiduciary relationship with the LLC, its borrower, and Plaintiff, L. Foistner, its borrower and personal guarantor and other LLC members and the manager under these circumstances and conditions alleged herein.

332.     Butler Bank breached its fiduciary duties to take all reasonable steps that were fair and reasonable as a commercial lender.  Butler Bank, in concert with Shelzi and others, aided and abetted the many alleged felony crimes set forth herein for its financial gain.

333.    Butler Bank's fiduciary duties included a duty to act fairly and in good faith and a duty of care, regarding their level of attention and diligence in the business and operations of the LLC.  Butler Bank breached its duty by not informing the LLC and Guarantor of Shelzi's fraudulent conduct, forgery and other crimes.

334.    Butler Bank also breached its fiduciary duty of loyalty by aiding and abetting Shelzi in the commission of the alleged crimes.  Butler also failed to work honestly with the other member and manager and to provide timely notices of Shelzi's alleged crimes, the forged checks and exchanged checks, necessary information and protection for its borrowers.

335.    Butler Bank's intentional silence and refusal to protect its borrower's interests and rights from the many alleged criminal and fraudulent acts committed by the Defendants, once Butler Bank became aware of these crimes, further breached its duties, as a fiduciary, to the LLC.

336.    All of these actions, individually and as a concerted scheme, have harmed and damaged the LLC for which they are entitled to damages as a result of Butler Bank's breaches of its fiduciary duties.

337.    That the Defendants breach of duty has caused the Plaintiffs damages, whereby the Plaintiffs seek enhanced compensatory damages, attorney fees and costs.

## COUNT SEVENTEEN
## BREACH OF CONTRACT – BUTLER BANK LOAN
## AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

338.    The Plaintiffs re-allege paragraphs 1-337 as though restated in full herein and not inconsistent herein.

72

339.   In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by the LLC. The LLC reasonably relied upon them to their detriment.

340.   On or about April 12, 2005, Butler Bank entered into a real estate development loan agreement, the $1.8-million construction loan with the LLC.  This agreement established that $100,000 would be kept in reserve, not to be released, until the LLC had subdivided and recorded the 20th lot in the project. This $100,000 was earmarked to be paid to the Bedford design Consultants.

341.   On or about September 2005, Butler Bank entered into a contractual loan agreement with Shelzi and New Boston Estates LLC, as a 3rd party beneficiary and pre-approved contractor, for the lot 8-84-44, home construction project.

342.   Butler Bank breached its obligations and duties, express and implied, in the $1.8-million development loan contract and the lot 8-84-44 home construction contract.

343.   Butler bank breached its written contract when it allowed Shelzi to forge and convert the $100,000 earmarked for the Bedford design Consultants.

345.   Butler breached its written contract and committed fraud when it reissued checks from New Boston Estates LLC to Waldorf Estates Builders, LLC on lot 8-84-44, aiding and abetting Shelzi to forge and embezzle these loan funds.

346.   The LLC, specifically J. Foistner and K. Prive, made repeated requests for Butler Bank to meet its contractual obligations but Butler had refused to do so.

347.   As set forth above, Butler Bank has breached its contractual obligations which has caused harm for which the LLC seek damages.

348.    That as a direct result of the Defendants breach, the LLC have been damaged and are seeking, in addition, attorney fees and costs.

349.    The Butler Bank did breach the Implied Covenant of Good Faith and Fair Dealing as set forth herein.

## COUNT EIGHTEEN
## NEGLIGENCE – BUTLER BANK

350.    The Plaintiffs re-allege paragraphs 1-349 as though restated in full herein and not inconsistent herein.

351.    The Defendant, Butler Bank owed the LLC a duty to conduct its business operation in a commercially reasonable manner and to exercise due diligence and care.

352.    Butler Bank did breach the duty it owed to the LLC as follows but without limiting the foregoing:

    a.    Did negligently administer the loan in a commercially unreasonable manner by allowing Shelzi to embezzle money;

    b.    Did fail to properly and timely administer the $1.8-million construction loan;

    c.    Did fail to properly and timely administer the $990,000, lot 8-84-44, home construction loan;

    d.    Did negatively and fraudulently impact the Plaintiff's credit score, credit standing and reputation;

    e.    Did fail to administer the requisition and disbursements of the $1.8-million development loan;

    f.    Did fail to administer the requisition and disbursements of the $990,000, lot 8-84-44, construction loan; and

    g.    Did fail to report the Shelzi crimes to law enforcement and Plaintiffs.

353.    That as a direct and proximate cause of the Defendants negligence, the Plaintiffs have been damaged.

354.     The Plaintiffs are seeking enhanced compensatory damages as a result of the Defendants wanton, willful, malicious or oppressive conduct.

## COUNT NINETEEN
## NEGLIGENT MISREPRESENTATION

355.     The Plaintiffs re-allege paragraphs 1-354 as though restated in full herein and not inconsistent herein.

356.     Butler Bank made certain representation concerning the $1.8-million development loan, the $990,000, Shelzi lot 8-84-44, home construction loan, and the $990,000, L. Foistner, lot 8-84-38, home construction loan, the new loans, the loan process, and what the Defendants could do, for the Waldorf Estates, 20 lot, Phase III project, owned by the LLC, which were uttered in an effort to induce the LLC to become bank customers.

357.     The representations were material and were false.

358.     The LLC justifiably relied upon the representations.

359.     That as a result of the negligent representations, the Plaintiffs have sustained substantial damages and are seeking enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY
## FRAUDULENT MISREPRESENTATION

360.     The Plaintiffs re-allege paragraphs 1-359 as though restated in full herein and not inconsistent herein.

361.     The Defendants representations were material facts relied upon by the LLC. Specifically that the loan proceeds of the $1.8-million loan would only be used for the development of the project and construction of the roads, not the personal use of Shelzi.

362.     Specifically that the loan funds for the lot 8-84-44, construction loan, would only be used for the construction of the home and payment of approved contractors, not for the benefit of Shelzi.

363.     Butler Bank promised to provide construction loans, for all 20 lots of the project, two at the time, after the construction of the two model homes on lot 8-84-44 and 8-84-38 which it failed to do.

364.     The representations were made with fraudulent intent to induce the LLC to become bank customers.

365.     That the LLC honestly believed the representations and justifiably relied upon them.

366.     That as a result of the LLC reliance on the misrepresentations, the LLC has sustained damages including enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY ONE
## CONVERSION BUTLER BANK

367.     The Plaintiffs re-allege paragraphs 1-366 as though restated in full herein and not inconsistent herein.

368.     Butler Bank had exercised dominion and control over the stolen and forged money, all checks, with the intent to deprive the LLC and 3rd parties of their ownership interest. Upon information and belief, Butler Bank provided the checks and stolen money to Shelzi and her alleged Racketeers.

369.     Butler Banks has and is interfering with the LLC rights of possession of these loan funds.

370.     The LLC is entitled to an immediate right of possession of the loan funds.

371.   The LLC is demanding that Butler Bank pay these loan funds, for which they collected and received monthly interest payments together with enhanced compensatory damages as a result of Butler Bank's willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY TWO
## CONVERSION- COMPUTERS

372.   The Plaintiffs re-allege paragraphs 1-371 as though restated in full herein and not inconsistent herein.

373.   Shelzi had exercised dominion and control over the stolen computer, its software and accounting data, with the intent to deprive the LLC and 3rd parties of their ownership interest.  Upon information and belief, her agent and/or representative Hassel, destroyed the Foistner Law Offices computer server, the LLC notebook computer, the operating and accounting software licenses and the accounting data in order to aid Shelzi in defrauding the IRS and to destroy evidence during the IRS audit.

374.   The Defendants have interfered with the LLC's rights of possession of these computers and intellectual property.

375.   The LLC is entitled to an immediate right of possession of these chattels.

376.   The LLC is demanding that the Defendants pay for the value of these computers, electronic recovery cost and chattel of the LLC together with enhanced compensatory damages as a result of Defendants willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY THREE
## CIVIL CONSPIRACY

377.    The Plaintiffs re-allege paragraphs 1-376 as though restated in full herein and not inconsistent herein.

378.    The Defendants collectively did engage in acts as set forth herein constituting a conspiracy.

379.    Each Defendant, by his/her/its conduct, aided and abetted the conspiracy to defraud and render the LLC bankrupt and harm the Plaintiffs.

380.    As a result of the Defendants concerted acts, the Plaintiffs have been damaged as set forth herein.

**WHEREFORE**, the Plaintiffs demand trial by jury and judgment as follows:

1.    Damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank, jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of their racketeering activities, conspiracy and aiding and abetting in racketeering activities;

2.    Treble damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank pursuant to 18 U.S.C. § 1964(c);

3.    Damages against Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of the Defendants' conspiracy to commit common law fraud and other cause of actions along with enhanced compensatory damages to the extent allowed by New Hampshire law;

4.    Prejudgment interest on the amount of damages and/or losses that the Plaintiffs have sustained; and

5.  All costs of litigation incurred by the Plaintiffs including its reasonable attorneys' fees and experts' fees, pursuant to 42 U.S.C. § 1988 and/or 18 U.S.C. § 964(c);

# EXHIBIT C

## THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS**                                            **SUPERIOR COURT**
**NORTHERN DISTRICT**

SEFF ENTERPRISES & HOLDINGS LLC
LAURIE J. FOISTNER

v.

BUTLER BANK et al
Docket No. 09-C-0522

## NOTICE OF FILING OF NOTICE OF REMOVAL
## DEFENDANT BUTLER BANK ONLY

Please take notice that, pursuant to 12 U.S.C. Section 1821 (d) (6), Plaintiffs Seff

Enterprises & Holdings, LLC and Laurie J. Foistner, (collectively "Plaintiffs") did, on

November 10, 2010, file a Notice of Removal of this action, on behalf of Defendant Butler

Bank only, all remaining Defendants, Robert Chapman, Antonia Shelzi and Hans H. Hassel

are to remain at the Hillsborough County Superior Court, to the United States District Court

for the District of Massachusetts. A true and correct copy of the Notice of Removal is

attached hereto. This matter, on behalf of Butler Bank only, shall proceed hereafter in the

United States District Court for the District of Massachusetts.


Dated:  November 10, 2010                    Respectfully submitted,

                                             SEFF ENTERPRISES & HOLDINGS, LLC
                                             LAURIE J. FOISTNER

                                             By their attorneys

                                             The Law Offices of Joseph A. Foistner, Esq.

1

& Affiliates, P.C.

By      /s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)
800 Turnpike Street, Suite 300
N. Andover, MA 01845
Tel:  978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via

US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan

Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)



# FOISTNER LAW OFFICES
## PROFESSIONAL CORPORATION
### AMERICAN COUNSELLORS & ATTORNEYS AT LAW
800 Turnpike Street,  Suite 300,  North Andover,  Massachusetts  01845  USA

November 10, 2010

John M. Safford, Clerk
Hillsborough County Superior Court, North
30 Spring Street
Nashua, NH  03060

     Re:   SEFF ENTERPRISES & HOLDINGS, LLC *et al* v. BUTLER BANK  *et al*,  Docket No. 09-C-522

Dear Clerk Safford:

     Enclosed please find the Plaintiffs' Notice of Filing Removal in the above referenced matter.

     Please take notice that this removal pertains to Defendant Butler Bank only, not the remaining Defendants.

     In accordance with the federal rules, I am required to file a certified docket record within 10 days of removing this matter to federal court.  Please provide me with the cost of obtaining a certified docket record in this matter and I will promptly send a check for the same.

     You may forward this information and invoice of cost to Attorney William Aivalikles, the Attorney of Record in this matter.  Attorney Aivalikles will continue to represent the Plaintiffs in this case against the remaining Defendants that are not removed to the Federal Court.

Thank you.

Very Truly Yours,

Joseph A. Foistner, Esquire

---

Tel:  603-487-2466
Fax: 603-487-2488

E-Mail:  AttorneyFoistner@msn.com
USMCAttorney@msn.com

# EXHIBIT D

### THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS**                                    **SUPERIOR COURT**
**NORTHERN DISTRICT**


SEFF ENTERPRISES & HOLDINGS LLC
LAURIE J. FOISTNER

v.

BUTLER BANK et al
Docket No. 09-C-0522


### NOTICE OF REMOVAL TO FEDERAL COURT
### DEFENDANT BUTLER BANK ONLY

Please take notice that, pursuant to 12 U.S.C. Section 1821 (d) (6), Plaintiffs Seff

Enterprises & Holdings, LLC and Laurie J. Foistner, (collectively "Plaintiffs") did, on

November 10, 2010, file a Notice of Removal of this action, on behalf of Defendant Butler

Bank only, all remaining Defendants, Robert Chapman, Antonia Shelzi and Hans H. Hassel

are to remain at the Hillsborough County Superior Court, to the United States District Court

for the District of Massachusetts.  A true and correct copy of the Notice of Removal is

attached hereto. This matter, on behalf of Butler Bank only, shall proceed hereafter in the

United States District Court for the District of Massachusetts.


Dated:  November 10, 2010                   Respectfully submitted,

                                            SEFF ENTERPRISES & HOLDINGS, LLC
                                            LAURIE J. FOISTNER

                                            By their attorneys

                                            The Law Offices of Joseph A. Foistner, Esq.
                                            & Affiliates, P.C.


1

By    /s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)
800 Turnpike Street, Suite 300
N. Andover, MA 01845
Tel: 978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2010, I mailed the foregoing Notice of Removal via US First Class Mail, Postage Prepaid, to the Defendant / Receiver, the FDIC, at 1601 Bryan Street, Dallas, TX 75201.

/s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)

2

JS 44 (Rev. 12/07)

10cv11979 PBS

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
SEFF ENTERPRISES & HOLDINGS, LLC

## DEFENDANTS
BUTLER BANK / PEOPLES BANK

2010 NOV 23 A 10:38

**(b)** County of Residence of First Listed Plaintiff HILLSBOROUGH CO.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant SUFFOLK
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
WILLIAM AIVALIKLES, 60 MAIN STREET, NASHUA, NH 03060

Attorneys (If Known)
UNKNOWN RECEIVER IS FDIC

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☒ 470 Racketeer Influenced and |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 810 Selective Service |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 850 Securities/Commodities/ |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | Exchange |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☒ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | to Justice |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | State Statutes |
| | Other | | ☐ 465 Other Immigration | | |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
12 U.S.C. SECTION 1821 (d) (6)

Brief description of cause:
CRIMINAL/ CIVIL CONSPIRACY RACKETEERING

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE N/A

DOCKET NUMBER N/A

DATE
11/15/2010

SIGNATURE OF ATTORNEY OF RECORD
JOSEPH A. FOISTNER, ESQ.

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.     **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

       (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

       (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.     **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: <u>47 USC 553</u>
                                                                  Brief Description: <u>Unauthorized reception of cable service</u>

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) SEFF ENTERPRISES & HOLDINGS, LLC et al v.

   BUTLER BANK / PEOPLES BANK

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   [✓]  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.              for patent, trademark or copyright cases

   [✓]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   [✓]  IV.   220, 422, 423, 430, 460, 462, 463, 465, 480, 490, 510, 530, 610,
             620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

   [ ]  V.    150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   NONE

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES [ ]      NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES [ ]      NO [✓]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES [ ]      NO [✓]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES [ ]      NO [✓]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES [ ]      NO [✓]

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division [ ]        Central Division [ ]        Western Division [ ]        [ ] UNKNOWN

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [ ]        Central Division [ ]        Western Division [ ]        [ ] UNKNOWN

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

   YES [ ]      NO [✓]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  JOSEPH A. FOISTNER, ESQ

ADDRESS  800 TURNPIKE STREET, SUITE 300, N. ANDOVER, MA 01845

TELEPHONE NO. 978-223-1446

(CategoryForm-08.wpd  -2/8/08)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

## NOTICE REGARDING
## NEW LOCAL RULE 5.4 and MANDATORY ELECTRONIC FILING
## EFFECTIVE JANUARY 1, 2006

<u>Local Rule 5.4</u> - This new Local Rule was adopted on October 3, 2005 to reflect the Court's determination that unless exempt or otherwise ordered by the Court, all pleadings or other papers submitted to the Court must be filed, signed, verified and served by electronic means. New Local rule 5.4 is effective on **January 1, 2006.**

Unless otherwise ordered by the Court, all attorneys must now file documents electronically. The only exceptions at this time are case opening documents and those listed below:

(a)  sealed documents;
(b)  ex parte motions;
(c)  documents generated as part of an alternative dispute resolution (ADR) process;
(d)  the administrative record in social security and other administrative proceedings;
(e)  the state court record in proceedings under 28 U.S.C. § 2254; and
(f)  such other types of documents as the clerk may direct in the ECF Administrative Procedures.

Prior Standing Orders are moot and courtesy copies should not be submitted unless specifically requested by a judicial officer.

The Court will make a public scanner and computer available for use in the Clerk's Offices in Boston and Worcester for those who do not have the necessary equipment or access to the Internet to file documents from their offices. Each attorney must obtain an ECF log-in and password by registering for electronic filing through the Court's web site. This notice will be sent to those attorneys still receiving notice in paper form and will be noted on the docket. Failure to register for ECF after receipt of this notice may result in sanctions.

/s/   *Sarah A. Thornton*
Sarah A. Thornton
Clerk of Court

Date:  December 23, 2005

## RULE 5.4 FILING AND SERVICE BY ELECTRONIC MEANS

**(A)     Electronic Filing Generally.**  Unless exempt or otherwise ordered by the court, all pleadings and other papers submitted to the court must be filed, signed, and verified by electronic means as provided herein.

**(B)     ECF Administrative Procedures.**  Subject to the supervision of the court, the clerk will maintain Electronic Case Filing (ECF) Administrative Procedures, including procedures for the registration of attorneys and other authorized users and for distribution of passwords to permit electronic filing.  All electronic filings must be made in accordance with the ECF Administrative Procedures.  The ECF Administrative Procedures will be generally available to the public and shall be posted on the court's web site.

**(C)     Service of Pleadings.**  Unless exempt or otherwise ordered by the court, all pleadings and other papers must be served on other parties by electronic means.  Transmission of the Notice of Electronic Filing (NEF) through the court's transmission facilities will constitute service of the filed document upon a registered ECF user.  Any pleading or other paper served by electronic means must bear a certificate of service in accordance with Local Rule 5.2(b).

**(D)     Deadlines.**  Although the ECF system is generally available 24 hours a day for electronic filing, that availability will not alter filing deadlines, whether set by rule, court order, or stipulation.  All electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day.

**(E)     Civil Case Opening Documents.**  Civil case opening documents, such as a complaint (or petition or notice of removal), summons, civil action cover sheet, or category sheet, must be filed and served in paper format, not electronically.    Emergency motions and supporting materials presented contemporaneously with civil case opening documents may be filed and served initially in paper format and not electronically. Unless exempt or otherwise ordered by the court, at the time a civil case is opened, the filing party must also file a disk with the clerk's office containing in PDF format the opening documents and any emergency motions and supporting papers not filed electronically.

**(F)     State Court Record in Removal Proceedings.**  Within thirty days after filing a notice of removal in a civil action, a party removing an action under 28 U.S.C. §§ 1441-52 must file certified or attested copies of all docket entries, records, and proceedings in the state court in paper format.  Unless exempt or otherwise ordered by the court, the removing party must also file a disk with the clerk's office containing the state court record in PDF format.

**(G)     Exemptions.**

(1)     *Documents That Should Not Be Filed Electronically*.  The following types of documents must not be filed electronically, and will not be scanned into the ECF system by the clerk's office:

(a)     sealed documents;
(b)     ex parte motions;
(c)     documents generated as part of an alternative dispute resolution (ADR) process;
(d)     the administrative record in social security and other administrative proceedings;
(e)     the state court record in proceedings under 28 U.S.C. § 2254; and

(f)     such other types of documents as the clerk may direct in the ECF Administrative Procedures.

(2)     *Documents That Need Not Be Filed Electronically.*  The following types of documents need not be filed electronically, but may be scanned into the ECF system by a filing party or the clerk's office:

(a)     handwritten pleadings;

(b)     documents filed by pro se litigants who are incarcerated or who are not registered ECF users;

(c)     indictments, informations, criminal complaints, and the criminal JS45 form;

(d)     affidavits for search or arrest warrants and related documents;

(e)     documents received from another court under Fed. R. Crim. P. 20 or 40;

(f)     appearance bonds;

(g)     any document in a criminal case containing the original signature of a defendant, such as a waiver of indictment or a plea agreement;

(h)     petitions for violations of supervised release;

(i)     executed service of process documents under Rule 4; and

(j)     such other types of documents as the clerk may direct in the ECF Administrative Procedures.



# FOISTNER LAW OFFICES
## PROFESSIONAL CORPORATION
### AMERICAN COUNSELLORS & ATTORNEYS AT LAW
800 Turnpike Street,  Suite 300,  North Andover,  Massachusetts 01845   USA

December 05, 2010

2010 DEC -7 P 2: 02

Sarah Allison Thornton
Clerk of Court
United States District Court
District of Massachusetts
Boston
1 Courthouse Way
Boston, Massachusetts 02210
(617) 748-9152

*10-11979 -P135*

Re:    NOTICE OF REMOVAL, as per FDIC Written Notice and Instruction,
matter of SEFF ENTERPRISES & HOLDINGS, LLC, et al v. BUTLER BANK,
et al., New Hampshire Superior Court Docket No, 09-C-522 – FILING FEE

Dear Clerk Thornton:

Thank you for your telephone calls, time and professional courtesy regarding the
above captioned matter.

After review of the information that I received from your office, I agree that the
Defendants, usually the removing party, usually pays the filing fee to remove a case from
the State Court to the Federal Court.  Here, the Plaintiff has already paid such a fee to the
New Hampshire Superior Court.

Please return the NOTICE OF REMOVAL and original Complaint to the address
listed above.  If the FDIC wants this case moved to the Federal Court, the FDIC, as
Defendant may initiate such an action and then pay the filing fee.

Thank you,


Joseph A. Foistner, Esquire

I certify that this is and such a document is
electronic docket in the captioned case
electronically filed original filed on _____
Original filed in my office on 12|7|10

Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts

④

---

Tel:  603-487-2466
Fax:  603-487-2488

E-Mail:  AttorneyFoistner@msn.com
USMCAttorney@msn.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SEFF ENTERPRISES & HOLDINGS LLC
and LAURIE J. FOISTNER
            Plaintiffs,

v.                                                    CIVIL ACTION NO. 1:10-cv-11979-PBS

BUTLER BANK,
            Defendant.

---

**NOTICE OF APPEARANCE**

Please enter my appearance as counsel for the FEDERAL DEPOSIT INSURANCE

CORPORATION IN ITS CAPACITY AS RECEIVER FOR BUTLER BANK in the above

matter.

FEDERAL DEPOSIT INSURANCE CORPORATION
IN ITS CAPACITY AS RECEIVER FOR BUTLER
BANK

By its attorney,


    /s/ Robert A. McCall
Robert A. McCall, Bar No. 552682
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
(617) 951-2100
rmccall@peabodyarnold.com

Dated: December 10, 2010

1

4

## CERTIFICATE OF SERVICE

I, Robert A. McCall, counsel for Federal Deposit Insurance Corporation, in its Capacity as Receiver of Butler Bank, do hereby certify, that I have this 10th day of December, 2010, served the within document by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF) and paper copies mailed, first class mail, postage prepaid to any non registered participants in this case.

