**SCHEDULE 7 –Accounts Excluded from Calculation of Deposit Franchise Bid Premium**

## Accounts Excluded from Calculation of Deposit Franchise Bid Premium

### Butler Bank
### Lowell, MA

The accounts identified below will pass to the Assuming Bank (unless otherwise noted).   When calculating the premium to be paid on Assumed Deposits in a P&A transaction, the FDIC will exclude the following categories of deposit accounts:

| Category | Description | Amount |
|---|---|---|
| I | Non- DO Brokered Deposits | $0 |
| II | CDARS | $0 |
| III | Market Place Deposits | $0 |
| | Total deposits excluded from Calculation of premium | $0 |

## Category Description

### I  Brokered Deposits
Brokered deposit accounts are accounts for which the "depositor of record" is an agent, nominee, or custodian who deposits funds for a principal or principals to whom "pass-through" deposit insurance coverage may be extended. The FDIC separates brokered deposit accounts into 2 categories:  1) Depository Organization (DO) Brokered Deposits and 2) Non-Depository Organization (Non-DO) Brokered Deposits. This distinction is made by the FDIC to facilitate our role as Receiver and Insurer. These terms will not appear on other "brokered deposit" reports generated by the institution.

Non-DO Brokered Deposits pass to the Assuming Bank, but are excluded from Assumed Deposits when the deposit premium is calculated. Please see the attached "Schedule 7 Non-DO Broker Deposit Detail Report" for a listing of these accounts. This list will be updated post closing with balances as of Bank Closing date.

DO Brokered Deposits (Cede & Co as Nominee for DTC), are typically excluded from Assumed Deposits in the P&A transaction. A list of these accounts is provided on "Schedule 2.1 DO Brokered Deposit Detail Report". If, however, the terms of a particular transaction are altered and the DO Brokered Deposits pass to the Assuming Bank, they will not be included in Assumed Deposits for purposes of calculating the deposit premium.

### II CDARS
CDARS deposits pass to the Assuming Bank, but are excluded from Assumed Deposits when the deposit premium is calculated.

Butler Bank **did not** participate in the CDARS program as of the date of the deposit download.  If CDARS deposits are taken between the date of the deposit download and the Bank Closing Date, they will be identified post closing and made part of Schedule 7 to the P&A Agreement.

### III  Market Place Deposits
"Market Place Deposits" is a description given to deposits that may have been solicited via a money desk, internet subscription service (for example, Qwickrate), or similar programs.

Butler Bank **did not** have Market Place Deposits as identified above as of the date of the deposit download. If Market Place Deposits are taken between the date of the deposit download and the Bank Closing Date, they will be identified post closing and made part of Schedule 7 to the P&A Agreement.

This schedule provides a snapshot of account categories and balances as of {insert date of deposit download], which is the date of the deposit download.  The deposit franchise bid premium will be calculated using account categories and balances as of Bank Closing Date that are reflected in the general ledger or subsystem as described above.  The final numbers for Schedule 7 will be provided post closing.

Butler Bank **did not** have Brokered Deposits as identified above as of the date of the deposit download. If Brokered Deposits are taken between the date of the deposit download and the Bank Closing Date, they will be identified post closing and made part of Schedule 7 to the P&A Agreement.

**EXHIBIT 2.3A**
**FINAL NOTICE LETTER**

**FINAL LEGAL NOTICE**
Claiming Requirements for Deposits
Under 12 U.S.C. 1822(e)

**[Date]**

[Name of Unclaimed Depositor]
[Address of Unclaimed Depositor]
[Anytown, USA]

Subject:  **[XXXXX – Name of Bank**
**City, State]** – In Receivership

Dear [Sir/Madam]:

   As you may know, on **[Date: Closing Date]**, the **[Name of Bank ("The Bank")]** was closed and the Federal Deposit Insurance Corporation ("FDIC") transferred **[The Bank's]** accounts to **[Name of Acquiring Institution].**

   According to federal law under 12 U.S.C., 1822(e), on **[Date: eighteen months from the Closing Date]**, **[Name of Acquiring Institution]** must transfer the funds in your account(s) back to the FDIC if you have not claimed your account(s) with **[Name of Acquiring Institution]**. Based on the records recently supplied to us by **[Name of Acquiring Institution]**, your account(s) currently fall into this category.

   This letter is your formal Legal Notice that you have until **[Date: eighteen months from the Closing Date]**, to claim or arrange to continue your account(s) with **[Name of Acquiring Institution]**. There are several ways that you can claim your account(s) at **[Name of Acquiring Institution]**. It is only necessary for you to take any one of the following actions in order for your account(s) at **[Name of Acquiring Institution]** to be deemed claimed. In addition, if you have more than one account, your claim to one account will automatically claim all accounts:

1.  Write to **[Name of Acquiring Institution]** and notify them that you wish to keep your account(s) active with them. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s), name, and address.  **[Name of Acquiring Institution]** address is:

    **[123 Main Street**

    **Anytown, USA]**

2.  Execute a new signature card on your account(s), enter into a new deposit agreement with **[Name of Acquiring Institution]**, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any).

3.  Provide **[Name of Acquiring Institution]** with a change of address form.

4.  Make a deposit to or withdrawal from your account(s).  This includes writing a check on any account or having an automatic direct deposit credited to or an automatic withdrawal debited from an account.

        If you do not want to continue your account(s) with **[Name of Acquiring Institution]** for any reason, you can withdraw your funds and close your account(s).  Withdrawing funds from one or more of your account(s) satisfies the federal law claiming requirement.  If you have time deposits, such as certificates of deposit, **[Name of Acquiring Institution]** can advise you how to withdraw them without being charged an interest penalty for early withdrawal.

        If you do not claim ownership of your account(s) at **[Name of Acquiring Institution by Date: eighteen months from the Closing Date]** federal law requires **[Name of Acquiring Institution]** to return your deposits to the FDIC, which will deliver them as unclaimed property to the State indicated in your address in the Failed Institution's records.  If your address is outside of the United States, the FDIC will deliver the deposits to the State in which the Failed Institution had its main office. 12 U.S.C. § 1822(e).  If the State accepts custody of your deposits, you will have 10 years from the date of delivery to claim your deposits from the State.  After 10 years you will be permanently barred from claiming your deposits.  However, if the State refuses to take custody of your deposits, you will be able to claim them from the FDIC until the receivership is terminated.  If you have not claimed your insured deposits before the receivership is terminated, and a receivership may be terminated at any time, all of your rights in those deposits will be barred.

        If you have any questions or concerns about these items, please contact **[Bank Employee]** at **[Name of Acquiring Institution]** by phone at **[(XXX) XXX-XXXX]**.

        Sincerely,


        **[Name of Claims Specialist]**
        **[Title]**

**EXHIBIT 2.3B**
**AFFIDAVIT OF MAILING**

## AFFIDAVIT OF MAILING

*State of*

COUNTY OF

I am employed as a **[Title of Office]** by the **[Name of Acquiring Institution]**.

This will attest that on **[Date of mailing]**, I caused a true and correct copy of the Final Legal Notice, attached hereto, to owners of unclaimed deposits of **[Name of Failed Bank]**, City, State, to be prepared for deposit in the mail of the United States of America on behalf of the Federal Deposit Insurance Corporation.  A list of depositors to whom the notice was mailed is attached.  This notice was mailed to the depositor's last address as reflected on the books and records of the **[Name of Failed Bank]** as of the date of failure.

-----------------------------------

**[Name]**
**[Title of Office]**
**[Name of Acquiring Institution]**

**Subscribed and sworn to before me this _____day of [Month, Year].**

**My commission expires:**

_____          _____

                                        **[Name], Notary Public**

[EXHIBIT 3.2(c) -- VALUATION OF CERTAIN
QUALIFIED FINANCIAL CONTRACTS

A.  Scope

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

B.  Exclusions

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Institution but are not subject to adjustment from Book Value.

C.  Adjustment

The difference between the Book Value and market value as of Bank Closing.

D.  Methodology

1.  The price at which the Assuming Institution sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Institution and the Receiver.

2.  In valuing all other Qualified Financial Contracts, the following principles will apply:

(i)  All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

(ii)  All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

(iii)  Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

(iv)     For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

(v)      For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Institution as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Institution will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.]

**EXHIBIT 4.13**
**INTERIM ASSET SERVICING ARRANGEMENT**

(a)     With respect to each asset (or liability) designated from time to time by the Receiver to be serviced by the Assuming Institution pursuant to this Arrangement, including any Assets sold by the Receiver but with respect to which the Receiver has an obligation to service or provide servicing support. (such being designated as "Pool Assets"), during the term of this Arrangement, the Assuming Institution shall:

(i) Promptly apply payments received with respect to any Pool Assets;

(ii) Reverse and return insufficient funds checks;

(iii) Pay (A) participation payments to participants in Loans, as and when received; and (B) tax and insurance bills on Pool Assets as they come due, out of escrow funds maintained for purposes;

(iv) Maintain accurate records reflecting (A) the payment history of Pool Assets, with updated information received concerning changes in the address or identity of the obligors and (B) usage of data processing equipment and employee services with respect to servicing duties;

(v) Send billing statements to obligors on Pool Assets to the extent that such statements were sent by the Failed Bank;

(vi) Send notices to obligors who are in default on Loans (in the same manner as the Failed Bank);

(vii) Send to the Receiver, Attn: Managing Liquidator, at the address provided in Section 13.7 of the Agreement, or to such other person at such address as the Receiver may designate, via overnight delivery: (A) on a weekly basis, weekly reports for the Pool Assets, including, without limitation, reports reflecting collections and the trial balances, transaction journals and loan histories for Pool Assets having activity, together with copies of (1) checks received, (2) insufficient funds checks returned, (3) checks for payment to participants or for taxes and insurance, (4) pay-off requests, (5) notices to defaulted obligors, and (6) data processing and employee logs and (B) any other reports, copies or information as may be periodically or from time to time requested;

(viii) Remit on a weekly basis to the Receiver, Attn: Division of Finance, Cashier Unit, Operations, at the address in (vii), via wire transfer to the account designated by the Receiver, or to such other person at such address and/or account as the Receiver may designate, all payments received on Pool Assets managed by the Assuming Institution or at such time and place and in such manner as may be directed by the Receiver;

(ix) prepare and timely file all information reports with appropriate tax authorities, and, if required by the Receiver, prepare and file tax returns and pay taxes due on or before the due date, relating to the Pool Assets; and

(x) provide and furnish such other services, operations or functions as may be required with regard to Pool Assets, including, without limitation, as may be required with regard to any business, enterprise or agreement which is a Pool Asset, all as may be required by the Receiver.

Notwithstanding anything to the contrary in this Section, the Assuming Institution shall not be required to initiate litigation or other collection proceedings against any obligor or any collateral with respect to any defaulted Loan. The Assuming Institution shall promptly notify the Receiver, at the address provided above in subparagraph (a)(vii), of any claims or legal actions regarding any Pool Asset.

(b)     The Receiver agrees to reimburse the Assuming Institution for actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(c)     The Assuming Bank shall provide the services described herein for a period of up to three hundred sixty-five (365) days after Bank Closing.

(d)     At any time during the term of this Arrangement, the Receiver may, upon written notice to the Assuming Institution, remove one or more Pool Assets from the Pool, at which time the Assuming Institution's responsibility with respect thereto shall terminate.

(e)     At the expiration of this Agreement or upon the termination of the Assuming Institution's responsibility with respect to any Pool Asset pursuant to paragraph (d) hereof, the Assuming Institution shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(f)     At the request of the Receiver, the Assuming Institution shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver and providing to the Receiver or its designee(s) (x) information and data regarding the Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool Assets to another system or systems, and (y) access to employees of the Assuming Institution involved in the management of, or otherwise familiar with, the Pool Assets.

**EXHIBIT 4.15A**

**SINGLE FAMILY SHARED-LOSS AGREEMENT**

This agreement for the reimbursement of loss sharing on certain single family residential mortgage loans (the "Single Family Shared-Loss Agreement") shall apply when the Assuming Institution purchases Single Family Shared-Loss Loans as that term is defined herein. The terms hereof shall modify and supplement, as necessary, the terms of the Purchase and Assumption Agreement to which this Single Family Shared-Loss Agreement is attached as Exhibit 4.15A and incorporated therein. To the extent any inconsistencies may arise between the terms of the Purchase and Assumption Agreement and this Single Family Shared-Loss Agreement with respect to the subject matter of this Single Family Shared-Loss Agreement, the terms of this Single Family Shared-Loss Agreement shall control. References in this Single Family Shared-Loss Agreement to a particular Section shall be deemed to refer to a Section in this Single Family Shared-Loss Agreement, unless the context indicates that it is intended to be a reference to a Section of the Purchase and Assumption Agreement.

**ARTICLE I -- DEFINITIONS**

The capitalized terms used in this Single Family Shared-Loss Agreement that are not defined in this Single Family Shared-Loss Agreement are defined in the Purchase and Assumption Agreement. In addition to the terms defined above, defined below are certain additional terms relating to loss-sharing, as used in this Single Family Shared-Loss Agreement.

"**Accounting Records**" means the subsidiary system of record on which the loan history and balance of each Single Family Shared-Loss Loan is maintained; individual loan files containing either an original or copies of documents that are customary and reasonable with respect to loan servicing, including management and disposition of Other Real Estate; the records documenting alternatives considered with respect to loans in default or for which a default is reasonably foreseeable; records of loss calculations and supporting documentation with respect to line items on the loss calculations; and, monthly delinquency reports and other performance reports customarily utilized by the Assuming Institution in management of loan portfolios.

"**Accrued Interest**" means, with respect to Single Family Shared-Loss Loans, the amount of earned and unpaid interest at the note rate specified in the applicable loan documents, limited to 90 days.

"**Affiliate**" shall have the meaning set forth in the Purchase and Assumption Agreement; provided, that, for purposes of this Single Family Shared-Loss Agreement, no Third Party Servicer shall be deemed to be an Affiliate of the Assuming Institution.

"**Commencement Date**" means the first calendar day following the Bank Closing.

"**Commercial Shared-Loss Agreement**" means the Commercial Shared-Loss Agreement attached to the Purchase and Assumption Agreement as Exhibit 4.15B.

"**Cumulative Loss Amount**" means the sum of the Monthly Loss Amounts less the sum of all Recovery Amounts.

"**Cumulative Servicing Amount**" means the sum of the Period Servicing Amounts for every consecutive twelve-month period prior to and ending on the True-Up Measurement Date in respect of each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement is in effect.

"**Cumulative Shared-Loss Amount**" means the excess, if any, of the Cumulative Loss Amount over the First Loss Tranche.

"**Cumulative Shared-Loss Payments**" means (i) the aggregate of all of the payments made or payable to the Assuming Institution under the Shared-Loss Agreements minus (ii) the aggregate of all of the payments made or payable to the Receiver under the Shared-Loss Agreements.

"**Customary Servicing Procedures**" means procedures (including collection procedures) that the Assuming Institution (or, to the extent a Third Party Servicer is engaged, the Third Party Servicer) customarily employs and exercises in servicing and administering mortgage loans for its own accounts and the servicing procedures established by FNMA or FHLMC (as in effect from time to time), which are in accordance with accepted mortgage servicing practices of prudent lending institutions.

"**Deficient Loss**" means the determination by a court in a bankruptcy proceeding that the value of the collateral is less than the amount of the loan in which case the loss will be the difference between the then unpaid principal balance (or the NPV of a modified loan that defaults) and the value of the collateral so established.

"**Examination Criteria**" means the loan classification criteria employed by, or any applicable regulations of, the Assuming Institution's Chartering Authority at the time such action is taken, as such criteria may be amended from time to time.

"**Home Equity Loan**" means a loan or funded or unfunded portions of a line of credit secured by a mortgage on a one-to four-family residences or stock of cooperative housing association, where the Failed Bank did not have a first lien on the same property as collateral.

"**Final Shared-Loss Month**" means the calendar month in which the tenth anniversary of the Commencement Date occurs.

"**Foreclosure Loss**" means the loss realized when the Assuming Institution has completed the foreclosure on a Single Family Shared-Loss Loan and realized final recovery on the collateral through liquidation and recovery of all insurance proceeds. Each Foreclosure Loss shall be calculated in accordance with the form and methodology specified in Exhibits 2c(1)-(3).

"**Holding Company**" means any holding company, not publicly traded on a national exchange, owning Shares of the Assuming Institution.

"**Intrinsic Loss Estimate**" means total losses under the shared loss agreements in

the amount of **thirty-four million dollars ($ 34,000,000.00).**

"**Investor-Owned Residential Loan**" means a Loan, excluding advances made pursuant to a Home Equity Loan, that is secured by a mortgage on a one- to four family residences or stock of cooperative housing associations that is not owner-occupied or the borrower's primary residence.

"**Loss**" means a Foreclosure Loss, Restructuring Loss, Short Sale Loss, Portfolio Loss, Modification Default Loss or Deficient Loss.

"**Loss Amount**" means the dollar amount of loss incurred and reported on the Monthly Certificate for a Shared-Loss Loan.

"**Modification Default Loss**" means the loss calculated in Exhibits 2a(1)-(3) for single family loans previously modified pursuant to this Single Family Shared-Loss Agreement that subsequently default and result in a foreclosure, short sale or Deficient Loss.

"**Modification Guidelines**" has the meaning provided in Section 2.1(a) of this Single Family Shared-Loss Agreement.

"**Monthly Certificate**" has the meaning provided in Section 2.1(b) of this Single Family Shared-Loss Agreement.

"**Monthly Loss Amount**" means the sum of all Foreclosure Losses, Restructuring Losses, Short Sale Losses, Portfolio Losses, Modification Default Losses and Deficient Losses realized by the Assuming Institution for any Shared Loss Month.

"**Monthly Shared-Loss Amount**" means the change in the Cumulative Shared-Loss Amount from the beginning of each month to the end of each month.

"**Neutral Member**" has the meaning provided in Section 2. 1(f)(ii) of this Single Family Shared-Loss Agreement.

"**Period Servicing Amount**" means, for any twelve month period with respect to each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement are in effect, the product of (i) the simple average of the principal amount of Shared-Loss Loans and Shared-Loss Assets (other than the Shared-Loss Securities) (in each case as defined in the Shared-Loss Agreements), as the case may be, at the beginning of such period and at the end of such period times (ii) one percent (1%).

"**Portfolio Loss**" means the loss realized on either (i) a portfolio sale of Single Family Shared-Loss Loans in accordance with the terms of Article IV or (ii) the sale of a loan with the consent of the Receiver as provided in Section 2.7.

"**Recovery Amount**" means, with respect to any period prior to the Termination Date, the amount of collected funds received by the Assuming Institution that (i) are applicable against a Foreclosure Loss calculated in accordance with Exhibits 2c(1)-(3), or (iii) gains

realized from a Section 4.1 sale of Single Family Shared-Loss Loans for which the Assuming Institution has previously received a Restructuring Loss payment from the Receiver (iv) or any incentive payments from national programs paid to an investor or borrower on loans that have been modified or otherwise treated (short sale or foreclosure) in accordance with Exhibit 5.

"**Related Loans**" has the meaning set forth in Section 3.1.

"**Restructuring Loss**" means the loss on a modified or restructured loan measured by the difference between (a) the principal, Accrued Interest, tax and insurance advances, third party or other fees due on a loan prior to the modification or restructuring, and (b) the net present value of estimated cash flows on the modified or restructured loan, discounted at the Then-Current Interest Rate. Each Restructuring Loss shall be calculated in accordance with the form and methodology attached as Exhibits 2a(1)-(3), as applicable.

"**Restructured Loan**" means a Single Family Shared-Loss Loan for which the Assuming Institution has received a Restructuring Loss payment from the Receiver. This applies to owner occupied and investor owned residences.

"**Servicing Officer**" has the meaning provided in Section 2.1(b) of this Single Family Shared-Loss Agreement.

"**Shared Loss Loan**" means a Single Family Shared-Loss Loan, Investor-Owned Residential Loan, Restructured Loan or Home Equity Loan.

"**Shared-Loss Month**" means each calendar month between the Commencement Date and the last day of the month in which the tenth anniversary of the Commencement Date occurs, provided that, the first Shared-Loss Month shall begin on the Commencement Date and end on the last day of that month.

"**Shared-Loss Payment Trigger**" means when the sum of the Cumulative Loss Amount under this Single Family Shared-Loss Agreement and the cumulative Shared-Loss Amounts under the Commercial Shared-Loss Agreement, exceeds the First Loss Tranche. If the First Loss Tranche is zero or a negative number, the Shared Loss Payment Trigger shall be deemed to have been reached upon Bank Closing.

"**Shares**" means common stock and any instrument which by its terms is currently convertible into common stock, or which may become convertible into common stock.

"**Short-Sale Loss**" means the loss resulting from the Assuming Institution's agreement with the mortgagor to accept a payoff in an amount less than the balance due on the loan (including the costs of any cash incentives to borrower to agree to such sale or to maintain the property pending such sale), further provided, that each Short-Sale Loss shall be calculated in accordance with the form and methodology specified in Exhibits 2b(1)-(3).

"**Single Family Shared-Loss Loan**" means a single family one-to-four owner-occupied residential mortgage loans, excluding advances made pursuant to Home Equity Loans, that is secured by a mortgage on a one-to four family residences or stock of cooperative housing associations (whether owned by the Assuming Institution or any Subsidiary).

"**Termination Date**" means the last day of the Final Shared-Loss Month.

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans for Investor-Owned Loans or such other interest rate approved by the Receiver.

"**Third Party Servicer**" means any servicer appointed from time to time by the Assuming Institution or any Affiliate of the Assuming Institution to service the Shared-Loss Loans on behalf of the Assuming Institution, the identity of which shall be given to the Receiver prior to or concurrent with the appointment thereof.

## ARTICLE II -- SHARED-LOSS ARRANGEMENT

**2.1    Shared-Loss Arrangement.**

(a)    **Loss Mitigation and Consideration of Alternatives**.

(i)  For each Single Family Shared-Loss Loan in default or for which a default is reasonably foreseeable, the Assuming Institution shall undertake reasonable and customary loss mitigation efforts, in accordance with any of the following programs selected by Assuming Institution in its sole discretion, Exhibit 5 (FDIC Mortgage Loan Modification Program), the United States Treasury's Home Affordable Modification Program Guidelines or any other modification program approved by the United States Treasury Department, the Corporation, the Board of Governors of the Federal Reserve System or any other governmental agency (it being understood that the Assuming Institution can select different programs for the various Single Family Shared-Loss Loans) (such program chosen, the "Modification Guidelines"). After selecting the applicable Modification Guideline for each such Single Family Shared-Loss Loan, the Assuming Institution shall document its consideration of foreclosure, loan restructuring under the applicable Modification Guideline chosen, and short-sale (if short-sale is a viable option) alternatives and shall select the alternative the Assuming Institution believes, based on its estimated calculations, will result in the least Loss. If unemployment or underemployment is the primary cause for default or for which a default is reasonably foreseeable, the Assuming Institution may consider the borrower for a temporary forbearance plan which reduces the loan payment to an affordable level for at least six (6) months.

(ii)  Losses on Home Equity Loans shall be shared under the charge-off policies of the Assuming Institution's Examination Criteria as if they were Single Family Shared-Loss Loans.

(iii)  Losses on Investor-Owned Residential Loans shall be treated as Restructured Loans, and with the consent of the Receiver can be restructured under terms separate from the Exhibit 5 standards. Please refer to Exhibits 2(a)(1)-(2) for guidance in Calculation of Loss for Restructured Loans. Losses on Investor-Owned Residential Loans will be treated as if they were Single Family Shared-Loss Loans.

(iv)  The Assuming Institution shall retain its loss calculations for the Shared Loss Loans and such calculations shall be provided to the Receiver upon request. For the avoidance

of doubt and notwithstanding anything herein to the contrary, (x) the Assuming Institution is not required to modify or restructure any Shared-Loss Loan on more than one occasion and (y) the Assuming Institution is not required to consider any alternatives with respect to any Shared-Loss Loan in the process of foreclosure as of the Bank Closing if the Assuming Institution can document that a loan modification is not cost effective and shall be entitled to continue such foreclosure measures and recover the Foreclosure Loss as provided herein, and (z) the Assuming Institution shall have a transition period of up to 90 days after Bank Closing to implement the Modification Guidelines, during which time, the Assuming Institution may submit claims under such guidelines as may be in place at the Failed Bank.

    (b)    **Monthly Certificates**.

Not later than fifteen (15) days after the end of each Shared-Loss Month, beginning with the month in which the Commencement Date occurs and ending in the Final Shared-Loss Month, the Assuming Institution shall deliver to the Receiver a certificate, signed by an officer of the Assuming Institution involved in, or responsible for, the administration and servicing of the Shared-Loss Loans whose name appears on a list of servicing officers furnished by the Assuming Institution to the Receiver, (a "Servicing Officer") setting forth in such form and detail as the Receiver may reasonably specify (a "Monthly Certificate"):

    (i)    (A)    a schedule substantially in the form of Exhibit 1 listing:

(i) each Shared-Loss Loan for which a Loss Amount (calculated in accordance with the applicable Exhibit) is being claimed, the related Loss Amount for each Shared-Loss Loan, and the total Monthly Loss Amount for all Shared-Loss Loans;

(ii) each Shared-Loss Loan for which a Recovery Amount was received, the Recovery Amount for each Shared-Loss Loan, and the total Recovery Amount for all Shared-Loss Loans;

(iii) the total Monthly Loss Amount for all Shared-Loss Loans minus the total monthly Recovery Amount for all Shared-Loss Loans;

(iv) the Cumulative Shared-Loss Amount as of the beginning and end of the month;

(v) the Monthly Shared Loss Amount;

(vi) the result obtained in (v) times 80%, which is the amount to be paid under Section 2.1(d) of this Single Family Shared-Loss Agreement by the Receiver to the Assuming Institution if the amount is a positive number, or by the Assuming Institution to the Receiver if the amount is a negative number;

    (ii)    for each of the Shared-Loss Loans for which a Loss is claimed for that Shared-Loss Month, a schedule showing the calculation of the Loss

Amount using the form and methodology shown in Exhibits 2a(1)-(3), Exhibit 2b, or Exhibits 2c(1)-(2), as applicable.

    (iii)    For each of the Restructured Loans where a gain or loss is realized in a sale under Section 4.1 or 4.2, a schedule showing the calculation using the form and methodology shown in Exhibits 2d(1)-(2).

    (iv)    a portfolio performance and summary schedule substantially in the form shown in Exhibit 3.

    (c)    **Monthly Data Download**. Not later than fifteen (15) days after the end of each month, beginning with the month in which the Commencement Date occurs and ending with the Final Shared-Loss Month, Assuming Institution shall provide Receiver:

    (i)    the servicing file in machine-readable format including but not limited to the fields shown on Exhibit 2.1(c) for each outstanding Single Family Shared-Loss Loan, as applicable; and

    (ii)    an Excel file for ORE held as a result of foreclosure on a Single Family Shared-Loss Loan listing:

    (A) Foreclosure date
    (B) Unpaid loan principal balance
    (C) Appraised value or BPO value, as applicable
    (D) Projected liquidation date

Notwithstanding the foregoing, the Assuming Institution shall not be required to provide any of the foregoing information to the extent it is unable to do so as a result of the Failed Bank's or Receiver's failure to provide information required to produce the information set forth in this Section 2.1(c); provided, that the Assuming Institution shall, consistent with Customary Servicing Procedures seek to produce any such missing information or improve any inaccurate information previously provided to it.

    (d)    **Payments With Respect to Shared-Loss Assets**. After the Shared Loss Payment Trigger is reached, not later than fifteen (15) days after the date on which the Receiver receives the Monthly Certificate, the Receiver shall pay to the Assuming Institution, in immediately available funds, an amount equal to eighty percent (80%) of the Monthly Shared-Loss Amount reported on the Monthly Certificate. If the total Monthly Shared-Loss Amount reported on the Monthly Certificate is a negative number, the Assuming Institution shall pay to the Receiver in immediately available funds eighty percent (80%) of that amount.

    (e)    **Limitations on Shared-Loss Payment**. The Receiver shall not be required to make any payments pursuant to Section 2.1(d) with respect to any Foreclosure Loss, Restructuring Loss, Short Sale Loss, Deficient Loss, or Portfolio Loss that the Receiver determines, based upon the criteria set forth in this Single Family Shared-Loss Agreement (including the analysis and documentation requirements of Section 2.1(a)) or Customary Servicing Procedures, should not have been effected by the Assuming Institution; provided, however, (x) the Receiver must provide notice to the Assuming Institution detailing the grounds

for not making such payment, (y) the Receiver must provide the Assuming Institution with a reasonable opportunity to cure any such deficiency and (z) (1) to the extent curable, if cured, the Receiver shall make payment with respect to the properly effected Loss, and (2) to the extent not curable, shall not constitute grounds for the Receiver to withhold payment as to all other Losses (or portion of Losses) that are properly payable pursuant to the terms of this Single Family Shared-Loss Agreement. In the event that the Receiver does not make any payment with respect to Losses claimed pursuant to Section 2.1(d), the Receiver and Assuming Institution shall, upon final resolution, make the necessary adjustments to the Monthly Shared-Loss Amount for that Monthly Certificate and the payment pursuant to Section 2.1(d) above shall be adjusted accordingly.

(f)     **Payments by Wire-Transfer**. All payments under this Single Family Shared-Loss Agreement shall be made by wire-transfer in accordance with the wire-transfer instructions on Exhibit 4.

(g)     **Payment in the Event Losses Fail to Reach Expected Level**. On the date that is 45 days following the last day (such day, the "True-Up Measurement Date") of the Final Shared Loss Month, or upon the final disposition of all Shared Loss Assets under this Single Family Shared-Loss Agreement at any time after the termination of the Commercial Shared-Loss Agreement, the Assuming Institution shall pay to the Receiver fifty percent (50%) of the excess, if any, of (i) twenty percent (20%) of the Intrinsic Loss Estimate less (ii) the sum of (A) twenty-five percent (25%) of the asset premium (discount) plus (B) twenty-five percent (25%) of the Cumulative Shared-Loss Payments plus (C) the Cumulative Servicing Amount. The Assuming Institution shall deliver to the Receiver not later than 30 days following the True-Up Measurement Date, a schedule, signed by an officer of the Assuming Institution, setting forth in reasonable detail the calculation of the Cumulative Shared-Loss Payments and the Cumulative Servicing Amount.

(h)     **Payments as Administrative Expenses.**  Payments from the Receiver with respect to this Single Family Shared-Loss Agreement are administrative expenses of the Receiver. To the extent the Receiver needs funds for shared-loss payments respect to this Single Family Shared-Loss Agreement, the Receiver may request funds under the Master Loan and Security Agreement, as amended ("MLSA"), from FDIC in its corporate capacity. The Receiver will not agree to any amendment of the MLSA that would prevent the Receiver from drawing on the MLSA to fund shared-loss payments.

2.2     **Auditor Report; Right to Audit.**

(a)     Within the time period permitted for the examination audit pursuant to 12 CFR Section 363 after the end of each fiscal year during which the Receiver makes any payment to the Assuming Institution under this Single Family Shared-Loss Agreement, the Assuming Institution shall deliver to the Receiver a report signed by its independent public accountants stating that they have reviewed the terms of this Single Family Shared-Loss Agreement and that, in the course of their annual audit of the Assuming Institution's books and records, nothing has come to their attention suggesting that any computations required to be made by the Assuming Institution during such fiscal year pursuant to this Article II were not made by the Assuming Institution in accordance herewith. In the event that the Assuming Institution cannot comply with

the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Assuming Institution during such year pursuant to this Article II were not made by the Assuming Institution in accordance herewith. In such event, the Assuming Institution and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made.

      (b)    The Assuming Institution shall perform on an annual basis an internal audit of its compliance with the provisions of this Article II and shall provide the Receiver and the Corporation with copies of the internal audit reports and access to internal audit workpapers related to such internal audit.

      (c)    The Receiver or the FDIC in its corporate capacity ("Corporation"), its contractors and their employees, and its agents may perform an audit or audits to determine the Assuming Institution's compliance with the provisions of this Single Family Shared-Loss Agreement, including this Article II, by providing not less than ten (10) Business Days' prior written notice. Assuming Institution shall provide access to pertinent records and proximate working space in Assuming Institution's facilities. The scope and duration of any such audit shall be within the reasonable discretion of the Receiver or the Corporation, but shall in no event be administered in a manner that unreasonably interferes with the operation of the Assuming Institution's business. The Receiver or the Corporation, as the case may be, shall bear the expense of any such audit. In the event that any corrections are necessary as a result of such an audit or audits, the Assuming Institution and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

    **2.3**    **Withholdings**. Notwithstanding any other provision in this Article II, the Receiver, upon the direction of the Director (or designee) of the Federal Deposit Insurance Corporation's Division of Resolutions and Receiverships, may withhold payment for any amounts included in a Monthly Certificate delivered pursuant to Section 2.1, if in its good faith and reasonable judgment there is a reasonable basis under the requirements of this Single Family Shared-Loss Agreement for denying the eligibility of an item for which reimbursement or payment is sought under such Section. In such event, the Receiver shall provide a written notice to the Assuming Institution detailing the grounds for withholding such payment. At such time as the Assuming Institution demonstrates to the satisfaction of the Receiver, in its reasonable judgment, that the grounds for such withholding of payment, or portion of payment, no longer exist or have been cured, then the Receiver shall pay the Assuming Institution the amount withheld which the Receiver determines is eligible for payment, within fifteen (15) Business Days.

    **2.4**    **Books and Records**. The Assuming Institution shall at all times during the term of this Single Family Shared-Loss Agreement keep books and records sufficient to ensure and document compliance with the terms of this Single Family Shared-Loss Agreement, including but not limited to (a) documentation of alternatives considered with respect to defaulted loans or loans for which default is reasonably foreseeable, (b) documentation showing the calculation of loss for claims submitted to the Receiver, (c) retention of documents that support each line item

on the loss claim forms, and (d) documentation with respect to the Recovery Amount on loans for which the Receiver has made a loss-share payment

**2.5** **Information**. The Assuming Institution shall promptly provide to the Receiver such other information, including but not limited to, financial statements, computations, and bank policies and procedures, relating to the performance of the provisions of this Single Family Shared-Loss Agreement, as the Receiver may reasonably request from time to time.

**2.6** **Tax Ruling**. The Assuming Institution shall not at any time, without the Receiver's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Receiver pursuant to this Single Family Shared-Loss Agreement.

**2.7** **Loss of Shared-Loss Coverage on Shared-Loss Loans**. The Receiver shall be relieved of its obligations with respect to a Shared-Loss Loan upon payment of a Foreclosure Loss amount, or a Short Sale Loss amount with respect to such Single Family Shared-Loss Loan, or upon the sale without FDIC consent of a Single Family Shared-Loss Loan by Assuming Institution to a person or entity that is not an Affiliate. The Assuming Institution shall provide the Receiver with timely notice of any such sale. Failure to administer any Shared-Loss Loan or Loans in accordance with Article III shall at the discretion of the Receiver constitute grounds for the loss of shared loss coverage with respect to such Shared-Loss Loan or Loans. Notwithstanding the foregoing, a sale of the Single Family Shared-Loss Loan, for purposes of this Section 2.7, shall not be deemed to have occurred as the result of (i) any change in the ownership or control of Assuming Institution or the transfer of any or all of the Single Family Shared-Loss Loan(s) to any Affiliate of Assuming Institution, (ii) a merger by Assuming Institution with or into any other entity, or (iii) a sale by Assuming Institution of all or substantially all of its assets.

### ARTICLE III - RULES REGARDING THE ADMINISTRATION OF SHARED-LOSS LOANS

**3.1** **Agreement with Respect to Administration**. The Assuming Institution shall (and shall cause any of its Affiliates to which the Assuming Institution transfers any Shared-Loss Loans to) manage, administer, and collect the Shared-Loss Loans while owned by the Assuming Institution or any Affiliate thereof during the term of this Single Family Shared-Loss Agreement in accordance with the rules set forth in this Article III. The Assuming Institution shall be responsible to the Receiver in the performance of its duties hereunder and shall provide to the Receiver such reports as the Receiver reasonably deems advisable, including but not limited to the reports required by Sections 2.1, 2.2 and 3.3 hereof, and shall permit the Receiver to monitor the Assuming Institution's performance of its duties hereunder.

**3.2** **Duties of the Assuming Institution**.

(a) In the performance of its duties under this Article III, the Assuming Institution shall:

(i) manage and administer each Shared-Loss Loan in accordance with Assuming Institution's

usual and prudent business and banking practices and Customary Servicing Procedures;

(ii) exercise its best business judgment in managing, administering and collecting amounts owed on the Shared-Loss Loans;

(iii) use commercially reasonable efforts to maximize Recoveries with respect to Losses on Shared-Loss Loans without regard to the effect of maximizing collections on assets held by the Assuming Institution or any of its Affiliates that are not Shared-Loss Loans;

(iv) retain sufficient staff (in Assuming Institution's discretion) to perform its duties hereunder; and

(v) other than as provided in Section 2.1(a), comply with the terms of the Modification Guidelines for any Single Family Shared-Loss Loans meeting the requirements set forth therein. For the avoidance of doubt, the Assuming Institution may propose exceptions to Exhibit 5 (the FDIC Loan Modification Program) for a group of Loans with similar characteristics, with the objectives of (1) minimizing the loss to the Assuming Institution and the FDIC and (2) maximizing the opportunity for qualified homeowners to remain in their homes with affordable mortgage payments.

(b)     Any transaction with or between any Affiliate of the Assuming Institution with respect to any Shared-Loss Loan including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Institution will manage, administer or collect any of the Shared-Loss Loans will be provided to FDIC for informational purposes and if such transaction is not entered into on an arm's length basis on commercially reasonable terms such transaction shall be subject to the prior written approval of the Receiver.

**3.3     Shared-Loss Asset Records and Reports**. The Assuming Institution shall establish and maintain such records as may be appropriate to account for the Single Family Shared-Loss Loans in such form and detail as the Receiver may reasonably require, and to enable the Assuming Institution to prepare and deliver to the Receiver such reports as the Receiver may from time to time request regarding the Single Family Shared-Loss Loans and the Monthly Certificates required by Section 2.1 of this Single Family Shared-Loss Agreement.

**3.4     Related Loans**.

(a)     Assuming Institution shall use its best efforts to determine which loans are "Related Loans," as hereinafter defined. The Assuming Institution shall not manage, administer or collect any "Related Loan" in any manner that would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Shared-Loss Loan to which such loan is related. A "Related Loan" means any loan or extension of credit to an Obligor of a Shared-Loss Loan held by the Assuming Institution at any time on or prior to the end of the Final Shared-Loss Month.

(b)     The Assuming Institution shall prepare and deliver to the Receiver with the Monthly Certificates for the calendar months ending June 30 and December 31, a schedule of all Related Loans on the Accounting Records of the Assuming Institution as of the end of each such semi-annual period.

**3.5     Legal Action; Utilization of Special Receivership Powers**. The Assuming

Institution shall notify the Receiver in writing (such notice to be given in accordance with Article V below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Assuming Institution derives as a result of having acquired an asset from the Receiver, and the Assuming Institution shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Assuming Institution and the Assuming Institution shall comply in all respects with such direction. Upon request of the Receiver, the Assuming Institution will advise the Receiver as to the status of any such legal action. The Assuming Institution shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

     **3.6**    **Third Party Servicer**. The Assuming Institution may perform any of its obligations and/or exercise any of its rights under this Single Family Shared-Loss Agreement through or by one or more Third Party Servicers, who may take actions and make expenditures as if any such Third Party Servicer was the Assuming Institution hereunder (and, for the avoidance of doubt, such expenses incurred by any such Third Party Servicer on behalf of the Assuming Institution shall be included in calculating Losses to the extent such expenses would be included in such calculation if the expenses were incurred by Assuming Institution); provided, however, that the use thereof by the Assuming Institution shall not release the Assuming Institution of any obligation or liability hereunder.

## ARTICLE IV – PORTFOLIO SALE

     **4.1**    **Assuming Institution Portfolio Sales of Remaining Shared-Loss Loans**. The Assuming Institution shall have the right, with the consent of the Receiver, to liquidate for cash consideration, from time to time in one or more transactions, all or a portion of Shared-Loss Loans held by the Assuming Institution at any time prior to the Termination Date ("Portfolio Sales"). If the Assuming Institution exercises its option under this Section 4.1, it must give sixty (60) days notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale, which shall be conducted by means of sealed bid sales to third parties, not including any of the Assuming Institution's affiliates, contractors, or any affiliates of the Assuming Institution's contractors. Sales of Restructured Loans shall be sold in a separate pool from Shared-Loss Loans that have not been restructured.  Other proposals for the sale of a Shared-Loss Loan or Shared-Loss Loans submitted by the Assuming Institution will be considered by the Receiver on a case-by-case basis.

     **4.2**    **Assuming Institution's Liquidation of Remaining Shared-Loss Loans**. In the event that the Assuming Institution does not conduct a Portfolio Sale pursuant to Section 4.1, the Receiver shall have the right, exercisable in its sole and absolute discretion, to require the Assuming Institution to liquidate for cash consideration, any Shared-Loss Loans held by the Assuming Institution at any time after the date that is six months prior to the Termination Date. If the Receiver exercises its option under this Section 4.2, it must give notice in writing to the Assuming Institution, setting forth the time period within which the Assuming Institution shall be required to liquidate the Shared-Loss Loans. The Assuming Institution will comply with the Receiver's notice and must liquidate the Shared-Loss Loans as soon as reasonably practicable by means of sealed bid sales to third parties, not including any of the Assuming Institution's affiliates, contractors, or any affiliates of the Assuming Institution's contractors. The selection of

any financial advisor or other third party broker or sales agent retained for the liquidation of the remaining Shared-Loss Loans pursuant to this Section shall be subject to the prior approval of the Receiver, such approval not to be unreasonably withheld, delayed or conditioned.

**4.3** **Calculation of Sale Gain or Loss.** For Shared-Loss Loans that are not Restructured Loans, gain or loss on the sales under Section 4.1 or Section 4.2 will be calculated as the sale price received by the Assuming Institution less the unpaid principal balance of the remaining Shared-Loss Loans. For any Restructured Loan included in the sale gain or loss on sale will be calculated as (a) the sale price received by the Assuming Institution less (b) the net present value of estimated cash flows on the Restructured Loan that was used in the calculation of the related Restructuring Loss plus (c) Loan principal payments collected by the Assuming Institution from the date the Loan was restructured to the date of sale. (See Exhibits 2d(1)-(2) for example calculations).

## ARTICLE V -- LOSS-SHARING NOTICES GIVEN TO RECEIVER AND PURCHASER

All notices, demands and other communications hereunder shall be in writing and shall be delivered by hand, or overnight courier, receipt requested, addressed to the parties as follows:

If to Receiver, to:

> Federal Deposit Insurance Corporation as Receiver for **BUTLER BANK**
> Division of Resolutions and Receiverships
> 550 17th Street, N.W.
> Washington, D.C. 20429
> Attention: Ralph Malami, Manager, Capital Markets

with a copy to:

> Federal Deposit Insurance Corporation
> as Receiver for **BUTLER BANK**
> Room E7056
> 3501 Fairfax Drive, Arlington, VA 2226
> Attn: Special Issues Unit

With respect to a notice under Section 3.5 of this Single Family Shared-Loss Agreement, copies of such notice shall be sent to:

> Federal Deposit Insurance Corporation
> Legal Division 1601 Bryan St.
> Dallas, Texas 75201
> Attention: Regional Counsel

If to Assuming Institution, to:

> **Attn**: **Phillip R. Sherringham**
> **President and CEO**
> **People's United Bank**
> **850 Main Street, 16th Floor**

**Bridgeport, Connecticut 06604**

███████████████

Such Persons and addresses may be changed from time to time by notice given pursuant to the provisions of this Article V. Any notice, demand or other communication delivered pursuant to the provisions of this Article V shall be deemed to have been given on the date actually received.

## ARTICLE VI -- MISCELLANEOUS

**6.1.    Expenses**. Except as otherwise expressly provided herein, all costs and expenses incurred by or on behalf of a party hereto in connection with this Single Family Shared-Loss Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

**6.2    Successors and Assigns; Specific Performance.** All terms and provisions of this Single Family Shared-Loss Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; provided, however, that, Receiver may assign or otherwise transfer this Single Family Shared-Loss Agreement (in whole or in part) to the Federal Deposit Insurance Corporation in its corporate capacity without the consent of the Assuming Institution. Notwithstanding anything to the contrary contained in this Single Family Shared-Loss Agreement, except as is expressly permitted in this Section 6.2, Assuming Institution may not assign or otherwise transfer this Single Family Shared-Loss Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio*. For the avoidance of doubt, a merger or consolidation of the Assuming Institution with and into another financial institution, the sale of all or substantially all of the assets of the Assuming Institution to another financial institution constitutes the transfer of this Single Family Shared-Loss Agreement which requires the consent of the Receiver; and for a period of thirty-six (36) months after Bank Closing, a merger or consolidation shall also include the sale by any one or more shareholders acting in concert, of more than nine percent (9%) of the outstanding Shares of the Assuming Institution, or of its Holding Company, or of any subsidiary holding Shared-Loss Assets, or the sale of Shares by the Assuming Institution or its Holding Company or any subsidiary holding Shared-Loss Assets, in a public or private offering, that increases the number of Shares outstanding by more than 9% and after issuance results in a change of shareholder interest of more than 9%, constitutes the transfer of this Single Family Shared-Loss Agreement which requires the consent of the Receiver. No Loss shall be recognized as a result of any accounting adjustments that are made due to any such merger, consolidation or sale consented to by the FDIC.

**6.3    WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS

SINGLE FAMILY SHARED-LOSS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**6.4**   **No Third Party Beneficiary**. This Single Family Shared-Loss Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in this Single Family Shared-Loss Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or Claim under or in respect of this Single Family Shared-Loss Agreement or any provision hereof.

**6.5**   **Consent**. Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

**6.6**   **Rights Cumulative**. Except as otherwise expressly provided herein, the rights of each of the parties under this Single Family Shared-Loss Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the Purchase and Sale Agreement and any of the related agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

### ARTICLE VII
### DISPUTE RESOLUTION

**7.1**   **Dispute Resolution Procedures**.

(a)   In the event a dispute arises about the interpretation, application, calculation of Loss, or calculation of payments or otherwise with respect to this Single Family Shared-Loss Agreement ("SF Shared-Loss Dispute Item"), then the Receiver and the Assuming Institution shall make every attempt in good faith to resolve such items within sixty (60) days following the receipt of a written description of the SF Shared-Loss Dispute Item, with notification of the possibility of taking the matter to arbitration (the date on which such 60-day period expires, or any extension of such period as the parties hereto may mutually agree to in writing, herein called the "Resolution Deadline Date"). If the Receiver and the Assuming Institution resolve all such items to their mutual satisfaction by the Resolution Deadline Date, then within thirty (30) days following such resolution, any payment due as a result of such resolution shall be made arising from the settlement of the SF Shared-Loss Dispute.

(b)   If the Receiver and the Assuming Institution fail to resolve any outstanding SF Shared-Loss Dispute Items by the Resolution Deadline Date, then either party may notify the other of its intent to submit the SF Shared-Loss Dispute Item to arbitration pursuant to the provisions of this Article VII. Failure of either party to submit pursuant to paragraph (c) hereof any unresolved SF Shared-Loss Dispute Item to arbitration within thirty (30) days following the Resolution Deadline Date (the date on which such thirty (30) day period expires is herein called the "Arbitration Deadline Date") shall extinguish that party's right to submit the non-submitted SF Shared-Loss Dispute Item to arbitration, and constitute a waiver of the submitting party's right to dispute such non-submitted SF Shared-Loss Dispute Item (but not a waiver of any

similar claim which may arise in the future).

(c)     If a SF Shared-Loss Dispute Item is submitted to arbitration, it shall be governed by the rules of the American Arbitration Association (the "AAA"), except as otherwise provided herein. Either party may submit a matter for arbitration by delivering a notice, prior to the Arbitration Deadline Date, to the other party in writing setting forth:

(i)     A brief description of each SF Shared-Loss Dispute Item submitted for arbitration;

(ii)    A statement of the moving party's position with respect to each SF Shared-Loss Dispute Item submitted for arbitration;

(iii)   The value sought by the moving party, or other relief requested regarding each SF Shared-Loss Dispute Item submitted for arbitration, to the extent reasonably calculable; and

(iv)    The name and address of the arbiter selected by the moving party (the "Moving Arbiter"), who shall be a neutral, as determined by the AAA.

Failure to adequately include any information above shall not be deemed to be a waiver of the parties right to arbitrate so long as after notification of such failure the moving party cures such failure as promptly as reasonably practicable.

(d)     The non-moving party shall, within thirty (30) days following receipt of a notice of arbitration pursuant to this Section 7.1, deliver a notice to the moving party setting forth:

(i)     The name and address of the arbiter selected by the non-moving party (the "Respondent Arbiter"), who shall be a neutral, as determined by the AAA;

(ii)    A statement of the position of the respondent with respect to each Dispute Item; and

(iii)   The ultimate resolution sought by the respondent or other relief, if any, the respondent deems is due the moving party with respect to each SF Shared-Loss Dispute Item.

Failure to adequately include any information above shall not be deemed to be a waiver of the non-moving party's right to defend such arbitration so long as after notification of such failure the non-moving party cures such failure as promptly as reasonably practicable

(e)     The Moving Arbiter and Respondent Arbiter shall select a third arbiter from a list furnished by the AAA. In accordance with the rules of the AAA, the three (3) arbiters shall constitute the arbitration panel for resolution of each SF Loss-Share Dispute Item. The concurrence of any two (2) arbiters shall be deemed to be the decision of the arbiters for all purposes hereunder. The arbitration shall proceed on such time schedule and in accordance with the Rules of Commercial Arbitration of the AAA then in effect, as modified by this Section 7.1. The arbitration proceedings shall take place at such location as the parties thereto may mutually agree, but if they cannot agree, then they will take place at the offices of the Corporation in Washington, DC, or Arlington, Virginia.

(f)     The Receiver and Assuming Institution shall facilitate the resolution of each

outstanding SF Shared-Loss Dispute Item by making available in a prompt and timely manner to one another and to the arbiters for examination and copying, as appropriate, all documents, books, and records under their respective control and that would be discoverable under the Federal Rules of Civil Procedure.

(g)     The arbiters designated pursuant to subsections (c), (d) and (e) hereof shall select, with respect to each Dispute Item submitted to arbitration pursuant to this Section 7.1, either (i) the position and relief submitted by the Assuming Institution with respect to each SF Shared-Loss Dispute Item, or (ii) the position and relief submitted by the Receiver with respect to each SF Shared-Loss Dispute Item, in either case as set forth in its respective notice of arbitration. The arbiters shall have no authority to select a value for each Dispute Item other than the determination set forth in Section 7.1(c) and Section 7.1(d). The arbitration shall be final, binding and conclusive on the parties.

(h)     Any amounts ultimately determined to be payable pursuant to such award shall bear interest at the Settlement Interest Rate from and including the date specified for the arbiters decisions specified in this Section 7.1, without regard to any extension of the finality of such award, to but not including the date paid. All payments required to be made under this Section 7.1 shall be made by wire transfer.

(i)     For the avoidance of doubt, to the extent any notice of a SF Shared-Loss Dispute Item(s) is provided prior to the Termination Date, the terms of this Single Family Shared-Loss Agreement shall remain in effect with respect to the Single Family Shared-Loss Loans that are the subject of such SF Shared-Loss Dispute Item(s) until such time as any such dispute is finally resolved.

**7.2     Fees and Expenses of Arbiters.**     The aggregate fees and expenses of the arbiters shall be borne equally by the parties.  The parties shall pay the aggregate fees and expenses within thirty (30) days after receipt of the written decision of the arbiters (unless the arbiters agree in writing on some other payment schedule).

### Exhibit 1

### Monthly Certificate

### SEE FOLLOWING PAGE

**CERTIFICATE**
**MONTHLY SUMMARY**
**FOR SINGLE FAMILY ASSETS**

**FDIC - RECEIVER FOR XXXXXXX BANK**

**PURCHASE AND ASSUMPTION AGREEMENT DATED: Jan 1, 2009**

**Shared-Loss Period Ended:** _____
(Dollars)

**Calculation of  Amount Due from (to) FDIC**

| FDIC % Share | 0% | 80% | | Total |
|---|---|---|---|---|
| Carry forward from other types of assets: | | | | |
| 1. Cumulative losses from single family pool | 0 | 0 | | 0 |
| 2. Cumulative losses from securities | 0 | 0 | | 0 |
| 3. Cumulative loss from commercial and other pool | 0 | 0 | – | 0 |
| 4. Total cumulative losses at beg of period | 0 | 0 | | 0 |
| 5. Covered single family losses (gains) during period | 0 | 0 | – | 0 |
| 6. Cumulative loss at end of period | 0 | 0 | | 0 |
| FDIC % Share | x 0% | x 80% | _____ | |
| 7. Amount Due from (to) FDIC | 0 + | 0 + | = | – |
| *Memo: threshold for recovery percentage* | *0* | *0* | | |

Preparer name: _____

_____
Preparer signature

Preparer title: _____

Officer name: _____

_____
Officer signature

Officer title: _____

Date: _____

Page 1 of 3

**XXXXXXXX Bank**
**FIN No. _____**

**Schedule 4.15B**                                             Date: _____
**Non-Single Family Shared-Loss Agreement**

|  | **Proforma Net Balance\*** | **Unfunded** |
|---|---|---|
| Schedule 4.15B as provided | $            -          $ | - |

| Loan Number | Name | Net Balance | Unfunded | Explanation (Loan Description) |
|---|---|---|---|---|
| Add the following loans currently included in Schedule 4.15A Non-Single Family Shared-Loss Agreement: | | | | |
|  |  | - | - | |
|  |  | - | - | |
|  |  | - | - | |
|  | Subtotal | - | - | |
| Subtract the following loans currently included in Schedule 4.15B Single Family Shared-Loss Agreement: | | | | |
|  |  | - | - | |
|  |  | - | - | |
|  |  | - | - | |
|  | Subtotal | - | - | |
| Add the following loan not included in either Schedule 4.15A or 4.15B Asset Detail (Must provide documentation) | | | | |
|  |  | - | - | |
|  |  | - | - | |
|  |  | - | - | |
|  | Subtotal | - | - | |
| Add the following Unfunded Commitments (Must provide documentation) | | | | |
|  |  | - | - | |
|  |  | - | - | |
|  |  | - | - | |
|  | Subtotal | - | - | |
|  | **Total Adjustments** | - | - | |
| **Schedule 4.15B Revised Totals** | | $        - $ | - | |

Note: Total adjustments should also be reflected in the Certificate filing for the quarter this form is submitted.
\* Net Balance agrees with amount noted on Schedule 4.15A Single Family Shared-Loss Agreement, or Revised Totals if this form has already been submitted previously.

**XXXXXXXXX Bank**
**FIN No. ___________**

**Schedule 4.15A**
**Single Family Shared-Loss Agreement**

Date: ___________________

| | **Proforma Net Balance*** | **Unfunded** |
|---|---|---|
| Schedule 4.15A as provided | $ - | $ - |

| Loan Number | Name | Net Balance | Unfunded | Explanation (Loan Description) |
|---|---|---|---|---|
| Add the following loans currently included in Schedule 4.15B Non-Single Family Shared-Loss Agreement: | | | | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | Subtotal | - | - | |
| Subtract the following loans currently included in Schedule 4.15A Single Family Shared-Loss Agreement: | | | | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | Subtotal | - | - | |
| Add the following loan not included in either Schedule 4.15A or 4.15B Asset Detail (Must provide documentation) | | | | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | Subtotal | - | - | |
| Add the following Unfunded Commitments (Must provide documentation) | | | | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | | - | - | |
| | Subtotal | - | - | |
| | **Total Adjustments** | - | - | |
| **Schedule 4.15A Revised Totals** | | $ - | $ - | |

Exhibit 2.1(c)

| 1 | Shared-Loss Month |
|---|---|
| 2 | Loan ID |
| 3 | First payment date |
| 4 | Property type |
| 5 | Lien |
| 6 | Original loan amount |
| 7 | Documentation |
| 8 | Original FICO |
| 9 | Original LTV |
| 10 | Original combined LTV |
| 11 | Original front-end DTI |
| 12 | Original back-end DTI |
| 13 | Negative Amortization cap |
| 14 | Property city |
| 15 | Property state |
| 16 | Property street address |
| 17 | Property zip |
| 18 | Maturity date |
| 19 | MI Coverage |
| 20 | Occupancy |
| 21 | Interest rate type |
| 22 | Product Type |
| 23 | Loan amortization type |
| 24 | Lookback |
| 25 | Margin |
| 26 | Interest rate index |
| 27 | Interest rate cap |
| 28 | Interest rate floor |
| 29 | First interest cap |
| 30 | Periodic interest cap |
| 31 | Periodic interest floor |
| 32 | Pay Cap |
| 33 | UPB |
| 34 | Interest rate |
| 35 | Paid-to date |
| 36 | Next payment due date |
| 37 | Scheduled payment |
| 38 | Escrow payment |

| 39 | Escrow balance |
|----|----------------|
| 40 | Next interest rate reset date |
| 41 | Next payment reset date |
| 42 | Rate reset period |
| 43 | Payment reset period |
| 44 | Payment History |
| 45 | Exceptional Loan Status |
| 46 | Valuation date |
| 47 | Valuation amount |
| 48 | Valuation type |
| 49 | Household income |
| 50 | Current FICO |
| 51 | Maximum Draw Amount |
| 52 | Draw period |
| 53 | Superior Lien Balance |

**Exhibit 2a (1)**
**CALCULATION OF RESTRUCTURING LOSS - HAMP or FDIC LOAN MODIFICATION**

| | | |
|---|---|---|
| 1 | Shared-Loss Month | 20090531 |
| 2 | Loan no: | 123456 |
| 3 | Modification Program: | HAMP |
| | **Loan before Restructuring** | |
| 4 | Unpaid principal balance | 450000 |
| 5 | Remaining term | 298 |
| 6 | Interest rate | 0.06500 |
| 7 | Next ARM reset rate (if within next 4 months) | 0.00000 |
| 8 | Interest Paid-To-Date | 20081230 |
| 9 | Delinquency Status | FC |
| 10 | Monthly payment - P&I | 3047 |
| 11 | Monthly payment - T&I | 1000 |
| | Total monthly payment | 4047 |
| 12 | Household current annual income | 95000 |
| 13 | Valuation Date | 20090121 |
| 14 | Valuation Amount | 425000 |
| 15 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | AVM |
| | **Terms of Modified/Restructured Loan** | |
| 16 | 1st Trial Payment Due Date | 20090119 |
| 17 | Modification Effective Date | 20090419 |
| 18 | Net Unpaid Principal Balance (net of forbearance & principal reduction) | 467188 |
| 19 | Principal forbearance | 0 |
| 20 | Principal reduction | 0 |
| 21 | Product (fixed or step) | step |
| 22 | Remaining amortization term | 480 |
| 23 | Maturity date | 20490119 |
| 24 | Interest rate | 0.02159 |
| 25 | Next Payment due date | 20090601 |
| 26 | Monthly payment - P&I | 1454 |
| 27 | Monthly payment - T&I | 1000 |
| | Total monthly payment | 2454 |
| 28 | Next reset date | 20140501 |
| 29 | Interest rate change per adjustment | 0.01000 |
| 30 | Lifetime interest rate cap | 0.05530 |
| 31 | Back end DTI | 0.45000 |
| | **Restructuring Loss Calculation** | |
| 4 | same as Unpaid Principal Balance before above restructuring/modification | 450000 |
| 34 | Accrued interest, limited to 90 days | 7313 |
| 35 | Attorney's fees | 0 |
| 36 | Foreclosure costs, including title search, filing fees, advertising, etc. | 500 |
| 37 | Property protection costs, maint. and repairs | 0 |
| 38 | Tax and insurance advances | 2500 |
| | Other Advances | |
| 39 | Appraisal/Broker's Price Opinion fees | 100 |
| 40 | Inspections | 0 |
| 41 | Other | 0 |
| | Total loan balance due before restructuring | 460413 |
| | **Cash Recoveries:** | |
| 42 | MI contribution | 0 |
| 43 | Other credits | 0 |
| 44 | T & I escrow account balances, if positive | |
| | Total Cash Recovery | 0 |
| | **Assumptions for Calculating Loss Share Amount, Restructured Loan:** | |
| 45 | Discount rate for projected cash flows | 0.05530 |
| 46 | Loan prepayment in full | 120 |
| 47 | NPV of projected cash flows (see amort schd1) | 386927 |
| 48 | **Gain/Loss Amount** | 73485 |

Line item definitions can be found in SFR Data Submission Handbook.

Exhibit 2a(2)

**CALCULATION OF RESTRUCTURING LOSS - 2nd FDIC MODIFICATION**

| | | |
|---|---|---|
| 1 | Shared-Loss Month | 20090531 |
| 2 | Loan no: | 123456 |
| 3 | Modification Program: | FDIC |
| | **Loan before Restructuring** | |
| 4 | Unpaid principal balance | 450000 |
| 5 | Remaining term | 298 |
| 6 | Interest rate | 0.06500 |
| 7 | Next ARM reset rate (if within next 4 months) | 0.00000 |
| 8 | Interest Paid-To-Date | 20081230 |
| 9 | Delinquency Status | FC |
| 10 | Monthly payment - P&I | 3047 |
| 11 | Monthly payment - T&I | 1000 |
| | Total monthly payment | 4047 |
| 12 | Household current annual income | 95000 |
| 13 | Valuation Date | 20090121 |
| 14 | Valuation Amount | 425000 |
| 15 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | AVM |
| | **Terms of Modified/Restructured Loan** | |
| 16 | 1st Trial Payment Due Date | 20090201 |
| 17 | Modification Effective Date | 20090501 |
| 18 | Net Principal balance (net of forbearance & principal reduction) | 467188 |
| 19 | Principal forbearance | 0 |
| 20 | Principal reduction | 0 |
| 21 | Product (fixed or step) | step |
| 22 | Remaining amortization term | 480 |
| 23 | Maturity date | 20490501 |
| 24 | Interest rate | 0.02159 |
| 25 | Next Payment due date | 20090601 |
| 26 | Monthly payment - P&I | 1454 |
| 27 | Monthly payment - T&I | 1000 |
| | Total monthly payment | 2454 |
| 28 | Next reset date | 20140501 |
| 29 | Interest rate change per adjustment | 0.01000 |
| 30 | Lifetime interest rate cap | 0.05530 |
| 31 | Back end DTI | 0.45000 |
| | **Restructuring Loss Calculation** | |
| 32 | Previous NPV of loan modification | 458740 |
| 33 | Less: Post modification principal payments | 2500 |
| | Plus: | |
| 35 | Attorney's fees | 0 |
| 36 | Foreclosure costs, including title search, filing fees, advertising, etc. | 500 |
| 37 | Property protection costs, maint. and repairs | 0 |
| 38 | Tax and insurance advances | 2500 |
| | Other Advances | |
| 39 | Appraisal/Broker's Price Opinion fees | 100 |
| 40 | Inspections | 0 |
| 41 | Other | 0 |
| | Total loan balance due before restructuring | 459340 |
| | **Cash Recoveries:** | |
| 42 | MI contribution | 0 |
| 43 | Other credits | 0 |
| 44 | T & I escrow account balances, if positive | |
| | Total Cash Recovery | 0 |
| | **Assumptions for Calculating Loss Share Amount, Restructured Loan:** | |
| 45 | Discount rate for projected cash flows | 0.05530 |
| 46 | Loan prepayment in full | 120 |
| 47 | NPV of projected cash flows (see amort schd1) | 386927 |
| 48 | **Gain/Loss Amount** | 72413 |

Line item definitions can be found in SFR Data Submission Handbook.

**Notes to Exhibits 2a (restructuring)**

1. The data shown are for illustrative purpose.  The figures will vary for actual restructurings.
2. For purposes of loss sharing, losses on restructured loans are calculated as the difference between:
   a. The principal, accrued interest, advances due on the loan, and allowable 3rd party fees prior to restructuring (2a(1) lines 34-41, 2a(2) lines 33-41), and
   b. The Net Present Value (NPV) of the estimated cash flows (line 47). The cash flows should assume no default or prepayment for 10 years, followed by prepayment in full at the end of 10 years (120 months).
3. For owner-occupied residential loans, the NPV is calculated using the most recently published Freddie Mac survey rate on 30-year fixed rate loans as of the restructure date.
4. For investor owned or non-owner occupied residential loans, the NPV is calculated using commercially reasonable rate on 30-year fixed rate loans as of the restructure date.
5. If the new loan is an adjustable-rate loan, interest rate resets and related cash flows should be projected based on the index rate in effect at the date of the loan restructuring. If the restructured loan otherwise provides for specific charges in monthly P&I payments over the term of the loan, those changes should be reflected in the projected cash flows. Assuming Institution must retain supporting schedule of projected cash flows as required by Section 2.1 of the Single Family Shared-Loss Agreement and provide it to the FDIC if requested for a sample audit.
6. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Institution to the loan account, any allocation of Assuming Institution's servicing costs, or any allocations of Assuming Institution's general and administrative (G&A) or other operating costs.
7. The amount of accrued interest that may be added to the balance of the loan is limited to the minimum of:
   a. 90 days
   b. The number of days that the loan is delinquent at the time of restructuring
   c. The number of days between the resolution date and the restructuring
   To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

**Exhibit 2b(1)**
**CALCULATION OF LOSS FOR SHORT SALE LOANS**
**Loan written down to book value prior to Loss Share**

| | | |
|---|---|---:|
| 1 | Shared-Loss Month: | 20090531 |
| 2 | Loan # | 62201 |
| | | |
| 3 | Interest Paid-to-Date | 20071130 |
| 4 | Short Payoff Date | 20090522 |
| 5 | Note Interest rate | 0.08500 |
| 6 | Occupancy | Owner |
| | If owner occupied: | |
| 7 | Household current annual income | 45000 |
| 8 | Estimated NPV of loan mod | 220000 |
| 9 | Valuation Date | 20090121 |
| 10 | Valuation Amount | 300000 |
| 11 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | Ext Appraisal |

**Short-Sale Loss calculation**

| | | |
|---|---|---:|
| 13 | Book Value | 300000 |
| 14 | Less: Post closing principal payments | 0 |
| 17 | Accrued interest, limited to 90 days | 6375 |
| 18 | Attorney's fees | 75 |
| 19 | Foreclosure costs, including title search, filing fees, advertising, etc. | 0 |
| 20 | Property protection costs, maint., repairs and any costs or expenses relating to environmental conditions | 0 |
| 21 | Tax and insurance advances | 0 |
| | Other Advances | |
| 22 | Appraisal/Broker's Price Opinion fees | 250 |
| 23 | Inspections | 600 |
| 24 | Other | 0 |
| 25 | Incentive to borrower | 5000 |
| | | |
| | Gross balance recoverable by Purchaser | 312300 |
| | | |
| 26 | Amount accepted in Short-Sale (net proceeds) | 275000 |
| 27 | Hazard Insurance | 0 |
| 28 | Mortgage Insurance | 0 |
| 29 | T & I escrow account balance, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| | | |
| | Total Cash Recovery | 275000 |
| | | |
| 31 | **Gain/Loss Amount** | 37300 |

[1] Costs with respect to environmental remediation activities
are limited to $200,000 unless prior consent of the FDIC
Line item definitions located in SF Data Submission Handbook

## Exhibit 2b(2)
### CALCULATION OF LOSS FOR SHORT SALE LOANS
#### No Preceeding Loan Mod under Loss Share

| | | |
|---|---|---|
| 1 | Shared-Loss Month: | 20090531 |
| 2 | Loan # | 58776 |
| 3 | Interest Paid-to-Date | 20080731 |
| 4 | Short Payoff Date | 20090417 |
| 5 | Note Interest rate | 0.07750 |
| 6 | Occupancy | Owner |
| | If owner occupied: | |
| 7 | Household current annual income | 38500 |
| 8 | Estimated NPV of loan mod | 200000 |
| 9 | Valuation Date | 20090121 |
| 10 | Valuation Amount | 300000 |
| 11 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | Ext Appraisal |

**Short-Sale Loss calculation**

| | | |
|---|---|---|
| 12 | Loan UPB | 375000 |
| 17 | Accrued interest, limited to 90 days | 7266 |
| 18 | Attorney's fees | 0 |
| 19 | Foreclosure costs, including title search, filing fees, advertising, etc. | 400 |
| 20 | Property protection costs, maint., repairs and any costs or expenses relating to environmental conditions | 1450 |
| 21 | Tax and insurance advances | 0 |
| | Other Advances | |
| 22 | Appraisal/Broker's Price Opinion fees | 350 |
| 23 | Inspections | 600 |
| 24 | Other | 0 |
| 25 | Incentive to borrower | 2000 |
| | Gross balance recoverable by Purchaser | 387066 |
| 26 | Amount accepted in Short-Sale (net proceeds) | 255000 |
| 27 | Hazard Insurance | 0 |
| 28 | Mortgage Insurance | 0 |
| 29 | T & I escrow account balance, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| | Total Cash Recovery | 255000 |
| 31 | **Gain/Loss Amount** | 132066 |

[1] Costs with respect to environmental remediation activities
are limited to $200,000 unless prior consent of the FDIC
Line item definitions located in SF Data Submission Handbook

## Notes to Exhibits 2b (short sale)

1. The data shown are for illustrative purpose.  The figures will vary for actual short sales.
2. The covered loss is the difference between the gross balance recoverable by Purchaser and the total cash recovery.  There are two methods of calculation for covered losses from short sales, depending upon the circumstances.  They are shown below:
   a. If the loan was restructured when the Loss Share agreement was in place, and then the short sale occurred, use Exhibit 2b(3).  This version uses the Net Present Value (NPV) of the modified loan as the starting point for the covered loss.
   b. Otherwise, use Exhibit 2b(2).  This version uses the unpaid balance of the loan as of the last payment as the starting point for the covered loss.
   c. Use Exhibit 2b(1) for loans written down to book value prior to the shared-loss agreement.
3. For Exhibit 2b(2), the gross balance recoverable by the purchaser is calculated as the sum of lines 12 – 25; it is shown after line 25. For Exhibit 2b(3), the gross balance recoverable by the purchaser is calculated as line 15 minus line 16 plus lines 18 – 25; it is shown after line 25.
4. For Exhibit 2b(2), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown in line 31. For Exhibit 2b(3), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown after line 30.
5. Reasonable and customary third party attorney's fees and expenses incurred by or on behalf of Assuming Institution in connection with any enforcement procedures, or otherwise with respect to such loan, are reported under Attorney's fees.
6. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Institution to the loan account, any allocation of Assuming Institution's servicing costs, or any allocations of Assuming Institution's general and administrative (G&A) or other operating costs.
7. If Exhibit 2b(3) is used, then no accrued interest may be included as a covered loss. Otherwise, the amount of accrued interest that may be included as a covered loss is limited to the minimum of:
   a. 90 days
   b. The number of days that the loan is delinquent when the property was sold
   c. The number of days between the resolution date and the date when the property was sold

To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

## Exhibit 2c(1)
### CALCULATION OF FORECLOSURE LOSS

**ORE or Foreclosure Occurred Prior to Loss Share Agreement**

| | | |
|---|---|---|
| 1 | Shared-Loss Month | 20090630 |
| 2 | Loan no: | 364574 |
| | | |
| 3 | Interest Paid-To-Date | 20071001 |
| 4 | Foreclosure sale date | 20080202 |
| 5 | Liquidation date | 20090412 |
| 6 | Note Interest rate | 0.08100 |
| 10 | Valuation Date | 20090121 |
| 11 | Valuation Amount | 228000 |
| 12 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | Int Appr |

**Foreclosure Loss calculation**

| | | |
|---|---|---|
| 13 | Book value at date of Loss Share agreement | 244900 |
| 14 | Less: Post closing principal payments | 0 |
| | | 3306 |
| | **Costs incurred after Loss Share agreement in place:** | |
| 19 | Attorney's fees | 0 |
| 20 | Foreclosure costs, including title search, filing fees, advertising, etc. | 0 |
| 21 | Property protection costs, maint. and repairs | 6500 |
| 22 | Tax and insurance advances | 0 |
| | Other Advances | |
| 23 | Appraisal/Broker's Price Opinion fees | 0 |
| 24 | Inspections | 0 |
| 25 | Other | 0 |
| | Gross balance recoverable by Purchaser | 254706 |

**Cash Recoveries:**

| | | |
|---|---|---|
| 26 | Net liquidation proceeds (from HUD-1 settl stmt) | 219400 |
| 27 | Hazard Insurance proceeds | 0 |
| 28 | Mortgage Insurance proceeds | 0 |
| 29 | T & I escrow account balances, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| | Total Cash Recovery | 219400 |
| 31 | **Gain/Loss Amount** | 35306 |

Line item definitions located in SF Data Submission Handbook

# Exhibit 2c(2)
## CALCULATION OF FORECLOSURE LOSS
### During Term of the Agreement
### No Preceeding Loan Mod under Loss Share

| | | |
|---|---|---|
| 1 | Shared-Loss Month | 20090531 |
| 2 | Loan no: | 292334 |
| | | |
| 3 | Interest Paid-to-Date | 20080430 |
| 4 | Foreclosure sale date | 20090115 |
| 5 | Liquidation date | 20090412 |
| 6 | Note Interest rate | 0.08000 |
| 7 | Occupancy | Owner |
| | If owner occupied: | |
| 8 | Household current annual income | 42000 |
| 9 | Estimated NPV of loan mod | 195000 |
| 10 | Valuation Date | 20090121 |
| 11 | Valuation Amount | 235000 |
| 12 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | Ext BPO |

**Foreclosure Loss calculation**

| | | |
|---|---|---|
| 14 | Loan Principal balance at property reversion | 300000 |
| | Plus: | |
| 18 | Accrued interest, limited to 90 days | 6000 |
| 19 | Attorney's fees | 0 |
| 20 | Foreclosure costs, including title search, filing fees, advertising, etc. | 4000 |
| 21 | Property protection costs, maint. and repairs | 5500 |
| 22 | Tax and insurance advances | 1500 |
| | Other Advances | |
| 23 | Appraisal/Broker's Price Opinion fees | 0 |
| 24 | Inspections | 50 |
| 25 | Other | 0 |
| | Gross balance recoverable by Purchaser | 317050 |

**Cash Recoveries:**

| | | |
|---|---|---|
| 26 | Net liquidation proceeds (from HUD-1 settl stmt) | 205000 |
| 27 | Hazard Insurance proceeds | 0 |
| 28 | Mortgage Insurance proceeds | 0 |
| 29 | T & I escrow account balances, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| | Total Cash Recovery | 205000 |
| 31 | **Gain/Loss Amount** | 112050 |

Line item definitions located in SF Data Submission Handbook

## Exhibit 2c(3)
### CALCULATION OF FORECLOSURE LOSS
### Foreclosure after a Covered Loan Mod

| | | |
|---|---|---|
| 1 | Shared-Loss Month | 20090531 |
| 2 | Loan no: | 138554 |
| | | |
| 3 | Interest Paid-to-Date | 20080430 |
| 4 | Foreclosure sale date | 20090115 |
| 5 | Liquidation date | 20090412 |
| 6 | Note Interest rate | 0.04000 |
| 10 | Valuation Date | 20081215 |
| 11 | Valuation Amount | 210000 |
| | | |
| 12 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | Ext Appr |

**Foreclosure Loss calculation**

| | | |
|---|---|---|
| 16 | NPV of projected cash flows at loan mod | 285000 |
| 17 | Less: Post modification principal payments | 2500 |
| | Plus: | |
| 19 | Attorney's fees | 0 |
| 20 | Foreclosure costs, including title search, filing fees, advertising, etc. | 4000 |
| 21 | Property protection costs, maint. and repairs | 7000 |
| 22 | Tax and insurance advances | 2000 |
| | Other Advances | |
| 23 | Appraisal/Broker's Price Opinion fees | 0 |
| 24 | Inspections | 0 |
| 25 | Other | 0 |
| | | |
| | Gross balance recoverable by Purchaser | 295500 |

**Cash Recoveries:**

| | | |
|---|---|---|
| 26 | Net liquidation proceeds (from HUD-1 settl stmt) | 201000 |
| 27 | Hazard Insurance proceeds | 0 |
| 28 | Mortgage Insurance proceeds | 0 |
| 29 | T & I escrow account balances, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| | Total Cash Recovery | 201000 |
| | | |
| 31 | Gain/Loss Amount | 94500 |

Line item definitions located in SF Data Submission Handbook

**Notes to Exhibits 2c (foreclosure)**

2. The data shown are for illustrative purpose.  The figures will vary for actual restructurings.
3. The covered loss is the difference between the gross balance recoverable by Purchaser and the total cash recovery.  There are three methods of calculation for covered losses from foreclosures, depending upon the circumstances.  They are shown below:
   a. If foreclosure occurred prior to the beginning of the Loss Share agreement, use Exhibit 2c(1).  This version uses the book value of the REO as the starting point for the covered loss.
   b. If foreclosure occurred after the Loss Share agreement was in place, and if the loan was not restructured when the Loss Share agreement was in place, use Exhibit 2c(2).  This version uses the unpaid balance of the loan as of the last payment as the starting point for the covered loss.
   c. If the loan was restructured when the Loss Share agreement was in place, and then foreclosure occurred, use Exhibit 2c(3).  This version uses the Net Present Value (NPV) of the modified loan as the starting point for the covered loss.
4. For Exhibit 2c(1), the gross balance recoverable by the purchaser is calculated as the sum of lines 13 – 25; it is shown after line 25. For Exhibit 2c(2), the gross balance recoverable by the purchaser is calculated as the sum of lines 14 – 25; it is shown after line 25. For Exhibit 2c(3), the gross balance recoverable by the purchaser is calculated as line 16 minus line 17 plus lines 17 – 25; it is shown after line 25.
5. For Exhibit 2c(1), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown in line 31. For Exhibit 2c(2), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown in line 31. For Exhibit 2c(3), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown in line 31.
6. Reasonable and customary third party attorney's fees and expenses incurred by or on behalf of Assuming Institution in connection with any enforcement procedures, or otherwise with respect to such loan, are reported under Attorney's fees.
7. Assuming Institution's (or Third Party Servicer's) reasonable and customary out-of-pocket costs paid to either a third party or an affiliate (if affiliate is pre-approved by the FDIC) for foreclosure, property protection and maintenance costs, repairs, assessments, taxes, insurance and similar items are treated as part of the gross recoverable balance, to the extent they are not paid from funds in the borrower's escrow account.  Allowable costs are limited to amounts per Freddie Mac and Fannie Mae guidelines (as in effect from time to time), where applicable, provided that this limitation shall not apply to costs or expenses relating to environmental conditions.
8. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Institution to the loan account, any allocation of Assuming Institution's servicing costs, or any allocations of Assuming Institution's general and administrative (G&A) or other operating costs.
9. If Exhibit 2c(3) is used, then no accrued interest may be included as a covered loss.  The amount of accrued interest that may be included as a covered loss on Exhibit 2c(2) is limited to the minimum of:
   a. 90 days
   b. The number of days that the loan is delinquent when the property was sold

c.   The number of days between the resolution date and the date when the property was sold

To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

**Exhibit 2d(1)**

**CALCULATION OF LOSS FOR UNRELATED 2ND LIEN
CHARGE-OFF**

| | | |
|---|---|---:|
| 1 | Shared-Loss Month: | 20090531 |
| 2 | Loan # | 58776 |
| | | |
| 3 | Interest paid-to-date | 20081201 |
| 4 | Charge-Off Date | 20090531 |
| 5 | Note Interest rate | 0.03500 |
| 6 | Occupancy | Owner |
| | If owner occupied: | |
| 7 | Household current annual income | 0 |
| 8 | Valuation Date | 20090402 |
| 9 | Valuation Amount | 230000 |
| 10 | Valuation Type (Interior/exterior appraisal, BPO, AVM, etc) | BPO |
| 11 | Balance of superior liens | 210000 |
| | | |
| | **Charge-Off Loss calculation** | |
| 12 | Loan Principal balance | 55000 |
| 13 | Charge-off amount (principal only) | 55000 |
| | Plus: | |
| 14 | Accrued interest, limited to 90 days | 481 |
| 15 | Attorney's fees | 0 |
| 16 | Foreclosure costs, including title search, filing fees, advertising, etc. | 250 |
| 17 | Property protection costs, maint., repairs and any costs or expenses relating to environmental conditions | 0 |
| 18 | Tax and insurance advances | 0 |
| | Other Advances | |
| 19 | Appraisal/Broker's Price Opinion fees | 75 |
| 20 | Inspections | 0 |
| 21 | Other | 0 |
| | | |
| | Gross balance recoverable by Purchaser | 55806 |
| | | |
| 22 | Foreclosure sale proceeds | 0 |
| 23 | Hazard Insurance proceeds | 0 |
| 24 | Mortgage Insurance proceeds | 0 |
| 25 | Tax overage | 0 |
| 26 | Short sale payoff | 1500 |
| 27 | Other credits, if any (itemize) | 0 |
| | | |
| | Total Cash Recovery | 1500 |
| | | |
| 28 | **Loss Amount** | 54306 |

[1] Costs with respect to environmental remediation activities
are limited to $200,000 unless prior consent of the FDIC
Line item definitions located in SF Data Submission Handbook

<div align="center">**Exhibit 2d(2)**</div>

**Shared-Loss Month:**                             [input month]
**Loan no.:**                                        [input loan no.)

<u>**NOTE**</u>
The calculation of recovery on a loan for which a Restructuring Loss has been paid will only apply if the loan is sold.

<u>**EXAMPLE CALCULATION**</u>

<u>Restructuring Loss Information</u>

| | | |
|---|---|---|
| Loan principal balance before restructuring | $ 200,000 | **A** |
| NPV, restructured loan | 165,000 | **B** |
| Loss on restructured loan | $   35,000 | **A – B** |
| Times FDIC applicable loss share % (80%) | 80% | **B** |
| **Loss share payment to purchaser** | $   28,000 | **C** |

<u>***Calculation – Recovery amount due to Receiver***</u>

| | | | |
|---|---|---|---|
| Loan sales price | | $ 190,000 | |
| NPV of restructured loan at mod date | | 165,000 | |
| Gain - step 1 | | 25,000 | **D** |
| PLUS | | | |
| Loan UPB after restructuring | (1) | 200,000 | |
| Loan UPB at liquidation date | | 192,000 | |
| Gain - step 2 (principal collections after restructuring) | | 8,000 | **E** |
| Recovery amount | | 33,000 | **D + E** |
| Times FDIC loss share % | | 80% | |
| **Recovery due to FDIC** | | $   26,400 | **F** |

| | |
|---|---|
| **Net loss share paid to purchaser (C – F)** | $    1,600 |

<u>**Proof Calculation**</u>     (2)

| | | |
|---|---|---|
| Loan principal balance | $ 200,000 | **G** |
| | | |
| Principal collections on loan | 8,000 | |
| Sales price for loan | 190,000 | |
| Total collections on loan | 198,000 | **H** |
| Net loss on loan | $    2,000 | **G – H** |
| Times FDIC applicable loss share % (80%) | 80% | |
| **Loss share payment to purchaser** | $    1,600 | |

(1) This example assumes that the FDIC loan modification program as shown in Exhibit 5 is applied and the loan restructuring does not result in a reduction in the loan principal balance due from the borrower.
(2) This proof calculation is provided to illustrate the concept and the Assuming Institution is not required to provide this with its Recovery calculations.

**Exhibit 3**
**Portfolio Performance and Summary Schedule**

**SHARED-LOSS LOANS**
**PORTFOLIO PERFORMANCE AND SUMMARY SCHEDULE**
**MONTH ENDED:**                                        **[input report month]**

**POOL SUMMARY**                                        #           $

Loans at Sale Date                                      xx          xx

Loans as of this month-end                              xx          xx

 

|   | # | $ | Percent of Total # |
|---|---|---|---|

**PORTFOLIO PERFORMANCE STATUS**
Current
30 – 59 days past due
60 – 89 days past due
90 – 119 days past due
120 and over days past due
In foreclosure
ORE
Total

Memo Item:
Loans in process of restructuring – total
Loans in bankruptcy

Loans in process of restructuring by delinquency status
Current
30 - 59 days past due
60 - 89 days past due
90 - 119 days past due
120 and over days past due In foreclosure
   Total

**List of Loans Paid Off During Month**

<div style="text-align:center">Loan #</div>

Principal
Balance

**List of Loans Sold During Month**

<div style="text-align:center">Loan #</div>

Principal
Balance

**Exhibit 4**
**Wire Transfer Instructions**

## PURCHASER WIRING INSTRUCTIONS

**BANK RECEIVING WIRE** _____

**9 DIGIT ABA ROUTING NUMBER** _____

**ACCOUNT NUMBER** _____

**NAME OF ACCOUNT** _____

**ATTENTION TO WHOM** _____

**PURPOSE OF WIRE** _____

## FDIC RECEIVER WIRING INSTRUCTIONS

**BANK RECEIVING WIRE** _____

**SHORT NAME** _____

**ADDRESS OF BANK RECEIVING WIRE** _____

**9 DIGIT ABA ROUTING NUMBER** _____

**ACCOUNT NUMBER** _____

**NAME OF ACCOUNT** _____

**ATTENTION TO WHOM** _____

**PURPOSE OF WIRE** _____

## EXHIBIT 5

## FDIC MORTGAGE LOAN MODIFICATION PROGRAM

Objective

The objective of this FDIC Mortgage Loan Modification Program ("Program") is to modify the terms of certain residential mortgage loans so as to improve affordability, increase the probability of performance, allow borrowers to remain in their homes and increase the value of the loans to the FDIC and assignees. The Program provides for the modification of Qualifying Loans (as defined below) by reducing the borrower's monthly housing debt to income ratio ("DTI Ratio") to no more than 31% at the time of the modification and eliminating adjustable interest rate and negative amortization features.

Qualifying Mortgage Loans

In order for a mortgage loan to be a Qualifying Loan it must meet all of the following criteria, which must be confirmed by the lender:

- The collateral securing the mortgage loan is owner-occupied and the owner's primary residence; and
- The mortgagee has a first priority lien on the collateral; and
- Either the borrower is at least 60 days delinquent or a default is reasonably foreseeable.

Modification Process

The lender shall undertake a review of its mortgage loan portfolio to identify Qualifying Loans. For each Qualifying Loan, the lender shall determine the net present value of the modified loan and, if it will exceed the net present value of the foreclosed collateral upon disposition, then the Qualifying Loan shall be modified so as to reduce the borrower's monthly DTI Ratio to no more than 31% at the time of the modification. To achieve this, the lender shall use a combination of interest rate reduction, term extension and principal forbearance, as necessary.

The borrower's monthly DTI Ratio shall be a percentage calculated by dividing the borrower's monthly income by the borrower's monthly housing payment (including principal, interest, taxes and insurance). For these purpose of the foregoing calculation:

(1) the borrower's monthly income shall be defined as the borrower's (along with any co-borrowers') income amount before any payroll deductions and includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payments, including Social Security received by adults on behalf of minors or by minors intended for their own support, and monthly income from annuities, insurance policies, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income.   All income information must be documented and verified.   If the borrower receives public assistance or collects unemployment, the Assuming Institution must determine whether the public assistance or unemployment income will continue for at least nine (9) months.

(2) the borrower's monthly housing payment shall be the amount required to pay monthly principal and interest plus one-twelfth of the then current annual amount required to pay real property taxes and homeowner's insurance with respect to the collateral.

In order to calculate the monthly principal payment, the lender shall capitalize to the outstanding principal balance of the Qualifying Loan the amount of all delinquent interest, delinquent taxes, past due insurance premiums, third party fees and (without duplication) escrow advances (such amount, the "Capitalized Balance").

In order to achieve the goal of reducing the DTI Ratio to 31%, the lender shall take the following steps in the following order of priority with respect to each Qualifying Loan:

1. Reduce the interest rate to the then current Freddie Mac Survey Rate for 30-year fixed rate mortgage loans, and adjust the term to 30 years.

2. If the DTI Ratio is still in excess of 31%, reduce the interest rate further, but no lower than 3%, until the DTI ratio of 31% is achieved.

3. If the DTI Ratio is still in excess of 31% after adjusting the interest rate to 3%, extend the remaining term of the loan by 10 years.

4. If the DTI Ratio is still in excess of 31%, calculate a new monthly payment (the "Adjusted Payment Amount") that will result in the borrower's monthly DTI Ratio not exceeding 31%. After calculating the Adjusted Payment Amount, the lender shall bifurcate the Capitalized Balance into two portions – the amortizing portion and the non-amortizing portion. The amortizing portion of the Capitalized Balance shall be the mortgage amount that will fully amortize over a 40-year term at an annual interest rate of 3% and monthly payments equal to the Adjusted Payment Amount. The non-amortizing portion of the Capitalized Balance shall be the difference between the Capitalized Balance and the amortizing portion of the Capitalized Balance. If the amortizing portion of the Capitalized Balance is less than 75% of the current estimated value of the collateral, then the lender may choose not to restructure the loan. If the lender chooses to restructure the loan, then the lender shall forbear on collecting the non-amortizing portion of the Capitalized Balance, and such amount shall be due and payable only upon the earlier of (i) maturity of the modified loan, (ii) a sale of the property or (iii) a pay-off or refinancing of the loan. No interest shall be charged on the non-amortizing portion of the Capitalized Balance, but repayment shall be secured by a first lien on the collateral.

<u>Special Note:</u>

The net present value calculation used to determine whether a loan should be modified based on the modification process above is distinct and different from the net present value calculation used to determine the covered loss if the loan is modified. Please refer only to the net present value calculation described in this exhibit for the modification process, with its separate assumptions, when determining whether to provide a modification to a borrower. Separate assumptions may include, without limitation, Assuming Institution's determination of a probability of default without modification, a probability of default with modification, home price forecasts, prepayment speeds, and event timing. These assumptions are applied to different projected cash flows over the term of the loan, such as the projected cash flow of the loan performing or defaulting without modification and the projected cash flow of the loan performing or defaulting with modification.

By contrast, the net present value for determining the covered loss is based on a 10 year period. While the assumptions in the net present value calculation used in the modification process may change, the net present value calculation for determining the covered loss remains constant.

<u>Related Junior Lien Mortgage Loans</u>

In cases where the lender holds a junior lien mortgage loan that is collateralized by the same property that collateralizes a Qualifying Loan that is modified as described above, the junior lien mortgage loan shall also be modified to enhance overall affordability to the borrower.  At a minimum, the lender shall reduce the interest rate on the junior lien mortgage loan to no more than 2% per annum.  Further modifications may be made at the lender's discretion as needed to support affordability and performance of the modified first lien Qualifying Loan.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

102

BUTLER BANK
LOWELL, MASSACHUSETTS

## EXHIBIT 4.15B

## COMMERCIAL SHARED-LOSS AGREEMENT

This agreement for reimbursement of loss sharing expenses on certain loans and other assets (the "Commercial Shared-Loss Agreement") shall apply when the Assuming Institution purchases Shared-Loss Assets as that term is defined herein. The terms hereof shall modify and supplement, as necessary, the terms of the Purchase and Assumption Agreement to which this Commercial Shared-Loss Agreement is attached as Exhibit 4.15B and incorporated therein. To the extent any inconsistencies may arise between the terms of the Purchase and Assumption Agreement and this Commercial Shared-Loss Agreement with respect to the subject matter of this Commercial Shared-Loss Agreement, the terms of this Commercial Shared-Loss Agreement shall control. References in this Commercial Shared-Loss Agreement to a particular Section shall be deemed to refer to a Section in this Commercial Shared-Loss Agreement unless the context indicates that a Section of the Purchase and Assumption Agreement is intended.

## ARTICLE I -- DEFINITIONS

Capitalized terms used in this Commercial Shared-Loss Agreement that are not defined in this Commercial Shared-Loss Agreement are defined in the Purchase and Assumption Agreement  In addition to the terms defined above, defined below are certain additional terms relating to loss-sharing, as used in this Commercial Shared-Loss Agreement.

"**AAA**" means the American Arbitration Association as provided in Section 2.1(f)(iii) of this Commercial Shared-Loss Agreement.

"**Accrued Interest**" means, with respect to any Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance at any time, the amount of earned and unpaid interest, taxes, credit life and/or disability insurance premiums (if any) payable by the Obligor accrued on or with respect to such Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance, all as reflected on the Accounting Records of the Failed Bank or the Assuming Institution (as applicable); provided, that Accrued Interest shall not include any amount that accrues on or with respect to any Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance after that Asset has been placed on non-accrual or nonperforming status by either the Failed Bank or the Assuming Institution (as applicable).

"**Additional ORE**" means Shared-Loss Loans that become Other Real Estate after Bank Closing Date.

"**Affiliate**" shall have the meaning set forth in the Purchase and Assumption Agreement; provided, that, for purposes of this Commercial Shared-Loss Agreement, no Third Party Servicer shall be deemed to be an Affiliate of the Assuming Institution.

"**Applicable Anniversary of the Commencement Date**" means the fifth (5th) anniversary of the Commencement Date.

"**Calendar Quarter**" means a quarterly period (a) for the first such period, beginning on the Commencement Date and ending on the last calendar day of either March, June, September or December, whichever is the first to occur after the Commencement Date, and (b) for quarterly periods thereafter, beginning on the first calendar day of the calendar month immediately after the month that ended the prior period and ending on the last calendar day of each successive three-calendar-month period thereafter (i.e.,

each March, June, September and December, starting in the applicable order depending on the ending date of first such period) of any year.

"**Capitalized Expenditures**" means those expenditures that (i) would be capitalized under generally accepted accounting principles, and (ii) are incurred with respect to Shared-Loss Loans, Other Real Estate, Additional ORE or Subsidiary ORE. Capitalized Expenditures shall not include expenses related to environmental conditions including, but not limited to, remediation, storage or disposal of any hazardous or toxic substances or any pollutant or contaminant.

"**Charge-Offs**" means, with respect to any Shared-Loss Assets for any period, an amount equal to the aggregate amount of loans or portions of loans classified as "Loss" under the Examination Criteria, including

(a) charge-offs of

(i) the principal amount of such assets net of unearned interest (including write-downs associated with Other Real Estate, Additional ORE, Subsidiary ORE or loan modification(s)); and

(ii) Accrued Interest; and

(iii) Capitalized Expenditures; plus

(b) Pre-Charge-Off Expenses incurred on the respective Shared-Loss Loans, all as effected by the Assuming Institution during such period and reflected on the Accounting Records of the Assuming Institution; provided, that:

(i) the aggregate amount of Accrued Interest (including any reversals thereof) for the period after Bank Closing that shall be included in determining the amount of Charge-Offs for any Shared-Loss Loan shall not exceed ninety (90) days' Accrued Interest; and

(ii) no Charge-Off shall be taken with respect to any anticipated expenditure by the Assuming Institution until such expenditure is actually incurred; and

(iii) any financial statement adjustments made in connection with the purchase of any Assets pursuant to this Purchase and Assumption Agreement or any future purchase, merger, consolidation or other acquisition of the Assuming Institution shall not constitute "Charge-Offs"; and

(iv) except for Portfolio Sales, the sale or other disposition of Other Real Estate, Additional ORE or Subsidiary ORE to a Person other than an Affiliate of the Assuming Institution conducted in a commercially reasonable and prudent manner, or any other sales or dispositions consented to by the Receiver, losses incurred on the sale or other disposition of Shared-Loss Assets or Shared-Loss Securities to any Person shall not constitute Charge-Offs.

"**Commencement Date**" means the first calendar day following Bank Closing.

"**Consumer Loans**" means loans to individuals for household, family and other personal expenditures (including United States and/or State-guaranteed student loans and extensions of credit pursuant to a credit card plan or debit card plan).

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

104

BUTLER BANK
LOWELL, MASSACHUSETTS

"**Cumulative Servicing Amount**" means the sum of the Period Servicing Amounts for every consecutive twelve-month period prior to and ending on the True-Up Measurement Date in respect of each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement is in effect.

"**Cumulative Shared-Loss Payments**" means (i) the aggregate of all of the payments made or payable to the Assuming Institution under the Shared-Loss Agreements minus (ii) the aggregate of all of the payments made or payable to the Receiver under the Shared-Loss Agreements.

"**Environmental Assessment**" means an assessment of the presence, storage or release of any hazardous or toxic substance, pollutant or contaminant with respect to the collateral securing a Shared-Loss Loan that has been fully or partially charged off.

"**Examination Criteria**" means the loan classification criteria employed by, or any applicable regulations of, the Assuming Institution's Chartering Authority at the time such action is taken, as such criteria may be amended from time to time.

"**Failed Bank Charge-Offs/Write-Downs**" means, with respect to any Asset, an amount equal to the aggregate amount of reversals or charge-offs of Accrued Interest and charge-offs and write-downs of principal effected by the Failed Bank with respect to that Asset as reflected on the Accounting Records of the Failed Bank.

"**FDIC Party**" has the meaning provided in Section 2.1(f)(ii) of this Commercial Shared-Loss Agreement.

"**Holding Company**" means any holding company, not publicly traded on a national exchange, owning Shares of the Assuming Institution.

"**Intrinsic Loss Estimate**" means total losses under the shared loss agreements in the amount of **thirty-four million dollars ($ 34,000,000.00)**

"**Net Charge-Offs**" means, with respect to any period, an amount equal to the aggregate amount of Charge-Offs for such period less the amount of Recoveries for such period.

"**Neutral Member**" has the meaning provided in Section 2.1(f)(ii) of this Commercial Shared-Loss Agreement.

"**New Shared-Loss Loans**" means loans that would otherwise be subject to loss sharing under this Commercial Shared-Loss Agreement that were originated after **February 10, 2010** and before Bank Closing.

"**Notice of Dispute**" has the meaning provided in Section 2.1(f)(iii) of this Commercial Shared-Loss Agreement.

"**ORE Subsidiary**" means any Subsidiary of the Assuming Institution that engages solely in holding, servicing, managing or liquidating interests of a type described in clause (A) of the definition of "Other Real Estate," which interests have arisen from the collection or settlement of a Shared-Loss Loan.

"**Other Real Estate**" means all of the following (including any of the following fully or partially charged off the books and records of the Failed Bank or the Assuming Institution) that (i) are owned

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

105

BUTLER BANK
LOWELL, MASSACHUSETTS

by the Failed Bank as of Bank Closing and are purchased pursuant to the Purchase and Assumption Agreement or (ii) have arisen subsequent to Bank Closing from the collection or settlement by the Assuming Institution of a Shared-Loss Loan:

    (A) all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights; and

    (B) all other assets (whether real or personal property) acquired by foreclosure or in full or partial satisfaction of judgments or indebtedness.

    "**OTTI Adjustment**" means any other than temporary impairment of the Shared-Loss Securities, determined pursuant to FAS 115, expressed as a positive number, or reversals of other than temporary impairment, expressed as a negative number (for the avoidance of doubt, normal and customary unrealized mark-to-market changes by reason of the application of fair value accounting do not qualify for loss sharing payments).

    "**OTTI Loss**" means any other than temporary impairment of the Shared-Loss Securities, determined pursuant to FAS 115, expressed as a positive number (for the avoidance of doubt, normal and customary unrealized mark-to-market changes by reason of the application of fair value accounting do not qualify for loss sharing payments).

    "**Period Servicing Amount**" means, for any twelve month period with respect to each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement are in effect, the product of (i) the simple average of the principal amount of Shared-Loss Loans and Shared-Loss Assets (other than the Shared-Loss Securities) (in each case as defined in the Shared-Loss Agreements), as the case may be, at the beginning of such period and at the end of such period times (ii) one percent (1%).

    "**Permitted Advance**" means an advance of funds by the Assuming Institution with respect to a Shared-Loss Loan, or the making of a legally binding commitment by the Assuming Institution to advance funds with respect to a Shared-Loss Loan, that

    (i) in the case of such an advance, is actually made, and, in the case of such a commitment, is made and all of the proceeds thereof actually advanced, within one (1) year after the Commencement Date; and

    (ii) does not cause the sum of

    (A) the book value of such Shared-Loss Loan as reflected on the Accounting Records of the Assuming Institution after any such advance has been made by the Assuming Institution; plus

    (B) the unfunded amount of any such commitment made by the Assuming Institution related thereto, to exceed 110% of the Book Value of such Shared-Loss Loan; and

    (iii) is not made with respect to a Shared-Loss Loan with respect to which

    (A) there exists a related Shared-Loss Loan Commitment; or

    (B) the Assuming Institution has taken a Charge-Off; and

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

106

BUTLER BANK
LOWELL, MASSACHUSETTS

(iv) is made in good faith, is supported at the time it is made by documentation in the Credit Files and conforms to and is in accordance with the applicable requirements set forth in Article III of this Commercial Shared-Loss Agreement and with the then effective written internal credit policy guidelines of the Assuming Institution; provided, that the limitations in subparagraphs (i), (ii) and (iii) of this definition shall not apply to any such action (other than to an advance or commitment related to the remediation, storage or final disposal of any hazardous or toxic substance, pollutant or contaminant) that is taken by Assuming Institution in its reasonable discretion to preserve or secure the value of the collateral for such Shared-Loss Loan.

"**Permitted Amendment**" means, with respect to any Shared-Loss Loan Commitment or Shared-Loss Loan, any amendment, modification, renewal or extension thereof, or any waiver of any term, right, or remedy thereunder, made by the Assuming Institution in good faith and otherwise in accordance with the applicable requirements set forth in Article III of this Commercial Shared-Loss Agreement and the then effective written internal credit policy guidelines of the Assuming Institution; provided, that:

(i) with respect to a Shared-Loss Loan Commitment or a Shared-Loss Loan that is not a revolving line of credit, no such amendment, modification, renewal, extension, or waiver, except as allowed under the definition of Permitted Advance, shall operate to increase the amount of principal (A) then remaining available to be advanced by the Assuming Institution under the Shared-Loss Loan Commitment or (B) then outstanding under the Shared-Loss Loan;

(ii) with respect to a Shared-Loss Loan Commitment or a Shared-Loss Loan that is a revolving line of credit, no such amendment, modification, renewal, extension, or waiver, except as allowed under the definition of Permitted Advance, shall operate to increase the maximum amount of principal authorized as of Bank Closing to be outstanding at any one time under the underlying revolving line of credit relationship with the debtor (regardless of the extent to which such revolving line of credit may have been funded as of Bank Closing or may subsequently have been funded and/or repaid); and

(iii) no such amendment, modification, renewal, extension or waiver shall extend the term of such Shared-Loss Loan Commitment or Shared-Loss Loan beyond the end of the final Shared-Loss Quarter unless the term of such Shared-Loss Loan Commitment or Shared-Loss Loan as existed on Bank Closing was beyond the end of the final Shared-Loss Quarter, in which event no such amendment, modification, renewal, extension or waiver shall extend such term beyond the term as existed as of Bank Closing.

"**Pre-Charge-Off Expenses**" means those expenses incurred in the usual and prudent management of a Shared-Loss Loan that would qualify as a Reimbursable Expense or Recovery Expense if incurred after a Charge-Off of the related Shared-Loss Asset had occurred.

"**Quarterly Certificate**" has the meaning provided in Section 2.1(a)(i) of this Commercial Shared-Loss Agreement.

"**Recoveries**" shall mean the following:

(i) **Generally**.

(A) In addition to any sums to be applied as Recoveries pursuant to subparagraph (ii) below, "Recoveries" means, with respect to any period, the sum of (without duplication):

(1) the amount of collections during such period by the Assuming Institution on Charge-Offs of Shared-Loss Assets effected by the Assuming Institution prior to the end of the final Shared-Loss Quarter;

plus

        (2) the amount of collections during such period by the Assuming Institution on Failed Bank Charge-Offs/Write-Downs; plus

        (3) the amount of gain on any sale or other disposition during such period by the Assuming Institution of Shared Loss Loans, Other Real Estate, Additional ORE or Subsidiary ORE (provided, that the amount of any such gain included in Recoveries shall not exceed the aggregate amount of the related Failed Bank Charge-Offs/Write-Downs and Charge-Offs taken and any related Reimbursable Expenses and Recovery Expenses); plus

        (4) the amount of collections during such period by the Assuming Institution of any Reimbursable Expenses or Recovery Expenses; plus

        (5) the amount of any fee or other consideration received by the Assuming Institution during or prior to such period in connection with any amendment, modification, renewal, extension, refinance, restructure, commitment or other similar action taken by the Assuming Institution with respect to a Shared-Loss Asset with respect to which there exists a Failed Bank Charge-Off/Write-Down or a Shared-Loss Loan as to which a Charge-Off has been effected by the Assuming Institution during or prior to such period (provided, that the amount of any such fee or other consideration included in Recoveries shall not exceed the aggregate amount of the related Failed Bank Charge-Offs/Write-Downs and Charge-Offs taken and any related Reimbursable Expenses and Recovery Expenses).

        (B) **Order of Application.** For the purpose of determining the amounts to be applied as Recoveries pursuant to subparagraph (A) above, the Assuming Institution shall apply amounts received on the Assets that are not otherwise applied to reduce the book value of principal of a Shared-Loss Loan (or, in the case of Other Real Estate, Additional ORE, Subsidiary ORE and Capitalized Expenditures, that are not otherwise applied to reduce the book value thereof) in the following order: first to Charge-Offs and Failed Bank Charge-Offs/Write Downs; then to Reimbursable Expenses and Recovery Expenses; then to interest income; and then to other expenses incurred by the Assuming Institution.

        (ii)   **Interest Income as Recoveries.**   If there occurs an amendment, modification, renewal, extension, refinance, restructure, commitment, sale or other similar action with respect to a Shared-Loss Loan as to which there exists a Failed Bank Charge-Off/Write Down or as to which a Charge-Off has been effected by the Assuming Institution during or prior to such period, and if, as a result of such occurrence, the Assuming Institution recognizes any interest income for financial accounting purposes on that Shared-Loss Loan, then "Recoveries" shall also include the portion of the total amount of any such interest income recognized by the Assuming Institution which is derived by multiplying:

        (A) the total amount of any such interest income recognized by the Assuming Institution during such period with respect to that Shared-Loss Loan as described above, by

        (B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Institution with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (II)(A) immediately above was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of

such period;

provided, however, that the amount of any interest income included as Recoveries for a particular Shared-Loss Loan shall not exceed the aggregate amount of (x) Failed Bank Charge-Offs/Write-Downs, (y) Charge-Offs effected by the Assuming Institution during or prior to the period in which the amount of Recoveries is being determined, plus (z) any Reimbursable Expenses and Recovery Expenses paid to the Assuming Institution pursuant to this Commercial Shared-Loss Agreement during or prior to the period in which the amount of Recoveries is being determined, all with respect to that particular Shared-Loss Loan; and, provided, further, that any collections on any such Shared-Loss Loan that are not applied to reduce book value of principal or recognized as interest income shall be applied pursuant to subparagraph (i) above.

(iii) **Exceptions to Recoveries.**   Notwithstanding subparagraphs (i) and (ii) above, the term "Recoveries" shall not include:

(A) any amounts paid to the Assuming Institution by the Receiver pursuant to Section 2.1 of this Commercial Shared-Loss Agreement;

(B) amounts received with respect to Charge-Offs effected by the Assuming Institution after the final Shared-Loss Quarter;

(C) after the final Shared-Loss Quarter, income received by the Assuming Institution from the operation of, and any gains recognized by the Assuming Institution on the disposition of, Other Real Estate, Additional ORE or Subsidiary ORE (such income and gains being hereinafter together referred to as "ORE Income"), except to the extent that aggregate ORE Income exceeds the aggregate expenses paid to third parties by or on behalf of the Assuming Institution after the final Shared-Loss Quarter to manage, operate and maintain Other Real Estate, Additional ORE or Subsidiary ORE (such expenses being hereinafter referred to as "ORE Expenses"). In determining the extent aggregate ORE Income exceeds aggregate ORE Expenses for any Recovery Quarter, the Assuming Institution will subtract

(1) ORE Expenses paid to third parties during such Recovery Quarter (provided, that, in the case of the final Recovery Quarter only, the Assuming Institution will subtract ORE Expenses paid to third parties from the beginning of the final Recovery Quarter up to the date the Assuming Institution is required to deliver the final Quarterly Certificate pursuant to this Commercial Shared-Loss Agreement), from

(2) ORE Income received during such Recovery Quarter, to calculate net ORE income ("Net ORE Income") for that Recovery Quarter. If the amount of Net ORE Income so calculated for a Recovery Quarter is positive, such amount shall be reported as Recoveries on the Quarterly Certificate for such Recovery Quarter.

If the amount of Net ORE Income so calculated for a Recovery Quarter is negative ("Net ORE Loss Carryforward"), such amount shall be added to any ORE Expenses paid to third parties in the next succeeding Recovery Quarter, which sum shall then be subtracted from ORE Income for that next succeeding Recovery Quarter, for the purpose of determining the amount of Net ORE Income (or, if applicable, Net ORE Loss Carryforward) for that next succeeding Recovery Quarter. If, as of the end of the final Recovery Quarter, a Net ORE Loss Carryforward exists, then the amount of the Net ORE Loss Carryforward that does not exceed the aggregate amount of Net ORE Income reported as Recoveries on Quarterly Certificates for all Recovery Quarters may be included as a Recovery Expense on the Quarterly Certificate for the final Recovery Quarter.

**"Recovery Amount"** has the meaning provided in Section 2.1(b)(ii) of this Commercial

Shared-Loss Agreement.

"**Recovery Expenses**" means, for any Recovery Quarter, the amount of actual, reasonable and necessary out-of-pocket expenses (other than Capitalized Expenditures) paid to third parties (other than Affiliates of the Assuming Institution) by or on behalf of the Assuming Institution, as limited by Sections 3.2(c) and (d) of Article III to this Commercial Shared-Loss Agreement, to recover amounts owed with respect to:

(i) any Shared-Loss Asset as to which a Charge-Off was effected prior to the end of the final Shared-Loss Quarter (provided that such amounts were incurred no earlier than the date the first Charge-Off on such Shared-Loss Asset could have been reflected on the Accounting Records of the Assuming Institution); and

(ii) Failed Bank Charge-Offs/Write-Downs (including, in each case, all costs and expenses related to an Environmental Assessment and any other costs or expenses related to any environmental conditions with respect to the Shared-Loss Assets (it being understood that any remediation expenses for any such pollutant or contaminant are not recoverable if in excess of $200,000 per Shared-Loss Asset, without the Assuming Institution having obtained the prior consent of the Receiver for such expenses).

Provided, that, so long as income with respect to a Shared-Loss Loan is being prorated pursuant to the arithmetical formula in subsection (ii) of the definition of "Recoveries", the term "Recovery Expenses" shall not include that portion of any such expenses paid during such Recovery Quarter to recover any amounts owed on that Shared-Loss Loan that is derived by:

subtracting (1) the product derived by multiplying:

(A) the total amount of any such expenses paid by or on behalf of the Assuming Institution during such Recovery Quarter with respect to that Shared-Loss Loan, by

(B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Institution with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (ii)(A) of the definition of "Recoveries" was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of such period;

from (2) the total amount of any such expenses paid during that Recovery Quarter with respect to that Shared-Loss Loan.

"**Recovery Quarter**" has the meaning provided in Section 2.1(a)(ii) of this Commercial Shared-Loss Agreement.

"**Reimbursable Expenses**" means, for any Shared-Loss Quarter, the amount of actual, reasonable and necessary out-of-pocket expenses (other than Capitalized Expenditures), paid to third parties (other than Affiliates of the Assuming Institution) by or on behalf of the Assuming Institution, as limited by Sections 3.2(c) and (d) of Article III of this Commercial Shared-Loss Agreement, to:

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

110

BUTLER BANK
LOWELL, MASSACHUSETTS

(i) recover amounts owed with respect to any Shared-Loss Asset as to which a Charge-Off has been effected prior to the end of the final Shared-Loss Quarter (provided that such amounts were incurred no earlier than the date the first Charge-Off on such Shared-Loss Asset could have been reflected on the Accounting Records of the Assuming Institution) and recover amounts owed with respect to Failed Bank Charge-Offs/Write-Downs (including, in each case, all costs and expenses related to an Environmental Assessment and any other costs or expenses related to any environmental conditions with respect to the Shared-Loss Assets (it being understood that any such remediation expenses for any such pollutant or contaminant are not recoverable if in excess of $200,000 per Shared-Loss Asset, without the Assuming Institution having obtained the prior consent of the Receiver for such expenses); provided, that, so long as income with respect to a Shared-Loss Loan is being pro-rated pursuant to the arithmetical formula in subsection (II) of the definition of "Recoveries", the term "Reimbursable Expenses" shall not include that portion of any such expenses paid during such Shared-Loss Quarter to recover any amounts owed on that Shared-Loss Loan that is derived by:

subtracting (1) the product derived by multiplying:

(A) the total amount of any such expenses paid by or on behalf of the Assuming Institution during such Shared-Loss Quarter with respect to that Shared-Loss Loan, by

(B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Institution with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (II)(A) of the definition of "Recoveries" was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of such period;

from (2) the total amount of any such expenses paid during that Shared-Loss Quarter with respect to that Shared-Loss Loan;

(ii) manage, operate or maintain Other Real Estate, Additional ORE or Subsidiary ORE less the amount of any income received by the Assuming Institution during such Shared-Loss Quarter with respect to such Other Real Estate, Additional ORE or Subsidiary ORE (which resulting amount under this clause (ii) may be negative);

(iii) litigation expenses with respect to Shared-Loss Assets.

"**Review Board**" has the meaning provided in Section 2.1(f)(i) of this Commercial Shared-Loss Agreement.

"**Shared-Loss Amount**" has the meaning provided in Section 2.1(b)(i) of this Commercial Shared-Loss Agreement.

"**Shared-Loss Asset Repurchase Price**" means, with respect to any Shared-Loss Asset, the principal amount thereof plus any other fees or penalties due from an Obligor (including, subject to the limitations discussed below, the amount of any Accrued Interest) stated on the Accounting Records of the Assuming Institution, as of the date as of which the Shared-Loss Asset Repurchase Price is being determined (regardless, in the case of a Shared-Loss Loan, of the Legal Balance thereof) plus all Reimbursable Expenses

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

111

BUTLER BANK
LOWELL, MASSACHUSETTS

and Recovery Expenses incurred up to and through the date of consummation of purchase of such Shared-Loss Asset; provided, that (i) in the case of a Shared-Loss Loan there shall be excluded from such amount the amount of any Accrued Interest accrued on or with respect to such Shared-Loss Loan prior to the ninety (90)-day period ending on the day prior to the purchase date determined pursuant to Sections 2.1(e)(i) or 2.1(e)(iii) of this Commercial Shared-Loss Agreement, except to the extent such Accrued Interest was included in the Book Value of such Shared-Loss Loan, and (ii) any collections on a Shared-Loss Loan received by the Assuming Institution after the purchase date applicable to such Shared-Loss Loan shall be applied (without duplication) to reduce the Shared-Loss Asset Repurchase Price of such Shared-Loss Loan on a dollar-for-dollar basis. For purposes of determining the amount of unpaid interest which accrued during a given period with respect to a variable-rate Shared-Loss Loan, all collections of interest shall be deemed to be applied to unpaid interest in the chronological order in which such interest accrued.

**"Shared-Loss Assets"** means Shared-Loss Loans, Other Real Estate purchased by the Assuming Institution, Additional ORE, Subsidiary ORE and Capitalized Expenditures, but does not include Shared-Loss Securities.

**"Shared-Loss Loan Commitment"** means:

(i) any Commitment to make a further extension of credit or to make a further advance with respect to an existing Shared-Loss Loan; and

(ii) any Shared-Loss Loan Commitment (described in subparagraph (i) immediately preceding) with respect to which the Assuming Institution has made a Permitted Amendment.

**"Shared-Loss Loan Commitment Advance"** means an advance pursuant to a Shared-Loss Loan Commitment with respect to which the Assuming Institution has not made a Permitted Advance.

**"Shared-Loss Loans"** means:

(i)     (A) Loans purchased by the Assuming Institution pursuant to the Purchase and Assumption Agreement set forth on Schedule 4.15(b) to the Purchase and Assumption Agreement;
(B) New Shared-Loss Loans purchased by the Assuming Institution pursuant to the Purchase and Assumption Agreement;
(C) Permitted Advances;
(D) Shared-Loss Loan Commitment Advances, if any; provided, that Shared-Loss Loans shall not include Loans, New Shared-Loss Loans, Permitted Advances and Shared-Loss Loan Commitment Advances with respect to which an Acquired Subsidiary, or a constituent Subsidiary thereof, is an Obligor;
(E) Loans owned by any Acquired Subsidiary which are not Shared-Loss Loans under the Single Family Shared-Loss Agreement, and;

(F) Consumer Loans.

(ii) any Shared-Loss Loans (described in subparagraph (i) immediately preceding) with respect to which the Assuming Institution has made a Permitted Amendment.

**"Shared-Loss Securities"** means those securities and other assets listed on Exhibit 4.15(C).

**"Shared-Loss Payment Trigger"** means when the sum of the Cumulative Loss Amount

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

112

BUTLER BANK
LOWELL, MASSACHUSETTS

under this Single Family Shared-Loss Agreement and the cumulative Shared-Loss Amounts under the Commercial Shared-Loss Agreement, exceeds the First Loss Tranche. If the First Loss Tranche is zero or a negative number, the Shared Loss Payment Trigger shall be deemed to have been reached upon Bank Closing.

"**Shared-Loss Quarter**" has the meaning provided in Section 2.1(a)(i) of this Commercial Shared-Loss Agreement.

"**Shares**" means common stock and any instrument which by its terms is currently convertible into common stock, or which may become convertible into common stock.

"**SLS Net Realized Gain**" means the net realized gain on the sale of a Shared Loss Security determined pursuant to FAS 115, expressed as a negative number on the Quarterly Certificate.

"**SLS Net Realized Loss**" means the net realized loss on the sale of a Shared Loss Security determined pursuant to FAS 115, expressed as a positive number on the Quarterly Certificate.

"**Subsidiary ORE**" means all assets owned by ORE Subsidiaries that would constitute ORE or Additional ORE if such assets were on the books of the Assuming Institution.

"**Termination Date**" means the eighth (8th) anniversary of the Commencement Date.

"**Third Party Servicer**" means any servicer appointed from time to time by the Assuming Institution or any Affiliate of the Assuming Institution to service the Shared-Loss Assets on behalf of the Assuming Institution, the identity of which shall be given to the Receiver prior to or concurrent with the appointment thereof.

## ARTICLE II -- SHARED-LOSS ARRANGEMENT

2.1   **Shared-Loss Arrangement.**

(a)   **Quarterly Certificates.** (i) Not later than thirty (30) days after the end of each Calendar Quarter from and including the initial Calendar Quarter to and including the Calendar Quarter in which the Applicable Anniversary of the Commencement Date falls (each of such Calendar Quarters being referred to herein as a "Shared-Loss Quarter"), the Assuming Institution shall deliver to the Receiver a certificate, signed by the Assuming Institution's chief executive officer and its chief financial officer, setting forth in such form and detail as the Receiver may specify (a "Quarterly Certificate")(an example of a Quarterly Certificate is attached as Exhibit 1):

(A)   the amount of Charge-Offs, the amount of Recoveries and the amount of Net Charge-Offs (which amount may be negative) during such Shared-Loss Quarter with respect to the Shared-Loss Assets (and for Recoveries, with respect to the Assets for which a charge-off was effected by the Failed Bank prior to Bank Closing); and

(B)   the aggregate amount of Reimbursable Expenses (which amount may be negative) during such Shared-Loss Quarter; and

(C)   SLS Net Realized Loss and SLS Net Realized Gain, if any; and

(D)   any OTTI Adjustment.

(ii)     Not later than thirty (30) days after the end of each Calendar Quarter from and including the first Calendar Quarter following the final Shared-Loss Quarter to and including the Calendar Quarter in which the Termination Date falls (each of such Calendar Quarters being referred to herein as a "Recovery Quarter"), the Assuming Institution shall deliver to the Receiver a Quarterly Certificate setting forth, in such form and detail as the Receiver may specify

(A)     the amount of Recoveries and Recovery Expenses during such Recovery Quarter. On the Quarterly Certificate for the first Recovery Quarter only, the Assuming Institution may report as a separate item, in such form and detail as the Receiver may specify, the aggregate amount of any Reimbursable Expenses that: (a) were incurred prior to or during the final Shared-Loss Quarter, and (b) had not been included in any Quarterly Certificate for any Shared-Loss Quarter because they had not been actually paid by or on behalf of the Assuming Institution (in accordance with the terms of this Commercial Shared-Loss Agreement) during any Shared-Loss Quarter and (c) were actually paid by or on behalf of the Assuming Institution (in accordance with the terms of this Commercial Shared-Loss Agreement) during the first Recovery Quarter; and

(B)     SLS Net Realized Gain, and any reversals of OTTI Loss.

**(b)     Payments With Respect to Shared-Loss Assets.**

(i)     For purposes of this Section 2.1(b), the Assuming Institution shall initially record the Shared-Loss Assets on its Accounting Records at Book Value, and initially record the Shared-Loss Securities on its Accounting Records at Book Value, and adjust such amounts as such values may change after the Bank Closing. If the amount of all Net Charge-Offs during any Shared-Loss Quarter plus Reimbursable Expenses, plus SLS Net Realized Gain and SLS Net Realized Loss, plus the OTTI Adjustment during such Shared-Loss Quarter (the "Shared-Loss Amount") is positive, then, except as provided in Sections 2.1(c) and (e) below, and subject to the provisions of Section 2.1(b)(vi) below, not later than fifteen (15) days after the date on which the Receiver receives the Quarterly Certificate with respect to such Shared-Loss Quarter, the Receiver shall pay to the Assuming Institution an amount equal to eighty percent (80%) of the Shared-Loss Amount for such Shared-Loss Quarter. If the Shared-Loss Amount during any Shared-Loss Quarter is negative, the Assuming Institution shall pay to the Receiver an amount equal to eighty percent (80%) of the Shared-Loss Amount for such Shared-Loss Quarter, which payment shall be delivered to the Receiver together with the Quarterly Certificate for such Shared-Loss Quarter.

(ii)     (A)     If the amount of gross Recoveries during any Recovery Quarter less Recovery Expenses during such Recovery Quarter plus SLS Net Realized Gains and reversals of OTTI Loss on Shared-Loss Securities (the "Recovery Amount") is positive, then, simultaneously with its delivery of the Quarterly Certificate with respect to such Recovery Quarter, the Assuming Institution shall pay to the Receiver an amount equal to eighty percent (80%) of the Recovery Amount for such Recovery Quarter.

(B)     If the Recovery Amount is negative, then such negative amount shall be subtracted from the amount of gross Recoveries during the next succeeding Recovery Quarter in determining the Recovery Amount in such next succeeding Recovery Quarter; provided, that this Section 2.1(b)(ii) shall operate successively in the event that the Recovery Amount (after giving effect to this Section 2.1(b)(ii)) in such next succeeding Recovery Quarter is negative.

(C)     The Assuming Institution shall specify, in the Quarterly Certificate for the final

Recovery Quarter, the aggregate amount for all Recovery Quarters only, as of the end of, and including, the final Recovery Quarter of (A) Recoveries plus SLS Net Realized Gains and reversals of OTTI Loss on Shared-Loss Securities ("Aggregate Recovery Period Recoveries"), (B) Recovery Expenses ("Aggregate Recovery Expenses"), and (C) only those Recovery Expenses that have been actually "offset" against Aggregate Recovery Period Recoveries (including those so "offset" in that final Recovery Quarter) ("Aggregate Offset Recovery Expenses"); as used in this sentence, the term "offset" means the amount that has been applied to reduce gross Recoveries in any Recovery Quarter pursuant to the methodology set forth in this Section 2.1(b)(ii). If, at the end of the final Recovery Quarter the amount of Aggregate Recovery Expenses exceeds the amount of Aggregate Recovery Period Recoveries, the Receiver shall have no obligation to pay to the Assuming Institution all or any portion of such excess.

      (D)     Subsequent to the Assuming Institution's calculation of the Recovery Amount (if any) for the final Recovery Quarter, the Assuming Institution shall also show on the Quarterly Certificate for the final Recovery Quarter the results of the following three mathematical calculations: (i) Aggregate Recovery Period Recoveries minus Aggregate Offset Recovery Expenses; (ii) Aggregate Recovery Expenses minus Aggregate Offset Recovery Expenses; and (iii) the lesser of the two amounts calculated in (i) and (ii) immediately above ("Additional Recovery Expenses") multiplied by 80% (the amount so calculated in (iii) being defined as the "Additional Recovery Expense Amount"). If the Additional Recovery Expense Amount is greater than zero, then the Assuming Institution may request in the Quarterly Certificate for the final Recovery Quarter that the Receiver reimburse the Assuming Institution the amount of the Additional Recovery Expense Amount and the Receiver shall pay to the Assuming Institution the Additional Recovery Expense Amount within fifteen (15) days after the date on which the Receiver receives that Quarterly Certificate.

      (E)     On the Quarterly Certificate for the final Recovery Quarter only, the Assuming Institution may include, in addition to any Recovery Expenses for that Recovery Quarter that were paid by or on behalf of the Assuming Institution in that Recovery Quarter, those Recovery Expenses that: (a) were incurred prior to or during the final Recovery Quarter, and (b) had not been included in any Quarterly Certificate for any Recovery Quarter because they had not been actually paid by or on behalf of the Assuming Institution (in accordance with the terms of this Commercial Shared-Loss Agreement) during any Recovery Quarter, and (c) were actually paid by or on behalf of the Assuming Institution (in accordance with the terms of this Commercial Shared-Loss Agreement) prior to the date the Assuming Institution is required to deliver that final Quarterly Certificate to the Receiver under the terms of Section 2.1(a)(ii).

      (iii)     With respect to each Shared-Loss Quarter and Recovery Quarter, collections by or on behalf of the Assuming Institution on any charge-off effected by the Failed Bank prior to Bank Closing on an Asset other than a Shared-Loss Asset or Shared-Loss Securities shall be reported as Recoveries under this Section 2.1 only to the extent such collections exceed the Book Value of such Asset, if any. For any Shared-Loss Quarter or Recovery Quarter in which collections by or on behalf of the Assuming Institution on such Asset are applied to both Book Value and to a charge-off effected by the Failed Bank prior to Bank Closing, the amount of expenditures incurred by or on behalf of the Assuming Institution attributable to the collection of any such Asset, that shall be considered a Reimbursable Expense or a Recovery Expense under this Section 2.1 will be limited to a proportion of such expenditures which is equal to the proportion derived by dividing (A) the amount of collections on such Asset applied to a charge-off effected by the Failed Bank prior to Bank Closing, by (B) the total collections on such Assets. With respect to Assets that were completely charged off by the Failed Bank and had a zero Book Value at Bank Closing, for the purpose of calculating the payments under this Section 2.1(b) for Recoveries on those Assets for each such quarter, the Assuming Institution shall pay an amount equal to fifty percent (50%) of the Recoveries on Failed Bank Charge-Offs/Write-Downs with respect to such Assets, and shall separately account for the other computations on those Recoveries under this Section 2.1(b) using fifty percent (50%) (and not eighty percent (80%)).

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

115

BUTLER BANK
LOWELL, MASSACHUSETTS

(iv)     If the Assuming Institution has duly specified an amount of Reimbursable Expenses on the Quarterly Certificate for the first Recovery Quarter as described above in Section 2.1(a)(ii)(E), then, not later than fifteen (15) days after the date on which the Receiver receives that Quarterly Certificate, the Receiver shall pay to the Assuming Institution an amount equal to eighty percent (80%) of the amount of such Reimbursable Expenses.

(v)     If the First Loss Tranche as determined under the Purchase and Assumption Agreement is a positive number, Receiver has no obligation to make payment for any Shared Loss Quarters until the Shared -Loss Payment Trigger is satisfied.

(vi)     Payments from the Receiver with respect to this Commercial Shared-Loss Agreement are administrative expenses of the Receiver. To the extent the Receiver needs funds for shared-loss payments respect to this Commercial Shared-Loss Agreement, the Receiver shall request funds under the Master Loan and Security Agreement, as amended ("MLSA"), from FDIC in its corporate capacity. The Receiver will not agree to any amendment of the MLSA that would prevent the Receiver from drawing on the MLSA to fund shared-loss payments.

(c)     **Limitation on Shared-Loss Payment.** The Receiver shall not be required to make any payments pursuant to this Section 2.1 with respect to any Charge-Off of a Shared-Loss Asset that the Receiver or the Corporation determines, based upon the Examination Criteria, should not have been effected by the Assuming Institution; provided, (x) the Receiver must provide notice to the Assuming Institution detailing the grounds for not making such payment, (y) the Receiver must provide the Assuming Institution with a reasonable opportunity to cure any such deficiency and (z) (1) to the extent curable, if cured, the Receiver shall make payment with respect to any properly effected Charge-Off and (2) to the extent not curable, the Receiver shall make a payment as to all Charge-Offs (or portion of Charge-Offs) that were effected which would have been payable as a Charge-Off if the Assuming Institution had properly effected such Charge-Off. In the event that the Receiver does not make any payments with respect to any Charge-Off of a Shared-Loss Asset pursuant to this Section 2.1 or determines that a payment was improperly made, the Assuming Institution and the Receiver shall, upon final resolution, make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections. Failure to administer any Shared-Loss Asset or Assets, or Shared-Loss Securities, in accordance with Article III shall at the discretion of the Receiver constitute grounds for the loss of shared loss coverage with respect to such Shared-Loss Loan or Loans.

(d)     **Sale of, or Additional Advances or Amendments with Respect to, Shared-Loss Loans and Administration of Related Loans.** No Shared-Loss Loan shall be treated as a Shared-Loss Asset pursuant to this Section 2.1 (i) if the Assuming Institution sells or otherwise transfers such Shared-Loss Loan or any interest therein (whether with or without recourse) to any Person, (ii) after the Assuming Institution makes any additional advance, commitment or increase in the amount of a commitment with respect to such Shared-Loss Loan that does not constitute a Permitted Advance or a Shared-Loss Loan Commitment Advance, (iii) after the Assuming Institution makes any amendment, modification, renewal or extension to such Shared-Loss Loan that does not constitute a Permitted Amendment, or (iv) after the Assuming Institution has managed, administered or collected any "Related Loan" (as such term is defined in Section 3.4 of Article III of this Commercial Shared-Loss Agreement) in any manner which would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of such Shared-Loss Asset to which such loan is related; provided, that any such Shared-Loss Loan that has been the subject of Charge-Offs prior to the taking of any action described in clause (i), (ii), (iii) or (iv) of this Section 2.1(d) by the Assuming Institution shall be treated as a Shared-Loss Asset pursuant to this Section 2.1 solely for the purpose of treatment of Recoveries on such Charge-Offs until such time as the amount of

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

116

BUTLER BANK
LOWELL, MASSACHUSETTS

Recoveries with respect to such Shared-Loss Asset equals such Charge-Offs.

>    (e)    **Option to Purchase.**

>        (i)    In the event that the Assuming Institution determines that there is a substantial likelihood that continued efforts to collect a Shared-Loss Asset or an Asset for which a charge-off was effected by the Failed Bank with, in either case, a Legal Balance of $5,000,000 or more on the Accounting Records of the Assuming Institution will result in an expenditure, after Bank Closing, of funds by on behalf of the Assuming Institution to a third party for a specified purpose (the expenditure of which, in its best judgment, will maximize collections), which do not constitute Reimbursable Expenses or Recovery Expenses, and such expenses will exceed ten percent (10%) of the then book value thereof as reflected on the Accounting Records of the Assuming Institution, the Assuming Institution shall (i) promptly so notify the Receiver and (ii) request that such expenditure be treated as a Reimbursable Expense or Recovery Expense for purposes of this Section 2.1. (Where the Assuming Institution determines that there is a substantial likelihood that the previously mentioned situation exists with respect to continued efforts to collect a Shared-Loss Asset or an Asset for which a charge-off was effected by the Failed Bank with, in either case, a Legal Balance of less than $1,000,000 on the Accounting Records of the Assuming Institution, the Assuming Institution may so notify the Receiver and request that such expenditure be treated as a Reimbursable Expense or Recovery Expense.) Within thirty (30) days after its receipt of such a notice, the Receiver will advise the Assuming Institution of its consent or denial, that such expenditures shall be treated as a Reimbursable Expense or Recovery Expense, as the case may be. Notwithstanding the failure of the Receiver to give its consent with respect to such expenditures, the Assuming Institution shall continue to administer such Shared-Loss Asset in accordance with Section 2.2, except that the Assuming Institution shall not be required to make such expenditures. At any time after its receipt of such a notice and on or prior to the Termination Date the Receiver shall have the right to purchase such Shared-Loss Asset or Asset as provided in Section 2.1(e)(iii), notwithstanding any consent by the Receiver with respect to such expenditure.

>        (ii)    During the period prior to the Termination Date, the Assuming Institution shall notify the Receiver within fifteen (15) days after any of the following becomes fully or partially charged-off:

>            (A) a Shared-Loss Loan having a Legal Balance (or, in the case of more than one (1) Shared-Loss Loan made to the same Obligor, a combined Legal Balance) of $5,000,000 or more in circumstances in which the legal claim against the relevant Obligor survives; or

>            (B) a Shared-Loss Loan to a director, an "executive officer" as defined in 12 C.F.R. 215.2(d), a "principal shareholder" as defined in 12 C.F.R. 215.2(l), or an Affiliate of the Assuming Institution.

>        During the period prior to the Termination Date, the Assuming Institution shall notify the Receiver within fifteen (15) days after any complete or partial charge-off of a Shared-Loss Loan to a director, an "executive officer" as defined in 12 C.F.R. 215.2(d), a "principal shareholder" as defined in 12 C.F.R. 215.2(l), or an Affiliate of the Assuming Institution.

>        (iii)    If the Receiver determines in its discretion that the Assuming Institution is not diligently pursuing collection efforts with respect to any Shared-Loss Asset which has been fully or partially charged-off or written-down (including any Shared-Loss Asset which is identified or required to be identified in a notice pursuant to Section 2.1(e)(ii)) or any Asset for which there exists a Failed Bank Charge-Off/Write-Down, the Receiver may at its option, exercisable at any time on or prior to the Termination Date, require the Assuming Institution to assign, transfer and convey such Shared-Loss Asset or Asset to and for

the sole benefit of the Receiver for a price equal to the Shared-Loss Asset Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Shared-Loss Asset or Asset.

(iv)    Not later than ten (10) days after the date upon which the Assuming Institution receives notice of the Receiver's intention to purchase or require the assignment of any Shared-Loss Asset or Asset pursuant to Section 2.1(e)(i) or (iii), the Assuming Institution shall transfer to the Receiver such Shared-Loss Asset or Asset and any Credit Files relating thereto and shall take all such other actions as may be necessary and appropriate to adequately effect the transfer of such Shared-Loss Asset or Asset from the Assuming Institution to the Receiver. Not later than fifteen (15) days after the date upon which the Receiver receives such Shared-Loss Asset or Asset and any Credit Files relating thereto, the Receiver shall pay to the Assuming Institution an amount equal to the Shared-Loss Asset Repurchase Price of such Shared-Loss Asset or Asset less the Related Liability Amount.

(v)    The Receiver shall assume all Related Liabilities with respect to any Shared-Loss Asset or Asset set forth in the notice described in Section 2.1(e)(iv).

(f)    **Dispute Resolution.**

(i) (A) Any dispute as to whether a Charge-Off of a Shared-Loss Asset was made in accordance with Examination Criteria shall be resolved by the Assuming Institution's Chartering Authority. (B) With respect to any other dispute arising under the terms of this Commercial Shared-Loss Agreement which the parties hereto cannot resolve after having negotiated such matter, in good faith, for a thirty (30) day period, other than a dispute the Corporation is not permitted to submit to arbitration under the Administrative Dispute Resolution Act of 1996 ("ADRA"), as amended, such other dispute shall be resolved by determination of a review board (a "Review Board") established pursuant to Section 2.1(f). Any Review Board under this Section 2.1(f) shall follow the provisions of the Federal Arbitration Act and shall follow the provisions of the ADRA. (C) Any determination by the Assuming Institution's Chartering Authority or by a Review Board shall be conclusive and binding on the parties hereto and not subject to further dispute, and judgment may be entered on said determination in accordance with applicable arbitration law in any court having jurisdiction thereof.

(ii)    A Review Board shall consist of three (3) members, each of whom shall have such expertise as the Corporation and the Assuming Institution agree is relevant. As appropriate, the Receiver or the Corporation (the "FDIC Party") will select one member, one member will be selected by the Assuming Institution and the third member (the "Neutral Member") will be selected by the other two members. The member of the Review Board selected by a party may be removed at any time by such party upon two (2) days' written notice to the other party of the selection of a replacement member. The Neutral Member may be removed by unanimous action of the members appointed by the FDIC Party and the Assuming Institution after two (2) days' prior written notice to the FDIC Party and the Assuming Institution of the selection of a replacement Neutral Member. In addition, if a Neutral Member fails for any reason to serve or continue to serve on the Review Board, the other remaining members shall so notify the parties to the dispute and the Neutral Member in writing that such Neutral Member will be replaced, and the Neutral Member shall thereafter be replaced by the unanimous action of the other remaining members within twenty (20) business days of that notification.

(iii)    No dispute may be submitted to a Review Board by any of the parties to this Commercial Shared-Loss Agreement unless such party has provided to the other party a written notice of dispute ("Notice of Dispute"). During the forty-five (45)-day period following the providing of a Notice of Dispute, the parties to the dispute will make every effort in good faith to resolve the dispute by mutual agreement. As part of these good faith efforts, the parties should consider the use of less formal dispute

resolution techniques, as judged appropriate by each party in its sole discretion. Such techniques may include, but are not limited to, mediation, settlement conference, and early neutral evaluation. If the parties have not agreed to a resolution of the dispute by the end of such forty-five (45)-day period, then, subject to the discretion of the Corporation and the written consent of the Assuming Institution as set forth in Section 2.1(f)(i)(B) above, on the first day following the end of such period, the FDIC Party and the Assuming Institution shall notify each other of its selection of its member of the Review Board and such members shall be instructed to promptly select the Neutral Member of the Review Board. If the members appointed by the FDIC Party and the Assuming Institution are unable to promptly agree upon the initial selection of the Neutral Member, or a timely replacement Neutral Member as set forth in Section 2.1(f)(ii) above, the two appointed members shall apply to the American Arbitration Association ("AAA"), and such Neutral Member shall be appointed in accordance with the Commercial Arbitration Rules of the AAA.

(iv)     The resolution of a dispute pursuant to this Section 2.1(f) shall be governed by the Commercial Arbitration Rules of the AAA to the extent that such rules are not inconsistent with this Section 2.1(f). The Review Board may modify the procedures set forth in such rules from time to time with the prior approval of the FDIC Party and the Assuming Institution.

(v)     Within fifteen (15) days after the last to occur of the final written submissions of both parties, the presentation of witnesses, if any, and oral presentations, if any, the Review Board shall adopt the position of one of the parties and shall present to the parties a written award regarding the dispute. The determination of any two (2) members of a Review Board will constitute the determination of such Review Board.

(vi)     The FDIC Party and the Assuming Institution will each pay the fees and expenses of the member of the Review Board selected by it. The FDIC Party and Assuming Institution will share equally the fees and expenses of the Neutral Member. No such fees or expenses incurred by or on behalf of the Assuming Institution shall be subject to reimbursement by the FDIC Party under this Commercial Shared-Loss Agreement or otherwise.

(vii)     Each party will bear all costs and expenses incurred by it in connection with the submission of any dispute to a Review Board. No such costs or expenses incurred by or on behalf of the Assuming Institution shall be subject to reimbursement by the FDIC Party under this Commercial Shared-Loss Agreement or otherwise. The Review Board shall have no authority to award costs or expenses incurred by either party to these proceedings.

(viii)     Any dispute resolution proceeding held pursuant to this Section 2.1(f) shall not be public. In addition, each party and each member of any Review Board shall strictly maintain the confidentiality of all issues, disputes, arguments, positions and interpretations of any such proceeding, as well as all information, attachments, enclosures, exhibits, summaries, compilations, studies, analyses, notes, documents, statements, schedules and other similar items associated therewith, except as the parties agree in writing or such disclosure is required pursuant to law, rule or regulation. Pursuant to ADRA, dispute resolution communications may not be disclosed either by the parties or by any member of the Review board unless:

(1) all parties to the dispute resolution proceeding agree in writing;
(2) the communication has already been made public;
(3) the communication is required by statute, rule or regulation to be made public; or
(4) a court determines that such testimony or disclosure is necessary to prevent a manifest injustice, help establish a violation of the law or prevent harm to the public health or safety, or

of sufficient magnitude in the particular case to outweigh the integrity of dispute resolution proceedings in general by reducing the confidence of parties in future cases that their communications will remain confidential.

(ix)     Any dispute resolution proceeding pursuant to this Section 2.1(f) (whether as a matter of good faith negotiations, by resort to a Review Board, or otherwise) is a compromise negotiation for purposes of the Federal Rules of Evidence and state rules of evidence. The parties agree that all proceedings, including any statement made or document prepared by any party, attorney or other participants are privileged and shall not be disclosed in any subsequent proceeding or document or construed for any purpose as an admission against interest. Any document submitted and any statements made during any dispute resolution proceeding are for settlement purposes only. The parties further agree not to subpoena any of the members of the Review Board or any documents submitted to the Review Board. In no event will the Neutral Member voluntarily testify on behalf of any party.

(x)     No decision, interpretation, determination, analysis, statement, award or other pronouncement of any Review Board shall constitute precedent as regards any subsequent proceeding (whether or not such proceeding involves dispute resolution under this Commercial Shared-Loss Agreement) nor shall any Review Board be bound to follow any decision, interpretation, determination, analysis, statement, award or other pronouncement rendered by any previous Review Board or any other previous dispute resolution panel which may have convened in connection with a transaction involving other failed financial institutions or Federal assistance transactions.

(xi)     The parties may extend any period of time in this Section 2.1(f) by mutual agreement. Notwithstanding anything above to the contrary, no dispute shall be submitted to a Review Board until each member of the Review Board, and any substitute member, if applicable, agrees to be bound by the provisions of this Section 2.1(f) as applicable to members of a Review Board. Prior to the commencement of the Review Board proceedings, or, in the case of a substitute Neutral Member, prior to the re-commencement of such proceedings subsequent to that substitution, the Neutral Member shall provide a written oath of impartiality.

(xii)     For the avoidance of doubt, and notwithstanding anything herein to the contrary, in the event any notice of dispute is provided to a party under this Section 2.1(g) prior to the Termination Date, the terms of this Commercial Shared-Loss Agreement shall remain in effect with respect to any such items set forth in such notice until such time as any such dispute with respect to such item is finally resolved.

(g)     **Payment in the Event Losses Fail to Reach Expected Level**. On the date that is 45 days following the last day (such day, the "True-Up Measurement Date") of the calendar month in which the tenth anniversary of the calendar day following the Bank Closing occurs, or upon the final disposition of all Shared Loss Assets under the Single Family Shared-Loss Agreement at any time after the termination of this Commercial Shared-Loss Agreement, the Assuming Institution shall pay to the Receiver fifty percent (50%) of the excess, if any, of (i) twenty percent (20%) of the Intrinsic Loss Estimate less (ii) the sum of (A) twenty-five percent (25%) of the asset premium (discount) plus (B) twenty-five percent (25%) of the Cumulative Shared-Loss Payments plus (C) the Cumulative Servicing Amount. The Assuming Institution shall deliver to the Receiver not later than 30 days following the True-Up Measurement Date, a schedule, signed by an officer of the Assuming Institution, setting forth in reasonable detail the calculation of the Cumulative Shared-Loss Payments and the Cumulative Servicing Amount.

2.2     **Administration of Shared-Loss Assets.**  The Assuming Institution shall at all times prior to the Termination Date comply with the Rules Regarding the Administration of Shared-Loss Assets as set forth in Article III of this <u>Commercial Shared-Loss Agreement</u>.

**2.3** **Auditor Report; Right to Audit.**

(a)    Within the time period permitted for the examination audit pursuant to 12 CFR Section 363 after the end of each fiscal year from and including the fiscal year during which Bank Closing falls to and including the calendar year during which the Termination Date falls, the Assuming Institution shall deliver to the Corporation and to the Receiver a report signed by its independent public accountants stating that they have reviewed the terms of this Commercial Shared-Loss Agreement and that, in the course of their annual audit of the Assuming Institution's books and records, nothing has come to their attention suggesting that any computations required to be made by the Assuming Institution during such year by this Article II were not made by the Assuming Institution in accordance herewith. In the event that the Assuming Institution cannot comply with the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Assuming Institution during such year by this Article II were not made by the Assuming Institution in accordance herewith. In such event, the Assuming Institution and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made. It is the intention of this provision to align the timing of the audit required under this Commercial Shared-Loss Agreement with the examination audit required pursuant to 12 CFR Section 363.

(b)    The Assuming Institution shall perform on an annual basis an internal audit of its compliance with the provisions of this Article II and shall provide the Receiver and the Corporation with copies of the internal audit reports and access to internal audit workpapers related to such internal audit.

(c)    The Receiver or the Corporation, their agents, contractors and their employees, may perform an audit to determine the Assuming Institution's compliance with the provisions of this Commercial Shared-Loss Agreement, including this Article II, at any time by providing not less than ten (10) Business Days prior written notice. The scope and duration of any such audit shall be within the discretion of the Receiver or the Corporation, as the case may be, but shall in no event be administered in a manner that unreasonably interferes with the operation of the Assuming Institution's business. The Receiver or the Corporation, as the case may be, shall bear the expense of any such audit. In the event that any corrections are necessary as a result of such an audit, the Assuming Institution and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

**2.4** **Withholdings.** Notwithstanding any other provision in this Article II, the Receiver, upon the direction of the Director (or designee) of the Corporation's Division of Resolutions and Receiverships, may withhold payment for any amounts included in a Quarterly Certificate delivered pursuant to Section 2.1, if, in its judgment, there is a reasonable basis under the terms of this Commercial Shared-Loss Agreement for denying the eligibility of an item for which reimbursement or payment is sought under such Section. In such event, the Receiver shall provide a written notice to the Assuming Institution detailing the grounds for withholding such payment. At such time as the Assuming Institution demonstrates to the satisfaction of the Receiver that the grounds for such withholding of payment, or portion of payment, no longer exist or have been cured, then the Receiver shall pay the Assuming Institution the amount withheld which the Receiver determines is eligible for payment, within fifteen (15) Business Days. In the event the Receiver or the Assuming Institution elects to submit the issue of the eligibility of the item for reimbursement or payment for determination under the dispute resolution procedures of Section 2.1(f), then (i) if the dispute is settled by the mutual agreement of the parties in accordance with Section 2.1(f)(iii), the Receiver shall pay the amount withheld (to the extent so agreed) within fifteen (15) Business Days from the date upon which the dispute is determined by the parties to be resolved by mutual agreement, and (ii) if the dispute is resolved by the

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

121

BUTLER BANK
LOWELL, MASSACHUSETTS

determination of a Review Board, the Receiver shall pay the amount withheld (to the extent so determined) within fifteen (15) Business Days from the date upon which the Receiver is notified of the determination by the Review Board of its obligation to make such payment. Any payment by the Receiver pursuant to this Section 2.4 shall be made together with interest on the amount thereof from the date the payment was agreed or determined otherwise to be due, at the interest rate per annum determined by the Receiver to be equal to the coupon equivalent of the three (3)-month U.S. Treasury Bill Rate in effect as of the first Business Day of each Calendar Quarter during which such interest accrues as reported in the Federal Reserve Board's Statistical Release for Selected Interest Rates H.15 opposite the caption "Auction Average - 3-Month" or, if not so reported for such day, for the next preceding Business Day for which such rate was so reported.

**2.5    Books and Records**.  The Assuming Institution shall at all times during the term of this Commercial Shared-Loss Agreement keep books and records which fairly present all dealings and transactions carried out in connection with its business and affairs. Except as otherwise provided for in the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement, all financial books and records shall be kept in accordance with generally accepted accounting principles, consistently applied for the periods involved and in a manner such that information necessary to determine compliance with any requirement of the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement will be readily obtainable, and in a manner such that the purposes of the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement may be effectively accomplished. Without the prior written approval of the Corporation, the Assuming Institution shall not make any change in its accounting principles adversely affecting the value of the Shared-Loss Assets except as required by a change in generally accepted accounting principles. The Assuming Institution shall notify the Corporation of any change in its accounting principles affecting the Shared-Loss Assets which it believes are required by a change in generally accepted accounting principles.

**2.6    Information**.  The Assuming Institution shall promptly provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of the Purchase and Assumption Agreement or otherwise relating to its business and affairs or this Commercial Shared-Loss Agreement, as the Corporation or the Receiver may request from time to time.

**2.7    Tax Ruling**.  The Assuming Institution shall not at any time, without the Corporation's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Corporation pursuant to the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement.

## ARTICLE III - RULES REGARDING THE ADMINISTRATION OF SHARED-LOSS ASSETS AND SHARED-LOSS SECURITIES

**3.1    Agreement with Respect to Administration.**  The Assuming Institution shall (and shall cause any of its Affiliates to which the Assuming Institution transfers any Shared-Loss Assets or Shared-Loss Securities), or shall cause a Third Party Servicer to, manage, administer, and collect the Shared-Loss Assets and Shared-Loss Securities while owned by the Assuming Institution or any Affiliate thereof during the term of this Commercial Shared-Loss Agreement in accordance with the rules set forth in this Article III ("Rules"). The Assuming Institution shall be responsible to the Receiver and the Corporation in the performance of its duties hereunder and shall provide to the Receiver and the Corporation such reports as the Receiver or the Corporation reasonably deems advisable, including but not limited to the reports required by Section 3.3 hereof, and shall permit the Receiver and the Corporation at all times to monitor the Assuming Institution's performance of its duties hereunder.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

122

BUTLER BANK
LOWELL, MASSACHUSETTS

**3.2**      **Duties of the Assuming Institution with Respect to Shared-Loss Assets.**

(a)  In the performance of its duties under these Rules, the Assuming Institution shall:

(i) manage, administer, collect and effect Charge-Offs and Recoveries with respect to each Shared-Loss Asset in a manner consistent with (A) usual and prudent business and banking practices; (B) the Assuming Institution's (or, in the case a Third Party Servicer is engaged, the Third Party Servicer's) practices and procedures including, without limitation, the then-effective written internal credit policy guidelines of the Assuming Institution, with respect to the management, administration and collection of and taking of charge-offs and write-downs with respect to loans, other real estate and repossessed collateral that do not constitute Shared Loss Assets;

(ii) exercise its best business judgment in managing, administering, collecting and effecting Charge-Offs with respect to Shared-Loss Assets;

(iii) use its best efforts to maximize collections with respect to Shared-Loss Assets and, if applicable for a particular Shared-Loss Asset, without regard to the effect of maximizing collections on assets held by the Assuming Institution or any of its Affiliates that are not Shared-Loss Assets;

(iv) adopt and implement accounting, reporting, record-keeping and similar systems with respect to the Shared-Loss Assets, as provided in Section 3.4 hereof;

(v) retain sufficient staff to perform its duties hereunder; and

(vi) provide written notification in accordance with Article IV of this Commercial Shared-Loss Agreement immediately after the execution of any contract pursuant to which any third party (other than an Affiliate of the Assuming Institution) will manage, administer or collect any of the Shared-Loss Assets, together with a copy of that contract.

(b)  Any transaction with or between any Affiliate of the Assuming Institution with respect to any Shared-Loss Asset including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Institution will manage, administer or collect any of the Shared-Loss Assets, or any other action involving self-dealing, shall be subject to the prior written approval of the Receiver or the Corporation.

(c)  The following categories of expenses shall not be deemed to be Reimbursable Expenses or Recovery Expenses:

(i)  Federal, State, or local income taxes and expenses related thereto;

(ii) salaries or other compensation and related benefits of Assuming Institution employees and the employees of its Affiliates including, without limitation, any bonus, commission or severance arrangements, training, payroll taxes, dues, or travel- or relocation-related expenses,;

(iii) the cost of space occupied by the Assuming Institution, any Affiliate thereof and their staff, the rental of and maintenance of furniture and equipment, and expenses for data processing including the purchase or enhancement of data processing systems;

(iv) except as otherwise provided herein, fees for accounting and other independent

professional consultants (other than consultants retained to assess the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant with respect to the collateral securing a Shared-Loss Asset that has been fully or partially charged-off); provided, that for purposes of this Section 3.2(c)(iv), fees of attorneys and appraisers engaged as necessary to assist in collections with respect to Shared-Loss Assets shall not be deemed to be fees of other independent consultants;

        (v) allocated portions of any other overhead or general and administrative expense other than any fees relating to specific assets, such as appraisal fees or environmental audit fees, for services of a type the Assuming Institution does not normally perform internally;

        (vi) any expense not incurred in good faith and with the same degree of care that the Assuming Institution normally would exercise in the collection of troubled assets in which it alone had an interest; and

        (vii) any expense incurred for a product, service or activity that is of an extravagant nature or design.

        (d) Subject to Section 3.7, the Assuming Institution shall not contract with third parties to provide services the cost of which would be a Reimbursable Expense or Recovery Expense if the Assuming Institution would have provided such services itself if the relevant Shared-Loss Assets were not subject to the loss-sharing provisions of Section 2.1 of this Commercial Shared-Loss Agreement.

### 3.3    Duties of the Assuming Institution with Respect to Shared-Loss Securities.

     (a) In the performance of its duties under these Rules, the Assuming Institution shall:

        (i) manage, administer, collect and each Shared-Loss Security in a manner consistent with (A) usual and prudent business and banking practices; (B) the Assuming Institution's practices and procedures including, without limitation, the then-effective written internal credit policy guidelines of the Assuming Institution, with respect to the management, administration and collection of similar assets that are not Shared-Loss Securities;

        (ii) exercise its best business judgment in managing, administering, collecting and effecting Charge-Offs with respect to Shared-Loss Securities;

        (iii) use its best efforts to maximize collections with respect to Shared-Loss Securities and, if applicable for a particular Shared-Loss Security, without regard to the effect of maximizing collections on assets held by the Assuming Institution or any of its Affiliates that are not Shared-Loss Securities, provided that, any sale of a Shared-Loss Security shall only be made with the prior approval of the Receiver or the Corporation;

        (iv) adopt and implement accounting, reporting, record-keeping and similar systems with respect to the Shared-Loss Securities, as provided in Section 3.4 hereof;

        (v) retain sufficient staff to perform its duties hereunder; and

        (vi) provide written notification in accordance with Article IV of this Commercial Shared-Loss Agreement immediately after the execution of any contract pursuant to which any third party (other than an Affiliate of the Assuming Institution) will manage, administer or collect any of the Shared-Loss Securities, together with a copy of that contract.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

124

BUTLER BANK
LOWELL, MASSACHUSETTS

(b)  Any transaction with or between any Affiliate of the Assuming Institution with respect to any Shared-Loss Security including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Institution will manage, administer or collect any of the Shared-Loss Assets, or any other action involving self-dealing, shall be subject to the prior written approval of the Receiver or the Corporation.

(c)  The Assuming Institution shall not contract with third parties to provide services the cost of which would be a Reimbursable Expense or Recovery Expense if the Assuming Institution would have provided such services itself if the relevant Shared-Loss Assets were not subject to the loss-sharing provisions of Section 2.1 of this Commercial Shared-Loss Agreement.

**3.4    Records and Reports**. The Assuming Institution shall establish and maintain records on a separate general ledger, and on such subsidiary ledgers as may be appropriate to account for the Shared-Loss Assets and the Shared-Loss Securities, in such form and detail as the Receiver or the Corporation may require, to enable the Assuming Institution to prepare and deliver to the Receiver or the Corporation such reports as the Receiver or the Corporation may from time to time request regarding the Shared-Loss Assets, the Shared-Loss Securities and the Quarterly Certificates required by Section 2.1 of this Commercial Shared-Loss Agreement.

**3.5    Related Loans**.

(a)    The Assuming Institution shall not manage, administer or collect any "Related Loan" in any manner which would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Shared-Loss Asset to which such loan is related. A "Related Loan" means any loan or extension of credit held by the Assuming Institution at any time on or prior to the end of the final Recovery Quarter that is: (i) made to the same Obligor with respect to a Loan that is a Shared-Loss Asset or with respect to a Loan from which Other Real Estate, Additional ORE or Subsidiary ORE derived, or (ii) attributable to the same primary Obligor with respect to any Loan described in clause (i) under the rules of the Assuming Institution's Chartering Authority concerning the legal lending limits of financial institutions organized under its jurisdiction as in effect on the Commencement Date, as applied to the Assuming Institution.

(b)    The Assuming Institution shall prepare and deliver to the Receiver with the Quarterly Certificates for the Calendar Quarters ending June 30 and December 31 for all Shared-Loss Quarters and Recovery Quarters, a schedule of all Related Loans which are commercial loans or commercial real estate loans with Legal Balances of $5,000,000 or more on the Accounting Records of the Assuming Institution as of the end of each such semi-annual period, and all other commercial loans or commercial real estate loans attributable to the same Obligor on such loans of $5,000,000 or more.

**3.6    Legal Action; Utilization of Special Receivership Powers**. The Assuming Institution shall notify the Receiver in writing (such notice to be given in accordance with Article IV below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Assuming Institution derives as a result of having acquired a Shared-Loss Asset from the Receiver, and the Assuming Institution shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Assuming Institution and the Assuming Institution shall comply in all respects with such direction. Upon request of the Receiver, the Assuming Institution will advise the Receiver as to the status of any such legal action. The Assuming Institution shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

**3.7**    **Third Party Servicer**.  The Assuming Institution may perform any of its obligations and/or exercise any of its rights under this Commercial Shared-Loss Agreement through or by one or more Third Party Servicers, who may take actions and make expenditures as if any such Third Party Servicer was the Assuming Institution hereunder (and, for the avoidance of doubt, such expenses incurred by any such Third Party Servicer on behalf of the Assuming Institution shall be Reimbursable Expenses or Recovery Expenses, as the case may be, to the same extent such expenses would so qualify if incurred by the Assuming Institution); provided, however, that the use thereof by the Assuming Institution shall not release the Assuming Institution of any obligation or liability hereunder.

## ARTICLE IV -- PORTFOLIO SALE

**4.1**    **Assuming Institution Portfolio Sales of Remaining Shared-Loss Assets**.  The Assuming Institution shall have the right with the concurrence of the Receiver, commencing as of the first day of the third to last Shared-Loss Quarter, to liquidate for cash consideration, in one or more transactions, all or a portion of Shared-Loss Assets held by the Assuming Institution ("Portfolio Sales").  If the Assuming Institution exercises its option under this Section 4.1, it must give thirty (30) days notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale which shall be conducted by means of sealed bid sales to third parties, not including any of the Assuming Institution's affiliates, contractors, or any affiliates of the Assuming Institution's contractors.

**4.2**    **Calculation of Sale Gain or Loss**.  For Shared-Loss Assets gain or loss on the sales under Section 4.1 will be calculated as the aggregate sales price received by the Assuming Institution less the aggregate book value of the remaining Shared-Loss Assets.

## ARTICLE V -- LOSS-SHARING NOTICES GIVEN TO CORPORATION AND/OR RECEIVER

As a supplement to the notice provisions contained in Section 13.7 of the Purchase and Assumption Agreement, any notice, request, demand, consent, approval, or other communication (a "Notice") given to the Corporation and/or the Receiver in the loss-sharing context shall be given as follows:

**5.1**    With respect to a Notice under Section 2 and Sections 3.1-3.5 of this Commercial Shared-Loss Agreement:

> Federal Deposit Insurance Corporation
> Division of Resolutions and Receiverships
> 550 17th Street, N.W.
> Washington, D.C.  20429

> Attention: Assistant Director, Franchise and Asset Marketing

**5.2**    With respect to a Notice under Section 3.6 of this Commercial Shared-Loss Agreement:

> Federal Deposit Insurance Corporation Legal Division
> 1601 Bryan Street
> Dallas, Texas 75201
> Attention: Regional Counsel

> with a copy to:

Federal Deposit Insurance Corporation Legal Division
550 17th Street, N.W.
Washington, D.C. 20429
Attention: Senior Counsel (Special Issues Group)

## ARTICLE VI – MISCELLANEOUS

**6.1**      **Expenses.**  Except as otherwise expressly provided herein, all costs and expenses incurred by a party hereto in connection with this Commercial Shared-Loss Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

**6.2**      **Successors and Assigns; Specific Performance.**  All terms and provisions of this Commercial Shared-Loss Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; provided, however, that, Receiver may assign or otherwise transfer this Commercial Shared-Loss Agreement (in whole or in part) to the Federal Deposit Insurance Corporation in its corporate capacity without the consent of Assuming Institution.  Notwithstanding anything to the contrary contained in this Commercial Shared-Loss Agreement, except as is expressly permitted in this Section 6.2, Assuming Institution may not assign or otherwise transfer this Commercial Shared-Loss Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio*.  For the avoidance of doubt, a merger or consolidation of the Assuming Institution with and into another financial institution, the sale of all or substantially all of the assets of the Assuming Institution to another financial institution constitutes the transfer of this Commercial Shared-Loss Agreement which requires the consent of the Receiver; and for a period of thirty-six (36) months after Bank Closing, a merger or consolidation shall also include the sale by any one or more shareholders of more than nine percent (9%) of the outstanding Shares of the Assuming Institution, or of its Holding Company, or of any subsidiary holding Shared-Loss Assets or Shared-Loss Securities, or the sale of Shares by the Assuming Institution or its Holding Company or any subsidiary holding Shared-Loss Assets or Shared-Loss Loans, in a public or private offering, that increases the number of Shares outstanding by more than 9% and after issuance results in a change of shareholder interest of more than 9%, constitutes the transfer of this Commercial Shared-Loss Agreement which requires the consent of the Receiver.  No Loss shall be recognized as a result of any accounting adjustments that are made due to any such merger, consolidation or sale consented to by the FDIC.

**6.3**      **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS COMMERCIAL SHARED-LOSS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**6.4**      **No Third Party Beneficiary.**  This Commercial Shared-Loss Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in Commercial Shared-Loss Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or claim under or in respect of this Commercial Shared-Loss Agreement or any provision hereof.

**6.5**      **Consent.**  Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

**6.6** **Rights Cumulative.** Except as otherwise expressly provided herein, the rights of each of the parties under this Commercial Shared-Loss Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the Purchase and Sale Agreement and any of the related agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

128

BUTLER BANK
LOWELL, MASSACHUSETTS

## Exhibit 1

For the commercial and other pool, the FDIC reporting requirement includes the following:
- o A quarterly loan level download for all loans in the asset pool
- o A quarterly asset level download of commercial ORE
- o A quarterly certificate report that includes 3 sections:
  - o 1: A summary report of total covered losses for the quarter and the derivation of the FDIC portion of the covered loss
  - o 2: A summary report on the commercial and other portfolio and covered losses and recoveries
  - o 3: A performance report on the outstanding commercial and other pool assets under loss share
- o A quarterly listing of assets with covered losses

A blank version of the quarterly certificate report is shown below.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 2.02
March 19, 2010

129

BUTLER BANK
LOWELL, MASSACHUSETTS

**CERTIFICATE**
QUARTERLY SUMMARY
FOR COMM AND OTHER SHARED-LOSS AGREEMENT

FDIC - RECEIVER OF

_____

PURCHASE AND ASSUMPTION AGREEMENT DATED: _____

Shared-Loss Quarter Ended: _____
(Dollars)

**Calculation of Amount Due from (to) FDIC**

| | 0% | 50% | 85% | Total |
|---|---|---|---|---|
| FDIC % Share | | | | |
| Carry forward from other types of assets. | | | | |
| 1. Cumulative losses from single family loans | 0 | 0 | 0 | 0 |
| 2. Cumulative losses from securities | 0 | 0 | 0 | 0 |
| 3. Cumulative loss from non-single family | 0 | 0 | 0 | 0 |
| 4. Total cumulative losses at beg of quarter | 0 | 0 | 0 | 0 |
| 5. Covered losses (gains) during quarter | 0 | 0 | 0 | 0 |
| 6. Cumulative loss at end of quarter | 0 | 0 | 0 | 0 |
| FDIC % Share | x 0% | x 50% | x 85% | |
| 7. Amount Due from (to) FDIC | 0 | 0 | 0 | - |
| Memo: threshold for recovery percentage | 0 | 0 | 0 | |

Preparer name: _____

Preparer title: _____          Preparer signature

Officer name: _____

Officer title: _____          Officer signature

Date: _____

Page 1 of 3

# CERTIFICATE
## QUARTERLY SUMMARY
### FOR COMM AND OTHER SHARED-LOSS AGREEMENT

FDIC - RECEIVER OF
_____ BANK

PURCH AND ASSUMPTION AGREEMENT DATED _____

Shared-Loss Quarter Ended: _____
(Dollars)

| PART A. Opening/Closing/Net Shared-Loss Asset Balances | Cumulative at Beg of Quarter | Commercial Real Estate Loans | | C & I Loans | ORE & oth repo assets | Consumer Loans | Other Loans | Total | FDIC Adjustments | Cumulative at end of Quarter |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Closed A Due | Other | | | | | | | |
| 1. Opening Balance | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 2. Adjustments  a) Transfers | | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| b) Repurchases/Collections | | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| c) Other | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 3. Adjusted Opening Balance | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 4. Add  a) Advances/Commitment Advances | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| b) Permitted Advances | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| c) Capital Expenditures | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| d) Recoveries | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 5. Less  a) Prin Collections (paydfs and amort) | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| b) Sales | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| c) Charge-Offs (excluding acct rec) | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| d) Qualifying loss on sales | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 6. Net Reduction/Recovery Amount | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 7. Closing Balance | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| **PART B. Charge-Offs, Recoveries & Reimbursable Expenses** | | | | | | | | | | |
| 8. Charge-offs  a) Principal (from 5c and 5d) | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| b) Add int (up to 90 days) | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 9. Total Charge-Offs | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 10. Less  Recoveries | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 11. Net Charge-Offs (Recovery) | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 12. Add  Reimbursable Expenses | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 13. Less  Clawing Income | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 14. Shared-Loss Cost (Credit) Amount | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |

Failed Bank Name
Performance Status: Commercial and Other Loans
Quarter ending _____
(Dollars)

## Number of Loans / Properties

|  | Performing | Delinquent 30-59 days | Delinquent 60-89 days | Delinquent 90+ days | In Foreclosure | Repossessed Assets * | Total |
|---|---|---|---|---|---|---|---|
| Construction & Development | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Comm Real Estate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Comm Real Estate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C&I | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumer Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## $ Balance (000s)

|  | Performing | Delinquent 30-59 days | Delinquent 60-89 days | Delinquent 90+ days | In foreclosure | Repossessed Assets * | Total |
|---|---|---|---|---|---|---|---|
| Construction & Development | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Comm Real Estate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Comm Real Estate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| C&I | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumer Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* ORE for CRE loans; other types of repossessed assets for other types of loans.

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                    SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

## PLAINTIFFS' REPLICATION TO THE FDIC'S OBJECTION TO PLAINTIFFS' MOTION TO SUBSTITUTE PEOPLES UNITED BANK

NOW COMES the Plaintiffs in the above entitled matter and in response to the

FDIC's objection to Plaintiffs' Motion to Substitute parties say as follows:

I.      **The FDIC is not proper party to defend the claim against the Butler Bank.**

1.  On April 16, 2010 the FDIC entered into a purchase and sale agreement

    (hereinafter sometimes referred to as "P & A agreement") with People's United

    Bank (hereinafter sometimes referred to as "People's United") in which People's

    United assumed all the assets of Butler Bank including the loan deficiency of Seff

    Enterprises and Holdings, LLC and Laurie Foistner. (**See Exhibit 1, Affidavit of**

    **Beth Berman**)

    According to the P & A agreement People's United agreed to take on existing

    litigation that had been brought by Butler Bank.

2.  Section 2.1(m) of the agreement relates to "defensive litigation liabilities."

        **ARTICLE II**

        **ASSUMPTION OF LIABILITIES**
        **2.1   Liabilities Assumed by Assuming Institution**.   The Assuming
Institution expressly assumes at Book Value (subject to adjustment pursuant to Article
VIII) and agrees to pay, perform, and discharge all of the following liabilities of the

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
\SHUA, NEW HAMPSHIRE
03060

Federal Bank as of bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumes"):

(m)   all assets-related offensive litigation liabilities **and all asset-related defensive litigation liabilities** (highlighted for emphasis), but only to the extent such liabilities relate to assets subject to a shared-loss agreement, and provided that all other defensive litigation and any class action with respect to credit card business are retained by the Receiver.

3.   According to paragraph 2.1(m) of the P & A agreement, People's United is the proper party since it assumed all defensive litigation related to the assets assumed which include the Seff Enterprises and Holdings, LLC deficiency.

4.   The FDIC and Butler Bank were well aware of the asserted claims of Seff Enterprises and Holdings, LLC and Laurie Foistner prior to taking over the failed bank. The FDIC was appointed receiver of the failed bank on April 16, 2010. The instant lawsuit was filed on September 3, 2009. Butler Bank filed an Appearance and Answer on November 3, 2009.

5.   Beginning on September 15, 2005, Butler Bank was provided with notice of the claims of the Plaintiffs. See Exhibit, **2** A notice was also sent to Butler Bank on November 18, 2005 see Exhibit 3, June 27, 2006, Exhibit 4 February 12, 2008 letter, Exhibit 5 a hand delivered letter of August 24, 2008, Exhibit 6 with copies to the FDIC and a Massachusetts banking commissioner, a letter of March 2, 2009, Exhibit 7, and copies forwarded to the FDIC and Massachusetts Banking Commissioner on March 3, 2009, Exhibit 8 a certified letter on April 7, 2009, Exhibit 9 and a letter of May 6, 2009, Exhibit 10.

6.   On March 17, 2009 Butler Bank acknowledge receipt of the March 2, 2009 letter. (**Exhibit 11**) On March 10, 2009 the FDIC acknowledged receipt of the Plaintiffs' complaint against Butler Bank. (**Exhibit 12**) On March 30, 2009 the

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **2** of **6**

Massachusetts Banking Commissioner acknowledged receipt of Plaintiffs' complaint. (**Exhibit 13**) All acknowledgments were prior to the failed banks takeover by the Commonwealth of Massachusetts and the appointment of the FDIC as receiver.

7.  It is evident by the filing of the instant lawsuit and the numerous letters to Butler Bank, the FDIC and the Commonwealth of Massachusetts that the FDIC and People's United had notice of the Plaintiffs' lawsuit. It is undisputed that the reference to defensive litigation in section 2.1(m) relates to the Plaintiffs' claim.

8.  In fact, Attorney Donahue, counsel for People's United, in the Massachusetts litigation moved to amend his claim by substituting the name of the failed bank by adding People's United. (**Exhibit 14**)

9.  Section 2.1(m) of the P & A agreement and the filing of the lawsuit predating the takeover by the Massachusetts banking commissioner and the appointment of the FDIC as receiver and the numerous correspondences setting forth the Plaintiffs' claims all of which were received by the FDIC and the Commonwealth of Massachusetts contradict the FDICs position that People's United is not the proper party.

II.    **Paragraph 9.3 is not applicable**

10. The FDIC does not have discretion to settle the claim filed by the Plaintiffs against Butler Bank pursuant to paragraph 9.3 as asserted by the FDIC.

11. The provisions of paragraph 9.3 relied upon by the FDIC do not grant it the right to defend or settle the claim of the Plaintiffs. Since this case is related to the Seff Enterprises and Holdings, LLC asset that People's United assumed and since

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **3** of **6**

section 2.1(m) of the P & A agreement conferred upon People's United the obligation to defend "defensive litigation", Section 9.3 is not applicable. The P & A agreement provision 2.1(m) clearly imposes on People's United the obligation to defend the Plaintiffs' claim and not the FDIC.

### III.   The within lawsuit is related to the deficiency lawsuit

12.  The FDIC's assertion that his litigation is not related to the Massachusetts litigation is wrong. The Plaintiffs have never viewed the New Hampshire claim as separate and apart from the pending Massachusetts litigation.

13.  In June of 2009, Butler Bank filed a suit against Seff Enterprises and Holdings, LLC and Laurie Foistner in Massachusetts. On May 22, 2009, Seff Enterprises and Holdings, LLC filed for bankruptcy and the Massachusetts litigation was stayed. On April 7, 2009 Seff Enterprises and Holdings, LLC filed an adversary proceeding against Butler Bank asserting the same allegations as contained in the Writ that is presently pending with this Court. On August 26, 2009 the Court dismissed the Seff Enterprises and Holdings, LLC bankruptcy.

14.  On September 18, 2009 some of the creditors of Seff Enterprises and Holdings, LLC filed an involuntary bankruptcy proceeding. On September 18, 2009 a second adversary proceeding against Butler Bank was filed in the bankruptcy court alleging the identical allegations contained in the pending Writ. On February 26, 2010 the involuntary bankruptcy petition was dismissed.

15.  On March 28, 2012 the New Hampshire Bankruptcy Court, the Honorable Judge Michael J. Deasy, discharged any and all outstanding debt, owed to Butler Bank or Peoples United Bank, by the Debtor, Laurie Foistner.

LAW OFFICES OF
,LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
,SHUA, NEW HAMPSHIRE
03060

16. This discharge dismissed any and all outstanding debt claimed by Butler Bank and Peoples United Bank, declared by Laurie Foistner.  The Discharge did not dismiss the outstanding RICO, Federal and State Claims, brought by Laurie Foistner against Butler Bank, now Peoples United Bank, in this Court as well as the Massachusetts Superior Court.

17. The FDIC's claim that Plaintiffs did not file a counterclaim in Massachusetts is nothing but a deliberate omission to support the FDIC's position. On June 16, 2011 the Plaintiffs, Laurie Foistner and Seff Enterprises and Holdings, LLC, did file an answer and counterclaim in the Massachusetts litigation (**Exhibit 15, containing the relevant pages since the entire document consists of 97 pages**) This counterclaim filing was authorized by the Massachusetts Court. (**Exhibit 16**)

18. The FDIC's claim that the Plaintiffs viewed New Hampshire claim separate and apart is directly controverted by the filing of their counterclaim with the Court's permission in the Massachusetts litigation.

## IV.   THE PLAINTIFF ARE NOT A PARTY TO THE P&A AGREEMENT

19. The Plaintiffs acknowledge that they are not a party to the P&A agreement nor have they ever asserted it, however, the FDIC is a party and is bound by the terms and conditions of the P&A agreement. The FDIC cannot pick and choose what provisions of the P&A agreement they decide to enforce because of its favorability and disregard those provisions that are unfavorable to the positions that it is advancing in its opposition to the Motion to Substitute Parties. The operative provision of the P&A agreement is provision 2.1(m) which obligates

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
.SHUA, NEW HAMPSHIRE
03060

Page **5** of 6

People's United to defend this lawsuit, since it was assigned the Seff Enterprises

and Holdings, LLC asset that resulted in the pending defensive litigation.

WHEREFORE the Plaintiffs respectfully request that the Court grant their Motion

to Substitute People's United as a proper party to the litigation.

Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
et al

Through their Attorney,

Dated: December 28, 2012

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 28th day of December 2012,
been forwarded to Attorney Robert A. McCall, Attorney James Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF
.LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
.SHUA, NEW HAMPSHIRE
03060

Page **6** of 6

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Superior Court of Lowell

Middlesex, ss.                                     Docket No. MICV 2009-02583-L

Butler Bank,                          )
                    Plaintiff         )
                                      )
     v.                               )
                                      )
Antonia Shelzi,                       )
Laurie Foistner,                      )
                    Defendants        )
_____ )

## AFFIDAVIT OF BETH BERMAN

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

BETH BERMAN, being duly sworn, deposes and says:

     1.    I am employed by the Federal Deposit Insurance Corporation ("FDIC") as an Asset Management Specialist. I have personal knowledge of the facts set forth herein and am authorized to make this Affidavit. I submit this Affidavit in support of the motion to substitute People's United Bank for Butler Bank as the plaintiff in this action.

     2.    On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank, Lowell, Massachusetts and appointed the FDIC as Receiver ("FDIC-Receiver"). The FDIC accepted its appointment as receiver that same day. (Copies of the appointment papers are attached as Exhibit A.)

     3.    On the same day that the FDIC was appointed as Receiver of Butler Bank, it sold most of the assets and only certain designated liabilities of Butler Bank to People's

United Bank ("PUB") of Bridgeport, CT pursuant to a written Purchase and Assumption

Agreement with Loss-Share ("P&A Agreement"), a copy of which is attached as Exhibit

B.

4.      Section 3.1 of the P&A Agreement provides in pertinent part that:

> With the exception of certain assets expressly excluded in Sections 3.5 and 3.6 [not relevant to this lawsuit], the Assuming Institution hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Institution, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing....

5.      Among the non loss-share assets of Butler Bank which the FDIC sold to

PUB, under the terms of the P&A Agreement, was a charge-off made by Butler Bank

prior to its failure which related to a deficiency on a construction mortgage loan Butler

Bank had made to Seff Enterprises & Holdings LLC ("Seff Enterprises"),  which

deficiency is at issue in the captioned litigation.


Beth Berman

Sworn to before me this _9th_ day of
_December_ , 2010

Notary Public

**LORRAINE S. FIELDS**
**Notary Public, State of New York**
**No. 02FI4864248**
**Qualified in Nassau County**
**Commission Expires June 9, 20 14**

# EXHIBIT 2

# GOTTESMAN & HOLLIS

### PROFESSIONAL ASSOCIATION

### Attorneys at Law

### 39 East Pearl Street • Nashua, New Hampshire 03060-3407

David M. Gottesman
Morgan A. Hollis
Paul M. DeCarolis
Andrew C. Bauer, Jr.
Anna Barbara Hantz
Dyan J. Lowman

Telephone: 603-889-5959
Fax: 603-886-0380
Email: mhollis@nh-lawyers.com
worldwide web
http://www.nh-lawyers.com

September 15, 2005

John H. Pearson, Jr., President
Butler Bank
Gateway Center
10 George Street
Lowell, Massachusetts 01852

Re:   SEFF Enterprises & Holdings, LLC
      Our File No.: 05-104

Dear Mr. Pearson:

This office represented SEFF Enterprises & Holdings, LLC with regard to certain construction loan financing for property in New Boston, New Hampshire. The Manager of the limited liability company is Joseph A. Foistner. It was recently brought to my attention that the Bank issued a disbursement of the construction loan proceeds which had been held in escrow at the time of the original closing, related to my client obtaining final approvals from the Planning Board for a twentieth lot which was providing security for the loan. The amount held in escrow was $100,000.00.

Enclosed is a copy of the check representing the disbursement which was directed to me out of concern for the names of the payee on the check, and the endorsing parties on the back of the check. As you can see by the check, the names of the payee include not only the borrowing entity, but the two individual members of the limited liability company, Antonia Shelzi and Laurie Foistner. My client's concern and my concern is that disbursement checks should be issued to the borrower, SEFF Enterprises & Holdings, LLC, and should not have the signature requirements of members. There are specific corporate votes taken by the members authorizing Mr. Foistner as the signatory party. As well, at the closing, the Bank had certain documents signed indicating that the members had assigned responsibility for management of the limited liability company, including check writing, depositing, and withdrawing, to Joseph A. Foistner. I am bringing this matter to your attention, as apparently it has been previously brought to the attention of the lending officer, Robert Chapman, without response.

# EXHIBIT 3

November 18, 2005

John H. Pearson, Jr., President
Butler Bank
Gateway Center
10 George Street
Lowell, Massachusetts  01852

> **Re:**  **Shelzi v. Seff Enterprises & Holdings, LLC, et al.**
> **Docket No. 05-E-0464**

Dear Mr. Pearson:

This office represents Seff Enterprises & Holdings, LLC, Joseff Foistner and Lauri Foistner in the pending matter of Antonia Shelzi v. Seff Enterprises & Holdings, LLC, Joseph Foistner and Lauri Foistner, Hillsborough County Superior Court, Docket No. 05-E-0464.  The Bank provided certain construction loan financing for certain property in New Boston, New Hampshire.  The Manager of the limited liability company is Joseph A. Foistner.  There are two matters that are raised in this letter:  1) a recent $100,000 disbursement of construction loan proceeds and 2) the recent payment of a contractor's requisition request.

It was recently brought to my attention that the Bank issued a disbursement of the construction loan proceeds which had been held in escrow at the time of the original closing, related to my client obtaining final approvals from the Planning Board for a twentieth lot which was providing security for the loan.  The amount held in escrow was $100,000.00.

Enclosed is a copy of the check representing the disbursement which was directed to me out of concern for the names of the payee on the check, and the endorsing parties on the back of the check.  As you can see by the check, the names of the payee include not only the borrowing entity, but the two individual members of the limited liability company, Antonia Shelzi and Laurie Foistner.  My client's concern and

John H. Pearson, Jr., President
November 18, 2005
Page 2

my concern is that disbursement checks should be issued to the borrower, Seff
Enterprises & Holdings, LLC, and should not have the signature requirements of
members. There are specific corporate votes taken by the members authorizing Mr.
Foistner as the signatory party. As well, at the closing, the Bank had certain documents
signed indicating that the members had assigned responsibility for management of the
limited liability company, including check writing, depositing, and withdrawing, to
Joseph A. Foistner. I am bringing this matter to your attention, as apparently it has
been previously brought to the attention of the lending officer, Robert Chapman,
without response.

Additionally, calling your attention to the back of the check, as well as the
marking on the front of the check, the face of the check indicates that it was returned for
lack of endorsements, yet on the rear of the check there appear to be signatures covering
all three parties. The concern is that the two signatures on the back representing Seff
Enterprises & Holdings, LLC and Laurie Foistner, are not by either the authorized party
for Seff Enterprises & Holdings, LLC or by Laurie Foistner herself. Please note the
signature for Laurie Foistner is indeed spelled the wrong way.

I am calling these matters to your attention, as the check was originally delivered
by the Bank to a member of the limited liability company, Antonia Shelzi, and not the
Manager. Obviously, the Bank has apparently recognized an issue with the endorsing
signatures as it did not honor the check, but instead issued a duplicate check, which
was forwarded to Attorney Morgan Hollis. Upon presentation to the Manager, the
Manager has asked me to call these matters to your attention.

The second matter concerns Mr. Foistner's submittal of a requisition for
construction funds as to Ms. Shelzi's Lot 44 through his limited liability company, New
Boston Estates, LLC. The original amount of $57,000 was reduced by the Bank to
$37,000 and apparently reduced further by a subsequent requisition submitted by Ms.
Shelzi on behalf of Waldorf Estate Builders, LLC to $49,928.26. Apparently, Ms. Shelzi
received this funding from the Bank and with that funding wrote a check to Seff
Enterprises & Holdings, LLC in the amount of $40,100.00. The requisition was based
upon work performed by the contractor, New Boston Estates, LLC, not Ms. Shelzi.

Mr. Foistner is also the sole member/manager of Waldorf Estate Builders, LLC.
Ms. Shelzi has no ownership or management interest in this limited liability company.
The Bank's loan documents on Ms. Shelzi's construction loan for Lot 44 provide that
two (2) party checks will be issued to the borrower and the vendor/contractor.
Apparently, the Bank disbursed the requisition request to Ms. Shelzi although she has
no interest in New Boston Estates, LLC and Waldorf Estate Builders, LLC. This leaves
New Boston Estates, LLC, the contractor on the job, unpaid.

John H. Pearson, Jr., President
November 18, 2005
Page 3

As the manager of New Boston Estates, LLC and Waldorf Estates Builders, LLC, Mr. Foistner is investigating the Bank's first requisition and who may have endorsed the check. Would you kindly forward a copy of such check to me at your earliest convenience.

Thank you for your anticipated cooperation and assistance.

Sincerely,

C. Kevin Leonard

CKL:dae
cc:    Joseff Foistner

# EXHIBIT 4

**JOSEPH & LAURIE FOISTNER, ESQUIRE**
**SEFF ENTERPRISES & HOLDINGS, LLC**
**WALDORF ESTATES BUILDERS, LLC**
**NEW BOSTON ESTATES, LLC**
3 Foxberry Drive
New Boston, NH  03070

TO:   Dona Hauswirth, Butler Bank
      Robert Chapman, V.P. Butler Bank

FM:   Laurie & Joseph A. Foistner Esquire

Date: June 27, 2006

Subj: Payoff Loan Number 75069362  $990-thousand Construction Loan

Encl: Loan Commitment Letter CCM in the amount of $2.2-million

Dear Ms. Hauswirth:

   Laurie and I will be closing our new construction loan this Friday, June 30, 2006 at 16:00 hours.  This will pay of our existing mortgage and construction loan with the Butler Bank in full.

   As you can see from the enclosed Commitment Letter, the original loan for $990-thousand was inadequate to complete the structure.

   I would like to take this opportunity to thank each and every person at your bank, starting with Carol at the receptionist desk, (she is truly a love and asset to the bank), to Ms. Sullivan, Ms. Sheppard, yourself and your support staff.  All of you have provided the most professional, courteous and fastest service that we have experienced in our 21 years as builders under extremely difficult condition.

   By difficult conditions, I mean the many Criminal Felony Acts committed by Mr. Robert Chapman in Aiding and Abetting, thereby becoming a Conspirator to our former Member, in Seff Enterprises, Ms. Antonia Shelzi.

1.   Ms. Shelzi was issued a $100,000 check by Mr. Chapman without our (Laurie as Borrower, and I as Manager of the LLC) knowledge.  Ms. Shelzi then forged the back of the check by spelling Laurie's name wrong (LORI).  The Citizens bank discovered this felony forgery and attempted larceny and marked the check "MISSING ENDORSEMENT", and returned the check to the Butler Bank.  Only Shelzi, Citizens Bank and Butler Bank (Chapman) had

1

possession and knowledge of this check and the many crimes committed by its issuance.

    a.  Mr. Chapman did not notify Seff LLC or Laurie Foistner and had a duty to do so.

    b.  Instead, Chapman issued a second check, in the amount of $100,000 at Shelzi's request, thereby aiding and abetting a second felony crime, even after Laurie and I personally informed him not to issue any additional checks to Shelzi, or at Shelzi's request.

2.    On or about September 2005, I personally submitted an invoice for services performed on Shelzi's House Lot at Waldorf Estates in the amount of $60-thousand. This invoice included services performed by several contractors and reimbursements for municipal permits, drawings and approvals. The invoice was submitted to the Butler Bank by New Boston Estates, LLC. This invoice was discussed and reviewed by the Butler Bank at great length by Mr. Keith Prive and yourself. I personally witnessed all of the conversation over a four day period with Butler.

    a.  The invoice was never paid and remains outstanding. A law suit has been filed by New Boston Estates, LLC against Shelzi.

    b.  I Joseph A. Foistner am the Sole and Only Owner of New Boston Estates, LLC and Waldorf Estates Builders, LLC. I gave no authorization to issue funds, endorse checks made out to my Company, or to switch checks to my other Company, Waldorf, LLC.

    c.  Ms. Shelzi never paid her invoices for creating Waldorf Estates Builders, LLC and a Certificate of Transfer of Ownership was never issued to Shelzi. She simply is not an Owner or Manager of either Company. She never has been and never will be. Your bank issued and paid funds, drawn on checks, made out to my Company, without my endorsement and consent. Chapman knew of this, if not, he had a duty to call me.

    d.  After Butler Bank issued a check to Shelzi, made payable to New Boston Estates, LLC, Shelzi informed us, after ordering Mr. Prive to generate the invoice and requisition, discuss same with Butler, that she would not pay her invoices. We informed her that we would not endorse the Butler Bank Check after we received knowledge of the $100, 000 attempted larceny and forgery committed by Shelzi and Chapman.

        I.  Shelzi then had Butler Bank issue her a second check, this time made payable to Waldorf Estates Builders, LLC. Butler Bank issued a new check to Shelzi and Waldorf Estates Builders even though Butler had full knowledge that all

2

invoices and services were provided by New Boston Estates LLC, not Waldorf Estates, LLC.

II.   Butler Bank had full knowledge of what it was doing, because it issued an earlier check to New Boston Estates, LLC, now to Waldorf Estates, Builders, LLC (who submitted no invoices). All approved by Chapman.

III.   When Shelzi endorsed this 2nd check and Butler cashed this check, a third set of felony crimes, larceny, forgery and criminal fraud where committed by Shelzi, and furthered by Butler Bank.

IV.   I am certain that Mr. Chapman authorized these crimes. Shelzi informed me personally in front of witnesses that Robert Chapman is a personal friend of hers. Her words to me were: "Last week I took Chapman and his wife out to dinner. He was all over me, drunk as can be. He has been after me for year. His wife was with him." There is more, enough said.

3.   We discovered that Shelzi opened a checking account in Massachusetts with the Citizens Bank for Waldorf Estates Builders, LLC, in which she deposited the stolen funds, embezzled with Butler's help, made payable to Waldorf Estates Builders, LLC.

   a.   Shelzi falsified corporate votes and other bank documents to accomplish this crime.

   b.   The only Owner / Manager of Waldorf Estates Builders, LLC is Joseph A. Foistner. This can be easily verified by a bank, by accessing the New Hampshire Secretary of State database, required by all banks that open accounts for business entities. Chapman failed to perform this duty as well.

   c.   When Shelzi started issuing checks out of this new Citizens Bank checking account, again forging all signatures, pretending to be the Business Owner, she committed a fourth set of felony crimes. Butler Bank cashed these funds having full knowledge of the crimes as they were being committed by Shelzi and Chapman.

   d.   I personally called Chapman twice (2 times) and provided legal notices to him pertaining to Shelzi's crimes. I personally informed Chapman not to allow any additional funds to be issued to Shelzi, or ordered by Shelzi. I had my lawyers write letters to the President of Butler Bank. No response.

e. Attorney Morgan Hollis provided legal notices to Butler Bank in writing as early as September 2005 informing Butler of the many crimes that they were aiding and abetting. No response.

f. Judge Douglas, New Hampshire Supreme Court Justice for ten years, and Superior Court Judge for another ten year reviewed these crimes and Butler's participation and had his law firm, Attorney Kevin Leonard, issue a second written notice to the Butler Bank, informing Butler of the many felonies that had been committed by Shelzi with Butlers help.

g. Chapman told Shelzi of these legal notices. Shelzi lawyers informed me personally that the Butler Bank had received these notices.

4. All of these crimes have been reported to the FBI during February 2006. A copy of this memo will be forwarded to the Massachusetts Banking Commissioner and Attorney General's Office.

5. Antonia Shelzi's membership in Seff LLC was revoked in accordance with Seff Enterprises Operating Agreement which allows the Sole Manager, Joseph Foistner, to revoke a membership under certain conditions.

a. Justice Douglas, Seff, LLC's lawyer, revoked Shelzi's membership on February 14, 2006 after verifying the many crimes committed by Shelzi and Butler Bank, mentioned above.

   I. We learned that Shelzi was a Convicted Felon when she joined our Company, something we did not know prior. Seff, LLC's Operating Agreement allows for the revocation of a membership if the person is "ever convicted of Felony Crimes or receives a Dishonorable Discharge". It also allows for the immediate revocation of a membership if felony crimes are committed by that person while a Member of the Company.

6. Robert Chapman performance that reflects very negatively on Butler Bank:

a. Chapman has never once returned my phone calls while he was my loan officer, between August 2003 through June 2006. He had a duty to do so. I am the only Manager of Seff, LLC, the borrower of a $1.5-million loan and later a $1.-8-million loan. My phone records show that I made over twenty seven (27) calls to Butler and Chapman. Never a return call.

b. Chapman never protected Laurie Foistner's interest as a Personal Guarantor of both loan with Seff, LLC, as well as the $990-thousand construction loan.

4

c.  Chapman breached his Fiduciary Obligation to both Laurie and Seff, LLC when he aided and abetted Shelzi in her crimes.

d.  Chapman had a duty to stop the issuance of all funds, once he became aware that forgery and larceny may be entering into the picture. "May" was no longer a question after I gave him my notice. He certainly became a Criminal Co-Conspirator when he with full knowledge, after receiving my notices, continued to issue funds to Shelzi.

e.  The Butler Bank received more than $400-thousand in interest payments from Seff, LLC since 2003. All of these payments were made on time, most of them came out of a interest reserve. In May 2006 Seff, LLC made only half a payment, for the very first time.

f.  Last month, May 2006, after receiving 34 payments on time, Chapman personally took pleasure, again aiding and abetting Shelzi, in announcing a foreclosure, via Certified Mail, when Seff, LLC was only a half payment behind. Chapman's Notice depicted that Seff, LLC mad a $7-thousand payment towards a $14-thousand balance due. Shelzi called Attorney Gregory Oberhauser and several of Seff's associates, just two (2) weeks prior to Chapman's demand letter, attempting to solicit Oberhauser and others to join her in having an Involuntary Bankruptcy Petition filed against Seff, LLC. She explained that Butler Bank would cooperate. We now understand that Butler Bank is with Shelzi all the way.

    I.    Foreclosure Notice for being a half of a payment behind, after 35 payments were made on time.

    II.   Chapman demanded a full payoff within 10 days of the receipt of the notice – extremely reasonable towards Shelzi, his Co-Conspirator in Crime.

    III.  Chapman did not even make a single telephone call prior to announcing his foreclosure intentions and demand for payments, after collecting three (3) years interest. This is criminal.

    IV.   Chapman is the single cause, besides Shelzi, for the more than $2.5-million in losses experienced by Seff' LLC. Chapman's manipulation of loan proceeds and his Conspiracy to support Shelzi have done much harm to our Company and personal construction loan.

V.      In other words.  Laurie and I blame Robert Chapman, the manager of our money for our damages and for missing this market.

VI.     When Laurie Foistner closed on her $990-thousand construction loan last fall, only Butler Bank, it's attorney, (also attorney to Shelzi on other matters), Laurie and I had knowledge of the closing date, or in fact that the closing was approved.  The week prior to the closing, Shelzi attempted to stop the closing by having her lawyers write to Morgan Hollis (Seff's attorney).  Butler violated Laurie's right to privacy.  How did Shelzi find out?

When I personally contacted the Butler Bank to report Shelzi's criminal acts, asking to receive information on checks Butler issued to Shelzi in my Company's name, I was informed that Butler could not give me this information.  Clear Double Standard, showing intent.  We did not have a personal relationship with Chapman, and Chapman has never been all over me while intoxicated.

VII.    How did Shelzi switch construction checks issued first to New Boston Estates, then re-issued to Waldorf Estates Builders, LLC?  This transaction was conducted by Keith Prive, Joseph Foistner, Dona Hauswirth, Glenda Sheppard, Robert Chapman and Antonia Shelzi?

VIII.   Half a payment behind and Butler call its loan due in 10 days after receiving 33 payments on time, while we have more than $10-thousand in a Butler Savings Account, and Butler has the right to offset and take these funds.  Butler seems to be as guilty as Shelzi and its criminal conduct was demonstrated in Chapman Demand.

7.     When Butler Bank issued the first $1.5-million land loan to me, Joseph A. Foistner, Esquire.  Now the only Owner of Seff, LLC, Waldorf Estates Builders, LLC and New Boston Estates, LLC, Butler conditioned it loan and specifically asked me to assure that:

*"MR. HANS HARRO HASSEL was not employed by, or associated with Seff, LLC".*

I assured Butler that Hassel was no employee or associate of Seff, LLC or Joseph and Laurie Foistner.

6

a. Hassel was at all times employed by Shelzi, as of today, he is Shelzi's Chief Financial Officer. Just like Shelzi's felony conviction, Hassel's employment was not known by Laurie and I.

b. Hassel signed the $1.8-million loan renewal, as a witness for Shelzi just four (4) weeks ago. This was forwarded to Chapman by Attorney Morgan Hollis. Why did Chapman not inform the Bank? He knows this.

c. Hassel became employed by Shelzi in 1995 after his release from the Massachusetts Prison System.

d. Hassel is the sole reason why these crimes were committed in the first place. He hates the Butler Bank, who foreclosed on him in 1998, making him loose hundreds of thousand of dollars. He filed bankruptcy after that.

e. Hassel has lost hundred of thousand of Laurie and my money as well during these foreclosures.

f. When Hassel was questioned as to the forged signature on the back of the $100-thousand Butler Bank Check, he informed me: "The Butler Bank signed Laurie Foistner's name on the check, thereby forging the check, spelling Laurie's name wrong ("LORI").

g. Hassel has on several occasions written to our offices spelling the name Laurie as "LORI". I have substantial evidence to suggest that Hassel is the real criminal in this tragedy.

h. Shelzi did much harm to Laurie and I, as well as the Butler Bank, when she lied and misrepresented Hassel's employment status to Butler and me.

i. Most of all. Chapman had full knowledge of Hassel's status with Shelzi. Chapman failed to safeguard our loan funds.

Butler Bank has much to answer for, especially Mr. Robert Chapman, the man that was all over Toni Shelzi in his drunken state.

Citizens Bank has since verified the Criminal allegations made above and has initiated its own FBI investigation. I have forwarded Mr. Chapman's 10 day demand to Attorney Morgan Hollis.

Laurie and I will pay off the Butler Bank $990-thousand construction loan this Friday. We will pay off Seff' LLC $1.55-million land loan as the law allows, under reasonable terms and conditions, not ten (10) days.

7

In 1985, prior to being an attorney, I filed a Lender Liability Law Suit against five (5) banks (FNH Banks), two insurance companies and the banks director, Mr. Don Wheeler. This bank was owned by the Bank of Ireland, then the largest bank in New Hampshire. I litigated this case as a Plaintiff at a cost of more than $3.4-million in legal fees from 1987 through 1992. In 1987 the bankers were laughing at me.

After a four week trial in 1992, costing a little more than $440-thousand, the Chief Executive of the Bank of Ireland handed me a very large check. I sued for $12-million and collected all my money. I watched FNH Banks close its doors. I had a lot to do with it. I collected an even larger check from New Hampshire Insurance who I personally bankrupted. I collected seven floors of office furniture from New Hampshire's largest Insurance Company after they closed their doors. I had a lot to do with that as well.

Most of all, I took great pleasure watching the Bank Director and Founder being removed from the Bank, after he handed me a very, very large check for damages.

When I was done, 60 months later, the bankers were not laughing any more. They also paid more than $4-million for legal fees to lawyers. In 1998 I became a Massachusetts licensed attorney, specializing in Lender Liability Litigation.

FNH Banks unlawful acts are Dwarfs when compared to the Butler's and Chapman's wrongful, negligent and criminal actions. I caution you, Laurie and I, as well as Seff, LLC, New Boston Estates, LLC, and Waldorf Estates Builders, LLC will not tolerate any additional breaches of our confidentiality from Chapman or the Bank's attorney to Shelzi. We will hold Butler Bank responsible for any and all present and future damages resulting from Chapman's conduct.

Shelzi never did tell me if Chapman ever got his way with her that night, physically being all over her, or any other night. This, I will be asking her in the open Court, in front of the Jury.

I blame Butler Bank's negligence and Robert Chapman's criminal acts for the breakdown of our real estate sub-division known as Waldorf Estates, which during a very healthy marked, placed permitted lots and home-construction on hold for more then 22 months. This, we were forced to do, and are still forced today, after learning that a Convicted Felon and her friend, the Banker, decided to manage our loan funds without authorization.

I urge you to mitigate all damages in this matter and to allow Seff, LLC to pay the bank in full in accordance with reasonable banking standards. I urge you to forward a copy of this letter to your President. Millions of dollars in litigation can be avoided by People simply talking to each other.

8

Unfortunately, talking with the Butler Bank, has been in my experience a One-Sited effort.  It is very sad to realize that one individual, with the power and authority of Robert Chapman, can destroy all the good deeds and professionalism done by the rest of the Butler Bank team.

From the enclosed $2.2-million Loan Commitment issued by a reputable bank, you can clearly see that Laurie and I are capable to honor our contractual agreement.


Thank you,

Laurie & Joseph A. Foistner

**EXHIBIT 5**

LAW OFFICE OF

## WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
triallaw1@verizon.net

February 12, 2008

John H. Pearson, Jr., President
Butler Bank
10 George Street
Lowell, MA  01852

Re:   Laurie Foistner

Dear Mr. Pearson:

Please be advised that I represent Laurie Foistner concerning the inaccurate reporting of late payment concerning a loan granted to Seff, LLC and guaranteed by Laurie Foistner.  In the first instance, the bank is improperly reporting alleged late payments made by Seff, LLC on Laurie Foistner's credit report, and secondly, the reporting of late payments is erroneous since the payments have not been late.

The bank's reporting of these alleged late payments on Laurie Foistner's credit report has caused her credit score to fall significantly and has made it very difficult for her to obtain financing.  If the bank does not correct the erroneous reporting, my client will have no other alternative but to file a lawsuit against the bank as a result of the damage to her credit reputation.

My client has had a longstanding relationship with Butler Bank and she would like to avoid the litigation.

Very truly yours,

William Aivalikles

WEA/rjb
cc   Laurie Foistner

DIRECT ALL CORRESPONDENCE TO THE NASHUA OFFICE
HUDSON OFFICE: ONE WALL STREET, HUDSON NH

# EXHIBIT 6

**SEFF ENTERPRISES & HOLDINGS, LLC**
**NEW BOSTON ESTATES, LLC**
**WALDORF ESTATES BUILDERS, LLC**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1015


**JOSEPH A. FOISTNER, ESQ.**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1015


August 24, 2008


**HAND DELIVERED**

John H. Pearson, Jr.
Chief Executive Officer, Butler Bank
10 George Street
Lowell, MA  01852


Re:    Legal notice of outstanding claims in accordance with 12 U.S.C.  § 1823(e)
       ["FIRREA"], for damages exceeding $12-million caused by Butler Bank, its
       Employees, and Agents by and through their criminal and tortuous acts

Dear Mr. Pearson:

I write today, as the owner and manager of the companies referenced above, as well as an individual who is the holder of all rights, claims, and entitlements of Laurie J. Foistner, a customer of the Butler Bank and my spouse.  You are hereby provided with legal notice that the criminal and tortuous acts of the Butler Bank, its employees, and its agents (collectively "the Butler Bank"), have committed varied and egregious violations of a multitude of laws, which have caused and aided and abetted others in causing me, my wife, and my businesses over $12-million in damages.

I, along with my wife, have been the continuous owner of a two hundred acre subdivision in New Boston, New Hampshire from 1985 through present, known as Waldorf Estates.  During these twenty-three years, we have constructed several miles of roads and numerous luxury homes within the subdivision.  We have also owned and managed several other business interests that constructed luxury homes in other subdivisions, built public roads and bridges, constructed ski areas and golf courses, and completed various municipal public works projects.  Our work over these past twenty-three years has provided us with innumerable interactions with various banks and commercial lenders.

1

Over the course of the past twenty-three years, I have been involved in several lender liability suits. Of note, in the early-1990s, I litigated against seven different banks owned by the Bank of Ireland (f/k/a FNH Banks) and their insurance company (New Hampshire Insurance), and prevailed, securing a substantial judgment, after five years of litigation. This suit was instrumental in closing the doors of these banks forever, and resulted from the tortuous conduct committed by these banks, their employees, and agents against my companies and me. The conduct that was the basis for my claims against these banks, pales in comparison in both severity and egregiousness to that committed by the Butler Bank.

## History of Transactions Between the Butler Bank and Seff Enterprises & Holdings, LLC

The Butler Bank is the lender of a $1.8-million (approximate) commercial loan to Seff Enterprises & Holdings, LLC ("Seff, LLC"). Seff, LLC was the business entity that owned the undeveloped land in the Waldorf Estates subdivision (Phase III), and was responsible for transforming the raw land into suitable house lots and building a three-quarter mile through the parcel. The loan was originally given in October 2003 in the amount of $1.5-million, and later, in April 2005, refinanced to the current amount and was intended to be used to build the necessary infrastructure (i.e. roads, wetlands crossings, etc.) in Phase III of the Waldorf Estates subdivision.

The business relationship between the Butler Bank and Seff, LLC developed as a result of Antonia Shelzi ("Shelzi"), who purports to be a member of Seff, LLC. Shelzi, unbeknown to me us at the time, a Convicted Felon, Drug Dealer and former Massachusetts Prison Inmate, introduced me, the manager of Seff, LLC, to the Butler Bank's Senior Vice President, Robert Chapman ("Chapman"), who she had a close personal and business relationship with. (Shelzi has since been ousted from Seff, LLC as a result of numerous felony - criminal acts she committed against the company, my wife, and me, with the help and support of Chapman).

Seff, LLC has made timely interest payments to the Butler Bank over the past forty-eight months that amount to close to a million dollars . In the past 48 months, our real estate project has stood still, at a monthly cost of $35,000.00, because of the many criminal acts and fraud, committed by Chapman and Butler Bank, unlawfully converting our loan funds, switching checks by fraud, aiding, abetting and furthering criminal felony forgeries, felony larceny and felony identity theft for your financial gain.

I reported these crimes, specifically Chapman and Felon Shelzi, to the Bedford, NH and Boston, MA FBI, Agent Schneider, in writing in 2006. Formal Criminal Complaints were filed to the United States Attorneys Massachusetts and New Hampshire, the Attorney General in Massachusetts, New Hampshire and Rhode Island, the IRS Criminal Investigation Division, the Lowell, Massachusetts Police Department, the Riverside, Rhode Island Police Department and the Bedford, NH Police Department.

## History of Transactions Between the Butler Bank and New Boston Estates, LLC and Waldorf Estates Builders, LLC

New Boston Estates, LLC ("NBE, LLC") and Waldorf Estates Builders, LLC (WEB, LLC") are two home construction companies owned and managed by me. These companies were created specifically to construct twenty homes on the twenty house lots created by Seff, LLC.

In 2005, the Butler Bank certified NBE, LLC as an "approved builder" and issued two loans in the amount of $990,000 for the construction of homes in Waldorf Estates, Phase III. One loan was given to Shelzi, and the home was to be constructed by NBE, LLC on lot 44; the other loan was given to Laurie Foistner on lot 38, the home was also to be constructed by NBE, LLC. WEB LLC was never certified as an "approved builder". In fact, Butler Bank required Shelzi to submit new Construction Agreements and contracts showing NBE, LLC as Contractor / Builder, after Shelzi originally submitted contracts executed with WEB, LLC. Butler Bank directed Keith Prive to switch these Contractors, in order for Shelzi to receive her loan.

## August 2005 Issuance of $100,000 Check to Shelzi

When the original $1.5-million loan was refinanced in April 2005 (to $1.8-million) a condition of this transaction was that the Butler Bank would retain $100,000 of the loan proceeds in escrow. At the time of refinancing, Phase III of the Waldorf Estates subdivision contained 19 approved house lots, and was in the process of subdividing one of the lots, so that Phase III would consist of 20 approved house lots. The Butler Bank agreed to release this $100,000 amount when the Town of New Boston approved the subdivision of the final lot, and Phase III did in fact consist of 20 house lots.

On August 25, 2005, the Butler Bank issued check no. 7148, payable to Seff, LLC, Shelzi, and Laurie Foistner, a check in the amount of $100,000 to Shelzi. Shelzi appeared at the Butler Bank on this date and requested that a check in this amount be issued to her. The Butler Bank was authorized by Seff, LLC to release this check to Shelzi (as authorized by corporate vote). However, these proceeds, as stated in the conditions set forth by the Butler Bank, were not to be released until the 20th house lot (known as lot 8-84-30-1) in Phase III of the Waldorf Estates subdivision was subdivided, the subdivision was recorded at the New Hampshire Registry of Deeds, and documents supporting these facts were submitted to the Butler Bank. The Butler Bank had been made aware, in various conversations, that the $100,000, when released, were going to be used to pay various engineering expenses associated with subdividing and creating this 20th house lot.

Chapman authorized the release of this $100,000, despite the fact that conditions set forth by the Butler Bank had not been met. Chapman was fully aware of these conditions, as he was the individual ultimately responsible for approving the loan and its conditions. Chapman, and the Butler Bank, had a fiduciary obligation to protect Seff, LLC, the borrower of the $1.8-million and insure that the loan proceeds were being properly and accurately released. However, Chapman, a close personal friend of Shelzi's, authorized the $100,000 to be released to Shelzi only to aid his friend in committing the felony acts of forgery and larceny. Simply put, all Chapman had to do to satisfy the Butler Bank's fiduciary obligation to Seff, LLC was to place a

3

telephone call to me, the sole manager of Seff, LLC, and inquire as to whether this check should be issued. At the time that this check was issued, Chapman was well aware that a dispute had arisen between Seff, LLC and Shelzi, but he clearly intended to act in such a manner as to "do a favor for his friend" rather than perform the duties expected of him as an officer of the Butler Bank.

Several weeks after the Butler Bank issued check no. 7148, it was discovered that both the endorsements of Seff, LLC (for which the only authorized endorser was Seff, LLC's sole manager, me) and Laurie Foistner (whose name had been spelled "Lori" in the endorsement) had been forged on the check. Moreover, the check, that was supposed to be paying engineering costs, had been endorsed "pay to the order of Domenic Shelzi," Shelzi's brother and attorney licensed in the state of Rhode Island. When Domenic Shelzi had attempted to cash the forged check at a Citizens Bank branch in Rhode Island, the teller to whom the check was presented refused to honor the check because of a missing endorsement; check no. 7148 was promptly returned to the Butler Bank by Citizens Bank, either Citizens or Butler then stamped the front of the check "endorsement missing."

Once made aware of these criminal acts committed by Shelzi, Felony Forgery, two counts, and Attempted Felony Larceny, one count, and Felony Fraud, I called Chapman and informed him that Shelzi's authorization to request funds drawn on Seff, LLC's account had been revoked, and that under no circumstances was the Butler Bank to issue any further checks or other payments to Shelzi. Further, I informed Chapman that Shelzi's membership in Seff, LLC had been revoked, and she was no longer associated with the company. I reaffirmed that only I, as Seff, LLC's manager, could authorize the payment or withdrawal of funds on behalf of Seff, LLC.

Further, on September 15, 2005, Seff, LLC's attorney, Morgan Hollis, Esq., provided written notice to you, directly, that this crime had occurred and been aided by Chapman. However, neither Attorney Hollis or Seff, LLC received any response from you.

**September 2005 Second Issuance of $100,000 Check to Shelzi**

On or about September 12, 2005, the Butler Bank, directly contravening the instructions they had previously received from Seff, LLC, issued check no. 7324, in the amount of $100,000, at the direction of Felon Shelzi. There is little doubt that Shelzi approached her good friend, Chapman, and told him because of the dispute between Seff, LLC and herself, she needed these funds released by her authorization (as she was still trying to pay her brother this money, and Seff, LLC had informed her that engineering costs would be paid from these proceeds, not her brother). The Butler Bank delivered this check, without the approval, knowledge, or consent of Seff, LLC, to Attorney Hollis.

Again, despite the fact that the conditions set forth in the commercial loan had not been satisfied, Chapman, released the proceeds that were to be held back to pay for engineering costs. Again, the check was delivered to Shelzi's brother, Domenic Shelzi, and the funds were used not

for their intended purpose to pay engineering expenses, but the Butler Bank aided in paying Shelzi's brother and further damaging Seff, LLC. Specifically in light of the fact that engineering firm, by virtue of not receiving the $100,000 promised to it, now had lien rights against Seff, LLC – the creation of which is directly attributable to the Butler Bank.

Chapman joined Felon Shelzi as a criminal conspirator, willingly and with full knowledge, aiding and abetting his friend in the commission of felony forgery, felony larceny, felony attempted larceny, bank fraud, conversion and racketeering.

## September 2005 Issuance of $65,000 Check

As discussed above, Shelzi had received a $990,000 loan to construct a home on one of the house lots in Phase III of the Waldorf Estates subdivision, specifically lot 8-84-44. The Butler Bank had gone through great lengths to qualify NBE, LLC as the builder of this home (a process that involved several months and substantial communication between the Butler Bank and NBE, LLC). At the time, NBE, LLC was solely owned and managed by me.

In September 2005, NBE, LLC submitted an invoice in the amount of $65,000 directly to the Butler Bank for work done in the construction of Shelzi's house on lot 8-84-44. The invoice was properly created and was accompanied by all necessary supporting documentation. The invoice was for surveying services provided by several contractors and a reimbursement of costs incurred in obtaining municipal permits, building plans, and other necessary approvals (i.e. NH Public Utilities Commission energy rating approval). Subsequently, the Butler Bank issued a check payable to NBE, LLC and Shelzi.

At the time that the Butler Bank issued the $65,000 check, I had learned of Shelzi's forgery of the $100,000 check drawn on Seff, LLC's account, and other criminal acts being committed by Shelzi and Chapman. Consequently, I refused to endorse the $65,000 check on behalf of NBE, LLC, until Shelzi provided assurances that all criminal acts she had committed would be rectified and she would insure that Seff, LLC was restored to the position it was in prior to the acts were committed.

NBE, LLC and Shelzi were at an impasse. Shelzi was in possession of the $65,000 check and was demanding that NBE, LLC endorse it, so that she could use it to pay other expenses she had on other housing projects she owned. NBE, LLC, was refusing to endorse the check and demanding that Shelzi endorse it and give it to NBE, LLC, so that NBE, LLC could pay the construction expenses – the legitimate reason for which the check was issued.

Shelzi, realizing that NBE, LLC would not endorse the check and allow her to retain the funds, again called on her close friend Chapman to do her another, additional criminal favor. Shelzi returned the original check to Chapman, which was promptly voided, and had a new check, in the same amount reissued to WEB, LLC. Shelzi insisted that she was the owner of WEB, LLC, despite the fact that this company was also solely owned and managed by me.

Chapman had absolutely no authority or legitimate reason to issue the new $65,000 check payable to WEB, LLC. WEB, LLC was not the qualified builder on lot 8-84-44; WEB, LLC was

not the builder of record in the loan documents; and WEB, LLC was not owed the $65,000 – as they did not perform any services on the lot or submit any invoices to the Butler Bank. Chapman's only reason for issuing the check to WEB, LLC was because he and Shelzi, intentionally intended, and in fact did conspire to defraud NBE LLC. The only reason Chapman issued the check to WEB, LLC was to assist Shelzi in stealing $65,000 from NBE, LLC and defraud this company. Chapman's and Shelzi's actions constitute additional counts of felony larceny and bank fraud.

Shelzi took the $65,000 check to a Citizens Bank branch where she fraudulently opened a business checking account for WEB, LLC (using falsified business records). Shelzi then cashed the new $65,000 check and converted the funds for her own personal use. Chapman provided substantial assistance in aide to these crimes. Identity theft, felony forgery of federal forms to open a bank account, felony larceny, felony solicitation, bank fraud, criminal and civil conspiracy to defraud, and more. Chapman and Butler Bank have much to answer to law enforcement.

I promptly reported these actions to the Butler Bank and Citizens Bank, and I have, on several occasions, requested copies of both the $65,000 checks (the voided NBE, LLC check and the cashed WEB, LLC check) be provided to me by the Butler Bank, however, the Butler Bank has never responded to my requests. Further I provided detailed notice of the crimes committed by the Butler Bank to you, Chapman, and Donna Hauswirth, and again, never received any response. You simply ignored these crimes committed by your Bank and your Officers.

## Butler Bank's Retaliation for Alleging Its Complicity in Criminal Conduct

The Butler Bank has undertaken a systematic retaliation against my wife and me for our allegations of its complicity with and involvement in Shelzi's criminal actions. The Butler Bank has schemed to financially destroy Seff, LLC, and my wife – the guarantor on Seff, LLC's commercial loan, by reporting false, inaccurate, and improper information regarding Laurie Foistner's credit to the various credit rating bureaus.

Specifically, the Butler Bank received ample notice of the ongoing litigation between Shelzi and Seff, LLC (and my wife and me), and that the court ordered that each party (Shelzi and the Foistners) make one-half of the monthly interest payment on the commercial loan to the Butler Bank. Further, the Butler Bank has received several notices from Seff, LLC's attorney, Morgan Hollis that Shelzi who resides in Belmont, Massachusetts, has on several occasions failed to make payment on her half of the monthly interest expense. However, despite these facts, the Butler Bank continues to send notices of late payments to Shelzi at Seff, LLC's business address (and my home address), intentionally failing to provide these notices to Shelzi at her residence. Moreover, the Butler Bank has continuously reported late interest payments, which result from Shelzi not paying her half as ordered by the court, on Laurie Foistner's credit score – despite the fact that Laurie Foistner is not responsible for these late payments, as her court ordered amount has been paid in a timely fashion. This inaccurate and malicious reporting has caused Laurie Foistner's credit score to plummet nearly 250 points. We will review Shelzi's credit report to see how many late's Chapman and your bank has reported against her credit report.

## Butler Bank's Refusal to Remove Chapman as Loan Officer

Despite the fact that Seff, LLC, Seff, LLC's attorney, and I have reported Chapman's criminal actions and misconduct to various individuals at the Butler Bank, including you, and made numerous requests to have Chapman removed as the loan officer for the Seff, LLC commercial loan, you and the Butler Bank have failed to respond to our requests or take any action. It is inconceivable that Chapman can be continually allowed to oversee this loan, and that it is expected that he can fairly and impartially carry-out his fiduciary duties to Seff, LLC, when all these allegations have been made against him. Further, his own past conduct has shown that his is incapable of carrying-out these fiduciary duties, as he has so egregiously breached them over the past several years.

## Butler Bank's Attempt to Coerce Payment of a $169,000 Lot Release

Over the past month or so, Seff, LLC has attempted to obtain from the Butler Bank the amount required to release one lot in Phase III of the Waldorf Estates subdivision from the mortgage held on the property by the Butler Bank. The terms of the commercial loan indicate that such release shall be no less than $129,000, but may be adjusted at the discretion of the Butler Bank. In late 2005, when two lots were released from the mortgage, the Butler Bank only required the minimum lot release fee of $129,000. The two lots released at this time were larger in size, had premium views, and were being released in a significantly healthier real estate market. At this time, the Butler Bank had absolutely no qualms about releasing the lots for the $129,000 amount and not adjusting this fee. However, now when I have inquired about the lot release fee, I was told that Chapman's file contains a handwritten note to increase the lot release fee by $40,000. There is no doubt that Chapman's exercise of this "discretion" is not due to commercially reasonable expectations or situations, but rather, because his "close friend" Shelzi has indicated a desire to have him "put the screws" to the Foistners. After delaying the closing on lot 36 for more than four weeks, Chapman eventually lowered the release amount from $169,000 to $129,000, after delaying the closing for more than four weeks.

## Conclusion

Over the past four years the Butler Bank has committed and aided and abetted in the commission of several substantial and egregious felony-criminal acts. Despite repeated attempts by my attorneys and me to speak with you about these acts and our expressing a desire to work with you to mitigate our damages, you have never answered us, nor have you ever taken any steps to mitigate the damages caused by the Butler Bank's breach of its fiduciary duties. Instead, over the years the Butler Bank has taken a course of action directly opposite those that would be in the interest of your customers, Seff, LLC, my wife, and me – when a check is forged and returned to the Butler Bank, the bank simply issues a new one. When the endorsement of a check is properly denied by those with the authority to do so, the Butler Bank issues a new check that does not require such an endorsement. The Butler Bank has completely, totally, and unequivocally failed to act as a fiduciary for Seff, LLC, my wife, or me, such failure will no longer be tolerated, nor will it be condoned.

In the past 48 months, your bank, Chapman and yourself, have not returned a single telephone call, or responded to any of the legal notices, attorney letters and my written notices, providing you with timely notice of these crimes and the damages caused by this fraud. Shocking, to say the least.

Sincerely,

Joseph A. Foistner, Esq.

CC  **FDIC:** David A. Schecker, Federal Deposit Insurance Corporation
Boston Area Office, 15 Braintree Hill Office Park, Braintree, Massachusetts 02184
**Area Director (Risk Management),** Daniel E. Frye (781) 794-5678, **Boston - North**
450 Bedford Street, 2nd Floor, Lexington, MA 02420, (781) 274-8127

**Massachusetts Banking Commissioner:** STEVEN L. ANTONAKES
COMMISSIONER OF BANKS, COMMONWEALTH OF MASSACHUSETTS
DIVISION OF BANKS, One South Station, 3rd Floor, Boston, MA 02110
Phone: (617) 956-1500, Fax: (617) 956-1599.
**Office of Consumer Affairs and Business Regulation:** Ten Park Plaza, Suite 5170
Boston, MA 02116, Phone: (617) 973-8700, Fax: (617) 973-8799
Consumer Hotline: (617) 973-8787 or 888-283-3757 toll free (MA only)
E-mail: consumer@state.ma.us or use our Question / Complaint Form

**New Hampshire Banking Commissioner:** Commissioner Peter C. Hildreth, 53
Regional Drive, Suite 200, Concord NH 03301

**United States Attorney District of New Hampshire**

**United States Attorney District of Massachusetts**

**FBI, Boston Massachusetts**

**Lowell Massachusetts Police Department**

# EXHIBIT 7

**SEFF ENTERPRISES & HOLDINGS, LLC**
**NEW BOSTON ESTATES, LLC**
**WALDORF ESTATES BUILDERS, LLC**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1160

**JOSEPH A. FOISTNER, ESQ.**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1160

March 02, 2009

## LEGAL NOTICE OF OUTSTANDING CLAIMS

### VIA CERTIFIED MAIL

Ms. Janet Bruno, President
Chief Executive Officer, Butler Bank
10 George Street
Lowell, MA 01852

Re:  Legal notice of outstanding claims in accordance with 12 U.S.C. § 1823(e)
["FIRREA"], for damages exceeding $12-million caused by Butler Bank, its
Employees, and Agents by and through their criminal and tortuous acts, as
defined herein.

Dear Ms. Bruno:

I personally started my banking relationship with Butler Bank in 1997. Seff Enterprises &
Holdings, LLC began its banking relationship with Butler Bank in 2003. I am the only, Sole
Manager and Sole Member of Seff Enterprises & Holdings, LLC (SEFF, LLC).

SEFF, LLC borrowed $1.4-million from Butler Bank in 2003, collateralized with our 20
lot subdivision, located in New Boston, New Hampshire. This Loan was personally guaranteed
by Laurie Foistner and Antonia Shelzi. The loan was increased in 2004 to $1.8-million, and has
since then been paid down to $1.4-million.

From 2003 through present SEFF, LLC has paid approximately 65 payments, plus roll
over fees, to Butler Bank, amounting to close to $900,000.00, while our real estate subdivision
stood still, during a very good market, 2003 through 2005.

1

On or about December 2002, Antonia Shelzi of Belmont, Massachusetts joined SEFF, LLC by purchasing Mr. Louis A. Maynard's, 50% Ownership Interest.  She did not disclose her status as a Convicted Felon, Drug Dealer and former Massachusetts Prison Inmate, to me, the Sole Manager and the remaining Members.  SEFF, LLC had no knowledge of Shelzi's criminal past until 2005, when our business was targeted by Shelzi and her Office Manager, Bookkeeper Hans Hassel, also a Convicted Criminal and former Massachusetts Prison Inmate, convicted as Dead Peat Dad Number Two, by the then Massachusetts Governor in 1992, with numerous felony crimes.

These crimes included many counts of Felony Forgery, Felony Larceny, Attempted Felony Larceny, Criminal Fraud, Identity Theft and more.  I have attached for you several checks that had been forged, embezzled and converted by Hassel and Shelzi, with the help of your Senior Vice President, Mr. Robert Chapman.  These crimes were promptly reported to the FBI, IRS, and various law enforcement agencies.  Shelzi has testified that Robert Chapman and his Wife from South America, were personal friends of hers with whom she has been associated, on a personal level, for many years.  Shelzi explained to me personally that Mr. Chapman was more than a personal friend, she stated: "last week Chapman and his wife were out to dinner with me.  He was all over me, drunk, his wife was there also".  It was Shelzi that introduced SEFF, LLC to Butler and Chapman, in 2003.

Attorney Morgan Hollis, SEFF, LLC's permitting attorney, who supervised both the $1.4-million and the $1.8-million loan closings, discovered that Shelzi had received a $100,000.00 Butler Bank Draft, see attached check, where she had forged my signature and the signature of my wife Laurie, misspelling her name as "LORI".  Attorney Hollis, myself and Attorney Kevin Leonard immediately wrote letters to President Pearson.  None were ever answered.

I personally called Robert Chapman informing him that he was not allowed to release any additional checks to Felon Shelzi, he issued several more checks, violating his Fiduciary Responsibilities to me, SEFF, LLC and Laurie Foistner.  In fact, Chapman not only committed additional criminal acts, thereby aiding and abetting Shelzi and Hassel, as a Co-Conspirator in many additional crimes, he intentionally failed to safeguard the money and SEFF, LLC's business interests.  Chapman failed to return a single telephone call or respond to any of our written notices from 2004 through present.  Chapman was under a duty, at all times, to inform his borrowers, SEFF, LLC and Laurie Foistner, of the crimes that he uncovered and became aware of, once he received the returned, forged $100,000 check.  Instead, Chapman helped Shelzi switch funds and issued new checks, without authorization, allowing Shelzi to criminally defraud New Boston Estates LLC, SEFF, LLC, Laurie Foistner and I.

Chapman did these acts, knowingly, intelligently and willfully, while he was your Employee and Agent.  Our damages to date exceed $13-million.  We hold Butler Bank responsible for these damages.

On or about December 2005, 38 months ago, SEFF LLC, New Boston Estates, LLC, Waldorf Estates Builders, LLC, Laurie and Joseph Foistner began their civil litigation against Shelzi, for the many crimes and fraud committed by Shelzi and Hassel, aided and abetted by

2

Chapman and the Butler Bank, in the Hillsborough County Superior Court, all the while, making interest payments to Butler Bank. Hassel was sued in the Commonwealth of Massachusetts. This civil litigation is ongoing.

Instead of suing the Butler Bank in 2006, I made the decision to pay the Bank off in full, and seek my damages from the Criminals that are the villains in this tragic story. Mr. Chapman's Legal Notices to foreclose on SEFF, LLC, now submitted to the Court, change everything. I am now forced to protect SEFF, LLC's assets.

If you and I cannot settle these matter in person, then, I will be forced to file Chapter 11, for SEFF, LLC in the weeks to come, starting an Adversarial Proceeding against Butler Bank, in that Federal Court (Jury Trial), to enjoin your foreclosure and to expose the criminal acts committed by Butler Bank, Chapman and others, claiming treble damages and attorney fees.

I have enclosed for your review the many letters that have gone un-answered by your Bank. I have also enclosed, a letter to President Pearson, dated August 24, 2008, marked "HAND DELIVERED". This letter, never submitted or delivered to Butler Bank, at our attorneys' direction, explains the many fraudulent acts and crimes committed by Butler Bank and Chapman. This letter serves now, to explain these actions and inactions to you, the new President of the bank.

We have funds available to pay the Butler Bank Note off in full, we also have Buyers that want to purchase the subdivision.

Please review the attached documents. I am willing to meet with you in person to discuss these matters. I have thus far, intentionally not implicated Butler Bank, in these crimes. The August 14, 2008 letter addressed to President Pearson, was not delivered, because I was made aware of Butler Bank's problems with the FDIC. I wanted your Bank to succeed, allowing me to complete my litigation against Shelzi and Hassel.

The Attorney of Record in the Shelzi matter is William Aivalikles of Nashua, New Hampshire, Attorney Morgan Hollis remains SEFF, LLC's permitting attorney, the Attorney of record, in the Massachusetts Hassel matter is Attorney John LaRivee.

May I please hear from you.

Very Truly Yours,

Joseph A. Foistner, Esquire
Sole Manager
Sole member


CC    Attorney John LaRivee
      Attorney William Aivalikles

# EXHIBIT 8



# FOISTNER LAW OFFICES

### PROFESSIONAL CORPORATION
### AMERICAN COUNSELLORS & ATTORNEYS AT LAW
800 Turnpike Street, Suite 300, North Andover, Massachusetts 01845 - USA

March 03, 2009

## CRIMINAL COMPLAINT BUTLER BANK

### VIA FIRST CLASS MAIL

Mr. David A. Schecker
Federal Deposit Insurance Corporation
Boston Area Office,
15 Braintree Hill Office Park,
Braintree, Massachusetts 02184

Area Director (Risk Management),
Daniel E. Frye (781) 794-5678,
Boston - North
450 Bedford Street, 2nd Floor,
Lexington, MA 02420, (781) 274-8127

Massachusetts Banking Commissioner
STEVEN L. ANTONAKES
COMMISSIONER OF BANKS COMMONWEALTH OF MASSACHUSETTS
One South Station, 3rd Floor,
Boston, MA 02110
Phone: (617) 956-1500, Fax: (617) 956-1599.

Office of Consumer Affairs and Business Regulation
Ten Park Plaza, Suite 5170
Boston, MA 02116, Phone: (617) 973-8700, Fax: (617) 973-8799
Consumer Hotline: (617) 973-8787 or 888-283-3757 toll free (MA only)
E-mail: consumer@state.ma.us or use our Question / Complaint Form

New Hampshire Banking Commissioner
Mr. Peter C. Hildreth
53 Reginal Drive, Suite 200
Concord, NH 03301

Dear Sir / Madam:

Please consider this writing a Formal Criminal Complaint, made this date, against the Butler Bank of Lowell, Massachusetts, its employees, agents and contractors.

I have attached for you various letters and documents, written by our attorneys and myself, to Butler Bank. Not one single letter or telephone call was ever answered.

Butler Bank through its agents, employees and contractors did commit many Felony Crimes, Criminal Fraud and failed to perform its Fiduciary Obligations as our bank, required at all times, to protect, the Borrowers, interests, property rights and investments.

Please see the attached documents for further details, explaining the fraudulent conduct of Mr. Chapman and the Butler Bank. The Bank aided and abetted, a Convicted Felon, convicted Drug Dealer and former Massachusetts Prison Inmate, Antonia Shelzi, of Belmont, Massachusetts and Hans Harro Hassel, also a Convicted Criminal and former Massachusetts Prison Inmate, of Cambridge, Massachusetts, joining both as Co-Conspirators, defrauding Seff Enterprises & Holdings, LLC, New Boston Estates Builders, LLC, Waldorf Estates Builders, LLC, Laurie and Joseph Foistner, causing all to realize more than $12-million in damages.

Specifically, Butler Bank and its employee, Robert Chapman, helped Hassel and Shelzi commit the felony crimes of Forgery and Larceny, Attempted Larceny, Identity Theft and Fraud, by issuing $100,000 Butler Bank Drafts, after receiving legal notices, that Shelzi, a personal friend of V.P. Chapman, had forged our signatures, to a previously issued, $100,000.00 Butler Bank Draft, issued by Chapman to Shelzi. Chapman had possession of the forged check, was aware that Shelzi had forged our signatures to the check, then issued another, new check to Shelzi, never notifying us, the Borrowers, of these crimes.

Butler Bank and V.P. Chapman, switched a construction loan draw in 2005, amounting to more than $62,000.00, at Shelzi's request, issuing a new check to a company that performed no work under the Butler Bank Loan. This defrauded the Butler Bank authorized Builder, New Boston Estates, LLC, a New Hampshire Limited Liability Company, who performed work on the project, authorized by Butler Bank, out of its authorized payments. Chapman switched the check and Shelzi, after opening a Massachusetts checking account with Citizens Bank, again forging federal and state documents, misrepresenting herself as an owner or signer, then converted the funds.

Shelzi and Hassel own and operate many businesses in the Boston Area that employ several convicted Felon, Drug Dealers and former Massachusetts Prison Inmates.

**This Complaint is made under the pains and penalties of Perjury, signed this date,**

Joseph A. Foistner, Sole Manager and Sole Member
New Boston Estates, LLC

Joseph A. Foistner, Sole Manager and Sole Member
Waldorf Estates Builders, LLC

Joseph A. Foistner, Sole Manager and Sole Member
SEFF Enterprises & Holdings, LLC

Joseph A. Foistner, Esquire
Individual

CC:   United States Attorney District of New Hampshire
United States Attorney District of Massachusetts
FBI, Boston Massachusetts
Lowell Massachusetts Police Department
Cambridge Police Department
Belmont Police Department.

3

**EXHIBIT 9**

**SEFF ENTERPRISES & HOLDINGS, LLC**
**NEW BOSTON ESTATES, LLC**
**WALDORF ESTATES BUILDERS, LLC**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1160

**JOSEPH A. FOISTNER, ESQ.**
3 Foxberry Drive
New Boston, NH 03070
(603) 487-1160

April 07, 2009

## LEGAL NOTICE OF OUTSTANDING CLAIMS

### VIA CERTIFIED MAIL

Ms. Janet Bruno, President
Chief Executive Officer, Butler Bank
10 George Street
Lowell, MA 01852

Re:   Legal notice of outstanding claims in accordance with 12 U.S.C. § 1823(e)
["FIRREA"], for damages exceeding $12-million caused by Butler Bank, its
Employees, and Agents by and through their criminal and tortuous acts, as
defined herein.

Dear Ms. Bruno:

Thank you for your fast response, I am in receipt of your letter dated March 17, 2009.
Your letter, responding to my Legal Notice, submitted to your Bank, by myself last month, was
the very first written response that I have ever received, as your Borrower, from the Butler Bank
in sixty-nine months (69). Likewise, the many letters submitted to the Butler Bank by our
Lawyers, Attorney Morgan Hollis, Attorney Stephen Ruddock, Attorney Kevin Leonard and
Attorney William Aivalikles, all had gone unanswered, since 2005. All were addressed to Mr.
Robert Chapman, Vice President of Commercial Lending, as well as John Pearson, the then,
appointed President of the Bank. Your letter to me is the first and only written response that I
had ever received.

My Business Partners, my Construction Companies and I have been active Construction
Borrowers with the Butler Bank since 1997. My Wife and I personally borrowed $990,000.00 in
1985, and paid the bank off in full in 1986. Our Real Estate Development Loan, in the amount

1

of $1.8-million, borrowed by Seff Enterprises & Holdings, LLC, in 2003, has been paid down to $1.44-million, and we paid close to $1-million in interest payments, since 2003. The great majority of these interest payments were paid to Butler Bank, by myself, while our Real Estates Subdivision stood still, during very good market conditions in 2004, 2005 and 2006.

Our Project, which began in 1985, 24 years ago, came to a total standstill, total hold, only because of the extreme and severe Felony Crimes that were committed by Antonia Shelzi, Hans Hassel, her Employee and your Robert Chapman, Senior Vice President.

Allow me to be perfectly clear. Your Senior Vice President, Robert Chapman, is as guilty and liable, as his close friend and associate of many years, Convicted Felon, and Former Massachusetts Prison Inmate, Convicted Drug Dealer, Antonia Shelzi.

Mr. Chapman personally informed me last September, 2008, that it was he personally, that stopped the forged $100,000.00 Butler Bank Check, from clearing through Butler Bank. Mr. Chapman informed me that it was he that affixed the stamp onto the front of the check "MISSING ENDORSEMENT", effectively stopping the check from clearing. That was Mr. Chapman's duty after he recognized that Felon Shelzi, a long time friend and associate of his, had forged my endorsement as the only Manager of Seff Enterprises & Holdings, LLC, the only Borrower and authorized signor, as well as my Wife, Laurie Foistner's endorsement, as the Guarantor of the $1.8-million loan, onto that $100-thousand check.

After my attorneys and I gained knowledge of these crimes, committed by Shelzi and Hassel, Felony Forgery and Felony Larceny (later reduced to Attempted Felony Larceny), I personally called Mr. Chapman to inform him that no other checks were authorized to be provided to Shelzi. My Attorneys followed up with written notices.

Chapman provided two more checks to Shelzi, without my authorization. Three (3) checks in total. Chapman, as a Fiduciary, also failed to provide notice to his Borrowers, Seff Enterprises and Laurie Foistner, warning us of the forgeries and attempted theft that he had uncovered. Chapman intentionally issued Shelzi two more checks, amounting to $170,000.00.

He accomplished this by receiving our Construction Invoices, from New Boston Estates, LLC, a Butler Bank approved Builder, the only authorized Builder on the Shelzi, Lot-44, $990,000.00 construction loan, issued by the Butler Bank to Shelzi in 2005. Ms. Dona Hauswirth, Chapman's Assistant, helped us generate our $70,000.00 Construction Draw Number One, and in fact, issued a check to Shelzi, the Borrower and New Boston Estates, LLC, the Holder of the Mechanic Lien Rights.

When I, the Owner / Member and Sole Manager of New Boston Estates, LLC, refused to endorse that check, after catching Shelzi in the act of forging the $100,000, Seff LLC Butler Bank Check, two weeks earlier, Shelzi visited her good friend, Mr. Chapman and had the funds switched.

In fact, Mr. Chapman voided the New Boston Estates Builders, LLC check and issued a new check, made payable to Waldorf Estates Builders, LLC and delivered that check to Shelzi.

The problem here is, Waldorf Estates Builders, LLC was **NOT** a Butler Bank approved Builder. Waldorf Estates Builders, LLC did not perform any work on Lot-44, or any other lot in the project and Mr. Chapman was fully aware of that. Waldorf Estates Builders also did not submit invoices or a requisition to Butler Bank and Ms. Dona Hauswirth, now implicated in the commission of these crimes, did not help Waldorf Estates Builders, LLC prepare a requisition for funds for Lot 44.

Shelzi wanted the checks switched, and Chapman through fraud and criminal conduct, aided and abetted Shelzi in the commission of these crimes. All these facts are uncontested and admitted by Felon Shelzi. No attorney, agent or employee of the Borrower ever authorized the issuance of the second check, or the fraudulent switching of the 3rd check.

After Shelzi received the 3rd, "Switched Check" from Chapman, she traveled to Cambridge, Massachusetts, opened up a new checking account with Citizens Bank, by falsifying Federal Bank Documents and Powers of Attorney, not being an Owner, Manager / Member of Waldorf Estates Builders, LLC, swearing on the bank forms that she was an Owner. She then wrote checks from her newly, unlawfully opened, Citizens Bank checking account, thereby converting and stealing the money.

This third (3rd) set of felony crimes, also committed by Mr. Chapman and your Bank, with full knowledge, effectively aiding and abetting Shelzi before and after the fact, included again, Felony Forgery, this time Felony Larceny, Criminal Fraud, Interstate Criminal Fraud, Identity Theft, Falsification of Federal and State Banking Forms, Corporate Votes, Federal Tax Forms and much more.

The Owner / Member of Waldorf Estates Builders, LLC was **NOT** Shelzi. The Owner / Manager of Waldorf Estates Builders, LLC and New Boston Estates Builders, LLC was then and remains to this date, Attorney Joseph A. Foistner, Esquire.

Chapman and Butler Bank are as guilty in committing these many crimes as is Shelzi. Butler Bank's conduct was intelligent, willful and premeditated. Butler Bank's conduct has caused me personally, damages exceeding $11-million.

You stated in your letter to me: "At this time, I see no involvement on the part of the Bank or its personnel ...". This is not the case. It was the Bank's and the unlawful, fraudulent and criminal conduct of its personnel, that is at issue here. These crimes and fraud have been committed by Butler Bank, Robert Chapman, Dona Hauswirth and several others, all witnessed by more than four separate licensed lawyers, their testimony received during the Shelzi Litigation, uncontested and admitted by Shelzi in writing.

Shelzi testified that:

" Robert Chapman has been my close friend for many years. I have him right, where I want him. A few weeks ago, he and his wife, she is also from South America, we were out for Dinner. Chapman was all over me that night. His wife was there   all the time. She did not care, Chapman was drunk. I've got him right where I want him."

3

These are the unfortunate facts and assurances, committed by individuals, at a time, before your watch, as President of Butler Bank, that have kept us, your Borrower, in litigation, in the Hillsborough County Superior Court, against Shelzi, in the past 38 months. During all these months, Butler Bank received its interest payments.

I hope that this will help you understand your Bank's liabilities and exposure. I have reported these facts, filing timely written Complaints to the FBI, the FDIC and both Banking Commissioners of New Hampshire and Massachusetts. I have also filed Criminal Complaints against Chapman and Butler Bank with the Bedford, NH Police Department, the Lowell, MA Police Department, the Riverside, RI Police Department, the New Hampshire and Massachusetts Attorney Generals and United States Attorney Generals.

I have instructed Attorney Aivalikles to consider filing a Civil Law Suit against Butler Bank, Robert Chapman and others in Massachusetts, if in fact, my efforts to resolve these atrocities, with the new management of the Butler Bank, fail. It is my belief, having more than 15 years, direct hands on experience in suing large Banks (Lender Liability), and collecting large "Enhanced Compensatory Damage Amounts", that a law suit should only be brought as a last resort.

I urge you to review these many facts with your attorneys and to make the necessary efforts to avoid costly litigation. In either case, Seff Enterprises & Holdings, LLC will be filing for bankruptcy protection, Chapter 11, within the next few weeks. In the event that we cannot settle our differences before hand, Attorney Aivalikles, will be filing an Adversary Proceeding in the Federal Bankruptcy Court against the Creditor, Butler Bank, asking for a Jury Trial, seeking treble damages, costs, and attorney fees.

Very Truly Yours,


Joseph A. Foistner, Esquire
Sole Manager
Sole member


CC     Attorney John LaRivee
       Attorney William Aivalikles

4

# EXHIBIT 10

LAW OFFICE OF

# WILLIAM E. AIVALIKLES, P.A.

60 Main Street, Suite 230
Nashua, NH  03060

MEMBER
NEW HAMPSHIRE AND
FLORIDA BAR

PHONE
603-880-0303
FAX
603-882-0065
E-MAIL
triallaw1@myfairpoint.net

May 6, 2009

Attorney Matthew C. Donahue
Eno, Boulay, Martin & Donahue, LLP
21 George Street
Lowell, MA  01852

Re:   **NOTICE OF IMPENDING LAWSUIT**
Seff Enterprises & Holdings, LLC, and Laurie Foistner v. Butler Bank,
et al

Dear Attorney Donahue:

Please be advised that I represent Seff Enterprises & Holdings, LLC ("Seff") and Laurie Foistner ("Foistner") concerning a number of lender liability issues that have arisen due to your client's conduct and the conduct of the bank's employees as follows:

1.      Butler Bank and its employee, Robert Chapman, aided and abetted certain individuals in committing crimes against Seff.  Mr. Chapman was aware of a forgery of a $100,000.00 check and took no steps to prevent the commission of the crime and, in fact, allowed the reissuance of a new check.  Mr. Chapman had a longstanding personal relationship with one of the participants.

2.      Mr. Chapman allowed the diversion of $62,000.00 to a company that was not the authorized builder nor entitled to the funds.

3.      Mr. Chapman failed to disclose these defalcations and furthered the conspiracy in an effort to accomplish the objectives of his good friend.  Butler Bank failed to safeguard the funds of its customer and protect Seff's business interest.

Once the lawsuit is filed and we engage in litigation, we expect to uncover more acts of the bank that have harmed my client.  The conduct of the bank as detailed herein

Page Two
Re: Seff/Foistner
May 6, 2009

has resulted in costly litigation which has brought the project to a standstill causing
Seff/Foistner multi-million dollar losses.

My client intends to file an adversary proceeding in the Bankruptcy Court when
Seff seeks bankruptcy protection raising these multiple issues.  Seff believes that the
conduct of the bank and its employees amounted to civil conspiracy, violation of the
RICO Act, tortious interference with contractual relationships, breach of contract
including a breach of the Covenant of Good Faith and Fair Dealing, breach of fiduciary
duty, fraud, misrepresentation and negligence.

My clients are prepared to settle their claim against the bank upon the discharge
of the mortgage and the marking of the promissory note satisfied.

Please be certain that this letter is put in my clients' file at the bank so that the
FDIC is put on notice of this lawsuit in the event the bank fails.

I look forward to your response.


Very truly yours,



William Aivalikles




WEA/rjb
Cc     Clients

# EXHIBIT 11

Janet M. Bruno
PRESIDENT & CEO



Gateway Center
10 George Street
Lowell, MA 01852
978-259-1000

B U I L D I N G   A M E R I C A
O N E   H O U S E   A T   A   T I M E®

March 17, 2009

Joseph A. Foistner, Esq.
c/o SEFF Enterprises & Holdings, LLC
New Boston Estates, LLC
Waldorf Estates Builders, LLC
3 Foxberry Drive
New Boston, NH  03070

Dear Mr. Foistner:

        I am responding to your March 2nd, letter to me.  At the outset I must say that I am not
quite sure how to respond to the allegations you make.  It appears to me that you are or were in a
dispute with Antonia Shelzi over one or more of the development or borrower entities that
borrowed construction funds from Butler Bank.  I do not believe the Bank is or should be
involved in that dispute or that it did anything improper with respect to any grievance you may
have had with Antonia Shelzi.  The $100,000 check about which you complain was by your own
account delivered by Mr. Chapman to Attorney Hollis whom, as I understand it, represented the
borrower entities.  At this time, I see no involvement on the part of the Bank or its personnel
with the private dispute you apparently have with your partner or former partners Ms. Shelzi.  I
frankly do not understand your suggestion that Butler Bank or Mr. Chapman did something
wrong by issuing checks to entities SEFF, LLC and WEB, LLC that you appear to have
controlled.

        I appreciate your offer to meet with me to discuss your situation.  I think it might be more
productive if you or your attorney contacted the Bank counsel in this matter.  Please contact
Stanley V. Ragalevsky, K&LGates, State Street Financial Center, One Lincoln Street, Boston,
MA  02111-2950, (617) 951-9203.

                              Very truly yours,

                              Janet M. Bruno
                              President and Chief Executive Officer

TOLL FREE: 888-285-7251 • FAX: 978-442-1762 • jbruno@butlerbank.com
**www.butlerbank.com**



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

NEWTON MA 02458

| | | |
|---|---|---|
| Postage | $ | $1.17 |
| Certified Fee | | $2.70 |
| Return Receipt Fee (Endorsement Required) | | $2.20 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $6.07 |

Postmark Here

04/09/2009

Sent To: MR. FRANKLIN Gould ESQ.
Street, Apt. No.; or PO Box No. 150 CALIFORNIA St.
City, State, ZIP+4 NEWTON  MA  02458

PS Form 3800, August 2006     See Reverse for Instructions

7008 3230 0001 9950 2775

# EXHIBIT 12



**FDIC**
**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO  64108

Consumer Response Center
1-800-378-9581
Fax number 703-812-1020

March 10, 2009
Ref. No.: SCC2009N-000112-0

Joseph A. Foistner
800 Turnpike Street
Suite 300
North Andover, MA  01845

Re:     Butler Bank
        Lowell, Massachusetts

Dear Mr. Foistner:

On March 3, 2009, our office received your correspondence concerning the referenced bank.  The Federal Deposit Insurance Corporation (FDIC) is the primary federal regulator for this financial institution, and is responsible for enforcing its compliance with federal consumer protection laws.  The Consumer Response Center is part of the Division of Supervision and Consumer Protection.

After reviewing the available information, it appears the issues in your situation are not subject to federal consumer protection regulations under the jurisdiction of this office.  However, due to the content of your correspondence, we forwarded your information to the Risk Management branch within the FDIC.  Risk Management is also a part of the FDIC's Division of Supervision and Consumer Protection.  If necessary, that group will correspond with you at a later date.

Thank you for bringing this matter to our attention.  The FDIC takes the concerns of consumers very seriously.  Complaints such as yours help the FDIC tailor its examinations to areas of concern, and also to provide comment to the banks on practices and policies.  Your complaint will become part of the file that will be made available during our next examination of the bank.

Sincerely,

*Lynne Gottesburen*

Lynne Gottesburen
Consumer Affairs Specialist

# EXHIBIT 13



# The Commonwealth of Massachusetts
## Office of the Commissioner of Banks
### One South Station
### Boston, Massachusetts 02110

DEVAL L. PATRICK
GOVERNOR

TIMOTHY P. MURRAY
LIEUTENANT GOVERNOR

DANIEL O'CONNELL
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

DANIEL C. CRANE
DIRECTOR, OFFICE OF
CONSUMER AFFAIRS AND
BUSINESS REGULATION

STEVEN L. ANTONAKES
COMMISSIONER OF BANKS

March 30, 2009

Seff Enterprises & Holdings LLC
Joseph A. Foistner, Esquire
3 Foxberry Drive
New Boston, NH 03070

Re: Butler Bank

Dear Mr. Foistner, ESQ:

The Division of Banks ("Division") received your letter of complaint filed against Butler Bank.

It is a longstanding position of the Division not to intervene in matters when the individual is represented by counsel as we would not want to give the appearance of circumventing the legal process. We do this to avoid taking actions which may be inconsistent with or duplicate those that an attorney may have planned or may have already taken.

Additionally, the loan addressed in your correspondence is a commercial account. The role of the Division is limited to intervention in disputes filed by consumers. A "consumer" is defined as "a person who purchases goods or services or borrows money for personal, family, or household use."

As a result of the limited intervention of the Division, we will be unable to unable to proceed with the complaint review process. However, the Division uses information regarding complaints in our examinations. The results of examinations are not public information. Thank you for bringing this matter to our attention.

Sincerely,

Jennifer Gordon
Consumer Assistance Unit
Division of Banks

TEL (617) 956-1500   ▪   FAX (617) 956-1599   ▪   TDD (617) 956-1577   ▪   www.mass.gov/dob

# EXHIBIT 14

**COMMONWEALTH OF MASSACHUSETTS**
The Trial Court
Superior Court of Lowell

Middlesex, ss.

Docket No: MICV 2009-02583-L

Butler Bank,                    )
            Plaintiff           )
                                )
v.                              )
                                )
Antonia Shelzi,                 )
Laurie Foistner,                )
            Defendants          )
_____)

## MOTION TO AMEND COMPLAINT BY SUBSTITUTING PARTY

NOW COMES People's United Bank, present owner of the loan that is the subject matter of the above titled action, and hereby requests this Honorable Court, pursuant to Superior Court Rule 9A and M.R.C.P. 15(a), to allow People's United Bank be substituted for Butler Bank as Plaintiff in the above captioned matter.  In support thereof, People's United Bank offers the following:

1.      On April 16, 2010 the Commissioner of Banks for the Commonwealth of Massachusetts seized Butler Bank and appointed the Federal Deposit Insurance Corporation as Receiver for Butler Bank (Receiver).

2.      On April 16, 2010 the Receiver entered into a Purchase and Assumption Agreement (the "P & A Agreement") with People's United Bank pursuant to which People's United Bank assumed all assets of Butler Bank not specifically retained by the Receiver, including but not limited to the outstanding loan deficiency which is the subject of the present action. (See "Exhibit B" of Affidavit of Beth Berman).

3.      Pursuant to the P & A Agreement, People United Bank, agreed to take on any existing

litigation that had been brought by Butler Bank prior to the time that it had been seized by the

Massachusetts Banking Commissioner, including but not limited to the present action.

4.      The substitution of plaintiffs does not harm the Defendants.

5.      The substitution of plaintiffs does not cause undue delay or hardship.

6.      The substitution of plaintiffs will assure that the proper parties are subject to the suit.

Respectfully submitted,
People's United Bank,
By Their Attorney,

Matthew C. Donahue
BBO# 548280
Eno, Boulay, Martin & Donahue, LLP
21 George Street
Lowell, MA  01852
(978) 452-8902

# EXHIBIT 15



# FOISTNER LAW OFFICES
## PROFESSIONAL CORPORATION
### AMERICAN COUNSELLORS & ATTORNEYS AT LAW
800 Turnpike Street,  Suite 300,  North Andover,  Massachusetts  01845   USA

Thursday, June 16, 2011

Michael A. Sullivan, Clerk
Middlesex Superior Court
360 Gorham Street
Lowell, MA   01852

>  **Re:**     *Butler Bank v. Laurie J. Foistner et al. Docket No. MICV 2009-02583-L*

Dear Clerk Sullivan:

   Enclosed for filing please find **DEFENDANT FOISTNER'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM-PLAINTIFFS' COUNTERCLAIMS TO PLAINTIFFS COMPLAINT, CROSS-PLAINTIFF'S CROSSCLAIM TO CROSS-DEFENDANT SHELZI AND JURY DEMAND**

Thank you.

Very Truly Yours,

Joseph A. Foistner, Esquire

COPY

Tel:  603-487-2466
Fax:  978-223-1446

E-Mail:  AttorneyFoistner@msn.com
USMCAttorney@msn.com

# COMMONWEALTH OF MASSACHUSETTS
## The Trial Court
## Superior Court of Lowell

Middlesex, ss

| | |
|---|---|
| BUTLER BANK ) | |
|      Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| ANTONIA SHELZI ) | |
| LAURIE FOISTNER ) | |
|      Defendants ) | |
| ) | |
|    and ) | |
| ) | |
| LAURIE FOISTNER ) | |
|      Counterclaim-Plaintiff ) | Civil Action |
| ) | Docket No. MICV 2009-02583-L |
| v. ) | |
| ) | |
| BUTLER BANK ) | |
|      Counterclaim-Defendant ) | |
| ) | |
|    and ) | |
| ) | |
| LAURIE FOISTNER ) | |
|      Cross-Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| ANTONIA SHELZI ) | |
|      Cross-Defendant ) | |

## DEFENDANT FOISTNER'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM-PLAINTIFFS' COUNTERCLAIMS TO PLAINTIFFS COMPLAINT, CROSS-PLAINTIFF'S CROSSCLAIM TO CROSS-DEFENDANT SHELZI AND JURY DEMAND

DEFENDANT FOISTNER'S ANSWER
AFFIRMATIVE DEFENSES
COUTERCLAIM AND
CROSSCLAIM

1

FOISTNER LAW OFFICES, PC
800 TURNPIKE STREET, SUITE 300
NORTH ANDOVER, MA 01845
TEL: 978-223-1446

Defendant Laurie Foistner ("L. Foistner") by and through her attorney, submits the following answer, affirmative defenses, and counterclaims to Plaintiff Butler Bank's ("Butler"), Complaint and further submits this cross-claim, to Cross-Defendant Antonia Shelzi ("Shelzi") as follows:

<p align="center">**ANSWER**</p>

1.      On information and belief, Plaintiff is <u>not</u> a bank with its usual place of business at 10 George Street, Gateway Center, Lowell, Middlesex County, Massachusetts. Butler Bank was ceased by the Federal Deposit Insurance Corporation ("FDIC"), on or about April 16, 2010, for committing and conducting unlawful banking practices within the Commonwealth.  The FDIC is now the Receiver of the failed Butler Bank. Except as stated herein Mrs. Foistner is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph One of the Complaint and therefore denies the same.

2.      Paragraph Two of the Complaint contains no allegations and therefore no response is required.

3.      Paragraph Three of the Complaint is denied.  Mrs. Foistner does not have an address at 3 Foxberry Drive, New Boston, Hillsborough County, New Hampshire.  Mrs. Foistner maintains an address at PO Box 240, 104 Foxberry Drive, New Boston, Hillsborough County, New Hampshire.

4.      Paragraph Four of the Complaint is admitted.

5.      Paragraph Five of the Complaint is denied.  On information and belief, Mrs. Foistner disputes the amount due, $1,411,169.24, in light of the fact that Butler Bank received $900,000, as foreclosure proceeds, in 2010, not accounted for in the Plaintiff's Complaint submitted in 2009. From 2005 through 2010, Butler Bank and its Loan Officers criminally

DEFENDANT FOISTNER'S ANSWER
AFFIRMATIVE DEFENSES
COUTERCLAIM AND
CROSSCLAIM

2

FOISTNER LAW OFFICES, PC
800 TURNPIKE STREET, SUITE 300
NORTH ANDOVER, MA 01845
TEL:  978-223-1446

extorted and embezzled more than $200,000 from the loan proceeds held at the bank and an additional $1.3-million were paid to Butler Bank for lot releases, interest and principal payments, totaling $2.4-million.  The original loan amount borrowed in 2005 was $1.8-million.  Sufficient funds were held and maintained at Butler Bank, at all times, allowing for timely payments, said loan funds were criminally stolen by Butler Bank's Loan Officer and Vice President of Commercial Lending.

6.      On information and belief, Mrs. Foistner denies the allegations of Paragraph Six of the Complaint.

7.      On information and belief, Mrs. Foistner denies the allegations of Paragraph Seven of the Complaint.  The criminal and civil Racketeering Activities of the Butler Bank, its personnel and agents, conspiring with Co-Defendant Antonia Shelzi ("Shelzi") were specifically designed, planned and executed, by these Conspirators, to bankrupt the Residential Subdivision known as Waldorf Estates, thereby causing the material breach of the loan.

8.      On information and belief, Mrs. Foistner denies the allegations of Paragraph Eight of the Complaint, the accounted for value of all payments made to the Butler Bank, by the Borrowers, far exceeded the stated loan amount, interest included.

9.      Paragraph Nine of the Complaint is admitted.

## AFFIRMATIVE DEFENSES

As separate and affirmative defenses, Mrs. Foistner states as follow:

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state facts sufficient to constitute a cause of action against Mrs. Foistner.

## SECOND AFFIRMATIVE DEFENSE

DEFENDANT FOISTNER'S ANSWER
AFFIRMATIVE DEFENSES
COUTERCLAIM AND
CROSSCLAIM

3

FOISTNER LAW OFFICES, PC
800 TURNPIKE STREET, SUITE 300
NORTH ANDOVER, MA 01845
TEL: 978-223-1446

**WHEREFORE**, the Counter-Plaintiff demands trial by jury and judgment as follows:

1.  Enter Judgment against the Counter-Plaintiff on all counts set forth in this Complaint.

2.  Award Damages to Mrs. Foistner, including actual damages, statutory damages, multiple damages, and damages for pain and suffering for Butler Bank's violations of M.G.L.ch. 93A;

3.  Order Butler Bank to disgorge and/or refund all profits, benefits, and other compensation improperly obtained by it from Mrs. Foistner, including, but not limited to, all closing costs and fees, as well as principal and interest payments paid by Mrs. Foistner relative to the Fist Butler Bank Loan, the Second Butler Bank Loan, and the $990,000, Lot 38, Construction Mortgage Loan.

4.  Award Damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank, jointly and severally, for a sum of money equal to the amount of damages and/or losses the Counter-Plaintiff has sustained or will sustain as a result of their racketeering activities, conspiracy and aiding and abetting in racketeering activities;

5.  Award Treble damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank pursuant to 18 U.S.C. § 1964(c);

6.  Award Damages against Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank jointly and severally, for a sum of money equal to the amount of damages and/or losses the Counter-Plaintiff has sustained or will sustain as a result of the Counter-Defendants' conspiracy to commit common law fraud and other cause of actions along with enhanced compensatory damages to the extent allowed by Massachusetts law;

7.  Award Prejudgment interest on the amount of damages and/or losses that the Counter-Plaintiff has sustained; and

8.  Award all costs of litigation incurred by the Counter-Plaintiff including its reasonable attorneys' fees and experts' fees, pursuant to 42 U.S.C. § 1988 and/or 18 U.S.C. § 964(c).

DEFENDANT FOISTNER'S ANSWER
AFFIRMATIVE DEFENSES
COUTERCLAIM AND
CROSSCLAIM

96

FOISTNER LAW OFFICES, PC
800 TURNPIKE STREET, SUITE 300
NORTH ANDOVER, MA 01845
TEL: 978-223-1446

Dated: June 15, 1011                    N. Andover, Massachusetts

                                        Respectfully Submitted
                                        Laurie Foistner
                                        By her attorneys


                                        _____
                                        Joseph A. Foistner, Esq.
                                        BBO No. 648871
                                        Foistner Law Offices, P.C.
                                        800 Turnpike Street, Suite 300
                                        N. Andover, Massachusetts 01845
                                        (978) 223 - 1446



### Certificate of Service

    I hereby certify that a copy of the foregoing was this day mailed, firsts class postage
prepaid, to Plaintiffs Butler Bank's Attorney, Mathew C. Donahue and Attorney Robert Carey of
Orr & Reno, PA, Attorney for Antonia Shelzi.


Date:  June 15, 2011                    _____

                                        Joseph A. Foistner, Esq.

# EXHIBIT 16

10:28 FAX 617 494 4094          MIDDLESEX CTY SECTY OFF                    ☒001

**COMMONWEALTH OF MASSACHUSETTS**
The Trial Court
Superior Court of Lowell

Middlesex, SS.                                              Docket No. MICV 2009-02583-L

Butler Bank
                    Plaintiff                    )
                                                 )
            v.                                    )
                                                 )
Antonia Shelzi                                   )
Laurie . Foistner                                )
                                                 )
                    Defendants                   )
                                                 )

## ORDER

At pre-trail hearing of the above entitled action was held on June 10, 2011, before the Honorable Justice Paul Chernoff. Present were Attorney Mathew Donahue for the Plaintiff, Attorney Foistner of Foistner Law Offices, PC and Attorney Robert Carey, of Orr & Reno, PA, representing the Defendants.

In response to <u>DEFENDANT LAURIE FOISTNER'S RENEWED MOTION TO CONTINUE – IN ORDER TO FILE ANSWERS, COUNTERCLAIMS AND SERVE NECESSARY PARTY LITIGANTS WITH NOTICE</u>, the Court ordered that the Automatic Stay, imposed by this Court, on or about July 28, 2009, pursuant to the Federal Bankruptcy Rules under chapter seven 7 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*) filed in the United States Bankruptcy Court for the District of New Hampshire Case No. 09-11862-MWV (REG)., was removed and revoked, effective Monday, June 13, 2011.

The Court further ordered, after all parties agreed, that the following dates and deadlines be established as the new Tracking Order:

1. Dispositive Motions, Motions to Dismiss to be completed by September 12, 2011;
2. Completion of Discovery by November 25, 2011;
3. Rule 56 Motion filing deadline by January 9, 2012;
4. Pre-trial Memorandums by April 02, 2012.
4. Motion in Limine completed, Anticipated Trial Date May 02, 2012.

SO ORDERED,

Date: June 14, 2011

By the Court

Paul A. Chernoff J

Paul Chernoff, Justice

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                              SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

**PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION TO DISMISS AND
CROSS MOTION FOR NEW ORDERS OF NOTICE**

NOW COME the Plaintiffs in the above entitled matter and object to Defendants,

Antonio Shelzi and Han Hassel's Motion to Dismiss and Cross Petition for New Orders

of Notice and say as follows:

1. On September 1, 2009, the Plaintiffs filed a writ of summons.

2. On October 27, 2009 the Court informed Plaintiffs' that service was incomplete

   and directed Plaintiffs to request new orders of notice by November 10, 2009 or

   the Court would dismiss the action.

3. On November 2, 2009 the Court was informed of Seff Enterprises bankruptcy

   filing.

4. On November 3, 2009 the Defendants, Butler Bank and Robert Chapman, filed an

   appearance and answer.

5. On November 9, 2009 the Court issued a stay in light of the Seff Enterprises

   bankruptcy filing and no new orders of notice were requested by November 10,

   2009 because of the stay nor has the Court dismissed the action.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
ASHUA, NEW HAMPSHIRE
03060

6.  On March 17, 2011 Plaintiffs' counsel by letter to the Court requested that in light of the Federal District Court remand of the case that the matter be scheduled for a structuring conference. A copy of the letter was sent to Attorney Laboe.

7.  On April 11, 2011 a Motion to Lift Stay was filed with the Court and Attorney Laboe was provided a copy.

8.  On June 21, 2011 a letter to the Court was sent in an effort to bring the matter forward and a copy was sent to Attorney Laboe.

9.  On June 27, 2011 Attorney Forbes withdrew as counsel for Butler Bank and Chapman and she provided Attorney Laboe with a copy of her withdrawal.

10. On September 19, 2011 Plaintiffs' counsel informed the Court of the dismissal of the bankruptcy and that the stay should be lifted. A copy was sent to Attorney Laboe.

11. On March 7, 2012 the Court informed all counsel including attorney Laboe of the trial the week of September 9, 2013.

12. On April 13, 2012 the Court was informed of Laurie Foistner's bankruptcy filing. A copy was sent to Attorney Laboe.

13. Despite the numerous correspondences to the Court concerning the case by Attorney Aivalikles and Attorney Forbes in which Attorney Laboe was copied, he never indicated he was not the attorney of record for Hans Hassel or Antonio Shelzi.

14. Despite the Court's notice of April 13, 2012 of the trial date which was sent to Attorney Laboe, he never informed the Court that he was not representing Antonio Shelzi or Hans Hassel.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **2** of 4

15. On November 14, 2012 at the structuring conference attorney Lisa Snow Wade who is associated with attorney Laboe appeared on behalf of Antonio Shelzi and Hans Hassel and never informed the Court that her firm was not representing Antonio Shelzi or Hans Hassel.

16. If Attorney Laboe had no intention of appearing for Defendants, Antonio Shelzi and Hans Hassel, he had an obligation to inform the Court well prior to December 12, 2012.

17. When Attorney Laboe received numerous correspondences from counsel and notices from the Court he had an obligation to inform both Plaintiffs' counsel and the Court that he was not representing Antonio Shelzi or Hans Hassel.

18. The Defendants are estopped from raising any issue concerning the manner of the service of process in light of the conduct of their attorney.

19. The Defendant, Antonio Shelzi and Hans Hassel, have waived any service defect as a result of the conduct of Attorney Laboe. See Lyford v. Trustees of Berwick Academy, 97 N.H. 167 (1951) and Wiebusch, NH Practice, Civil Practice and Procedure, Section 1110, page 81-82.

20. In the event the Court does not find a waiver or estoppel precluding the dismissal of the action, the Plaintiffs request new orders of notice in order to perfect service. WHEREFORE the Plaintiffs respectfully request the following relief:

    A.  That the Court deny the Motion to Dismiss or in the alternative;

    B.  The Court issue new orders of notice;

    C.  For such other relief as may be fair and just.

LAW OFFICES OF
.LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
.SHUA, NEW HAMPSHIRE
03060

Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
et al

Through their Attorney,

Dated: December 20, 2012

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 20th day of December 2012,
been forwarded to Attorney Robert A. McCall, Attorney James Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF
.LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
.SHUA, NEW HAMPSHIRE
03060

Page **4** of **4**

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                        SUPERIOR COURT
NORTHERN DISTRICT

Docket No. 09-cv-0522

Seff Enterprises & Holdings, LLC
Laurie Foistner

v.

Butler Bank
Robert Chapman

## MOTION TO CONTINUE STRUCTURING CONFERENCE

NOW COMES Robert Chapman, *pro se* and hereby moves this Court to postpone the

structuring conference scheduled for January 16, 2013.  In support of this Motion, Mr. Chapman

states as follows:

1.       I currently reside at _19505 Quesada Ave #11204 Port Charlotte, FL 33948_, Florida and have no means to travel to

New Hampshire for the structuring conference scheduled for January 16, 2013.

2.

WHEREFORE, I respectfully request this Court:

A.       To postpone the Structuring Conference schedule for January 16, 2013 for a

period of 60 days to enable me to find counsel; and

B.       To grant other and further relief as this Court deems just and proper.

*Granted [signature] 1/14/13*

Respectfully submitted,

Robert Chapman, *pro se*

Dated:  January 9, 2013

[signature] , pro se



Statement from Robert Chapman:

I was employed at the Butler Bank and was assigned to be the Loan Officer the subject loan given to Seff Enterprises, et al. I was the primary contact person for all signers on the loan until February 20009. I received the notice of a structuring hearing scheduled for January 16, 2013. The notice was dated December 7, 2012 and I received it on December 20, 2012. I then contacted Attorney, Karyn Forbes, who was originally hired by the Butler Bank to represent the Butler Bank. She told me she had dismissed herself from this case and was no longer involved.

After I left the Bank in February 2009, Attorney Forbes contacted me to help her and the Butler Bank answer the counts on the case. I did help her on the condition that the Bank pay all my personal legal fees to do with this case. She confirmed that the Bank would pay the fees.  I believe that the Butler Bank was under controlled by the FDIC at that time and that they also may have been involved with this decision at that time. I never heard from Karyn Forbes since then, more than three years ago.

I found out Attorney Robert McCall now represents the FDIC / Butler Bank. I also found out the Bank that took over the Butler Bank, the Peoples United Bank,  is involved with the subject loan and also has employed an attorney to work out repayment of the loan. I do not know the name of their attorney. I do not know, at this time, if any of the above named parties are responsible to provide me with an attorney as agreed to by Karyn Forbes representing the Butler Bank / FDIC.

I have tried over the Christmas and New Year Holidays to contact attorneys with not much luck. **I have no idea where to locate the legal files, the loan files or my desk files for the subject loan that were in the possession of the Butler Bank / FDIC back in 2009.** I was only involved as the assigned loan officer on the loan. Others in the bank also made decisions and helped to service the subject loan.

Robert Chapman, pro se
January 9,2013

**CERTIFICATE OF SERVICE**

I hereby certify that the following Motion has been forwarded this 9th day of January 2013 via  First Class Mail postage prepaid to William Aivalikles, Esq.


Robert Chapman

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                    **SUPERIOR COURT**
**NORTHERN DISTRICT**

Antonia Shelzi
v.
Seff Enterprises & Holdings, LLC, Joseph Foistner, Laurie Foistner

Docket No. 05-E-464

and

Joseph Foistner, New Boston Estate, LLC, Waldorf Estates Builders, LLC,
Seff Enterprises & Holdings, LLC
v.
Antonia Shelzi

Docket No. 07-C-113

and

Seff Enterprises & Holdings, LLC, Laurie Foistner
v.
Butler Bank, Robert Chapman, Antonia Shelzi, Hans Harro Hassel

Docket No. 09-C-522

## ORDER

Following a chamber conference on January 17, 2013, with counsel for Shelzi and Foistner, the court orders all matters in the above-captioned proceedings stayed until March 15, 2013 so that the parties may explore possible settlement.

**SO ORDERED.**

January 17, 2013

_____
David A. Garfunkel
Presiding Justice



**THE STATE OF NEW HAMPSHIRE**
**SUPERIOR COURT**

HILLSBOROUGH, SS.                              NORTHERN DISTRICT


ANTONIA SHELZI
v.
SEFF ENTERPRISES & HOLDINGS, LLC, JOSEPH FOISTNER,
LAURIE FOISTNER
05-E-464


JOSEPH FOISTNER, NEW BOSTON ESTATE, LLC,
WALDORF ESTATES BUILDERS, LLC,
SEFF ENTERPRISES & HOLDINGS, LLC
v.
ANTONIA SHELZI
07-C-113


SEFF ENTERPRISES & HOLDINGS, LLC, LAURIE FOISTNER
v.
BUTLER BANK, ROBERT CHAPMAN, ANTONIA SHELZI,
HANS HARRO HASSEL
09-C-522


**ORDER ON STATUS CONFERENCE**

A status conference was held in the above matters on Thursday, May 16,

2013.  The following matters are noted and/or ordered.

    1.  The parties have not been able to come to a settlement.  Twelve

       (12) trial days should be scheduled for this matter.

2. Certain discovery needs to be completed.   That discovery encompasses two depositions and resolution of certain interrogatory issues.

3. At the conference, the Deputy Clerk of Court notified the parties of a number of potential trial periods.  The parties shall notify the Clerk's Office of an agreed upon period within the proposed periods.  In the event that the parties do not so notify the Clerk's Office within thirty (30) days of the date of the Clerk of Court's notice of this order, the Clerk's Office shall assign a trial period.

4. A one hour hearing is needed on pending motions concerning <u>Seff Enterprises & Holdings, LLC, Laurie Foistner v. Butler Bank, Robert Chapman, Antonia Shelzi, Hans Harro Hassel</u>, 09-C-522.

SO ORDERED.

5-16-13
Date

Philip P. Mangones
Presiding Justice

2

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                          SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

### PLAINTIFFS' MOTION FOR DEFAULT

NOW COMES the Plaintiffs in the above entitled matter and moves that the Court

enter a default against Robert Chapman and Hans Hassel and says as follows:

1. On or about April 16, 2013 the Court informed Hans Hassel of a Status

   Conference scheduled for May 16, 2013.

2. On or about April 16, 2013 the Court informed Robert Chapman of a Status

   Conference scheduled for May 16, 2013.

3. On May 16, 2013 the Court conducted a Status Conference hearing and neither

   Hans Hassel nor Robert Chapman appeared at the hearing.

4. Prior to the previously scheduled hearing Robert Chapman did file a Motion to

   Continue claiming that he was unavailable. The Court did grant his continuance

   request and rescheduled the matter to May 16, 2013.

5. In light of the Defendant Robert Chapman and Hans Hassel's failure to appear in

   Court the Court should enter a default.

WHEREFORE the Plaintiffs respectfully request that the Court enter a default

against Hans Hassel and Robert Chapman and schedule a hearing on damages.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Respectfully submitted by,

Seff Enterprises and Holdings, LLC, et al

Through their Attorney,

Dated: May 21, 2013

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 21st day of May 2013, been forwarded via certified mail to Hans Hassel, Robert Chapman and via regular mail to Attorney Robert A. McCall, Attorney James Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **2** of **2**

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH ,SS.                                    SUPERIOR COURT
NORTHERN DISTRICT

Docket No. 09-CV-0522

Seff Enterprises & Holdings, LLC

Laurie Foistner

v.

Butler Bank et al

**MOTION OF OPOSITION TO THE PLAINTIFF'S MOTION FOR DEFAULT**

NOW COMES Robert Chapman, pro se and hereby moves this Court grant this motion and allow
Robert Chapman to attend the pending hearing on pending motions scheduled for June 24,
2013 by telephone. In support of this motion, Mr. Chapman States as follows:

1. Robert Chapman received a notice of a Status Hearing scheduled for May 16, 2013. The
   notice stated the CASE NAME as **Antonia Shelzi v. Seff Enterprises, et al**. Robert
   Chapman is a defendant in the CASE NAMED as **Seff Enterprises & Holdings, LLC, et al v.
   Butler Bank**. There was no attached page stating all three cases were included in this
   hearing. The notice Robert Chapman just received on May 24th for a hearing scheduled
   for June 24, 2013 to consider this subject default motion stated the correct CASE NAME
   as **Seff Enterprises & Holdings, LLC, et al v. Butler Bank**. Robert did not know that this
   notice was for him.

2. Robert Chapman was approached by the Butler Bank when it was under control by the
   FDIC to help them to answer the charges against them on this subject case. Robert
   agreed provided the service to Butler Bank provide and pay for counsel for him. Butler
   agreed and a meeting was held at the Butler bank with the Butler Bank's attorney and
   Robert Chapman. The FDIC was present at the bank at this time but they did not
   participate directly in the meeting. In January 2013, when Robert contacted the
   attorney, who is representing the FDIC as receiver for Butler Bank, and requested he
   contact the FDIC and request counsel for Mr. Chapman. The attorney for the FDIC
   responded to Mr. Chapman that the FDIC is not able or obligated to provide counsel for
   him.

32

3. The FDIC did however follow up with a notice that Mr. Chapman could put in a claim against the Butler Bank. Robert submitted the proof of claim including his contract with the bank. On May 9, 2013, The FDIC disallowed the claim because it is considered a post closing activity and is not considered the responsibility of the Receiver.

4. Mr. Chapman has also been in discussion with his and the bank's former attorney, Karen Forbes, but has not entered into a contract with her, pending the outcome of a proposed settlement agreement by the parties. Mr. Chapman did receive the court notice on May 24, 2013 stating the parties were unable to come to an agreement. Mr. Chapman attempted to contact Attorney Forbes for advice on May 24, 2013, at that but was informed that she was on vacation until June 2, 2013.time. Mr. Chapman was led to believe that he would receive court notices of hearings for the subject case only after the settlement discussions were completed as determined by the court.

5. On March 6, 2013, Mr. Chapman suffered a stroke and was rushed to a hospital for treatment. He stayed at the hospital in the intensive care unit and was tested and treated for three days by a team of four doctors until he was in stable condition and able to return home. Mr. Chapman suffered both mental and physical damage as a result. Mr. Chapman was informed later that the MRI x-rays showed that he has received a total of 6 strokes. Mr. Chapman has no health insurance and lives on his social security income. He will be able for Medicare on August 1, 2013.  Mr. Chapman now has thousands of dollars of medical bills to deal with that will not be paid by Medicare.

6.  Earlier in 2013, Mr. Chapman had an eye exam due to failing vision and learned he has cataracts in both eyes and needs surgery to correct his vision.  Mr. Chapman prefers not drive at this time because his medical conditions.

7.  It would have been an extreme financial and physical hardship for Robert Chapman to travel from Florida to New Hampshire and attend the court hearing on May 16, 2013. Robert would have requested to attend by phone if he had realized the hearing notice was for him. Mr. Chapman now realizes his mistake and requests to court to take into account his continued recovery from the effects of his strokes. Robert Chapman requests the court to consider that he has continued to act in good faith and needs counsel to represent him is this case due to his heath related issues.

8. Robert Chapman continues to reside in Port Charlotte, Florida and it would be a financial and physical hardship for him to travel to New Hampshire to attend the June 24, 2013 hearing.

WEREFORE Robert Chapman requests the court to accept and consider this Motion of Opposition and allow Mr. Chapman to attend the hearing scheduled for June 24, 2013 by telephone.

Respectfully submitted by,

Robert Chapman, pro se

Robert Chapman

19505 Quesada Ave, II204

Port Charlotte, FL 33948

978-935-2017

After review, motion granted.

6/7/13
Date

David A. Garfunkel
Presiding Justice

*[handwritten note:] MR. CHAPMAN MAY APPEAR BY TELEPHONE 6/24/13 AT THE HEARING AT WHICH TIME THE COURT WILL ADDRESS THE PLAINTIFF'S MOTION FOR DEFAULT & MR. CHAPMAN'S OBJECTION.*

**CERTIFICATION**

I hereby certify that a copy of the foregoing has this 31th day of May 2013, has been forwarded via certified mail to Hans Hassel, Seff Enterprises and Holdings, LLC, Laurie Foistner and Attorney William Aivalikles and by regular mail to Attorney Robert A. McCall and Attorney James Leboe.

Robert Chapman

Page 3 of 3

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: Hillsborough County Superior Court Northern District

Case Name: Self Enterprises & Holdings, ea V Rotor Rink, et als

Case Number: 09-C-522
(if known)

## APPEARANCE/WITHDRAWAL
### SUPERIOR COURT

[X] I request a jury trial
(if you do not check this box, your case will be heard by a judge)

**APPEARANCE**
Please enter my appearance as
[ ] Counsel for _____

**WITHDRAWAL**
Please withdraw my appearance as
[ ] Counsel for _____

[X] I will represent myself (*pro se*).

Notice of Withdrawal sent to my clients on:

_____

at the following address:

_____

_____

I hereby certify that duplicates of this notice were [ ] delivered [X] mailed to the person(s) listed below (or on attached list) on June 7, 2013 :
Date

Name: See Attached List

Address: _____

_____

_____

June 7, 2013
Date

Signature

Printed Name    Robert Chapman

Address: 18565 Oveeda Ave 11204
Port Charlotte, Fl 23948

Telephone  978 935 2017        NH Bar ID #

Email Address (optional)

Mailing List

Attorney James Laboe
Orr & Reno
One Eagle Square
Concord, NH 03302

Attorney Robert McCall
Peabody & Arnold
Federal Reserve Plaza
600 Atlantic Ave.
Boston, MA 02210

Hans Hassel
31 Lee St.
Cambridge, MA 02139

Seff Enterprises & Holdings, LLC
3 Foxberry Dr.
New Boston, NH 03070

Laurie Foistner
3 Foxberry Dr.
New Boston, NH 03070

Attorney William Aivalikes
60 Main St.  Suite 30
Nashua, NH 03060

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                          SUPERIOR COURT
NORTHERN DISTRICT

Docket No. 09-cv-0522

Seff Enterprises & Holdings, LLC
Laurie Foistner

v.

Butler Bank
Robert Chapman
Antonia Shelzi
Hans Harro Hassel

## MOTION TO DISMISS

I am Hans Harro Hassel, named Defendant in the above matter, specially appearing "pro

se" and move this Court to dismiss this action for lack of personal jurisdiction.  In support of this

Motion, I state as follows:

1.        On or about September 1, 2009, the plaintiffs Joseph Foistner, New Boston

Estates, LLC, Waldorf Estates Builders, LLC and Seff Enterprises & Holdings, LLC (the

"Plaintiffs") filed a Writ of Summons in the above-captioned matter.

2.        However, the Plaintiffs failed to serve me pursuant to RSA 510:4, II.  "Proper

service of process is a necessary prerequisite to obtaining jurisdiction over an out-of-state

defendant." *Lunt v. Gaylor*, 150 N.H. 96, 97 (2003)(quoting *South Down Recreation Assoc. v.*

*Moran*, 141 N.H. 484, 486 (1994)).  "We consistently require strict compliance with statutory

requirements for service of process." *Id.*  Since the Plaintiffs have failed to comply with the

statutory requirements for service of process under RSA 510:4, II, this case must be dismissed as

against me for lack of personal jurisdiction.

34

3.      This is similar to the case captioned: *Joseph A. Foistner, et al. v. Antonia Shelzi,* Docket No. 06-E-0189 which this Court (Barry, J.) dismissed for lack of personal jurisdiction. Attached hereto is Judge Barry's order dated September 28, 2006.

4.      The Court's record in this matter confirms that the Plaintiffs failed to meet the statutory requirements for service of process under RSA 510:4, II.

5.      Therefore, this action must be dismissed for lack of personal jurisdiction.

WHEREFORE, I respectfully request this Court:

A.      To dismiss this action; and

B.      To grant other and further relief as this Court deems just and proper.


                                        Respectfully submitted,

                                        Hans Harro Hassel, Pro Se
                                        31 Lee Street #5
                                        Cambridge, MA 021349
                                        (617) 354-6651

Dated:  June 7, 2013

                                        2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion has been forwarded this 13th day of June, 2013 via First Class Mail postage prepaid to

Attorney William E. Aivalikles
William E. Aivalikles, P.A.
60 Main Street, Suite 230
Nashua, N.H. 03060


Attorney James F. Laboe,
Orr and Reno
One Eagle Squarer
P.O.Box 3550
Concord, N.H. 03302-3550


Attorney  Robert A. McCall
Peabody & Arnold
Federal Reserve Plaza
600 Atlantic Ave.
Boston, MA 02210-2261


Robert Chapman
19505 Quesada Ave.ii204
Port Charlotte, FL 33948

Hans Harro Hassel

3

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                          SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

## PLAINTIFFS' OBJECTION TO DEFENDANT'S MOTION TO DISMISS AND CROSS MOTION FOR ORDERS OF NOTICE

NOW COME the Plaintiffs in the above entitled matter and object to Defendant's, Hans Hassel, Motion to Dismiss and Cross Petition for New Orders of Notice and say as follows:

1. On September 1, 2009, the Plaintiffs filed a writ of summons.

2. On October 27, 2009 the Court informed Plaintiffs that service was incomplete and directed Plaintiffs to request new orders of notice by November 10, 2009 or the Court would dismiss the action.

3. On November 2, 2009 the Court was informed of Seff Enterprises bankruptcy filing.

4. On November 3, 2009 the Defendants, Butler Bank and Robert Chapman, filed an Appearance and Answer.

5. On November 9, 2009 the Court issued a stay in light of the Seff Enterprises bankruptcy filing and no new orders of notice were requested by November 10, 2009 because of the stay nor has the Court dismissed the action.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060



6.  On March 17, 2011 Plaintiffs' counsel by letter to the Court requested that in light of the Federal District Court remand of the case that the matter be scheduled for a structuring conference.

7.  On April 11, 2011 a Motion to Lift Stay was filed with the Court.

8.  On June 21, 2011 a letter to the Court was sent in an effort to bring the matter forward.

9.  On September 19, 2011 Plaintiffs' counsel informed the Court of the dismissal of the bankruptcy and that the stay should be lifted.

10. On March 7, 2012 the Court informed all counsel including Hans Hassel of the trial the week of September 9, 2013. If the Defendant, Hans Hassel, had any intention of contesting personal jurisdiction, this was an opportune time to file a Motion to Dismiss. Mr. Hassel failed to do so.

11. Undersigned counsel recalls that at the November 14, 2012 structuring conference hearing, Hans Hassel participated in the structuring conference. At no time did Mr. Hassel raise the personal jurisdiction issue during his participation.

12. The Defendant, Hans Hassel, had an obligation to inform the Court by motion well prior to June 7, 2013 that he was objecting to the manner of service of Writ. He had the opportunity at the structuring conference to preserve the issue and/or raise it with the Court.

13. The Court also recognized that Mr. Hassel was a proper party to the proceedings since the Court has provided him with all notifications of hearings concerning the within matter.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **2** of 4

14. The Defendant, Hans Hassel, led the Court as well as Plaintiffs' counsel into believing he was a proper party and waived all procedural service defects as evidenced by his attendance at the November 14, 2012 structuring conference and his failure to timely inform the Court of his challenge to the Court's personal jurisdiction over him.

15. The Defendant, Hans Hassel, has waived any service defect as a result of his participation in the structuring conference. See Lyford v. Trustees of Berwick Academy, 97 N.H. 167 (1951) and Wiebusch, NH Practice, Civil Practice and Procedure, Section 1110, page 81-82.

16. In the event the Court does not find a waiver or estoppel precluding the dismissal of the action, the Plaintiffs request new orders of notice in order to perfect service.

WHEREFORE the Plaintiffs respectfully request the following relief:

    A. That the Court deny the Motion to Dismiss or in the alternative;

    B. The Court issue new orders of notice;

    C. For such other relief as may be fair and just.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **3** of 4

Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
et al

Through their Attorney,

Dated: June 14, 2013

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 14th day of June 2013, been
forwarded to Hans Hassel, Robert Chapman, Attorney Robert A. McCall, Attorney James
Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page 4 of 4

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                              SUPERIOR COURT
NORTHERN DISTRICT

Docket No. 09-cv-0522

Seff Enterprises & Holdings, LLC

Laurie Foistner

v

Butler Bank
Robert Chapman
Antonia Shelzi
Hans Harro Hassel

I am Robert Chapman, named Defendant in the above matter, specially appearing "pro-se" and move this court to dismiss this action for lack of personal jurisdiction. In support of this motion, I state the following:

1. On or about September 1, 2009, the plaintiffs, Joseph Foistner, New Boston Estates, LLC, Waldorf Estates Builders, LLC and Seff Enterprises & Holdings, LLC (the "Plaintiffs") filed a Writ of summons in the above-captioned matter.

2. However, Plaintiffs failed to serve me pursuant to RSA 510:4, II. "Proper service of process is necessary prerequisite to obtaining jurisdiction over an out-of-state defendant." Lunt v Gaylor, 150 N.H. 96, 97 (2003) (quoting, South Down Recreation Assoc. v Moran, 141 N.H. 484,486 (1994)). "We consistently require strict compliance with statutory requirements for service process." Id. Since the Plaintiffs have failed to comply with the statutory requirements for service of process under RSA 510:4, II, this case must be dismissed against me for lack of jurisdiction.

3. This is similar to the case captioned: Joseph A. Foistner, et al v Antonia Shelzi, Docket No. 06-E-0189 which this Court (Barry J.) dismissed for lack of personal jurisdiction by an order dated September 28, 2006.

36

4. The court's record in this matter confirms that the Plaintiffs failed to meet the statutory requirements for service of process under RSA 510:4 II.

5. Therefore, this action must be dismissed for lack of personal jurisdiction.

WHEREFOREI respectfully request this Court:

A. To dismiss this action, and

B. To grant other and further relief as this Court deems just and proper.

Respectfully submitted,

Robert Chapman, Pro-Se

19505 Quesada Ave., II204

Port Charlotte, FL 33948

978-935-2017

Dated June 19, 2013

Cc: William Aivalikes, ESQ ; Hans Harro Hassel, James Laboe, ESQ, Robert McCall, ESQ

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 19 day of June 2013, has been forwarded via regular mail to Hans Hassel,   William Aivalikles, ESQ, Robert A. McCall, ESQ  and James Laboe, Esq..

Robert Chapman

June 19, 2013

John N. Safford, Clerk
Hillsboro County Superior Court Northern District
300 Chestnut St.
Manchester, NH 03101

Re: Seff enterprises & Holdings, LLC, et al v. butler Bank, et al

Docket No. 09-CV -0522

Dear Mr. Safford,

Enclosed please find Robert Chapman's Motion to dismiss.

Sincerely,

Robert Chapman
19505 Quesada Ave. ii204
Port Charlotte, FL 33948
978-935-2017

Encl

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, ss.                                          NORTHERN DISTRICT


Seff Enterprises & Holdings, LLC and Laurie Foistner

v.

Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel

09-C-0522

## POST HEARING MEMORANDUM OF FDIC-RECEIVER ON FDIC-RECEIVER'S MOTION TO SUBSTITUTE AND PLAINTIFF'S MOTION TO AMEND

Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Bank ("FDIC-Receiver") hereby submits this short post-hearing memorandum on the cross-motions relating to the substitution of FDIC-Receiver for defendant Butler Bank. The sole issue is the plaintiffs' assertion that New Hampshire law governs the interpretation of the retention of liabilities by FDIC-Receiver pursuant to the Purchase and Assumption Agreement ("P&A Agreement") with Peoples United Bank ("PUB"). Specifically, the plaintiffs cited for the first time at the June 21, 2013 hearing the case of Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998) (attached hereto as Exhibit A).

The Barnsley case is of no assistance to the plaintiffs. In Barnsley, the holder of a mortgage to a failed bank sought to foreclose on the plaintiff's property. The plaintiff sought to enjoin the foreclosure. The New Hampshire Supreme Court held that the mortgage was subject to whatever defenses existed prior to the bank failure. The issue in that case was not whether FDIC-Receiver could convey certain assets to a third party and retain certain liabilities. The claim or defense in Barnsley is related to enforceability of a mortgage. The court held that state

law claims and defenses followed the mortgage.  Here, the claim is a stand-alone cause of action against the failed bank.  Although there was a borrower-lender relationship between Butler Bank and one of the plaintiffs, PUB has already foreclosed on the mortgage and filed a collection action on the note in Massachusetts state court.  Thus, this case does not turn on whether the note and mortgage are enforceable, but rather who is the proper defendant to a damages claim arising out of pre-failure activities of Butler Bank.

Therefore, the Barnsley case has no precedential value here and therefore, this court should grant the motion of FDIC-Receiver and deny the plaintiffs' motion.

<div style="margin-left:40%;">

Respectfully submitted,

FEDERAL DEPOSIT INSURANCE
CORPORATION IN ITS CAPACITY AS
RECEIVER FOR BUTLER BANK

By its attorney,

Robert A. McCall (Bar No. 14221)
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210-2261
617- 951-2100
rmccall@peabodyarnold.com

</div>

Dated:  June 27, 2013

2

## CERTIFICATE OF SERVICE

I, Robert A. McCall, hereby certify that on this 27 day of June, 2013, I served the above

document, by causing a copy thereof, to be sent via first-class mail to:

Joseph A. Foistner, Esq.
3 Galloway Road, #27
Merrimack, NH  03054

Hans Harro Hassel, Pro Se
31 Lee Street #5
Cambridge, MA  02139

James F. Laboe, Esq.
Orr and Reno
One Eagle Square
P.O. Box 3550
Concord, NH  03302-3550

William Aivalikles, Esq.
60 Main Street, Suite 230
Nashua, NH  03060

Robert Chapman, Pro Se
19505 Quesada Avenue ii204
Port Charlotte, FL  33948

Robert A. McCall
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02110-2261
617-951-2100
*rmccall@peabodyarnold.com*

798565_1
15669-94708

Page 721

**142 N.H. 721 (N.H. 1998)**

**720 A.2d 63**

**William C. BARNSLEY**

v.

**EMPIRE MORTGAGE LIMITED PARTNERSHIP V.**

**No. 97-027.**

**Supreme Court of New Hampshire.**

**March 31, 1998**

Page 722

William E. Aivalikles, Nashua, by brief and orally, for plaintiff.

Law Offices of John L. Allen & Associates, P.C., Manchester (Richard M. Husband, on the brief and orally), for defendant.

HORTON, Justice.

The plaintiff, William C. Barnsley, appeals the Superior Court's (Hollman, J.) grant of summary judgment in favor of the defendant, Empire Mortgage Limited Partnership V. We reverse and remand.

On November 8, 1988, the plaintiff executed a commercial real estate promissory note and mortgage for $180,000 with the Hillsborough Bank and Trust Company (bank), secured by four building lots located in Temple and one lot located in New Ipswich. The note provided for monthly interest payments "at a rate equal to the base lending rate of Hillsborough Bank & Trust Company, Inc., plus Four (4.0%) percent, adjusted daily."

The bank foreclosed on three lots by June 1991. In August 1991, the plaintiff learned of foreclosure proceedings scheduled for September 1991 on the last two lots, which were subsequently cancelled. Around August 30, 1991, the Federal Deposit Insurance Corporation (FDIC) assumed the obligations of the then-failed bank and distributed many of the bank's assets, not including the subject note, to Peterborough Savings Bank. On June 25, 1995, the FDIC, as receiver for the bank, assigned the Barnsley mortgage to the defendant.

In 1996, the defendant notified the plaintiff of plans to foreclose the mortgage on the last two lots on May 23,

alleging an outstanding balance due on the $180,000 promissory note. In May 1996, the

Page 723

plaintiff filed an ex parte bill in equity to enjoin the foreclosure proceedings. The plaintiff alleges that through the foreclosure sales, and pursuant to an **[720 A.2d 64]** agreement dated August 10, 1988, the promissory note has been paid. The plaintiff has not provided a copy of this agreement to this court on appeal. See Sup.Ct. R. 13(3). The defendant alleges that after the bank paid the plaintiff's other debts, no funds were available to satisfy the mortgage. The defendant also contends that the plaintiff offered no evidence to the contrary. Finding the note to be negotiable, and the defendant to be a holder in due course, the trial court did not consider the merits of Barnsley's arguments. The defendant moved for summary judgment. After a hearing, the superior court granted the plaintiff's request for a preliminary injunction to enjoin the foreclosure proceedings. In November 1996, however, the court granted the defendant's motion for summary judgment. The plaintiff appeals.

On appeal, the plaintiff argues: (1) because the note includes a variable interest rate, it is not for a sum certain and is therefore non-negotiable; (2) because the note is non-negotiable, the defendant is not a holder in due course and is therefore a holder subject to the plaintiff's defense of payment; and (3) the mortgage deed was void since the plaintiff had paid the note in full.

"When reviewing a motion for summary judgment, the court must consider the evidence in the light most favorable to the party opposing the motion and take all reasonable inferences from the evidence in that party's favor." *High Country Assocs. v. New Hampshire Ins. Co.,* 139 N.H. 39, 41, 648 A.2d 474, 476 (1994) (citation omitted). We find that the trial court erred as a matter of law in granting summary judgment to the defendant.

Although the defendant and the trial court considered recent amendments to the Uniform Commercial Code (UCC), see RSA 382-A:3-101 et seq. (1994), we apply only the 1961 version of the UCC since it governed negotiable instruments at the time of the execution of the promissory note in question. See N.H. CONST. pt. I, art. 23.

To be negotiable, a note must be for a "sum certain." Former RSA 382-A:3-106(1) (1961) (amended and recodified 1994) provided:

The sum payable is a sum certain even though it is to be paid

(a) with stated interest or by stated installments; or

(b) with stated different rates of interest before and after default or a specified date; or

**Page 724**

(c) with a stated discount or addition if paid before or after the date fixed for payment; or

(d) with exchange or less exchange, whether at a fixed rate or at the current rate; or

(e) with costs of collection or an attorney's fee or both upon default.

Official Comment 1 further provided:

It is sufficient that at any time of payment the holder is able to determine the amount then payable from the instrument itself with any necessary computation.... The computation must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest "at the current rate."

Former RSA 382-A:3-106 Official Comment 1.

The negotiability of a variable interest rate note under the 1961 UCC is a question of first impression. Since a primary purpose of the UCC is "to make uniform the law among the various jurisdictions," RSA 382-A:1-102(2)(c) (1961), we look to other jurisdictions for guidance. Courts grappling with the negotiability of variable interest rate notes have been divided. See 5A R. Anderson, Uniform Commercial Code § 3-106:9, at 204 (3d ed.1994); see generally Annotation, Negotiability of Instruments Providing for Variable Rate of Interest Under UCC § 3-106, 69 A.L.R.4th 1127 (1989). Some courts found notes containing variable interest rates to be for a sum certain and, therefore, negotiable. See 5A R. Anderson, supra § 3-106:9, at 204. Others, however, strictly rejected any variable rate that could not be calculated from the four corners of the document. See id. § 3-106:10, at 206.

We adopt the view established in Centerre Bank of Branson v. Campbell, 744

**[720 A.2d 65]** S.W.2d 490 (Mo.Ct.App.1988). In Campbell, the interest rate in the note could vary based on the bank rate charged to the maker. Id. at 492. The note provided that "[i]nterest may vary with bank rates charged to Strand Investment Company." Id. In deciding that the note was not negotiable, the Campbell court reasoned that the "holder of the note would have to investigate [the interest charges] before determining the amount due on the note at any time of payment." Id. at 498.

In the present case, the note establishes the rate based on the "base lending rate" of the bank. To determine interest due on the note, the holder must inquire to

identify the "base rate." Thus,

**Page 725**

as drafted, this note does not contain all instructions necessary for the holder to identify the actual variable rate. To determine the amount due on the note at any given time, the holder must ask the bank its "base lending rate." We hold that under former RSA 382-A:3-106, when the note includes a variable interest rate which cannot be ascertained through a formula contained within the document, the note is not for a sum certain. We decline to decide whether a variable rate of interest tied to objectively ascertainable and widely disseminated rates (e.g., prime rate, federal funds discount rate, London Interbank Offer Rate, etc.) prevent notes under the 1961 UCC from being negotiable. Compare Klehm v. Grecian Chalet, Ltd., 164 Ill.App.3d 610, 115 Ill.Dec. 662, 667, 518 N.E.2d 187, 192 (1987) with Taylor v. Roeder, 234 Va. 99, 360 S.E.2d 191, 194 (1987). Subsequent legislative enactment further persuades us that notes under the former UCC are not negotiable. Under the revised Article 3, adopted in 1994, instruments with variable interest rates are specifically made negotiable. RSA 382-A:3-104(a),:3-112(b) (1994); see Cowan v. Tyrolean Ski Area, Inc., 127 N.H. 397, 403, 506 A.2d 690, 694 (1985).

The plaintiff next argues that the defendant is not a holder in due course. We agree. Because the note was not for a sum certain, the note cannot be a negotiable instrument. RSA 382-A:3-106 (1961) (amended and recodified 1994). Because the plaintiff's note was not negotiable, the FDIC could not become a holder in due course. When the FDIC takes over a failed savings institution, "[t]he [FDIC] shall, as conservator or receiver, and by operation of law, succeed to ... all rights, titles, powers, and privileges of the insured depository institution...." 12 U.S.C. § 1821(d)(2)(A)(i) (1994). Further, the FDIC's rights to the bank's assets are provided for under state law, and are not supplemented by federal law. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 86, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). Consequently, as we explained, the FDIC could only be a holder, subject to the claims and defenses of the payee. See RSA 382-A:3-306 (1961) (amended and recodified 1994). Regardless of how the defendant acquired the note from the FDIC, it is subject to the plaintiff's claims and defenses.

Finding that the defendant was a holder in due course, the trial court did not consider evidence on the plaintiff's claim of payment. We reverse and remand to determine whether the plaintiff satisfied the note through the alleged payments and application of foreclosure proceeds. See RSA 479:6 (1992); RSA 382-A:3-603(1) (1961) (amended and recodified 1994). The UCC and foreclosure law

**Page 726**

both consider payments as a discharge of liability, and thus, their respective provisions are not in conflict. We need not decide which statute controls the foreclosure. Under the UCC and our mortgage law, liability on the note and mortgage has been satisfied to the extent that any payment has been made. On remand, the plaintiff may assert any defenses against the defendant's demand for payment and for foreclosure. See 4 R. Powell & P. Rohan, Powell on Real Property § 37.33, at 37-226 to 37-239 (1997).

Reversed and remanded.

All concurred.

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                    SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

**PLAINTIFFS' OBJECTION TO DEFENDANT, ROBERT CHAPMAN'S,
MOTION TO DISMISS**

NOW COME the Plaintiffs in the above entitled matter and object to Defendant,

Robert Chapman's, Motion to Dismiss and assign the following grounds:

1. The Plaintiffs recently appeared before the Court and set forth their position

   concerning the Motion to Dismiss orally.

2. The Plaintiffs in an effort to document their objection to Defendant, Robert

   Chapman's, Motion to Dismiss say as follows:

   a. The Defendant, Robert Chapman, retained the services of Attorney Forbes

      who filed an Appearance for him.

   b. In light of Attorney Forbes Appearance any procedural defects have been

      waived by Mr. Chapman.

WHEREFORE the Plaintiffs respectfully request that the Defendant, Robert

Chapman's, Motion to Dismiss be denied.

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
ASHUA, NEW HAMPSHIRE
03060

Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
et al

Through their Attorney,

Dated: July 9, 2013

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

## CERTIFICATION

I hereby certify that a copy of the foregoing has this 9th day of July 2013, been forwarded to Hans Hassel, Robert Chapman, Attorney Robert A. McCall, Attorney James Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                    SUPERIOR COURT
NORTHERN DISTRICT

Seff Enterprises and Holdings, LLC
and Laurie Foistner

v.

Butler Bank, etal
Docket No. 09-C-0522

## PLAINTIFFS' RESPONSE TO FDIC-RECEIVER'S POST HEARING MEMORANDUM

NOW COME the Plaintiffs in the above entitled matter and in response to the

FDIC's post hearing memorandum says as follows:

1.  The case of Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998) specifically

    states that when the FDIC takes over a failed savings institution as conservator or

    receiver it succeeds to all rights, title, powers and privileges of the insured

    depository institution 12 U.S.C. § 1821 (d)(2)(A)(i) 1994. "…the FDIC's rights to

    the bank's assets are provided for under state law, and are not supplemented by

    federal law. See O' Melveny & Meyers v. FDIC, 512 U.S. 79, 86 (1994)." Id 725.

2.  The Court must look to state law in determining the validity of Peoples United

    Bank's right to acquire the assets of the failed institution and retention of some of

    the liabilities.

3.  New Hampshire recognizes an exception to the general rule of not imposing

    liability of a corporate debt upon the successor. See Bielagus v. EMRE of N.H.,

    149 N.H. 635, 640 (2003)

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060



4.  One such exception recognized in New Hampshire to successor liability involves a transaction that is fraudulent because its only purpose is to evade corporate liability Id. citing Kleen Laundry I, 817 F. Supp. at 230; Welco Industries Inc. v. Applied Cos., 617 Northeast 2nd 1129, 1132 (Ohio 1993)

5.  Peoples United Bank is liable for the claims of the Plaintiff since Peoples United Bank was on notice of the claims of the Plaintiffs prior to the transaction with the FDIC. The FDIC was also on notice of Plaintiffs' claim prior to the transaction. The structuring of the transaction between the FDIC and Peoples United Bank was done for the sole purpose so that Peoples United Bank could avoid the corporate liability of Butler Bank as it relates to the Plaintiffs' claim. It is inequitable to allow Peoples Bank to receive 100% of the asset and pay zero for the known liability associated with the acquired asset.

WHEREFORE the Plaintiffs respectfully request that the Court grant Plaintiff's Motion to Add Peoples United Bank as a Defendant.

Respectfully submitted by,

Seff Enterprises and Holdings, LLC,
 et al

Through their Attorney,

Dated: July 15, 2013

William Aivalikles NH Bar#308
60 Main Street, Suite 230
Nashua, NH  03063
(603)880-0303

LAW OFFICES OF
LIAM E. AIVALIKLES, P.A.
60 MAIN STREET
SUITE 230
SHUA, NEW HAMPSHIRE
03060

Page **2** of **3**

<u>CERTIFICATION</u>

    I hereby certify that a copy of the foregoing has this 15th day of July 2013, been forwarded to Hans Hassel, Robert Chapman, Attorney Robert A. McCall, Attorney James Laboe and the Plaintiffs.

William Aivalikles

LAW OFFICES OF

LIAM E. AIVALIKLES, P.A.

60 MAIN STREET

SUITE 230

SHUA, NEW HAMPSHIRE

03060

Page **3** of **3**

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                    **SUPERIOR COURT**
**NORTHERN DISTRICT**

Seff Enterprises & Holdings, LLC,
Laurie Foistner

v.

Butler Bank, et. al.

Docket No. 216-2009-CV-522

## ORDER

On June 24, 2012, the court held a hearing on the following motions: 1) the

plaintiffs' motion to amend their complaint to substitute Peoples United Bank ("Peoples")

for Butler Bank/FDIC; 2) the FDIC's motion to intervene and to be substituted in place of

Butler Bank; and 3) Robert Chapman's and Hans Haro Hassel's motions to dismiss for

lack of personal jurisdiction.  The plaintiffs do not object to the FDIC's being named a

party to the litigation, but contend that People's has assumed the liabilities related to the

plaintiffs' lawsuit and therefore People's is the real party of interest to those liabilities,

not the FDIC.  After consideration of the pleadings, arguments, and applicable law, the

court finds and rules as follows.

### The Plaintiffs' Motion to Amend/The FDIC's Motion to Intervene

On September 1, 2009, the plaintiffs filed the present suit, alleging the

defendants conspired to defraud them of $100,000 pursuant to a forged check drawn on

Butler Bank.[1]  On April 16, 2010, the Massachusetts Division of Banks closed Butler

---

[1] The facts are drawn from the parties' pleadings and the record.

Bank and tendered to the FDIC the appointment as Liquidating Agent to act as Receiver. By operation of law, the FDIC as receiver succeeded to all rights, titles, powers and privileges of Butler Bank. See 12 U.S.C. §1821(d)(2).

On that same day, the FDIC sold the assets and certain designated liabilities to People's, pursuant to a written Purchase and Assumption Agreement (the "P&A"). Article II of the P&A, Assumption of Liabilities, states that the

> Assuming Institution expressly assumes at Book Value . . . all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement:
> . . . .
> (m) all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a shared-loss agreement . . . .

(Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 9–10.) Neither the P&A nor the parties' submissions present a comprehensive breakdown of which of the transferred liabilities "relate to assets subject to a shared-loss agreement." (Id. at 10.) However, William Starnes, FDIC Resolution & Closings Manager, stated in an affidavit that: "[t]he instant litigation is a liability of Butler Bank which was not transferred to [People's] pursuant to written Purchase and Assumption Agreement."[2] (Starnes Aff. ¶ 5, Dec. 3, 2012.) Accordingly, the court finds the instant litigation is not among the assets or liabilities transferred to People's pursuant to the P&A.

---

[2] The plaintiffs also submitted the affidavit of Beth Berman, FDIC Asset Management Specialist, in which Ms. Berman states: "[a]mong the non loss-share of assets of Butler Bank which the FDIC sold to PEOPLE'S, under the terms of the P&A Agreement, was a charge-off made by Butler Bank prior to its failure which related to a deficiency on a construction mortgage loan Butler Bank had made to [Seff], which deficiency is at issue in the captioned litigation." (Berman Aff. ¶ 5, Dec. 9, 2010.) However, the captioned litigation referred to in the Berman Affidavit was a suit brought by Butler Bank in the Superior Court of Lowell, Massachusetts against Antonia Shelzi and Laurie Foistner to recover the deficiency on a defaulted loan. The instant litigation involves a suit by Seff Enterprises against Butler Bank for, inter alia, conspiracy and fraud. Accordingly, the Berman affidavit has no bearing on the court's analysis.

Moreover, Article IX of the P&A states that the FDIC-Receiver "shall have the right, in its discretion, to . . . defend or settle any claim or suit against [People's] with respect to any Liability Assumed . . . ." (Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 31.) Therefore, even if the FDIC transferred the instant litigation to People's, and People's assumed that liability, the P&A grants the FDIC the authority to defend or settle the claim in its discretion.

Finally, the plaintiffs argue New Hampshire law governs the interpretation of the retention of liabilities by FDIC-Receiver pursuant to the P&A. The plaintiffs cite Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998), in which the New Hampshire Supreme Court held that a plaintiff seeking to enjoin foreclosure was entitled to whatever claims or defenses existed prior to a bank's failure. Here, the plaintiffs are not seeking to enjoin foreclosure. Rather, they have brought claims against Butler Bank arising out of the Bank's alleged pre-failure conduct. The Barnsley case is therefore not instructive as to the FDIC's right to convey assets to a third party and retain certain liabilities.

Accordingly, the court finds the FDIC now "stands in the shoes" of Butler Bank for purposes of the claims asserted against Butler Bank by the plaintiffs. See O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994). Therefore, the FDIC's motion to intervene and be substituted for Butler Bank is GRANTED. The plaintiffs' motion to substitute People's is DENIED.

**Defendants' Motions to Dismiss**

In separate motions, defendants Robert Chapman and Hans Hassel have moved to dismiss the plaintiffs' claims against them for lack of personal jurisdiction. Plaintiffs

3

do not dispute service on Chapman and Hassel was ineffective, but requests the court
issue new orders of notice so that the defendants can be properly served.

"Proper service of process is a necessary prerequisite to obtaining jurisdiction
over an out-of-state defendant." South Down Recreation Assoc. v. Moran, 141 N.H.
484, 486 (1996). However, this is not the only way in which the personal jurisdiction of
the court may arise. "The actions of the defendant amount to a legal submission to the
jurisdiction of the court, whether voluntary or not." Insurance Corp. v. Compagnie des
Bauxites, 456 U.S. 694, 704-05 (1982). "Because the requirement of personal
jurisdiction represents . . . an individual right [flowing from the Due Process Clause], it
can, like other such rights, be waived." Id. at 703. Thus, a defendant may consent or
submit to the jurisdiction of a court which otherwise would not have jurisdiction over it.
See Barton v. Hayes, 141 N.H. 118 (1996) (defendant waived personal jurisdiction
when she made a general appearance by moving to strike default); Lachapelle v. Town
of Goffstown, 134 N.H. 478 (1991) (filing a motion for late entry of appearance and
motion to strike default is a voluntary submission to the jurisdiction of the court).

On October 1, 2009, Attorneys Stephen Duggan and Karyn Forbes filed general
appearances on behalf of Mr. Chapman. Although Attorneys Duggan and Forbes later
withdrew as Mr. Chapman's counsel, Mr. Chapman filed a pro se appearance on his
own behalf on June 7, 2013. By these filings, Mr. Chapman has voluntarily submitted
himself to the jurisdiction of this court and has waived any challenges to personal
jurisdiction. Accordingly, no further action by the plaintiffs is necessary to invoke the
personal jurisdiction of the court over Mr. Chapman. Mr. Chapman's motion to dismiss
is DENIED.

4

Conversely, no appearances have been filed on behalf of Mr. Hassel.  At the

June 24, 2013 hearing, the plaintiffs asserted that Attorney Lisa Snow-Wade of Orr &

Reno appeared on behalf of Mr. Hassel at a November 14, 2012 structuring conference.

However, although the above-captioned case was scheduled for a structuring

conference on that day, the parties at that conference exclusively discussed a related

docket, Foistner et al v Orr & Reno et al, 216-2008-CV-083, to which Mr. Hassel is not a

party.  When the court asked the parties who was representing Mr. Hassel in the above-

captioned case, the following exchange occurred:

> Attorney Aivalikles: I believe your honor, he's pro se, but I say that with
> reluctance because I think Attorney Laboe may have been there for him at
> the deposition, so maybe Orr & Reno can answer that question better than
> I—
>
> Attorney Snow-Wade: —Wrong Docket—
>
> Attorney Aivalikles: —But I believe he was pro se at one point, your
> Honor.

(Audio of Structuring Conference, Foistner et. Al. v Orr & Reno et. al., November 14,

2012 at 9:45:22.)  As evidenced by this exchange, neither Attorney Snow-Wade nor any

other attorney made an appearance on Mr. Hassel's behalf at the November 14, 2012

structuring conference.  At the June 24, 2013 hearing, Mr. Hassel was present for the

purpose of contesting personal jurisdiction.  Therefore, Mr. Hassel has not submitted

himself to the jurisdiction of the court.  Mr. Hassel's motion to dismiss is GRANTED.

**SO ORDERED.**

Date: 8/22/13

David A. Garfunkel
Presiding Justice

5

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                   **SUPERIOR COURT**
**NORTHERN DISTRICT**

Seff Enterprises & Holdings, LLC,
Laurie Foistner

v.

Butler Bank, et. al.

Docket No. 216-2009-CV-522

### AMENDED ORDER[1]

On June 24, 2012, the court held a hearing on the following motions: 1) the

plaintiffs' motion to amend their complaint to substitute Peoples United Bank ("Peoples")

for Butler Bank/FDIC; 2) the FDIC's motion to intervene and to be substituted in place of

Butler Bank; and 3) Antonia Shelzi's, Robert Chapman's and Hans Haro Hassel's

motions to dismiss for lack of personal jurisdiction.  The plaintiffs do not object to the

FDIC being named a party to the litigation, but contend that Peoples has assumed the

liabilities related to the plaintiffs' lawsuit and therefore Peoples is the real party of

interest to those liabilities, not the FDIC.  After consideration of the pleadings,

arguments, and applicable law, the court finds and rules as follows.

**The Plaintiffs' Motion to Amend/The FDIC's Motion to Intervene**

On September 1, 2009, the plaintiffs filed the present suit, alleging the

defendants conspired to defraud them of $100,000 pursuant to a forged check drawn on

---

[1] This order is amended because the court inadvertently excluded defendant Antonia Shelzi's motion to
dismiss in its order of August 22, 2013.  This order also addresses the plaintiffs' requests for new orders
of notice.

Butler Bank.[2]  On April 16, 2010, the Massachusetts Division of Banks closed Butler

Bank and tendered to the FDIC the appointment as Liquidating Agent to act as

Receiver.  By operation of law, the FDIC as receiver succeeded to all rights, titles,

powers and privileges of Butler Bank.  See 12 U.S.C. §1821(d)(2).

On that same day, the FDIC sold the assets and certain designated liabilities to

Peoples, pursuant to a written Purchase and Assumption Agreement (the "P&A").

Article II of the P&A, Assumption of Liabilities, states that the

> Assuming Institution expressly assumes at Book Value . . . all of the
> following liabilities of the Failed Bank as of Bank Closing, except as
> otherwise provided in this Agreement:
>
> . . . .
>
> (m) all asset-related offensive litigation liabilities and all asset-related
> defensive litigation liabilities, but only to the extent such liabilities relate to
> assets subject to a shared-loss agreement . . . .

(Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 9–10.)

Neither the P&A nor the parties' submissions present a comprehensive breakdown of

which of the transferred liabilities "relate to assets subject to a shared-loss agreement."

(Id. at 10.)  However, William Starnes, FDIC Resolution & Closings Manager, stated in

an affidavit that: "[t]he instant litigation is a liability of Butler Bank which was not

transferred to [People's] pursuant to written Purchase and Assumption Agreement."[3]

(Starnes Aff. ¶ 5, Dec. 3, 2012.)  Accordingly, the court finds the instant litigation is not

among the assets or liabilities transferred to People's pursuant to the P&A.

---

[2] The facts are drawn from the parties' pleadings and the record.

[3] The plaintiffs also submitted the affidavit of Beth Berman, FDIC Asset Management Specialist, in which Ms. Berman states: "[a]mong the non loss-share of assets of Butler Bank which the FDIC sold to PEOPLE'S, under the terms of the P&A Agreement, was a charge-off made by Butler Bank prior to its failure which related to a deficiency on a construction mortgage loan Butler Bank had made to [Seff], which deficiency is at issue in the captioned litigation." (Berman Aff. ¶ 5, Dec. 9, 2010.) However, the captioned litigation referred to in the Berman Affidavit was a suit brought by Butler Bank in the Superior Court of Lowell, Massachusetts against Antonia Shelzi and Laurie Foistner to recover the deficiency on a defaulted loan.  The instant litigation involves a suit by Seff Enterprises against Butler Bank for, inter alia, conspiracy and fraud.  Accordingly, the Berman affidavit has no bearing on the court's analysis.

Moreover, Article IX of the P&A states that the FDIC-Receiver "shall have the right, in its discretion, to . . . defend or settle any claim or suit against [People's] with respect to any Liability Assumed . . . ." (Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 31.)  Therefore, even if the FDIC transferred the instant litigation to People's, and People's assumed that liability, the P&A grants the FDIC the authority to defend or settle the claim in its discretion.

Finally, the plaintiffs argue New Hampshire law governs the interpretation of the retention of liabilities by FDIC-Receiver pursuant to the P&A.  The plaintiffs cite Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998), in which the New Hampshire Supreme Court held that a plaintiff seeking to enjoin foreclosure was entitled to whatever claims or defenses existed prior to a bank's failure.  Here, the plaintiffs are not seeking to enjoin foreclosure.  Rather, they have brought claims against Butler Bank arising out of the Bank's alleged pre-failure conduct.  The Barnsley case is therefore not instructive as to the FDIC's right to convey assets to a third party and retain certain liabilities.

Accordingly, the court finds the FDIC now "stands in the shoes" of Butler Bank for purposes of the claims asserted against Butler Bank by the plaintiffs.  See O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994).  Therefore, the FDIC's motion to intervene and be substituted for Butler Bank is GRANTED.  The plaintiffs' motion to substitute People's is DENIED.

**Defendants' Motions to Dismiss**

In separate motions, defendants Robert Chapman, Hans Hassel, and Antonia Shelzi have moved to dismiss the plaintiffs' claims against them for lack of personal

3

jurisdiction. The plaintiffs do not dispute service on Chapman, Hassel, and Shelzi was ineffective, but requests the court issue new orders of notice so that the defendants can be properly served.

"Proper service of process is a necessary prerequisite to obtaining jurisdiction over an out-of-state defendant." South Down Recreation Assoc. v. Moran, 141 N.H. 484, 486 (1996). However, this is not the only way in which the personal jurisdiction of the court may arise. "The actions of the defendant amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Insurance Corp. v. Compagnie des Bauxites, 456 U.S. 694, 704-05 (1982). "Because the requirement of personal jurisdiction represents . . . an individual right [flowing from the Due Process Clause], it can, like other such rights, be waived." Id. at 703. Thus, a defendant may consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it. See Barton v. Hayes, 141 N.H. 118 (1996) (defendant waived personal jurisdiction when she made a general appearance by moving to strike default); Lachapelle v. Town of Goffstown, 134 N.H. 478 (1991) (filing a motion for late entry of appearance and motion to strike default is a voluntary submission to the jurisdiction of the court).

On October 1, 2009, Attorneys Stephen Duggan and Karyn Forbes filed general appearances on behalf of Mr. Chapman. Although Attorneys Duggan and Forbes later withdrew as Mr. Chapman's counsel, Mr. Chapman filed a pro se appearance on his own behalf on June 7, 2013. By these filings, Mr. Chapman has voluntarily submitted himself to the jurisdiction of this court and has waived any challenges to personal jurisdiction. Accordingly, no further action by the plaintiffs is necessary to invoke the

4

personal jurisdiction of the court over Mr. Chapman. Mr. Chapman's motion to dismiss is DENIED.

Conversely, no appearances have been filed on behalf of Mr. Hassel. At the June 24, 2013 hearing, the plaintiffs asserted that Attorney Lisa Snow-Wade of Orr & Reno appeared on behalf of Mr. Hassel at a November 14, 2012 structuring conference. However, although the above-captioned case was scheduled for a structuring conference on that day, the parties at that conference exclusively discussed a related docket, Foistner et al v Orr & Reno et al, 216-2008-CV-083, to which Mr. Hassel is not a party. When the court asked the parties who was representing Mr. Hassel in the above-captioned case, the following exchange occurred:

> Attorney Aivalikles: I believe your honor, he's pro se, but I say that with reluctance because I think Attorney Laboe may have been there for him at the deposition, so maybe Orr & Reno can answer that question better than I—
>
> Attorney Snow-Wade: —Wrong Docket—
>
> Attorney Aivalikles: —But I believe he was pro se at one point, your Honor.

(Audio of Structuring Conference, Foistner et. al. v Orr & Reno et. al., November 14, 2012 at 9:45:22.) As evidenced by this exchange, neither Attorney Snow-Wade nor any other attorney made an appearance on Mr. Hassel's behalf at the November 14, 2012 structuring conference. At the June 24, 2013 hearing, Mr. Hassel was present for the purpose of contesting personal jurisdiction. Therefore, Mr. Hassel has not submitted himself to the jurisdiction of the court. Mr. Hassel's motion to dismiss is GRANTED.

Likewise, no general appearances have been filed on behalf of Ms. Shelzi. On March 17, 2011, the plaintiffs' counsel copied Attorney Laboe on a letter to the court

requesting that the court schedule a structuring conference in the above-captioned case. Although Attorney Laboe had not filed any appearance, general or otherwise, the plaintiffs' counsel began copying Attorney Laboe on subsequent correspondences with the court. On March 7, 2012, the court copied Attorney Laboe on a Notice of Jury Trial in the above-captioned case. Further notices from the court also copied Attorney Laboe. However, each of those notices also referenced related cases, including 216-2008-CV-083, in which Attorney Laboe is a named party, and Shelzi v. Seff Enterprises, et. al., 216-2005-EQ-464, and Foistner et. al. v. Shelzi, 216-2007-CV-113, in which Attorney Laboe has appeared on behalf of Antonia Shelzi.

Attorney Laboe filed a special appearance on behalf of Ms. Shelzi on December 13, 2012. The plaintiffs argue Ms. Shelzi should be estopped from raising any issue concerning personal jurisdiction because Attorney Laboe was copied on correspondences from counsel and notices from the court, yet failed to inform the court that he was not appearing on Ms. Shelzi's behalf. The court disagrees. Attorney Laboe never appeared as counsel of record for Ms. Shelzi. The plaintiffs' decision to begin copying Attorney Laboe on all correspondence beginning in 2011 did not place upon Attorney Laboe the affirmative obligation to inform the court that he was not representing Ms. Shelzi. And, the notices from the court included cases in which Attorney Laboe was either a party or counsel. Accordingly, Ms. Shelzi has not submitted herself to the jurisdiction of the court. Therfore, Ms. Shelzi's motion to dismiss is GRANTED.

The plaintiffs do not dispute that service on Mr. Chapman, Mr. Hassel, and Ms. Shelzi was incomplete and therefore ineffective.[4]  However, the plaintiffs request that new orders of notice be issued so that service can be perfected.  The plaintiffs request for new orders of notice is GRANTED.  The court notes, however, that issuing new orders of notice is merely procedural and does not preclude Hassel or Shelzi from raising any defenses they may have.

**SO ORDERED.**

August 27, 2013

David A. Garfunkel
Presiding Justice

---

[4] As noted above, Mr. Chapman has submitted himself to the jurisdiction of the court.

7

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name:   **Hillsborough Superior Court Northern District**

Case Name:    **SEFF ENTERPRISES ea v. BUTLER BANK ea**

Case Number:  **09-CV-0522**
(if known)

## APPEARANCE/WITHDRAWAL
SUPERIOR COURT

☐ I request a jury trial
(If you do not check this box, your case will be heard by a judge)

**APPEARANCE**                                          **WITHDRAWAL**

Please enter my appearance as                           Please withdraw my appearance as

☐ Counsel for _____               ☐ Counsel for _____

<u>**AS CO-COUNSEL**</u> _____

☑ I will represent myself (*pro se*).                  Notice of Withdrawal sent to my clients on:

*ON BEHALF OF*
*SEFF ENTERPRISES + HOLDINGS,*                          at the following address:
*LLC, AS APPROVED BY THIS*
*COURT, BY MOTION, IN ALL*
*FOUR CASES.*

I hereby certify that duplicates of this notice were ☐ delivered ☑ mailed to the person(s) listed
below (or on attached list) on <u>**02/15/2013**</u>                         :
                                    Date

Name:    **JAMES LABOE AND WILLIAM AIVALIKLES**

Address:  **CONCORD AND NASHUA, NEW HAMPSHIRE**

<u>*02/15/2013*</u>                          _____
Date                                         Signature

                                             **JOSEPH A. FOISTNER, ESQUIRE**
                                             Printed Name

Address:  **300 BRICKSTONE SQUARE**
          **SUITE 201, ANDOVER MA 01810 USA**

          <u>**(978) 223-1446**</u>          **PRO SE**
          Telephone                           NH Bar ID #

          <u>**USMCATTORNEY@MSN.COM**</u>
          Email Address (optional)

NHJB-2318-S (10/01/2010)

17

THE STATE OF NEW HAMPSHIRE
SUPERIOR COURT
NORTHERN DISTRICT OF HILLSBOROUGH COUNTY
300 CHESTNUT STREET
MANCHESTER, NH    03101

September 11, 2013

## ORDER OF NOTICE

**No. 216-2009-CV-522**

Seff Enterprises & Holdings, LLC     v.     FDIC Receiver for Butler Bank
Laurie Foistner                              Robert Chapman, Senior, VP
                                             Antonia Shelzi
                                             Hans Harro Hassel

This action having been entered in court and it appearing that no personal service in this suit has been made on said defendants, **Antonia Shelzi** and **Hans Harro Hassel**

It is ordered by the Court, that the action be continued at said Court at 300 Chestnut Street, Manchester, NH 03101 within and for said County of Hillsborough, on the **First Tuesday of November, 2013** and that the plaintiff give notice to the said defendants **Antonia Shelzi** and **Hans Harro Hassel** of the pendency thereof by causing an attested copy of said writ, receipt of writ, Orders of Court and of this order to be given to said defendants **Antonia Shelzi** and **Hans Harro Hassel** or left at the abode at least fourteen days before said return day.

William E. Aivalikles, PA **Plaintiffs' Attorney**
60 Main Street, Suite 230
Nashua, NH    03060

ATTEST: *John M. Safford*
_____
Clerk of Court

The attached is a true copy of the writ, receipt of writ, Orders of Court and of the order of notice.

ATTEST: *John M. Safford*
_____
Clerk of Court



# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**
**NORTHERN DISTRICT**

**SUPERIOR COURT**

Seff Enterprises & Holdings, LLC,
Laurie Foistner

v.

Butler Bank, et. al.

Docket No. 216-2009-CV-522

## ORDER

On June 24, 2012, the court held a hearing on the following motions: 1) the

plaintiffs' motion to amend their complaint to substitute Peoples United Bank ("Peoples")

for Butler Bank/FDIC; 2) the FDIC's motion to intervene and to be substituted in place of

Butler Bank; and 3) Robert Chapman's and Hans Haro Hassel's motions to dismiss for

lack of personal jurisdiction.  The plaintiffs do not object to the FDIC's being named a

party to the litigation, but contend that People's has assumed the liabilities related to the

plaintiffs' lawsuit and therefore People's is the real party of interest to those liabilities,

not the FDIC.  After consideration of the pleadings, arguments, and applicable law, the

court finds and rules as follows.

## The Plaintiffs' Motion to Amend/The FDIC's Motion to Intervene

On September 1, 2009, the plaintiffs filed the present suit, alleging the

defendants conspired to defraud them of $100,000 pursuant to a forged check drawn on

Butler Bank.[1]  On April 16, 2010, the Massachusetts Division of Banks closed Butler

---

[1] The facts are drawn from the parties' pleadings and the record.

40

Bank and tendered to the FDIC the appointment as Liquidating Agent to act as

Receiver.  By operation of law, the FDIC as receiver succeeded to all rights, titles,

powers and privileges of Butler Bank.  See 12 U.S.C. §1821(d)(2).

On that same day, the FDIC sold the assets and certain designated liabilities to

People's, pursuant to a written Purchase and Assumption Agreement (the "P&A").

Article II of the P&A, Assumption of Liabilities, states that the

> Assuming Institution expressly assumes at Book Value . . . all of the
> following liabilities of the Failed Bank as of Bank Closing, except as
> otherwise provided in this Agreement:
>
> . . . .
>
> (m) all asset-related offensive litigation liabilities and all asset-related
> defensive litigation liabilities, but only to the extent such liabilities relate to
> assets subject to a shared-loss agreement . . . .

(Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 9–10.)

Neither the P&A nor the parties' submissions present a comprehensive breakdown of

which of the transferred liabilities "relate to assets subject to a shared-loss agreement."

(Id. at 10.)  However, William Starnes, FDIC Resolution & Closings Manager, stated in

an affidavit that: "[t]he instant litigation is a liability of Butler Bank which was not

transferred to [People's] pursuant to written Purchase and Assumption Agreement."[2]

(Starnes Aff. ¶ 5, Dec. 3, 2012.)  Accordingly, the court finds the instant litigation is not

among the assets or liabilities transferred to People's pursuant to the P&A.

---

[2] The plaintiffs also submitted the affidavit of Beth Berman, FDIC Asset Management Specialist, in which
Ms. Berman states: "[a]mong the non loss-share of assets of Butler Bank which the FDIC sold to
PEOPLE'S, under the terms of the P&A Agreement, was a charge-off made by Butler Bank prior to its
failure which related to a deficiency on a construction mortgage loan Butler Bank had made to [Seff],
which deficiency is at issue in the captioned litigation." (Berman Aff. ¶ 5, Dec. 9, 2010.)  However, the
captioned litigation referred to in the Berman Affidavit was a suit brought by Butler Bank in the Superior
Court of Lowell, Massachusetts against Antonia Shelzi and Laurie Foistner to recover the deficiency on a
defaulted loan.  The instant litigation involves a suit by Seff Enterprises against Butler Bank for, inter alia,
conspiracy and fraud.  Accordingly, the Berman affidavit has no bearing on the court's analysis.

2

Moreover, Article IX of the P&A states that the FDIC-Receiver "shall have the right, in its discretion, to . . . defend or settle any claim or suit against [People's] with respect to any Liability Assumed . . . ." (Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 31.) Therefore, even if the FDIC transferred the instant litigation to People's, and People's assumed that liability, the P&A grants the FDIC the authority to defend or settle the claim in its discretion.

Finally, the plaintiffs argue New Hampshire law governs the interpretation of the retention of liabilities by FDIC-Receiver pursuant to the P&A. The plaintiffs cite Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998), in which the New Hampshire Supreme Court held that a plaintiff seeking to enjoin foreclosure was entitled to whatever claims or defenses existed prior to a bank's failure. Here, the plaintiffs are not seeking to enjoin foreclosure. Rather, they have brought claims against Butler Bank arising out of the Bank's alleged pre-failure conduct. The Barnsley case is therefore not instructive as to the FDIC's right to convey assets to a third party and retain certain liabilities.

Accordingly, the court finds the FDIC now "stands in the shoes" of Butler Bank for purposes of the claims asserted against Butler Bank by the plaintiffs. See O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994). Therefore, the FDIC's motion to intervene and be substituted for Butler Bank IS GRANTED. The plaintiffs' motion to substitute People's is DENIED.

## Defendants' Motions to Dismiss

In separate motions, defendants Robert Chapman and Hans Hassel have moved to dismiss the plaintiffs' claims against them for lack of personal jurisdiction. Plaintiffs

3

do not dispute service on Chapman and Hassel was ineffective, but requests the court

issue new orders of notice so that the defendants can be properly served.

"Proper service of process is a necessary prerequisite to obtaining jurisdiction

over an out-of-state defendant." South Down Recreation Assoc. v. Moran, 141 N.H.

484, 486 (1996). However, this is not the only way in which the personal jurisdiction of

the court may arise. "The actions of the defendant amount to a legal submission to the

jurisdiction of the court, whether voluntary or not." Insurance Corp. v. Compagnie des

Bauxites, 456 U.S. 694, 704-05 (1982). "Because the requirement of personal

jurisdiction represents . . . an individual right [flowing from the Due Process Clause], it

can, like other such rights, be waived." Id. at 703. Thus, a defendant may consent or

submit to the jurisdiction of a court which otherwise would not have jurisdiction over it.

See Barton v. Hayes, 141 N.H. 118 (1996) (defendant waived personal jurisdiction

when she made a general appearance by moving to strike default); Lachapelle v. Town

of Goffstown, 134 N.H. 478 (1991) (filing a motion for late entry of appearance and

motion to strike default is a voluntary submission to the jurisdiction of the court).

On October 1, 2009, Attorneys Stephen Duggan and Karyn Forbes filed general

appearances on behalf of Mr. Chapman. Although Attorneys Duggan and Forbes later

withdrew as Mr. Chapman's counsel, Mr. Chapman filed a pro se appearance on his

own behalf on June 7, 2013. By these filings, Mr. Chapman has voluntarily submitted

himself to the jurisdiction of this court and has waived any challenges to personal

jurisdiction. Accordingly, no further action by the plaintiffs is necessary to invoke the

personal jurisdiction of the court over Mr. Chapman. Mr. Chapman's motion to dismiss

is DENIED.

4

Conversely, no appearances have been filed on behalf of Mr. Hassel. At the June 24, 2013 hearing, the plaintiffs asserted that Attorney Lisa Snow-Wade of Orr & Reno appeared on behalf of Mr. Hassel at a November 14, 2012 structuring conference. However, although the above-captioned case was scheduled for a structuring conference on that day, the parties at that conference exclusively discussed a related docket, Foistner et al v Orr & Reno et al, 216-2008-CV-083, to which Mr. Hassel is not a party. When the court asked the parties who was representing Mr. Hassel in the above-captioned case, the following exchange occurred:

> Attorney Aivalikles: I believe your honor, he's pro se, but I say that with reluctance because I think Attorney Laboe may have been there for him at the deposition, so maybe Orr & Reno can answer that question better than I—
>
> Attorney Snow-Wade: —Wrong Docket—
>
> Attorney Aivalikles: —But I believe he was pro se at one point, your Honor.

(Audio of Structuring Conference, Foistner et. Al. v Orr & Reno et. al., November 14, 2012 at 9:45:22.) As evidenced by this exchange, neither Attorney Snow-Wade nor any other attorney made an appearance on Mr. Hassel's behalf at the November 14, 2012 structuring conference. At the June 24, 2013 hearing, Mr. Hassel was present for the purpose of contesting personal jurisdiction. Therefore, Mr. Hassel has not submitted himself to the jurisdiction of the court. Mr. Hassel's motion to dismiss is GRANTED.

**SO ORDERED.**

Date: 8/22/13

David A. Garfunkel
Presiding Justice

5

# THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                          **SUPERIOR COURT**
**NORTHERN DISTRICT**

Seff Enterprises & Holdings, LLC,
Laurie Foistner

v.

Butler Bank, et. al.

Docket No. 216-2009-CV-522

## AMENDED ORDER[1]

On June 24, 2012, the court held a hearing on the following motions: 1) the plaintiffs' motion to amend their complaint to substitute Peoples United Bank ("Peoples") for Butler Bank/FDIC; 2) the FDIC's motion to intervene and to be substituted in place of Butler Bank; and 3) Antonia Shelzi's, Robert Chapman's and Hans Haro Hassel's motions to dismiss for lack of personal jurisdiction. The plaintiffs do not object to the FDIC being named a party to the litigation, but contend that Peoples has assumed the liabilities related to the plaintiffs' lawsuit and therefore Peoples is the real party of interest to those liabilities, not the FDIC. After consideration of the pleadings, arguments, and applicable law, the court finds and rules as follows.

### The Plaintiffs' Motion to Amend/The FDIC's Motion to Intervene

On September 1, 2009, the plaintiffs filed the present suit, alleging the defendants conspired to defraud them of $100,000 pursuant to a forged check drawn on

---

[1] This order is amended because the court inadvertently excluded defendant Antonia Shelzi's motion to dismiss in its order of August 22, 2013. This order also addresses the plaintiffs' requests for new orders of notice.

Butler Bank.[2] On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank and tendered to the FDIC the appointment as Liquidating Agent to act as Receiver. By operation of law, the FDIC as receiver succeeded to all rights, titles, powers and privileges of Butler Bank. See 12 U.S.C. §1821(d)(2).

On that same day, the FDIC sold the assets and certain designated liabilities to Peoples, pursuant to a written Purchase and Assumption Agreement (the "P&A"). Article II of the P&A, Assumption of Liabilities, states that the

> Assuming Institution expressly assumes at Book Value . . . all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement:
>
> . . . .
>
> (m) all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a shared-loss agreement . . . .

(Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 9–10.) Neither the P&A nor the parties' submissions present a comprehensive breakdown of which of the transferred liabilities "relate to assets subject to a shared-loss agreement." (Id. at 10.) However, William Starnes, FDIC Resolution & Closings Manager, stated in an affidavit that: "[t]he instant litigation is a liability of Butler Bank which was not transferred to [People's] pursuant to written Purchase and Assumption Agreement."[3] (Starnes Aff. ¶ 5, Dec. 3, 2012.) Accordingly, the court finds the instant litigation is not among the assets or liabilities transferred to People's pursuant to the P&A.

---

[2] The facts are drawn from the parties' pleadings and the record.
[3] The plaintiffs also submitted the affidavit of Beth Berman, FDIC Asset Management Specialist, in which Ms. Berman states: "[a]mong the non loss-share of assets of Butler Bank which the FDIC sold to PEOPLE'S, under the terms of the P&A Agreement, was a charge-off made by Butler Bank prior to its failure which related to a deficiency on a construction mortgage loan Butler Bank had made to [Seff], which deficiency is at issue in the captioned litigation." (Berman Aff. ¶ 5, Dec. 9, 2010.) However, the captioned litigation referred to in the Berman Affidavit was a suit brought by Butler Bank in the Superior Court of Lowell, Massachusetts against Antonia Shelzi and Laurie Foistner to recover the deficiency on a defaulted loan. The instant litigation involves a suit by Seff Enterprises against Butler Bank for, inter alia, conspiracy and fraud. Accordingly, the Berman affidavit has no bearing on the court's analysis.

Moreover, Article IX of the P&A states that the FDIC-Receiver "shall have the right, in its discretion, to . . . defend or settle any claim or suit against [People's] with respect to any Liability Assumed . . . ." (Opp'n of FDIC-Receiver t Pls.' Mot. Amend Compl. Subst. Party Ex. A at 31.)  Therefore, even if the FDIC transferred the instant litigation to People's, and People's assumed that liability, the P&A grants the FDIC the authority to defend or settle the claim in its discretion.

Finally, the plaintiffs argue New Hampshire law governs the interpretation of the retention of liabilities by FDIC-Receiver pursuant to the P&A.  The plaintiffs cite Barnsley v. Empire Mortgage LP, 142 N.H. 721 (1998), in which the New Hampshire Supreme Court held that a plaintiff seeking to enjoin foreclosure was entitled to whatever claims or defenses existed prior to a bank's failure.  Here, the plaintiffs are not seeking to enjoin foreclosure.  Rather, they have brought claims against Butler Bank arising out of the Bank's alleged pre-failure conduct.  The Barnsley case is therefore not instructive as to the FDIC's right to convey assets to a third party and retain certain liabilities.

Accordingly, the court finds the FDIC now "stands in the shoes" of Butler Bank for purposes of the claims asserted against Butler Bank by the plaintiffs.  See O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994).  Therefore, the FDIC's motion to intervene and be substituted for Butler Bank IS GRANTED.  The plaintiffs' motion to substitute People's is DENIED.

## Defendants' Motions to Dismiss

In separate motions, defendants Robert Chapman, Hans Hassel, and Antonia Shelzi have moved to dismiss the plaintiffs' claims against them for lack of personal

jurisdiction. The plaintiffs do not dispute service on Chapman, Hassel, and Shelzi was ineffective, but requests the court issue new orders of notice so that the defendants can be properly served.

 "Proper service of process is a necessary prerequisite to obtaining jurisdiction over an out-of-state defendant." South Down Recreation Assoc. v. Moran, 141 N.H. 484, 486 (1996). However, this is not the only way in which the personal jurisdiction of the court may arise. "The actions of the defendant amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Insurance Corp. v. Compagnie des Bauxites, 456 U.S. 694, 704-05 (1982). "Because the requirement of personal jurisdiction represents . . . an individual right [flowing from the Due Process Clause], it can, like other such rights, be waived." Id. at 703. Thus, a defendant may consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it. See Barton v. Hayes, 141 N.H. 118 (1996) (defendant waived personal jurisdiction when she made a general appearance by moving to strike default); Lachapelle v. Town of Goffstown, 134 N.H. 478 (1991) (filing a motion for late entry of appearance and motion to strike default is a voluntary submission to the jurisdiction of the court).

 On October 1, 2009, Attorneys Stephen Duggan and Karyn Forbes filed general appearances on behalf of Mr. Chapman. Although Attorneys Duggan and Forbes later withdrew as Mr. Chapman's counsel, Mr. Chapman filed a pro se appearance on his own behalf on June 7, 2013. By these filings, Mr. Chapman has voluntarily submitted himself to the jurisdiction of this court and has waived any challenges to personal jurisdiction. Accordingly, no further action by the plaintiffs is necessary to invoke the

personal jurisdiction of the court over Mr. Chapman.  Mr. Chapman's motion to dismiss is DENIED.

Conversely, no appearances have been filed on behalf of Mr. Hassel.  At the June 24, 2013 hearing, the plaintiffs asserted that Attorney Lisa Snow-Wade of Orr & Reno appeared on behalf of Mr. Hassel at a November 14, 2012 structuring conference. However, although the above-captioned case was scheduled for a structuring conference on that day, the parties at that conference exclusively discussed a related docket, Foistner et al v Orr & Reno et al, 216-2008-CV-083, to which Mr. Hassel is not a party.  When the court asked the parties who was representing Mr. Hassel in the above-captioned case, the following exchange occurred:

> Attorney Aivalikles: I believe your honor, he's pro se, but I say that with reluctance because I think Attorney Laboe may have been there for him at the deposition, so maybe Orr & Reno can answer that question better than I—
>
> Attorney Snow-Wade: —Wrong Docket—
>
> Attorney Aivalikles: —But I believe he was pro se at one point, your Honor.

(Audio of Structuring Conference, Foistner et. al. v Orr & Reno et. al., November 14, 2012 at 9:45:22.)  As evidenced by this exchange, neither Attorney Snow-Wade nor any other attorney made an appearance on Mr. Hassel's behalf at the November 14, 2012 structuring conference.  At the June 24, 2013 hearing, Mr. Hassel was present for the purpose of contesting personal jurisdiction.  Therefore, Mr. Hassel has not submitted himself to the jurisdiction of the court.  Mr. Hassel's motion to dismiss is GRANTED.

Likewise, no general appearances have been filed on behalf of Ms. Shelzi.  On March 17, 2011, the plaintiffs' counsel copied Attorney Laboe on a letter to the court

requesting that the court schedule a structuring conference in the above-captioned case. Although Attorney Laboe had not filed any appearance, general or otherwise, the plaintiffs' counsel began copying Attorney Laboe on subsequent correspondences with the court. On March 7, 2012, the court copied Attorney Laboe on a Notice of Jury Trial in the above-captioned case. Further notices from the court also copied Attorney Laboe. However, each of those notices also referenced related cases, including 216-2008-CV-083, in which Attorney Laboe is a named party, and <u>Shelzi v. Seff Enterprises, et. al.</u>, 216-2005-EQ-464, and <u>Foistner et. al. v. Shelzi</u>, 216-2007-CV-113, in which Attorney Laboe has appeared on behalf of Antonia Shelzi.

Attorney Laboe filed a special appearance on behalf of Ms. Shelzi on December 13, 2012. The plaintiffs argue Ms. Shelzi should be estopped from raising any issue concerning personal jurisdiction because Attorney Laboe was copied on correspondences from counsel and notices from the court, yet failed to inform the court that he was not appearing on Ms. Shelzi's behalf. The court disagrees. Attorney Laboe never appeared as counsel of record for Ms. Shelzi. The plaintiffs' decision to begin copying Attorney Laboe on all correspondence beginning in 2011 did not place upon Attorney Laboe the affirmative obligation to inform the court that he was not representing Ms. Shelzi. And, the notices from the court included cases in which Attorney Laboe was either a party or counsel. Accordingly, Ms. Shelzi has not submitted herself to the jurisdiction of the court. Therfore, Ms. Shelzi's motion to dismiss is GRANTED.

The plaintiffs do not dispute that service on Mr. Chapman, Mr. Hassel, and Ms. Shelzi was incomplete and therefore ineffective.[4]  However, the plaintiffs request that new orders of notice be issued so that service can be perfected.  The plaintiffs request for new orders of notice is GRANTED.  The court notes, however, that issuing new orders of notice is merely procedural and does not preclude Hassel or Shelzi from raising any defenses they may have.

**SO ORDERED.**

August 27, 2013

David A. Garfunkel
Presiding Justice

---

[4] As noted above, Mr. Chapman has submitted himself to the jurisdiction of the court.

7

# HILLSBOROUGH COUNTY SUPERIOR COURT
## NORTHERN DISTRICT

300 Chestnut Street
Manchester, N.H.  03101
(603) 669-7410

### RECEIPT OF WRIT

Date:  September 3, 2009

Docket Number  09-C-522

Seff Enterprises & Holdings, LLC  v.  Butler Bank
Laurie Foistner                        Robert Chapman, Senior VP,
                                         Butler Bank
                                       Antonia Shelzi
                                       Hans Harro Hassel

        The writ in the above-captioned matter was filed with the Clerk of this Court on September 3, 2009.

        The Plaintiff or his/her attorney is to attach a copy of this receipt to identical copies of the original writ and deliver them to the Sheriff or other legally authorized entity for service on each named defendant.  Sufficient copies shall be provided to allow for a service copy for each named defendant and a copy for each officer completing service to complete the return. The return copies shall be filed with the court in accordance with Superior Court Rule 3.

                        By Order of the Court


                        John M. Safford, Clerk

JMS/jel

cc: William Aivalikles, Esq.
    60 Main Street
    Nashua, NH  03060

# The State of New Hampshire

## SUPERIOR COURT

HILLSBOROUGH COUNTY
NORTHERN DISTRICT

( ) COURT
(X) JURY

### WRIT OF SUMMONS

Seff Enterprises & Holdings, LLC
3 Foxberry Drive
New Boston, NH   03070

v.

Laurie Foistner
3 Foxberry Drive
New Boston, NH   03070

Butler Bank
3 George Street, Lowell, MA   01852

Robert Chapman, Senior VP, Butler Bk
26 Luz Drive, Lowell, MA   01854

Antonia Shelzi
10 Townsend Road, Belmont, MA 02478

Hans Harro Hassel
31 Lee Street, Cambridge,MA   02139

The Sheriff or Deputy of any County is ordered to summon each defendant to file a written appearance with the Superior Court at the address listed below by the return day of this writ which is the first Tuesday of <u>October</u> , 2009

<u>MONTH</u>
<u>YEAR</u>

The PLAINTIFF(S) state(s):

SEE ATTACHED.

and the Plaintiff(s) claim(s) damages within the jurisdictional limits of this Court.

9/1/09
DATE OF WRIT

ENDORSER (sign and print name)   Manager of Seff Enterprises
& Holdings, LLC

NOTICE TO THE DEFENDANT

The Plaintiff listed above has begun legal action against you. **You do not have to physically appear** in Court on the return day listed above since there will be no hearing on that day. However, if you intend to contest this matter, you or your attorney must file a written appearance form with the Clerk's Office by that date. (Appearance forms may be obtained from the Clerk's Office.) You will then receive notice from the Court of all proceedings concerning this case. If you fail to file an appearance by the return day, judgment will be entered against you for a sum of money which you will then be obligated to pay.

Witness, Robert J. Lynn, Chief Justice, Superior Court.

John M. Safford, Clerk
NH Superior Court Hillsborough County
Northern District
300 Chestnut St
Manchester NH 03101-2490
(603) 669-7410

SIGNATURE OF PLAINTIFF/ATTORNEY

William Aivalikles
PRINTED/TYPED NAME
60 Main Street, Suite 230
ADDRESS
Nashua, NH   03060   /603-880-0303
PHONE

## INTRODUCTION

This Writ is brought by Seff Enterprises and Holdings, LLC (hereinafter sometimes referred to as "LLC" or "Plaintiffs") and Laurie Foistner (hereinafter sometimes referred to as "L. Foistner" or "Plaintiffs"), a former owner of a 50% interest in the LLC and the Guarantor of a Promissory Note with the Butler Bank against the Butler Bank of Lowell Massachusetts and a group of individuals ("Defendants") for their ongoing alleged conspiracy to run their bank and business as a criminal enterprise as that term is used under the Federal Racketeering Influence Corrupt Organizations Act, RICO, 18 U.S.C. § 96, *et seq.*, depriving Plaintiffs of the intangible right of honest services through fraud and criminal means.

Plaintiffs also complain that the Bank and the Individual Defendants, acting as one, deprived them of their fundamental rights to conduct their businesses and to enjoy their quiet right to life, liberty, freedom and pursuit of happiness, by allegedly committing criminal felony acts against the Plaintiffs' persons, properties and businesses. These crimes include, but are not limited to Felony Perjury, U.S.C. § 1621, *et seq.*, Felony Forgery U.S.C. § 513 – Securities of the States and Private Entities, Mail Fraud 18 U.S.C. § 1343 – Fraud by Wire, 18 U.S.C. § 1349 – Attempt and Conspiracy, Stolen Goods 18 U.S.C. § 2314 – Interstate Transportation of Stolen Goods, Securities and Money, Fraud 18 U.S.C. § 1028 – Forging Corporate Records, 18 U.S.C. §1028A – Aggravated Identity Theft, Tax Fraud 26 U.S.C. § 7201 – Attempts to Evade or Defeat Tax, 26 U.S.C. § 7206 – Fraud and False Statements, 26 U.S.C. § 7207 – Fraudulent Returns, Statements Other Documents, 26 U.S.C. § 7212 – Attempts to Interfere with Administration of Internal Revenue Laws and IRS audit, and, Conspiracy – Crime against the United States of America, 18 U.S.C. § 371 – Conspiracy, Bank Fraud 18 U.S.C. § 1344, §1344(2), Extortion 18 U.S.C. § 1951 and other crimes as defined in Federal and New Hampshire law.

## PARTIES

1.      Seff Enterprises & Holdings, LLC, Plaintiff, of 3 Foxberry Drive, New Boston, New Hampshire  03070.

2.      Laurie Foistner of 3 Foxberry Drive, Plaintiff, New Boston, New Hampshire 03070.

3.      Defendant Butler Bank, Inc., ("Butler Bank" or "the Bank"), is a Commercial Banking Corporation, conducting business at 3 George Street, Lowell, Massachusetts 01852.

4.      Defendant Robert Chapman, ("Chapman"), Butler Bank Senior Vice President, resides at 26 Luz Drive, Lowell, Massachusetts 01854.

5.      Defendant Antonia Shelzi, ("Shelzi"), resides at 10 Townsend Road, Belmont, Massachusetts 02478.

6.      Defendant Hans Harro Hassel, ("Hassel"), resides at 31 Lee Street, Cambridge, Massachusetts 02139.

## FACTS

7.      The LLC was formed on or about August 28, 2000, pursuant to the New Hampshire Limited Liability Act, as a "Single Manager Managed - Limited Liability Company, by Laurie J. Foistner, 50% Member, Louis A. Maynard (Maynard), 50% Member, and Joseph A. Foistner, Esq. (J. Foistner), its sole and only manager.

8.      In order to begin operations, L. Foistner contributed $1.24-million to the company and L. Maynard contributed $150-thousand, to be recorded on the books of the company, as well as on the Operating Agreement signed and executed between the Members and Sole Manager.

9.     The LLC's primary purpose for formation, as shown on the Operating Agreement, was to fund and file a Federal RICO Law Suit, 18 U.S.C. § 96, against the Town of New Boston and many of its Public Officials, who allegedly had been using their position with the Town, under Color of Statute, for Criminal Enterprise, for more than thirty (30) years.

10.     It is averred that these Public Servants had intentionally and with malice, bankrupted four real estate developers in town, from 1980 through 2000.

11.     These alleged Racketeers had embezzled more than $17-million out of the town's treasury, containing federal funds, over a period of thirty (30) years, while they, as Public Officials, were the guardians of that treasury.

12.     In order to fund and pay for the New Boston RICO Law Suit, containing more than 13,000 individual documents as evidence, anticipated to cost between $2.5-million and $4-million in legal fees, L. Maynard agreed to re-mortgage his only business and home, the Molly Stark Restaurant, a well established land mark in Southern New Hampshire. His home and business, appraised in 2000, had a market value of $1.1-million, with an outstanding mortgage in 2000, in the amount of $23-thousand.

13.     L. Foistner and J. Foistner agreed that they would complete the development of their Waldorf Estates Subdivision, Phase III, 20 lots, the LLC's only asset, appraised in 2000 at $2.7-million, with an outstanding mortgage lien, recorded against the title, in the amount of $850-thousand.  $16.5-million (25% profit) from home construction and sales was anticipated from the 20 lots remaining in phase III of the project.

14.     In fact, both L. Maynard and the Foistners borrowed $850-thousand from several Hard Money Lenders, (the Muffaletto Note), at 38% percent annual interest, in 2000, pledging the Molly Stark Restaurant and the Phase III, 20, lot subdivision, as collateral.

3

15.     This high annual interest was required to be paid to Street Lenders, because ordinary bank financing was not available to the LLC, while it was litigating several civil claims, then pending in 2000 and 2001, in the Hillsborough County Superior Court, against the Town of New Boston.

16.     The LLC's Operating Agreement, Article III. Management of the Company provided unlimited and unrestricted, total and final authority on all matters to its only Sole Manager, J. Foistner. "Full and Complete Authority" was vested in the only manager.

17.     The development and construction of the Waldorf Estates subdivision, 54 lots began in 1985 by the Foistners. From 1985 through present, 35 estate homes have been constructed and sold, some with more than 28,000 square feet of living space, located on 15 mountain-view acre house lots, with some of the highest views and elevations located in Southern New Hampshire.

18.     The Foistners, through their companies, have been the continuous owners of this project and its copyrighted approvals and drawings and engineering documents, since 1985, now for 24 years.  During these 24 years, the Foistner's continuously suffered many millions of dollars in money damages and personal hardship, including human rights violations, constitutional violations, crimes against their persons and property, at the hands of these alleged Town of New Boston Racketeers.

19.     L. Maynard, an "Outsider", like the Foistners, allegedly suffered the same damages and harm, at the hands of the very same individuals, the Dodges, whom by 1985, had driven all businesses owned by "Outsiders", out of Town, effectively bankrupting all "Outsiders", while they, the Dodges, subdivided their lands without having to adhere to local

4

subdivision regulations and without having to construct roads, on their lands, when other LLCs and Outsiders were required to do so.

20.     Upon formation of the LLC, L. Maynard, L. Foistner and J. Foistner established by Company Votes as evidenced by Minutes, which established that J. Foistner, the sole manager, was not required, in fact would intentionally refuse, to be required to perform any of the bookkeeping and accounting functions, or to manage any money payments, check writing and invoicing functions of the company. It was voted that Foistner was to receive a monthly Fee, in the amount of $10-thousand, for his required services as the manager.

21.     L. Maynard maintained all checkbooks, bookkeeping records, check writing and creation and record keeping of the accounting records for the LLC, from inception, August 2000 through December 22, 2002. Maynard was the only authorized signor on any and all checking accounts, owned by the LLC, from 2000 through 2002. Foistner refused all check writing authorities. Foistner managed all business and development management requirements, such as financing, road construction, surveying, engineering, sales, and primarily, the hiring of RICO Experts and Lawyers, to include the gathering of evidence, managing the many attorneys, at the time litigating the Town of New Boston litigation, preparing for the upcoming RICO Law Suit.

22.     On or about December 2002, L. Maynard informed the Foistners that he was running out of cash, because the Town of New Boston had intentionally and unlawfully delayed the Waldorf Estates subdivision, for another 28 months, August 2000 through December 2002. All this time, both L. Maynard and the Foistner were paying the 38 percent monthly interest to their Street Lenders, while the town systematically and with a plan and design bankrupted both in order to stop the forthcoming RICO litigation against them and the town.

5

23.    It became crystal clear, to all involved, by December 2002, attorneys, engineers and road builders that without a RICO Law Suit in the Federal Court, holding the Town of New Boston accountable for its alleged criminal, unconstitutional, unlawful and corrupt acts, used against the Plaintiffs, the Waldorf Estates subdivision and other "Outsiders" that the land development and road construction could never.be completed and the subdivision approvals could never be obtained through legal means.

24.    By 2002, the Plaintiffs had hired Attorney Morgan Hollis, ("Hollis"), after dismissing all four of its earlier hired law firms, managing the ongoing New Boston litigations and all municipal legal issues. The Law Firm of Orr & Reno, P.A. (Orr & Reno), have been the Foistner's lawyers since 1995, on the same Waldorf Project. Orr & Reno has been the Plaintiffs', L. Maynard's and the remaining LLC member's lawyers since 2003, on the same Waldorf Estates Project.

25.    In fact, by December 2002, Hollis had completely stopped the town's unlawful acts, settled most of the outstanding disputes and even accomplished to force the town to preliminarily approve the subdivision, changing the Phase III portion of the land from 18 lots to 20 lots. Maynard however was out of money and simply wanted out.

26.    On or about December 23, 2002, Antonia Shelzi ("Shelzi") purchased L. Maynard's 50% Ownership Interest of Seff, by paying Maynard the sum of $250,000.00. Shelzi joined Seff after conducting her Due Diligence. Shelzi was represented by Attorney and CPA Michael Di Iulio ("Di Iulio"), CPA Brian Becks, ("Becks") and Attorney Gregory Oberhauser, ("Oberhauser"). Shelzi, while she was represented by two (2) CPA's and two (2) lawyers, provided the LLC with her Financial Statements, depicting her total assets to exceed $27,115,000.00. Her Owners Equity was shown to be $18,753,010.

27.     When Shelzi purchased Maynard's Ownership Interest, she stepped into Maynard's shoes as to the accounting and bookkeeping responsibilities.

28.     Seff's Operating Agreement and Corporate Votes, all reviewed By Shelzi and Oberhauser, remained in force as company policy.

29.     Attorney Oberhauser managed the closing for Shelzi. All signed, accepted and executed written contracts, their specific terms known as: "PURCHASE CONTRACT", "PARTICIPATION AGREEMENT", "ASSIGNMENT AND BILL OF SALE", "GENERAL AND MUTUAL RELEASES", and "MUTUAL RELEASE SETTLEMENT AGREEMENT", (hereinafter referred to as ("Purchase Contracts").

30.     Specifically, Shelzi contractually obligated herself to become the Financier of the LLC.  Shelzi received her Ownership Transfer Certificate, ownership now, as of December 23, 2002, for her promise to pay, finance and match L. Foistner's contribution as recorded on the books of the company.

31.     Shelzi knew that the upcoming RICO litigation was needed in order to continue forward with the Waldorf Estates development.  Shelzi also knew and fully understood that several million dollars in cash contributions, were required from her to fund the needs of the LLC and to match the other 50% Member.

32.     Specifically, Shelzi contractually obligated herself to establish financing with a local bank, within six months, no later than June 23, 2003, now that the New Boston litigation had ended and the town approvals had been obtained, by Hollis, for the Waldorf Development. Bank financing would lower the monthly interest rate of 38 percent paid to the Street Lenders, to 8.5% to be paid to a Commercial Bank.  The mortgage lien on Maynard's Molly Stark

Restaurant, now that Maynard was no longer a member of the company, was contractually required to be released by June 23, 2003.

33.     Shelzi contractually agreed to finance the RICO litigation for the first six months, immediately hire lawyers, paralegals and other employees, a bookkeeper, an accountant, sales staff and other, all listed in the Purchase Contracts. Shelzi also agreed to lease office space to house the RICO team, purchase equipment and vehicles to complete the Waldorf Project, market and sell the same.

34.     Shelzi's sole intent and reason for joining the LLC, as its new 50%Member, was her absolute requirement, and contractual stipulation, allowing her to capitalize on the LLC's losses, for tax years 2000, 2001, 2002, 2003 and 2004, all resulting and reporting, millions of dollars of legal business expenses, as losses, to develop the project, along with its many law suits and legal requirements. During those tax years, while the Waldorf Estates subdivision was constructing roads and seeking town and state approvals to sell lots, no sales or other income was realized by the LLC, resulting in reporting only losses to the IRS.

35.     Shelzi demanded and contracted to receive, millions of dollars in tax savings, by legally obtaining the LLC's losses for those years. In fact, Shelzi spent her tax dollars owed to the IRS, at the advice of her Counsel and CPA's, to purchase L. Maynard's Ownership Interest.

36.     Shelzi's Purchase Contracts, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, reads as follows:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

37.     Prior to December 23, 2002, during Shelzi's due diligence, her CPA and Lawyer, DeIulio gave notice to J. Foistner by saying, "If things don't go as planned in the future for Toni, we will be filing a law suit for an accounting".

38.     Prior to Shelzi becoming a Member of the LLC, on or about May 2002, Shelzi sent two of her employees / contractors to the offices of the LLC, located at 100 State Street, Boston, Massachusetts in order to move the LLC's property, computers, furniture and 30 years of evidentiary documents, approximately 13,000 documents, to the company's new offices in Lowell, Massachusetts.  These two employees were Hans Harro Hassel ("Hassel") and Jim Chubb ("Chubb"), both former Massachusetts Prison Inmates and Criminals.  Chubb, a convicted Felon and Drug Dealer, freshly released from the Massachusetts Prison System in 2002.  Hassel was imprisoned in 1993, as Massachusetts Dead Beat Dad Number Two, employed by Shelzi since his release from prison in 1994.

39.     Chubb explained to J. Foistner, in front of witnesses, one, another licensed Massachusetts Attorney that he had agreed, to serve a prison term for Shelzi, the actual Drug Dealer and guilty party, for her promise to pay him $10-thousand dollars, when he got out of prison.  He further explained that Shelzi was now employing him and had reneged on the $10-thousand she had promised.  Both Hassel and Chubb explained that Shelzi's business in Cambridge employed newly released Felons on a regular basis – part of the Commonwealths Justice System.  Hassel further explained that Shelzi's Brother, a Rhode Island Attorney, had left the Country and traveled to the Orient in order to escape prosecution for this Drug Deal gone bad.

40.     Shelzi's alleged racketeering enterprises, her businesses in Massachusetts, employs, as a mode of operation, known felons and illegal aliens. Individuals and undesirables

which the law defines and labels as "Convicted Felons", the identical legal status, given by our criminal justice system, to Shelzi.

41.    Her criminal status as a Convicted Felon was unknown to the Plaintiffs when Shelzi joined the LLC. The Andover facility was specifically rented and constructed to house the new RICO Lawyers, the RICO Team along with all the evidentiary documents and office equipment. Shelzi in fact maintained an office in that facility in Andover, occupied by Hassel, her Financial and Business Manager. This office occupied by Hassel and Shelzi, maintained all accounting records, cancelled checks, bank statements, invoices, contracts, deposit slips, engineering documents and any and all documents owned by the Plaintiffs, pertaining to the Waldorf Project and the Rico Law Suit.

42.    Shelzi and Hassel had unrestricted access to all the documents and the computer located in their office. The computer in their office maintained all electronic data, including Peachtree Accounting data. Shelzi and Hassel had the only password for that computer. The computer was part of a Peer to Peer, Windows Network (without a server).

43.    By January 2003 Shelzi and J. Foistner prepared and approved a detailed Operating Budget depicting the employees to be hired, the equipment to be purchased and the future RICO Attorneys to be hired to bring the RICO Claim, until that time, managed by Oberhauser. This Operating Budget was approved, voted and recorded by Minutes, as the LLC's Operating Budget and became approved company policy.

44.    By January 2003, J. Foistner hired a full time Bookkeeper, Office Manager, Accountant and Sales Staff. Additionally J. Foistner signed and executed the lease for the Andover RICO Office and contracted to complete the leasehold improvements to install walls, wiring, doors and ceilings. Foistner Law Offices P.C. (Foistner Law) began purchasing

10

computers, office equipment and furniture and hired paralegals to manage the upcoming RICO Suit.

45.     From March 2001 through January 2004, Foistner Law interviewed lawyers in Boston, Massachusetts and New Hampshire, attempting to find an experienced law firm to manage the RICO litigation. More than 13 separate lawyers and their firms were interviewed. Each interview, requiring a total review of 30 years of documented evidence and damages, depicting hundreds of RICO Crimes allegedly committed by the Town of New Boston and its corrupt Public Servants.

46.     Shelzi fully funded the financial requirements depicted and approved in the Budget for the months of January, February and March 2003 only.  She partially paid the April and May invoices and by June stopped funding all requirements for which she was contractually obligated.

47.     By May 2003, Foistner was required to dismiss all employees since Shelzi would not fund their salaries nor her promised bank financing was not received.

48.     By May 2003, J. Foistner had been employed as a manager since August 2000. Foistner was entitled to be paid for forty (40) months at the rate of $10,000.00 per month.  By May 2003, Foistner had not drawn a single Penny for his fees, by then amounting to more than $ 400,000.00, with interest.  In fact, Foistner never received a Penny for his labor and services, from 2000 through present, 2009, at all times required to provide legal services and services as the LLC's manager.

49.     Instead of receiving compensation for his services, Foistner was made to contribute more than $5.5-million in the form of Cash and Invoices, for legal services, provided by Foistner Law, supporting the RICO Claim and civil litigation, from 2000 to 2009.

50.   Shelzi materially breached her contractual obligation to establish bank financing by June 23, 2003, failing to have the Street Lenders mortgage liens released from L. Maynard's Molly Stark Restaurant and home, causing Maynard to eventually become homeless.

51.   As Shelzi struggled to fund the operations of the LLC, only paying the absolute minimum invoices, usually 90 to 120 days behind, the LLC's business reputation began to suffer. Shelzi, on more than three occasions, wrote, issued and signed bank drafts, made payable to the LLC, deposited into the LLC's bank, Citizens Bank, amounts as high as $100-thousand, which bounced, due to insufficient funds.

52.   Vehicle payments were not made, lease payments defaulted, employee employment contracts were breached, several legal claims were lost, the Statute of Limitation deadline expired on those claims, because Shelzi failed to fund their legal fees. The RICO litigation was not being funded.

53.   Shelzi's key financial manger, Hassel, was so disgusted with Shelzi's material breaches that he wrote a sworn Affidavit, dated October 31, 2003.  In that Affidavit Hassel stated that Shelzi usually buys into businesses and always financially abandons her partners, in an attempt to bankrupt the business and to swallow up her partners.  In the manager's opinion, it became clear that Shelzi was a Fraud, intending only to bankrupt the LLC, in order to gain control of the assets and the tax losses.

54.   On or about August 2003, Shelzi introduced her close friend and banker, Senior Vice President of the Butler Bank, Mr. Robert Chapman ("Chapman") to the LLC and personally guaranteed a $1.5-million commercial loan from the Butler Bank, earmarked for the construction of Roads and to complete the development of the Waldorf Project, now without employees, staff, and accountants.

55.     The only Borrower on this loan was the LLC.  The two members Shelzi and L. Foistner were obligated to personally guarantee the loan.  Only J. Foistner, the LLC's only Manager was authorized to manage the loan, draw funds, disburse funds, make interest payments and manage the repayment.  Shelzi and L. Foistner had no authority to make any decision on this $1.5-million loan.

56.     The $1.5-million Butler Bank loan was inadequate from the start, late and underfunded, due to the fact that Shelzi had missed and breached the June 23, 2003 deadline date, to pay off the Street Lenders, thereby causing more than a $160-thousand Roll Over Fee, to be paid out of the Butler Bank loan proceeds originally earmarked for road construction.  The road was contracted to costs $1.2-million, including engineering, road construction, pavement, erosion controls, supervisory labor and interest.

57.     Hollis and Foistner were told at the closing, without any advance notice by Butler's Closing Attorney that they were short by $160,000.  These Roll-Over Fee damages were caused by Shelzi's material breaches of the Purchase Contract.

58.     During a meeting held at Hollis Law Offices, on or about November 11, 2003, Shelzi admitted that she had no money left, as she had promised, to pay her consideration for her 50% Ownership.

59.     In order to continue operations, now without employees and staff, the LLC was required to borrow money from other Street Lenders, Shelzi's Brother, Attorney Domenic Shelzi, and others.  Because of Shelzi's alleged fraud and material breaches, the LLC was now required to borrow money and pay interest and points for money that was originally contracted, to be received as a contribution from Shelzi, interest free, without points, Shelzi's Consideration, for receiving her Ownership Interest.

60.    For the LLC and the Foistners to borrow money to cover Shelzi's breaches, was not a contract requirement in the Purchase Documents.  Shelzi received up to a 50% Ownership, 10 house lots for her written promises to finance and fund the operations. Now Shelzi wanted to own her 50% of the project and have the remaining members finance the project out of their pockets.

61.    Because of Shelzi's alleged fraud and material breaches, J. Foistner borrowed $350-thousand from Maynard, in order to pay for the road construction of the project, because the funds remaining at the Butler Bank were inadequate.  Butler Bank was aware of this.

62.    J. Foistner was required to manage the LLC, full time – 65 plus hours each week, from 2002 through 2009, without receiving any compensation, while Shelzi, demanding her 50% Ownership, did not produce a single labor hour for the benefit of the RICO Suit or the completion of the project.

63.    Foistner managed all RICO litigation requirements, 2000 through 2006, managed 108 months, nine years of Planning Board, Selectmen and Town meetings, surveyed the project, engineered the roads and driveways, supervised on a daily basis, six day per week, from 5:00 AM each day till 8:00 PM, the construction of the 3,000 ft. road, the financing and financial management (not the accounting) of the Company,  the IRS Audits for the LLC, marketing, home construction and 50 months of civil litigation against Shelzi, 2005 through 2009.

64.    Because of Shelzi's Fraud and material breaches, the Foistners borrowed an additional $2.1-million, from Banks and Relatives, to pay for the funding requirements of the LLC.

65.    On or about July 2003, J. Foistner and L. Maynard visited the law Offices of Orr & Reno, P.A. (Orr & Reno), in order to hire Orr & Reno as their RICO Lawyers.  Foistner and

14

the Waldorf Estates Subdivision Project, along with its many complicated legal issues, law suits and claims, were already Clients of Orr & Reno, in light of the fact that Foistner and the predecessor company which owned Waldorf Estates, owned by J. Foistner, had hired and paid Orr & Reno in 1995. This has been admitted by Orr & Reno in their Sworn Statements / Affidavits.

66.     When J. Foistner and L. Maynard, as owners, managers and members of the LLC, visited Orr & Reno, in Concord New Hampshire, representing the LLC, the then only owner of the project, Shelzi was already a member of the LLC. Only the LLC had the authority to bring a RICO Claim against the Town of New Boston, and all of the LLC's members and manager, including Shelzi, were asking Orr & Reno to review the many documents and evidence to bring the RICO Claim.

67.     Confidential information was communicated to Attorney Martha Van Oot, ("Van Oot") regarding Waldorf Estates, the LLC its members and manager, Seff's legal issues, its finances, its accounting and damages caused by the Town of New Boston. Although Orr & Reno did not accept to be Advocates on the RICO Claim, and in fact refused to invoice for their services and did not receive or invoice any fees, Van Oot provided legal advice to the LLC, L. Maynard, L. Foistner, and Shelzi, creating a valid Attorney Client Relationship, to the already existing Attorney Client Relationship, formed in 2003.

68.     On or about December 2004, the law firm of Debruckeyre, Patrillo and Fulton of Salem, New Hampshire, were retained to become the Advocates for the RICO Claim. Attorney Peter Fulton ("Fulton") accepted the assignment after completing a six months evaluation of the claims. The LLC paid more than $130-thousand for this Evaluation and the RICO Claim was filed in Federal Court on or about June 04, 2004. Shelzi paid nothing.

15

69.     In 2004, Shelzi signed a Fee Agreement with Fulton, becoming a named Plaintiff. Under this fee Agreement Shelzi is wholly and severally liable for all legal fees to Fulton, including the legal fees and costs of all contract lawyers under Fulton's control.  This included Foistner Law, who has been employed for this effort since 2001 without compensation.

70.     By the time the RICO Claim was filed in the Federal Court, Foistner Law, J. Foistner, L. Foistner and L. Maynard had paid more then $760-thousand to fund this law suit. Shelzi never paid a single Penny for her legal representation, materially breaching her contract.

71.     Instead of honoring her contractual agreements and obligations set forth in the Fee Agreement, Shelzi materially breached that contract as well.  Shelzi's alleged fraud and material breach of her contractual obligations, set forth in the Purchase Contract, as well as the Fulton Fee Agreement, were the sole cause for the RICO Claim being voluntarily dismissed in 2006, after J. Foistner was forced to file a Motion for Voluntary Non-Suit, because Shelzi was not paying her share of the legal fees.

72.     On or about July 2004, the LLC, Maynard and the Foistners gained knowledge from Hassel and a local bank that Shelzi was a Convicted Felon, Convicted Drug Dealer and former Massachusetts Prison Inmate, having served time in the Massachusetts prison system.

73.     Shelzi's status as a Convicted Felon, voided her ownership in the LLC, required, at the managers sole discretion, by the Operating Agreement, Articles III, and Exhibit C.  No American Business is required to conduct business with Felons and Drug Dealers.  Instead of disclosing this information, her status as a Convicted Felon, to the LLC, its remaining members and L. Maynard, Shelzi attempted to gain her 50% Ownership Interest, through fraud, deception, misrepresentation and criminal conduct.

16

74.   Although Shelzi materially breached all of her contractual obligations and brought much harm, millions of dollars in losses, caused by the delay of the Waldorf subdivision from 2002 through 2009, 84 months, to the LLC, failing to finance the contractual obligations set forth in the Purchase Contracts and the Fulton Fee Agreement, Shelzi and her CPA, still insisted that she had the right, to write off the millions of dollars in business expenses, as losses, starting with tax year 2001.

75.   On or about April 2003, after Shelzi became a member of the LLC on December 23, 2002, Shelzi's CPA, Brian Becks (Becks) and Shelzi contacted J. Foistner, instructing him to prepare the LLC's Federal Tax Returns in order for Shelzi to receive her deductions on her personal tax returns.

76.   L. Maynard and J. Foistner, were not required to file, and had not prepared and filed any tax returns for tax years 2000, 2001, 2002, and 2003 since no income was realized, by the LLC in those years, only expenses.  Millions of Dollars in losses.

77.   In 2003, J. Foistner provided the bookkeeping records and financial data, maintained and generated by Keith Prive, (Prive), under Shelzi's supervision, generated by Peachtree Accounting, 2003 Complete Accounting, to Becks for tax years 2001, 2002 and 2003, along with a preliminary 1065 Federal IRS tax return for tax years 2001, 2002, and 2003.  J. Foistner and Keith Prive, were never paid or compensated by Shelzi for this work.  Their invoices remain unpaid to this date.

78.   On or about May 2003, upon receipt of this accounting information, Becks acknowledging, on behalf of his Client Shelzi, that he was in receipt, of the LLC's accounting records for 2001, 2002 and 2003, ordered changes to be made to the tax returns.

17

79.     Shelzi was the Keeper of these records. These records were contractually required to be kept, maintained and paid for by Shelzi, the owner / member, not J. Foistner the non-owner / manager, and certainly not Keith Prive, the unpaid office manager, as mandated by the LLC's corporate votes. Becks demanded that Shelzi's share of losses would be changed from 50% to 85%, allowing Shelzi more losses, or funds that would not be received from Shelzi.

80.     After Becks was satisfied with the LLC's tax returns and Shelzi's share of the losses, Becks amended Shelzi's personal, 1040 Federal tax return, for tax year 2001 and increased Shelzi's write-offs by more than $800-thousand dollars, from the original return, prepared, signed and filed by Becks, as the "Paid Tax Preparer". Becks also reported the losses for 2002, 2003 and 2004, in a similar manner as Shelzi's "Paid Tax Preparer", acknowledging that he was in receipt of all accounting records, on behalf of his client Shelzi, for those tax years.

81.     In order for Shelzi to satisfy the "Recourse Liabilities" requirement, allowing her to legally write off the losses, Becks claimed and demanded for her, on her 2001 personal tax returns that Shelzi sign and execute two (2) separate Promissory Notes with Personal Guarantees, agreeing to pay and guaranteeing Foistner Law Offices and JFL Trust $459,856.00 and $673,303.00.

82.     In fact, Shelzi, under counsel by CPA Becks insisted to receive these Recourse Liabilities. The signing and execution of these Promissory Notes was witnessed, by now, Attorney Prive, then forwarded in writing to Becks, in order to satisfy Shelzi's "Material Participation and Recourse Liabilities", questioned by the IRS, who was by 2004, auditing Shelzi and Becks alleged fraudulent 2001 amended tax return.

83.     In 2005 Butler Bank modified its original $1.5-million loan and agreed to a new $1.8-million loan for the completion of the Waldorf Estates Phase III road construction. This

$1.8-million loan, again personally guaranteed by Shelzi and L. Foistner, required a special allocation, in the amount of $100-thousand, to be held back from disbursement until the 20th lot, lot 8-84-31-1 was subdivided and recorded at the Hillsborough County Registry of Deeds.

84.     This $100-thousand hold back money was guaranteed and promised in writing, on Butler Bank's Commitment Letter and loan documents, to the Bedford Design Consultants, Inc. ("BDC"), the Waldorf project Engineers and Surveyors, actually performing the work to subdivide this 20th lot.

85.     Butler Bank also agreed in writing, to make available two (2) separate construction loans, for "Owner Occupied" residential home construction, $990-thousand each, one loan to Shelzi, the other loan to L. Foistner.  These loans were executed for Butler Bank in 2005 and 2006.  Butler Bank, Robert Chapman, promised to finance the construction of these 20 homes, along with two immediate construction loans, to construct two Models.  Participating loans between Butler Bank and other Massachusetts banks were discussed. The LLC relied upon these representations and closed three (3) separate construction loans with Butler, not counting Shelzi's lot 8-84-44 loan.

86.     In order to accomplish this, prior to closing the two Owner Occupied home construction, model loans, Butler Bank and Shelzi instructed Prive and J. Foistner that Butler Bank wanted two separate business entities established and qualified by Butler Bank, as "Qualified Authorized Builders" to construct both homes. Prive submitted these documents to Butler, supervised by J. Foistner.

87.     No longer trusting Shelzi, after witnessing the many frauds and misrepresentations made by her, and after experiencing million of dollars in losses caused by her breaches and her unwillingness to show up at work, for at least one hour per week, in order to

perform her duties as an owner, it was agreed that Shelzi and L. Foistner would not take on any new business together, especially, not the construction of multi-million dollar estate homes.

88.   By 2005, the Foistners had constructed, hands on, and participated in the ground work, of more than 64 separate homes, in two subdivisions located in New Boston and Amherst, New Hampshire. The Foistners could demonstrate more than 20 years, direct hands-on experience as "Qualified Builders".

89.   Shelzi had never constructed a single home with her very own hands and possessed no construction skills as a "Qualified Builder". In fact, Shelzi failed to show up for work, one hundred percent, (100%) of the time, not even on one full day, from December 2002 through present.

90.   In order for Shelzi to qualify for the Butler Bank $990-thousand, "Owner Occupied Home Construction Loan", Shelzi personally supervised Prive, by now in 2005, the LLC's only remaining unpaid employee and office manager, from her home in Belmont, Massachusetts by telephone. She never paid Prive for his labor.

91.   The only compensation received by Prive came from the L. Foistner's and L. Maynard.

92.   On or about October 10, 2004, J. Foistner created two (2) new Limited Liability Companies as mandated by the Butler Bank. One known as New Boston Estates, LLC, ("NBE LLC"), originally planned to be used for the $990-thousand L. Foistner, Lot 8-84-38 loan. The other known as Waldorf Estates Builders, LLC, ("WEB LLC"), originally planned to be used for the $990-thousand Shelzi, lot 8-84-44 loan.

93.   Separate loan applications were filed and submitted to Butler Bank by Prive and J. Foistner, as instructed by the Butler Bank's loan Officers, Chapman and Donna Hauswirth,

("Hauswirth"). Butler Bank instructed Prive and J. Foistner, to submit builders information and Builders Resumes for the Foistners, attempting to qualify their New Boston Estates, LLC as a "Qualified Builder" for the Lot 38 loan.

94.     Butler Bank also instructed Prive and J. Foistner to submit Waldorf Estates Builders information on behalf of Shelzi. This was impossible for Shelzi had no experiences and was not a New Hampshire Builder. Prive and J. Foistner could not and did not submit any "Qualified Builders" information or Builders Resume, on behalf of Shelzi to Butler Bank.

95.     Lacking the Shelzi "Qualified Builders" information, Butler Bank instructed Prive and Foistner to change all construction contracts to reflect J. Foistner as the Builder and General Contractor for the lot-44 Shelzi loan and all future loans, thereby changing all loan documents to reflect New Boston Estates, LLC, solely owned and managed by the Foistners. Shelzi was never approved as a Qualified Builder by Butler Bank.

96.     Waldorf Estates Builders, LLC, the second company, incorporated and owned by J. Foistner, was never transferred to Shelzi because of Butler Banks refusal, to qualify the company as a "Qualified Builder". No Ownership Transfer Certificate was ever issued to Shelzi, for any amount of ownership, by Waldorf Estates Builders, LLC or New Boston Estates, LLC. Shelzi was never a member, manager, agent, employee or authorized representative of either construction company. J. Foistner was the only and sole founder, manager and member of both companies.

97.     Since Butler Bank would not authorize Shelzi, or any business entity owned by Shelzi, to be certified as a "Qualified Builder", Prive was instructed by Butler Bank to change all contracts and loan application documents, on behalf of Shelzi, for the lot 44- Shelzi loan, to

New Boston Estates, LLC.  By then, certified by Butler Bank, as a "Qualified Builder".  Only after those changes were made, did  Butler and Shelzi both agree to close the loan for lot 44.

98.      The Shelzi lot-44 construction loan closed on or about September 2005, for $990-thousand.  New Boston Estates, LLC was the only authorized General Contractor on the loan.

99.      Prior to the lot-44, Shelzi loan closing, Prive, J. Foistner, Brown Excavation (Brown), the Road Builder, now the Excavator for Shelzi's construction site, BDC, Engineers and Surveyors and other subcontractors, performed contract work on behalf of Shelzi, with Shelzi's knowledge and invoiced Shelzi and Butler Bank, $65,003.26, for their work in order to receive a Building Permit from the town.  The invoice amounts were part of the Construction Agreement approved by Butler Bank and Shelzi.

100.  ·  Butler Bank's loan officer, Hauswirth, personally instructed Prive and J. Foistner, how to complete the first money requisition and draw to pay this invoice.  Several phone calls and fax transmissions were initiated by Butler Bank, which approved this requisition, after making several changes and after receiving Shelzi's signature. This first requisition, took three individuals, seven hours each, to be correctly submitted and accepted by Butler Bank.

101.      Butler issued this one and only draw, Cashiers Check, in the amount unknown, made payable to, Antonia Shelzi, the Borrower, and New Boston Estates, LLC, the only "Qualified General Contractor".  Butler Bank then delivered this first bank draft into Shelzi's hands.

102.      Butler Bank was fully aware that New Boston Estates, LLC·had the only Mechanic Lien Rights on that project and loan, and were required to be paid. NBE LLC was never paid by Shelzi and Butler Bank.

103.    By July 05, 2005, the IRS announced its audit of the LLCs 2001, Federal Tax Return, filed and submitted, by the LLC in 2003.  Agent Quang Trieau (Quang) was conducting this audit for the Boston IRS Office.

104.    During the first meeting, on or about August 2005, Quang informed J. Foistner that he was only auditing the LLC's 2001, Federal Tax Return, because he wanted to disallow Shelzi's 2001, Amended Personal Tax Return, filed by CPA Becks in 2003, which he had been auditing since 2004.  Quang made it perfectly clear that he was fully aware of Shelzi's tax frauds.  Quang explained to J. Foistner that he was only auditing the LLC because of Shelzi's fraudulent 2001, 1040 Amended Return.

105.    During the first audit appointment, at the LLC's Bedford, New Hampshire offices, on or about September 2005, Quang opened his Shelzi, 1040, 2001 personal audit file, which contained all accounting information, from the LLC for tax years 2001, 2002, 2003, and 2004, originally provided by the LLC to CPA Becks and Shelzi. Quang explained that all these accounting records and tax returns were provided to him by Becks.  This clearly evidences that Shelzi and CPA Becks, were in possession of all accounting information at all times.  Shelzi sued the LLC in 2005, falsely claiming that she never received "any accounting records from the LLC", her basis for a frivolous law suit, abusing the legal system.

106.    Prior to the IRS audit for the LLCs 2001 Federal 1065, Income Tax Return was announced by Quang, in 2005, Shelzi had contacted J. Foistner by telephone, on or about December 2004, asking Foistner to help her establish her "Material Participation and Recourse Liabilities" in the LLC's business operations for 2001. Shelzi specifically asked J. Foistner to help her create a "Meeting Log" for meetings that took place between Shelzi and J. Foistner, in

23

2001, showing that Shelzi "Materially Participated" in the LLCs business management and work performance.

107.    J. Foistner became keenly aware that Shelzi, "Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to join a criminal conspiracy to aid her, to falsify, Federal IRS Forms, during an IRS Audit.

108.    J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, by providing wrongful information during an IRS Audit.

109.    J. Foistner became keenly aware that Shelzi, Criminally Solicited" his participation to defraud the United States of America, the IRS, by asking Foistner to participate in a Criminal Conspiracy, to establish a false record, of meetings that never took place, attempting to commit the Felony Crime, IRS Tax Fraud and IRS Tax Evasion.

110.    After this initial call from Shelzi; additional calls were received from Shelzi, Hassel, and CPA Becks, all soliciting J. Foistner's criminal solicitation to defraud the IRS, J. Foistner called Becks, inquiring about Shelzi's criminal request to manufacture a "False Meeting Log". Becks informed J. Foistner that he would not complete such a "False Meeting Log" and that he did not require, or want any help from J. Foistner.  Becks instructed Foistner not to get involved in the audit that he was managing for Shelzi.

111.    Within a few days from Shelzi's criminal solicitation attempt, Attorney Hollis called J. Foistner, inquiring as to Foistner's knowledge or possible authority to allow Shelzi to receive and pick-up a $100-thousand Butler Bank Cashiers Check, on behalf of the LLC.

112.    J. Foistner informed Hollis that he had no knowledge of such a transaction and that he had not authorized, Shelzi, to draw any funds from the Butler Bank.  Both Hollis and J.

Foistner were fully aware that Shelzi had written authority to pickup checks from the Butler Bank, in light of the fact, that she was a personal guarantor and co-borrower. However, in order to draw funds, a company vote, and company signed requisition was still required to be submitted to the Butler Bank.

113.    Hollis informed Foistner that Butler Bank's Senior Vice President of Commercial Lending, Robert Chapman, Shelzi's personal friend, had issued a check to Shelzi, from the $1.8-million loan. Hollis informed Foistner that it appeared that Shelzi and Hassel had negotiated this $100- Cashiers Check, issued by Chapman to Shelzi. Hollis informed J. Foistner that he was awaiting receipt of a copy of that check from Chapman. Within days a copy of Check No. 7148, dated August 25, 2005, was received from Butler Bank.

114.    Upon close examination of Check No. 7148 the LLC and J. Foistner realized that the endorsements, on the check, had been forged. Check No. 7148 was made payable to "Seff Enterprises & Holdings, LLC" for which Joseph A. Foistner, Esquire, sole manager, was the only authorized signatory, "Antonia Shelzi and Laurie Foistner, Members". The check showed the following Memo: "75045479-Lot 30-1 Waldorf Estates Phase III". The banks intent was to pay for Lot 30-1 with this $100,000 check is evident.

115.    Shelzi was the only person in possession of check no. 7148, after Chapman and other Butler Bank employees, handed her the check. She testified and admitted to these facts in front of witnesses, all licensed lawyers.

116.    By September 2005, the LLC, Prive, and Hollis, discovered that Shelzi, the only individual, in possession, of check no. 7148, had forged, or caused to have forged, The LLC's endorsement on the back of the check. She also forged or caused to have forged, Laurie Foistner's endorsement on the back of the check, spelling it "LORI" instead of Laurie. After

25

committing the two (2) counts of Felony Forgery, this Convicted Felon, allegedly signed and

endorsed check no. 7148, with her very own signature, thereby attesting to her knowledge and

specific intent to appropriate these funds, with forged endorsements.

117.    Shelzi then wrote the following words on this falsified bank draft, *"Pay to the

order of Domenic Shelzi"*, her brother, a Rhode Island Attorney. He endorsed the check with his

signature, failing, as required by law, the Uniform Commercial Code (UCC), as a Holder in Due

Course, to inspect the bank draft for the required – matching endorsement, matching the front of

the check, prior to affixing his very own endorsement.  Domenic Shelzi then deposited the

forged funds into his account at the Citizens Bank. The appropriation of the check, by Shelzi,

constituted the felony crime of Attempted Larceny and/or Larceny. Attorney Domenic Shelzi's

participation in these alleged crimes, have been reported to Rhode Island Supreme Court, Board

of Bar Overseers, and various law enforcement agencies.

118.    Butler Bank and Chapman had an obligation to protect the LLC and Laurie

Foistner from these alleged crimes, once Chapman became aware of these unlawful acts.  A

simple telephone call from Chapman would have stopped these alleged crimes, before they were

ever started.  This was not the case, Chapman had knowledge of these alleged criminal acts at all

times.  Chapman's criminal involvement, alleged as a co-conspirator, continues to harm the LLC

and the Foistners.

119.    Shelzi admitted in front of witnesses, *"Chapman has been a very close friend of

mine for many years.  His wife is from South America, we both speak Portuguese.  Last week

Chapman and I went out on a dinner date.  He was drunk and his hands were all over me.  All

this, in front of his wife, she was there.  I have him right where I want him.  This was not his

first time".*

120.    In 2005, the Plaintiffs were under the belief that a bank teller, employed by Citizens Bank, discovered the forged endorsements, stamped the instrument, "MISSING ENDORSEMENT" and returned it either to Shelzi or Butler Bank, effectively rendering the crime of Attempted Larceny.

121.    Chapman, as a Fiduciary, was required at all times to inform the LLC and L. Foistner of Shelzi's alleged criminal conduct and he certainly was under a duty to report these crimes to law enforcement. Chapman intentionally failed to fulfill his obligation. It is alleged that Chapman was a member of this criminal conspiracy that issued the check, delivered it to Shelzi, and then covered up these crimes with silence.

122.    After the check was returned, the LLC, Foistner, Hollis and Prive gained knowledge of Shelzi's and Chapman's alleged criminal conduct. Robert Baskerville, the Engineer and Surveyor, who was promised the $100,000.00 payment for his services was promptly notified.

123.    In a meeting held, on or about September 2005, at the law offices of Gottesman & Hollis, P.A., Shelzi admitted, in front of witnesses, to the forgeries and conversion of the $100,000.00 Butler Bank Draft, implicating Chapman. Shelzi and Butler Bank; transported this stolen instrument across Interstate Lines affecting Interstate Commerce; and used the wire and mail to allegedly promote the criminal conspiracy.

124.    When Chapman gained possession of check no. 7148, he, as a professional banker, recognized that the ledger on the instrument " MISSING ENDORSEMENT", that the endorsements on the back of the check were forgeries and that some endorsement where missing.

125.    Instead of performing his legal and/or fiduciary duties to the Plaintiffs, Chapman moved swiftly to help Shelzi, thereby allegedly defrauding the Plaintiffs and the Foistners.

Instead of performing his duties as a bank official, Chapman issued Hollis, on behalf of Shelzi, a second bank draft for $100,000.00. Again, without the Plaintiffs expressed written approval.

126.    Butler Bank and Chapman intentionally refused to protect their borrowers, and both decided, not to respond, or talk to their Borrowers, until September 2008. In fact, Butler Bank and Chapman have not returned one single telephone call, or responded to one of more than ten (10) written notices, in more than 48 months. All the while, Butler Bank collected more than $15,000.00 each month, from the LLC as interest.

127.    When Shelzi needed Chapman's help to receive a second check, she wrote to him, "please issue new check, because of stockholder problems". She received check no. 7324 in the amount of $100,000.00, constituting another alleged act of felony fraud and larceny.

128.    Joseph Foistner, Esquire, the LLC's only manager, called Chapman and the Butler Bank, informing both of the alleged crimes that had been committed by Shelzi and ordered Chapman, "Not to release any additional funds or issue any additional checks to Shelzi".

129.    Chapman and the Butler Bank were given NOTICE, that only "Attorney Foistner, the LLC's only Manager could order or release funds from their loan". Chapman and the Butler Bank received notice from Attorney Foistner that Shelzi was no longer a Member of The LLC and that her membership had been revoked, as authorized by The LLC's Operating Agreement, which allowed for the removal of convicted criminals, at the sole discretion of The LLC's only manager, Attorney Joseph A. Foistner, Esq.

130.    On or about September 15, 2005, Attorney Morgan Hollis provided a written notice to the President of Butler Bank, informing him of the misconduct and crimes allegedly committed by his bank and its personnel. Attorney Hollis' letter to Butler Bank received no reply. Instead of correcting these problems and protecting their borrowers, the Butler Bank and

28

Chapman issued more checks to Shelzi, constituting additional alleged felony crimes, causing the LLC and the Foistners millions in damages.

131.    On or about September 12, 2005, Butler Bank and Chapman issued Check No. 7324, in the amount of $100,000.00 to Shelzi, in total disregard of their borrowers written notices, thereby allegedly committing felony bank fraud, this time, with full knowledge, intending to defraud the LLC and the Foistners. Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and did use the mail and/or wire to commit these acts.

132.    Check no. 7324, was ordered by Shelzi, mailed or delivered by Butler Bank, Chapman or Shelzi, to Morgan Hollis, without the express written approval or knowledge of the LLC the borrower or Laurie Foistner, the Member/Guarantor.

133.    Instead of paying the Bedford Design Consultants for subdividing lot 30-1, the written purpose for the $100,000.00, held back by Butler Bank, as part of the loan agreement, stated in writing on the loan documents, the money ended up in Attorney Domenic Shelzi's checking account. The very same checking account, that was to originally, receive the forged and stolen funds, via Check no. 7148.

134.    After Butler Bank and Chapman closed and funded the Shelzi Lot – 44, Owner Occupied construction loan, in the amount of $990-Thousand, and after receiving the first invoice from New Boston Estates, LLC, the only "Qualified Builder" and approved "General Contractor", on or about September 2005, in the amount of $65-thousand, and after Hauswirth, Butler's Loan Administrator, personally supervised, Prive, in the drafting and submittal of the draw and invoices, and after Butler Bank issued a check to Shelzi, made payable to New Boston

Estates, LLC and Shelzi, in the amount of $65-Thousand, Butler Bank and Chapman allegedly committed their third alleged criminal act.

135.    Butler Bank issued a check, check number unknown (Butler Bank has refused to provide a copy of both checks to NBE LLC), to Shelzi, made payable to NBE LLC and Antonia Shelzi, for services performed under the construction agreement. This NBE LLC check was issued at the very same time, just prior to discovering the alleged crimes committed by Butler, Chapman and Shelzi, pertaining to check no. 7148 and check no. 7324. Knowing that Shelzi and Chapman were committing fraud against the LLC and the Foistners, including the switching of checks, Prive and Foistner refused to endorse the $65,000 NBE check in Shelzi's possession.

136.    Instead, Prive and Foistner insisted that Shelzi endorse the NBE LLC check, so that the funds could be used for its intended and lawful purpose, to pay the contractors in full.

137.    The payment of the contractors in full, should have been Shelzi's and Chapman's intent, when Chapman issued the check to Shelzi, after Shelzi signed and executed bank forms, "the Bank Requisition for Funds". The only authorized purpose for these funds was to pay NBE LLC, the authorized builder on the loan, and its contractors.

138.    This did not occur. When Prive and NBE LLC refused to endorse the back of the $65,000.00 check, knowing that Shelzi would never pay them, Shelzi again visited her friend Chapman, in order to conspire to commit additional acts of bank fraud and felony larceny.

139.    Chapman unlawfully cancelled out and voided the original $65,000.00 check made payable to NBE LLC and issued Shelzi a new check, made payable to Shelzi and another New Boston Estates Limited Liability Company, called Waldorf Estates Builders, LLC ("WEB LLC").

140.    Chapman issued a second check to a Company, WEB LLC, which was not an authorized builder with the Bank.  Additionally, WEB LLC, was not a party to the signed and executed construction agreements required by Butler, to issue the loan.  WEB LLC had not performed any work what-so-ever and was not entitled to any payment from Butler.  Chapman knew this when he allegedly committed this 3rd felony act of bank fraud.

141.    Hauswirth did not work with anyone at WEB LLC to generate an invoice or the required bank forms, mechanic lien affidavits, invoice submittals, money requisition and supporting documents.

142.    Chapman knowingly and intelligently switched the two checks and allegedly committed felony bank fraud. Shelzi represented to Chapman that she was the Owner and Manager of WEB LLC.  This representation was false with the intent to provide the Bank and Chapman with a pretext to issue the check.

143.    Shelzi did not own any rights or ownership in WEB LLC.  Chapman knew this.  If not, he was under an obligation as a fiduciary and banker to investigate the rightful owners of WEB LLC.  This he failed to do.

144.    Had Chapman and the Bank performed their duties as a loan officer/lender, they would know that Joseph A. Foistner, Esquire, was the only founder, owner, member, and manager of WEB LLC.  Chapman's changing of the $65,000 check defrauded NBE LLC and its subcontractors, by issuing a new check, through fraud, not supported by invoices, a requisition, to a Limited Liability Company owned by the very same individual that was being defrauded.

145.    Shelzi took the new check, issued to WEB LLC, opened a false and fraudulent checking account with the Citizens Bank, allegedly forging and falsifying federal bank forms and power of attorney forms to open such an account.  She then allegedly forged the new check by

31

endorsing her name onto the back of the check representing to be an owner, manager or authorized signor of WEB LLC and then converted the funds.

146.    These alleged acts constitute the commission of felony forgery, felony identity theft, felony larceny and Chapman along with Butler Bank, are liable as co-conspirators for these alleged crimes. Shelzi and Butler Bank transported these stolen funds across Interstate Lines, affecting Interstate Commerce and used the mail and wire to commit these acts.

147.    The LLC and the Foistners reported this to the Citizens Bank Security Staff which provided copies of the falsified checking account documents as well as copies of forged and falsified checks from that Citizens Bank Account.

148.    Upon gaining knowledge of the alleged crimes and fraud, Foistner, the LLC, NBE LLC and WEB LLC, provided written notices to the President and Chief Executive Officer of the Butler Bank, Chapman and Hauswirth.  Instead of correcting and stopping these many alleged crimes, Butler Bank, in contravention of their duties as a Fiduciary/Lender, chose to hide their involvement with silence and not answer a single telephone call or written notice from the LLC in 49 months.  Butler Bank not only facilitated the commission of the alleged crimes, but by their conduct allowed it to continue harming their borrowers.  Chapman and the Bank became members of this alleged criminal conspiracy, aiding and abetting Shelzi in the performance of these alleged crimes.

149.    Instead of performing its fiduciary duties, Chapman and Butler Bank, falsely and through fraud, schemed to destroy the LLC and the Foistners by reporting negative credit information to various Credit Bureaus.

32

150.    In fact, Butler Bank's false reporting, of the LLC's late payments to Butler Bank, caused the Guarantor's Credit Score to plummet. This was done by Chapman, to intentionally destroy Laurie Foistner and to aid and abet his friend Shelzi.

151.    The Butler Bank was fully aware that the New Hampshire Courts had ordered Shelzi to make half the interest payments to Butler, the other half, was ordered to be made by Laurie Foistner. Butler Bank and Chapman had received written notices from Attorney Morgan Hollis that Shelzi, living in Belmont, Massachusetts, was not making her share of the court ordered payment to Butler, while she was carrying on in her alleged personal and criminal affairs with Chapman.

152.    Numerous notices, from 2005 through present, now for 49 months, had been provided, to Butler Bank, that Shelzi did not reside at 3 Foxberry Drive, New Boston, New Hampshire, and that Shelzi should receive Butler Bank's false and threatening letters, at her home in Belmont, Massachusetts, always declaring a default, when there was, in fact, no default.

153.    Butler Bank intentionally did not provide these notices to Shelzi. Instead, Butler Bank reported Shelzi's late payments onto Laurie Foistners' Credit report.

154.    Upon information and belief, a detailed review and comparison of Shelzi's Credit Report and Laurie Foistner's Credit Report documents this fact.

155.    On each occasion, when Butler Bank mailed a Default Notice to Laurie Foistner at 3 Foxberry Drive only and not to Shelzi at her Belmont address, Butler Bank erroneously declared a default at the stated date on the letter. In effect, Butler each time declared a default at a given date in the future, the date that had not occurred as of the date of the writing. Therefore, there never was a default. Only threatening letters designed to harass the LLC and the Foistners were issued.

156.    After the commissions of these alleged crimes and fraud committed by the employees of Butler Bank, and after millions of dollars in damages, J. Foistner personally wrote to Butler Bank, as did Attorney Hollis, asking to have Chapman removed as the loan officer of the loan.  The LLC and Hollis specifically wrote to Butler Bank, informing the Bank of all the alleged crimes and fraud, harassment and racketeering, committed by the bank and its employees in aiding and abetting Shelzi's commission of the alleged crimes.  Butler Bank did not respond and chose to allow these alleged crimes to continue.  Chapman continued to manage, control and administer the LLC's loan until 2009.

157.    In order for Shelzi to keep her reported losses for tax years 2001, 2002, and 2003, and, in light of the fact that Shelzi did not become part of the LLC until tax year 2003, the IRS required Shelzi to demonstrate that she was materially involved as a member of the LLC in 2001 – this Shelzi and her CPA were not able to do.  Shelzi had an assignment clause from Maynard, purchasing his losses for tax years 2001 and 2002, in the Ownership Transfer Agreement.  This clause however, would not and could not, allow Shelzi and Becks to claim material participation.

158.    In order to mislead the IRS Auditor, Quang, who had requested for Shelzi and Becks to complete and submit meeting logs and records showing her involvement in 2001, Shelzi prepared a letter, dated August 1, 2005, to Brian Beck stating, " *... please note that I do not keep logs on meetings I conduct with business associates, managers, and staff at any one of the companies that I own.*"  In this letter, Shelzi attempts to falsely, and with fraudulent intent, mislead the IRS, by creating her own fictional participation history; all of which is not true.  Shelzi never materially participated in the LLC's operations until January 2003.

159.    On or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and Becks, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax

34

No. 617-776-5690, pages 1, 2 and 3.  Page 2 of the fax consisted of an IRS Form 4564, depicting

Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu,

dated July 15, 2005.  This IRS Form set forth the following Information and Documentation

Request:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC
nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

1. Proof of material participation in the Seff Enterprises & Holding LLC in a
regular, continuous, and substantial manner by Antonia Shelzi under IRC 469
(b)(i) & (5).
2. Complete the attached activities log which complies with your record keeping
requirements in Reg. 1.469-5T(f)(4).
3. Provide a copy of your appointment book or calendar for the year 200112 to
support the information provided in the activities log .....
4. Did you perform most of the work in Seff Enterprises & Holdings, LLC?
5. Did you work more than 100 hours and no one (including non-owners or
employees) works more hours?
6. Did any person receive compensation in connection with managing Seff
Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call ...."

Page 3 of the fax was a blank IRS Form, entitled "Activity Log".

160.    Hassel followed up his fax transmission with a telephone call to J. Foistner,

asking him to help him defraud the IRS by falsifying this Activity Log". Hassel allegedly

committed Felony Solicitation, to defraud the IRS, when he asked J. Foistner for his involvement

to falsify this IRS Form and to provide fraudulent and false information to the IRS Auditor.

161.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law

Offices writing, *"IRS ... Per accountant need to keep log and therefore review copy of log*

*prepared for Toni."* Hassel submitted along with his fax document, a two page document

depicting a false meeting schedule log that he had prepared for Shelzi.  The document contained

a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner in 2001.

162.    All were manufactured by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place. Prior to submitting this fax transmission from his Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf of Shelzi and Becks.

163.    When Hassel submitted this second fax transmission to Attorney Foistner, he again allegedly committed the felony crimes of Criminal Solicitation, IRS Tax Fraud, Criminal Conspiracy to provide false information to the IRS.

164.    On or about August 1, 2005, Hassel and Shelzi prepared a letter to CPA Becks in which Shelzi, attempting to defraud the IRS by providing the IRS with false and fraudulent information, attempting to evade or defeat her owed taxes, attempting to file fraudulent returns, statements, or other documents, furthering the alleged criminal conspiracy with Hassel and Becks, and others to allegedly defraud the United States of America.  Shelzi made the following untrue statements:

> "In July 2001 I was approached by Attorney Foistner to discuss my participation in the purchase of the development … I spent most of the following 10 days on due diligence …. Overall I would conservatively estimate my time spent in 2001 on Seff Enterprise business to be well in excess of 200 hours.  Sincerely yours,  Antonia Shelzi".

165.    Shelzi never joined the LLC until December 2002, she performed her due diligence from October 2002 through December 2002 and never performed any work on behalf of the LLC.  Shelzi's written statements and misrepresentations are a testament of her felonious character and clearly demonstrate her criminal intent to defraud the IRS and others.

166.     During Hassel's August 8, 2005 telephone call to the Foistner Law Offices, his second attempt to criminally solicit J. Foistner's participation in the IRS Tax Fraud, Hassel explained that he was forwarding the August 01, 2005 Shelzi letter to CPA Becks, which he had prepared for Shelzi.

167.     Instead of helping Hassel and Shelzi commit this IRS Tax Fraud, refusing to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS Auditor, J. Foistner reported all of these crimes to Agent Quang.  Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi Tax Fraud.

168.     J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.  Butler Bank received written notices of these alleged crimes along with copes all evidentiary exhibits, the FBI Complaint, the forged checks, the IRS meeting logs and the original the LLC tax returns, as well as the amended the LLC, tax returns, tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.  These tax returns depict Shelzi as being ousted from the LLC, because of her status as a Convicted Felon. Butler was kept informed by J. Foistner and his lawyers, in writing, at all times.  Butler Bank was given every opportunity to renounce its involvement in the alleged conspiracy but refused to do so.

169.     Upon information and belief, Attorney Laboe and Orr & Reno had full knowledge of Shelzi's unlawful activities, forgeries and larcenies pertaining to the IRS Tax Fraud and the stolen Butler Bank checks as evidenced by the many written letters submitted by Attorney Laboe

to Hassel in an attempt to coerce J. Foistner not to comply with the IRS audit and further attempting to cover up the stolen and forged checks.

170.   On or about September 26, 2005, Shelzi's lawyer, Attorney Laboe, attempted to coerce J. Foistner, not to cooperate, with the IRS Audit in writing, in a letter to Attorney Hollis. He wrote, **"Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001. Mr. Foistner has characterized these schedules as 'fraud'."**

171.   Attorney Laboe wrote in his September 26, 2005, letter to Hollis, page 2:

> "However, unilaterally expanding the scope of the current IRS audit outside tax year 2001, could potentially expand liability for Seff, as well as Mr. Foistner and Ms. Shelzi. Therefore, we ask that you caution Mr. Foistner from taking such action. Granted, if the IRS requests the information, Mr. Foistner has no other choice but full disclosure. However, it is in nobody's best interest to bog this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions described above and below certainly interfered in the company's participation in the audit in the opinion of the Plaintiff. Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities." Upon information and belief, Attorney Laboe cautioned Mr. Foistner not to cooperate with the IRS.

172.   Upon information and belief, Attorney Laboe assisted Shelzi by filing a frivolous law suit against the LLC, his First Petition, asking the State Court to remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit.   This first Petition, falsely claimed:

1.  That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2.  That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3.  That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4.  To have all of the LLC's checking accounts attached.

173.     Prior to filing this frivolous law suit, allegedly abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis Law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

174.     This solution would not work for Shelzi since she needed to remove all accounting records and evidence of the Shelzi IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to stop Foistner from providing this evidence to Auditor Quang.

175.     In fact, Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  This conduct was perfectly timed to interfere with the IRS Audit.

176.     J. Foistner completed the IRS audit with Agent Quang successfully. Agent Quang and J. Foistner agreed to amend all of the LLC's Federal Tax Returns for calendar years 2001, 2002, 2003, 2004 and 2005, effectively reducing all deduction to Zero for those tax years, by moving millions of dollars into the LLC's "Inventory Account", thereby capitalizing all expenses.

177.    This was requested by the IRS in writing and J. Foistner complied, amending all tax returns as requested.  This however caused Shelzi millions of dollars in additional income taxes for those tax years, effectively removing all of the losses that she and Becks had improperly written off.

178.    After amending the tax returns, J. Foistner, as sole manager of the company and then, as 100% owner / member as defined by Seff's Operating Agreement, ousted Shelzi as a member, effective February 14, 2006, from the company, citing the many alleged Felony Crimes she, Butler Bank and their accomplices had committed.

179.    After Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, then the LLC's attorney, her alleged criminal conduct increased.  It was not enough for Shelzi and her representatives to allegedly criminally interfere with the administration of Internal Revenue Laws, the IRS audit, by removing the accounting records from J. Foistner, during the audit, they also stole, removed and converted Seff's only Notebook Computer, maintaining and storing the only copy of the LLC's accounting data, tax data and company data.

180.    This computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2008.  Additionally, Hassel destroyed and sabotaged Seff's only back-up copy of this data and software, housed on Foistner Law Offices, new server.  This server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only backup electronic data.  These alleged acts constituted crimes of Larceny, Criminal Mischief and other crimes as defined in New Hampshire and Massachusetts.  Hassel transported the computer, data and software, without authority, across interstate lines and used the mail and wire to perpetrate the alleged crimes.

181.    On or about March 2009, Attorney Laboe, now Hassel's new Lawyer's, having full knowledge that a law suit had been filed in Massachusetts, by the LLC, against Hassel, his client, complaining of the computer and data theft by Hassel, and, that Hassel had admitted having possession of the computer and the LLC's data since 2004, filed a Motion for Spoliation against the LLC, claiming that the LLC had destroyed computer data, when in fact, it was his very own clients, Hassel and Shelzi, that committed the spoliation, in order for the IRS <u>not to</u> receive any amended tax returns.

182.    When Shelzi realized that her tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, that Attorney Laboe's and Shelzi's attempts to stop Foistner from meeting with IRS had failed, Shelzi allegedly initiated Phase II, of their criminal conspiracy to defraud the IRS.

183.    Attorney Laboe, representing Shelzi in retaliation, on February 15, 2006 and February 22, 2006, respectively, while Shelzi was no longer a member / owner of Seff, LLC filed a Petition to have Foistner, by then the 100% owner / member removed as manager. This was designed to interfere with the IRS Audit and the successful amendment of the tax returns.

184.    Upon completion of the IRS audit, an audit performed without accounting records since Shelzi had the LLC's accounting records removed from the company by Court Order, in an attempt to interfere with the audit, J. Foistner provided notice, as sole manager of the LLC, to Shelzi and Attorney Laboe that J. Foistner, had reached an agreement with the IRS, to amend the 2001 2002, 2003, 2004, and 2005 tax returns, as suggested by the IRS, to ZERO. Foistner, in fact, amended the returns within a few days after the audit and forwarded same to Shelzi, Attorney Laboe and Butler Bank.

41

185.   After Foistner reported Shelzi's and Attorney Laboe's alleged tax fraud to the Auditor and the IRS Criminal Investigation Division, and provided Shelzi and Attorney Laboe with the notices of his actions taken in regard to the IRS Settlement, Attorney Laboe and Shelzi realized that by capitalizing close to $6-million worth of expenses that Shelzi had planned to write off, or in fact, already had partially written off, his client, Shelzi would now owe millions more on owed taxes and penalties. Attorney Laboe filed another Petition to remove J. Foistner, as a Manager, by allegedly making misrepresentations and false statements to the Court in an attempt to mislead the Court that Foistner was acting unlawfully as manager of the LLC.

186.   Attorney Laboe and Shelzi also asked the Court to remove J. Foistner as the "Tax Matter Person" for LLC.  This, an impossibility, because Foistner, remained the only owner, of the company.

187.   Upon information and belief, Attorney Laboe, at all times, was J. Foistner's and the LLC's attorney, under a duty to keep his client's information confidential.  Instead, Attorney Laboe zealously advocated his client's (Shelzi's) position contrary to the best interest of his former clients.

188.   The acts of Shelzi were designed to interfere with the IRS Audit by intentionally misrepresenting facts and withholding information, intending to further her cause in allegedly defrauding the IRS out of millions of dollars.

189.   Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

190.   On or about June 2006 Shelzi called Robert Baskerville, the Projects Engineer and Oberhauser, the LLC's attorney. Baskerville's sworn statement and signed affidavit states

that Shelzi had asked him, if he would be willing to help her bankrupt the LLC and the project. Oberhauser contacted J. Foistner, warning him of Shelzi's alleged criminal motives, to bankrupt her very own company, the LLC.

191.    The LLC has attempted to litigate these claims in the State Court against Shelzi and others for more than 49 months, realizing more than $16.5-million in damages.

192.    On or about January 2007,   The LLC hired a Forensic CPA, Mr. Antony Albright and required that Mr. Albright generate a new set of accounting records, for tax years 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 in preparation for the civil trial against Shelzi and others.  Albright was asked to re-enter all accounting and bookkeeping data, from the LLC's original documents into his CPA Firm accounting computers, in order to present accurate and complete accounting information and tax information for the Court.

193.    On or about March 27, 2007, CPA Albright stated in his sworn statement and Affidavit to the Court:

> *" I understand that aspects of this litigation pertain to various loans and/or capital contribution of Laurie Foistner, as member. My analysis to date indicates that Ms. Foistner's loan and or capital funding (exclusive of original capitalization) has exceeded all loan repayments and/or capital withdrawals since inception".*

What Albright was stating, simply said, was that L. Foistner had never withdrawn more money from the Company, at any time, than what she had deposited into the company as loans, the original $1.3-million capitalization excluded. L. Foistner was at all times entitled to remove another $1.3-million, at her discretion, before she would have overdrawn her account and actually taken money from the LLC.  Shelzi knew this.

194.    Instead of promoting his client's best interest and aiding his clients well being, Attorney Laboe claimed to the State Court that Foistner had removed money from the company

without Shelzi's authorization – asserting that the Foistner's were embezzling money from their

very own Company, which owed them several million dollars. This representation was not true.

195.    By 2009, the time of this bankruptcy filing, the Foistners had contributed more

than $3-million, to pay for the operations of the LLC, abandoned by Shelzi in 2003. After Shelzi

was ousted from the LLC, in 2006, the Foistners paid for the construction and completion of the

3,000 ft. long road, installed final pavement and completed all contractual subdivision condition

set forth by the Town of New Boston.

196.    The Town accepted the road in October 2008, after the Foistners provided all road

maintenance and snow removal from 2003 through 2008. Shelzi never allocated a single hour to

the LLC's Waldorf Project or the RICO Claim, the only reasons for the LLC's existence.

197.    Shelzi accomplished her original promise made by CPA / Attorney Di Iulio, to

sue for an accounting, while she was under an obligation to perform and pay for the accounting,

while Shelzi, at all times was in possession of all the accounting records. Shelzi, by her conduct

and the use of the Court, finally bankrupted the LLC, causing more than $16.5-mllion in

damages, excluding the loss of the future construction of the remaining 18 homes, estimated cost

to construct $36.8-million.

198.    In summary, Shelzi's, Hassel's, Chapman's and the Butler Bank's planned and

executed alleged criminal conduct began on or about July 2005. These alleged co-conspirators,

were aided and abetted by the Butler Bank. This harmed the LLC financially, (1) by interfering

with the contractual relations of the Waldorf project, the Creditors and its Financiers; (2) by

intentionally destroying a valid RICO Case and the millions of dollars in costs associated with

this claim; (3) by interfering with the business activities, sales, construction of homes, delaying

the project from 2002 through 2009 and finally bankrupting the project in 2009; (4) by forging

44

endorsement on $100-thousand dollar bank drafts and converting same, transporting these stolen goods over interstate lines; (5) by intentionally implicating and attempting to criminally solicit the LLC, its agents, employees, members and manager, to help commit criminal IRS Tax Fraud, to falsify IRS Tax Forms and to provide false information during an IRS Audit; (6) interfering with the administration of an IRS Audit, by removing accounting records and destroying computer servers, in order to further the alleged criminal conspiracy to defraud the IRS, at all times attempting to aid and abet Shelzi in evading her payment of owed income taxes; (7) transporting stolen computers over interstate lines, affecting Interstate Commerce; (8) committing the crime of Identity Theft by opening up a false checking account in Massachusetts and then converting the stolen funds; (9) committing the crime of Larceny, Attempted Larceny, Theft by Deception, Criminal Mischief and other criminal conduct; (10) abusing the legal system, bringing frivolous claims, misrepresenting the truth to a tribunal, and allegedly committing many counts of material, felony perjury, using the legal system to further their criminal enterprise; and, (11) at all times using telephone lines and the US Mail to conduct their criminal acts, committing Mail and Wire Fraud.

199.    Shelzi, through her lawyer, did intentionally prepare and file more than forty (40) separate motions and legal action, at all times intending to bankrupt the LLC, causing the LLC millions of dollars in damages.

200.    The Defendants, by their conduct, intentionally bankrupted the LLC by appropriating and wasting the LLC property, at all times affecting commerce, by alleged larceny, extortion, attempts to conspire to perform larceny and extortion, through intimidation and coercion, placing immediate fear of injury to the LLC's property and well-being, including the taking of the LLC's property without its consent, as defined in 18 U.S.C. § 1951.

201.    On or about February 19, 2008, the LLC filed a civil action, in the Hillsborough County Superior Court, Docket No.08-C-83, against their Lawyers Orr & Reno, P.A. and Attorney James Laboe for allegedly violating the Plaintiff's confidential information, breaching their fiduciary duties, violating the Attorney Client Rules of Professional Conduct.

202.    Orr & Reno's conduct was also reported to the FBI, the New Hampshire Attorney General's Office, the United States Attorney, District of New Hampshire and other law enforcement agencies.

203.    Butler Bank's alleged criminal conduct, criminal and civil conspiracies in aiding and abetting Shelzi was reported to the FBI, the IRS, the FDIC, the New Hampshire Banking Commissioner, the Massachusetts Banking Commissioner, the New Hampshire and Massachusetts Attorney Generals, the United States Attorneys for New Hampshire and Massachusetts and other law enforcement agencies.

204.    In 2008, the LLC, through their attorneys, filed a Writ of Certiorari to the New Hampshire Supreme Court, accompanied by their Expert's Opinion, regarding the alleged unethical conduct of Orr & Reno, P.A. The New Hampshire Supreme Court refused to hear the Writ.

205.    On or about August 2007, the LLC filed a civil suit against Hans Hassel, for the theft and conversion of the Computer System, its operating software, its accounting software and its accounting and financial data, in the Commonwealth of Massachusetts, Middlesex Superior Court, Docket No. 2007-01627-C. Hassel intentionally converted this computer that contained the LLC's only electronic accounting data, in order to interfere, hinder and delay the ongoing IRS audit, attempting to destroy the evidence contained in the computer from reaching the IRS auditor and the IRS Criminal Investigation Division. The LLC has substantial and compelling

evidence, to show that Hassel also physically destroyed the LLC computer server, maintaining the only backup electronic copy of the accounting data, in 2006, believing that the LLC could not provide any evidence concerning the Defendants ongoing alleged IRS tax fraud and falsification of tax forms to the IRS.

206.    The Defendants allegedly coerced and abused the legal system by filing frivolous claims, committing countless acts of Perjury and provided false information to a Tribunal. Defendants violated and conspired to violate the LLC's rights to free association, to petition government, procedural due process and equal protection of the laws under the United States Constitution and have engaged in seeking selective enforcement of the law, to serve their criminal enterprise.

## A RICO CLAIM'S 18 U.S.C. § 96, et seq
## COUNT ONE: RACKETEERING

207.    The Plaintiffs re-allege paragraphs 1-206 as though restated in full herein and not inconsistent herein.

208.    At all times, the Butler Bank and the Individual Defendants constituted an "enterprise," within the meaning of U.S.C. §§ 1961(4) and 1962(c), as a body corporate pursuant to RSA 31:1.

209.    Defendants were individual "persons" within the meaning of U.S.C. §§ 1961(3) and 1962 (c), who associated with and/or participated in the conduct of the enterprise's affairs.

210.    Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted, the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

211.    Defendants conspired with each other to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering

47

activity in violation of 18 U.S.C. § 1962(d). Each intended to further an endeavor of Shelzi and Hassel, which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and adopted the goal of furthering or facilitating the criminal endeavor.

212.    Defendants carried out a scheme to defraud the Plaintiffs that was knowingly and intentionally devised and carried out in concert to financially damage the Plaintiffs for their own economic gain and to deprive the Plaintiffs of the intangible right of honest services under 18 USC § 1346 by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

213.    Defendants placed, or foreseeably caused to be placed in a post office or authorized depository for mail, matter that furthered the scheme to defraud thereby committed mail fraud, in violation of 18 U.S.C § 1341, and by use of the wire in violation of 18 U.S.C § 1343.

2 14.    These alleged acts all occurred after the effective date of the enactment of the RICO statute and more than two such acts occurred within ten years of one another. At all relevant times, the enterprise engaged in, and its activities affected interstate commerce and foreign commerce.

215.    All of the predicate acts described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to extort and defraud the Plaintiffs; their common result was to extort and deprive the Plaintiffs of civil rights, money and the intangible right of honest services under 18 USC § 1346.

216.    Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth, each personally or through their agents or servants, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission.

217.    The Plaintiffs were the victims of the acts of racketeering and the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

218.    All of the predicate acts described were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts over a substantial period of time.

219.    The patterns of racketeering activity engaged in by Defendants continues, because such conduct has become a regular way of conducting on-going business activities.

220.    As a direct and proximate result of, and by reason of, the activities of the Defendants and their conduct in violation of 18 U.S.C. §§ 1962(c) and 18 U.S.C. § 1964(c), LLC have been injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). The Defendants appropriated from the Plaintiffs of their property, affecting commerce, by larceny, forgery and extortion, and attempts to conspire to commit larceny, extortion and other crimes through immediate fear of injury to the Plaintiff's property and well being, including the taking of the Plaintiff's property without its consents as defined in 18 U.S.C. § 1951.

221.    Among other things, the Plaintiffs have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages and physical harm to their persons,

property and reputation, intentionally caused by the Defendant's alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present.  The alleged fraud, crimes, conspiracies, thefts and wrongful acts committed by the Defendants, harming the LLC detailed herein entitles the LLC to recover threefold the damages they have sustained together with the cost of the suit, including reasonable attorneys' and experts' fees.

## COUNT TWO
## RICO - AIDING AND ABETTING

222.    The Plaintiffs re-allege paragraphs 1-221 as though restated in full herein and not inconsistent herein.

223.    In the alternative and without waiving the forgoing, Defendants aided and abetted one another in carrying out their alleged schemes to defraud through criminal conduct.  As set forth herein, Defendants engaged in various schemes to defraud LLC as defined and set forth in 18 U.S.C. § 1341: 18 U.S.C. § 1344; and 18 U.S.C. § 1962(c).

224.    Defendants knew that Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth were engaged in various schemes to defraud and harm the Plaintiffs. The Defendants received written notices from the LLC attorneys informing them of the alleged crimes, said crimes are individually and separately alleged herein.

225.    Defendants engaged in actions that were intended to and, in fact, did facilitate and advance Antonia Shelzi's and Hans Hassel's schemes to defraud and harm the Plaintiffs.

226.    As a direct and proximate result of Defendants' aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth to defraud the Plaintiffs.  The Plaintiffs have incurred and/or will incur loss and damages in excess of the minimal jurisdictional limits of the Court.

227. Defendants conduct by aiding and abetting of Antonia Shelzi, Hans Hassel, Butler Bank, Robert Chapman and Dona Hauswirth's alleged schemes to defraud and harm the Plaintiffs was committed with fraud, and/or actual malice, and/or deliberate acts, and/or oppression, and/or willfulness, and/or such gross negligence as to indicate a wanton disregard for the rights of the Plaintiffs. As a result, the Plaintiffs are entitled to an award of punitive damages against the Defendants.

## COUNT THREE
## CONSPIRACY TO COMMIT BANK FRAUD AND OTHER CRIMES

228. The Plaintiffs re-allege paragraphs 1-227 as though restated in full herein and not inconsistent herein.

229. In the alternative and without waiving the forgoing, Defendants allegedly committed fraud in making false statements of material fact and engaging in fraudulent acts that they knew were false at the time they made them, which statements and acts were intended to be relied upon by the Plaintiffs. The Plaintiffs reasonably relied upon them to their detriment.

230. These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages including the cost of the delay in the approval, completion and sale of their Waldorf Estates land and homes, from 2002 through present (2009). The Plaintiff's have suffered damages by the Defendant's intentional destruction and interference of the Town of New Boston RICO suit, dismissed by the LLC in 2005. The Plaintiffs have suffered monetary damages to their property and reputation, intentionally caused by the Defendants' alleged "felony crime spree", planned, conspired, executed and completed by these alleged Racketeers, from 2003 through present, (2009). The alleged fraud, crimes, conspiracies, thefts and wrongful

51

acts, individually and collectively identified and alleged herein committed by the Defendants

harming the Plaintiffs caused the LLC to file for Chapter 7 Bankruptcy protection.

231.    This fraud was adopted, aided, abetted, furthered and approved by the Butler

Bank.

<div align="center">

**COUNT FOUR**
**BANK FRAUD AND FELONY FORGERY**
**THE FIRST $100-THOUSAND CHECK FORGED BY THE DEFENDANTS**

</div>

232.    The Plaintiffs re-allege paragraphs 1-231 as though restated in full herein and not

inconsistent herein.

233.    On or about October 2005, Shelzi admitted to Attorney Foistner, Attorney Hollis

and Attorney Prive, after she was caught, in the actual commission of these alleged crimes, that

she alone, traveled to the Butler Bank, in Lowell, Massachusetts to pick up the $100-thousand

and Butler Bank construction loan check, No. 7148.  Shelzi admitted that after she gained

possession of the checks, without the Plaintiffs consent and/or knowledge, she and her employee

Hans Hassel, being the only persons in possession of the check, she, Shelzi, endorsed the check

with her signature and attempted to negotiate it knowing that one of the signatures was a forgery.

234.    Shelzi further admitted that she endorsed the check over to her Brother, Attorney

Domenic Shelzi, who deposited this forged instrument into his Citizens Bank checking account

in Rhode Island.

235.    Check No. 7148, depicts the LLC forged signatures "LORI FOISTNER" and

"The LLC" above Shelzi's endorsements.  These forged endorsements could only have been

affixed onto the paper draft by Shelzi and/or her agent and employee, Hans Hassel. Hassel had,

in the past, written the name Laurie, as "LORI", on his written communications, given to the

LLC.

<div align="center">

52

</div>

236.   When Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005, received the check from Butler Bank's, Robert Chapman, without the LLC – Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC', two (2) endorsements on the back of the check, the Defendants allegedly committed two (2) separate and distinct counts of Felony Forgery, as defined within the meaning of "Forgery" in 18 U.S.C. § 513 and State Law, Securities of the States and Private Entities and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

237.   The only individuals to possess the loan disbursement check, as admitted by Shelzi, were Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi. Upon information and belief, no other person could have forged the signatures other than Robert Chapman, Antonia Shelzi, Hassel and Attorney Domenic Shelzi.

238.   The LLC and Guarantor Laurie Foistner, the named Payees on this Butler Bank Draft, the business entity and individuals, the victims of the alleged crimes, became aware of their damages, only after this $100-thousand check was returned, stamped and marked "MISSING ENDORSEMENT".

239.   The LLC reported this alleged crime to the FBI in 2006, assuming that a Citizens Bank employee stopped the clearing of this forged instrument, since the check was marked as deposited, by Attorney Shelzi, into his "Riverside, Rhode Island" Citizens Bank account.

240.   Riverside, Rhode Island is the primary check clearing facility for all checks deposited into Citizens Bank. On or about September 2008, approximately thirty six (36) months after the LLC discovered that the Defendants had forged the endorsement on this check and allegedly committed the felony crime of Larceny, reduced to the felony crime of Attempted Larceny, since the check was stopped from clearing, Robert Chapman claimed to Attorney

Foistner that it was he, Chapman, not the Citizens Bank that marked and stamped the check "MISSING ENDORSEMENT".

241.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests.  Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to conduct their Racketeering activities.

242.    Butler Bank sanctioned and facilitated the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

243.    Butler Bank intentionally and knowingly helped the furtherance of these alleged, unlawful acts which destroyed the LLC business and caused the LLC's bankruptcy.

## COUNT FIVE
## BANK FRAUD AND ATTEMPTED LARCENY
## THE FIRST $100-THOUSAND CHECK ATTEMPTED TO BE CONVERTED BY THE DEFENDANTS

244.    The Plaintiffs re-allege paragraphs 1-243 as though restated in full herein and not inconsistent herein.

245.    Shelzi and Hassel traveled to the Butler Bank in Lowell, Massachusetts in 2005 and received the check from Butler Bank's employee, Robert Chapman, without the LLC, Borrowers and Guarantors approval and/or knowledge, then, unlawfully forged the LLC two (2) endorsements on the back of the check, then endorsed the check and deposited the check, across interstate lines.  The Defendants committed Felony Attempted Larceny, attempting to convert the money, transporting a negotiable instrument across State Lines, thereby affecting Interstate Commerce, as defined within the meaning of "Stolen Goods" in 18 U.S.C. § 2314,

Transportation of Stolen Goods, Securities and Money and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

246.    Butler Bank and Chapman knew of these alleged crimes as early as September 2005 and did absolutely nothing to protect their Borrowers interests or report the alleged crimes to Law Enforcement.  Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

247.    Butler Bank approved the Defendants actions, aided and abetted the Defendants, and  received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

### COUNT SIX
### BANK FRAUD AND LARCENY
### THE SECOND $100-THOUSAND CHECK AND THIRD $65-THOUSAND CHECK
### CONVERTED BY THE DEFENDANTS

248.    The Plaintiffs re-allege paragraphs 1-247 as though restated in full herein and not inconsistent herein.

249.    On or about September 12, 2005, the Butler Bank, directly contravening the instructions they had previously received from the LLC, issued check no. 7324, in the amount of $100,000, at the direction of Shelzi.  Upon information and belief, Shelzi approached her good friend, Chapman, and told him because of the dispute between the LLC and herself, she needed these funds released by her authorization (as she was still trying to pay her brother this money when the LLC had informed her that engineering costs would be paid from these proceeds, not her brother).  The Butler Bank delivered this check, without the approval, knowledge, or consent of the LLC to Attorney Hollis.

250.    Despite the fact that the conditions set forth in the commercial loan <u>had not</u> been satisfied, Chapman, released the proceeds that were to be held back to pay for engineering costs. The check was delivered to Shelzi's brother, Domenic Shelzi, and the funds were used not for their intended purpose to pay engineering expenses.

251.    The Butler Bank aided and abetted in Shelzi's brother being paid and further damaged the Plaintiffs.  Specifically, in light of the fact that the engineering firm, by virtue of not receiving the $100,000 promised to it, now had lien rights against the LLC– the creation of which is directly attributable to the Butler Bank.

252.    The Defendant's used undue influence to force the LLC, under threat of causing a lawsuit and the calling the loan, to endorse this second $100-thousand check and forwarding it to Attorney Shelzi.

253.    As stated in herein, Shelzi had received a $990,000 loan to construct an "Owner Occupied" home on Lot 8-84-44 in Phase III of the Waldorf Estates subdivision.  The Butler Bank had gone through great lengths to qualify NBE, LLC as the builder of this home (a process that involved several months and substantial communication between the Butler Bank and NBE, LLC). At the time, NBE, LLC was solely owned and managed by Joseph Foistner.

254.    In September 2005, NBE, LLC submitted an invoice in the amount of $65,000 directly to the Butler Bank for work done in the construction of Shelzi's house on lot 8-84-44. The invoice was properly created and was accompanied by all necessary supporting documentation.

255.    The invoice was for surveying services provided by several contractors and a reimbursement of costs incurred in obtaining municipal permits, building plans, and other

necessary approvals (i.e. NH Public Utilities Commission energy rating approval).

Subsequently, the Butler Bank issued a check payable to NBE, LLC and Shelzi.

256.     At the time that the Butler Bank issued the $65,000 check, the LLC had learned of

Shelzi's forgery of the $100,000 check on the LLC' bank account and other criminal acts being

committed by Shelzi and Chapman.

257.     Consequently, the LLC refused to endorse the $65,000 check on behalf of NBE,

LLC, until Shelzi provided assurances that all criminal acts she had committed would be

rectified and she would insure that the Plaintiffs were restored to the position they were in prior

to when the Defendants committed these acts..

258.     NBE, LLC and Shelzi were at an impasse.  Shelzi was in possession of the

$65,000 check and was demanding that NBE, LLC endorse it so that she could use it to pay other

expenses she had on other housing projects she owned.  NBE, LLC, was refusing to endorse the

check and demanding that Shelzi endorse it and give it to NBE, LLC, so that NBE, LLC could

pay the construction expenses – the legitimate basis for which the check was issued.

259.     Upon information and belief, Shelzi, realizing that NBE, LLC would not endorse

the check and allow her to retain the funds, contacted her close friend Chapman to do her another

act of misconduct.  Shelzi returned the original check to Chapman, which was promptly voided,

and had a new check, in the same amount reissued to WEB, LLC.

260.     Upon information and belief, Shelzi insisted that she was the owner of WEB,

LLC, despite the fact that this company was also solely owned and managed by Joseph Foistner.

Chapman knew or should have known that Shelzi was not the owner of WEB, LLC.

261.     Chapman had absolutely no authority or legitimate reason to issue the new

$65,000 check payable to WEB, LLC.  WEB, LLC was not the qualified builder on lot 8-84-44;

WEB, LLC was not the builder of record in the loan documents; and WEB, LLC was not owed the $65,000 – as they did not perform any services on the lot or submit any invoices to the Butler Bank. Chapman's only reason for issuing the check to WEB, LLC was because he wanted to aid and abet Shelzi's misconduct of intentionally conspiring to defraud NBE, LLC.

262.    The only reason Chapman issued the check to WEB, LLC was to assist Shelzi in diverting $65,000 from NBE, LLC and defraud this company. Chapman's and Shelzi's alleged actions constitute additional counts of felony larceny as defined by 18 U.S.C. § 2314, Transportation of Stolen Goods, Felony Forgery as defined by 18 U.S.C. § 513, Securities of the State and Private Entities, Bank Fraud as defined by 18 U.S.C. § 1028, Forging Corporate Records, and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

263.    No other person had possession of the forged construction loan disbursement check, as admitted by Shelzi, except for Robert Chapman, Antonia Shelzi, and Hans Hassel. No other person could have committed the forgery crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

264.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Instead of reporting these crimes to the LLC and/or law enforcement, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to complete their alleged Racketeering activities.

265.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect, a higher monthly interest rate from the LLC.

266. Butler bank did benefit from these alleged crimes as they remained silent. Butler Bank also intentionally and knowingly aided and abetted these unlawful acts which destroyed the LLC business and caused the LLC bankruptcy and harmed L. Foistner.

## COUNT SEVEN
## BANK FRAUD IDENTITY THEFT OPENING UP FALSE CHECKING ACCOUNT BY THE DEFENDANTS

267. The Plaintiffs re-allege paragraphs 1-266 as though restated in full herein and not inconsistent herein.

268. These and other fraudulent acts caused in fact and proximately caused LLC to suffer monetary damages.

269. Shelzi took the $65,000 check to a Citizens Bank branch where she fraudulently opened a business checking account for WEB, LLC (using falsified business records). Shelzi then cashed the new $65,000 check and converted the funds for her own personal use. Chapman provided substantial assistance in aide to this alleged criminal conduct.

270. When the Defendants opened a business checking account at the Citizens Bank, without authority and through fraud and deceit, all Defendants committed the felony crimes of Aggravated Identity Theft as defined by 18 U.S.C. § 1028 and § 1028 A, Forging Corporate Records, Aggravated Identity Theft and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

271. The Defendants forged Federal Forms, corporate votes and other bank forms and falsely represented themselves as Owner / Members or Managers of WEB, LLC, in order to open up their fraudulent checking account.

272. No one possessed these forged documents, the forged check, the forged corporate votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank

personnel of Butler Bank. Upon information and belief, no other person could have committed these alleged crimes other than Robert Chapman, Antonia Shelzi, and Hans Hassel.

273.    In 2006, the LLC reported these alleged crimes to the FBI and law enforcement.

274.    The Butler Bank and Chapman acquired knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Instead of informing the LLC and/or law enforcement of these alleged crimes, Butler's President Pearson, and Robert Chapman intentionally remained silent, allowing Shelzi and Hassel to accomplish their alleged Racketeering activities.

275.    Butler Bank approved the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

<div align="center">

**COUNT EIGHT**
**BANK FRAUD AND FORGERY OF CORPORATE RECORDS**
**FORGING FEDERAL BANK FORMS AND CORPORATE FORMS TO OPEN**
**FRAUDULENT CHECKING ACCOUNT BY THE DEFENDANTS**

</div>

276.    The Plaintiffs re-allege paragraphs 1-275 as though restated in full herein and not inconsistent herein.

277.    When the Defendants opened a business checking account at the Citizens Bank, without authority and through fraud and deceit, all Defendants committed the felony crimes of Fraud and Forgery of Corporate Records as defined by 18 U.S.C. § 1028 and § 1028A, Forging Corporate Records and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State Crimes.

278.    The Defendants forged Federal forms, corporate votes and other bank forms and falsely represented themselves as owner / members or managers of WEB LLC, in order to open up the checking account.

279.     No one had possession of these falsified documents, the forger check, the forged corporate votes, the forged bank forms, except for Robert Chapman, Antonia Shelzi, Hans Hassel and bank personnel of the Butler Bank.

280.     Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

<div align="center">

**COUNT NINE**
**BANK FRAUD ,STOLEN GOODS TRANSPORTATION OF STOLEN GOODS**
**SECURITIES AND MONEY – THE FORGED CHECKS AND MONEY**

</div>

281.     The Plaintiffs re-allege paragraphs 1-280 as though restated in full herein and not inconsistent herein.

282.     In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material facts and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by LLC and reasonably relied upon by the LLC to their detriment.

283.     These and other fraudulent acts caused in fact and proximately caused the Plaintiffs to suffer monetary damages.

284.     When the Defendants caused Check No. 7148, Check No. 7324 and the $65,000 check, Check No. "unknown" to be deposited into the United States Mail System and employed other modes of transportation to move the stolen funds and negotiable instruments from Lowell, Massachusetts to Riverside, Rhode Island and Bedford, New Hampshire, they committed the crimes of Transportation of Stolen Goods – Money, as defined in 18 U.S.C. § 2314 and Bank Fraud, 18 U.S.C. § 1344, §1344(2) and other Federal and State defined crimes.  This affected Interstate Commerce.

285.    Butler Bank and Chapman knowingly participated in these alleged crimes by using the mail and wires to transport these stolen funds and negotiable instruments from Massachusetts, thereby aiding and abetting the Defendants as they allegedly criminally conspired with Shelzi and Hassel, as defined in 18 U.S.C. 1349, Attempt and Conspiracy and Bank Fraud, 18 U.S.C. § 1344, §1344(2).

286.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

287.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harmed L. Foistner.

<div align="center">

**COUNT TEN**
**FRAUD AND CRIMINAL SOLICITATION BY THE DEFENDANTS TO COMMIT IRS TAX FRAUD**

</div>

288.    The Plaintiffs re-allege paragraphs 1-287 as though restated in full herein and not inconsistent herein.

289.    As stated herein, Shelzi, her agent CPA Becks, and Hassel contacted the LLC' office in Bedford, New Hampshire by telephone and via Facsimile, asking Attorney Foistner to join their alleged criminal conspiracy and fraudulent efforts to defraud the United States of America, the Internal revenue Service, out of millions of dollars, consisting of owed income taxes, interest and penalties, owed by Shelzi. The alleged premeditated, intentional and unlawful acts of the Defendants, soliciting Foistner's criminal conspiracy to commit offenses against the United States of America, to defraud the United States of America, constitute the crimes of Conspiracy to commit Tax Fraud as defined in 18 U.S.C. § 371.

290.    Shelzi's sole purpose and motive for joining the LLC in 2002, was her need to receive the LLC's "Business Deductions" in order to use the money she owed to the IRS, to purchase her fifty percent Ownership Interest from Maynard. Her written contract, fine tuned into its final version, by her two CPA's, DeJulio and Becks, and her two Lawyers, DeJulio and Oberhauser, signed and executed on or about December 23, 2002, clearly states:

> "AGREEMENT, effective as of the 1st day of January 2001, finalized this date, by and between LOUIS A. MAYNARD (MAYNARD, represented in person and by Counsel, a resident of New Boston, New Hampshire, and ANTONIA SHELZI (SHELZI), represented in person and by Counsel, a resident of Belmont, Massachusetts ...."

291.    When the IRS audited Shelzi in 2005, demanding from Shelzi that she substantiate her "Material Participation" in the business of the LLC, as early as 2001 when, in fact, Shelzi never physically appeared or participated until December 2002 in the LLC's affairs. The Defendants, specifically Shelzi and Hassel, with the support, knowledge and consent of her agent directly, knowingly and with criminal intent, asked Attorney Foistner to help and aid them, to prepare, falsify and substantiate a false and untrue "Meeting Log", for tax year 2001, which was requested by the IRS.

292.    The form that the Defendant's wanted falsified was IRS Form 4564, which Quang Trieu demanded from Shelzi to justify and prove her material participation. The IRS specifically demanded that Shelzi would provide the following information:

"Please provide additional information regarding to Seff Enterprises & Holdings, LLC nonpassive K-1 loss of ($508,143) claimed on your F1040X as follows:

1. Proof of material participation in the Seff Enterprises & Holdings, LLC in a regular, continuous, and substantial manner by Antonia Shelzi under IRC 469 (b)(i) & (5).
2. Complete the attached activities log which complies with your record keeping requirements in Reg. 1.469-5T(f)(4).
3. Provide a copy of your appointment book or calendar for the year 200112 to support the information provided in the activities log .....
4. Did you perform most of the work in Seff Enterprises & Holdings, LLC?

5. Did you work more than 100 hours and no one (including non-owners or employees) works more hours?
6. Did any person receive compensation in connection with managing Seff Enterprises & Holdings, LLC?

If you would like to meet with me to discuss this issue at depth, please give me a call .... "

293.    In fact after Shelzi, her representatives and Hassel's alleged criminal solicitation of Attorney Foistner's participation in these alleged crimes, the Defendants followed up their verbal solicitation in two separate writings. The first, on or about July 21, 2005, at 11:16 AM, Hassel, on behalf of Shelzi and her agent, forwarded a fax transmission from his Avid Management Office (Avid), owned by Shelzi, Fax No. 617-776-5690, pages 1, 2 and 3.  Page 2 of the fax consisted of an IRS Form 4564, setting forth Request No. 2, addressed to Shelzi and CPA Becks, submitted by IRS Auditor Quang Trieu, dated July 15, 2005.

294.    Hassel followed up his fax transmission with a telephone call to J. Foistner, asking him to help him defraud the IRS by falsifying this Activity Log".

295.    On August 8, 2005, Hassel submitted a second fax transmission to Foistner Law Offices writing, "IRS ... Per accountant need to keep log and therefore review copy of log prepared for Toni." Hassel submitted along with his fax document, a two page document depicting a false meeting schedule log that he had prepared for Shelzi.  The document contained a list of falsified meeting dates that were supposed to have taken place between Shelzi and J. Foistner, in 2001.  These documents were created by Hassel and Shelzi in an attempt to defraud the IRS. None of the meetings ever took place.  Prior to submitting this fax transmission from Shelzi's Avid office in Massachusetts, Hassel called J. Foistner, announcing that he was forwarding a fax on behalf Shelzi and her agent.

296.    Instead of helping Hassel and Shelzi commit IRS Tax Fraud, J. Foistner refused to participate in the forgery and falsification of IRS tax forms and further refusing to report false and fraudulent information to the IRS, J. Foistner reported all of these alleged crimes to Agent Quang.

Foistner provided Quang with copies of all the falsified "Activities Logs" the fraudulent letter created by Hassel and Shelzi to Becks, copies of the forged checks along with his sworn statement of Shelzi's alleged Tax Fraud.

297.    J. Foistner immediately forwarded formal written criminal complaints to the IRS Criminal Investigative Division, Ms. Roberta A. Keenan, followed up with written sworn statements and Agent Schneider of the Bedford, New Hampshire FBI.

298.    The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005 and did absolutely nothing to protect their Borrowers and the Creditors' interests. Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

299.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud.

## COUNT ELEVEN
## FRAUD AND ATTEMPTS TO EVADE OR DEFEAT TAXES

300.    The Plaintiffs re-allege paragraphs 1-299 as though restated in full herein and not inconsistent herein.

301.    The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Attempt to Evade or Defeat Taxes, as defined in 26 U.S.C. § 7201.

302.    The Butler Bank and Chapman gained knowledge of these alleged crimes as early as September since Butler received copies of all Federal and State income tax returns, both for the LLC and Shelzi for tax years 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

## COUNT TWELVE
## FRAUD AND MAKING FALSE STATEMENTS

303.    The Plaintiffs re-allege paragraphs 1-302 as though restated in full herein and not inconsistent herein.

304.    The written, falsified, forged and signed documents submitted by the Defendants, specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi, addressed to CPA Becks, demonstrated that these documents were submitted by Hassel from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of Fraud and Making False Statements, as defined in 26 U.S.C. § 7206.

305.    Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud, by being able to charge and collect a higher monthly interest rate from the LLC.

306.    Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner.

## COUNT THIRTEEN
## FRAUD AND FILING FRAUDULENT RETURNS, STATEMENTS AND DOCUMENTS

307.    The Plaintiffs re-allege paragraphs 1-306 as though restated in full herein and not inconsistent herein.

308.    The written, falsified, forged and signed documents submitted by the Defendants specifically the falsified and forged IRS Meeting Log and the written letter signed by Shelzi addressed to CPA Becks, all showing that these documents were submitted by Hassel, from Shelzi's Real Estate Office, depicting Shelzi's Fax Number as the Sender, constitute the fraudulent acts of filing Fraudulent Returns, Statements, Or Other Documents, as defined in 26 U.S.C. § 7207.

309. Butler Bank sanctioned the Defendants actions, aided and abetted the Defendants, and received financial gain from this fraud by being able to charge and collect a higher monthly interest rate from the LLC.

310. Butler Bank knowingly helped commit these unlawful acts which destroyed the LLC business and caused the LLC' bankruptcy and harm to L. Foistner

## COUNT FOURTEEN
## FRAUD COERCION TO INTERFERE WITH ADMINISTATION OF IRS LAWS

311. The Plaintiffs re-allege paragraphs 1-310 as though restated in full herein and not inconsistent herein.

312. In order to interfere in the IRS Audit and to interfere in the Administration of Internal Revenue Laws, the Defendants, with the help of her agent, attempted to coerce Attorney Foistner, not to cooperate with IRS Auditor. Attorney Laboe wrote to Attorney Morgan Hollis on or about September 26, 2005:

> "Mr. Foistner intends to provide meeting schedules allegedly prepared by Mr. Hassel that reflect meetings between Ms. Shelzi and Mr. Foistner in 2001. Mr. Foistner has characterized these schedules as 'fraud'."

> "However, unilaterally expanding the scope of the current IRS audit outside tax year 2001, could potentially expand liability for Seff, as well as Mr. Foistner and Ms. Shelzi. Therefore, we ask that you caution Mr. Foistner from taking such action. Granted, if the IRS requests the information, Mr. Foistner has no other choice but full disclosure. However, it is in nobody's best interest to bog this project down in further debt and liability if it can be avoided."

Attorney Laboe's actions as set forth herein interfered in the LLC participation in the audit. Not giving the IRS the falsified meeting schedules had nothing to do, or had no impact, on the "project being bogged down, or establishing further debt or liabilities." Attorney Laboe intimated that Mr. Foistner should not cooperate with the IRS.

313.   Attorney Laboe's did create, publish and file a frivolous law suit against the LLC requesting that the State Court remove all accounting records, cancelled checks and bank statements from J. Foistner, in order to materially interfere with the ongoing IRS audit.  This first Petition, falsely claimed:

1. That Shelzi was not allowed by Foistner to review the accounting records, at all times in her possession, located in her office;

2. That perhaps no accounting records existed, even though CPA Becks had received all accounting records in order to amend Shelzi's tax returns;

3. That for those reasons they, Shelzi and Attorney Laboe, wanted to attach their own project, the Waldorf Project; and,

4. To have all of the LLC's checking accounts attached.

314.   Prior to filing this frivolous law suit and abusing the legal system and damaging his former client, the LLC, Attorney Laboe received written notice from Hollis that all accounting records were located at the Hollis law Offices and that Shelzi, Attorney Laboe or any of Shelzi's accountants could review and copy all records by providing only a 24 hour notice to Hollis.

315.   This procedure would not permit Shelzi to remove all accounting records and evidence of Shelzi's alleged IRS Fraud, her falsified tax forms and Activity Logs from J. Foistner's possession, in order to prevent Foistner from providing this evidence to Auditor Quang.

316.   Shelzi was instrumental in removing all accounting records from the Company's possession for three months.  All this, perfectly timed to interfere in the IRS Audit.

317.   Shelzi sued her own company, the LLC, by only requesting an Accounting that she had received years earlier, allowing her to write off the LLC' business losses.  Her request for an accounting was motivated by her desire to interfere in the IRS Audit and to remove all evidence of her alleged criminal activities from the purview of the IRS.

318.   The Defendants intentional unlawful acts by writing letters attempting to coerce the LLC not cooperating with the IRS, abusing the legal system by filing a frivolous Petition, in order to remove accounting records and evidence, during an IRS audit, in order to hide incriminating evidence, and finally, the physical destruction of the only Computer System used by the LLC, containing LLC only electronic copy of the accounting data, clearly met the requisite elements of the crime of Attempts To Interfere With the Administration of Internal Revenue Laws, 26 U.S.C. § 7212.

319.   The Butler Bank and Chapman gained knowledge of these crimes as early as September 2005.

## COUNT FIFTEEN
## STOLEN GOODS TRANSPORTATION OF STOLEN GOODS – COMPUTERS AND DATA AND SOFTWARE

320.   The Plaintiffs re-allege paragraphs 1-319 as though restated in full herein and not inconsistent herein.

321.   As stated herein, after Shelzi was ousted as a Member of The LLC, by Attorney Charles Douglas III, the LLC' attorney, her alleged criminal conduct increased.  Not only did Shelzi and her representative criminally interfere with the administration of internal revenue laws, the IRS audit by removing the accounting records from J. Foistner, during the audit, they, as alleged criminal conspirators, stole, removed and converted the LLC 's only Notebook

Computer that maintained and stored the only electronic copy of the LLC's accounting data, tax data and company data.

322.   The computer was taken by Hassel to his home in Cambridge, Massachusetts and not returned until 2009.  Additionally, Hassel destroyed and sabotaged the LLC's only back-up electronic copy of this data and software housed at Foistner Law Offices.  The Server was destroyed, its circuit cards damaged, its "Mirror Hard Drive" containing the only LLC electronic data backup was destroyed.  These were criminal acts committed by Hassel.  Hassel transported the computer, data and software without authority across State lines.

323.   When Shelzi and Hassel realized that Shelzi's tax liabilities would be increased by millions of dollars, comprised of unpaid taxes, interest and penalties, and, when the Defendants realized that their unlawful acts to interfere in the IRS Audit had failed, and after Attorney Laboe and Shelzi successfully removed all accounting records, during the audit, these alleged Racketeers completed their final act of conspiracy by destroying the electronic equipment thereby destroying all electronic data.

324.   The evidence, stored on the LLC's computer system and at Foistner Law Offices Computer Server, was destroyed so that the incriminating evidence could not be used by the IRS.

325.   The Defendants criminal actions to convert and destroy the LLC's only computer, the LLC's only set of electronic accounting records, and Foistner Law Offices only Server, constitute the crimes of Grant Larceny and Transportation of Stolen Goods, 18 U.S.C. § 2314 and other Federal and State crimes with the intent to defraud the IRS.

326.   After Foistner reported Shelzi's alleged tax fraud to the Auditor and also the IRS Criminal Investigation Division and provided Shelzi and her representative with the notice of his actions taken in regard to the IRS Settlement, as manager of the LLC, Shelzi realized that by

capitalizing close to $6-million worth of expenses that Shelzi had, or was going to write-off, as losses, his client would now owe millions on taxes and penalties.

327.    Shelzi's representative filed another Petition to remove J. Foistner, as a Manager by making misrepresentations and knowingly making false statements to the Court in an attempt to mislead the Court, that Foistner was unlawfully and without authorization acting as Manager of LLC.  Shelzi also asked the court to remove J. Foistner as the "Tax Matter Person" for LLC. This, an impossibility, because Foistner, remained the only owner, of the company.

328.    Justice Mangones of the Hillsborough County Superior Court denied Attorney Laboe's frivolous motion and issued an Order refusing to remove J. Foistner as the LLC's manager and tax matter person.

<div align="center">

**COMMON LAW CAUSE OF ACTIONS**
**COUNT SIXTEEN**
**BREACH OF FIDUCIARY DUTIES**
**BUTLER BANK**

</div>

329.    The Plaintiffs re-allege paragraphs 1-328 as though restated in full herein and not inconsistent herein.

330.    In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them.

331.    As a commercial lender and bank, Butler Bank had a fiduciary relationship with the LLC, its borrower, and Plaintiff, L. Foistner, its borrower and personal guarantor and other LLC members and the manager under these circumstances and conditions alleged herein.

332.    Butler Bank breached its fiduciary duties to take all reasonable steps that were fair and reasonable as a commercial lender.  Butler Bank, in concert with Shelzi and others, aided and abetted the many alleged felony crimes set forth herein for its financial gain.

<div align="center">71</div>

333.    Butler Bank's fiduciary duties included a duty to act fairly and in good faith and a duty of care, regarding their level of attention and diligence in the business and operations of the LLC.  Butler Bank breached its duty by not informing the LLC and Guarantor of Shelzi's fraudulent conduct, forgery and other crimes.

334.    Butler Bank also breached its fiduciary duty of loyalty by aiding and abetting Shelzi in the commission of the alleged crimes.  Butler also failed to work honestly with the other member and manager and to provide timely notices of Shelzi's alleged crimes, the forged checks and exchanged checks, necessary information and protection for its borrowers.

335.    Butler Bank's intentional silence and refusal to protect its borrower's interests and rights from the many alleged criminal and fraudulent acts committed by the Defendants, once Butler Bank became aware of these crimes, further breached its duties, as a fiduciary, to the LLC.

336.    All of these actions, individually and as a concerted scheme, have harmed and damaged the LLC for which they are entitled to damages as a result of Butler Bank's breaches of its fiduciary duties.

337.    That the Defendants breach of duty has caused the Plaintiffs damages, whereby the Plaintiffs seek enhanced compensatory damages, attorney fees and costs.

## COUNT SEVENTEEN
## BREACH OF CONTRACT – BUTLER BANK LOAN
## AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

338.    The Plaintiffs re-allege paragraphs 1-337 as though restated in full herein and not inconsistent herein.

339.    In the alternative and without waiving the forgoing, Defendants committed fraud in making false statements of material fact and engaging in false acts that they knew were false at the time they made them and did them, which statements and acts were intended to be relied upon by the LLC. The LLC reasonably relied upon them to their detriment.

340.    On or about April 12, 2005, Butler Bank entered into a real estate development loan agreement, the $1.8-million construction loan with the LLC.  This agreement established that $100,000 would be kept in reserve, not to be released, until the LLC had subdivided and recorded the 20th lot in the project. This $100,000 was earmarked to be paid to the Bedford design Consultants.

341.    On or about September 2005, Butler Bank entered into a contractual loan agreement with Shelzi and New Boston Estates LLC, as a 3rd party beneficiary and pre-approved contractor, for the lot 8-84-44, home construction project.

342.    Butler Bank breached its obligations and duties, express and implied, in the $1.8-million development loan contract and the lot 8-84-44 home construction contract.

343.    Butler bank breached its written contract when it allowed Shelzi to forge and convert the $100,000 earmarked for the Bedford design Consultants.

345.    Butler breached its written contract and committed fraud when it reissued checks from New Boston Estates LLC to Waldorf Estates Builders, LLC on lot 8-84-44, aiding and abetting Shelzi to forge and embezzle these loan funds.

346.    The LLC, specifically J. Foistner and K. Prive, made repeated requests for Butler Bank to meet its contractual obligations but Butler had refused to do so.

347.    As set forth above, Butler Bank has breached its contractual obligations which has caused harm for which the LLC seek damages.

348.    That as a direct result of the Defendants breach, the LLC have been damaged and are seeking, in addition, attorney fees and costs.

349.    The Butler Bank did breach the Implied Covenant of Good Faith and Fair Dealing as set forth herein.

## COUNT EIGHTEEN
## NEGLIGENCE – BUTLER BANK

350.    The Plaintiffs re-allege paragraphs 1-349 as though restated in full herein and not inconsistent herein.

351.    The Defendant, Butler Bank owed the LLC a duty to conduct its business operation in a commercially reasonable manner and to exercise due diligence and care.

352.    Butler Bank did breach the duty it owed to the LLC as follows but without limiting the foregoing:

  a.    Did negligently administer the loan in a commercially unreasonable manner by allowing Shelzi to embezzle money;

  b.    Did fail to properly and timely administer the $1.8-million construction loan;

  c.    Did fail to properly and timely administer the $990,000, lot 8-84-44, home construction loan;

  d.    Did negatively and fraudulently impact the Plaintiff's credit score, credit standing and reputation;

  e.    Did fail to administer the requisition and disbursements of the $1.8-million development loan;

  f.    Did fail to administer the requisition and disbursements of the $990,000, lot 8-84-44, construction loan; and

  g.    Did fail to report the Shelzi crimes to law enforcement and Plaintiffs.

353.    That as a direct and proximate cause of the Defendants negligence, the Plaintiffs have been damaged.

354.    The Plaintiffs are seeking enhanced compensatory damages as a result of the

Defendants wanton, willful, malicious or oppressive conduct.

## COUNT NINETEEN
## NEGLIGENT MISREPRESENTATION

355.    The Plaintiffs re-allege paragraphs 1-354 as though restated in full herein and not

inconsistent herein.

356.    Butler Bank made certain representation concerning the $1.8-million development

loan, the $990,000, Shelzi lot 8-84-44, home construction loan, and the $990,000, L. Foistner, lot

8-84-38, home construction loan, the new loans, the loan process, and what the Defendants could

do, for the Waldorf Estates, 20 lot, Phase III project, owned by the LLC, which were uttered in

an effort to induce the LLC to become bank customers.

357.    The representations were material and were false.

358.    The LLC justifiably relied upon the representations.

359.    That as a result of the negligent representations, the Plaintiffs have sustained

substantial damages and are seeking enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY
## FRAUDULENT MISREPRESENTATION

360.    The Plaintiffs re-allege paragraphs 1-359 as though restated in full herein and not

inconsistent herein.

361.    The Defendants representations were material facts relied upon by the LLC.

Specifically that the loan proceeds of the $1.8-million loan would only be used for the

development of the project and construction of the roads, not the personal use of Shelzi.

362.    Specifically that the loan funds for the lot 8-84-44, construction loan, would only be used for the construction of the home and payment of approved contractors, not for the benefit of Shelzi.

363.    Butler Bank promised to provide construction loans, for all 20 lots of the project, two at the time, after the construction of the two model homes on lot 8-84-44 and 8-84-38 which it failed to do.

364.    The representations were made with fraudulent intent to induce the LLC to become bank customers.

365.    That the LLC honestly believed the representations and justifiably relied upon them.

366.    That as a result of the LLC reliance on the misrepresentations, the LLC has sustained damages including enhanced compensatory damages, costs and attorney fees.

## COUNT TWENTY ONE
## CONVERSION BUTLER BANK

367.    The Plaintiffs re-allege paragraphs 1-366 as though restated in full herein and not inconsistent herein.

368.    Butler Bank had exercised dominion and control over the stolen and forged money, all checks, with the intent to deprive the LLC and 3rd parties of their ownership interest. Upon information and belief, Butler Bank provided the checks and stolen money to Shelzi and her alleged Racketeers.

369.    Butler Banks has and is interfering with the LLC rights of possession of these loan funds.

370.    The LLC is entitled to an immediate right of possession of the loan funds.

371.    The LLC is demanding that Butler Bank pay these loan funds, for which they collected and received monthly interest payments together with enhanced compensatory damages as a result of Butler Bank's willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY TWO
## CONVERSION- COMPUTERS

372.    The Plaintiffs re-allege paragraphs 1-371 as though restated in full herein and not inconsistent herein.

373.    Shelzi had exercised dominion and control over the stolen computer, its software and accounting data, with the intent to deprive the LLC and 3rd parties of their ownership interest. Upon information and belief, her agent and/or representative Hassel, destroyed the Foistner Law Offices computer server, the LLC notebook computer, the operating and accounting software licenses and the accounting data in order to aid Shelzi in defrauding the IRS and to destroy evidence during the IRS audit.

374.    The Defendants have interfered with the LLC's rights of possession of these computers and intellectual property.

375.    The LLC is entitled to an immediate right of possession of these chattels.

376.    The LLC is demanding that the Defendants pay for the value of these computers, electronic recovery cost and chattel of the LLC together with enhanced compensatory damages as a result of Defendants willful and/or wanton, and/or malicious conduct, and/or oppressive conduct.

## COUNT TWENTY THREE
## CIVIL CONSPIRACY

377.   The Plaintiffs re-allege paragraphs 1-376 as though restated in full herein and not inconsistent herein.

378.   The Defendants collectively did engage in acts as set forth herein constituting a conspiracy.

379.   Each Defendant, by his/her/its conduct, aided and abetted the conspiracy to defraud and render the LLC bankrupt and harm the Plaintiffs.

380.   As a result of the Defendants concerted acts, the Plaintiffs have been damaged as set forth herein.

**WHEREFORE**, the Plaintiffs demand trial by jury and judgment as follows:

1.   Damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank, jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of their racketeering activities, conspiracy and aiding and abetting in racketeering activities;

2.   Treble damages against the Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank pursuant to 18 U.S.C. § 1964(c);

3.   Damages against Antonia Shelzi, Hans Hassel, Robert Chapman, and Butler Bank jointly and severally, for a sum of money equal to the amount of damages and/or losses the Plaintiffs have sustained or will sustain as a result of the Defendants' conspiracy to commit common law fraud and other cause of actions along with enhanced compensatory damages to the extent allowed by New Hampshire law;

4.       Prejudgment interest on the amount of damages and/or losses that the Plaintiffs have sustained; and

5.  All costs of litigation incurred by the Plaintiffs including its reasonable attorneys' fees and experts' fees, pursuant to 42 U.S.C. § 1988 and/or 18 U.S.C. § 964(c);

*JPERIOR COURT*
STNUT STREET
ER, N.H. 03101-2490



$ 00.46⁰
0004257702     SEP 11 2013
MAILED FROM ZIP CODE 03101

Undeliverable, commercial mail
receiving agent, No authorization to
mail for this addressee

NIXIE       015    5E 1009      0009/19/13

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

8C: 03101241299     *1363-00244-11-38

44

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Hillsborough Superior Court Northern District
300 Chestnut Street
Manchester NH 03101

Telephone: (603) 669-7410
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

September 11, 2013

JOSEPH A. FOISTNER, ESQ., ESQ
300 BRICKSTONE SQUARE SUITE 201
ANDOVER MA 01810

Case Name:   **Seff Enterprises & Holdings, LLC, et al   v.   Butler Bank,**
Case Number:   **216-2009-CV-00522**

TO:  WILLIAM AIVALIKLES, ESQ.

Enclosed please find orders of notice returnable first Tuesday of

November, 2013 for service on Antonia Shelzi and Hans Harro Hassel.

John M. Safford
Clerk of Court

(539)

C: William E Aivalikles, ESQ; Robert Chapman; Antonia Shelzi; Hans Harro Hassel; Robert A.
McCall, ESQ; James F. Laboe, ESQ

NHJB-2012-DFPS (07/01/2011)

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                                    SUPERIOR COURT

216-2009-cv-00522

SEFF ENTERPRISES & HOLDINGS, LLC and LAURIE FOISTNER

v.

BUTLER BANK, ET AL

NOTICE OF FILING OF NOTICE OF REMOVAL TO STATE COURT

TO:     John M. Safford, Clerk of Court
        Hillsborough County Superior Court
        300 Chestnut Street
        Manchester, NH  03101

        Take notice that pursuant to 28 U.S.C. § 1446, Defendant, Federal Deposit Insurance

Corporation in its capacity as Receiver for Butler Bank, has this day filed in the Clerk's Office of

the United States District Court for the District of New Hampshire, Concord, New Hampshire, a

Notice of Removal of this case, as shown by copy attached, and in accordance with the above

statute, the State Court proceedings should proceed no further unless and until the case is

remanded.

45

Dated:  October 11, 2013                    Respectfully submitted,

                                            By its attorneys,

                                            /s/ Robert A. McCall
                                            Robert A. McCall
                                            NH Bar No. 14221
                                            Peabody & Arnold LLP
                                            Federal Reserve Plaza
                                            600 Atlantic Avenue
                                            Boston, MA  02210-2261
                                            617-951-2100
                                            rmccall@peabodyarnold.com

## CERTIFICATE OF SERVICE

I, Robert A. McCall, hereby certify that on October 11, 2013 the within Notice of Filing

Notice of Removal was served on the following parties, by causing a copy thereof to be sent via

first-class mail to:

Joseph A. Foistner, Esq.                    William Aivalikles, Esq.
3 Galloway Road, #27                        60 Main Street, Suite 230
Merrimack, NH  03054                        Nashua, NH  03060

James F. Laboe, Esq.                        Robert Chapman
Orr and Reno, P.A.                          19505 Quesada Avenue, ii204
P.O. Box 3550                               Port Charlotte, FL  33948
Concord, NH  03302-3550

and to the Hillsborough County Superior Court, John M. Safford, Clerk, via first class mail on
October 11, 2013.

                                            /s/ Robert A. McCall

PABOS2:RMCCALL:805953_1
15669-94708

2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

SEFF ENTERPRISES & HOLDINGS, LLC
and LAURIE FOISTNER
            Plaintiffs

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
BUTLER BANK, ROBERT CHAPMAN and
ANTONIA SHELZI
            Defendants

CIVIL ACTION NO.  13-454

## NOTICE OF REMOVAL

Pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. §§ 1331, 1441 and 1446, the Federal

Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver for Butler Bank ("FDIC-

Receiver"), the Defendant in the above-captioned case filed in the Hillsborough County Superior Court

- Northern District, with Docket No. 216-2009-CV-522 ("Hillsborough Superior Court Lawsuit"),

hereby removes this case to the United States District Court for the District of New Hampshire.

As grounds for removal, the FDIC-Receiver states as follows:

The FDIC is a corporation organized under the laws of the United States and existing pursuant

to an Act of Congress known as the Federal Deposit Insurance Act of 1950, as amended, 12 U.S.C. §

1811, et seq.  The FDIC maintains its principal place of business in Washington, D.C.

On April 16, 2010, the Massachusetts Division of Banks closed Butler Bank in Lowell,

Massachusetts and tendered to the FDIC the appointment as liquidating agent to act as Receiver.

Pursuant to 12 U.S.C. § 1821(c)(2)(A), the FDIC accepted the appointment and has served in that

capacity since that time.

46

12 U.S.C. § 1819(b)(2) provides, in pertinent part, that: (1) suits in which the FDIC is a party in any capacity are deemed to arise under the laws of the United States; (2) the FDIC may remove any action, suit or proceeding from a state court to the appropriate United States District Court; and (3) the FDIC is not required to post bond or security.

On or about September 1, 2009, the Plaintiffs filed a Complaint against Butler Bank, Robert Chapman, Antonia Shelzi and Hans Harro Hassel in Hillsborough Superior Court alleging claims arising out of Butler Bank's alleged pre-failure conduct, including conspiracy and fraud pursuant to a forged check drawn on Butler Bank. The Hillsborough Superior Court Lawsuit was administratively closed for a number of years.

After the Hillsborough Superior Court Lawsuit was re-opened, the Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Bank filed a Motion to Intervene and to be Substituted in Place of Butler Bank.

On August 22, 2013, the Hillsborough Superior Court issued an Order which allowed the Motion of the Federal Deposit Insurance Corporation in its capacity as Receiver for Butler Bank to Intervene and to be Substituted in Place of Butler Bank.

The Hillsborough Superior Court Lawsuit comprises, in whole or in part, a claim for payment from, or seeks a determination of rights with respect to, claimed assets of the FDIC in its capacity as Receiver of Butler Bank.

Removal is proper and timely because, under 12 U.S.C. § 1819(b)(2)(B), FDIC-Receiver may exercise its right of removal within 90 days after substitution as a party to an affirmative claim against FDIC-Receiver. See Buczkowski v. FDIC, 415 F.3d 594, 596 (7th Cir. 2005); McDougald v. FDIC, 848 F. Supp. 1073, 1075 n.3 (D. Mass. 1994).

Pursuant to 12 U.S.C. §1819(b)(4), the FDIC is not subject to payment of any filing fees in the United States district courts.  Pursuant to 28 U.S.C. § 1446(d), FDIC-Receiver is providing written notice of this removal to all parties in the Hillsborough County Superior Court Lawsuit and is filing a copy of this Notice of Removal with the Clerk of the Hillsborough County Superior Court.

Venue properly lies with this court pursuant to 28 U.S.C. §§1441(a) and 1446(a) as this action is presently pending in the Superior Court of Hillsborough County located within the District of New Hampshire.

In accordance with 28 U.S.C. § 1446(a), copies of all process, pleadings and orders served upon FDIC-Receiver in the Hillsborough County Superior Court Action that give rise to the FDIC's right of removal are attached to this Notice of Removal as the following exhibits:

A.  Writ of Summons; and

B.  Notice and Order dated August 22, 2013.

Respectfully submitted,

FEDERAL DEPOSIT INSURANCE CORPORATION,
IN ITS CAPACITY AS RECEIVER FOR BUTLER BANK,

By its attorney

/s/ Robert A. McCall
Robert A. McCall
NH Bar No. 14221
PEABODY & ARNOLD LLP
Federal Reserve Plaza, 600 Atlantic Avenue
Boston, MA 02210-2261
Phone (617) 951-2100
Fax (617) 951-2125
rmccall@peabodyarnold.com

Dated:  October 11, 2013

## CERTIFICATE OF SERVICE

I, Robert A. McCall, hereby certify that on October 11, 2013 the within Notice of Removal was

served on the following parties, by causing a copy thereof to be sent via first-class mail to:

Joseph A. Foistner, Esq.           William Aivalikles, Esq.
3 Galloway Road, #27            60 Main Street, Suite 230
Merrimack, NH  03054            Nashua, NH  03060

James F. Laboe, Esq.             Robert Chapman
Orr and Reno, P.A.              19505 Quesada Avenue, ii204
P.O. Box 3550                  Port Charlotte, FL  33948
Concord, NH  03302-3550

*/s/ Robert A. McCall*

PABOS2:RMCCALL:805951_1
15669-94708

4