/s/ *Robert A.  McCall*

735354_1
15422-93508

2

5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEFF ENTERPRISES & HOLDINGS LLC and LAURIE J. FOISTNER<br><br>    Plaintiffs,<br><br>v.<br><br>BUTLER BANK,<br><br>    Defendant. | CIVIL ACTION NO. 1:10-cv-11979-PBS |

## MOTION OF FDIC-RECEIVER TO REMAND TO STATE COURT

Federal Deposit Insurance Corporation, in its capacity as receiver of Butler Bank ("FDIC-Receiver") moves the Court pursuant to 28 U.S.C. § 1447 to remand this case to the Superior Court for the State of New Hampshire, Hillsborough County, Northern District. As stated more fully in the Memorandum of Law in support of its Motion and the attached Declaration of Jeffry M. Quick in Support of Motion of FDIC-Receiver, the Plaintiffs were entirely without authority, in statute or in practice, to remove the instant matter.

FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR BUTLER BANK

By its attorney,

_/s/ Robert A. McCall_
Robert A. McCall, Bar No. 552682
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
(617) 951-2100
rmccall@peabodyarnold.com

Dated: December 10, 2010

1

<u>CERTIFICATE OF SERVICE</u>

I, Robert A. McCall, counsel for Federal Deposit Insurance Corporation, in its Capacity as Receiver of Butler Bank, do hereby certify, that I have this 10th day of December, 2010, served the within document by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF) and paper copies mailed, first class mail, postage prepaid to any non registered participants in this case.

<u>/s/ Robert A.  McCall</u>

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SEFF ENTERPRISES & HOLDINGS LLC
and LAURIE J. FOISTNER

Plaintiffs,

v.

BUTLER BANK,

Defendant.

CIVIL ACTION NO. 1:10-cv-11979-PBS

DECLARATION OF JEFFRY M. QUICK IN SUPPORT OF MOTION OF FDIC
RECEIVER

I, Jeffry M. Quick, hereby declare as follows:

1. I am employed by the Federal Deposit Insurance Corporation ("FDIC") as a Claims Agent.
   I am familiar with the facts set forth herein and am authorized to make this declaration. I
   submit this declaration in support of the motion of the FDIC in its capacity as Receiver of
   Butler Bank ("FDIC-Receiver") to remand this action.

2. I am currently a Claims Agent for administrative claims filed with the FDIC- Receiver.
   As Claims Agent, I am responsible for overseeing the receivership claims process for
   the Butler Bank receivership. As part of my job, I accept, log and track creditor claims
   that are filed as part of the administrative claims process for the Butler Bank
   receivership.

3. On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank in Lowell,
   Massachusetts and tendered to the FDIC the appointment as liquidating agent to act as

Receiver. The FDIC accepted its appointment as Receiver that same day. Attached hereto as Exhibit A are true and correct copies of the Massachusetts Division of Banks' Tender of Appointment to the FDIC and the FDIC's Acceptance of Appointment dated April 16, 2010.

4. In its capacity as Receiver for Butler Bank, the FDIC established July 21, 2010 as the "claims bar date." The claims bar date is the deadline for filing any administrative claims, as well as supporting proof, against the Receivership.

5. In connection with the Receivership of Butler Bank, the Claims Office prepared a Publication Notice to Creditors and Depositors of Butler Bank. The Publication Notice was published in the Lowell Sun and Boston Globe newspapers. True copies of those publication notices are attached hereto as Exhibit B. Publication was made on April 22, 2010, May 21, 2010 and June 21, 2010. The notices informed the creditors and other claimants of Butler Bank that any claims against Butler Bank, together with supporting proof, must be submitted to FDIC-Receiver for review by July 21, 2010. The notices further advised creditors and other claimants that failure to submit a proof of claim by July 21, 2010 could result in disallowance of the claim.

6. On or about May 14, 2010, Seff Enterprises filed a proof of claim with the FDIC-Receiver.

7. On September 27, 2010, the FDIC-Receiver sent by certified mail to the Plaintiff Seff Enterprises & Holdings, LLC, in care of its attorney, Joseph A. Foistner, a Notice of Disallowance of Claim. Attached hereto as Exhibit C is a true and correct copy of the Notice of Disallowance of Claim sent to Plaintiff Seff Enterprises & Holdings, LLC.

8.  The Notice of Disallowance (capitalization and bold type in the original) states, among

other things, that:

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this
disallowance, you have the right to file a lawsuit on your claim (or continue any
lawsuit commenced before the appointment of the Receiver), in the United
States District (or Territorial) Court for the District within which the failed
institution's principal place of business was located or the United States District
Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced
before the appointment of the Receiver) **BEFORE THE END OF THE 60-
DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR
CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO
FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR
CLAIM. 12 U.S.C. Section 1821 (d)(6)(B).**

10.  Laurie Foistner has not filed a proof of claim with the FDIC-Receiver.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Jeffry M. Quick

CERTIFICATE OF SERVICE

I, Robert A. McCall, counsel for Defendant Federal Deposit Insurance Corporation, in its
Capacity as Receiver of Butler Bank, do hereby certify, that I have this 10th day of December,
2010, served the within document by causing a copy thereof, to be sent electronically to the
registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF)
and paper copies mailed, first class mail, postage prepaid to any non registered participants in
this case.

/s/ Robert A. McCall

**EXHIBIT A**

## The Commonwealth of Massachusetts

### Office of the Commissioner of Banks
### 1000 Washington Street, 10th Floor
### Boston, Massachusetts 02118

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**GREGORY BIALECKI**
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

**BARBARA ANTHONY**
UNDERSECRETARY, OFFICE OF
CONSUMER AFFAIRS AND
BUSINESS REGULATION

**STEVEN L. ANTONAKES**
COMMISSIONER OF BANKS

April 16, 2010

Cheryl Bates
Receiver-in-Charge
Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

Dear Ms. Bates:

Pursuant to the authority vested under the provisions of section 26 of Chapter 167 of the Massachusetts General Laws, I, Steven L. Antonakes, as Commissioner of Banks under section 2 of Chapter 26 of the Massachusetts General Laws, hereby tender to the Federal Deposit Insurance Corporation the appointment as Liquidating Agent, in order for it to act as receiver, of Butler Bank, Lowell, Massachusetts, which has been closed and which is in my possession for liquidation pursuant to section 22 of Chapter 167 of the Massachusetts General Laws.

Very truly yours,

Steven L. Antonakes
Commissioner of Banks

EXHIBIT A

**EXHIBIT A**

 **FDIC**

**Division of Resolutions and Receiverships**
**Dallas Regional Office**
1601 Bryan Street
Dallas, Texas 75201                                    Telephone (214) 754-0098

April 16, 2010

Steven L. Antonakes
Commissioner of Banks
Commonwealth of Massachusetts
Division of Banks
1000 Washington Street, 10th Floor
Boston, MA 02118-6400

Subject:      Butler Bank
              Lowell, Massachusetts – In Receivership
              <u>Acceptance of Appointment as Receiver</u>

Dear Commissioner Antonakes:

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: _____
    Cheryl Bates
    Receiver-in-Charge

**EXHIBIT A**

EXHIBIT B

## CLASSIFIEDS

THE SUN

26 THURSDAY, APRIL 22, 2010





**NOTICE TO DEPOSITORS OF BUTLER BANK**

On Friday April 16, 2010, Butler Bank was closed and the FDIC was appointed receiver. The FDIC has entered into a purchase and assumption agreement with People's United Bank, which assumed the banking operations of Butler Bank, including its division, Marlborough Co-Operative. Butler Bank's branches will reopen as branches of People's United Bank. All deposit accounts have been transferred to People's United Bank and will be available immediately at Butler Bank ATMs and branches during regular business hours.

At this time deposits will continue to earn interest at their current rates. Until they enter into a new deposit agreement with People's United Bank, Butler Bank depositors will be able to withdraw all or part of their deposits without penalty unless the deposit has been pledged as collateral for a loan.

Depositors who have questions about their accounts can call People's United Bank at 1-877-972-2244 or go online at www.butlerbank.com. The FDIC has set up a toll-free number (1-877-275-3342) to assist depositors with any questions regarding insurance coverage for their accounts and the FDIC or they may access EDIE, the FDIC's Electronic Deposit Insurance Estimator at www.FDIC.gov

**NOTICE TO CREDITORS AND DEPOSITORS OF BUTLER BANK LOWELL, MA**

April 8, 15, 22, 2010

**EXHIBIT B**

20 MONDAY, JUNE 21, 2010 · CLASSIFIED THE SUN



**EXHIBIT B**

**EXHIBIT B**

---

24 FRIDAY, MAY 21, 2010          **CLASSIFIEDS**                                    THE SUN

---

| Public Notice | Public Notice | Public Notice |



**NOTICE TO CREDITORS AND DEPOSITORS OF BUTLER BANK LOWELL, MA**

On April 16, 2010 (the "Closing Date"), the Massachusetts Division of Banks closed BUTLER BANK, LOWELL, MA, 01852 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by July 21, 2010 (the "Bar Date"), at the following address:

FDIC as Receiver of BUTLER BANK
1601 Bryan Street, Dallas, TX 75201
Attention: Creditor Claims Agent

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposit(s) at the Failed Institution to another insured depository institution, PEOPLE'S UNITED BANK, BRIDGEPORT, CT 06604 ("the New Institution"). This arrangement should minimize the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by October 17, 2011, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account;
2. Executing a new signature card on your account(s), entering into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form; or
4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including officer's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state in accordance with its unclaimed property laws. If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state declines to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

---

**EXHIBIT B**

www.FDIC.gov

| Public Notice | Public Notice | Public Notice | Public Notice |

# FDIC

## NOTICE TO CREDITORS AND DEPOSITORS OF BUTLER BANK LOWELL, MA

On April 16, 2010 the "Closing Date", the Massachusetts Division of Banks closed BUTLER BANK, LOWELL, MA, (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

### TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by July 21, 2010 (the "Bar Date"), at the following address:

FDIC as Receiver of BUTLER BANK
1601 Bryan Street, Dallas, TX 75201
Attention: Claims Agent

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with respect to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (6)(B).

### TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, insures your deposits (the "FDIC"), arranged for the transfer of the deposits at the Failed Institution to another insured depository institution. PEOPLE'S UNITED BANK, BRIDGEPORT, CT 06604 (the "New Institution"). The New Institution is assuming the insured deposits of the Failed Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Executing a new deposit or withdrawal from your account(s). This includes writing a check on your account, or having an automated direct deposit credited to or an automated withdrawal debited from your account.

2. Executing a new signature card on your account(s), entering into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account.

3. Providing the New Institution with a completed change of address form; or writing to the New Institution and notify them that you want to keep your account(s) active.

Please be sure to include the name(s) of the account(s), the account number(s), and the signature card to the New Institution, your name and address.

You must know that bank accounts issued by the Failed Institution, including cashier's checks, are cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and can be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, New Institution (18 months from the Closing Date), the deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have to claim your deposit(s) directly from the state and you do not claim your deposit(s) from the state within the time limit, the funds will be returned to the FDIC and you will be permanently barred from claiming your deposit(s). If you have a legal obligation, pursuant to the above paragraph you will have to prove from the FDIC any unclaimed property to the state unless you keep the deposit(s) directly from the FDIC and you provide the federal government is terminated. However, you will not be able to claim your deposit(s).

If you have a loan with the Failed Institution, and you would like to discuss paying your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the amount(s) made available at the New Institution, you have a right of review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for the review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

Newspaper Co., publishers of the Boston Globe; that the above advertisement has been inserted in said
newspaper one time(s) Friday, ~~Case 1:13-cv-00454-LM   Document 2~~ Filed 12/10/10   Page 5 of 14

true.............

*Suffolk ss.*

Personally appeared before me and made oath that the above statement subscribed to by her is

Boston, Mass.   May 21, 2010

Marie Burke ..............

.......................................
Notary Public.
My Commission Expires 2/27/15

**MAUREEN A. O'BRIEN**
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
February 27, 2015

**EXHIBIT B**

---

| LEGAL NOTICES | LEGAL NOTICES | LEGAL NOTICES | LEGAL NOTICES |

**FDIC**

**NOTICE TO CREDITORS
AND DEPOSITORS OF
BUTLER BANK
LOWELL, MA**

On April 16, 2010 (the "Closing Date"), the Massachusetts Division of Banks closed BUTLER BANK, LOWELL, MA, (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by July 21, 2010 (the "Bar Date"), at the following address:

FDIC as Receiver of BUTLER BANK
1601 Bryan Street, Dallas, TX 75201
Attention: Creditor Claims Agent

Under federal law, with certain limited exceptions, failure by the such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C)(i)-(iii).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits the FDIC, arranged for the transfer of the deposit(s) at the Failed Institution to another insured depository institution, PEOPLE'S UNITED BANK, BRIDGEPORT, CT 06604 ("the New Institution"). This arrangement should minimize the inconvenience of the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by October 17, 2011, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to locate these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account;

2. Executing a new signature card on your account(s), entering into a new deposit agreement with the New Institution, changing the ownership on your account(s), or negotiating the terms of your certificate of deposit account;

3. Providing the New Institution with a completed change of address form; or

**B9**

**EXHIBIT B**

Below is your advertisement from THE BOSTON GLOBE, beginning 5/21/2010 and
ending 5/21/2010, appearing 1 Time(s) in Classification, LEGAL EXHIBIT B   Filed 12/10/10   Page 6 of 14

*Thank you!*
**Boston Globe Advertising**

B9

LEGAL NOTICES   LEGAL NOTICES   LEGAL NOTICES



**NOTICE TO CREDITORS
AND DEPOSITORS OF
BUTLER BANK
LOWELL, MA**

On April 16, 2010 (the "Closing Date"), the Massachusetts Division of Banks closed BUTLER BANK, LOWELL, MA, 01853 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by July 21, 2010 (the "Bar Date"), at the following address:

FDIC as Receiver of BUTLER BANK
1601 Bryan Street, Dallas, TX 75201
Attention: Creditor Claims Agent

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance by the Receiver, the disallowance will be final, and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposit(s) of the Failed Institution to another insured depository institution, PEOPLE'S UNITED BANK, BRIDGEPORT, CT 06604 (the "New Institution"). The arrangement for depositors, beginning on the inconvenience the closing of the Failed Institution causes you. You may have your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law (12 U.S.C. Section 1822(e)), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by October 17, 2011, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your account(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by taking any of the following actions within 18 months from the Closing Date. If you have more than one account(s)**, or in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account.

2. Executing a new signature card on your account(s), entering into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account.

3. Providing the New Institution with a current change of address form; or

4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including official checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC, for the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit from that state, in accordance with the unclaimed property laws. If you do...

EXHIBIT B

on any account, or having an automated direct deposit credited to an account;
withdrawal debited from any account.

2. Executing a new signature card & signature card agreement with the New Institution, if requested by the New Institution, changing the ownership on your account, or renegotiating the terms of your account;

3. Arranging for the New Institution to continue with a completed change of address form; or

4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including cashier's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office. If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim your deposit(s) from the state within the ten years. If you do not claim your deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be permanently barred from claiming your deposit(s). If the state declines to accept custody of your unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership is terminated. However, please note that a receivership may be terminated at any time. Once the receivership is terminated, you will not be able to claim your deposit(s).

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. You must file your request for this review no later than 60 days after the date on which the FDIC made your deposit(s) available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.

**EXHIBIT B**

newspaper one time(s) Monday, June 21, 2010 and that it is charged at the usual rates.

Case 1:10-cv-11979-PBS   Document 72   Filed 12/10/10   Page 8 of 14   EXHIBIT B

Boston, Mass   June 21, 2010

Personally appeared before me and made oath that the above statement subscribed to by her is true.

Suffolk ss.

*Marie Burke*

*Maureen A. O'Brien*
Notary Public.
My Commission Expires 2/27/15



MAUREEN A. O'BRIEN
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
February 27, 2015

**EXHIBIT B**

---



**NOTICE TO CREDITORS AND DEPOSITORS OF BUTLER BANK LOWELL, MA**

On April 16, 2010 (the "Closing Date"), the Massachusetts Division of Banks closed BUTLER BANK, LOWELL, MA, 01852 (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver by July 21, 2010 (the "Bar Date"), at the following address:

FDIC as Receiver of BUTLER BANK
1601 Bryan Street, Dallas, TX 75201
Attention: Creditor Claims Agent

Under federal law, with certain limited exceptions, failure to file such claims by the Bar Date will result in disallowance of the claims, the disallowance will be final, the Bar Date will result in disallowance by the Bar Date and further rights or remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C), (d)(6).

**TO THE DEPOSITORS OF THE INSTITUTION**

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures your deposits (the "FDIC"), arranged for the transfer of the deposits at the Failed Institution to another insured depository institution, PEOPLE'S UNITED BANK, BRIDGEPORT, CT 06604 (the "New Institution"). This arrangement to avoid the inconvenience the closing of the Failed Institution causes you. You may leave your deposits in the New Institution, but you must take action to claim ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your deposits at the New Institution within eighteen (18) months from the Closing Date. If you do not claim your deposits at the New Institution by October 17, 2011, the funds in your account(s) will be transferred back to the FDIC, and you will no longer have access to your deposit(s) at the New Institution. However, as described in more detail below, you may still be able to obtain these funds from your state government or the Receiver.

You may claim your deposits at the New Institution by using any of the following actions. If you do not claim your deposits at the New Institution by using any one of these actions within 18 months from the Closing Date. If you have more than one account, your action in claiming your deposit in one account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a check on any account, or having an automated direct deposit credited to or an automated withdrawal debited from any account.

2. Executing a new signature card on your account(s), entering into a new deposit agreement with the New Institution, changing the ownership on your account(s), or renegotiating the terms of your certificate of deposit account.

3. Providing the New Institution with a completed change of address form; or

4. Writing to the New Institution and notifying them that you wish to keep your account(s) active. Please be sure to include the name(s) of the account(s), the account number(s), and the signature of an authorized signer on the account(s), name and address.

You should know that bank drafts issued by the Failed Institution, including officer's checks, cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months

Page 9 of

You'll find i

in our new
weekday
classified
section.

In print
and online a
Boston.com

The Boston Glob
boston.com

The one
place to loo

## NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

## NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

## OF MORTGAGEE'S SALE OF REAL ESTATE

WESTERLY

EASTERLY

EASTERLY

WESTERLY

## ADVERTISEMENT

CITY OF BOSTON/COUNTY OF SUFFOLK

INVITATION FOR SEALED BIDS FOR THE PROCUREMENT OF
Boston Police Department
Ford vehicles

Provide three year manufacturers warranty
coverage and for all vehicles

Edward E. Davis
Police Commissioner

LEGAL NOTICE MORTGAGEE'S SALE OF REAL ESTATE

**EXHIBIT B**

## THE LOWELL SUN
**491 Dutton Street, Lowell, MA 01854**

### *AFFIDAVIT OF INSERTION*

On this _22ⁿᵈ_ day of ___April___ , 20_10_ , before me, the undersigned Notary Public, personally appeared **Rebecca Rudeen,** Legal Publications, proved to me through satisfactory evidence of identification and acknowledged to me that a legal notice advertisement placed by **Miller Advertising Agency** on behalf of **the Federal Deposit Insurance Corporation** ran in the **Lowell Sun** on **April 22, 2010.**

Signature: _Rebecca A. Rudeen_

Print Name: _Rebecca A. Rudeen_

Date: _4/22/2010_

Notary Public: _James H. Wright_

**JAMES H. WRIGHT**
**Notary Public**
My commission expires: **Commonwealth of Massachusetts**
**My Commission Expires**
**June 10, 2016**

**EXHIBIT B**

**EXHIBIT B**

## TO GLOBE NEWSPAPER CO., INC.,

*For Advertising in the BOSTON GLOBE*

**Miller Advertising**
**71 Fifth Avenue, 7ᵗʰ Floor**
**New York, NY 10003**

### LEGAL NOTICE

**I,** *Teresa F. Conley,* hereby certify that I am a *Classified Advertising Sales Representative* of the Globe Newspaper Co., publishers of the Boston Globe; that the above advertisement has been inserted in said newspaper one time(s) Thursday, April 22, 2010 and that it is charged at the usual rates.

*Teresa F. Conley*

Boston, Mass   April 22, 2010

Personally appeared before me and made oath that the above statement subscribed to by her is true............
***Suffolk ss.***

*Maureen A. O'Brien*

Notary Public.
My Commission Expires   2/27/15



**EXHIBIT B**

**EXHIBIT B**

Ad Number    2000327845
ID:          FDIC - Closing Butler Bank
Class:       LEGAL
Begin Date:  4/22/2010
End Date:    4/22/2010

MILLER ADVT NY
71 5TH AVENUE
NEW YORK, NY 10003

*To place an ad:* **617-929-1500**

# The Boston Globe

## CERTIFIED

Below is your advertisement from THE BOSTON GLOBE, beginning 4/22/2010 and ending 4/22/2010, appearing 1 time(s) in Classification, LEGAL.

*Thank you!*
**Boston Globe Advertising**

**EXHIBIT B**

EXHIBIT B



**N E W   E N G L A N D**

## LOWELL PUBLISHING COMPANY
## AFFIDAVIT OF INSERTION

Before me, a Notary Public, personally appeared _Rebecca Ruder_
who being duly sworn, deposes and says that a

_3 column x 7.5_ inch advertisement

_____ line advertisement

_____ Insert/preprint       Qty ___1___

For _FDIC (placed by Miller Advertising)_ did appear in The Lowell Sun
on the following date(s):       _May 21, 2010_
_____
_____
_____

_Rebecca A Ruder_
**Signature**

State of Massachusetts
Middlesex County

Sworn to and subscribed before me this

_21_ day of _May_ , 20 _10_

JAMES H. WRIGHT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 10, 2016

_James A Wright_
Notary Public Signature

_10 June 2016_
**Commission Expires**

THE☉SUN    Sentinel & Enterprise    **Nashoba Publishing**    broadcaster    THE VALLEY DISPATCH
The Sun, 491 Dutton Street, Lowell, MA 01854 • Sentinel & Enterprise, 808 Main Street, Fitchburg, MA 01420 • Nashoba Publishing, 78 Barnum Road, Devens, MA 01434

**EXHIBIT B**

EXHIBIT B



# MEDIA One

### N E W   E N G L A N D

## LOWELL PUBLISHING COMPANY
## AFFIDAVIT OF INSERTION

Before me, a Notary Public, personally appeared **Rebecca Ruden**
who being duly sworn, deposes and says that a

__3col x 7.5__ inch advertisement

_____ line advertisement

_____ Insert/preprint      Qty      __1__

For __Miller Advertising Agency__ did appear in The Lowell Sun
on the following date(s):      __06/21/2010__

_____

_____

_____

_____

__Rebecca A. Ruder__
**Signature**

State of Massachusetts
Middlesex County

Sworn to and subscribed before me this

__21__ day of __June__ , 20 __10__

__James H. Wright__
**Notary Public Signature**

__10 June 2016__
**Commission Expires**

JAMES H. WRIGHT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 10, 2016

THE☉SUN   Sentinel & Enterprise   Nashoba Publishing   broadcaster   THE VALLEY DISPATCH

The Sun, 491 Dutton Street, Lowell, MA 01854 • Sentinel & Enterprise, 808 Main Street, Fitchburg, MA 01420 • Nashoba Publishing, 78 Barnum Road, Devens, MA 01434

EXHIBIT B

 **FDIC**                                      **EXHIBIT C**

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL 7010 1060 0002 2564 9485**
**RETURN RECEIPT REQUESTED**

September 27, 2010

Seff Enterprises & Holdings, LLC
C/O Foistner Law Offices, P.C.
Attorney Joseph A. Foistner, ESQ.
800 Turnpike St., Suite 300
North Andover, MA 01845

SUBJECT:   10211–BUTLER BANK
           LOWELL, MA – In Receivership
           **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of BUTLER BANK has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

> The claim in the amount of $26,810,530 is disallowed because it has not been proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

Creditor Claims Agent
Claims Department

RLS7218

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SEFF ENTERPRISES & HOLDINGS LLC
and LAURIE J. FOISTNER
            Plaintiffs,

v.                                          CIVIL ACTION NO. 1:10-cv-11979-PBS

BUTLER BANK,
            Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF FDIC-RECEIVER'S MOTION TO REMAND TO STATE COURT

Federal Deposit Insurance Corporation, in its capacity as receiver of Butler Bank ("FDIC-Receiver") moves the Court pursuant to 28 U.S.C. § 1447 to remand this case to the Superior Court for the State of New Hampshire, Hillsborough County, Northern District.[1]  As set forth more fully herein, Plaintiffs were entirely without authority, in statute or in practice, to remove the instant matter.

### FACTS AND PROCEDURAL BACKGROUND

On September 3, 2009, the Plaintiffs commenced this action against Butler Bank of Lowell, Massachusetts and others in the Superior Court for the State of New Hampshire, Hillsborough County, Northern District.  *See* Docket sheet from Hillsborough County Superior Court, attached hereto as Exhibit A.

On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank and tendered to the FDIC the appointment as Liquidating Agent (act as Receiver). *See* Declaration

---

[1] As explained below, this Motion is brought by FDIC-Receiver because the Bank has been closed and placed into receivership.

of Jeffry M. Quick in Support of Motion of FDIC-Receiver ("Quick Declaration"), at ¶ 3,

attached hereto as Exhibit B.  Pursuant to 12 U.S.C. § 1821(c) the FDIC accepted its

appointment as Receiver that same day.  *Id.*

Shortly upon the appointment of FDIC-Receiver, notices were published informing

creditors and claimants of Butler Bank that any claims against Butler Bank, together with

supporting proof, must be submitted to FDIC-Receiver for review by June 21, 2010.  *Id.* at ¶5.

The notices further advised creditors and other claimants that failure to submit a proof of claim

by June 21, 2010 could result in disallowance of the claim.  *Id.*

On May 14, 2010, Seff filed a proof of claim with the FDIC-Receiver.  *Id.* at ¶6.  Plaintiff

Laurie Foistner has not filed a proof of claim with FDIC-Receiver.  *Id.* at ¶10.  On September 27,

2010, the FDIC-Receiver sent by certified mail to Seff in care of its attorney, Joseph A. Foistner,

a Notice of Disallowance of Claim ("Notice of Disallowance").  *Id.* at ¶7.  The Notice of

Disallowance (capitalization and bold type in the original) states, among other things, that:

> Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this
> disallowance, you have the right to file a lawsuit on your claim (or continue any
> lawsuit commenced before the appointment of the Receiver), in the United States
> District (or Territorial) Court for the District within which the failed institution's
> principal place of business was located or the United States District Court for the
> District of Columbia within 60 days from the date of this notice.
>
> **IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced
> before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY
> PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM
> WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER
> RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C.
> Section 1821 (d)(6)(B).**

*Id.* at ¶8.

On November 10, 2010, the Plaintiffs filed a Notice of Removal[2] of the instant case in the United States District Court for the District of Massachusetts.

ANALYSIS

Plaintiffs' removal to the United States District Court for the District of Massachusetts was in error, and thus, this Court should remand the instant case to the Superior Court for the State of New Hampshire, Hillsborough County, Northern District.

First, the general federal removal statute, 28 U.S.C. § 1446, clearly provides that only a defendant to an action may remove a case, and may only do so to the federal district where the action is pending. Section 1446(a) provides that "[a] *defendant* or *defendants* desiring to remove any civil action . . . from a State court *shall file in the district court of the Untied States for the district and division within which such action is pending* a notice of removal." 28 U.S.C. § 1446(a) (emphasis supplied). This section "authorizes removal only by defendants and only on the basis of claims brought against them . . . [p]laintiffs cannot remove . . . " *Ballard's Serv. Ctr., Inc. v. Transue*, 865 F.2d 447, 449 (1st Cir. 1989) (District Court imposed Rule 11 sanctions on plaintiff's attorney who tried to remove case from state to federal court). By its clear and unequivocal language, Section 1446 does not confer upon a plaintiff to an action the right to remove a case from state to federal court.

---

[2] Plaintiffs' Notice of Removal states that "[t]his Removal Action pertains only to the Defendant Butler Bank" and that the action as against the other defendants "is requested to remain at the New Hampshire, Hillsborough County, Northern District Court." *See* Notice of Removal, ¶ 2. Plaintiffs have taken the further liberty of adding "Peoples Bank" to the caption and deleting any reference in the caption to the other properly named defendants) without any justification.

3

Additionally, Section 1446 only authorizes the removal of a case from a state court to a

district court *where the action is pending*—not a district in an entirely different state.  In *Hoover*

*v. Gershman Inv. Corp.*, 774 F. Supp. 60, 62 (D. Mass. 1991), the plaintiff executed a petition for

removal of his Missouri Circuit Court case for unlawful detainer to the District Court of

Massachusetts.  In rejecting the plaintiff's attempt at removal, the Court noted:

> Federal law only allows for the removal of a civil action of which a district court
> has original jurisdiction 'to the District Court of the United States for the district
> and division embracing the place where such action is pending.'  28 U.S.C. §
> 1441(a). There is no provision of federal law which would permit a defendant to
> remove an action to a federal court sitting in a district and division other than
> where the state court action is pending.

*Hoover*, 774 F. Supp. at 63.  Therefore, the Court ruled the plaintiff's attempt to remove his

Missouri state court case to the District Court for the District of Massachusetts was clearly in

error. *Id.*

Moreover, the FDIC removal statute, 12 U.S.C. § 1819, clearly provides that only the

FDIC has the right to remove an action from state to federal court.  Section 1819 provides that:

> [T]he Corporation may, without bond or security, remove any action, suit or
> proceeding from a State court to the appropriate United States district court before
> the end of the 90-day period beginning on the date the action, suit, or proceeding
> is filed against the Corporation or the Corporation is substituted as a party.

12 U.S.C. § 1819(b)(2).

In fact, the First Circuit has expressly rejected the proposition that Section 1819(b)(2)

allows other parties to actions involving the FDIC to remove.  *See, e.g., FDIC v. Cabral*, 989

F.2d 525, 526 (1st Cir. 1992) (noting that "Section 1819(b)(2)(B) authorizes *only* the FDIC to

remove" and that "Section 1819(b)(2)(B) authorizes removal by the FDIC whenever it is a

party—whether a plaintiff or a defendant—but the general removal statute [28 U.S.C. § 1446(a)]

permits other parties to remove *only when they are defendants*.") (Emphasis supplied).

Upon receiving the Notice of Disallowance, Seff had at least two options. First, Seff could have moved to continue the case in the state court. *See, e.g., Marquis v. FDIC*, 965 F.2d 1148, 1154 (1st Cir. 1992) (construing 12 U.S.C. § 1821(d) as allowing the court to "retain jurisdiction over pending lawsuits—suspending, rather that dismissing, the suits—subject to a stay of proceedings as may be appropriate to permit exhaustion of the administrative review process as it pertains to the underlying claims"). Second, Seff could have elected to file an entirely new lawsuit in federal court.[3] In no circumstance, however, did Seff have authority to remove the case to the federal district court of another state.

Additionally, as of the date of this filing, Seff has failed to file a state court record, as required by Massachusetts Local Rule 81.1(a), which provides that "[w]ithin thirty (30) days after filing a notice for removal of an action from a state court to this court pursuant to 28 U.S.C. § 1446, the party filing the notice shall file certified or attested copies of all records and proceedings in the state court and a certified or attested copy of all docket entries in the state court."

Finally, Plaintiff Laurie J. Foistner has no standing to seek removal or to pursue claims against the FDIC-Receiver as she has not complied with the administrative claims process. *See, Heno v. FDIC*, 20 F.3d 1204, 1207 (1st Cir. 1994) (noting that "[f]ailure to participate in the administrative claims review process . . . is a jurisdictional bar to judicial review.") (internal quotation marks omitted); *Marquis*, 965 F.2d at 1151-52 (noting that "participation in the administrative claims review process [is] mandatory" and where a claimant fails to do so within

---

[3] If Seff had elected to file a new case in federal court, such new case would be properly filed either in the United States District Court for the District of Massachusetts, the state where Butler Bank formerly operated, or in the United States District Court for the District of Columbia. *See* 12 U.S.C. § 1821 (d)(6)(A), *see also Lloyd v. FDIC*, 22 F.3d 335, 337 (1st Cir. 1994).

the filing period [12 U.S.C. § 1821(d)(3)(B)(i)], "the claimant necessarily forfeits any right to pursue a claim against the failed institution's assets in any court.").

## CONCLUSION

For the foregoing reasons, this Motion should be granted and this case remanded to the Superior Court for the State of New Hampshire, Hillsborough County, Northern District in accordance with the provisions of 28 U.S.C. § 1447.

FEDERAL DEPOSIT INSURANCE CORPORATION
IN ITS CAPACITY AS RECEIVER FOR BUTLER
BANK

By its attorney,


___*/s/ Robert A. McCall*___
Robert A. McCall, Bar No. 552682
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
(617) 951-2100
rmccall@peabodyarnold.com


## CERTIFICATE OF SERVICE

I, Robert A. McCall, counsel for Federal Deposit Insurance Corporation, in its Capacity as Receiver of Butler Bank, do hereby certify, that I have this 10th day of December, 2010, served the within document by causing a copy thereof, to be sent electronically to the registered participants in this case, if any, as identified on the Notice of Electronic Filing (NEF) and paper copies mailed, first class mail, postage prepaid to any non registered participants in this case.


___*/s/ Robert A. McCall*___

734903_2
15669-94708¶

6

**EXHIBIT A**

## INDEX

Seff Enterprises & Holdings, LLC vs.

Laurie Forstner

Butler Bank
Robert Chapman
Antonia Shelzi
Hans Harro Hassel

09 C 522
Docket No.

| Document # | | |
|---|---|---|
| 1. | Writ of Summons   (William A. ... ...) | 9-3-09 |
| 2. | Receipt of Writ | 9-3-09 |
| 3. | Return of Service | 9-30-09 |
| 4. | App for A: Butler Bank + Robert Chapman (Stephen A Duggan) | 10-5-09 |
| 5. | App for A: Butler Bank + Robert Chapman (Karen P Forbes) | " |
| 6. | Dfts' (Butler Bank + Chapman) Answer | 11-4-09 |
| 7. | Plfs' Notice of Bankruptcy as to Seff Enterprises | " |
| 8. | 11-19-09  Order as to Bankruptcy (Ins Clerk) | |

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2011 JUN -6  P 12: 49

| | |
|---|---|
| SEFF ENTERPRISES & HOLDINGS LLC<br>LAURIE J. FOISTNER | } CIVIL ACTION NO.<br>} 1:10-cv-11979-PBS<br>} |
| Plaintiffs, | } |
| | } Removed From Hillsborough |
| v. | } County Superior Court North<br>} Docket No. 09-C-522 |
| BUTLER BANK<br>PEOPLES BANK | } |
| | } |
| Defendants | } |
| | } |

## PLAINTIFFS MOTION ASSENTING TO REMAND TO STATE COURT

Pursuant to 28 U.S.C. §§ 1447 Plaintiffs Seff Enterprises & Holdings, LLC and

Laurie J. Foistner (collectively, "Plaintiffs") assent and agree to remand this action back

to the Hillsborough County Superior Court, North in Nashua, New Hampshire to be

adjudicated against all Defendants.

Dated:  December 29, 2010                Respectfully submitted,


                                         SEFF ENTERPRISES & HOLDINGS, LLC
                                         LAURIE J. FOISTNER

                                         By their attorneys

1



The Law Offices of Joseph A. Foistner, Esq.
& Affiliates, P.C.

By      /s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)
800 Turnpike Street, Suite 300
N. Andover, MA 01845
Tel:  978-223-1446

## CERTIFICATE OF SERVICE

I certify that, on December 29, 2010, I mailed the foregoing Notice to Remand via

US First Class Mail, Postage Prepaid, to all attorneys of record.

/s/ Joseph A. Foistner, Esq.

Joseph A Foistner, Esq. (MABBO# 648871)

THE STATE OF NEW HAMPSHIRE

**APPEARANCE**

HILLSBOROUGH, SS.                                   SUPERIOR COURT
NORTHERN DISTRICT                                   DOCKET #09-C-0522

_____COURT
_X__ JURY

Seff Enterprises & Holdings, LLC & Laurie Foistner
Plaintiffs,

v.

Butler Bank, Robert Chapman,
Antonia Shelzi and Hans Harro Hassel,
Defendants.

---

| **APPEARANCE** | **WITHDRAWAL** |
|---|---|

Please enter my Appearance as counsel for:

Please withdraw my Appearance as counsel for:

____

___X___ Defendant, Butler Bank and Robert Chapman

___  Pro se

Notice of withdrawal sent to my client on this date

I hereby certify that a duplicate of this notice was mailed to:

William Aivalikles, Esq.
60 Main Street, Suite 230
Nashua, NH 03060

On: June 27, 2011

Signed _____
Karyn P. Forbes, Esq.
NH Bar #834
SHAHEEN & GORDON
P.O. Box 2703
Concord, NH 03302
(603) 225-7262

THE STATE OF NEW HAMPSHIRE
~~APPEARANCE~~ / **WITHDRAWAL**

County of Hillsborough                      Superior Court Northern District
[ ] COURT
[ ] JURY

Seff Enterprises & Holdings, LLC, et al. v. Butler Bank, et al.

Docket No.: 216-2009-CV-00522

---

APPEARANCE                      **WITHDRAWAL**

Please enter my appearance as:          Please withdraw my appearance as:
[ ] Counsel for:                        [X] Counsel for:

_____                 _____ Butler Bank, et al. _____

                                        Notice of withdrawal sent to my client
                                        on:

                                        _____

[ ] Pro se                              at the following address:

---

I hereby certify that a duplicate of this notice was mailed to:

on ____ March 15, 2012 _____
       Date

   Signed _____

       ____ Stephen A. Duggan _____   ____ 12180 _____
       Print or type name              Bar No.

   Address: Douglas, Leonard & Garvey, P.C.
            6 Loudon Road, Suite 502
            Concord, NH 03301-5321

   Telephone: (603) 224-1988

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                              SUPERIOR COURT
(Northern District)

Seth Enterprises

v.

Butler Bank

Docket No. 09-CV-522

## MOTION TO WITHDRAW

NOW COMES the undersigned, Stephen A. Duggan, Esq., and hereby moves to withdraw from the above-referenced matter stating as follows:

1.      I am an associate with the law office of Douglas, Leonard & Garvey, P.C.

2.      I formerly represented Butler Bank when I was an associate at Shaheen & Gordon, P.A.

3.      Upon my departure from Shaheen & Gordon, P.A., the file remained with that firm, with Karyn P. Forbes, Esq., as counsel.

4.      I have had no interaction with the parties involved since my departure from Shaheen & Gordon, P.A., and do not know the client contact information.

5.      I have called Attorney Forbes to obtain the former clients address, but have not received a call back.

WHEREFORE, the undersigned requests that this Honorable Court:

A.      Grant this motion to withdraw as counsel for Butler Bank; and

B.      Grant such other and further relief as may be just and equitable.

1

Respectfully submitted,
DOUGLAS, LEONARD
& GARVEY, P.C.

Dated: April 11, 2012

By: _____
Stephen A. Duggan (NH Bar #11280)
6 Loudon Road, Suite 502
Concord, NH 03301
(603) 224-1988

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been mailed this 11th day of April, 2011, to Karyn P. Forbes, Esq., at 107 Storrs Street, Concord, NH, 03302, Lorraine Fields, FDIC, as Receiver for Butler Bank, (via email Lfields@fdic.gov), James F. Laboe. Esq., Orr & Reno, P.A., P.O. Box 3550, Concord, NH 03302-3550, Robert Chapman, 26 Luz Drive, Lowell, MA 01854, William Aivalikles, Esq., 60 Main Street, Suite 230, Nashua, NH 03060.

Stephen A. Duggan

2

THE STATE OF NEW HAMPSHIRE
~~APPEARANCE~~ / **WITHDRAWAL**

County of Hillsborough                    Superior Court Northern District
[ ] COURT
[ ] JURY

Seff Enterprises & Holdings, LLC, et al. v. Butler Bank, et al.

Docket No.: 216-2009-CV-00522

| APPEARANCE | WITHDRAWAL |
|---|---|
| Please enter my appearance as:<br>[ ] Counsel for: | Please withdraw my appearance as:<br>[X] Counsel for: |
| | Butler Bank, et al. |
| | Notice of withdrawal sent to my client<br>on:<br>April 11, 2012 |
| [ ] Pro se | at the following address: |

I hereby certify that a duplicate of this notice was mailed to:

Lorraine Fields, FDIC as Receiver for Butler Bank (via email);
James F. Laboe, Esq., Orr & Reno, P.A., P.O. Box 3550, Concord,
NH 03302-3550; Robert Chapman, 26 Luz Drive, Lowell, MA
01854; William Aivalikies, Esq., 60 Main Street, Suite 230, Nashua,
NH 03060; Karyn P. Forbes, Esq., Shaheen & Gordon, P.A., P.O.
Box 2703, Concord, NH 03302-2703

on ___April 11, 2012___
        Date

Signed  _____

Stephen A. Duggan                12180
Print or type name               Bar No.

Address: Douglas, Leonard & Garvey, P.C.
            6 Loudon Road, Suite 502
            Concord, NH 03301-5321

Telephone: (603) 224-1988



# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                    **SUPERIOR COURT**
**NORTHERN DISTRICT**

Antonia Shelzi
v.
Seff Enterprises & Holdings, LLC, Joseph Foistner, Laurie Foistner
Docket No. 05-E-464

and

Joseph Foistner, New Boston Estate, LLC, Waldorf Estates Builders, LLC,
Seff Enterprises & Holdings, LLC
v.
Antonia Shelzi
Docket No. 07-C-113

and

Joseph Foistner, Seff Enterprises, LLC, New Boston Estates, LLC
v.
Orr & Reno, PA, James F. Laboe
Docket No. 08-C-83

and

Seff Enterprises & Holdings, LLC, Laurie Foistner
v.
Butler Bank, Robert Chapman, Antonia Shelzi, Hans Harro Hassel
Docket No. 09-C-522

## ORDER

After a review of summaries provided by the parties and the relevant pleadings, it

appears that the only motions identified by the parties as pending are: (1) Plaintiff's

Motion for Sanctions against the Defendants for Concealment and Spoliation of

Evidence (No. 05-E-464, Doc. # 115); (2) Plaintiff's Motion for Contempt (No. 05-E-464,

Doc. # 181); and, (3) Plaintiff's Motion to Enforce November 7, 2005 Stipulated Order

(No. 05-E-464, Doc. # 183).

With respect to the motion for "Sanctions against the Defendants for Concealment and Spoliation of Evidence," the court (Order, Smukler, J.) issued an order on April 13, 2009 granting the motion, in part; denying the defendant's request for fees and costs; and denying the plaintiff's other requests without prejudice. (See Doc. # 220). The remaining two motions are still pending. The parties shall file a pleading to clarify whether these outstanding motions are now moot. If the parties do not believe these motions are moot, they shall clarify what issues remain outstanding in each motion and whether there have been changes since the time the motions were filed that would affect those issues.

**SO ORDERED.**

April 13, 2012

David A. Garfunkel
Presiding Justice

2

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                    SUPERIOR COURT
Northern District

Antonia Shelzi

v.

Seff Enterprises, et al.

Docket No. 216-2005-EQ-00464
*216-2007-CV-00113; 216-2008-CV-00083; 216-2009-CV-00522*

## MOTION TO WITHDRAW

NOW COMES Stephen A. Duggan, Esq., and respectfully requests that this Honorable Court permit him to withdraw from the above captioned matter and, in support thereof, states as follows:

1.      The undersigned was appointed to represent Butler Bank in the original matter.

2.      A Motion Hearing is scheduled to be heard before this Honorable Court on September 20, 2012, and undersigned counsel is no longer counsel for Mr. Bank and hereby requests that new counsel be appointed to represent Mr. Bank, if necessary.

WHEREFORE, the undersigned hereby requests that this Honorable Court:

A.      Grant this Motion to Withdraw; and

B.      Grant such other relief as may be just and proper.

Respectfully submitted,

Date: August 14, 2012

By: _____

Stephen A. Duggan
Douglas, Leonard and Garvey, P.C.
6 Loudon Road, Suite 502
Concord, NH 03301
(603) 224-1988

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been mailed by first-class mail this 14th day of August, 2012, to Butler Bank, 3 George Street, Lowell, MA 01852; James F. Laboe, Esq., Orr & Reno, P.A., P.O. Box 3550, Concord, NH 03302-3550; Robert Chapman, 26 Lux Drive, Lowell, MA 01854; William Aivalikles, Esq., 60 Main Street, Suite 230, Nashua, NH 03060; Joseph Foistner, Esq., 300 Brickstone Square, Suite 201, Andover, MA 01819; Laurie Foistner, 3 Foxberry Drive, New Boston, NH 03070; Joseph MacAllister, Esq., Gawryl & MacAllister, 41 East Pearl Street, Nashua, NH 03060; Emily G. Rice, Esq., Orr & Reno, P.A., P.O. Box 3550, Concord, NH 03302-3550.

_____

Stephen A. Duggan

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Hillsborough Superior Court Northern District
300 Chestnut Street
Manchester NH 03101

Telephone: (603) 669-7410
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## RULE 20 NOTICE

**FILE COPY**

Case Name:     **Antonia Shelzi**     **v. Seff Enterprises, et al.**
Case Number:   **216-2005-EQ-00464**   *216-2007-CV-00113; 216-2008-CV-00083; 216-2009-CV-00522*

Please be advised that withdrawal as attorney for BUTLER BANK and ROBERT CHAPMAN in 09-CV-522 has been approved no other appearance has been entered.  If BUTLER BANK and ROBERT CHAPMAN in 09-CV-522 or an attorney fail to file an appearance by September 20, 2012, the court may take such action as justice may require.

September 10, 2012

John M. Safford
Clerk of Court

(539)

C: William E Aivalikles, ESQ; Joseph Foistner; James F Laboe, ESQ; Laurie Foistner; New Boston
   Estates LLC; Hans Harro Hassel; Butler Bank; Robert Chapman; Antonia Shelzi; Lisa Snow
   Wade, ESQ; Seff Enterprises & Holdings, LLC

NHJB-2460-S (07/01/2011)

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                              **SUPERIOR COURT**
**NORTHERN DISTRICT**

Antonia Shelzi
v.
Seff Enterprises & Holdings, LLC, Joseph Foistner, Laurie Foistner

Docket No. 05-E-464

and

Joseph Foistner, New Boston Estate, LLC, Waldorf Estates Builders, LLC,
Seff Enterprises & Holdings, LLC
v.
Antonia Shelzi

Docket No. 07-C-113

and

Joseph Foistner, Seff Enterprises, LLC, New Boston Estates, LLC
v.
Orr & Reno, PA, James F. Laboe

Docket No. 08-C-83

and

Seff Enterprises & Holdings, LLC, Laurie Foistner
v.
Butler Bank, Robert Chapman, Antonia Shelzi, Hans Harro Hassel

Docket No. 09-C-522

## ORDER ON MOTION FOR CLARIFICATION

The court held a hearing today on Antonia Shelzi's motion for clarification of this
court's order of April 13, 2012.  Following arguments by counsel, the court issued the
following order:

1.     With respect to Shelzi's December 10, 2008 motion to enforce November 7, 2005 stipulated order (Docket Nos. 05-E-464 and 07-C-113), the parties shall file memoranda of law as follows:  plaintiff's memorandum is due on or before October 20, 2012; defendant's memorandum is due on or before November 19, 2012.

2.     With respect to Shelzi's December 8, 2008 motion for contempt (Docket Nos. 05-E-464 and 07-C-113), the clerk of court shall schedule an evidentiary hearing (1/2 day).

3.     With respect to discovery issues raised at today's hearing, the parties shall confer and shall file pleadings within 30 days of the date of this order setting forth their respective positions with respect to the status of discovery at the time of the Bankruptcy stay, including any discovery that was outstanding at that time, the discovery deadlines that were in effect at the time of the Bankruptcy stay, and any requests for additional discovery.

4.     The clerk of court shall schedule structuring conferences in Docket Nos. 09-C-522 and 08-C-83.

With respect to the issue of spoliation of evidence and the court's order on that issue, the court will review the prior court order in light of the parties' arguments at today's hearing and will thereafter issue a further order.

**SO ORDERED.**

September 20, 2012

David A. Garfunkel
Presiding Justice

2

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                    SUPERIOR COURT
NORTHERN DISTRICT                                DOCKET NO. 09-C-522

Seff Enterprises & Holdings, LLC
Laurie J. Foistner
v.
Antonia Shelzi
Hans H. Hassel
Butler Bank
Robert Chapman, VP Butler Bank

## **MOTION TO AMEND COMPLAINT BY SUBSTITUTING PARTY**

NOW COME the Plaintiffs and request this Honorable Court to allow Peoples United

Bank to be substituted for Butler Bank/FDIC as Defendant in the above captioned matter.  In

support thereof, the Plaintiffs offer the following:

1.      This case was filed and docketed in this Court on or about October 7, 2009, while

the Butler Bank was still allowed to operate its banking business in Massachusetts and New

Hampshire.

2.      On or about June 30, 2009, Butler Bank of Lowell, Massachusetts, through its

Attorneys, Enno, Boulay, Martin & Donahue, LLP, of Lowell, Massachusetts, filed a Civil Suit,

seeking a deficiency judgment, against Antonia Shelzi and Laurie Foistner, resulting from the

foreclosure of the Waldorf Estates Subdivision, located in New Boston, New Hampshire, **Butler**

**Bank v. Antonia Shelzi et al. Docket No. MICV 2009-02583-L.**

3.      On or about July 27, 2009, an automatic stay was ordered by the Federal

Bankruptcy Court, staying both the New Hampshire and Massachusetts litigation.

1

4.      On or about December 21, 2010, Attorney Matthew C. Donahue (Donahue), representing both the Butler Bank and the Peoples United Bank (PUB), filed his **MOTION TO AMEND COMPLAINT BY SUBSTITUTING PARTY** into the Lowell Massachusetts Superior Court, after his Client, the Butler Bank, Plaintiff in the Massachusetts case was seized by the FDIC and the Massachusetts Attorney General, Martha Coakley, began her investigation into the banking practices, of Butler Bank, see Exhibit A.

7.      Attorney Donahue's language used in his Motion to the Massachusetts Court, Exhibit A, applies to this Motion as well, and is incorporated herein. Donahue stated under oath, as an Officer of the Massachusetts Court, that on April 16, 2010, the Commissioner of Banks for the Commonwealth of Massachusetts seized Butler Bank.

8.      On April 16, 2010 the Receiver entered into a Purchase and Assumption Agreement (the "P & A Agreement") with People's United Bank pursuant to which People's United Bank assumed all assets of Butler Bank not specifically retained by the receiver, including but not limited to the outstanding loan deficiency. (See "Exhibit B" of Affidavit of Beth Berman).

9.      Pursuant to the P & A Agreement, People's United Bank, agreed to take on any existing litigation that had been brought by Butler Bank prior to the time that it had been seized by the Massachusetts Banking Commissioner.

10.      The above written admissions were made under oath and signed, People's United Bank, by their attorney, Mathew Donahue.

11.      The Affidavit of Beth Berman, employee of the FDIC, as an Asset Management Specialist swore under Oath as follows:

1. I am employed by the Federal Deposit Insurance Corporation (FDIC) as an Asset Management Specialist I submit this Affidavit in support of the motion to substitute People's United Bank for Butler Bank ...

4. Section 3.1 of the P&A Agreement provides in pertinent part that:

With the exception of certain assets expressly excluded in Sections 3.5 and 3.6 [not relevant in this law suit], the Assuming Institution hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Institution, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Federal Bank, whether or not reflected on the books of the Failed Bank as of Bank Closing ...

5. Among the non-loss-share assets of Butler Bank which the FDIC sold to PUB, under the terms of the P&A Agreement, was the charge-off made by Butler Bank prior to its failure which related to a deficiency on a construction mortgage loan Butler Bank had made to Seff Enterprises & Holdings, LLC ("Seff Enterprises") which deficiency is at issue here.

12.     Attorney Donahue, on behalf of People's United Bank avers in his **MOTION TO STRIKE DOCKETING OF DEFENDANT'S NOTICE OF DISALLOWANCE** on December 12, 2010, See Exhibit C:

1. The above entitled matter is not a Federal matter.

2. The Purchase and Assumption Agreement between the Federal Deposit Insurance Corporation as Receiver for Butler Bank, the Federal Deposit Insurance Corporation and People's United Bank, signed on April 16, 2010, specifically states in Section 2.1(m), the Assuming Institution (People's United Bank) assumes "all asset-related offensive litigation liabilities" to the extent that they "relate to assets subject to the shared-loss agreement ..." Please see attached Affidavit of Beth Berman.

3. Pursuant to the Purchase & Assumption Agreement, Section 3.1(m), Peoples United Bank has purchased all of the assets and asset related offensive litigation liabilities not specifically withheld by the FDIC.

4. The FDIC has assured People's United Bank that the Shared Loss Agreement signed on the same day as the above Purchase and Assumption Agreement, encompass the assets included in the deficiency that is being collected in the

3

above entitled matter, and are not among assets specifically withheld by the FDIC.

5. As the FDIC has not withheld the assets included in the Butler Bank litigation against the above-mentioned Defendants, Laurie Foistner and Antonia Shelzi [emphasis added], the above case should not be dismissed or removed to Federal Court, but should be allowed to proceed pursuant to the proposed amended tracking order, filed in a motion herein.

13.   Section 2.1(m) of the agreement relates dedicates to "defensive litigation liabilities", see Exhibit D:

> **ARTICLE II**
> **ASSUMPTION OF LIABILITIES**
> **2.1  Liabilities Assumed by Assuming Institution**.  The Assuming Institution expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Federal Bank as of bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumes"):
>
> (m) all assets-related offensive litigation liabilities **and all asset-related defensive litigation liabilities,** but only to the extent such liabilities relate to assets subject to a shared-loss agreement, and provided that all other defensive litigation and any class action with respect to credit card business are retained by the Receiver.

14.   The language of Section 3.1 of the P&A Agreement, and the language of

**ARTICLE II, ASSUMPTION OF LIABILITIES, 2.1  Liabilities Assumed by Assuming**

**Institution,** and the Sworn Affidavit of Beth Berman, the FDIC Employee who managed the

People's United Bank transaction for the Receiver, the FDIC, of the failed Butler Bank and the

sworn statements, admission  made by Attorney Donahue, Attorney of Record for both Butler

Bank and People's United Bank, Officer of the Lowell Massachusetts Superior Court, clearly

assign all Defensive and Offensive Litigation Responsibilities from the Defendant Butler Bank,

in this New Hampshire Case, to People's United Bank.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court:

4

A.    Substitute Defendant Butler Bank with Defendant People's United Bank; and

B.    For any other relief deemed in the interest of justice.

Respectfully submitted by

Joseph A. Foistner,
Laurie J. Foistner,
Seff Enterprises & Holdings, LLC

By its Attorneys

Law Offices of William Aivalikles PA

Dated: December 3, 2012

_____
William Aivalikles
60 Main Street, Suite 230
Nashua, NH  03060
(603) 880-0303
NH Bar # 308

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been sent this date, postage paid, to Attorney Laboe and Attorney Matthew Donahue and the Plaintiffs.

_____
William Aivalikles

# EXHIBIT A



# The Commonwealth of Massachusetts
## Office of the Commissioner of Banks
### 1000 Washington Street, 10th Floor
### Boston, Massachusetts 02118

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**GREGORY BIALECKI**
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

**BARBARA ANTHONY**
UNDERSECRETARY, OFFICE OF
CONSUMER AFFAIRS AND
BUSINESS REGULATION

**STEVEN L. ANTONAKES**
COMMISSIONER OF BANKS

April 16, 2010

Cheryl Bates
Receiver-in-Charge
Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

Dear Ms. Bates:

Pursuant to the authority vested under the provisions of section 26 of Chapter 167 of the Massachusetts General Laws, I, Steven L. Antonakes, as Commissioner of Banks under section 2 of Chapter 26 of the Massachusetts General Laws, hereby tender to the Federal Deposit Insurance Corporation the appointment as Liquidating Agent, in order for it to act as receiver, of Butler Bank, Lowell, Massachusetts, which has been closed and which is in my possession for liquidation pursuant to section 22 of Chapter 167 of the Massachusetts General Laws.

Very truly yours,

Steven L. Antonakes
Commissioner of Banks

Case 1:13-cv-00454-LM   Document 2-1   Filed 10/29/13   Page 232 of 334

The Official Website of the Office of Consumer Affairs & Business Regulation (OCABR)

## Consumer Affairs and Business Regulation



Home    Business    Banking    Banking Legal Resources    Enforcement Actions    2009 Enforcement Actions

## Butler Bank, Lowell, MA - Order to Cease and Desist

By the Division of Banks

### FEDERAL DEPOSIT INSURANCE CORPORATION

### WASHINGTON, D.C.

### and

### THE COMMONWEALTH OF MASSACHUSETTS

### DIVISION OF BANKS

**ORDER TO CEASE AND DESIST**

**FDIC-09-148b**

## In the Matter of

## BUTLER BANK
## LOWELL, MASSACHUSETTS

## (INSURED STATE NONMEMBER BANK)

Butler Bank, Lowell, Massachusetts (Bank), having been advised of its right to a
Notice of Charges and of Hearing detailing the unsafe or unsound banking
practices and violations of law and/or regulations alleged to have been
committed by the Bank, and of its right to a hearing on such alleged charges
under section 8(b) of the Federal Deposit Insurance Act (Act), 12 U.S.C. § 1818
(b), and having waived those rights, and having waived any rights that the Bank
has or may have under the Massachusetts General Laws, entered into a
STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO
CEASE AND DESIST (CONSENT AGREEMENT) with a representative of the
Legal Division of the Federal Deposit Insurance Corporation (FDIC), and with
the Commissioner of Banks of the Commonwealth of Massachusetts
(Commissioner), dated April 16, 2009, whereby solely for the purpose of this
proceeding and without admitting or denying any unsafe or unsound banking
practices or violations of law and/or regulations, the Bank consented to the
issuance of an ORDER TO CEASE AND DESIST (ORDER) by the FDIC and
the Commonwealth of Massachusetts Division of Banks (Division).
The FDIC and the Division considered the matter and determined that they had
reason to believe that the Bank engaged in unsafe or unsound banking practices

and violations of law and/or regulations. The FDIC and the Division, therefore, accepted the CONSENT AGREEMENT and issued the following:

## ORDER TO CEASE AND DESIST

IT IS HEREBY ORDERED that the Bank, its institutionaffiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns, cease and desist from the following unsafe or unsound banking practices and violations of law and/or regulations:

1. Operating with an inadequate level of capital for the kind and quality of assets held;

2. Operating with an excessive volume of criticized assets;

3. Operating with inadequate management, policies and practices;

4. Failing to provide for an effective system to identify problem assets and prevent deterioration; and

5. Operating with deficient earnings.

IT IS FURTHER ORDERED that the Bank, its institutionaffiliated parties, and its successors and assigns, take affirmative action as follows:

1. (a) The Bank shall achieve and maintain the following minimum capital levels (as defined in Part 325 of the FDIC Rules and Regulations), after establishing an adequate Allowance for Loan and Lease Losses (Allowance):

(i) Tier 1 capital of not less than six percent (6.0%) of total assets;

(ii) Tier 1 risk-based capital of not less than six percent (6.0%) of total risk-weighted assets; and

(iii) Total risk-based capital of not less than ten percent (10%) of total risk-weighted assets.

(b) In addition, the Bank shall comply with the FDIC's Statement of Policy on Risk-Based Capital found in Appendix A to Part 325 of the FDIC Rules and Regulations, 12 C.F.R. Part 325, App. A.

(c) In the event any of the foregoing ratios falls below the established minimum, the Bank shall notify the Area Director of the Boston Area Office of the FDIC (Area Director) and the Commissioner and shall increase capital in an amount sufficient to comply with this provision within sixty (60) days.

(d) The Bank shall not initiate a plan to increase total assets by more than two and one-half percent (2.5%) during any consecutive three-month period, or more than eight percent (8.0%) during any twelve-month period.

2. (a) Within thirty (30) days of the effective date of this ORDER, the Bank's board of directors (Board) shall develop a capital plan (Capital Plan) that shall be submitted to the Area Director and the Commissioner for review and comment. Within fifteen (15) days of receipt of all such comments from the Area Director and the Commissioner, and after incorporation and adoption of all such comments, the Bank shall approve the revised Capital Plan, which approval shall be recorded in the minutes of the meetings of the Board. Thereafter, the Bank shall implement and fully comply with the Capital Plan. The Board shall review the Bank's adherence to the Capital Plan, at minimum, on a monthly

Case 1:13-cv-00454-LM   Document 2-1   Filed 10/29/13   Page 234 of 334

basis. Copies of the reviews and updates shall be submitted to the Area Director and the Commissioner as part of the progress reports required under paragraph 9(c) of this ORDER, and in any event no later than ten (10) days after completion. At a minimum, the Capital Plan shall include:

(i) specific plans to achieve the capital levels required under this ORDER;

(ii) specific plans for the maintenance of adequate capital that may in no event be less than the requirements of the provisions of this ORDER;

(iii) projections for asset growth and capital requirements, and such projections shall be based upon a detailed analysis of the Bank's current and projected assets, liabilities, earnings, fixed assets, and off-balance sheet activities, each of which shall be consistent with the Bank's strategic business plan;

(iv) projections for the amount and timing of the capital necessary to meet the Bank's current and future needs; (v) the primary source(s) from which the Bank will strengthen its capital to meet the Bank's needs;

(vi) contingency plans that identify alternative sources of capital should the primary source(s) under (v) above not be available; and

(vii) a dividend policy that permits the declaration of a dividend only:

1. when the Bank is in compliance with its approved Capital Plan;

2. when the Bank is in compliance with applicable State and Federal laws and regulations;

3. when, after payment of such dividends, the Bank remains in compliance with the above minimum capital ratios;

4. when such declaration and payment of dividends has been approved in advance by the Board; and

5. when such declaration and payment of dividends has been approved in advance, in writing, by the Area Director and the Commissioner.

(b) The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the program developed pursuant to the Capital Plan.

3. Within thirty (30) days after the receipt of any Report of Examination of the Bank from the FDIC and/or the Division, the Bank shall eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" in any Report of Examination that have not been previously collected or charged off.

4. (a)Within thirty (30) days from the effective date of this ORDER, the Bank shall formulate a written plan to reduce the Bank's risk exposure in each asset relationship in excess of $750,000 classified as "Substandard" (Risk Exposure Plan). For purposes of this provision, "reduce" means to collect, charge off, or improve the quality of an asset so as to warrant its removal from adverse classification by the FDIC and/or the Division. In developing the Risk Exposure Plan, the Bank shall, at a minimum, and with respect to each adversely classified loan or lease, review, analyze, and document the financial position of the borrower, including source of repayment, repayment ability, and alternative

repayment sources, as well as the value and accessibility of any pledged or assigned collateral, and any possible actions to improve the Bank's collateral position.

(b) In addition, the Risk Exposure Plan shall also include, at minimum, the following:

(i) a schedule for reducing the outstanding dollar amount of each adversely classified asset, including timeframes for achieving the reduced dollar amounts (at a minimum, the schedule for each adversely classified asset must show its expected dollar balance on a quarterly basis) ;

(ii) specific action plans intended to reduce the Bank's risk exposure in each classified asset;

(iii) a schedule showing, on a quarterly basis, the expected consolidated balance of all adversely classified assets, and the ratio of the consolidated balance to the Bank's projected Tier 1 capital plus the Allowance;

(iv) a provision for the Bank's submission of monthly written progress reports to its Board; and

(v) a provision mandating Board review of the progress reports, with a notation of the review recorded in the minutes of the meeting of the Board.

(c) The Bank shall submit the plan to the Area Director and the Commissioner for review and comment. Within fifteen (15) days from receipt of any comment from the Area Director or the Commissioner, and after incorporation and adoption of any required changes, the Bank shall approve the plan, which approval shall be recorded in the minutes of the meeting of the Board. Thereafter, the Bank shall implement and fully comply with the plan.

5. (a) Within sixty (60) days from the effective date of this ORDER, the Bank shall have an appropriate number and type of qualified senior officers, with the requisite knowledge, skills, ability, and experience, giving consideration to the size and complexity of the Bank, to restore the Bank to a satisfactory financial condition, including, but not limited to, capital adequacy, asset quality, management effectiveness, earnings, liquidity, and sensitivity to market risk.

Each member of management shall be provided appropriate written authority from the Board to implement the provisions of this ORDER.

(b) The Bank shall notify the Area Director and the Commissioner in writing when it proposes to add any individual to the Board or employ any individual as a senior executive officer. Such notification must be received at least thirty (30) days before such addition or employment is intended to become effective. The Bank shall not add any individual to the Board or employ any individual as a senior executive officer if the Area Director or Commissioner, in response to the notification required by this subparagraph, objects to such addition or employment.

6.(a) Within thirty (30) days of the effective date of this ORDER, the Board shall develop a program of independent loan review (Loan Review Program) that will provide for a periodic review of the Bank's loan portfolio and the identification and categorization of problem credits. At a minimum, the Loan Review Program shall provide for:

Case 1:13-cv-00454-LM   Document 2-1   Filed 10/29/13   Page 236 of 334

(i) prompt identification of loans with credit weaknesses that warrant the special attention of management, including the name of the borrower, amount of the loan, reason why the loan warrants special attention, and assessment of the degree of risk that the loan will not be fully repaid according to its terms;

(ii) action plans to reduce the Bank's risk exposure from each identified relationship;

(iii) prompt identification of all outstanding balances and commitments attributable to each obligor identified under the requirements of subparagraph (i), including outstanding balances and commitments attributable to related interests of such obligors, including the obligor of record, relationship to the primary obligor identified under subparagraph (i), and an assessment of the risk exposure from the aggregate relationship;

(iv) identification of trends affecting the quality of the loan portfolio, potential problem areas, and action plans to reduce the Bank's risk exposure;

(v) assessment of the overall quality of the loan portfolio;

(vi) identification of credit and collateral documentation exceptions and an action plan to address the identified deficiencies;

(vii) identification and status of violations of laws, rules, or regulations with respect to the lending function and an action plan to address the identified violations;

(viii) identification of loans that are not in conformance with the Bank's lending policy and an action plan to address the identified deficiencies;

(ix) identification of loans to directors, officers, principal shareholders, and their related interests;

(x) an assessment of the ability of individual members of the lending staff to operate within the framework of the Bank's loan policy and applicable laws, rules, and regulations, and an action plan to address the identified deficiencies; and

(xi) a mechanism for reporting periodically, but in no event less than monthly, the information developed in paragraphs (i) through (x) above to the Board. The report should also describe the action(s) taken by management with respect to problem credits.

(b) The Bank shall submit the Loan Review Program to the Area Director and the Commissioner for review and comment. Within fifteen (15) days from receipt of any comment from the Area Director or the Commissioner, and after due consideration of any required changes, the Bank shall approve the program, which approval shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the program.

(c) Upon implementation, a copy of each periodic report required by the Loan Review Program shall be submitted to the Board, as well as documentation of the actions taken by the Bank or recommendations to the Board that address identified deficiencies in specific loan relationships or the Bank's policies, procedures, strategies, or other elements of the Bank's lending activities. Such reports and recommendations, as well as any resulting determinations, shall be recorded and retained in the minutes of the meeting of the Board.

Case 1:13-cv-00454-LMC Document 31   Filed 10/29/13   Page 237 of 334

7. (a) Within thirty (30) days from the effective date of this ORDER, the Board shall establish a comprehensive policy and methodology for determining the adequacy of the Allowance (ALLL Policy). The ALLL Policy shall provide for a review of the Allowance at least once each calendar quarter and be completed in sufficient time such that the results of the review conducted by the Board may be properly reported in the quarterly Consolidated Reports of Condition and Income. shall, at a minimum, include the following:

(i) the Federal Financial Institutions Examination Council's Instructions for the Consolidated Reports of Condition and Income, the Interagency Statement of Policy on the Allowance, other applicable regulatory guidance that addresses the adequacy of the Bank's Allowance, and any analysis of the Bank's Allowance provided by the FDIC and/or the Division;

(ii) the volume and mix of the overall loan portfolio, including trends in the portfolio mix by loan type and geography, trends in the severity of nonperforming or delinquent loans, trends in the severity of weaknesses in extensions of credit identified as "Special Mention" and adversely classified in the latest Report of Examination;

(iii) previous loan loss experience by loan type, including the level, trends, and severity of overdrafts, trend of net charge-offs as a percent of average loans over the past several years, as well as an analysis of net charge-offs experienced on previously adversely classified loans;

(iv) the degree of risk associated with renewed and extended loans;

(v) the volume, trend, rate and duration of loan growth;

(vi) the results of internal loan reviews;

(vii) concentrations of credit and significant individual credits;

(viii) present and prospective economic conditions, generally and locally;

(ix) off-balance sheet credit risks; and

(x) any other factors appropriate in determining future Allowances, including changes in the Bank's strategic plan, and loan products and markets.

(b) A deficiency in the Allowance shall be remedied in the calendar quarter in which it is discovered by a charge to current operating earnings prior to any Tier 1 capital determinations required by this ORDER and prior to the Bank's submission of its Consolidated Report of Condition and Income. The Board shall thereafter maintain an appropriate Allowance.

(c) The Bank shall submit the ALLL Policy to the Area Director and the Commissioner for review and comment. Within fifteen (15) days from receipt of any comment from the Area Director or the Commissioner, and after incorporation and adoption of any required changes, the Bank shall approve the policy, which approval shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the ALLL Policy.

(d) The Bank shall submit to the Area Director and the Commissioner the analysis supporting the determination of the adequacy of the Allowance. These submissions may be made at such times as the Bank files the progress reports required by this ORDER or sooner upon the written request of the Area Director or the Commissioner. The Bank's ALLL Policy and methodology for determining the adequacy of the Bank's Allowance and its implementation shall remain

subject to the approval of the Area Director and the Commissioner. In the event that the Area Director or the Commissioner determines that the Bank's Allowance is inadequate, the Bank shall increase the Allowance and amend its Consolidated Reports of Condition and Income accordingly.

8. Within thirty (30) days from the date of this ORDER, the Bank shall develop and fully implement a written strategic plan (Strategic Plan) supported by an operating budget and consisting of goals and strategies, consistent with sound banking practices, and taking into account the Bank's other written plans, policies, or other actions as required by this ORDER. The Strategic Plan and any subsequent modification thereto shall be submitted to the Area Director and the Commissioner for review and comment. Within fifteen (15) days of receipt of all such comments from the Area Director or the Commissioner, and after incorporation and adoption of any required changes, the Bank shall approve the revised Strategic Plan, which approval shall be recorded in the minutes of the meetings of the Board. Thereafter, the Bank shall implement and fully comply with the Strategic Plan. The written Strategic Plan shall include, at a minimum:

(a) identification of the major areas in and means by which the Bank will seek to improve operating performance;

(b) specific goals to improve the net interest margin, increase interest income, reduce discretionary expenses, and improve and sustain earnings, as well as maintain appropriate provisions to the Allowance;

(c) realistic and comprehensive budgets for all categories of income and expense items;

(d) a description of the operating assumptions that form the basis for, and adequately support, material projected revenue and expense components;

(e) coordination of the Bank's loan, investment, funds management, and operating policies, strategic plan, and Allowance methodology with the profit and budget planning;

(f) a budget review process to monitor the revenue and expenses of the Bank whereby actual performance is compared against budgetary projections not less than quarterly, recording the results of the evaluation and any actions taken by the Bank in the minutes of the Board meeting at which such evaluation is undertaken; and,

(g) identification of personnel responsible for implementing each of the goals and strategies of the Profit Plan.

9. (A) Within fifteen (15) days from the effective date of this ORDER, the Board shall adopt and implement a program that will provide for monitoring of the Bank's compliance with this ORDER (Monitoring Program). The Bank shall submit the Monitoring Program, and any future modifications, to the Area Director and the Commissioner for review and comment. Within fifteen (15) days of receipt of all such comments from the Area Director or the Commissioner, and after incorporation and adoption of any required changes, the Bank shall approve the revised program, which approval shall be recorded in the minutes of the meeting of the Board. Thereafter, the Bank shall implement and fully comply with the Monitoring Program. Following the adoption of the program, the Board shall review the Bank's compliance with this ORDER and record its review in the

minutes of the meeting of the Board. At a minimum, the Monitoring Program will incorporate the provisions of subparagraphs (b) and (c) below.

(b) The Board shall be responsible for ensuring compliance with the ORDER and overseeing corrective measures with respect to the ORDER. The Board shall monitor compliance with this ORDER and any discussion or report relating to such compliance shall be incorporated into the minutes of the meeting of the Board.

(c) Within thirty (30) days of the effective date of this ORDER, and monthly thereafter, the Bank shall furnish written progress reports to the Area Director and the Commissioner detailing the form, manner, and results of any actions taken to secure compliance with this ORDER. In addition, the Bank shall furnish such other reports as requested by the Area Director or the Commissioner. All progress reports and other written responses to this ORDER shall be reviewed by the Board and made a part of the minutes of the Board meeting.

10. This ORDER shall not bar, estop, or otherwise prevent the FDIC, the Division, or any other federal or state agency or department from taking any action against the Bank, the Bank's current or former institution-affiliated parties, and/or any of their respective directors, officers, employees, and agents.

11. Nothing herein shall prevent the FDIC or the Division from conducting on-site reviews and/or examinations of the Bank, its affiliates, agents, service providers or other institutionaffiliated parties at any time to monitor compliance with this ORDER.

12. This ORDER shall become effective upon issuance by the FDIC and the Division and shall be fully enforceable by the FDIC pursuant to the provisions of section 8(i) (1) of the Act, 12 U.S.C. § 1818(i) (1), and by the Division pursuant to the provisions of Massachusetts General Laws Chapters 167 through 172 and other applicable statutes.

13. The provisions of this ORDER shall be binding upon the Bank, its successors and assigns, any of their respective directors, officers, employees, and agents, and any of the Bank's institution-affiliated parties.

14. The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provision of this ORDER shall have been modified, suspended, or terminated in writing by the FDIC and by the Division.

Pursuant to delegated authority.

Dated at Braintree, Massachusetts, this 17th day of April, 2009.

_____

Mary A. Barry
Acting Area Director

_____

Honorable Steven L. Antonakes
Commissioner of Banks

© 2012 Commonwealth of Massachusetts.

Mass.Gov® is a registered service mark of the Commonwealth of Massachusetts.



**FDIC**
Division of Resolutions and Receiverships
**Dallas Regional Office**
1601 Bryan Street
Dallas, Texas 75201

Telephone (214) 754-0098

April 16, 2010

Steven L. Antonakes
Commissioner of Banks
Commonwealth of Massachusetts
Division of Banks
1000 Washington Street, 10th Floor
Boston, MA 02118-6400

Subject:     **Butler Bank**
             **Lowell, Massachusetts – In Receivership**
             <u>**Acceptance of Appointment as Receiver**</u>

Dear Commissioner Antonakes:

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: _____
     Cheryl Bates
     Receiver-in-Charge

# EXHIBIT B

# COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Superior Court of Lowell

Middlesex, ss.                          Docket No. MICV 2009-02583-L

---

Butler Bank, )
              Plaintiff )
)
v. )
)
Antonia Shelzi, )
Laurie Foistner, )
             Defendants )
)

---

## AFFIDAVIT OF BETH BERMAN

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

BETH BERMAN, being duly sworn, deposes and says:

1.      I am employed by the Federal Deposit Insurance Corporation ("FDIC") as an Asset Management Specialist. I have personal knowledge of the facts set forth herein and am authorized to make this Affidavit. I submit this Affidavit in support of the motion to substitute People's United Bank for Butler Bank as the plaintiff in this action.

2.      On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank, Lowell, Massachusetts and appointed the FDIC as Receiver ("FDIC-Receiver"). The FDIC accepted its appointment as receiver that same day. (Copies of the appointment papers are attached as Exhibit A.)

3.      On the same day that the FDIC was appointed as Receiver of Butler Bank, it sold most of the assets and only certain designated liabilities of Butler Bank to People's

United Bank ("PUB") of Bridgeport, CT pursuant to a written Purchase and Assumption

Agreement with Loss-Share ("P&A Agreement"), a copy of which is attached as Exhibit

B.

4.      Section 3.1 of the P&A Agreement provides in pertinent part that:

> With the exception of certain assets expressly excluded in Sections
> 3.5 and 3.6 [not relevant to this lawsuit], the Assuming Institution
> hereby purchases from the Receiver, and the Receiver hereby sells,
> assigns, transfers, conveys, and delivers to the Assuming Institution,
> all right, title, and interest of the Receiver in and to all of the assets
> (real, personal and mixed, wherever located and however acquired)
> including all subsidiaries, joint ventures, partnerships, and any and
> all other business combinations or arrangements, whether active,
> inactive, dissolved or terminated, of the Failed Bank whether or not
> reflected on the books of the Failed Bank as of Bank Closing....

5.      Among the non loss-share assets of Butler Bank which the FDIC sold to

PUB, under the terms of the P&A Agreement, was a charge-off made by Butler Bank

prior to its failure which related to a deficiency on a construction mortgage loan Butler

Bank had made to Seff Enterprises & Holdings LLC ("Seff Enterprises"), which

deficiency is at issue in the captioned litigation.

_Beth Berman_
Beth Berman

Sworn to before me this 9th day of
December, 2010

_Lorraine S. Fields_
Notary Public

**LORRAINE S. FIELDS**
**Notary Public, State of New York**
**No. 02FI4864248**
**Qualified in Nassau County**
**Commission Expires June 9, 20 14**

# EXHIBIT C

# COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Superior Court of Lowell

Middlesex, ss.                                    Docket No: MICV 2009-02583-L

| | |
|---|---|
| Butler Bank, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| Antonia Shelzi, | ) |
| Laurie Foistner, | ) |
| Defendants | ) |

## MOTION TO STRIKE DOCKETING OF DEFENDANT'S NOTICE OF DISALLOWANCE

NOW COMES the Plaintiff, and pursuant to Rule 9A, in response to the Defendant's Notice of Disallowance, requests that this Honorable Court quash the Defendant's Notice of Disallowance for the foregoing reasons:

1)      The above entitled action is not a Federal matter.

2)      The Purchase and Assumption Agreement between the Federal Deposit Insurance Corporation as Receiver for Butler Bank, the Federal Deposit Insurance Corporation and People's United Bank, signed on April 16, 2010, specifically states in Section 2.1(m), that the Assuming Institution (People's United Bank) assumes "all asset-related offensive litigation liabilities" to the extent that they "relate to assets subject to a shared-loss agreement..." (Please see attached Affidavit of Beth Berman)

3)      Pursuant to the Purchase and Assumption Agreement, Section 3.1(m), People's United Bank has purchased all of the assets and asset-related offensive litigation liabilities not specifically withheld by the FDIC.

4)   The FDIC has assured People's United Bank that the Shared Loss Agreements signed on the same date as the above Purchase and Assumption Agreement, encompass the assets included in the deficiency that is being collected in the above entitled matter, and are not among assets specifically withheld by the FDIC.

5)   As the FDIC has not withheld the assets included in the Butler Bank litigation against the above-mentioned Defendants, the above case should not be dismissed or removed to Federal Court, but should be allowed to proceed pursuant to the proposed amended tracking order, filed in a motion herewith.

6)   Defendant did not follow the Rule of 9A in presenting his Notice of Disallowance, using the same document, both as a response to the Plaintiff's Motion to Amend the Tracking Order, and Notice to the Court.  The Defendant mailed his response directly to the Court with a copy to opposing counsel in clear violation of Rule 9A.  As such, the Defendant's pleading should not be allowed by this court.

For the above stated reasons, the Plaintiff's Motion in Opposition to Defendant's Notice of Disallowance should be allowed, and the Plaintiff's Motion to Amend Tracking Order should be allowed, filed herewith along with Defendant's alleged opposition, pursuant to Rule 9A.

Respectfully submitted,
People's United Bank
By Its Attorney,

Matthew C. Donahue
BBO# 548280
Eno, Boulay, Martin & Donahue, LLP
21 George Street
Lowell, MA  01852
(978) 452-8902

CERTIFICATE OF SERVICE

I, Matthew C. Donahue, do hereby certify that I have this day caused the attached Motion to Strike Docketing of Defendant's Notice of Disallowance to be served upon all parties by virtue of First Class Mail, postage pre-paid, to the following attorneys:

Joseph A. Foistner, Esq.
Foistner Law Offices, P.C.
800 Turnpike Street, Suite 300
N. Andover, MA  01845
(603) 487-1169

Robert S. Carey, Esq.
Orr & Reno, Professional Association
One Eagle Square, PO Box 3550
Concord, NH  03302-3550
(603) 224-2381

Matthew C. Donahue

Dated: December 21, 2010

# EXHIBIT D

# ARTICLE II
# ASSUMPTION OF LIABILITIES

*IS PEOPLES BA*

**2.1** **Liabilities Assumed by Assuming Institution.** The Assuming Institution expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):

*see CM*

(a)     Assumed Deposits, except those Deposits specifically listed on Schedule 2.1(a); provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Institution agrees to properly secure such Deposits with such Assets as appropriate which, prior to Bank Closing, were pledged as security by the Failed Bank, or with assets of the Assuming Institution, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b)     liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c)     borrowings from Federal Reserve Banks and Federal Home Loan Banks, if any, provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

(d)     ad valorem taxes applicable to any Asset, if any; provided, that the assumption of any ad valorem taxes pursuant to this paragraph shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)     liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including Bank Closing); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)     United States Treasury tax and loan note option accounts, if any;

9

(g)    liabilities for any acceptance or commercial letter of credit (including any "standby letters of credit" as defined in 12 C.F.R. Section 337.2(a) issued on the behalf of any Obligor of a Loan acquired hereunder by the Assuming Institution, but excluding any other standby letters of credit); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)    duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's Records, credit card business, overdraft protection plans, safe deposit business, safekeeping business or trust business, if any;

(i)    liabilities, if any, for Commitments;

(j)    liabilities, if any, for amounts owed to any Subsidiary of the Failed Bank acquired under Section 3.1;

(k)    liabilities, if any, with respect to Qualified Financial Contracts;

(l)    duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others, including (i) any seller obligations, including seller origination; and repurchase obligations, and (ii) any government sponsored enterprise ("GSE") seller or servicer obligations, provided that, if the Assuming Institution is not an approved GSE servicer, or does not intend or is unable to become an approved GSE servicer, the Assuming Institution will cooperate with Receiver and the GSE to effect the transfer of any such servicing obligations to a GSE approved servicer; and

*PEOPLES BANK ASSUMES:*
*→*

(m)    all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a shared-loss agreement, and provided that all other defensive litigation and any class actions with respect to credit card business are retained by the Receiver.

Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

**2.2    Interest on Deposit Liabilities.**    The Assuming Institution agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at a rate(s) it shall determine; provided, that for non-transaction Deposit liabilities such rate(s) shall not be less than the lowest rate offered by the Assuming Institution to its depositors for non-transaction deposit accounts. The Assuming Institution shall permit each depositor to withdraw, without penalty for early withdrawal, all or any portion of such

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, ss.                                          NORTHERN DISTRICT

Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522

## MOTION OF FDIC-RECEIVER TO INTERVENE
## AND TO BE SUBSTITUTED IN PLACE OF BUTLER BANK

The Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Bank ("FDIC-Receiver") hereby moves this Court for an order substituting FDIC-Receiver for the defendant Butler Bank. In support of this Motion, FDIC-Receiver states as follows:

1.     On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank, Lowell, Massachusetts and tendered to the FDIC the appointment as Liquidating Agent to act as Receiver. Pursuant to 12 U.S.C. § 1821 (c ) the FDIC accepted its appointment as Receiver that same day. *See Affidavit of William A. Starnes in Support of Motion of FDIC-Receiver* (Starnes Aff.) at ¶ 3, Exhibit A.

2.     On the same day that the FDIC was appointed as Receiver of Butler Bank, it sold the assets and only certain designated liabilities of Butler Bank to People's United Bank ("PUB") of Bridgeport, CT pursuant to a written Purchase and Assumption Agreement ("P&A Agreement"). *Starnes Aff.* at ¶ 4

3.     The instant litigation is a liability of Butler Bank which was not transferred to PUB under the P&A Agreement and thus has been retained by FDIC-Receiver. *Starnes Aff.* at ¶ 5

20

4.      By its appointment as Receiver for Butler Bank, FDIC-Receiver succeeded by operation of law to "all rights, titles, powers and privileges" of Butler Bank and was authorized to "take over the assets and operate" the bank with all powers thereof.  12 U.S.C. §§1821(d)(2)(A)(i), 1821(d)(2)(B)(i).  This authority includes the power to resolve outstanding claims against Butler Bank.

5.      FDIC-Receiver now 'stands in the shoes' of Butler Bank for purposes of the claims asserted against Butler Bank by the Plaintiffs in this action.  *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) ("[T]he FDIC as receiver 'steps into the shoes' of the failed [financial institution]").  Substituting FDIC-Receiver is routine in these circumstances.  *See, e.g., Buczkowski v. FDIC*, 415 F.3d 594, 597 (7th Cir. 2005) ("Any litigant, or the court on its own motion, can substitute the FDIC for the failed bank as a party."); *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 293 n.6 (3d Cir. 2005) (granting the FDIC's motion to substitute as real party in interest after FDIC was appointed as receiver); *Brown Leasing Co. v. Cosmopolitan Bancorp*, 42 F.3d 1112, 1115 (7th Cir. 1994) ("After being appointed as receiver, the FDIC was substituted as defendant in [the bank's] place . . . ").  Accordingly, FDIC-Receiver should be substituted for the defendant Butler Bank.

6.      Accordingly, FDIC-Receiver should be allowed to intervene and should be substituted for Butler Bank as the real party-in-interest.  In further support of this motion, FDIC-Receiver relies on the accompanying *Affidavit of William A. Starnes in Support of Motion of FDIC-Receiver* and exhibits attached thereto.

2

FEDERAL DEPOSIT INSURANCE CORPORATION
IN ITS CAPACITY AS RECEIVER FOR BUTLER
BANK

By its attorney,

Robert A. McCall (Bar No. 14221)
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com

Dated:  December 7, 2012

3

## CERTIFICATE OF SERVICE

I, Robert A. McCall, hereby certify that on this *9th* day of December, 2012, I served the above document, by causing a copy thereof, to be sent via first-class mail to:

Joseph A. Foistner, Esq.
3 Galloway Road, #27
Merrimack, NH  03054

William Aivalikles, Esq.
60 Main Street
Suite 230
Nashua, NH  03060

Robert A. McCall
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com

778346_1
15669-94708

4

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, ss.                                                    NORTHERN DISTRICT


Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522

## AFFIDAVIT OF WILLIAM A. STARNES IN SUPPORT OF MOTION OF FDIC-RECEIVER

William A. Starnes, being duly sworn, deposes and says:

1.      I am employed full time by the Federal Deposit Insurance Corporation ("FDIC"),
at 1601 Bryan Street, Dallas, Texas 75201, in the FDIC's Division of Resolutions and
Receiverships, as Resolution & Closings Manager.  I am familiar with the facts set forth in this
Affidavit.

2.      I submit this Affidavit in support of the FDIC-Receiver's Motion to Intervene and
to be Substituted as Defendant in place of Butler Bank.

3.      On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank in
Lowell, Massachusetts and tendered to the FDIC the appointment as liquidating agent to act as
Receiver.  The FDIC accepted its appointment as Receiver that same day ("FDIC-Receiver").
Attached hereto as Exhibit 1 are true and correct copies of the Massachusetts Division of Banks'
Tender of Appointment to the FDIC and the FDIC's Acceptance of Appointment dated April 16,
2010.

4.     On the same day that the FDIC was appointed as Receiver of Butler Bank, FDIC-Receiver sold the assets and only certain designated liabilities of Butler Bank to People's United Bank ("PUB") of Bridgeport, CT pursuant to a written Purchase and Assumption Agreement ("P&A Agreement").

5.     The instant litigation is a liability of Butler Bank which was not transferred to PUB under the P&A Agreement and thus has been retained by FDIC-Receiver.

Signed under the pains and penalties of perjury this 3ʳᵈ day of December, 2012.

_____
William A. Starnes

STATE OF TEXAS

On Dec 3, 2012, personally appeared before me, William A. Starnes, signing the above affidavit after swearing that the facts contained in the affidavit are true and accurate.

JEFFREY S. MORGAN
Notary Public, State of Texas
My Commission Expires
March 9, 2013

_____
Notary Public
My Commission Expires on

## **CERTIFICATE OF SERVICE**

I, Robert A. McCall, hereby certify that on this ⁴⁄ᵏ day of December, 2012, I served the above document, by causing a copy thereof, to be sent via first-class mail to:

Joseph A. Foistner, Esq.
3 Galloway Road, #27
Merrimack, NH  03054

William Aivalikles, Esq.
60 Main Street
Suite 230
Nashua, NH  03060

Robert A. McCall
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com

778347_1
15669-94708

3

# EXHIBIT 1



# The Commonwealth of Massachusetts

### Office of the Commissioner of Banks
### 1000 Washington Street, 10th Floor
### Boston, Massachusetts 02118

**DEVAL L. PATRICK**
GOVERNOR

**TIMOTHY P. MURRAY**
LIEUTENANT GOVERNOR

**GREGORY BIALECKI**
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

**BARBARA ANTHONY**
UNDERSECRETARY, OFFICE OF
CONSUMER AFFAIRS AND
BUSINESS REGULATION

**STEVEN L. ANTONAKES**
COMMISSIONER OF BANKS

April 16, 2010

Cheryl Bates
Receiver-in-Charge
Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

Dear Ms. Bates:

Pursuant to the authority vested under the provisions of section 26 of Chapter 167 of the Massachusetts General Laws, I, Steven L. Antonakes, as Commissioner of Banks under section 2 of Chapter 26 of the Massachusetts General Laws, hereby tender to the Federal Deposit Insurance Corporation the appointment as Liquidating Agent, in order for it to act as receiver, of Butler Bank, Lowell, Massachusetts, which has been closed and which is in my possession for liquidation pursuant to section 22 of Chapter 167 of the Massachusetts General Laws.

Very truly yours,

Steven L. Antonakes
Commissioner of Banks

**EXHIBIT 1**



## FDIC

**Division of Resolutions and Receiverships**
**Dallas Regional Office**
1601 Bryan Street
Dallas, Texas 75201

Telephone (214) 754-0098

April 16, 2010

Steven L. Antonakes
Commissioner of Banks
Commonwealth of Massachusetts
Division of Banks
1000 Washington Street, 10th Floor
Boston, MA 02118-6400

Subject:     **Butler Bank**
             **Lowell, Massachusetts – In Receivership**
             **Acceptance of Appointment as Receiver**

Dear Commissioner Antonakes:

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: _____
    **Cheryl Bates**
    **Receiver-in-Charge**

**EXHIBIT 1**

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, ss.                                    NORTHERN DISTRICT


Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522


## NOTICE OF APPEARANCE

Please enter my appearance as counsel for Federal Deposit Insurance Corporation in its

capacity as Receiver for Butler Bank in the above referenced matter.

FEDERAL DEPOSIT INSURANCE CORPORATION
IN ITS CAPACITY AS RECEIVER FOR BUTLER
BANK

By its attorney,

Robert A. McCall (Bar No. 14221)
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com


Dated:  December 7, 2012

21

## <u>CERTIFICATE OF SERVICE</u>

I, Robert A. McCall, hereby certify that on this 4/2 day of December, 2012, I served the above document, by causing a copy thereof, to be sent via first-class mail to:

Joseph A. Foistner, Esq.            William Aivalikles, Esq.
3 Galloway Road, #27             60 Main Street
Merrimack, NH  03054             Suite 230
                                     Nashua, NH  03060

Robert A. McCall
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com

778907_1
15669-94708

2

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                   SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

## PLAINTIFFS' RESPONSE TO MOTION OF FDIC-RECEIVER TO INTERVENE AND TO BE SUBSTITUTED IN PLACE OF BUTLER BANK

NOW COME the Plaintiffs in the above entitled matter and in response to the

FDIC's motion say as follows:

1. The Plaintiffs do not object to the FDIC being a named party to the litigation.

2. The Plaintiffs deny the averment in paragraph three (3) of the motion. The

   allegation contained in paragraph six (6) of the motion is denied since the

   People's United Bank has assumed the liabilities of the Plaintiffs' lawsuit and the

   real party of interest is People's United Bank.

3. The Plaintiffs have not objected to the substitution of the FDIC so that this

   disputed issue of responsibility of the liability can be resolved by the Court.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060



Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
et al

Through their Attorney,

Dated: December 12, 2012

_____
William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 12th day of December 2012, been forwarded to Attorney Robert A. McCall, Attorney James Laboe, Attorney Matthew Donahue and the Plaintiffs.

_____
William Aivalikles

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.
Northern District

SUPERIOR COURT
__ COURT
XX JURY

Docket No.  216-2009-CV-00522

Seff Enterprises & Holdings, LLC and
Laurie Foistner

v.

Butler Bank, Robert Chapman, Sr.
VP Butler Bank, Antonia Shelzi and
Hans Harro Hassel

## SPECIAL APPEARANCE

Please enter my special appearance as counsel for Antonia Shelzi in the above-captioned matter.

It is hereby certified that a duplicate of this Special Appearance was mailed on December 12, 2012.

to    William E. Aivalikles, Esq.
      60 Main Street, Suite 230
      Nashua, NH   03060

Dated:  December 12, 2012

James F. Laboe  NH Bar #14571
ORR & RENO, P.A.
One Eagle Square, P.O. Box 3550
Concord, NH  03302-3550
603/224-2381 – phone/603/224-2318 – fax

941530_1

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                           SUPERIOR COURT
NORTHERN DISTRICT

Docket No. 09-cv-0522

Seff Enterprises & Holdings, LLC
Laurie Foistner

v.

Butler Bank
Robert Chapman
Antonia Shelzi
Hans Harro Hassel

**MOTION TO DISMISS**

NOW COMES Antonia Shelzi ("Shelzi") named Defendant in the above-captioned

matter, by and through her attorneys, Orr & Reno, P.A., and moves this Court to dismiss this

action for lack of personal jurisdiction.  In support of this Motion, Shelzi states as follows:

1.     On or about September 1, 2009, the plaintiffs Joseph Foistner, New Boston

Estates, LLC, Waldorf Estates Builders, LLC and Seff Enterprises & Holdings, LLC (the

"Plaintiffs") filed a Writ of Summons in the above-captioned matter.

2.     However, the Plaintiffs failed to serve Shelzi pursuant to RSA 510:4, II.  "Proper

service of process is a necessary prerequisite to obtaining jurisdiction over an out-of-state

defendant." *Lunt v. Gaylor*, 150 N.H. 96, 97 (2003)(quoting *South Down Recreation Assoc. v.

Moran*, 141 N.H. 484, 486 (1994)).  "We consistently require strict compliance with statutory

requirements for service of process." *Id.*  Since the Plaintiffs have failed to comply with the

statutory requirements for service of process under RSA 510:4, II, this case must be dismissed

for lack of personal jurisdiction.

3.     This is similar to the case captioned: *Joseph A. Foistner, et al. v. Antonia Shelzi*, Docket No. 06-E-0189 which this Court (Barry, J.) dismissed for lack of personal jurisdiction. Attached hereto is Judge Barry's order dated September 28, 2006.

4.     The Court's record in this matter confirms that the Plaintiffs failed to meet the statutory requirements for service of process under RSA 510:4, II.

5.     Therefore, this action must be dismissed for lack of personal jurisdiction.

WHEREFORE, Shelzi respectfully requests this Court:

A.     To dismiss this action; and

B.     To grant other and further relief as this Court deems just and proper.


Respectfully submitted,

Antonia Shelzi

By her Attorneys,

Orr & Reno, PA
One Eagle Square
P.O. Box 3550
Concord, New Hampshire, 03302-3550
(603) 224-2381

Dated:  December 12, 2012          By: _____
                                        James F. Laboe

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Motion has been forwarded this 12th day of December 2012 via First Class Mail postage prepaid to William Aivalikles, Esq.

James F. Laboe

941540

# JUDGE BARRY ORDER
# DATED 9-28-2006
# DOCKET NO. 06-E-189

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                     **SUPERIOR COURT**
**Northern District**

Joseph A. Foistner, *pro se*
New Boston Estates, LLC
Waldorf Estates Builders, LLC
Seff Enterprises & Holdings, LLC

v.

Antonia Shelzi

Docket No. 06-E-0189

## ORDER

Hearing was held on Wednesday, September 27, 2006, on the motion to dismiss filed by the defendant, based upon lack of personal jurisdiction, as a result of defective service.  Also scheduled for hearing at the same time were the plaintiff's motion for default judgment and the plaintiff's motion to strike the appearance of Orr and Reno.

The Court finds initially, that the special appearance filed by Attorney Laboe preserves the defendant's right to seek dismissal based upon lack of jurisdiction, as a result of lack of personal service.

Service of process on nonresident defendants is governed by RSA 510:4, which provides in section II:

> II. SERVICE OF PROCESS ON SECRETARY OF
> STATE.  Service of process upon any person who is subject
> to the jurisdiction of this state, as provided in this section,
> may be made by leaving a copy thereof, with a fee of $10, in
> the hands or office of the secretary of state.  Such service

shall be of the same legal force and effect as if served on
the defendant at his abode or place of business in the state
or country where he resides and according to the law of that
state or country, provided that notice thereof and a copy of
the process is forthwith sent by registered mail, postage
prepaid, by the plaintiff or his attorney to the defendant at his
last known abode or place of business in the state or country
in which the defendant resides.  The defendant's return
receipt and an affidavit of the plaintiff or his attorney of
compliance with the section shall be appended to the
process and entered therewith.  In the event that the notice
and a copy of the process are not delivered to or accepted
by the defendant, the court may order such additional notice,
if any, as justice may require.

Counsel for the defendant represented that the defendant received a call from the sheriff's office to pick up some papers.  He further represented that she picked up papers essentially involving the complaint in this case, which was not accompanied by a writ of summons or order of notice setting forth a return date by which the defendant was to appear.

Service on nonresidents has been specifically addressed by the New Hampshire Supreme Court in two recent cases.  In the case of <u>South Down Recreation Assoc. v. Moran</u> 141 N.H. 484 (1996), the court held at page 487-88.

RSA 510:4, II provides no explicit authorization for
out-of-state personal service.  It provides that when
jurisdiction is vested in New Hampshire courts by virtue of
RSA 510:4, I, substituted service, made by registered mail
and by service on the secretary of state, will "be of the same
legal force and effect as if served on the defendant at his
abode ... in the state ... where he resides." *Id.*  This
language does not authorize out-of-state personal service.
*Compare* RSA 510:4, II with *Vt.R.Civ.P.* 4(e) (specifically

- 2 -

providing that out-of state defendants "may be served ... in the same manner as service is made within the state").

More recently, the New Hampshire Supreme Court held in the case of Margaret Lunt v. Gaylor 150 N.H. 96 (2003) at p. 97:

..."Proper service of process is a necessary prerequisite to obtaining jurisdiction over an out-of-state defendant...

In that case, the Court found that the out-of-state defendants were never properly served and the Court, therefore, never obtained personal jurisdiction over them.  Such is the situation in this case.

After hearing, the defendant's motion to dismiss for lack of proper service is **GRANTED**.

The plaintiff's motion for default and motion to strike appearance of Orr and Reno are therefore, moot.

So ordered.

Date: _____ 20 Sept. 2006 _____            _____ _____

JAMES J. BARRY, JR.
Presiding Justice

- 3 -

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, ss.                                        NORTHERN DISTRICT

Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522

## OPPOSITION OF FDIC-RECEIVER TO PLAINTIFFS' MOTION TO AMEND COMPLAINT BY SUBSTITUTING PARTY

The Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Bank

("FDIC-Receiver") hereby submits the following opposition to plaintiffs' *Motion to Amend*

*Complaint by Substituting Party* ("Plaintiffs' Motion").  For the following reasons, Plaintiffs'

Motion should be denied, as the FDIC-Receiver is the only proper party to defend this action as

against Butler Bank.[1]

### ARGUMENT

**I.   THE FDIC-RECEIVER IS THE PROPER PARTY TO DEFEND THE INSTANT CLAIMS AGAINST BUTLER BANK.**

Upon its appointment and acceptance as receiver on April 16, 2010, the FDIC-Receiver

succeeded by operation of law to all rights, titles, powers and privileges of Butler Bank.  *See* 12

U.S.C. §1821(d)(2).  As such, the FDIC-Receiver "stands in the shoes" of Butler Bank as a

proper party defendant on the claims asserted by the Plaintiffs.  *See* §1821(d)(2)(B); *see also*

---

[1] Prior to the filing of the Plaintiffs' Motion, the FDIC-Receiver filed with this Court a *Motion of FDIC-Receiver to Intervene and to be Substituted in Place of Butler Bank* ("FDIC Motion to Intervene"). The FDIC-Receiver hereby incorporates the arguments contained in the FDIC Motion to Intervene.



*O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) ("[T]he FDIC as receiver 'steps into the shoes' of the failed [financial institution]."). Substitution of the FDIC-Receiver as defendant is routine in these circumstances. *See, e.g., Buczkowski v. FDIC*, 415 F.3d 594, 597 (7th Cir. 2005) ("Any litigant, or the court on its own motion, can substitute the FDIC for the failed bank as a party."); *In re Community Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 293 n.6 (3d Cir. 2005) (granting the FDIC's motion to substitute as real party in interest after FDIC was appointed as receiver); *Brown Leasing Co. v. Cosmopolitan Bancorp*, 42 F.3d 1112, 1115 (7th Cir. 1994) ("After being appointed as receiver, the FDIC was substituted as defendant in [the bank's] place . . . "). Accordingly, the FDIC-Receiver is the proper party to defend the instant claims against Butler Bank, and therefore, the Plaintiffs' motion to substitute People's United Bank ("PUB") for Butler Bank must be denied.

## II.    BY AGREEMENT, THE FDIC-RECEIVER HAS FULL DISCRETION TO DEFEND ALL CLAIMS AGAINST BUTLER BANK.

Pursuant to written agreement, the FDIC-Receiver has full discretion to defend any and all claims made against Butler Bank, including the instant matter. On the very same day that the FDIC was appointed as Receiver of Butler Bank, it sold the assets *and certain designated liabilities* of Butler Bank to PUB pursuant to the Purchase and Assumption Agreement ("P&A Agreement") between the FDIC-Receiver and PUB. A copy of the P&A Agreement is attached hereto as **Exhibit A**.[2] Provision 9.3(a) of the P&A Agreement gives the FDIC full discretion to defend or settle any claim against the failed financial institution, stating as follows:

---

[2] The FDIC-Receiver asks that the Court take judicial notice of the P&A Agreement which is available on the FDIC's website at: http://www.fdic.gov/bank/individual/failed/butlerbank_p_and_a.pdf . *See Branch v. FDIC*, 825 F. Supp. 384, 398 n.8 (D. Mass. 1993) ("[a]lthough the . . . Purchase and Assumption Agreements . . . are incorporated in Branch's Complaints only by reference, their authenticity is not disputed and it is well established that a district court may take judicial notice of public records . . . "); *see also* N.H. R. EVID. 201(a) (noting that a court may take judicial notice of a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.")

> The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Institution with respect to which the Receiver has indemnified the Assuming Institution in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Institution with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing.

Provision 9.3 is clear in its granting of authority to the FDIC-Receiver to defend the present claims brought against Butler Bank, a claim which existed "on or before Bank Closing." The instant litigation is a liability of Butler Bank which was not transferred to PUB under the P&A Agreement and thus has been retained by FDIC-Receiver. *See Yeomalakis v. FDIC*, 562 F.3d 56, 60 (2009) (First Circuit holding that under the P&A Agreement provision similar to the one at issue here, the assuming institution was not a proper defendant to a borrower claim). For this reason, the Plaintiffs' motion to substitute PUB for Butler Bank must be denied.

## III.   PLAINTIFFS HAVE ACKNOWLEDGED THAT THIS LAWSUIT IS NOT RELATED TO THE MASSACHUSETTS LAWSUIT AND PUB'S RIGHT TO SUE ON THE DEBT.

The Plaintiffs' present assertion that the instant action concerns an "asset-related offensive litigation liability" of Butler Bank is inconsistent with their prior pleadings. The purported offensive action is the first-filed case pending in Massachusetts, styled *Butler Bank v. Shelzi, et al.*, MICV2009-02583, pending in Middlesex Superior Court ("Massachusetts action"). In June 2009, Butler Bank filed the Massachusetts action, seeking a deficiency judgment against Antonia Shelzi and Laurie Foistner, resulting from the foreclosure of the Waldorf Estates Subdivision. *See Plaintiffs' Motion*, ¶ 2. Rather than filing a counterclaim in the Massachusetts action, the Plaintiffs filed the instant action months later. This is so even though the Massachusetts Rules of Civil Procedure requires a claim to be plead as a counterclaim where it arises out of the subject matter of the complaint. Mass. R. Civ. P. 13(a) ("A pleading shall state

as a counterclaim any claim for relief the court has power to give which at the time of serving the pleading the pleader has against any opposing party . . . ").

Plaintiffs did not file the instant claim as a counterclaim in the Massachusetts action because they believe that it is a claim separate and apart from that pending in Massachusetts. Their prior position was that this case is not a defense to the collection action pending in Massachusetts (the "offensive-related liability") but a separate RICO conspiracy claim arising out of misuse of bank accounts by former business associates of plaintiffs. For this additional reason, the Plaintiffs' motion to substitute PUB for Butler Bank must be denied.

## IV.   PLAINTIFFS HAVE NO STANDING TO ASSERT CLAIMS AGAINST PEOPLE'S UNITED BANK.

The Plaintiffs' Motion must be denied for the additional reason that they have no standing to assert any claims against PUB under the P&A Agreement. The Plaintiffs are not a party to the P&A Agreement, which explicitly states that the Agreement is by and among only: (1) "the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF BUTLER BANK, LOWELL, MASSACHUSETTS** (the 'Receiver')"; (2) "**PEOPLE'S UNITED BANK**, organized under the laws of the United States of America, and having its principal place of business in **BRIDGEPORT, CONNECTICUT** (the 'Assuming Institution')"; and (3) "the **FEDERAL DEPOSIT INSURANCE CORPORATION** (the 'Corporation')", organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity." *See P&A Agreement*, p. 1.

In fact, the explicit terms of the P&A Agreement clearly provide that no third party is a beneficiary of any rights under the Agreement. Section 13.5, "**Successors**," states as follows:

> All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Institution. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Institution any legal or equitable right, remedy or claim under or with respect to this Agreement or any

4

provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Institution and for the benefit of no other Person.

The Plaintiffs' Motion must therefore be denied for the additional reason that the

Plaintiffs have no standing to assert claims against PUB under the explicit terms of the P&A

Agreement.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs' *Motion to Amend Complaint by Substituting Party* should be denied.

FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CAPACITY AS RECEIVER FOR BUTLER BANK

By its attorney,

Robert A. McCall (Bar No. 14221)
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
Tel. (617) 951-2100
Fax. (617) 951-2125
rmccall@peabodyarnold.com

Dated:  December /9, 2012

## CERTIFICATE OF SERVICE

I, Robert A. McCall, hereby certify that on this 14th day of December, 2012, I served the above document, by causing a copy thereof, to be sent via first-class mail to:

Joseph A. Foistner, Esq.
3 Galloway Road, #27
Merrimack, NH  03054

William Aivalikles, Esq.
60 Main Street
Suite 230
Nashua, NH  03060

Robert A. McCall

779453_1
15669-94708

**PURCHASE AND ASSUMPTION AGREEMENT**

**WHOLE BANK**

**ALL DEPOSITS**

**AMONG**

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF BUTLER BANK,
LOWELL, MASSACHUSETTS**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**and**

**PEOPLE'S UNITED BANK
BRIDGEPORT, CONNECTICUT**

**DATED AS OF**

**APRIL 16, 2010**

# TABLE OF CONTENTS

**ARTICLE I**          **DEFINITIONS** ........................................................2

**ARTICLE II**         **ASSUMPTION OF LIABILITIES**.................................9

    2.1        Liabilities Assumed by Assuming Institution.............................9
    2.2        Interest on Deposit Liabilities................................................10
    2.3        Unclaimed Deposits..............................................................11
    2.4        Employee Plans.....................................................................11

**ARTICLE III**        **PURCHASE OF ASSETS** ........................................11

    3.1        Assets Purchased by Assuming Institution .............................11
    3.2        Asset Purchase Price ..............................................................12
    3.3        Manner of Conveyance; Limited Warranty;
                    Nonrecourse; Etc....................................................12
    3.4        Puts of Assets to the Receiver................................................13
    3.5        Assets Not Purchased by Assuming Institution ......................15
    3.6        Assets Essential to Receiver ..................................................16

**ARTICLE IV**        **ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS**........17

    4.1        Continuation of Banking Business..........................................17
    4.2        Agreement with Respect to Credit Card Business....................18
    4.3        Agreement with Respect to Safe Deposit Business .................18
    4.4        Agreement with Respect to Safekeeping Business...................18
    4.5        Agreement with Respect to Trust Business .............................18
    4.6        Agreement with Respect to Bank Premises.............................19
    4.7        Agreement with Respect to Leased Data
                    Processing Equipment..............................................22
    4.8        Agreement with Respect to Certain
                    Existing Agreements.................................................23
    4.9        Informational Tax Reporting ..................................................24
    4.10      Insurance ...............................................................................24
    4.11      Office Space for Receiver and Corporation.............................24
    4.12      Agreement with Respect to Continuation of Group
                    Health Plan Coverage for Former Employees ...........25
    4.13      Agreement with Respect to Interim Asset Servicing ...............26
    4.14      Reserved ................................................................................26
    4.15      Agreement with Respect to Loss Sharing ...............................26

Module 1 – Whole Bank w/ Loss Share – P&A                       BUTLER BANK
Version 2.02                        ii                     LOWELL, MASSACHUSETTS
March 19, 2010

| | | |
|---|---|---|
| **ARTICLE V** | **DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK** | **26** |
| 5.1 | Payment of Checks, Drafts and Orders | 26 |
| 5.2 | Certain Agreements Related to Deposits | 26 |
| 5.3 | Notice to Depositors | 27 |
| **ARTICLE VI** | **RECORDS** | **27** |
| 6.1 | Transfer of Records | 27 |
| 6.2 | Delivery of Assigned Records | 28 |
| 6.3 | Preservation of Records | 28 |
| 6.4 | Access to Records; Copies | 28 |
| **ARTICLE VII** | **BID; INITIAL PAYMENT** | **26** |
| **ARTICLE VIII** | **ADJUSTMENTS** | **29** |
| 8.1 | Pro Forma Statement | 29 |
| 8.2 | Correction of Errors and Omissions; Other Liabilities | |
| 8.3 | Payments | 30 |
| 8.4 | Interest | 30 |
| 8.5 | Subsequent Adjustments | 30 |
| **ARTICLE IX** | **CONTINUING COOPERATION** | **31** |
| 9.1 | General Matters | 31 |
| 9.2 | Additional Title Documents | 31 |
| 9.3 | Claims and Suits | 31 |
| 9.4 | Payment of Deposits | 31 |
| 9.5 | Withheld Payments | 32 |
| 9.6 | Proceedings with Respect to Certain Assets and Liabilities | 32 |
| 9.7 | Information | 33 |
| **ARTICLE X** | **CONDITION PRECEDENT** | **33** |
| **ARTICLE XI** | **REPRESENTATIONS AND WARRANTIES OF THE ASSUMING INSTITUTION** | **33** |
| **ARTICLE XII** | **INDEMNIFICATION** | **34** |
| 12.1 | Indemnification of Indemnitees | 34 |
| 12.2 | Conditions Precedent to Indemnification | 37 |
| 12.3 | No Additional Warranty | 38 |
| 12.4 | Indemnification of Corporation and Receiver | 38 |
| 12.5 | Obligations Supplemental | 39 |

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

iii

BUTLER BANK
LOWELL, MASSACHUSETTS

| | | |
|---|---|---|
| 12.6 | Criminal Claims | 39 |
| 12.7 | Limited Guaranty of the Corporation | 39 |
| 12.8 | Subrogation | 39 |
| **ARTICLE XIII** | **MISCELLANEOUS** | **40** |
| 13.1 | Entire Agreement | 40 |
| 13.2 | Headings | 40 |
| 13.3 | Counterparts | 40 |
| 13.4 | Governing Law | 40 |
| 13.5 | Successors | 40 |
| 13.6 | Modification; Assignment | 40 |
| 13.7 | Notice | 40 |
| 13.8 | Manner of Payment | 41 |
| 13.9 | Costs, Fees and Expenses | 41 |
| 13.10 | Waiver | 42 |
| 13.11 | Severability | 42 |
| 13.12 | Term of Agreement | 42 |
| 13.13 | Survival of Covenants, Etc. | 42 |

## SCHEDULES

| | | |
|---|---|---|
| 2.1 | Certain Liabilities Assumed | 44 |
| 2.1(a) | Excluded Deposit Liability Accounts | 45 |
| 3.1 | Certain Assets Purchased | 46 |
| 3.2 | Purchase Price of Assets or Assets | 47 |
| 3.5(l) | Excluded Securities | 49 |
| 4.15A | Single Family Shared-Loss Loans | 50 |
| 4.15B | Commercial Shared-Loss Share Loans | 51 |
| 4.15C | Shared-Loss Securities | 52 |
| 7 | Calculation of Deposit Premium | 52 |

## EXHIBITS

| | | |
|---|---|---|
| 2.3A | Final Notice Letter | 55 |
| 2.3B | Affidavit of Mailing | 57 |
| 4.13 | Interim Asset Servicing Arrangement | 60 |
| 4.15A | Single Family Shared-Loss Agreement | 62 |
| 4.15B | Commercial Shared-Loss Agreement | 103 |

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

## ALL DEPOSITS

**THIS AGREEMENT**, made and entered into as of the **16th day of APRIL, 2010,** by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of BUTLER BANK, LOWELL, MASSACHUSETTS** (the "Receiver"), **PEOPLE'S UNITED BANK**, organized under the laws of the United States of America, and having its principal place of business in **BRIDGEPORT, CONNECTICUT** (the "Assuming Institution"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

## WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed **BUTLER BANK** (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, the Assuming Institution desires to purchase certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Institution to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Institution on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

# ARTICLE I
# DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" means Subsidiaries of the Failed Bank acquired pursuant to Section 3.1.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Agreement**" means this Purchase and Assumption Agreement by and among the Assuming Institution, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Deposits.

"**Bank Closing**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

"**Bank Premises**" means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with adjacent parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, and unimproved land that are owned or leased by the Failed Bank and that have formerly been utilized, are currently utilized, or are intended to be utilized in the future by the Failed Bank as shown on the Accounting Record of the Failed Bank as of Bank Closing.

"**Bid Amount**" has the meaning provided in Article VII.

"**Bid Valuation Date**" means **February 10, 2010**.

"**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Receiver for

differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Institution shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income, fees or expenses, or general or specific reserves on the Accounting Records of the Failed Bank. For Shared-Loss Securities, Book Value means the value of the security provided in the Information Package.

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. Section 1821(c), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Institution, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Deposit Secured Loan**" means a loan in which the only collateral securing the loan is Assumed Deposits or deposits at other insured depository institutions

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fair Market Value**" means (i)(a) "Market Value" as defined in the regulation prescribing the standards for real estate appraisals used in federally related transactions, 12 C.F.R. § 323.2(g), and accordingly shall mean the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;
(2) Both parties are well informed or well advised, and acting in what they consider their own best interests;
(3) A reasonable time is allowed for exposure in the open market;
(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the

sale;

as determined as of Bank Closing by an appraiser chosen by the Assuming Institution from a list of acceptable appraisers provided by the Receiver; any costs and fees associated with such determination shall be shared equally by the Receiver and the Assuming Institution, and (b) which, with respect to Bank Premises (to the extent, if any, that Bank Premises are purchased utilizing this valuation method), shall be determined not later than sixty (60) days after Bank Closing by an appraiser selected by the Receiver and the Assuming Institution within seven (7) days after Bank Closing; or (ii) with respect to property other than Bank Premises purchased utilizing this valuation method, the price therefore as established by the Receiver and agreed to by the Assuming Institution, or in the absence of such agreement, as determined in accordance with clause (i)(a) above.

"**First Loss Tranche**" means the amount of loss the Assuming Institution shall absorb prior to the commencement of loss sharing and it must be stated as zero or a positive number. The First Loss Tranche bid is expressed as a percentage of the Book Value of Assets covered by loss sharing. The First Loss Tranche must be a positive number.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment, other than motor vehicles, leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing and located on or at Bank Premises, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance, security systems and artwork. Motor vehicles shall be considered other assets and pass at Book Value. Furniture and equipment located at a storage facility not adjacent to a Bank Premises are excluded from this definition.

"**Indemnitees**" means, except as provided in paragraph (11) of Section 12.1(b), (i) the Assuming Institution, (ii) the Subsidiaries and Affiliates of the Assuming Institution <u>other than</u> any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Institution, and (iii) the directors, officers, employees and agents of the Assuming Institution and its Subsidiaries and Affiliates who are <u>not</u> also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

"**Information Package**" means the most recent compilation of financial and other data with respect to the Failed Bank, including any amendments or supplements thereto, provided to the Assuming Institution by the Corporation on the web site used by the Corporation to market the Failed Bank to potential acquirers.

"**Initial Payment**" means the payment made pursuant to Article VII (based on the best information available as of the Bank Closing Date), the amount of which shall be either (i) if the Bid Amount is positive, the aggregate Book Value of the Liabilities Assumed minus the sum of the aggregate purchase price of the Assets and assets purchased and the positive Bid Amount, or (ii) if the Bid Amount is negative, the sum of the aggregate Book Value of the Liabilities Assumed and the negative Bid Amount minus the aggregate purchase price of the Assets and assets purchased. The Initial Payment shall be payable by the Corporation to the Assuming Bank if (i) the Liabilities Assumed are greater than the sum of the positive Bid Amount and the Assets and assets purchased, or if (ii) the sum of the Liabilities Assumed and the negative Bid Amount are greater than the Assets and assets purchased. The Initial Payment shall be payable by the Assuming Bank to the Corporation if (i) the Liabilities Assumed are less than the sum of the positive Bid Amount and the Assets and assets purchased, or if (ii) the sum of the Liabilities Assumed and the negative Bid Amount is less than the Assets and assets purchased. Such Initial Payment shall be subject to adjustment as provided in Article VIII.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loans**" means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i)     loans (including loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to and including the Bid Valuation Date), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii)     all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii)     all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

"**Other Real Estate**" means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Bank.

"**Payment Date**" means the first Business Day after the Bank Closing Date.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Primary Indemnitor**" means any Person (other than the Assuming Institution or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Pro forma**" means producing a balance sheet that reflects a reasonably accurate financial statement of the Failed bank through the date of closing. The pro forma financial statements serve as a basis for the opening entries of both the Assuming Institution and the Receiver.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Institution, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Institution (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Repurchase Price**" means, with respect to any Loan the Book Value, adjusted to reflect changes to Book Value after Bank Closing, plus (i) any advances and interest on such Loan after Bank Closing, minus (ii) the total of amounts received by the Assuming Institution for such Loan, regardless of how applied, after Bank Closing, plus (iii) advances made by Assuming Institution, plus (iv) total disbursements of principal made by Receiver that are not included in the Book Value.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is three hundred sixty-five (365) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Institution. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Shared-Loss Securities**" means those securities and other assets listed on Schedule 4.15C.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

**2.1**    **Liabilities Assumed by Assuming Institution.** The Assuming Institution expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):

(a)    Assumed Deposits, except those Deposits specifically listed on Schedule 2.1(a); provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Institution agrees to properly secure such Deposits with such Assets as appropriate which, prior to Bank Closing, were pledged as security by the Failed Bank, or with assets of the Assuming Institution, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b)    liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c)    borrowings from Federal Reserve Banks and Federal Home Loan Banks, if any, provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

(d)    ad valorem taxes applicable to any Asset, if any; provided, that the assumption of any ad valorem taxes pursuant to this paragraph shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)    liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including Bank Closing); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)    United States Treasury tax and loan note option accounts, if any;

(g)     liabilities for any acceptance or commercial letter of credit (including any "standby letters of credit" as defined in 12 C.F.R. Section 337.2(a) issued on the behalf of any Obligor of a Loan acquired hereunder by the Assuming Institution, but excluding any other standby letters of credit); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)     duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's Records, credit card business, overdraft protection plans, safe deposit business, safekeeping business or trust business, if any;

(i)     liabilities, if any, for Commitments;

(j)     liabilities, if any, for amounts owed to any Subsidiary of the Failed Bank acquired under Section 3.1;

(k)     liabilities, if any, with respect to Qualified Financial Contracts;

(l)     duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others, including (i) any seller obligations, including seller origination; and repurchase obligations, and (ii) any government sponsored enterprise ("GSE") seller or servicer obligations, provided that, if the Assuming Institution is not an approved GSE servicer, or does not intend or is unable to become an approved GSE servicer, the Assuming Institution will cooperate with Receiver and the GSE to effect the transfer of any such servicing obligations to a GSE approved servicer; and

(m)     all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a shared-loss agreement, and provided that all other defensive litigation and any  class actions with respect to credit card business are retained by the Receiver.

Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

2.2     **Interest on Deposit Liabilities.** The Assuming Institution agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at a rate(s) it shall determine; provided, that for non-transaction Deposit liabilities such rate(s) shall not be less than the lowest rate offered by the Assuming Institution to its depositors for non-transaction deposit accounts. The Assuming Institution shall permit each depositor to withdraw, without penalty for early withdrawal, all or any portion of such

depositor's Deposit, whether or not the Assuming Institution elects to pay interest in accordance with any deposit agreement formerly existing between the Failed Bank and such depositor; and further provided, that if such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge. The Assuming Institution shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay and of such withdrawal rights.

    **2.3**    **Unclaimed Deposits.** Fifteen (15) months following the Bank Closing Date, the Assuming Institution will provide the Receiver a listing of all deposit accounts, including the type of account, not claimed by the depositor. The Receiver will review the list and authorize the Assuming Institution to act on behalf of the Receiver to send a "Final Legal Notice" in a form substantially similar to Exhibit 2.3A to the owner(s) of the unclaimed deposits reminding them of the need to claim or arrange to continue their account(s) with the Assuming Institution. The Assuming Institution will send the "Final Legal Notice" to the depositors within thirty (30) days following notification of the Receiver's authorization. The Assuming Institution will prepare an Affidavit of Mailing and will forward the Affidavit of Mailing to the Receiver after mailing out the "Final Legal Notice" in a form substantially similar to Exhibit 2.3B to the owner(s) of unclaimed deposit accounts.

    If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Institution, the Assuming Institution shall, within fifteen (15) Business Days after the end of such eighteen (18) month period, (i) refund to the Receiver the full amount of each such deposit (without reduction for service charges), (ii) provide to the Receiver a schedule of all such refunded Deposits in such form as may be prescribed by the Receiver, and (iii) assign, transfer, convey, and deliver to the Receiver, all right, title, and interest of the Assuming Institution in and to the Records previously transferred to the Assuming Institution and other records generated or maintained by the Assuming Institution pertaining to such Deposits. During such eighteen (18) month period, at the request of the Receiver, the Assuming Institution promptly shall provide to the Receiver schedules of unclaimed deposits in such form as may be prescribed by the Receiver.

    **2.4**    **Employee Plans.** Except as provided in Section 4.12, the Assuming Institution shall have no liabilities, obligations or responsibilities under the Failed Bank's health care, bonus, vacation, pension, profit sharing, deferred compensation, 401K or stock purchase plans or similar plans, if any, unless the Receiver and the Assuming Institution agree otherwise subsequent to the date of this Agreement.

### ARTICLE III
### PURCHASE OF ASSETS

    **3.1**    **Assets Purchased by Assuming Institution**. With the exception of certain assets expressly excluded in Sections 3.5 and 3.6, the Assuming Institution hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Institution, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint

ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. Schedule 3.1 attached hereto and incorporated herein sets forth certain categories of Assets purchased hereunder. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII. Assets are purchased hereunder by the Assuming Institution subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. Notwithstanding Section 4.8, the Assuming Institution specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

**3.2     Asset Purchase Price**.

(a)     All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Institution shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank before the Bid Valuation Date shall be purchased at a price of zero.

(b)     The purchase price for securities (other than the capital stock of any Acquired Subsidiary, Shared-Loss Securities, FRB and FHLB stock) purchased under Section 3.1 by the Assuming Institution shall be the market value thereof as of Bank Closing, which market value shall be (i) the market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P., or alternatively, at the discretion of the Receiver, IDC/Financial Times (FT) Interactive Data; (ii) provided, that if such market price is not available for any such security, the Assuming Institution will submit a bid for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Institution and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from the Assuming Institution, each such security shall not pass to the Assuming Institution and shall be deemed to be an excluded asset hereunder.

(c)     Qualified Financial Contracts shall be purchased at market value determined in accordance with the terms of Exhibit 3.2(c). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Institution.

**3.3     Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.** THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING INSTITUTION UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY,

**COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.**

    3.4    **Puts of Assets to the Receiver.**

    (a)    **Puts Within 30 Days After Bank Closing**. During the thirty (30)-day period following Bank Closing and only during such period (which thirty (30)-day period may be extended in writing in the sole absolute discretion of the Receiver for any Loan), in accordance with this Section 3.4, the Assuming Institution shall be entitled to require the Receiver to purchase any Deposit Secured Loan transferred to the Assuming Institution pursuant to Section 3.1 which is not fully secured by Assumed Deposits or deposits at other insured depository institutions due to either insufficient Assumed Deposit or deposit collateral or deficient documentation regarding such collateral;  provided with regard to any Deposit Secured Loan secured by an Assumed Deposit, no such purchase may be required until any Deposit setoff determination, whether voluntary or involuntary, has been made; and,

at the end of the thirty (30)-day period following Bank Closing and at that time only, in accordance with this Section 3.4, the Assuming Institution shall be entitled to require the Receiver to purchase any remaining overdraft transferred to the Assuming Institution pursuant to 3.1 which both was made after the Bid Valuation Date and was not made pursuant to an overdraft protection plan or similar extension of credit.

Notwithstanding the foregoing, the Assuming Institution shall not have the right to require the Receiver to purchase any Loan if (i) the Obligor with respect to such Loan is an Acquired Subsidiary, or (ii) the Assuming Institution has:

    (A)    made any advance in accordance with the terms of a Commitment or otherwise with respect to such Loan;

    (B)    taken any action that increased the amount of a Related Liability with respect to such Loan over the amount of such liability immediately prior to the time of such action;

    (C)    created or permitted to be created any Lien on such Loan which secures indebtedness for money borrowed or which constitutes a conditional sales agreement, capital lease or other title retention agreement;

    (D)    entered into, agreed to make, grant or permit, or made, granted or permitted any modification or amendment to, any waiver or extension with respect to, or any renewal, refinancing or refunding of, such Loan or related Credit Documents or collateral, including, without limitation, any act or omission which diminished such collateral; or

    (E)    sold, assigned or transferred all or a portion of such Loan to a third party (whether with or without recourse).

The Assuming Institution shall transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Institution with respect to any such Asset, as provided in Section 12.4.

(b) **Puts Prior to the Settlement Date.** During the period from the Bank Closing Date to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset which the Assuming Bank can establish is evidenced by forged or stolen instruments as of the Bank Closing Date; provided, that, the Assuming Bank shall not have the right to require the Receiver to purchase any such Asset with respect to which the Assuming Bank has taken any action referred to in Section 3.4(a)(ii) with respect to such Asset. The Assuming Bank shall transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset, as provided in Section 12.4.

(c) **Notices to the Receiver.** In the event that the Assuming Institution elects to require the Receiver to purchase one or more Assets, the Assuming Institution shall deliver to the Receiver a notice (a "Put Notice") which shall include:

> (i) a list of all Assets that the Assuming Institution requires the Receiver to purchase;

> (ii) a list of all Related Liabilities with respect to the Assets identified pursuant to (i) above; and

> (iii) a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Institution shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

(d) **Purchase by Receiver.** The Receiver shall purchase Assets that are specified in the Put Notice and shall assume Related Liabilities with respect to such Assets, and the transfer of such Assets and Related Liabilities shall be effective as of a date determined by the Receiver which date shall not be later than thirty (30) days after receipt by the Receiver of the Put Notice (the "Put Date").

(e) **Purchase Price and Payment Date.** Each Asset purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Asset less the Related Liability Amount applicable to such Asset, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Institution the amount

of such difference; if the difference between such amounts is negative, then the Assuming Institution shall pay to the Receiver the amount of such difference. The Assuming Institution or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(d) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

     (f)   **Servicing.** The Assuming Institution shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

     (g)   **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Institution shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

     **3.5**   **Assets Not Purchased by Assuming Institution**. The Assuming Institution does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement:

     (a)   any financial institution bonds, banker's blanket bonds, or public liability, fire, extended coverage insurance policy, bank owned life insurance or any other insurance policy of the Failed Bank, or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

     (b)   any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

     (c)   prepaid regulatory assessments of the Failed Bank, if any;

     (d)   legal or equitable interests in tax receivables of the Failed Bank, if any, including any claims arising as a result of the Failed Bank having entered into any agreement or otherwise being joined with another Person with respect to the filing of tax returns or the payment of taxes;

(e)      amounts reflected on the Accounting Records of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any;

(f)      leased or owned Bank Premises and leased or owned Furniture and Equipment and Fixtures and data processing equipment (including hardware and software) located on leased or owned Bank Premises, if any; provided, that the Assuming Institution does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto;

(g)      owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances;

(h)      any "goodwill," as such term is defined in the instructions to the report of condition prepared by banks examined by the Corporation in accordance with 12 C.F.R. Section 304.3, and other intangibles;

(i)      any criminal restitution or forfeiture orders issued in favor of the Failed Bank;

(j)      reserved;

(k)      assets essential to the Receiver in accordance with Section 3.6;

(l)      the securities listed on the attached Schedule 3.5(l); and

(m)      prepaid accounts associated with any contract or agreement that the Assuming Institution either does not directly assume pursuant to the terms of this Agreement nor has an option to assume under Section 4.8.

### 3.6    Retention or Repurchase of Assets Essential to Receiver.

(a)      The Receiver may refuse to sell to the Assuming Institution, or the Assuming Institution agrees, at the request of the Receiver set forth in a written notice to the Assuming Institution, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Institution's right, title and interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:

    (i)      made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

    (ii)      the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii)   made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv)   secured by collateral which also secures any asset owned by the Receiver; or

(v)   related to any asset of the Failed Bank not purchased by the Assuming Institution under this Article III or any liability of the Failed Bank not assumed by the Assuming Institution under Article II.

(b)   Each such Asset or asset purchased by the Receiver shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming Institution not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. The Assuming Institution agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Asset or asset is purchased by the Receiver. All transfers with respect to Asset or assets under this Section 3.6 shall be made as provided in Section 9.6. The Assuming Institution shall transfer all such Asset or assets and Related Liabilities to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Institution with respect to any such Asset or asset, as provided in Section 12.4.

## ARTICLE IV
## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Institution agrees with the Receiver and the Corporation as follows:

**4.1   Continuation of Banking Business**. For the period commencing the first banking Business Day after Bank Closing and ending no earlier than the first anniversary of Bank Closing, the Assuming Institution will provide full service banking in the trade area of the Failed Bank. Thereafter, the Assuming Institution may cease providing such banking services in the trade area of the Failed Bank, provided the Assuming Institution has received all necessary regulatory approvals. At the option of the Assuming Institution, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area. The trade area shall be determined by the Receiver. For the avoidance of doubt, the foregoing shall not restrict the Assuming Institution from opening, closing or selling branches upon receipt of the necessary regulatory approvals, if the Assuming Institution or its successors continue to provide banking services in the trade area.  Assuming Institution will pay to the Receiver, upon the sale of a branch or branches within the year following the date of this agreement, fifty percent (50%) of any franchise premium in excess of the franchise premium paid by the Assuming Institution with respect to such branch or branches.

**4.2**     **Agreement with Respect to Credit Card Business**. The Assuming Institution agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's credit card business, and/or processing related to credit cards, if any, and assumes all outstanding extensions of credit with respect thereto.

**4.3**     **Agreement with Respect to Safe Deposit Business**. The Assuming Institution assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefore paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Institution may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Institution located in the trade area of the Failed Bank. The Safe Deposit Boxes shall be located and maintained in the trade area of the Failed Bank for a minimum of one year from Bank Closing. The trade area shall be determined by the Receiver. Fees related to the safe deposit business earned prior to the Bank Closing Date shall be for the benefit of the Receiver and fees earned after the Bank Closing Date shall be for the benefit of the Assuming Institution.

**4.4**     **Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Institution and the Assuming Institution accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Institution assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Institution shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto. The Assuming Institution shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing. The assets held for safekeeping by the Failed Bank shall be held and maintained by the Assuming Institution in the trade area of the Failed Bank for a minimum of one year from Bank Closing. At the option of the Assuming Institution, the safekeeping business may be provided at any or all of the Bank Premises, or at other premises within such trade area. The trade area shall be determined by the Receiver. Fees related to the safekeeping business earned prior to the Bank Closing Date shall be for the benefit of the Receiver and fees earned after the Bank Closing Date shall be for the benefit of the Assuming Institution.

**4.5**     **Agreement with Respect to Trust Business**.

(a)     The Assuming Institution shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Institution had assumed the same from the Failed Bank prior to Bank Closing; provided, that any liability based on the misfeasance, malfeasance

or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder.

(b)    The Assuming Institution shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)    In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Institution agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Institution in accomplishing such transfer.

(d)    The Assuming Institution shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

### 4.6    **Agreement with Respect to Bank Premises**.

(a)    **Option to Purchase.** Subject to Section 3.5, the Receiver hereby grants to the Assuming Institution an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to purchase any or all owned Bank Premises, including all Furniture, Fixtures and Equipment located on the Bank Premises. The Assuming Institution shall give written notice to the Receiver within the option period of its election to purchase or not to purchase any of the owned Bank Premises. Any purchase of such premises shall be effective as of the date of Bank Closing and such purchase shall be consummated as soon as practicable thereafter, and in no event later than the Settlement Date. If the Assuming Institution gives notice of its election not to purchase one or more of the owned Bank Premises within seven (7) days of Bank Closing, then, not withstanding any other provision of this Agreement to the contrary, the Assuming Institution shall not be liable for any of the costs or fees associated with appraisals for such Bank Premises and associated Fixtures, Furniture and Equipment.

(b)    **Option to Lease.** The Receiver hereby grants to the Assuming Institution an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Institution any or all leases for leased Bank Premises, if any, which have been continuously occupied by the Assuming Institution from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Institution containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Institution shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Institution agrees to assume all leases assigned (or enter into subleases or new leases

in lieu thereof) pursuant to this Section 4.6.   If the Assuming Institution gives notice of its election not to accept an assignment of a lease for one or more of the leased Bank Premises within seven (7) days of Bank Closing, then, not withstanding any other provision of this Agreement to the contrary, the Assuming Institution shall not be liable for any of the costs or fees associated with appraisals for the Fixtures, Furniture and Equipment located on such leased Bank Premises.

(c)     **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Institution; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Institution or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(d)     **Occupancy.** The Assuming Institution shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Institution has not exercised the option provided in Section 4.6(b). Any such notice shall be deemed to terminate the Assuming Institution's option with respect to such leased Bank Premises.

(e)     **Occupancy Costs.**

(i)     The Assuming Institution agrees to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, during and for the period of any occupancy by it of (x) owned Bank Premises the market rental value, as determined by the appraiser selected in accordance with the definition of Fair Market Value, and all operating costs, and (y) leased Bank Premises, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent. Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent. If the Assuming Institution elects to purchase any owned Bank Premises in accordance with Section 4.6(a), the amount of any rent paid (and taxes paid to the Receiver which have not been paid to the taxing authority and for which the Assuming Institution assumes liability) by the Assuming Institution with respect thereto shall be applied as an offset against the purchase price thereof.

(ii)     The Assuming Institution agrees during the period of occupancy by it of owned or leased Bank Premises, to pay to the Receiver rent for the use of all owned or leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Assuming Institution purchases any owned Furniture and Equipment or owned Fixtures in accordance with Section 4.6(f) or 4.6(h), the amount of any rents paid by the Assuming Institution with respect thereto shall be applied as an offset against the purchase price thereof.

(f)     **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Institution purchases owned Bank Premises or accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises as provided in Section 4.6(a) or 4.6(b), or if the Assuming Institution does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a) or (b), the Assuming Institution shall (i) effective as of the date of Bank Closing, purchase from the Receiver all Furniture and Equipment and Fixtures owned by the Failed Bank at Fair Market Value and located thereon as of Bank Closing, (ii) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (iii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (ii) or (iii).

(g)     **Vacating Premises.**

(i)     If the Assuming Institution elects not to purchase any owned Bank Premises, the notice of such election in accordance with Section 4.6(a) shall specify the date upon which the Assuming Institution's occupancy of such premises shall terminate, which date shall not be later than ninety (90) days after the date of the Assuming Institution's notice not to exercise such option. The Assuming Institution promptly shall relinquish and release to the Receiver such premises and the Furniture and Equipment and Fixtures located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By occupying any such premises after the expiration of such ninety (90)-day period, the Assuming Institution shall, at the Receiver's option, (x) be deemed to have agreed to purchase such Bank Premises, and to assume all leases, obligations and liabilities with respect to leased Furniture and Equipment and leased Fixtures located thereon and any ground lease with respect to the land on which such premises are located, and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

(ii)     If the Assuming Institution elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(b) shall specify the date upon which the Assuming Institution's occupancy of such leased Bank Premises shall terminate, which date shall not be later than ninety (90) days after the date of the Assuming Institution's notice not to exercise such option. Upon vacating such premises, the Assuming Institution shall relinquish and release to the Receiver such premises and the Fixtures and the Furniture and Equipment located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(b), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph (ii), the Assuming Institution shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the

Receiver previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Failed Bank at Fair Market Value and located on such premises as of Bank Closing.

(h)    **Furniture and Equipment and Certain Other Equipment.** The Receiver hereby grants to the Assuming Institution an option to purchase <u>all</u> Furniture and Equipment and/or all telecommunications, data processing equipment (including hardware and software) and check processing and similar operating equipment owned by the Failed Bank at Fair Market Value and located at any leased Bank Premises that the Assuming Institution elects to vacate or which it could have, but did not occupy, pursuant to this Section 4.6; provided, that, the Assuming Institution shall give the Receiver notice of its election to purchase such property at the time it gives notice of its intention to vacate such Bank Premises or within ten (10) days after Bank Closing for Bank Premises it could have, but did not, occupy.

(i)    **Option to Put Bank Premises and Related Fixtures, Furniture and Equipment.**

(i)    For a period of ninety (90) days following Bank Closing, the Assuming Institution be entitled to require the Receiver to purchase any Bank Premises that is owned, directly or indirectly, by an Acquired Subsidiary and the purchase price paid by the Receiver shall be the Fair Market Value of the Bank Premises.

(ii)    If the Assuming Institution elects to require the Receiver to purchase any Bank Premises that is owned, directly or indirectly, by an Acquired Subsidiary, the Assuming Institution shall also have the option, exercisable within the same ninety (90) day time period, to require the Receiver to purchase any Fixtures, Furniture and Equipment that is owned, directly or indirectly, by an Acquired Subsidiary and which is located on such Bank Premises. The purchase price paid by the Receiver shall be the Fair Market Value of the Fixtures, Furniture and Equipment.

(iii)    In the event the Assuming Institution elects to exercise its option under this subparagraph, the Assuming Institution shall pay to the Receiver occupancy costs in accordance with Section 4.6(e) and shall vacate the Bank Premises in accordance with Section 4.6(g)(i).

(iv)    Regardless of whether the Assuming Institution exercises any of its option under this subparagraph, the purchase price for the Acquired Subsidiary shall be adjusted by the difference between the Fair Market Value of the Bank Premises and Fixtures, Furniture and Equipment and their respective Book Value as reflected of the books and records of the Acquired Subsidiary. Such adjustment shall be made in accordance with Article VIII of this Agreement.

**4.7    Agreement with Respect to Leased Data Processing Equipment**

(a)    The Receiver hereby grants to the Assuming Institution an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to accept an assignment

from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

(b)     The Assuming Institution shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept or decline an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

(c)     The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Institution; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Institution or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

(d)     The Assuming Institution agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(e)     The Assuming Institution shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8     Agreement with Respect to Certain Existing Agreements.**

(a)     Subject to the provisions of Section 4.8(b), with respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within thirty (30) days after Bank Closing, the Assuming Institution shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Institution agrees to comply with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to the Failed Bank, the date which is thirty (30) days after the Assuming Institution has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Institution. The Assuming Institution shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Institution all right, title and interest of the Receiver, if any, in and to agreements the Assuming Institution assumes hereunder. In the event the Assuming Institution elects not to accept an assignment of any lease

(or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8(a) shall not apply to service agreements related to such premises. The Assuming Institution agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement.

(b)     The provisions of Section 4.8(a) regarding the Assuming Institution's election to assume or not assume certain agreements shall not apply to (i) agreements pursuant to which the Failed Bank provides mortgage servicing for others or mortgage servicing is provided to the Failed Bank by others, (ii) agreements that are subject to Sections 4.1 through 4.7 and any insurance policy or bond referred to in Section 3.5(a) or other agreement specified in Section 3.5, and (iii) consulting, management or employment agreements, if any, between the Failed Bank and its employees or other Persons. Except as otherwise expressly set forth elsewhere in this Agreement, the Assuming Institution does not assume any liabilities or acquire any rights under any of the agreements described in this Section 4.8(b).

**4.9     Informational Tax Reporting**. The Assuming Institution agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Institution, as may be required by the Receiver.

**4.10     Insurance**. The Assuming Institution agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to owned or leased Bank Premises that it occupies, and all owned or leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Institution as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

**4.11     Office Space for Receiver and Corporation**. For the period commencing on the day following Bank Closing and ending on the one hundred eightieth (180th) day thereafter, the Assuming Institution agrees to provide to the Receiver and the Corporation, without charge, adequate and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines), email accounts, network access and technology resources (such as shared drive) and utilities (including local telephone service and fax machines) at the Bank Premises occupied by the Assuming Institution for their use in the discharge of their respective functions with respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Institution. Additionally, the

Assuming Institution agrees to pay such bills and invoices on behalf of the Receiver and Corporation as the Receiver or Corporation may direct for the period beginning on the date of Bank Closing and ending on Settlement Date. Assuming Institution shall submit it requests for reimbursement of such expenditures pursuant to Article VIII of this Agreement.

**4.12    Agreement with Respect to Continuation of Group Health Plan Coverage for Former Employees of the Failed Bank.**

(a)    The Assuming Institution agrees to assist the Receiver, as provided in this Section 4.12, in offering individuals who were employees or former employees of the Failed Bank, or any of its Subsidiaries, and who, immediately prior to Bank Closing, were receiving, or were eligible to receive, health insurance coverage or health insurance continuation coverage from the Failed Bank ("Eligible Individuals"), the opportunity to obtain health insurance coverage in the Corporation's FIA Continuation Coverage Plan which provides for health insurance continuation coverage to such Eligible Individuals who are qualified beneficiaries of the Failed Bank as defined in Section 607 of the Employee Retirement Income Security Act of 1974, as amended (respectively, "qualified beneficiaries" and "ERISA"). The Assuming Institution shall consult with the Receiver and not later than five (5) Business Days after Bank Closing shall provide written notice to the Receiver of the number (if available), identity (if available) and addresses (if available) of the Eligible Individuals who are qualified beneficiaries of the Failed Bank and for whom a "qualifying event" (as defined in Section 603 of ERISA) has occurred and with respect to whom the Failed Bank's obligations under Part 6 of Subtitle B of Title I of ERISA have not been satisfied in full, and such other information as the Receiver may reasonably require. The Receiver shall cooperate with the Assuming Institution in order to permit it to prepare such notice and shall provide to the Assuming Institution such data in its possession as may be reasonably required for purposes of preparing such notice.

(b)    The Assuming Institution shall take such further action to assist the Receiver in offering the Eligible Individuals who are qualified beneficiaries of the Failed Bank the opportunity to obtain health insurance coverage in the Corporation's FIA Continuation Coverage Plan as the Receiver may direct. All expenses incurred and paid by the Assuming Institution (i) in connection with the obligations of the Assuming Institution under this Section 4.12, and (ii) in providing health insurance continuation coverage to any Eligible Individuals who are hired by the Assuming Institution and such employees' qualified beneficiaries shall be borne by the Assuming Institution.

(c)    No later than five (5) Business Days after Bank Closing, the Assuming Institution shall provide the Receiver with a list of all Failed Bank employees the Assuming Institution will not hire. Unless otherwise agreed, the Assuming Institution pays all salaries and payroll costs for all Failed Bank Employees until the list is provided to the Receiver. The Assuming Institution shall be responsible for all costs and expenses (i.e. salary, benefits, etc.) associated with all other employees not on that list from and after the date of delivery of the list to the Receiver. The Assuming Institution shall offer to the Failed Bank employees it retains employment benefits comparable to those the Assuming Institution offers its current employees.

(d)     This Section 4.12 is for the sole and exclusive benefit of the parties to this Agreement, and for the benefit of no other Person (including any former employee of the Failed Bank or any Subsidiary thereof or qualified beneficiary of such former employee). Nothing in this Section 4.12 is intended by the parties, or shall be construed, to give any Person (including any former employee of the Failed Bank or any Subsidiary thereof or qualified beneficiary of such former employee) other than the Corporation, the Receiver and the Assuming Institution any legal or equitable right, remedy or claim under or with respect to the provisions of this Section.

**4.13     Agreement with Respect to Interim Asset Servicing.** At any time after Bank Closing, the Receiver may establish on its books an asset pool(s) and may transfer to such asset pool(s) (by means of accounting entries on the books of the Receiver) all or any assets and liabilities of the Failed Bank which are not acquired by the Assuming Institution, including, without limitation, wholly unfunded Commitments and assets and liabilities which may be acquired, funded or originated by the Receiver subsequent to Bank Closing. The Receiver may remove assets (and liabilities) from or add assets (and liabilities) to such pool(s) at any time in its discretion. At the option of the Receiver, the Assuming Institution agrees to service, administer, and collect such pool assets in accordance with and for the term set forth in Exhibit 4.13 "Interim Asset Servicing Arrangement."

**4.14     Reserved**.

**4.15     Agreement with Respect to Loss Sharing.**  The Assuming Institution shall be entitled to require reimbursement from the Receiver for loss sharing on certain loans in accordance with the Single Family Shared-Loss Agreement attached hereto as Exhibit 4.15A and the Commercial Shared-Loss Agreement attached hereto as Exhibit 4.15B, collectively, the "Shared-Loss Agreements." The Loans that shall be subject to the Shared-Loss Agreements are identified on the Schedules 4.15A and 4.15B, and Schedule 4.15C, Shared-Loss Securities, attached hereto.


**ARTICLE V**
**DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK**

**5.1     Payment of Checks, Drafts and Orders.** Subject to Section 9.5, the Assuming Institution agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Assuming Institution, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Institution under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Institution under this Agreement.

**5.2     Certain Agreements Related to Deposits.** Subject to Section 2.2, the Assuming Institution agrees to honor the terms and conditions of any written escrow or mortgage servicing

agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Institution pursuant to this Agreement.

### 5.3    Notice to Depositors.

(a)    Within seven (7) days after Bank Closing, the Assuming Institution shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Institution agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

(b)    The Assuming Institution shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the Assuming Institution by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Institution pursuant to Section 5.3(a).

(c)    If the Assuming Institution proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Institution shall give notice by mail of such changed fees to such depositors.

**ARTICLE VI**
**RECORDS**

### 6.1    Transfer of Records.

(a)    In accordance with Sections 2.1 and 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Institution, whether located on Bank Premises occupied or not occupied by the Assuming Institution or at any other location, the following:

(i)    all Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Institution under this Agreement, including, but not limited to, the following:

(A)    signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

(B)    passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors; and

(ii)    all Records pertaining to the Assets, including, but not limited to, the following:

(A)     records of deposit balances carried with other banks, bankers or trust companies;

(B)     Loan and collateral records and Credit Files and other documents;

(C)     deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(D)     signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(E)     records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)     The Receiver, at its option, may assign and transfer to the Assuming Institution by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Institution as provided in this Agreement, whether located on Bank Premises occupied or not occupied by the Assuming Institution or at any other location, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

**6.2     Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Institution all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3     Preservation of Records**. The Assuming Institution agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Institution, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Institution shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries and customer requests for lien releases with respect to the Records of which it has custody.

**6.4     Access to Records; Copies**. The Assuming Institution agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Institution has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Receiver or the Corporation, any Record in the form of microfilm or microfiche pertaining to Deposit account relationships; provided, that in the event that the Failed Bank maintained one or more duplicate copies of such microfilm or microfiche Records, the Assuming Institution hereby assigns, transfers, and conveys to the Corporation one such duplicate copy of each such Record without cost to the Corporation, and agrees to deliver to the Corporation all Records assigned and transferred to the Corporation under this Article VI as soon as practicable on or after the date of this Agreement. The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing

such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

## ARTICLE VII
## BID; INITIAL PAYMENT

The Assuming Institution has submitted to the Receiver a Deposit premium bid of 0% and an Asset premium (discount) bid of 2.7% (the "Bid Amount"). The Deposit premium bid will be applied to the total of all Assumed Deposits except for brokered, CDARS, and any market place or similar subscription services Deposits. The Asset premium (discount) bid will be applied to the purchase price of all Assets acquired. On the Payment Date, the Assuming Bank will pay to the Corporation, or the Corporation will pay to the Assuming Bank, as the case may be, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of the Bank Closing Date) from and including the day following the Bank Closing Date to and including the day preceding the Payment Date at the Settlement Interest Rate.

## ARTICLE VIII
## ADJUSTMENTS

**8.1     Pro Forma Statement**. The Receiver, as soon as practicable after Bank Closing, in accordance with the best information then available, shall provide to the Assuming Institution a pro forma statement reflecting any adjustments of such liabilities and assets as may be necessary. Such pro forma statement shall take into account, to the extent possible, (i) liabilities and assets of a nature similar to those contemplated by Section 2.1 or Section 3.1, respectively, which at Bank Closing were carried in the Failed Bank's suspense accounts, (ii) accruals as of Bank Closing for all income related to the assets and business of the Failed Bank acquired by the Assuming Institution hereunder, whether or not such accruals were reflected on the Accounting Records of the Failed Bank in the normal course of its operations, and (iii) adjustments to determine the Book Value of any investment in an Acquired Subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting, whether or not the Failed Bank used the equity method of accounting for investments in subsidiaries, except that the resulting amount cannot be less than the Acquired Subsidiary's recorded equity as of Bank Closing as reflected on the Accounting Records of the Acquired Subsidiary. Any Loan purchased by the Assuming Institution pursuant to Section 3.1 which the Failed Bank charged off during the period beginning the day after the Bid Valuation Date to the date of Bank Closing shall be deemed not to be charged off for the purposes of the pro forma statement, and the purchase price shall be determined pursuant to Section 3.2.

### 8.2    Correction of Errors and Omissions; Other Liabilities.

(a)    In the event any bookkeeping omissions or errors are discovered in preparing any pro forma statement or in completing the transfers and assumptions contemplated hereby, the parties hereto agree to correct such errors and omissions, it being understood that, as far as practicable, all adjustments will be made consistent with the judgments, methods, policies or accounting principles utilized by the Failed Bank in preparing and maintaining Accounting Records, except that adjustments made pursuant to this Section 8.2(a) are not intended to bring the Accounting Records of the Failed Bank into accordance with generally accepted accounting principles.

(b)    If the Receiver discovers at any time subsequent to the date of this Agreement that any claim exists against the Failed Bank which is of such a nature that it would have been included in the liabilities assumed under Article II had the existence of such claim or the facts giving rise thereto been known as of Bank Closing, the Receiver may, in its discretion, at any time, require that such claim be assumed by the Assuming Institution in a manner consistent with the intent of this Agreement. The Receiver will make appropriate adjustments to the pro forma statement provided by the Receiver to the Assuming Institution pursuant to Section 8.1 as may be necessary.

### 8.3    Payments. 

The Receiver agrees to cause to be paid to the Assuming Institution, or the Assuming Institution agrees to pay to the Receiver, as the case may be, on the Settlement Date, a payment in an amount which reflects net adjustments (including any costs, expenses and fees associated with determinations of value as provided in this Agreement) made pursuant to Section 8.1 or Section 8.2, plus interest as provided in Section 8.4. The Receiver and the Assuming Institution agree to effect on the Settlement Date any further transfer of assets to or assumption of liabilities or claims by the Assuming Institution as may be necessary in accordance with Section 8.1 or Section 8.2.

### 8.4    Interest. 

Any amounts paid under Section 8.3 or Section 8.5, shall bear interest for the period from and including the day following Bank Closing to and including the day preceding the payment at the Settlement Interest Rate.

### 8.5    Subsequent Adjustments. 

In the event that the Assuming Institution or the Receiver discovers any errors or omissions as contemplated by Section 8.2 or any error with respect to the payment made under Section 8.3 after the Settlement Date, the Assuming Institution and the Receiver agree to promptly correct any such errors or omissions, make any payments and effect any transfers or assumptions as may be necessary to reflect any such correction plus interest as provided in Section 8.4.

# ARTICLE IX
# CONTINUING COOPERATION

**9.1**   **General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

**9.2**   **Additional Title Documents**. The Receiver, the Corporation and the Assuming Institution each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Institution shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Institution. The Assuming Institution shall be responsible for recording such instruments and documents of conveyance at its own expense.

**9.3**   **Claims and Suits**.

(a)   The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Institution with respect to which the Receiver has indemnified the Assuming Institution in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Institution with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Institution with respect to any of its obligations under this Agreement.

(b)   In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

**9.4**   **Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Institution to pay any Deposit liability of the Failed Bank assumed by the Assuming Institution pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Institution agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Institution at the time such claim is made. Upon payment by the Assuming Institution to the Receiver of such amount, the Assuming

Institution shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5    Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Institution pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Institution to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Institution agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Institution agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Institution shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Institution shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Institution shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Institution shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Institution in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6    Proceedings with Respect to Certain Assets and Liabilities**.

(a)    In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Institution shall cooperate to the extent reasonably required by the Receiver.

(b)    In addition to its obligations under Section 6.4, the Assuming Institution shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Assuming Institution, and (ii) its books and records, the books and records of such Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files shall be provided by the Assuming Institution as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

(c)    Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Institution to the Receiver pursuant to Section 3.6, the Assuming Institution shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of

interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) maintained by, owned by, or in the possession of the Assuming Institution or any Affiliate of the Assuming Institution relating to the transferred Loan.

**9.7    Information**. The Assuming Institution promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Institution to assist in preparation of the pro forma statement pursuant to Section 8.1.

## ARTICLE X
## CONDITION PRECEDENT

The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Institution, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Institution, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES OF THE ASSUMING INSTITUTION

The Assuming Institution represents and warrants to the Corporation and the Receiver as follows:

(a)    **Corporate Existence and Authority**. The Assuming Institution (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Institution has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the performance of the transactions contemplated hereby.

(b)    **Third Party Consents**. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with the execution, delivery or performance by the Assuming Institution of this Agreement, other than such consents as have been duly obtained and are in full force and effect.

(c)    **Execution and Enforceability**. This Agreement has been duly executed and delivered by the Assuming Institution and when this Agreement has been duly authorized, executed and delivered by the Corporation and the Receiver, this Agreement will constitute the

legal, valid and binding obligation of the Assuming Institution, enforceable in accordance with its terms.

(d)    **Compliance with Law**.

(i)    Neither the Assuming Institution nor any of its Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Institution or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Assuming Institution or of any of its Subsidiaries, or the ownership of the properties of the Assuming Institution or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Institution or the ability of the Assuming Institution to perform, satisfy or observe any obligation or condition under this Agreement.

(ii)    Neither the execution and delivery nor the performance by the Assuming Institution of this Agreement will result in any violation by the Assuming Institution of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

e)    **Representations Remain True**.   The Assuming Institution represents and warrants that it has executed and delivered to the Corporation a Purchaser Eligibility Certification and Confidentiality Agreement and that all information provided and representations made by or on behalf of the Assuming Institution in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, the Purchaser Eligibility Certification and Confidentiality Agreement (which are affirmed and ratified hereby) are and remain true and correct in all material respects and do not fail to state any fact required to make the information contained therein not misleading.

## ARTICLE XII
## INDEMNIFICATION

**12.1    Indemnification of Indemnitees**. From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee based on liabilities of the Failed Bank that are not assumed by the Assuming Institution pursuant to this Agreement or subsequent to the execution hereof by the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution for which indemnification is provided hereunder in (a) of this Section 12.1, subject to certain exclusions as provided in (b) of this Section 12.1:

(a)

    (1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

    (2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank arising prior to Bank Closing;

    (3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

    (4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

    (5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

    (6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Institution to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Institution is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Institution elected not to assume in accordance with this Agreement and which neither the Assuming Institution nor any Subsidiary or Affiliate of the Assuming Institution has assumed subsequent to the execution hereof;

    (7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

    (8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

    (b)    provided, that, with respect to this Agreement, except for paragraphs (7) and (8) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

    (1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages

against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Institution in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Institution pursuant to this Agreement or subsequent to the execution hereof by the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which liability is expressly assumed by the Assuming Institution pursuant to this Agreement or subsequent to the execution hereof by the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Institution not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Institution;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Institution or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Institution of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection; and

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Institution, other than pursuant to this Agreement.

**12.2   Conditions Precedent to Indemnification**. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

(a)      give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

(b)      provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c)      cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

(d)      in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to

conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

(e)     not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(f)     not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

(g)     take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

**12.3     No Additional Warranty**. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Institution subsequent to the execution of this Agreement by the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

**12.4     Indemnification of Receiver and Corporation**. From and after Bank Closing, the Assuming Institution agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)     claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Institution pursuant to this Agreement or subsequent to the execution hereof by the Assuming Institution or any Subsidiary or Affiliate of the Assuming Institution, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)     claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Institution with

respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5    Obligations Supplemental.** The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6    Criminal Claims.** Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7    Limited Guaranty of the Corporation.**    The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Institution as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Institution shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

**12.8    Subrogation.** Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

# ARTICLE XIII
# MISCELLANEOUS

**13.1** __Entire Agreement__. This Agreement, the Single Family Shared-Loss Agreement, and the Commercial Shared-Loss Agreement, including the Schedules and Exhibits thereto, embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

**13.2** __Headings__. The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**13.3** __Counterparts__. This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

**13.4** __GOVERNING LAW__. THIS AGREEMENT, THE SINGLE FAMILY SHARED-LOSS AGREEMENT, AND THE COMMERCIAL SHARED-LOSS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

**13.5** __Successors__. All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Institution. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Institution any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Institution and for the benefit of no other Person.

**13.6** __Modification; Assignment__. No amendment or other modification, rescission, release, or assignment of any part of this Agreement, the Single Family Shared-Loss Agreement, and the Commercial Shared-Loss Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

**13.7** __Notice__. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered in person against receipt therefore, or sent by certified mail, postage prepaid, courier service,

telex, facsimile transmission or email to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee.

**Assuming Institution**

**Attn: Phillip R. Sherringham**
**President and CEO**
**People's United Bank**
**850 Main Street, 16th Floor**
**Bridgeport, Connecticut 06604**

█████████████████████

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of **BUTLER BANK**
1601 Bryan Street, Suite 1700
Dallas, Texas 75201

Attention: Settlement Manager

**and with respect to notice under Article XII:**

Federal Deposit Insurance Corporation
Receiver of **BUTLER BANK**
1601 Bryan Street, Suite 1700
Dallas, Texas 75201
Attention: Regional Counsel (Litigation Branch)

     13.8    **Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided, that in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

     13.9    **Costs, Fees and Expenses**. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; provided, that the Assuming Institution shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

**13.10   Waiver**. Each of the Receiver, the Corporation and the Assuming Institution may waive its respective rights, powers or privileges under this Agreement; provided, that such waiver shall be in writing; and further provided, that no failure or delay on the part of the Receiver, the Corporation or the Assuming Institution to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Institution under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

**13.11   Severability**. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

**13.12   Term of Agreement**. This Agreement shall continue in full force and effect until the tenth (10th) anniversary of Bank Closing; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement; and provided further, that the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement, and in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term of this Agreement. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

**13.13   Survival of Covenants, Etc.** The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF BUTLER BANK
LOWELL, MASSACHUSETTS

BY: _____
    CHERYL BATES
    RECEIVER-IN-CHARGE

Attest:

_____
John W. Popeo

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: _____
    CHERYL BATES
    ATTORNEY-IN-FACT

Attest:

_____
John W. Popeo

PEOPLE'S UNITED BANK
BRIDGEPORT, CONNECTICUT

BY: _____
    JOHN P. BARNES
    SENIOR EXECUTIVE VICE PRESIDENT

Attest:

_____

**SCHEDULE 2.1 - Certain Liabilities Assumed by the Assuming Institution**

**SCHEDULE 2.1(a) – Excluded Deposit Liability Accounts**

## Accounts Excluded from P&A Transaction

## Butler Bank
### Lowell, MA

As of February 10, 2010, Butler Bank did not have deposits associated with the Depository Organization (DO) Cede & Co as Nominee for DTC. The DO accounts do not pass to the Assuming Bank and are excluded from the transaction as described in section 2.1 of the P&A Agreement.  If DO accounts are taken between the date of the deposit download, February 10, 2010, and the Bank Closing Date, they will be identified post closing and made part of Schedule 7 to the P&A Agreement.

## SCHEDULE 3.1 - Certain Assets Purchased

### SEE ATTACHED LIST

THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE DATE OF THE MOST RECENT PERTINENT DATA MADE AVAILABLE TO THE ASSUMING INSTITUTION AS PART OF THE INFORMATION PACKAGE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE LOANS AND ASSETS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY NOT INCLUDE ALL LOANS AND ASSETS (E.G., CHARGED OFF LOANS). THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.

**SCHEDULE 3.2 - Purchase Price of Assets or assets**

| | | |
|---|---|---|
| (a) | cash and receivables from depository institutions, including cash items in the process of collection, plus interest thereon: | Book Value |
| (b) | securities (exclusive of the capital stock of Acquired Subsidiaries, Shared-Loss Securities, FRB and FHLB stock), plus interest thereon: | As provided in Section 3.2(b) |
| (c) | federal funds sold and repurchase agreements, if any, including interest thereon: | Book Value |
| (d) | Loans: | Book Value |
| (e) | credit card business, if any, including all outstanding extensions of credit and offensive litigation, but excluding any class action lawsuits related to the credit card business: | Book Value |
| (f) | Safe Deposit Boxes and related business, safekeeping business and trust business, if any: | Book Value |
| (g) | Records and other documents: | Book Value |
| (h) | Other Real Estate | Book Value |
| (i) | boats, motor vehicles, aircraft, trailers, fire arms, repossessed collateral | Book Value |
| (j) | capital stock of any Acquired Subsidiaries and FRB and FHLB stock: | Book Value |
| (k) | amounts owed to the Failed Bank by any Acquired Subsidiary: | Book Value |
| (l) | assets securing Deposits of public money, to the extent not otherwise purchased hereunder: | Book Value |
| (m) | Overdrafts of customers: | Book Value |

| | | |
|---|---|---|
| (n) | rights, if any, with respect to Qualified Financial Contracts. | As provided in Section 3.2(c) |
| (o) | rights of the Failed Bank to provide mortgage servicing for others and to have mortgage servicing provided to the Failed Bank by others and related contracts. | Book Value |
| (p) | Shared-Loss Securities | Book Value |

**assets subject to an option to purchase:**

| | | |
|---|---|---|
| (a) | Bank Premises: | Fair Market Value |
| (b) | Furniture and Equipment: | Fair Market Value |
| (c) | Fixtures: | Fair Market Value |
| (d) | Other Equipment: | Fair Market Value |

## SCHEDULE 3.5(l) – Excluded Securities

**BUTLER BANK SECURITIES INVENTORY (as of 2/28/2010)**

| CUSIP | DESCRIPTION | ORIGINAL FACE/PAR | # SHARES | BOOK VALUE |
|---|---|---|---|---|
| ██████ | ███████████████ | ██████ | ████ | ████ |
| ██████ | ███████████████ | ██████ | ████ | ██████ |
| ██████ | █████████████ | ██████ | | ████ |
| ██████ | ██████████ | ██████ | | ██████ |
| ██████ | ████████ | ██████ | | ██████ |
| ██████ | ███████ | ██████ | | ██████ |
| ██████ | █████████████ ████ | ██████ | | ██████ |
| ██████ | ██████████ ████ | ██████ | | ████ |

## SCHEDULE 4.15A

## LOANS SUBJECT TO LOSS SHARING UNDER THE
## SINGLE FAMILY SHARED-LOSS AGREEMENT

**SCHEDULE 4.15B**

**LOANS SUBJECT TO LOSS SHARING UNDER THE
COMMERCIAL SHARED-LOSS AGREEMENT**

# SCHEDULE 4.15C

# SHARED-LOSS SECURITIES

# [NONE]